# EXHIBIT B

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNIVERSITAS EDUCATION, LLC<br><br>     Plaintiff,<br><br>v.<br><br>BENISTAR, BENISTAR ADMIN SERVICES, INC., TPG GROUP, INC., GRIST MILL PARTNERS, LLC, MOONSTONE PARTNERS, LLC, ALLIANCE CHARITABE TRUST, PHOENIX CHARITABLE TRUST, ATLANTIC CHARITABLE TRUST, AVON CHARITABLE TRUST, CARPENTER CHARITABLE TRUST, DONALD TRUDEAU, MOLLY CARPENTER, JANE DOE ENTITIES UNDER CONTROL OF MOLLY CARPENTER AND/OR DONALD TRUDEAU, AND JANE DOE ENTITIES UNDER CONTROL OF JUDGMENT DEBTORS<br><br>     Defendants. | CIVIL ACTION NO. 3:20-cv-00738<br><br><br><br>JUNE 1, 2020 |

## AFFIDAVIT OF BENJAMIN CHERNOW

I, Benjamin Chernow, being duly sworn depose and say:

1.      I am over eighteen years of age and believe in the obligation of an oath.

2.      I am an associate in the Law Offices of Joseph L. Manson III, counsel for Plaintiff Universitas Education, LLC ("Universitas").

3.      I submit this affidavit in support of Plaintiff's Application for Prejudgment Remedy ("PJR App.").

4.      I make this affidavit based on personal knowledge. My personal knowledge in this matter is the result of information and inferences gleaned from the documents attached to the PJR App. and cited in support of the relevant statements. My personal knowledge is also

based on information and inferences gleaned from the court decisions referenced and discussed in this affidavit.

BACKGROUND INFORMATION ON THIS DISPUTE

5.        On January 24, 2011 the American Arbitration Association issued an award in favor of Universitas and against Nova Group, Inc. ("Nova Group") as the Sponsor, Trustee, and Plan Administrator of the Charter Oak Trust ("COT") in the amount of $26.5 million in an action entitled *Universitas Education, LLC v. Nova Group, Inc.*, AAA No. 13-195-Y-001558-10 (Jan. 24, 2011). A copy of this award is attached to the PJR App. as Exhibit 1. The arbitrator found that both Nova Group and Benistar Admin Services, Inc. ("BASI") breached their fiduciary duties to Universitas by denying Universitas' claim to the Spencer insurance proceeds under the COT and COT Welfare Benefit Plan.

6.        On June 5, 2012 the United States District Court for the Southern District of New York confirmed the arbitration award in an action entitled *Universitas Educ., LLC v. Nova Group, Inc.*, Case Nos. 11-civ-1590 (LTS)(HBP) and 11-civ-8726 (LTS)(HBP), 2012 U.S. Dist. LEXIS 79295 (S.D.N.Y. June 5, 2012). The court entered judgment against Nova Group and in favor of Universitas in the amount of $26.5 million, plus interest thereon from January 24, 2011 at the rate of ten percent per annum.

7.        During post-judgment discovery Universitas learned that the Spencer insurance proceeds were transferred through a series of entities and used to purchase a vacation property in Rhode Island. Universitas filed a turnover proceeding to recover insurance proceeds owed as a result of damage to the Rhode Island property. On November 20, 2013 the Southern District of New York ordered that the insurance proceeds be paid to Universitas in an action entitled

*Universitas Educ., LLC v. Nova Group, Inc.*, Case Nos. 11-civ-1590 (LTS)(HBP) and 11-civ-8726 (LTS)(HBP), 2013 U.S. Dist. LEXIS 165803 (S.D.N.Y. Nov. 20, 2013).

8.     The court's ruling in the turnover proceeding details the Judgment Debtors' fraud. The court found that Daniel Carpenter caused $10.8 million of the Spencer insurance proceeds to be transferred from COT, that he made these transfers with knowledge of pending litigation over the Spencer insurance proceeds, and that these transfers were "clearly made with fraudulent intent."

9.     The court detailed how Mr. Carpenter fraudulently transferred the Spencer insurance proceeds through numerous entities before ultimately conveying a portion of these proceeds to Moonstone Partners, LLC ("Moonstone"). Moonstone then used the Spencer insurance proceeds to purchase the Rhode Island property.

10.     The court explained that the Spencer insurance proceeds were dissipated through a deliberately complicated series of fraudulent bank transfers intended to obfuscate the trail of this money and shield these proceeds from creditors.

11.     The court also explained that Moonstone is a shell company owned and operated by Daniel and Molly Carpenter that was created for the sole purpose of holding title to the Carpenters' vacation property. The court further explained that Moonstone's purchase of the Rhode Island property was the result of a series of fraudulent transfers designed "to remove a portion of the Life Insurance Proceeds from the Charter Oak Trust and to purchase a property for the Carpenters' personal use, insulated from the reach of Mr. Carpenter's creditors."

12.     The court further explained that Mr. Carpenter created a promissory note and mortgage against the Moonstone property in favor of another Benistar entity fifteen months after Moonstone purchased the property. The court determined that this was done solely to

shield the Moonstone property from Mr. Carpenter's personal creditors and invalidated these transactions as fraudulent conveyances.

13.    The court further explained that Daniel Carpenter controlled hundreds of corporate entities from his offices at 100 Grist Mill Road in Simsbury, Connecticut, and that Mr. Carpenter used a subset of these entities to defalcate the Spencer insurance proceeds and attempt to conceal and/or shield these proceeds from his creditors.

14.    Universitas subsequently filed a second turnover application seeking judgment against the entities that received Spencer insurance proceeds and a preliminary injunction to enjoin Mr. Carpenter and the entities under his control from transferring or assigning any assets pending resolution of the turnover application. On January 13, 2014 the Southern District of New York granted the preliminary injunction in an action entitled *Universitas Educ., LLC v. Nova Group, Inc.*, Case Nos. 11-civ-1590 (LTS)(HBP) and 11-civ-8726 (LTS)(HBP), 2014 U.S. Dist. LEXIS 3983 (S.D.N.Y. Jan. 13, 2014).

15.    The court found that Universitas "is clearly likely to suffer imminent and irreparable harm if Mr. Carpenter is allowed, directly or through his affiliated entities, to continue to dissipate assets." This finding was based, *inter alia*, on the court's observation that Mr. Carpenter and his affiliates "ha[ve] taken great pains to hide the funds," and "the strong inference that [Mr. Carpenter] is further dissipating these funds, or their proceeds, to defeat [Universitas'] efforts to satisfy the Judgment."

16.    The court's ruling explained that Daniel Carpenter "frequently" transfers assets between entities under his control without any documentation or business justification. The court found such transfers to be "evidence … concerning the actions of Mr. Carpenter and his

affiliates demonstrat[ing] an absence of respect for distinctions among his business entities, for his obligations to creditors, and for the orders of this Court."

17.     The court also noted that Mr. Carpenter and his associates transferred assets after being served restraining notices prohibiting such transfers and gave examples of Mr. Carpenter and his associates contacting various insurance carriers to request that they change the owner and beneficiary of certain insurance policies from COT to Grist Mill Capital, LLC ("GMC") after the court had entered judgment against Nova Group and after Mr. Carpenter and his associates were served with restraining notices prohibiting transfers of COT property.

18.     Shortly after the court enjoined Mr. Carpenter and the entities under his control, a check became payable to a Carpenter-controlled entity as a result of settlement in an unrelated litigation. Mr. Carpenter instructed his attorneys to ignore the preliminary injunction and pay the settlement to the designated entity under his control – he fired his attorneys when they refused to violate the court order. (*See* PJR App. Ex. 26.)

19.     Mr. Carpenter then emailed the settlement payor and explained that the attorneys instructing that the settlement payment not be made to the designated entity no longer represented him and had no authority over the proceeds. Mr. Carpenter demanded that payment be made to the designated entity and threatened legal consequences if they did not comply with his demands. (*See* PJR App. Ex. 34.)

20.     On August 7, 2014 the Southern District of New York granted Universitas' second turnover application in an action entitled *Universitas Educ., LLC v. Nova Group, Inc.*, Case Nos. 11-civ-1590 (LTS)(HBP) and 11-civ-8726 (LTS)(HBP), 2014 U.S. Dist. LEXIS 109077 (S.D.N.Y. Aug. 7, 2014). The court entered judgment in favor of Universitas and against Daniel Carpenter and seven entities under his control on August 12, 2014.

21.     The court's ruling further details the Judgment Debtors' fraud. The court found Daniel Carpenter caused an additional $19.8 million of the Spencer insurance proceeds to be transferred from COT for the personal benefit of Mr. Carpenter and his associates. The court explained that these proceeds were also dissipated through a complex series of fraudulent bank transfers involving entities under Mr. Carpenter's control, and that these transfers were "undertaken in order to deprive [Universitas] of rightful access to the Insurance Proceeds."

22.     The court reiterated that Mr. Carpenter controls hundreds of corporate entities and that he operates these entities in unison to enrich himself and his associates to the detriment of his creditors, including Universitas. The court also explained that Mr. Carpenter controls numerous shell companies that he uses to hide assets from his creditors.

23.     Daniel Carpenter was subsequently prosecuted in the District of Connecticut for, *inter alia*, his involvement with COT and Nova Group. Mr. Carpenter was charged with thirty-two counts of mail and wire fraud, ten counts of money laundering, thirteen counts of illegal monetary transactions, conspiracy to commit money laundering, and conspiracy to commit mail and wire fraud. On June 6, 2016 the District of Connecticut found Daniel Carpenter guilty on all fifty-seven counts in his indictment in an action entitled *United States v. Carpenter*, 190 F. Supp. 3d 260 (Dist. Conn. 2016). All of the charges for money laundering and illegal monetary transactions in Mr. Carpenter's indictment were predicated upon the disbursal and usage of the Spencer insurance benefits, and all of the illegal monetary transaction counts were specifically based on Moonstone's acquisition of the Rhode Island property.

24.     The District of Connecticut's findings support the Southern District of New York's findings and further detail the fraudulent and criminal behavior of Mr. Carpenter and his associates. The essence of the court's decision was that Mr. Carpenter controlled a network

of corporate entities from his offices at 100 Grist Mill Road that he operated as part of a criminal conspiracy to, *inter alia*, commit fraud and launder money for the personal enrichment of himself and his associates.

25.     The court specifically found that Defendants BASI, TPG Group, Inc. ("TPG"), and Donald Trudeau were part of a criminal conspiracy controlled by Mr. Carpenter from his offices at 100 Grist Mill Road and that Mr. Carpenter controlled both BASI and TPG.

26.     The court explained that entities under Mr. Carpenter's control operated in a manner such that these entities have no independent significance of their own. The court noted that "the formal corporate structure of the various Benistar Entities had little meaning for the people involved." The court also discussed how Mr. Carpenter's employees fabricated positions for themselves, including executive titles, and how employees were given executive positions without their knowledge.

27.     The court further explained that "corporate entities were created and discarded at Mr. Carpenter's direction when it suited his purposes." The court provided an example wherein Mr. Carpenter dissolved Benefit Plan Advisors, LLC ("BPA") and created U.S. Benefits Group, Inc. in order to create a semblance of distinction between various entities under his control. As part of these efforts, Mr. Carpenter emailed his employees instructions to "[g]et rid of BPA everywhere" and to "remember you are US Benefits Group, Inc now…. No more BPA."

28.     The court also discussed Donald Trudeau's involvement in the Carpenter criminal conspiracy and stated that "[t]he evidence establishes beyond a reasonable doubt that [Daniel Carpenter] conspired with Ed Waesche, Charles Westcott, and Don Trudeau, among

others." The court further noted that "[t]he emails that form the basis of Counts 4, 8, 10, 12, 14, 16, 18, 30, and 32 [of Carpenter's mail and wire fraud charges] were sent by Don Trudeau…."

29.     The court also detailed a series of fraudulent transfers that conveyed assets from the Charter Oak Trust ("COT") to the Life Insurance Fund Elite Trust ("Life Elite Trust"). These transactions transferred COT assets through various entities before conveying them to Avon Capital, LLC ("Avon"), which ultimately sold them to Life Elite Trust. The court explained that Mr. Trudeau served as a signatory on every fraudulent transfer of the COT assets, and that Mr. Trudeau was Avon's signatory for the sale to Life Elite Trust.

30.     The court indicated that this series of conveyances from COT to Life Elite Trust occurred on November 16, 2010 – in the midst of the arbitration between Nova Group and Universitas. These transfers left Nova Group without assets and unable to satisfy the award issued against it two months later.

31.     The sale of COT assets resulted in arbitration between Avon and Life Elite Trust. Mr. Trudeau testified during the arbitration proceedings that Avon sold these assets in exchange for an ownership stake in Life Elite Trust. Mr. Trudeau further testified that this ownership stake was conveyed to a "creditor-proof" entity that he created specifically to shield assets from creditors. (*See* PJR App. Ex. 24.)

32.     Avon received $6.7 million of the Spencer insurance proceeds and is a judgment debtor in this proceeding.[1]

---

[1] There are technically three Avon Capital, LLCs, and Mr. Trudeau and his affiliates are currently arguing in a related proceeding that the Avon Capital, LLC which received the Spencer life insurance proceeds is distinct from the Avon Capital, LLC that fraudulently conveyed COT's assets to Life Elite Trust. There is currently a motion before the court in that proceeding to find that all three Avon Capital, LLC operate as a single entity and are alter egos of each other. The evidence supporting this motion includes, *inter alia*, financial statements including entries from all three Avon Capital entities that are aggregated to determine singular annual amounts for an

33.     The aforementioned litigations demonstrate that Daniel Carpenter controlled hundreds of corporate entities from his offices at 100 Grist Mill Road, which collectively (and with other entities and persons) constitute a single business enterprise ("Benistar").

## BACKGROUND ON BENISTAR

34.     All fifty-seven felony counts in Mr. Carpenter's indictment were the result of Benistar operations.

35.     One of the necessary elements of the money laundering counts was that Mr. Carpenter use the money with an intent to perform additional illegal activity. The court found that payments intended to further Benistar business interests constituted the requisite intent to perform additional criminal activity because such payments perpetuated a fraudulent scheme.

36.     Mr. Carpenter was also indicted on fourteen counts of wire fraud and five counts of mail fraud in the District of Massachusetts. These charges were also a result of Benistar operations. On March 30, 2015, the First Circuit Court of Appeals affirmed the conviction of Daniel Carpenter on all nineteen counts in an action entitled *United States v. Carpenter*, 781 F.3d 599 (1st Cir. 2015).

37.     Benistar operations have also caused Molly Carpenter to commit fraud. On November 21, 2001 the Commonwealth of Massachusetts denied Molly Carpenter's motion to dismiss the claims against her for lack of personal jurisdiction in an action entitled *Cahaly v. Benistar Prop. Exch. Trust Co., Inc.*, Case No. 01-00075 (Mass. Sup. Ct. Nov. 21, 2001). A copy of this decision is attached to the PJR App. as Exhibit 31. The court found that it had

overarching Avon Capital, LLC. Avon does not substantively dispute Universitas' alter ego argument nor the contents of the financial statements. Rather Avon contests the authenticity of the financial statements (which Avon produced in discovery during the underlying litigation). More information can be found in the action entitled *Universitas Educ., LLC v. Nova Group, Inc.*, Case No. FJ-14-0005-HE (W.D. Okla.).

personal jurisdiction over Molly Carpenter because, *inter alia*, she: (i) was involved in a scheme to defraud Benistar investors, (ii) personally converted these investors' money, (iii) made fraudulent representations to these investors, and (iv) personally used the investors' money for her own purposes.

38.     The findings from the legal proceedings discussed above are further supplemented by findings from courts in other unrelated matters.

39.     On September 23, 2003 the Commonwealth of Massachusetts found BASI to be an alter ego of both Daniel Carpenter and Molly Carpenter in an action entitled *Cahaly v. Benistar Prop. Exch. Trust Co., Inc.*, Case No. 01-0075 (Mass. Super. Ct. Sep. 23, 2003). A copy of this decision is attached to the PJR App. as Exhibit 2. This decision explains that the Benistar defendants in the proceeding, including BASI and Carpenter Financial Group (a Judgment Debtor in this proceeding), were commonly owned by the Carpenters, who had pervasive control over all of their activities; that the business activities, assets, and management of the organizations were intermingled; that the corporations were inadequately capitalized; that corporate formalities were not observed; that no corporate records existed; that no dividends were paid; that Daniel Carpenter misappropriated Benistar funds for his personal use; and that the corporations were used to promote fraud.

40.     The court also noted that Mr. Trudeau was the president of BASI and proceeded to explicitly state that the Carpenters were the only persons who functioned as officers or directors for any Benistar defendants. The court noted "the appalling lack of knowledge about BASI that was demonstrated by its … alleged president, Donald Trudeau," and stated that "[t]he depositions of Donna Wayne, BASI's assistant secretary and the head of administrative services, and Donald Trudeau, BASI's president, both of whom are also directors of the

company, reveals in painful fashion that they are essentially in the dark about the management of the company, at least from any perspective tied to finances and financial control."

41.     The court also found that BASI is ultimately owned by the Carpenters, and that BASI is not owned by an Employee Stock Ownership Program ("ESOP"). The court determined that the documents supposedly creating the BASI ESOP and supposedly transferring ownership of BASI to this ESOP were not valid corporate documents, and further determined that the relevant evidence "discredited" the "ESOP ownership theory" put forth by the Benistar defendants.

42.     The court further explained how Daniel Carpenter applied for fiduciary liability insurance and a financial institution bond with applications listing numerous Benistar entities, including Defendants BASI and TPG, as one group with a common set of employees and assets. The court further noted that Mr. Carpenter signed on behalf of all these entities as "chairman" and indicated on the applications that he was the only person with check-signing authority for these entities.

43.     On June 26, 2008 these findings were upheld on appeal in an action entitled *Cahaly v. Benistar Prop. Exch. Trust Co., Inc.*, Case No. SJC-10041 (Mass. June 26, 2008). A copy of this decision is attached to the PJR App. as Exhibit 3. This decision explicitly affirmed all of the aforementioned findings and noted that "[t]his case is one in which piercing the corporate veil was so obviously appropriate…." The court also castigated the Carpenters for their attempts to "insulate themselves from liability on grounds of corporate form, when all the corporate forms were created and controlled by Daniel Carpenter with assistance from Molly Carpenter…."

44. The *Cahaly* judgment creditors subsequently sought to satisfy their judgment in a reach and apply proceeding. As part of these proceedings, the District of Massachusetts denied the Benistar defendants' motion to vacate a preliminary injunction in an action entitled *Iantosca v. Benistar Admin Servs*, Case No. 08-cv-11785, 2009 U.S. Dist. LEXIS 66159 (D. Mass. July 30, 2009). The First Circuit Court of Appeals affirmed this same preliminary injunction in an action entitled *Iantosca v. Step Plan Servs.*, 604 F.3d 24 (1st Cir. 2010). These decisions complement each other and together illustrate the entirety of the relevant facts.

45. The decisions explain that plaintiffs had an unsatisfied judgment against Daniel Carpenter, BASI, and other Benistar affiliates. An unrelated litigation resulted in settlement proceeds payable to BASI, Benistar 419 Plan Services, Inc. and STEP Plan Services, Inc. The plaintiff judgment creditors sought to reach and apply these settlement proceeds in satisfaction of their judgment. The Benistar defendants claimed that the entirety of these settlement proceeds were payable to Step Plan Services, Inc., which was not a judgment debtor, and argued that plaintiffs could not recover proceeds from a non judgment debtor. The court granted plaintiffs' motion for a preliminary injunction and found that plaintiffs were likely to succeed on the merits because Step Plan Services, Inc. was "likely abusing the corporate form." Subsequently, the Benistar defendants claimed "without explanation" that the entirety of the settlement proceeds were payable to Benistar 419 Plan Services, Inc., and argued on appeal that the preliminary injunction was improper because plaintiffs did not demonstrate that Benistar 419 Plan Services, Inc. would be subject to corporate disregard. The Benistar defendants further claimed that Benistar 419 Plan Services, Inc. was not a judgment debtor, and argued that plaintiffs could not recover proceeds from a non judgment debtor.

46.     As part of these same proceedings the District Court for the Southern District of Indiana denied the Benistar defendants' motion to quash certain subpoenas in an action entitled *Iantosca v. Benistar Admin Servs.*, Case No. 1:11-mc-00066 (RLY) (DML), 2011 U.S. Dist. LEXIS 81389 (S.D. Ind. July 26, 2011).

47.     The court explained that the United States federal government subsequently intervened in the case and sought to reach and apply these same settlement proceeds in satisfaction of outstanding tax liens against Benistar 419 Plan Services, Inc. and BASI. The Benistar defendants then reverted back and claimed that the entirety of the settlement proceeds were owed to Step Plan Services, Inc., and argued that the government could not recover any portion of the settlement proceeds since there was no tax lien against Step Plan Services, Inc.

48.     On June 21, 2013 the District of Massachusetts entered judgment in the reach and apply proceedings in an action entitled *Iantosca v. Benistar Admin Services, Inc.*, Case No. 08-cv-11785 (NMG) (D. Mass. June 21, 2013). A copy of the court's entry of judgment is attached to the PJR App. as Exhibit 4.

49.     The court found that Step Plan Services, Inc. and Benistar 419 Plan Services, Inc. were both alter egos of Daniel Carpenter and/or BASI, and operated such that they had no separate corporate identity. The court further found that BASI fraudulently transferred its interest in the settlement proceeds to Step Plan Services, Inc.

50.     Courts have also found that Daniel Carpenter and his affiliates are likely to conceal assets absent court intervention. On November 21, 2008, the District of Massachusetts granted a preliminary injunction enjoining various Benistar affiliates, including Molly Carpenter and BASI, in an action entitled *Iantosca v. Benistar Admin Services, Inc.*, Case No. 08-cv-11785 (NMG) (D. Mass. Nov. 21, 2008). A copy of this decision is attached to the PJR

App. as Exhibit 25. The court "readily determine[d] … that there is a substantial risk that, unless enjoined, the defendants will dissipate or conceal the assets…."

51.     In one instance, Mr. Carpenter's judgment creditors located and obtained a writ of execution against his property and in response Mr. Carpenter conveyed the land to his sister for $0 and subsequently encumbered the property with mortgages held by a Benistar entity. (*See* PJR App. Ex. 30.)

52.     In another instance, after the court entered judgment against Nova Group, Mr. Carpenter and his associates arranged for money owed to COT as a result of settlement in an unrelated litigation to bypass COT and Nova Group and instead be paid to GMC. (*See* PJR App. Ex. 27.)

53.     These settlement proceeds were then paid to GMC. (PJR App. Ex. 29.)

54.     GMC was not a party to this litigation. (*See* PJR App. Ex. 28 ¶ 78.)

55.     In financial disclosures submitted to the Probation Office in 2005 as part of restitution and forfeiture proceedings in the Massachusetts criminal proceedings, Mr. Carpenter claimed to own assets totaling $23,000 and to have a net worth of negative $129,000. The government doubted the truthfulness of these disclosures because, *inter alia*, Mr. Carpenter distributes lavish gifts to his employees, makes sizeable charitable donations, drives a Cadillac Escalade, leases SUVs for his wife and daughter, and pays substantial attorneys' fees. (*See* PJR App. Ex. 6 at 5-6.)

56.     Five years after claiming a net worth of negative $129,000, Mr. Carpenter requested permission from the court to travel to London on business and to attend the World Cup in South Africa. In opposition to this request the government noted that Mr. Carpenter

spent over **$10,000,000** on legal fees and argued that there was no financial justification for Mr. Carpenter to leave the country on business. (*See* PJR App. Ex. 7.)

57.     These expenditures pre-date the criminal prosecution of Mr. Carpenter in Connecticut, which involved hundreds of filings and numerous appeals. Mr. Carpenter also filed numerous cases seeking to challenge the federal raids upon his offices which resulted in the acquisition of incriminating evidence, continued to litigate the Massachusetts criminal proceeding, continued to litigate civil suits against Universitas, continued to litigate civil suits against other Benistar creditors, and litigated tax penalties issued to Benistar entities.

OTHER RELEVANT FACTS

58.     All Judgment Debtors operated from the offices at 100 Grist Mill Road.

59.     Judgment Debtors GMC, Avon, and COT all used the phone number  (860) 408-7000. (*See* PJR App. Ex. 38.)

60.     Judgment Debtor Carpenter Financial Group used the phone number (860) 408-7000. (*See* PJR App. Ex. 40.)

61.     Judgment Debtor Nova Group used the phone number (860) 408-7000. (*See* PJR App. Ex. 39.)

62.     Judgment Debtor Grist Mill Holdings, LLC used the phone number (860) 408-7000. (*See* PJR App. Ex. 44.)

63.     Judgment Debtor Grist Mill Trust used the phone number (860) 408-7000. (*See* PJR App. Ex. 43.)

64.     Defendant Grist Mill Partners, LLC ("GM Partners") operated from 100 Grist Mill Road and used the phone number (860) 408-7000. (*See* PJR App. Ex. 35.)

65.     Defendant Moonstone operated from 100 Grist Mill Road and used the phone number (860) 408-7000. (*See* PJR App. Ex. 41.)

66.     Defendant TPG operated from 100 Grist Mill Road and used the phone number (860) 408-7000. (*See* PJR App. Ex. 42.)

67.     Defendant BASI operated from 100 Grist Mill Road. (*See* PJR App. Ex. 37.)

68.     Defendant BASI used the phone number (860) 408-7000. (*See* PJR App. Ex. 36.)

69.     Defendant Carpenter Charitable Trust operated from 100 Grist Mill Road. (*See* PJR App. Ex. 23.)

70.     Defendant Donald Trudeau listed 100 Grist Mill Road as his residence address and his business address in official filings with the Connecticut Secretary of State. (*See* PJR App. Ex. 37.)

71.     Defendant Molly Carpenter listed 100 Grist Mill Road as her residence address and her business address in official filings with the Connecticut Secretary of State. (*See* PJR App. Ex. 37.)

72.     The Rule 30(b)(6) corporate representative for Nova Group and COT testified that BASI is the only Benistar entity with employees and explained that BASI employees service all Benistar entities. (*See* PJR App. Ex. 5.)

73.     Moonstone spent more than $10,000 on Mrs. Carpenter's personal credit card bills after it received $1.1 million of the Spencer insurance proceeds. (*See* PJR App. Ex. 18.)

74.     Judgment Debtor Carpenter Financial Group paid Molly Carpenter at least $160,300 after it received $11.14 million of the Spencer insurance proceeds. (*See* PJR App. Ex. 19.)

75.     There is evidence suggesting that the Alliance Charitable Trust, Phoenix Charitable Trust, Atlantic Charitable Trust, Avon Charitable Trust, and Carpenter Charitable Trust (collectively the "Charitable Trusts") are entities used by Mr. Carpenter to conceal and/or shield his assets from creditors. There is also evidence to suggest that GM Partners is an entity used by Mr. Carpenter to conceal and/or shield assets from his creditors.

76.     The Southern District of New York found that Mr. Carpenter controls numerous shell companies that he uses to hide assets from creditors. The court also found that Moonstone is a shell company created to hold title to real property purchased "for the Carpenters' personal use, insulated from the reach of Mr. Carpenter's creditors."

77.     Mr. Carpenter's attorney wrote a letter to Mr. Carpenter's judgment creditors in an unrelated proceeding stating that the relevant Benistar debtors were "judgment proof." Mr. Carpenter told these same creditors that "his assets were safely protected in other people's names." (*See* PJR App. Ex. 20.)

78.     Mr. Carpenter testified that he controls over two hundred bank accounts and that none of these accounts are in his name. Mr. Carpenter further testified that all of his assets and property are held in trusts and LLCs in order to conceal and/or shield his assets and property from his creditors. (*See* PJR App. Ex. 8.)

79.     Mr. Carpenter is a signatory on at least some of the Charitable Trusts' bank accounts. (*See* PJR App. Ex. 10.)

80.     Mr. Carpenter is a signatory on at least some of GM Partners' bank accounts. (*See* PJR App. Ex. 35.)

81.     Daniel Carpenter testified that he is the sole trustee for all of the Charitable Trusts. (*See* PJR App. Ex. 9.)

82.     Daniel Carpenter controls GM Partners. (*See* PJR App. Ex. 17.)

83.     GM Partners owns the property located at 100 Grist Mill Road. (*See* PJR App. Ex. 17.)

84.     Daniel Carpenter unequivocally represented that the property at 100 Grist Mill Road was "**his**" property. (*See* PJR App. Ex. 21 ¶¶ 20, 23, 25, 28.)

85.     Mr. Carpenter testified that the only assets held by the Charitable Trusts are his personal assets and cash distributions from Benistar entities. (*See* PJR App. Ex. 9.)

86.     Mr. Carpenter stated that the Charitable Trusts contain assets worth "tens of millions of dollars." (*See* PJR App. Ex. 11.)

87.     Mr. Carpenter stated that a reason people use charitable trusts is "because money in [charitable trusts] is secure from the hands of creditors." (*See* PJR App. Ex. 12.)

88.     Mr. Carpenter transferred $1.76 million of the Spencer insurance proceeds from Judgment Debtor Grist Mill Holdings, LLC to the Charitable Trusts. (*See* PJR App. Ex. 13.)

89.     Mr. Carpenter threatened to terminate his attorneys if they informed the court that Spencer insurance proceeds were transferred to the Charitable Trusts. (*See* PJR App. Ex. 14.)

90.     Mr. Carpenter's attorney subsequently informed the court that a single charitable trust received Spencer insurance proceeds from Judgment Debtor Grist Mill Holdings, LLC. (*See* PJR App. Ex. 23.)

91.     Mr. Carpenter pled the 5th Amendment when asked under oath if he created trusts for the purpose of shielding assets from creditors and when asked if he used the Charitable Trusts to shield assets from BASI's creditors. (*See* PJR App. Ex. 15.)

92.     In the same proceeding, Molly Carpenter pled the 5th Amendment in response to all questions concerning the Charitable Trusts. (*See* PJR App. Ex. 16.)

93.     On June 20, 2014 the First Circuit Court of Appeals upheld the District Court's decision that the jury was permitted to draw negative inferences from the Carpenters' 5th Amendment pleas in that proceeding in an action entitled *Iantosca v. Benistar Admin Servs.*, 567 Fed. Appx. 1 (1st Cir., 2014).

94.     Edward Waesche identified the Charitable Trusts as "Carpenter Entities" and pled the 5th Amendment in response to all questions concerning the Charitable Trusts. (*See* PJR App. Ex. 22.)

Based on the foregoing facts and taking into account any known defenses, counterclaims or setoffs, there exists probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, will be rendered in Universitas' favor in this matter. Furthermore, based on the foregoing facts there is a reasonable likelihood that the Defendants have fraudulently disposed of property with the intent to hinder, delay, or otherwise defraud Universitas, are about to fraudulently dispose of property with the intent to hinder, delay, or otherwise defraud Universitas, and/or have fraudulently hidden or withheld money, property, or effects which should be liable to the satisfaction of their debts.

STATE OF VIRGINIA

CITY OF ALEXANDRIA

_____

Benjamin Chernow
Counsel for Universitas Education, LLC


Sworn to me on this __1__ day
of __June__ , 20__20__.




Notary Public