# EXHIBIT 1

AMERICAN ARBITRATION ASSOCIATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Universitas Education, LLC,

              Claimant,

        - against -

Nova Group, Inc., Wayne Bursey Benistar Admin
Services, Inc., Donald Trudeau Grist Mill Capital,
LLC, and Daniel E. Carpenter,

              Respondents.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

AAA No.: 13-195-Y-001558-10

INTERIM AWARD

        I, Peter Louis Altieri, the undersigned Arbitrator, was designated in accordance with the arbitration agreement contained in the Charter Oak Trust and having been duly sworn, and having heard the proofs and allegations of the Parties, hereby render the following Interim Award.

        Consistent with the "Report of Preliminary Hearing and Scheduling Order" dated September 17, 2010, it was determined that the parties would receive a reasoned Award, and not findings of fact and conclusions of law. Subsequently, by Order dated November 3, 2010, consistent with Commercial Arbitration Rule 30(b), it was determined that the arbitration proceedings were to be bifurcated. Hearings for the initial phase were held on December 6 through 8, 2010 ("PHASE I") with extensive briefings before and after the hearings. The parties for the PHASE I hearings were Claimant Universitas Education, LLC, against Respondents Nova Group, Inc. ("Nova"), Wayne Bursey ("Bursey") in his capacity as Trustee of the Charter Oak Trust and Charter Oak Trust Welfare Benefit Plan (hereinafter the Trust and Plan are collectively

"COT") and Benistar Admin Services, Inc. ("BASI") in its capacity as an administrator of the COT, (collectively "Respondents"). The issues to be determined in PHASE I included whether Respondents appropriately denied Claimant's claim for benefits and, if not, what damages should be awarded to Claimant.

This proceeding arises out of a claim by Universitas, a designated beneficiary of the COT, following the COT's denial of Universitas' claim for $30,000,000 in death benefits received by the COT in connection with life insurance on the life of Sash Spencer provided by The Lincoln National Life Insurance Company ("Lincoln National") at the request of Mr. Spencer's employer, Holdings Capital Group, Inc. ("Holdings Capital").

By their very nature, trusts are established for the benefit of their participants and beneficiaries, not for the benefit of the Sponsor, Trustee, or Plan Administrator. As a matter of law, the Sponsor, Trustee and Plan Administrator owe a fiduciary duty to the participants and their beneficiaries. Nova admits that it is a fiduciary of an employee welfare benefit plan. (See Respondents' Post Hearing Brief, p. 38). On behalf of Nova, the named trustee and Plan Sponsor of the COT, Mr. Bursey acknowledged Nova's fiduciary responsibilities when he wrote on October 22, 2008, "The Charter Oak Trust has been the Owner and Beneficiary of the Sash Spencer ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ since the inception of the policies. We have a fiduciary responsibility and legal obligation to carry out Mr. Spencer's wishes as he intended in a timely fashion to pay those death proceeds to a charity that he established prior to his death." (Exhibit 104).

Whether analyzed under the common law or under ERISA principles, based on the evidence presented, I determine that the PHASE I Respondents violated their fiduciary duties

by denying the claim for benefits under the COT. While I would be inclined to adopt certain adverse inferences requested by Claimant, as Claimant acknowledges, "adverse inferences are not necessary for Claimant to prevail on the merits in this proceeding" and therefore this Award is rendered based on the record evidence actually presented and not on any inferences. (Claimant's letter of January 4, 2011, fn. 4). I do not need to reach Claimant's other substantive legal claims given this determination of breach of fiduciary duty.

Following Mr. Spencer's untimely death on June 10, 2008, Universitas' representatives regularly communicated with Respondents in connection with assisting the COT in recovering the death benefits payable to it by Lincoln National and then by asserting Universitas' claim for those benefits to be paid by the COT to Universitas as the named beneficiary. Emails, phone calls, letters and meetings were frequent and continuous leading up to the formal submission of a written claim on the prescribed claim form on July 14, 2009 and corrected claim on September 21, 2009. The original claim as amended was denied October 2, 2009 and the subsequent appeal was denied February 9, 2010. (Exhibit 433).

Essentially, the claim and the appeal were denied for five reasons: (1) the existence of an illegal agreement to allow reversion to the employer and an illegal payment to an insurance broker; (2) the parties were engaged in a life settlement transaction; (3) the failure to file a timely claim; (4) the Claimant threatened litigation; and (5) any interest in the COT was transferred to Grist Mill Capital.

In connection with this proceeding, in addition to those reasons, Respondents asserted other defenses including alleged misrepresentation in connection with the insurance

claim and failure to pay the $1,500 enrollment and administration fees, all of which defenses I determine are similarly insufficient to warrant the denial of the benefits to Universitas.

(1)     Any illegal agreement to allow reversion to the Employer or make payment to the insurance broker was terminated and should not be a proper basis for denial of the benefit and/or appeal of the denial. (Exhibit 430). The termination of the settlement agreement and Mr. Mactas' testimony that he is not to receive any further payment resolves these issues.

(2)     The life settlement transaction proposition espoused by Respondents is based upon an inference made from the fact of a series of evaluation reports run by Mr. Mactas and that inference was directly contradicted by Mr. Mactas. Mr. Mactas' testimony on the intended purposes of the valuation reports was credible and the fact remains a life settlement transaction was never effectuated. To use an unrealized intention to cause a forfeiture of the benefits would be an unjustifiable consequence under the circumstances.

(3)     Respondents' contend there was a failure to file a timely claim. There can be no question that there were extensive dealings on behalf of Claimant with the Trust by its representatives to obtain payment of the life benefits in a timely matter. While the Trust provides for submitting the claim on a claim form to be supplied by the Trustee, initially, no such form was ever supplied by the Trustee. When the form was provided it was completed and submitted within the time requested and in the manner requested by Mr. Robinson. (Exhibit 425). There can be no question that the COT was on notice that Universitas was asserting a claim for benefits under the two policies shortly after Mr. Spencer died and well within the deadlines required by the Trust.

- 4 -

There is also no question that the COT or its representatives never supplied a claim "form" during the time period required and when they finally did provide one it was thereafter timely submitted. There is no general legal requirement or requirement under the COT itself that any claim form for trust benefits must be "signed" under oath. While the form eventually supplied by COT did provide for verification, the Trust itself made no separate requirement other than to direct use of the form. To determine that a timely claim was not made by Universitas would truly be putting "form" over substance given the overwhelming evidence of interaction between the COT representatives and Universitas' representatives following the untimely death of Mr. Spencer as well as the numerous statements by the COT representatives themselves to Lincoln National and to the Claimant's representatives concerning the fiduciary responsibilities of Nova and the entitlement of Universitas to the benefits. Respondents' technical arguments purportedly justifying the rejection of the claim are based in substantial part on Connecticut insurance law contract cases. It is inappropriate to consider insurance contract cases and principles which may require stricter adherence to the terms of the contract rather than trust/fiduciary principles where the very existence of the trust is for the benefit of the participants and the beneficiaries.

(4) <u>Threatened litigation</u>. The letters submitted on behalf of Attorney Schinderman, Alex Sgoutas and Bruce Mactas do not constitute threats of litigation sufficient to warrant a denial of benefits by the fiduciaries.

(5) <u>Conflicting claim of Grist Mill Capital</u>. There is no credible evidence that any agreement was ever consummated arising out of the discussions Mr. Spencer had before he died with Grist Mill Capital regarding the possible assignment of the beneficial interest under the policies to Grist Mill Capital in return for a $1.8 million payment to Universitas. Even Mr.

Robinson acknowledged that there was no written evidence of such an agreement. (Tr. 762-3). According to Respondents' position, such agreement, if entered into, may have constituted a life settlement transaction which would not have been permitted in any event. Finally, there was no evidence that in accordance with that agreement the Trust intended to pay such benefits to Grist Mill Capital.

While Respondents' present a myriad of defenses to justify their denial of the claim, they are not, however, individually or collectively sufficient to overcome the fact that all Respondents are acting in a fiduciary capacity in connection with the Trust that is designed for "the exclusive benefit of the Participants, their dependents and, in the case of life benefits, their beneficiaries...." (Exhibit 436). To adopt Respondents' defenses to Claimants' assertion of a wrongful denial of the claim would defeat the underlying stated purpose of the COT, would result in an unwarranted forfeiture of the benefits clearly designed and obtained by Mr. Spencer and Holding Capital through their participation in the Plan, and would result in an undeserved windfall to either the other COT participants or the Plan's Sponsor, Administrator or Trustee, that is not justifiable under the circumstances presented in this proceeding.

Having established Claimants' entitlement to benefits, the question remains as to what amount of benefits are warranted. Specifically, the following issues are presented: (1) whether the death benefits under both policies should be considered part of the Plan adopted by Holding Capital and Mr. Spencer or just the second $20 million policy; (2) does the 20% withhold inserted in the Trust in January 2009 apply to either policy or both; (3) which funding costs if any are properly included as a deduction under the terms of the Plan; (4) is the benefit limited to the face value of the policies or should the additional interest payments be included in what the beneficiary under the Plan is entitled to recover; (5) should prejudgment interest be

Awarded and, if so, from when and at what amount; and (6) what reasonable amount of attorneys' fees and costs should be granted to the prevailing party.

(1)     The first issue is whether by subsequently executing an Adoption Agreement in the amount of $20 million did Holding Capital and Mr. Spencer limit any right to have included within the COT the initial $10 million death benefit policy they obtained from Lincoln National for the benefit of the COT. To find, as Respondents urge, that Mr. Spencer "clearly manifested his intent to change the death benefit from $10 million to $20 million" when he executed the second Adoption Agreement in March 2007 (Respondents' Post Hearing Brief, p. 42; Exhibit 411) is contrary to the evidence submitted at the hearing and would require application of contorted logic and law to sustain a finding that the second Adoption Agreement succeeded and pre-empted the first (Exhibit 406) particularly where all the objective evidence indicates otherwise and in the absence of any integration or merger clause in the second Adoption Agreement.

The fact that Mr. Spencer, with the assistance of Mr. Mactas, designated the change in beneficiary form for the two separate policies (Exhibits 56 and 57) a year later, is the best evidence of their intent to adopt and participate in the Plan for both policies and $30 million. Similarly, Mr. Bursey's understanding that Holding Capital was in for $30 million is borne out by his correspondence with Lincoln National acknowledging once again his fiduciary duty and legal obligation to pay out the proceeds of both policies to Universitas. (Exhibit 104). There is no independent evidence other than the Adoption Agreement itself submitted in connection with the second insurance policy for $20,000,000 at the time that the first $10 million policy and the corresponding Adoption Agreement were in place, that Holding Capital and Mr. Spencer had any intention to reduce their participation in the COT from $30 million to $20 million and to leave

- 7 -

$10 million in coverage obtained earlier for the benefit of other unknown and unrelated "participants" in the COT. (See also Exhibit 83). Had Nova believed that Holding Capital and Mr. Spencer only intended to participate for $20 million, they should have objected or not accepted the irrevocable beneficiary designation for the $10 million policy when that was submitted on May 14, 2008 (Exhibit 58) and they are now estopped from asserting otherwise. (See Tr. 671-72).

(2)     The next issue to determine is whether the payment due to Claimant for benefits received by COT in connection with the $10 million or $20 million policy are subject to the provision appearing in Section 6.01 of the Plan entitling the beneficiary to a death benefit equal to only 80% of the original face amount of any of the policies held by the Plan. Respondents admit that "Spencer was enrolled in the Plan using the draft documents on or about December 17, 2006." (Exhibit 406; Respondents' Post Hearing brief, p. 46). Those documents, including the COT itself (Exhibit 19) have no mention of the 20% retention of the death benefit found in a later version of the COT that was adopted no earlier than January 19, 2007.

Accordingly, I determine that at the time Holdings Capital and Mr. Spencer committed to participate in the Plan and that the first policy was acquired, there was no 20% withhold in effect and it would be inequitable to apply that deduction to the benefit payable under the $10 million policy. The right to receive the death benefits without the withhold became analogous to a vested benefit as of that time that should not be forfeitable by a subsequent "amendment" of the Plan. On the other hand, I do credit Mr. Robinson's testimony that the Plan in place as of the time the second policy was obtained did contain the provision allowing for the 20% withhold. (See Tr. 522-24). Accordingly, I determine that the COT is

allowed to retain the 20% withhold as to the ▮▮▮ $20,000,000 policy obtained in March 2007, but not as to the ▮▮▮ 10,000,000 policy obtained in December 2006.

(3)    Deductions for funding costs. Both versions of the Plan provide for the deduction for "the cost of any premiums or placement or origination fees listed in the Plan documents." Claimant acknowledges the appropriateness of deducting the total premiums paid by Grist Mill Capital (Exhibit 437) $2,322,305.79, an origination fee of 20% of the premiums paid (Exhibit 406 at 750; Exhibit 411 at 826) totaling $464,461.58, and the premium funding fee/placement fee of 2% of the total death benefit (Id.) of $600,000. (See Affirmation of Paula K. Colbath regarding amount of arbitration Award at Exhibit 1). In addition to these amounts, Respondents are claiming entitlement to deduct funding costs of $835,394.83 (on both policies) and then taking an origination fee of 20% of the total amount funded pursuant to Section 10b of $631,540.12 and they assert that those two amounts should be proper additional deductions beyond the amount acknowledged by Claimant. (See Exhibit 441, at ¶ 14). Based on the evidence before me, in addition to the amounts above acknowledged as proper by Claimant, I determine that funding costs of $633,686.28, representing the interest due and paid to Ridgewood in connection with the two policies is appropriately charged against the benefits payable pursuant to the COT, but not the other amounts claimed by Respondents. (See Exhibit 437).

(4)    Beyond the face values of the two policies, on May 15, 2009, Lincoln made payment to the COT of interest in the amount of $451,517.83 on the $20 million policy and $225,752.92 on the $10 million policy. Finally, on November 3, 2009, Lincoln made payment of $250,000 in connection with the two policies to the COT (Exhibits 168, 173) representing additional interest. Section 2.07 of the Plan defines "Death Benefit" as meaning "the net amount

- 9 -

of death benefit, after payment of any amounts owed with respect to any such death benefit and/or with respect to any insurance policy related thereto, as selected by the Employer in the Adoption Agreement, payable under the terms of the Plan on the death of the participant to the participant's designated beneficiary." (Exhibit 436). I determine that the interest constitutes proceeds of the insurance policy that pursuant to the terms of the Plan should be paid to the beneficiaries and not be retained by the Trust itself except with respect to that portion of interest attributable to the allowable 20% withhold on the ▮▮▮▮ policy which amount the COT was entitled to retain pursuant to the Trust language in effect at the time that particular policy was acquired.

(5)    The COT itself is silent on the issue of my power to Award prejudgment interest. Section 8.02(d) however provides that the COT shall be construed, regulated and administered by and under the laws of the State of Connecticut. Under Connecticut law, pre-judgment interest is governed by Connecticut General Statue Section 37-3a. Cases interpreting that section provide that the trier of fact may Award prejudgment interest as an element of damages for the wrongful detention of money after it becomes payable if equitable considerations deem that such interest is warranted. In this instance, given the fiduciary duty of the Trust to pay the benefit, I determine that the detention of the money was wrongful under the circumstances. The trier of fact must also determine the date upon which the wrongful detention began in order to assess the time from which interest should be calculated. Prejudgment interest shall run from the denial of the claim on October 2, 2009, except as to that portion of the interest proceeds received from Lincoln National on November 3, 2009, which should be assessed as of that date.

Given these determinations, the Award is calculated as follows:

## AWARD CALCULATION

| | | | |
|---|---|---|---|
| Death Benefit | | $10,000,000.00 | $20,000,000.00 |
| Interest on Death Benefit | 5/15/09 | $225,752.92 | $451,517.82 |
| | 11/3/09 | $83,333.34 | $166,666.66 |
| Less 20% Death Benefit and Proportional Interest | | N/A | $4,123,636.90 |
| Less Premiums Paid | | $779,200.00 | $1,543,105.79 |
| Less Origination Fee of 20% of Premiums Paid | | $155,840.00 | $308,621.16 |
| Less Premium Funding Fee/ Placement Fee of 2% of Death Benefit | | $200,000.00 | $400,000.00 |
| Less Reasonable Costs of Funding | | $217,010.54 | $416,675.74 |
| **Subtotals** | | **$8,957,035.72** | **$13,826,144.89** |
| Prejudgment Interest at 10% through January 21, 2011 on Amounts withheld from denial of claim on October 2, 2009, except as to amounts received on November 3, 2009 | | 8,873,702.38 for 474 days = $1,152,365.57 | 13,659,478.23 for 474 days = $1,773,861.10 |
| | | 83,333.34 for 434 days = $9,908.65 | 166,666.66 for 434 days = $19,817.30 |
| **PREJUDGMENT INTEREST TOTALS** | | $1,162,274.22 | $1,793,678.40 |
| **TOTALS BY POLICY** | | **$10,119,309.94** | **$15,619,823.30** |
| **TOTAL BENEFIT PAYABLE WITH INTEREST THROUGH JANUARY 21, 2011** | | $25,739,133.24 | |

(6)    Attorneys' fees and costs. The COT provides "all costs of the prevailing party (including attorneys' fees and costs), as well as the costs of arbitration, shall be borne exclusively by the non-prevailing party." Article 8, Section 8.02(d). Claimant is the prevailing party and is entitled to its attorneys' fees and costs.  However, inherent in any award of attorneys' fees and costs is that they must be reasonable. Respondents contest that the fees outlined and sought by Claimant in the total amount of $1,075,918.14 by Loeb and Loeb for services rendered, a 5% contingency fee of arbitration Award to the Schinderman estate of $1,786,620.78 and a 3% success fee for Loeb and Loeb of $1,071,972.47 are in fact reasonable. A fair reading of the agreement provides that only those fees incurred in connection with a denial of the benefits and claims are appropriate. For that reason alone, Mr. Schinderman's fees should not be Awarded as clearly his services were rendered prior to the commencement of any arbitration and prior to the formal submission of the claim and the appeal from the denial thereof. By providing merely the dates and total hours by timekeeper without any description of services, it is more difficult to determine with precision a reasonable amount of attorneys' fees and costs incurred by Loeb in connection with the denial of benefits.  However, based on the bills that were submitted, the time spent by Respondents' counsel, and my review of much of the work product of Claimant's counsel,  I hereby determine that $750,000 is reasonable in fees and $36,402.64 in costs to be recovered in connection with the adjudication of the PHASE I issues. Any and all fees of the American Arbitration Association and the Arbitrator are to be paid by Respondents as the non-prevailing party.

Claimant has asserted this claim not only against Nova Group, Inc. as Administrator of the COT, but against Mr. Bursey, as Trustee, and BASI as Plan Administrator.  At this stage I do not believe that it is warranted to enter any Award against Mr. Bursey or BASI. In the first instance,

- 12 -

claims for wrongfully denied benefits are typically only liabilities of the Plan or Trust itself and not of the Plan Administrator or Trustee. Should the COT fail to make timely payment of the Award, during the PHASE II proceeding and/or any court proceedings, upon a full record, the trier of fact should properly determine liability of Mr. Bursey or BASI, if any. I make no determination of those issues at this time.

Accordingly, I award Universitas Education, LLC, the sum of $26,525,535.88 against Respondent Nova as Sponsor, Trustee and Administrator of the COT as of the date of this Award.

The administrative fees of the American Arbitration Association totaling $20,800.00, and the compensation of the arbitrator totaling $47,889.50 shall be borne by Respondent, Nova Group. Therefore, Nova Group shall reimburse Universitas Education, LLC the sum of $32,772.38, shall reimburse Donald Trudeau the sum of $11,972.38 and shall reimburse Daniel E. Carpenter the sum of $11,972.36, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Universitas Education, LLC, Donald Trudeau and Daniel E. Carpenter.

PHASE I Respondents are directed to deposit $26,525,535.98 in escrow with the law firm of Updike Kelly and Spellacy on or before the later of 30 days following the date of this Award or 30 days after determination of any motion for reconsideration under Rule 46, the grounds for which are extremely limited. Should Respondents not do so, PHASE II discovery and hearings will be promptly scheduled or Claimant may proceed judicially to obtain further

relief without violating Article VII, Section 8.02(d) of the COT, as such action to enforce the terms of the Award would be appropriate and warranted under the circumstances.

_1/24/2011_
Date

_Peter J. Altieri_
Peter Louis Altieri

    I, Peter Louis Altieri, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_Peter J. Altieri_
Peter Louis Altieri

# EXHIBIT
# 2

3138

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

> SUPERIOR COURT
> CIVIL ACTION
> NOs. 01-0116BLS2,
> 01-0229BLS2,01-0330BLS2,
> 01-0581BLS2, 01-3433BLS2,
> 01-4305BLS2;
> NO. 01-0075 (Norfolk County)
> (Consolidated Actions)

GAIL A. CAHALY and others[1]
Consolidated Plaintiffs

vs.

BENISTAR PROPERTY EXCHANGE TRUST CO., INC. and others[2]
Consolidated Defendants

## MEMORANDUM OF DECISION AND ORDER ON PHASE III

This is Phase III of these consolidated cases. It concerns the plaintiffs' claims that five additional defendants should be held answerable, by piercing the corporate veil, for the verdicts earlier awarded by the jury against the principal defendants. The defendants concerned in this phase are the following: Benistar Ltd.; Benistar Admin Services, Inc. (BASI); Benistar Employer Services Trust Corporation (BESTCO); Carpenter Financial Group, LLC (CFG); and U.S. Property Exchange(U.S. Property) (collectively referred to as the Phase III defendants).

After a jury trial in November and December 2002, the jury found each of the defendants Benistar Property Exchange Trust Co., Inc.(Benistar Property), Daniel Carpenter (sometimes referred to

---

[1]  Jeffrey M. Johnston; Byron Darling; Massachusetts Lumber Company, Inc.; Joseph Iantosca, Individually and as Trustee of the Faxon Heights Apartment Realty Trust and Fern Realty Trust; Belridge Corporation; Bellemore Associates, LLC; and R&B Enterprises.

[2]  Benistar Employer Services Trust Corporation; Martin L. Paley; Molly Carpenter; Daniel E. Carpenter, Esq.; UBS PaineWebber, Inc. Carpenter Financial Group, LLC; Benistar Admin Services, Inc.; Jane Doe Affiliates and Subsidiaries of Benistar Defendants and Jane Doe Entities controlled by Daniel Carpenter; Merrill Lynch Pierce Fenner & Smith, Inc.; and U.S. Property Exchange.

# 3139

hereafter as "Daniel"), and Martin Paley liable for a total of $8,664,150 (not including interest or costs); at issue were claims of breach of fiduciary duty, misrepresentation, conversion, and breach of contract. The jury also found the defendant Molly Carpenter (sometimes referred to hereafter as "Molly") liable to some of the plaintiffs for breach of fiduciary duty.[3]  In Phase II of this case, relating to claims against these four defendants under G. L. c. 93A, I concluded that Benistar Property, Daniel Carpenter, and Martin Paley committed unfair or deceptive acts within the scope of the statute, and have awarded double damages against each of them in the amount of $17,288,300.[4]   There is no dispute that Benistar Property is defunct, with no assets and certainly no capacity to answer the judgments that will be entered against it in this case.

The jury-waived trial on the corporate disregard claims took place on parts of March 11, March 24, and May 30, 2003.[5]  The presentation was entirely documentary.  My findings are set out below, based on the evidence submitted.  They are followed by a discussion of relevant legal issues.[6]

---

[3] The jury also found previously Merrill Lynch Pierce, Fenner & Smith (Merrill Lynch) liable, but I previously allowed Merrill Lynch's judgment notwithstanding the verdict.

[4] The plaintiffs are also entitled to an award of attorneys' fees and expenses on their c. 93A claims; their applications for fees have not yet been submitted.  The final judgment against the defendants who have been found liable under both c. 93A and the plaintiffs' common law claims will award a single set of damages – on the c. 93A claims – to avoid duplication.  See, e.g., *Calimlim v. Foreign Car Ctr., Inc.*, 392 Mass. 228, 235 (1984).  Accord, *Vassallo v. Baxter Healthcare Corp.*, 428 Mass. 1, 23 (1998).

[5] The court has received a number of inquiries from certain plaintiffs (not from their counsel), who appear to be under the misimpression that the trial of this entire case concluded in December 2002.  That is simply not the case.  The trial of Phase III was originally scheduled for February 2003, but was continued twice or three times, due to difficulties concerning the presentation of the plaintiffs' documentary evidence and then the schedules of counsel.

[6] The findings are also preceded by consideration of a legal issue.  The Phase III defendants have again moved to dismiss the plaintiffs' claims on a number of bases.  With respect to the issue of service, the motion is denied.  All the parties have been participating in

3140

### Findings of Fact

Benistar Ltd. is a Delaware corporation, incorporated on or about May 3, 1995.  It has an office in Stamford, Connecticut, but its principal place of business is 507 Hopemeadow Street, Simsbury, Connecticut.  Daniel is the sole shareholder of Benistar Ltd. (see ex. 445, schedule E; see also deposition of Daniel Carpenter, pp. 5-6), which he describes in his affidavit of January 29, 2001, as "a holding company owning the stock of several corporations . . . ." (Carpenter aff., ¶ 2.)   At all relevant times, Daniel was the chairman and secretary of Benistar Ltd. as well as of the defendant Benistar Property, which itself either a wholly owned subsidiary of Benistar Ltd., wholly owned by Daniel or owned by Daniel and Molly together.[7]  Benistar Property is also a Delaware corporation, incorporated on October 7, 1998, and while it had an office in Newton, Massachusetts, its official principal place of business is listed as 507 Hopemeadow Street in Simsbury, Connecticut.

---

these consolidated cases for a good number of years.  The purpose of service is to provide notice and an opportunity to respond.  All the defendants have had this opportunity.  Dismissal for lack of service of process would be a travesty at this stage.  With respect to the defendants' repeated argument for dismissal on the grounds of lack of personal jurisdiction, the motion is also denied (as it has been a number of times in the past).  The plaintiffs' theory of personal jurisdiction over the Phase III defendants except U.S. Property (which does not challenge personal jurisdiction) is integrally tied to their argument that the court should pierce the various corporate veils of these entities and should consider them as essentially one with Benistar Property Exchange, or Daniel Carpenter, or Molly Carpenter, or a combination of these three defendants.  Case law makes clear that when personal jurisdiction is claimed on such a ground, the inquiry into personal jurisdiction and the merits inquiry into whether there is an appropriate case for corporate disregard are very linked.  See, e.g., *Kleinerman v. Morse,* 26 Mass. App. Ct. 819, 822-824 (1989).  See also *United Electrical, Radio and Machine Workers of America v. 163 Pleasant Street Corp.,* 960 F.2d 1080, 1091 (1st Cir. 1992); *Snell v. Bob Fisher Enterprises,* 106 F. Supp. 87, 90 (D. Me. 2000).  If the plaintiffs have established on the merits the basis for disregarding the corporate form in connection with Benistar Ltd., BASI, BESTCO, and CFG, then they will have satisfied the jurisdictional requirement.  At this stage of the case, following the trial(s), it is appropriate to consider the merits.

[7]  See Memorandum of Decision and Order on Plaintiffs' Claims Under G.L. c. 93A, dated September 23, 2003, p. 3, note 7.

3

## 3141

Although Daniel states in his sworn affidavit that his wife Molly was not an officer or director of either Benistar Ltd. or Benistar Property, some of the Merrill Lynch account authorization documents signed by Daniel and Molly for Benistar Property indicate that Molly was at relevant times the treasurer and "managing director" of Benistar Property[8] and the managing director of Benistar Ltd. Accordingly, I find that she was an officer or director of both corporations.

The defendants BASI, BESTCO and CFG are also Delaware corporations, respectively incorporated on July 18, 1997, October 7, 1998, and January 19, 2000. According to financial statements of BASI for the year ended January 31, 1999 -- which are the only financial statements for any of the Phase III defendants or Benistar Property that the defendants have produced -- BASI was at that time a wholly owned subsidiary of Benistar Ltd. Two witnesses, including the designated Rule 30(b)(6) witness for BASI, Donna Wayne, testified that in early 2000, the ownership of BASI was transferred to an employee stock ownership plan (ESOP), which was wholly owned by BASI's employees. However, I am not persuaded that BASI's ownership was transferred to an ESOP.[9]

---

[8] These documents, marked as ex. 401, are dated October 22, 1999 (Molly as treasurer) and June 4, 2000 (Molly as "managing director"). See also Memorandum of Decision and Order on Plaintiffs' Claims Under G.L. c. 93A, dated September 23, 2003, p. 3, note 7.

[9] Despite the two witnesses' testimony about the ESOP, I am not persuaded for the following reasons. (1) The accountant's notes to the BASI financial statements for year ending January 31, 1999, state that as of that date, BASI had no employees of its own, but used the employees of its parent, Benistar Ltd. The financial statements were prepared in the form of a compilation report by Frederick J. Prior, a certified public accountant, based on "information that "is the representation of [BASI's] management." (Ex. 424). (2) Donna Wayne, BASI's Rule 30(b)(6) designee, filed an affidavit in this case dated August 6, 2001 -- more than 18 months following the alleged change in BASI's ownership in February 2000-- in which she describes BASI and never mentions that it is owned by its employees through an ESOP. (3) Further, and significantly, while the plaintiffs requested documents related to the ownership of BASI, no trust or similar documents evidencing the actual creation of the ESOP were produced. (4) Donald Trudeau, identified as the president of BASI, testified that all employees of BASI were entitled to an ownership interest in the corporation as long as they had been working for BASI for at least

3142

Accordingly, I find that as indicated in the 1999 financial statements prepared by the accountant, BASI

was at all relevant times a wholly owned subsidiary of Benistar Ltd.  While there is evidence that Molly

Carpenter is the chairman and secretary of BASI, Donald Trudeau its president and Donna Wayne its

assistant secretary (see documents attached to ex. 426), I am unable to determine whether in fact Daniel

or Molly is secretary, since each purports to have signed different corporate documents on the same day

in that capacity.  (See documents attached to ex. 426.)

Daniel Carpenter is the chairman and secretary of BESTCO, and Molly Carpenter its treasurer.

BESTCO's principal office is also at 507 Hopemeadow Street in Simsbury.  Daniel asked Donald

Trudeau to be BESTCO's designated Rule 30(b)(6) witness.  Trudeau was aware of no officers,

directors, or employees of BESTCO other than Daniel.  BESTCO neither produced in discovery nor

introduced at trial any corporate documents other than its extremely general articles of organization and

perhaps a form set of bylaws.  I infer from the absence of corporate documents and Trudeau's

---

six months and that he himself owned a percentage of the company.  Yet Donna Wayne, who
stated she had worked for BASI since 1997, testified in 2002 that she did not hold any ownership
interest in the company to her knowledge, and Trudeau himself could not give any specific
information about his ownership interest.  (5) The only documents in evidence relating to the
creation and organization of BASI include (a) a copy of the certificate of incorporation from
1998, (b) a copy of BASI's bylaws – which make no reference to any ESOP – signed by Molly
Carpenter as the secretary of the BASI  and dated December 29, 2000, (c) a purported
"Certificate of Corporate Resolution" concerning the ESOP, signed by Daniel, also as the
secretary of BASI and also dated December 29, 2000, and (d) a copy of a "written consent of sole
shareholder," dated December 29, 2000, identifying the directors and officers of BASI, and
signed by Daniel Carpenter as representative of BESTCO, which is identified there as the trustee
of the BASI employee stock ownership plan.  (6) Finally, the appalling lack of knowledge about
BASI that was demonstrated by its official Rule 30(b)(6) designee, Donna Wayne, as well as its
alleged president, Donald Trudeau; their consistent testimony that Molly Carpenter was the
person who was in charge of all financial aspects of the company and, according to Wayne, the
principal person running the company; and the adverse inference that I draw from Molly's failure
to appear and testify as a witness at Phase III (or indeed any other phase) of this trial, are further
bases for discrediting the ESOP ownership theory advanced by the defendants.

5

3143

incredibly uninformed Rule 30(b)(6) testimony that BESTCO is owned by Daniel or perhaps by Daniel and Molly. Trudeau was also the designated Rule 30(b)(6) witness for CFG – again at Daniel Carpenter's request – but, if possible, knew even less about CFG than he did about BESTCO; his knowledge was confined to the fact that Daniel was an officer or director. CFG produced no corporate documents beyond its articles of organization (which provide no useful information about ownership or business). I draw the inference that CFG is owned by Daniel.

Benistar Property's business was to serve as a qualified intermediary for holding the funds – proceeds from real estate sales -- of persons seeking to effectuate a tax-deferred property exchange under § 1031 of the Internal Revenue Code. Daniel Carpenter (and to some extent Molly) assumed control over and managed all such funds entrusted to Benistar Property by the plaintiffs and other clients. Daniel opened accounts at Merrill Lynch and later at PaineWebber in the name of Benistar Property into which he deposited the plaintiffs' funds. He also opened accounts at Merrill Lynch and Paine Webber in the name of others of the Benistar entities, including Benistar Ltd.(Merrill Lynch), and BESTCO (Merrill Lynch and PaineWebber). The only two persons authorized to deal with and write checks on the Merrill Lynch and PaineWebber accounts for Benistar Property were Daniel and Molly. Benistar Property marketed its services as a qualified intermediary for tax-deferred §1031 property exchanges on the internet as part of a website with the URL "www.Benistar.com." The website also described services of employee benefit plan and employee stock ownership plan administration presumably provided by Benistar Ltd., BESTCO, and BASI. There was no separate website for Benistar Property or indeed for any of the Benistar defendants. The website presents Benistar Property as an integral part of the Benistar family of companies. In addition, Benistar Property made individualized presentations, accompanied by promotional materials, that described §1031 tax-

6

## 3144

deferred exchanges, and the services Benistar Property could and would provide as a qualified intermediary. All these Benistar materials– including the website– include a presentation to the effect that a potential §1031 exchangor (i.e. a person like the plaintiffs) may be assured that his or her or its money is safe with Benistar Property because Benistar Property is part of "Benistar, the largest 419 Trust Plan Administrator in the country, and we protect your assets." (See ex. 11, 35, 69A, 69B.)

Persons such as the plaintiffs who contracted with Benistar Property for its services as a qualified intermediary were obligated to pay certain set fees. When Benistar Property received these fees, it originally split them between itself and Benistar Ltd., but at some later point, Benistar Property staff (in particular Linda Jokinen) received instructions to split the fees between Benistar Property and BASI. The record includes a fair number of checks reflecting the transfer of funds that appear to represent these client fees from Benistar Property to BASI.

In April of 2000, Daniel Carpenter submitted applications to the Travelers Casualty Company for fiduciary liability insurance and a financial institution bond, respectively. (See ex. 424.) The insurance application lists as the insured, "Benistar Group, Benistar Administrative Services, Benistar Property Exchange, Benistar Ltd, TPG, and Benistar Insurance Group." It states that the "insured" has been in business for 20 years and had annual sales or revenues of $1.6 million and assets of $50 million. Daniel Carpenter signed this application as "chairman/Benistar Employer Services Trust Corporation/Trustee." The fiduciary bond application lists as the applicants, "Benistar Administrative Services, Inc., Benistar Ltd., Benistar Insurance Group, Inc., T.P.G., Benistar Group." It includes property exchange services in its description of the applicants' business, even though Benistar Property is not listed as an applicant. It states that "only chairman of board is permitted to sign checks." It is signed by "Daniel Carpenter, Chairman", on behalf of "Benistar et als" as the insured.

7

## 3145

The plaintiffs requested documents from Benistar Ltd., BASI, BESTCO, and CFG that related to corporate structure, corporate minutes and other records, financial statements and other financial information including tax returns, and capitalization. The defendants produced absolutely nothing except the articles of organization and bylaws and the few other corporate documents described above. In the face of this non-production, I infer that none of the requested corporate documents exists.

This inference is supported by the testimony of the corporate designees of BASI, BESTCO and CFG. Donna Wayne, the corporate designee of BASI and a director as well as the assistant secretary of that company, testified that she knew nothing about the capitalization of the company, nothing about who the stockholders were, nothing about whether there were annual meetings or minutes of any such meetings, that she did not have any responsibilities as assistant secretary, that she was unable to identify any employees of the company, and that she knew nothing about the financial transfers of funds between BASI and Benistar Property reflected in the checks and account statements. She also had no knowledge that BASI's accountant had described BASI described in 1999 as an entity which operated by using the employees and assets of its parent, and that the parent, Benistar Ltd., imposed an administrative charge for these services of over $400, 000 in 1999. Donald Trudeau, the president of BASI (but not its designated Rule 30(b)(6) representative), and corporate designee for BESTCO and CFG, testified that he knew of no employees of BESTCO or CFG other than Daniel Carpenter, who was an officer or director of both; could not describe the day to day business operations of BESTCO or CFG; had no knowledge of why $2,414,230 in funds belonging to the plaintiff Cahaly – which were entrusted to Benistar Property -- were placed for a time in a BESTCO account, and had no knowledge of why $412,000 was transferred from Benistar Property's Merrill Lynch account to a CFG account. Trudeau also testified with respect to BASI, and stated that he knew the company had assets but could

8

not tell the "monetary measure" (dep. p. 83), even though he served as BASI's president, had no knowledge as to why there were intercompany transfers between BASI and Benistar Ltd., between Benistar Property and BASI, and between BASI and CFG, or why funds were being transferred from Benistar Ltd. to the BASI 401K plan; had no knowledge that BASI was charged $422,504 by its parent Benistar Ltd. in the year ending January 31, 1999, or whether there were similar charges in subsequent years; that while it is within the purview of his responsibilities as president of BASI to know who was providing financial information to the company's accountant, he was not that person; and he had no knowledge of where the operating bank account for BASI was held.

The plaintiffs did obtain, through subpoenas, bank statements from various bank accounts in the name of Benistar Property, Benistar Ltd., BESTCO, BASI, and CFG. They also obtained account statements related to the Merrill Lynch and PaineWebber accounts standing in the names of Benistar Property, Benistar Ltd., and BESTCO. There are a significant number of large fund transfers between and among Benistar Property, Benistar Ltd., BESTCO, BASI, and CFG.[10]

---

[10] For example, transfers of funds from Benistar Property to BESTCO – none of which were explained by the Rule 30(b)(6) designee – included: from Benistar Property to BESTCO: $150,000 on February 26, 1999; $500,000 on September 28, 1999; $500,000 on October 6, 1999; $150,000 on December 30, 1999; $89,000 on February 4, 2000; and $607,062 on January 3, 2001, which was the date that Daniel Carpenter first notified any of the plaintiffs that all funds entrusted by them to Benistar Property had been lost. In addition, on December 31, 2000, there was a transfer of $290,000 from BESTCO to Benistar Property, and a transfer of $150,000 from Benistar Property to BESTCO. It was also the case that the plaintiff Gail Cahaly's funds, totaling $2,414,230, that had been entrusted with Benistar Property, were initially deposited on November 9, 2000, in a BESTCO account, and then transferred to Benistar Property on November 14, 2000. On July 27, 2000, CFG transferred $400,000 from a bank account to a Benistar Property Merrill Lynch account intended to hold Benistar Property's client funds in escrow, and on September 18, 2000, $412,000 of funds from the same Benistar Property Merrill Lynch account were transferred to CFG – in the context of Benistar Property's agreements with each of its clients that no monies would be transferred by Benistar Property except at the client's direction. On October 12, 2000, $500,000 from a "Benistar Employees" (an unexplained entity, perhaps?) bank account was transferred to this same Benistar Property Merrill Lynch account

# 3147

With respect to U.S. Property, the corporation was organized on January 12, 2001, days after

Benistar Property had closed its doors and notified at least some of the plaintiffs that their funds were

lost. Like Benistar Property, U.S. Property is a Delaware corporation, and like Benistar Property, it has

a Massachusetts office at 233 Needham Street in Newton. Its corporate purpose is to act as a qualified

intermediary for tax deferred property exchanges, which of course was Benistar Property's business as

well. Martin Paley is listed as the president, vice president, and the sole director of U.S. Property, and

his wife Susan Paley is listed as the secretary; Martin Paley was listed as the president, treasurer, clerk

and one of two directors of Benistar Property. Linda Jokinen, was employed by Benistar Property

beginning in October 1998 – the month it was incorporated – until it "ceased to exist," in, she stated,

February 2001, and was then employed by U.S. Property at the time of her deposition in March 2001.

She worked in the same office for U.S. Property that she had for Benistar Property, and used the same

computer, the same email and the same financial software system as she had for Benistar Property.

Martin Paley himself did not testify, asserting his rights under the Fifth Amendment to the United

States Constitution not to do so.

## Discussion

### I. Benistar Ltd., BASI, BESTCO, and CFG.

---

intended to hold client funds in escrow. With respect to Benistar Ltd., there is a transfer of
approximately $10,000 from a Benistar Property Merrill Lynch account to Benistar Ltd. on
October 27, 2000, for which no explanation was given. In addition, there are a great number of
transfers of significant funds between Benistar Ltd. and BASI –between 45 and 50 transfers of
$10,000 or more (most of which are far in excess of $10,000) – during the time period from
January 28, 1999, to August 21, 2001. Donald Trudeau, the president of BASI during this entire
period, testified on deposition that he had no knowledge of any of these transfers. He also was
unable to explain a $65,000 transfer from BASI to the law firm of Eckert Seamans, a law firm in
Boston, for the benefit of Benistar, Ltd. (See ex. 415, Trudeau deposition, p. 115. See generally
ex. 425, which summarizes these transfers; the underlying checks and account statements are also
in evidence.)

# 3148

"The doctrine of corporate disregard is an equitable tool that authorizes courts, in rare situations, to ignore corporate formalities, where such disregard is necessary to provide a meaningful remedy for injuries and to avoid injustice." *Attorney General v. M.C.K., Inc.*, 432 Mass. 546, 555 (2000).[11] As the Supreme Judicial Court has observed:

> 'Where there is a common control of a group of separate corporations engaged in a single enterprise, failure (a) to make clear which corporation is taking action in a particular situation and the nature and extent of that action, *or* (b) to observe with care the formal barriers between the corporations with a proper segregation of their separate businesses . . . records, and finances, may warrant some disregard of the separate entities in rare particular situations in order to prevent gross inequity' (emphasis added).

*Id.* at 557, quoting *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 620 (1968).

Accord, *Evans v. Multicon Const. Corp.*, 30 Mass. App. Ct. 728, 732-733 (1991).[12]

The courts have identified twelve factors to consider in determining whether to set aside "corporate formalities" ( *Attorney Gen. v. M.C.K., Inc., supra,* 432 Mass. at 555), and they are the

---

[11] The Phase III defendants contend that since they are all Delaware corporations, the law of Delaware on the issue of corporate disregard applies to this case, rather than the law of Massachusetts. I disagree. This case concerns Massachusetts plaintiffs transferring proceeds from the sale of primarily Massachusetts real estate to Benistar Property, which had an office in Newton, Massachusetts, the location from which its direct contacts with the plaintiffs emanated. See *Evans v. Multicon Const. Corp.*, 30 Mass. App. Ct. 728, 729, 737 n. 7 (1991)(applying Massachusetts law to question of piercing the corporate veil of an Ohio corporation because of the Massachusetts contacts in the case). See also *DeCastro v. Sanfill, Inc.*, 198 F.3d 282 (1st Cir. 1999)(applying Puerto Rican law to corporate veil question in case involving a Delaware corporation, because of the location of the pertinent transactions).

[12] "Occasion for doing so [i.e., piercing the corporate veil] arises when (1) there is active and pervasive control of related business entities by the same controlling persons *and* there is a fraudulent or injurious consequence by reason of the relationship among those business entities; or (2) there is 'a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.'" *Evans v. Multicon Const. Corp., supra,* 30 Mass. App. Ct. at 731-732, quoting *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 619 (1968).

## 3149

following: (1) common ownership; (2) pervasive control; (3) confused intermingling of business

activity assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6)

absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated

transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning

of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and

(12) use of the corporation in promoting fraud. *Id.* at 555 n. 19. Accord, *Evans v. Multicon Constr.*

*Corp., supra,* 30 Mass. App. Ct. at 733. See *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.,* 754 F.2d

10, 14-16 (1ˢᵗ Cir. 1985).

A consideration of these factors in the present case follows:

(1) <u>Common ownership</u>  Daniel Carpenter owns Benistar Ltd., which in turn wholly owns

BASI.  In addition, I have inferred that Daniel, Daniel and Molly, or Benistar Ltd. also owns Benistar

Property, Daniel or Daniel and Molly own BESTCO, and Daniel owns CFG.  I have indicated in the

findings the evidentiary bases for these inferences, and I add the following.  As indicated, the corporate

designee of BESTCO and CFG could answer virtually no questions about these two companies

concerning their ownership, their directors or officers.  He was at best totally unprepared – he stated he

had spoken to counsel about the Rule 30(b)(6) deposition for approximately five minutes and had

reviewed nothing.  This is unacceptable.  "Producing an unprepared witness is tantamount to a failure to

appear at a deposition." *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.,* 201 F.R.D. 33, 39

(D. Mass. 2001)(quotation omitted), and cases cited.  In the circumstances, it is appropriate to permit

an adverse inference to be drawn.  Cf., e.g., *Graves v. R. M. Packer Co., Inc.,* 45 Mass. App. Ct. 760,

770 (1998).  Moreover, where Daniel Carpenter, a witness who the evidence indicates had far greater

knowledge about the designated subjects for each of the corporations, did not testify on each of their

# 3150

behalf but chose to assert his Fifth Amendment rights, I draw the inference that any answers that might have been given to the questions posed concerning ownership and activities of these corporations would have been prejudicial to Daniel Carpenter – that is, would have undermined any claim by him that he is not the owner of one or both of these entities.  See *Lentz v. Metropolitan Property and Cas. Ins. Co.,* 437 Mass. 23, 26 (2002), and cases cited.

(2) <u>Pervasive control</u>.  The evidence shows that Daniel Carpenter appears to exercise pervasive control over the activities of Benistar Ltd., BESTCO, and CFG – despite document requests and despite Rule 30(b)(6) depositions, there was simply no evidence at all introduced to the contrary, and since Carpenter is the owner of these entities, the only conclusion one can reasonably reach is that he was the person in control.  Carpenter also exercised, with some participation from his wife Molly, complete control over the financial all management of client funds for Benistar Property.

(3) <u>Confused intermingling of business activity assets or management</u>.  The check and bank account information introduced by the plaintiffs reveals inter-company fund transfers between Benistar Property and BASI, BESTCO, CFG and Benistar Ltd., , as well as between and among each of the last four entities; the defendants offered for no explanation for any of them.  It is also true that all of these entities had a common principal place or places of business at 507 Hopemeadow Street in Simsbury, Connecticut or "Benistar Plaza" in Stamford, Connecticut, or both.  The Benistar website included all of the companies, and presented the information in a way that showed them to be interconnected members of the same business family, and potential clients of Benistar Property were specifically assured that their money was sale with that company because it was part of Benistar.

With respect to management, the fiduciary insurance and fiduciary bond applications to Travelers demonstrate that Daniel Carpenter presented and, one may infer, treated these individual

13

## 3151

companies – along with some additional ones that are not defendants here – as one group, with a common set of 28 employees and assets of $50 million, and for all of which he, as "chairman," was the only person with check-signing authority.  In addition, insofar as Benistar Ltd., BESTCO and CFG are concerned, in the face of the evidence about their common ownership and common officers and directors, the defendants presented no real evidence to indicate what, if any, distinct corporate purposes or functions the three companies performed.[13]  I choose to draw an inference against Daniel with respect to the scope of his control over and mingling of the management and operations of BESTCO and CFG. BASI is in a slightly different place.  The evidence revealed that Molly Carpenter was the driving force of this entity on a day to day basis, and Molly was the person with pervasive control over the company's finances, banking relationships,  and all things related to them, although, as the Travelers insurance applications and "corporate resolution" signed by Daniel, demonstrate, in some instances Daniel asserted control.[14]  Molly, while a party to this case, did not appear or testify, and I infer from her absence that her testimony would have been detrimental to the defendants' position that BASI should be considered a separately functioning corporation not subject to piercing.  See *Custody of Two Minors*, 396 Mass. 610, 616 (1986).

(4) Thin capitalization.  Despite requests for documents on the subject of capitalization, nothing

---

[13]  As stated previously, the Rule 30(b)(6) designee Trudeau could not describe anything the companies did, but simply mentioned his knowledge that Daniel Carpenter was the person involved in them. While Donna Wayne offered some testimony concerning BESTCO's activities as a trustee for employee plans, she was not the corporate designee for BESTCO and the scope of her knowledge appeared both narrow and shallow.

[14]  The depositions of Donna Wayne, BASI's assistant secretary and the head of administrative services, and Donald Trudeau, BASI's president, both of whom are also directors of the company, reveals in painful fashion that they are essentially in the dark about the management of the company, at least from any perspective tied to finances and financial control.

3152

was presented for any of the companies except the representation by Daniel Carpenter on the Travelers insurance and bond application that the companies, presumably as a group, had assets of approximately $50 million. (There was also testimony by Donald Trudeau that BASI was "capitalized" through lines of credit with vendors such as the Dell computer company.) In the circumstances, and again drawing adverse inferences from Daniel Carpenter's assertion of Fifth Amendment privilege and Molly Carpenter's non-appearance as a witness, I conclude that none of the defendant companies was adequately capitalized for the conduct of legitimate business.

(5) Non-observance of corporate formalities. Other than the fact that each of these corporations was indeed organized as a Delaware corporation and many of them appear to have (form) bylaws, there is simply no evidence that Benistar Property or any of the Phase III defendants except BASI observed any corporate formalities in the form of stockholder or director meetings, the keeping of corporate minutes and other corporate records. With respect to BASI, however, Trudeau testified to annual meetings and Donna Wayne testified to some sort of directors' meetings, and there are the two corporate documents described above (see note 9) that were signed by Daniel Carpenter. I do not credit Trudeau's testimony concerning annual meetings because he could remember absolutely no details of these supposed meetings, and I am not persuaded by the evidence that what Donna Wayne was attempting to describe were in fact corporate directors' meetings. I also do not find that the corporate resolution and other document signed by Daniel Carpenter are valid corporate documents.

(6) Absence of corporate records. This absence is obvious from the record of the case.

(7) No payment of dividends. There was no evidence that any of the Benistar entities had ever paid a dividend.

(8) Insolvency at the time of the litigated transaction. Insofar as Benistar Property is concerned,

15

## 3153

there is no dispute that as a result of Daniel Carpenter's and PaineWebber's activities in relation to the Benistar Property brokerage accounts in PaineWebber, as of January 2001, Benistar Property was insolvent.

(9) <u>Siphoning away of corporate assets by the dominant shareholders</u>.   The proof here is indirect at best.  There were no tax returns or financial statements for Benistar Ltd., BASI, BESTCO, or CFG that might have shown what the assets of these entites were, and whether any or all of them were retaining earnings.  But it is not clear whether or to what extent Daniel and Molly have drained the assets of these companies and taken them for their personal use.

(10) <u>Non-functioning of officers or directors other than the shareholders</u>.  The only officers or directors of any of these corporations, Benistar Property included, who functioned as such, were Daniel and Molly.  There is no contrary evidence.

(11) <u>Use of the corporation for transactions of the dominant shareholders</u>.  As the evidence in Phase I of this case reflected – and as the jury implicitly found – Daniel Carpenter and Molly Carpenter used Benistar Property as a source of funds to support Daniel's personal penchant for risky option trading on the stock market.  As for the Phase III corporate defendants, the many inter-corporate fund transfers through checks and wires signed or authorized by Daniel or Molly demonstrate that these corporations have been used for the transaction – whatever they might be – of these two individuals. Daniel's assertion of the Fifth Amendment privilege and Molly's non-appearance add inferential proof to this factor.

(12) <u>Use of the corporation in promoting fraud</u>.  Again, the trial of Phase I showed that Benistar Property was used to promote fraud in relation to the plaintiffs, who had entrusted their §1031 property exchange funds to that company.  Insofar as Benistar Property funds beyond the fairly minimal fees

16

3154

paid by its clients were transferred between and among BESTCO, BASI, CFG and Benistar Ltd., the corporations promoted fraud on the plaintiffs as well.

This summary of the corporate disregard factors demonstrates that on the evidentiary record of this case, most of them apply: the first, second, third, fourth, fifth, sixth, seventh, tenth, and to some extent the twelfth apply to Benistar Property and the four Benistar-related Phase III defendants Benistar Ltd., BASI, BESTCO and CFG; the eighth, eleventh and twelfth apply to Benistar Property, the principal corporate defendant in the case. It is only the ninth factor that does not appear to be shown with any great clarity.

What gives one initial pause in this case is that the record certainly contains hints that some of the Phase III defendants appear to perform independent corporate services and functions unrelated to Benistar Property. However, (1) the blatant refusal of all the Phase III defendants to produce records supporting the legitimacy and independent existence of these corporations[15]; (2) their cynical response to the Rule 30(b)(6) depositions, shown by the choice of designees and the designees' total lack of preparation; and (3) the adverse inferences I draw from Daniel's assertion of his Fifth Amendment privilege to all questions and Molly's voluntary non-appearance as a witness, persuade me that on the record of this case, it is appropriate and necessary to disregard the corporate form with respect to Benistar Ltd., BASI, BESTCO and CFG in order "to provide a meaningful remedy and avoid injustice"[16], in this case. The plaintiffs have been awarded very substantial verdicts from the jury,

---

[15] It is true that there are a variety of corporate bank statements that the plaintiffs subpoenaed, but even they present some interesting questions. For example, a bank account in Benistar Ltd.'s name was later changed to be in BASI's name, with no explanation for the change being provided by the defendants.

[16] *Attorney General v. M.C.K., Inc.*, 432 Mass. 546, 555 (2000).

## 3155

commensurate with the very substantial losses they suffered at the hands of the principal defendants. Those defendants should not be permitted to escape responsibility through the misuse of the corporate form.

II. U.S. Property

The evidence shows that U.S. Property is clearly the successor to Benistar Property. Benistar Property no longer exists, that U.S. Property operates the same type of business out of the same Newton office that Benistar Property did, Martin Paley serves as president and principal representative of U.S. Property as he did for Benistar Property, and U.S. Property uses the same computers and software programs.

It is true that Benistar Ltd., Daniel Carpenter and Molly Carpenter appear to have no ownership interest in or operational association with U.S. Property, in contrast to the case with Benistar Property, but as far as the corporate business is concerned, the two are essentially the same. Moreover, no witness testified[17] and no other evidence was introduced to refute the inference that U.S. Property is simply a continuation of Benistar Property. I conclude that U.S. Property should be held liable for the judgments against Benistar Property on a theory of successor corporate liability. See *Cargill, Inc. v. Beaver Coal & Oil Co., Inc.,* 424 Mass. 356, 359 (1997).

### ORDER

---

[17]As mentioned previously, Martin Paley has asserted his Fifth Amendment privilege and declined to testify at any phase of this trial. In light of Paley's role as principal officer and director of U.S. Property, his refusal to testify gives rise to an inference against U.S. Property on the facts supporting a finding of successor liability. See *Lentz v Metropolitan Property and Cas. Ins.* Co., 437 Mass. 23, 26 (2002). Furthermore, it appears that Susan Paley – the secretary of U.S. Property and Martin Paley's wife – presumably could have testified on the subject of U.S. Property, but she was not called to do so. See *Custody of Two Minors*, 396 Mass. 610, 616 (1986). Cf. *McGinnis v Tetna Life & Cas. Co.*, 398 Mass. 37, 38-39 (1986). Indeed, no memorandum was filed by Paley or U.S. Property in connection with Phase III.

3156

For the foregoing reasons, it is **ordered** that final judgment is ultimately to enter in this case against the defendants Benistar Ltd., Benistar Admin Services, Inc., Benistar Employer Services Trust Corporation and Carpenter Financial Group, LLC, in the amount of the judgments entered against the defendants Benistar Property Exchange Trust Co., Inc., Daniel Carpenter and Molly Carpenter; and that final judgment is ultimately to enter in this case against the defendant U.S. Property Exchange in the amount of the judgment entered against the defendant Benistar Property Exchange Trust Co., Inc.

Margot Botsford
Justice of the Superior Court

Dated: September 23, 2003

19

# EXHIBIT
# 3

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                    SUPREME JUDICIAL COURT
                                                No. SJC-10041


GAIL A. CAHALY

vs.

BENISTAR PROPERTY EXCHANGE TRUST COMPANY, INC. & others[1]
(and six companion cases[2]).


AMENDED ORDER AND MEMORANDUM

In Cahaly v. Benistar Property Exchange Trust Company (and

six companion cases), 451 Mass. 343 (2008), (Cahaly) we affirmed

a judgment against the defendants Benistar Properties Exchange

Trust (Benistar Trust); Benistar Ltd.; Benistar Employer Services

Trust Corporation (BESTCO); Benistar Admin. Services, Inc.

(BASI); Carpenter Financial Group, LLC (CFG); Molly Carpenter;

Daniel E. Carpenter; and U.S. Property Exchange (collectively the

Benistar defendants).

---

[1] Benistar Ltd.; Benistar Employer Services Trust
Corporation (BESTCO); Benistar Admin. Services, Inc. (BASI);
Carpenter Financial Group, LLC (CFG); Molly Carpenter; Daniel E.
Carpenter; Merrill Lynch, Pierce, Fenner & Smith, Inc.; and U.S.
Property Exchange.

[2] Jeffrey M. Johnston vs. Benistar Property Exchange Trust
Company, Inc., & others.  Massachusetts Lumber Company, Inc. vs.
Benistar Property Exchange Trust Company, Inc., & others.
Bellemore Associates, LLC vs. Benistar Property Exchange Trust
Company, Inc., & others.  Joseph Iantosca & others vs. Benistar
Property Exchange Trust Company, Inc., & others.  R & B
Enterprises, Inc. vs. Benistar Property Exchange Trust Company,
Inc., & others.  Byron Darling vs. Benistar Property Exchange
Trust Company, Inc., & others.

The Benistar defendants have filed a petition for rehearing in which they argue, inter alia, that the assertion of personal jurisdiction over certain of them[3] meets neither the requirements of the Massachusetts long-arm statute, G. L. c. 223A, § 3, nor the requirements of the Due Process clause of the Fourteenth Amendment of the United States Constitution.

The petition is denied in all respects.  This amended order and memorandum addresses the issue of jurisdiction only.

In Cahaly, supra, we affirmed that it was appropriate to pierce the corporate veil (disregard the corporate form) of Benistar Trust.  In their petition the Benistar defendants do not challenge that Massachusetts courts have jurisdiction over Benistar Trust.  Contrary to their claim, under both the Massachusetts long-arm statute and Federal law, the doctrine of piercing the corporate veil (appropriately disregarding the corporate form) may properly play a role in determining whether a defendant is subject to personal jurisdiction.  This case is one in which piercing the corporate veil was so obviously appropriate that imputing the conduct of Benistar Trust to the other Benistar defendants is well within the range of what the law of personal jurisdiction permits.

---

[3] The defendants who claim that there is no jurisdiction over them are Benistar Ltd.; Benistar Employer Services Trust Corporation (BESTCO); Benistar Admin. Services, Inc. (BASI); Carpenter Financial Group, LLC (CFG); Molly Carpenter; and Daniel E. Carpenter.

The facts found by the trial judge supporting disregarding the corporate form (piercing the corporate veil), all of which are supported by the evidence and none of which are challenged by the Benistar defendants in their petition, include the following: There was common ownership of the various corporate entities where Daniel Carpenter owned Benistar Limited, of which BASI was a wholly owned subsidiary, and also owned CFG; either alone or with Molly Carpenter he owned BESTCO; and either Daniel, Daniel and Molly, or Benistar Ltd. owned Benistar Trust.[4] Daniel Carpenter exercised pervasive control over all of the entities, with participation from Molly Carpenter as to the activities of Benistar Trust and substantial participation by Molly Carpenter as to BASI.  There was substantial evidence of a confused intermingling of assets and activities in the form of "a significant number of large fund transfers between and among" all the entities; and "all of these entities had a common principal place or places of business" at two Connecticut addresses. Daniel Carpenter presented the companies "as one group, with a common set of 28 employees and assets of $50 million, and for all of which he, as 'chairman,' was the only person with check-signing authority" for purposes of applying for insurance; the

---

[4] As to U.S. Property, the trial judge found, and the evidence supported, that U.S. Property was "clearly the successor" to Benistar Trust, operating the same business out of the same Newton, Massachusetts office with the same computers and software and the same president, Martin Paley.

3

companies' services were advertised together on the Benistar website; and clients of Benistar Trust "were specifically assured that their money was safe with that company because it was part of Benistar."  As to capitalization, "none of the defendant companies was adequately capitalized for the conduct of legitimate business."  There was a near-total lack of observance of corporate formalities:  While each of the entities was organized as a Delaware corporation, and some appeared to have (form) bylaws, there was no evidence of stockholder or director meetings, the keeping of corporate minutes or other corporate records.  Corporate records were entirely absent.  There was no evidence of payment of dividends.

Benistar Trust was insolvent as of January 2001.  The judge found that "[t]he only officers or directors of any of these corporations, Benistar [Trust] included, who functioned as such, were Daniel and Molly."  Benistar Trust was used as "a source of funds to support Daniel's personal penchant for risky option trading on the stock market," and that Benistar Trust was used to promote fraud.  In light of these factual findings, all supported by the evidence, the conclusion to pierce the corporate veil was more than amply supported.[5]

---

[5] The petition does not press various additional arguments asserted in the defendants' briefs as to the exercise of personal jurisdiction over Molly Carpenter, and we need not address them here.  We note, however, the trial judge properly drew adverse inferences from Molly Carpenter's decision to invoke her Fifth Amendment privilege against self-incrimination in response to

The efforts of the Benistar defendants to insulate
themselves from liability on grounds of corporate form, when all
the corporate forms were created and controlled by Daniel
Carpenter with assistance from Molly Carpenter, are unavailing
under Massachusetts law,[6] a conclusion strengthened by the

---

questions regarding her own contacts with Massachusetts and her
involvement with trading, and converting, the plaintiffs' funds.
In addition there was affirmative evidence that Molly Carpenter,
a director and officer of Benistar Trust, was involved with the
scheme at issue in this case to the extent that she "gave
directions to Merrill Lynch and PaineWebber personnel on a few
occasions with respect to the handling or disposition of certain
funds that Benistar Property either was sending to, or had
previously deposited with, the brokerage firms," and may have
also directed brokers to buy or sell stocks or options with the
Benistar Trust funds.

[6] The defendants claim that Delaware law should control this
issue.  Massachusetts and other authority support the decision of
the trial judge to apply the law of the jurisdiction where the
underlying conduct took place (Massachusetts), rather than the
place of incorporation (Delaware).  See, e.g., Evans v. Multicon
Constr. Corp., 30 Mass. App. Ct. 728, 737 n.7 (1991) (applying
Massachusetts law to issue of piercing corporate veil because
"the place of contracting, the place of negotiation of the
contract, the place of performance of the contract, and the place
of the subject matter of the contract were in Massachusetts").
Even were we to agree that Delaware law should govern, it would
make no difference because there was more than ample
justification for disregarding the corporate form under either
Massachusetts or Delaware law.
     In Massachusetts, the law of piercing the corporate veil
"differs in no material respect from the description in United
States v. Bestfoods, 524 U.S. 51, 62-63 (1998)," Scott v. NG US
1, 450 Mass. 760, 768 (2008).  Delaware law similarly permits a
court to pierce the corporate veil of an entity "where there is
fraud or where [the entity] is in fact a mere instrumentality or
alter ego of its owner."  Geyer v. Ingersoll Publications Co.,
621 A.2d 784, 793 (Del. Ch. 1992). "A subsidiary corporation may
be deemed the alter ego of its corporate parent where there is a
lack of attention to corporate formalities, such as where the
assets of two entities are commingled, and their operations
intertwined. . . [or] where a corporate parent exercises complete
domination and control over its subsidiary." Mobil Oil Corp. v.

adverse inferences correctly drawn from these defendants'
assertion of their Fifth Amendment privileges and refusal to
submit to questioning on issues relevant to personal
jurisdiction.

The fundamental argument of the Benistar defendants in their
petition is that the determination of personal jurisdiction
should be made before and not in light of the trial judge's
findings on piercing the corporate veil.  This is not the law
under either the Massachusetts long-arm statue[7] or the Due
Process clause.  Under Massachusetts law, ownership of a
Massachusetts subsidiary does not, of course, automatically
confer jurisdiction over a parent corporation, Escude Cruz v.
Ortho Pharmaceutical Corp., 619 F.2d 902, 905 (1st Cir. 1980),
nor does jurisdiction over a corporation automatically secure
jurisdiction over its officers.  Kleinerman v. Morse, 26 Mass.
App. Ct. 819, 824 (1989).  However, the combination of
intermingling of officers and directors, and controlling the
operations of a Massachusetts subsidiary, is sufficient to

---

Linear Films, Inc., 718 F. Supp. 260, 266 (D. Del. 1989); see
also Fletcher v. Atex, Inc., 68 F.3d 1451, 1457 (2d Cir. 1995).
As the facts in this case well illustrate, under either
Massachusetts or Delaware law, this case is almost a paradigm for
piercing the corporate veil.

[7] For purposes of this inquiry we apply Massachusetts, not
Delaware, law, regardless of what law applied to the veil-
piercing question.  See, e.g., Good Hope Indus., Inc. v. Ryder
Scott Co., 378 Mass. 1, 5-6 (1979) (explaining Massachusetts law
of personal jurisdiction).

satisfy the long-arm statute.  As the Appeals Court held in

Kleinerman v. Morse, supra at 823:

> "Significant exercise of control by an out-of-State
> parent corporation over a subsidiary and significant
> intermingling of officers and directors between parent and
> subsidiary have served to establish jurisdiction in the
> State where the subsidiary is conducting its business
> operations.  Willis v. American Permac, Inc., 541 F. Supp.
> 118, 122 (D. Mass. 1982).  Cf. My Bread Baking Co. v.
> Cumberland Farms, Inc., 353 Mass. 614, 618-619 (1968).
> Running the operations of a subsidiary in Massachusetts
> constitutes a breadth of business activity that necessarily
> involves exercise of the privilege of conducting business
> here.  Hanson v. Denckla, 357 U.S. 235, 253 (1958).  Compare
> Good Hope Indus. v. Ryder Scott Co., 378 Mass. 1, 6-12
> (1979); Balloon Bouquets, Inc. v. Balloon Telegram Delivery,
> Inc., 18 Mass. App. Ct. 935, 935-936 (1984); Gunner v.
> Elmwood Dodge, Inc., 24 Mass. App. Ct. 96, 100-101 (1987).
> By contrast, ownership alone of the controlling stock of a
> subsidiary does not confer jurisdiction over an out-of-State
> parent corporation if the parent does not exercise control
> over the activities of the subsidiary.  Escude Cruz v. Ortho
> Pharmaceutical Corp., 619 F.2d 902, 905 (1st Cir.1980)."[8]

Despite the efforts of the Benistar defendants to argue

otherwise, Federal due process requirements, which form the

second prong of the personal jurisdiction inquiry, are not to the

contrary.  Here too jurisdiction over a parent corporation does

not "automatically establish jurisdiction over a wholly owned

subsidiary."  Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781

n.13 (1984).  However, where the corporate form may be

disregarded, as it was appropriately done in this case, imputing

the contacts of the subsidiary with the forum state to the parent

---

[8] Although Kleinerman v. Morse, 26 Mass. App. Ct. 819
(1989), does not state its holding in terms of piercing the
corporate veil, piercing the corporate veil requires, if
anything, a higher degree of control and elements of fraudulent
conduct, than does the test in Kleinerman.

comports with due process.  See Epps v. Stewart Info. Servs.
Corp., 327 F.3d 642, 648-649 (8th Cir. 2003); Lakota Girl Scout
Council, Inc. v. Havey Fund-Raising Mgt., Inc., 519 F.2d 634,637
(8th Cir. 1975).

> "Although [the parent], in its own right, lacked sufficient
> minimum contacts with Massachusetts to permit the assertion
> of jurisdiction over its corporate person, [the subsidiary]
> was unarguably subject to the jurisdiction of the
> Massachusetts courts.  Hence, if [the subsidiary]'s contacts
> can be attributed to [the parent], then the jurisdictional
> hurdle can be vaulted."

United Elec., Radio and Mach. Workers of Am. v. 163 Pleasant St.
Corp., 960 F.2d 1080, 1091 (1st Cir. 1992).

Not every case dealing with the question of personal
jurisdiction over nonresident parent corporations invokes the
doctrine of piercing the corporate veil by name.  The underlying
principle, however, is clear.  "Since the essence of personal
jurisdiction is to bring responsible parties before the court, a
corporation which is actually responsible for its subsidiary's
decision to undertake instate activities should, in all fairness,
be within the state courts' jurisdictional reach."  Donatelli v.
National Hockey League, 893 F.2d 459, 466 (1st Cir. 1990).  The
defendants' attempt to circumvent this authority through an
analogy to the purportedly "similar" theory that was rejected in
Rush v. Savchuk, 444 U.S. 320 (1980), is unavailing.  That case
did not involve in any respect piercing the corporate veil,
parent corporations, or subsidiaries.

The relief granted in this case was appropriate where Massachusetts had personal jurisdiction over corporate entities and individuals to whom actions establishing personal jurisdiction in Massachusetts have been attributed.

The petition for rehearing is denied.

By the Court
(Cowin, Botsford, JJ., recused),

*Susan Mellen*

Susan Mellen, Clerk

ENTERED:   June 26, 2008

9

# EXHIBIT
# 4

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH IANTOSCA, BELRIDGE CORPORATION, GAIL A. CAHALY, JEFFREY M. JOHNSTON, BELLMORE ASSOCIATES, LLC, MASSACHUSETTS LUMBER COMPANY, INC., and UNITED STATES OF AMERICA,<br>    Plaintiffs,<br><br>v.<br><br>BENISTAR ADMIN SERVICES, INC., DANIEL CARPENTER, STEP PLAN SERVICES, INC., and BENISTAR 419 PLAN SERVICES, INC.,<br>    Defendants.<br><br>TRAVELERS INSURANCE COMPANY and UNDERWRITERS AT LLOYDS, LONDON,<br>    Reach and Apply Defendants. | Civil Action No. 08-11785-NMG |

## ENTRY OF FINAL JUDGMENT

This case came before the Court for a trial by jury. At trial, the jury found in favor of the plaintiff-by-intervention United States of America (the "United States") and the plaintiffs Joseph Iantosca, individually and as trustee of the Faxon Heights Apartments Realty Trust and Fern Realty Trust, Belridge Corporation, Gail A. Cahaly, Jeffrey M. Johnston, Bellemore Associates, LLC, and Massachusetts Lumbar Company, Inc. (the "Plaintiffs"), and against defendants STEP Plan Services, Inc., Benistar Admin Service, Inc., Benistar 419 Plan Services, Inc., and Daniel Carpenter. (Docket no. 541.) Specifically, the jury found that:

(a) STEP Plan Services, Inc., is the alter ego of Daniel Carpenter or Benistar Admin Services, Inc., such that it is appropriate to disregard their separate corporate identities;

1

9218727.1

Case 3:13-cv-00572-AVC   Document 51-2   Filed 09/04/13   Page 3 of 6

Case 1:08-cv-11785-NMG   Document 588   Filed 06/21/13   Page 2 of 5
Case 1:08-cv-11785-NMG   Document 563-4   Filed 12/07/12   Page 2 of 5

(b) Benistar 419 Plan Services, Inc., is the alter ego of Daniel Carpenter or Benistar Admin Services, Inc., such that it is appropriate to disregard their separate corporate identities;

(c) Daniel Carpenter or Benistar Admin Services, Inc., or any entity which is an alter ego of those defendants, fraudulently conveyed their right, title, and interest in the Pennsylvania Settlement (defined below) to STEP Plan Services, Inc.;

(d) Benistar 419 Plan Services, Inc., was required by law to keep lists of participants in the Benistar 419 Plan during the period from October 23, 2004, to January 20, 2006;

(e) Benistar 419 Plan Services, Inc., did not have "reasonable cause" for failing to provide the IRS with lists of participants in the Benistar 419 Plan for the period from October 23, 2004, to January 20, 2006;

(f) STEP Plan Services, Inc., is the alter ego of Benistar 419 Plan Services, Inc., such that it is appropriate to disregard its separate corporate identity;

(g) Benistar Admin Services, Inc., was required by law to keep lists of participants in the Benistar 419 Plan during the period from October 23, 2004, to January 20, 2006;

(h) Benistar Admin Services, Inc., did not have "reasonable cause" for failing to provide the IRS with lists of participants in the Benistar 419 Plan for the period from October 23, 2004, to January 20, 2006; and

(i) STEP Plan Services, Inc., is the alter ego of Benistar Admin Services, Inc., such that it is appropriate to disregard its separate corporate identity. (Id.)

After trial, the Plaintiffs and the United States reached a compromise of their dispute regarding which of them have priority to apply the proceeds of the Pennsylvania Settlement in which they each have an interest according to the jury's findings.

2

9218727.1

Case 3:13-cv-00572-AVC   Document 51-2   Filed 09/04/13   Page 4 of 6

Case 1:08-cv-11785-NMG   Document 588   Filed 06/21/13   Page 3 of 5
Case 1:08-cv-11785-NMG   Document 563-4   Filed 12/07/12   Page 3 of 5

This case now being ripe for final judgment, it is ORDERED, ADJUDGED, and DECREED as follows:

1.      Benistar Admin Services, Inc., is indebted to the United States for a tax penalty assessed pursuant to 26 U.S.C. § 6708 on July 8, 2009 in the original amount of $1,120,000.00, which constitutes a lien against all property and rights to property of Benistar Admin Services, Inc. The amount owing on that tax penalty is $1,256,859.67 as of September 11, 2012.  Interest continues to accrue on the tax penalty in accordance with 26 U.S.C. §§ 6601, 6621, and 6622.

2.      Benistar 419 Plan Services, Inc., is indebted to the United States for a tax penalty assessed pursuant to 26 U.S.C. § 6708 on July 8, 2009 in the original amount of $1,120,000.00, which constitutes a lien against all property and rights to property of Benistar 419 Plan Services, Inc.  The amount owing on that tax penalty is $1,256,860.09 as of September 11, 2012.  Interest continues to accrue on the tax penalty in accordance with 26 U.S.C. §§ 6601, 6621, and 6622.

3.      STEP Plan Services, Inc., is the alter ego of Benistar Admin Services, Inc., making it indebted to the United States for the tax penalty assessment against Benistar Admin Services, Inc., described in Paragraph 1, above.  Accordingly, the federal tax lien associated with that assessment attaches to all property and rights to property of STEP Plan Services, Inc., including proceeds from the settlement of the case styled *Step Plan Services, Inc.,* et al. *v. Koresko Associates,* Court of Common Pleas of Philadelphia County (Civil Action No. 7718) (the "Pennsylvania Settlement").  Alternatively, because Benistar Admin Services, Inc., and STEP Plan Services, Inc., are alter egos of each other, the Pennsylvania Settlement constitutes an asset of Benistar Admin Services, Inc.

4.      STEP Plan Services, Inc., is the alter ego of Benistar 419 Plan Services, Inc., making it indebted to the United States for the tax penalty assessment against Benistar 419 Plan

9218727.1

Case 3:13-cv-00572-AVC   Document 51-2   Filed 09/04/13   Page 5 of 6
Case 1:08-cv-11785-NMG   Document 588   Filed 06/21/13   Page 4 of 5
Case 1:08-cv-11785-NMG   Document 563-4   Filed 12/07/12   Page 4 of 5

Services, Inc., described in Paragraph 2, above. Accordingly, the federal tax lien associated with that assessment attaches to all property and rights to property of STEP Plan Services, Inc., including the proceeds from the Pennsylvania Settlement. Alternatively, because Benistar 419 Plan Services, Inc., and STEP Plan Services, Inc., are alter egos of each other, the Pennsylvania Settlement constitutes an asset of Benistar 419 Plan Services, Inc.

5.      STEP Plan Services, Inc., is the alter ego of Daniel Carpenter and/or Benistar Admin Services, Inc.

6.      Daniel Carpenter, Benistar Admin Services, Inc., or an entity which is an alter ego of one or both of those defendants, fraudulently transferred their interests in the Pennsylvania Settlement to STEP Plan Services, Inc.

7.      Consistent with the compromise reached between the United States and the Plaintiffs, the United States may take the amount of $750,000 from the proceeds from the Pennsylvania Settlement, plus interest (if any) in accordance with that agreement, in partial satisfaction of the tax penalty liabilities Benistar Admin Services, Inc., and Benistar 419 Plan Services, Inc., described in Paragraphs 1 and 2, above. That amount may be applied as between the tax liabilities of Benistar Admin Services, Inc., and/or Benistar 419 Plan Services, Inc., and to particular liabilities of each, in the discretion of the United States.

8.      Consistent with the compromise reached between the United States and the Plaintiffs, the Plaintiffs are entitled to the remainder of the proceeds from the Pennsylvania Settlement, plus interest (if any) in accordance with that agreement, in partial satisfaction of a judgment against Benistar Admin Services, Inc., and Daniel Carpenter. That amount may be applied as between the judgment against Benistar Admin Services, Inc., and Daniel Carpenter in the discretion of the Plaintiffs.

9218727 1

Case 3:13-cv-00572-AVC   Document 51-2   Filed 09/04/13   Page 6 of 6

Case 1:08-cv-11785-NMG   Document 588   Filed 06/21/13   Page 5 of 5
Case 1:08-cv-11785-NMG   Document 563-4   Filed 12/07/12   Page 5 of 5

9.     The injunction with respect to the Pennsylvania Settlement is dissolved and

reach-and-apply defendants Travelers Insurance Company and Certain Underwriters at Lloyds of

London are to distribute forthwith the amount of $4,550,000 in proceeds from the Pennsylvania

Settlement, plus any interest that has accrued thereon, in accordance with Paragraphs 7 and 8,

above.

10.     All claims not specifically referenced in this judgment are dismissed with

prejudice.

**IT IS SO ORDERED, ADJUDGED, AND DECREED:**


Dated:  June 21, 2013                    _Nathaniel M. Gorton_
                                         Nathaniel M. Gorton
                                         United States District Judge

5

9218727.1

# EXHIBIT
# 5

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CASE NO. 11-1590-LTS-HBP


UNIVERSITAS EDUCATION, LLC

       Plaintiff,


       VS.


NOVA GROUP, INC., as trustee,

sponsor and fiduciary of the

CHARTER OAK TRUST WELFARE

BENEFIT PLAN,

       Defendant.


       JULY 26, 2013

       9:30 a.m.

       DEPOSITION OF PETER A. GOLDMAN


REPORTED BY:

MARY G. VAN DINA, Certified Court Reporter,

Certified LiveNote Reporter

JLM039535

1

2    July 26, 2013

3    10:00 a.m.

4

5        Deposition of PETER A. GOLDMAN, taken by

6    Plaintiffs, pursuant to subpoena, at the offices

7    of LOEB & LOEB, LLP, 345 Park Avenue, New York,

8    New York, before MARY G. VAN DINA, a Certified

9    Shorthand Reporter and Notary Public within and

10   for the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JLM039536

Goldman 7/26/13

1

2      of them.

3              When I say "we," they're so

4      interrelated that, you know, I don't think anyone

5      said, "Oh, yeah, only we keep this."  You know,

6      we need it for everyone.

7          Q.    Well, what do you mean they're so

8      interrelated and you used the hand signal like

9      your hands are interrelated?

10             What do you mean by that gesture?

11         A.    Well, the different entities exchange

12     funds back and forth through bank accounts.  So

13     the appearance is if one entity was short monies,

14     another entity would loan it back and forth in a

15     very -- you know, documentation would be prepared

16     to show that the monies were going back and

17     forth, but it wasn't like they had to go out

18     through some third party and negotiate or

19     anything like that.

20             So when one of the entities needed

21     money or they had excess money and they could pay

22     it back, they used it like that.  They used all

23     the different entities separately.

24         Q.    So let's say intercompany transfers?

25         A.    Yes, and there wasn't -- there was a

1                    Goldman 7/26/13

2       what I'll call a common employer that employed

3       all of these people, so that when you asked about

4       did Nova Group have employees, did Charter Oak

5       have employees, did Grist Mill Capital have

6       employees, they weren't perceived as employees.

7       There was a pool of people that were employed by

8       one employer and that's how they were paid.

9            Q.   That one employer you're referring to,

10      is that Benistar Admin Services, Inc.?

11           A.   Yes.

12           Q.   So in any given year, Amanda Rossi

13      might work on 32 different companies of Dan

14      Carpenter.

15                Correct?

16           A.   I don't know if he has 32, but yes.

17      Whatever needed to get done, they would do for

18      whatever entity it was.

19           Q.   Have you ever seen the corporate chart

20      of companies prepared by the accountants related

21      to Mr. Carpenter's empire?

22           A.   No.

23           Q.   I submit I think 32 is a gross

24      understatement.

25           A.   I have no idea.

# EXHIBIT
# 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO. 04-10029-GAO |
| | ) |
| DANIEL E. CARPENTER, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States submits this memorandum in advance of the December 19, 2005

sentencing hearing in this case.

### Introduction

On July 27, 2005, following a thirteen-day trial, a jury convicted Daniel E. Carpenter

("Carpenter") of nineteen counts of wire and mail fraud, stemming from his misappropriation of

client funds that had been entrusted to his company, Benistar Property Exchange Trust

Company, Inc. ("BPE").  Contrary to representations that the funds would be held in fixed

interest escrow accounts, Carpenter transferred the money to trading accounts, gambled it in

speculative stock options, and lost approximately $9 million.

In anticipation of Carpenter's sentencing, the government submits this memorandum

presenting: (i) a summary of relevant facts; (ii) the government's guidelines computations;

(iii) the government's sentencing recommendation; and (iv) a response to certain departure and

sentencing arguments that the defendant has made to the Probation Office.

### I.    Relevant Facts

The Probation Office's Presentence Report ("PSR") summarizes the principal evidence

JLM038836

that the government introduced at trial.  (PSR ¶¶ 8 - 57).  Rather than repeat that summary here, the government highlights five principal factual points that it believes are material to the Court's sentencing determination:[1]

    A.    Carpenter Is Fully Culpable for His Criminal Conduct.

Carpenter is fully culpable for his criminal conduct, which he undertook in an attempt to enrich himself.

Carpenter knew that clients were entrusting their funds to BPE based on representations that the money would be held in short term, fixed interest escrow accounts and returned to them to complete their 1031 property exchanges.  Carpenter personally participated in BPE's first exchange, was advised in writing by Attorney David Patterson during that exchange of the importance of maintaining the funds' security, and signed an Exchange Agreement and an Escrow Agreement containing such assurances.  (Gov. Exs. 138, 140, 142).

Contrary to these representations, Carpenter misappropriated the client escrow funds by using them to trade in the options market.  He knew full well the associated risks.  Merrill Lynch and PaineWebber warned him of those risks when he opened the trading accounts (Gov. Exs. 145-46, 166-67); he experienced the risks firsthand in the form of millions of dollars in trading losses that he suffered beginning in April, 2000 (Gov. Exs. 196, 206); and yet from August through December of the same year, he took millions more that the victims in this case entrusted to BPE, and proceeded to trade and lose that money as well.  (Id.).  He did so despite the repeated warnings of Merrill Lynch and PaineWebber and the enormous losses he had already sustained.  (Gov. Exs. 152-53, 161-63, 172).

---

[1] The government refers the Court to the PSR for a broader discussion of the evidence.

JLM038837

Carpenter's conduct cannot be justified as "good faith" investments authorized by BPE's clients. The clients received documents and signed agreements stating that their funds would be held in escrow in fixed interest accounts. (Gov. Exs. 1-3, 10-13, 18). They were never told, nor did they authorize, the funds to be traded in high risk options. No reason existed for them ever to suspect that would happen. Sufficient yields were available from U.S. Treasury instruments, money market accounts, and similar vehicles to enable Carpenter to satisfy the rates of interest owed to clients consistent with the escrow representations that BPE had made to them, particularly since the majority of the funds were to be held at 3%. (Gov. Exs. 148D, 168, 208). However, as Carpenter stated in a memorandum dated October 30, 2000, putting BPE's client funds in such prudent holdings would not have yielded profits "worthy of [his] time." (Gov. Ex. 184). So, instead, Carpenter gambled the funds in speculative options trading. He did so for the purpose of enriching himself, by using the escrow money to finance aggressive trading that he hoped would generate substantial profits – profits which, after paying the 3% or 6% interest that BPE owed to clients, Carpenter could then pocket. Id.

That BPE did not collapse until January, 2001 is not a testament to either Carpenter's "good faith" or the "prudence" of his investments, as he now asserts. BPE's ability to continue to close replacement property transactions in the latter part of 2000 was attributable solely to the fact that enough new client money was coming in to pay off existing clients whose funds had (unbeknownst to them) been traded and lost in the market. In essence, Carpenter's conduct was analogous to a Ponzi scheme. As early as April, 2000, Carpenter's trading losses caused BPE to have far less escrow money in its accounts than what it owed to clients. (Gov. Ex. 207). However, Carpenter was able to cover up the sizeable shortfall, and hide what was in fact

3

JLM038838

happening to the money, because enough new clients were being lured in to cover the redemptions owed to earlier clients who had requested their money back.

    B.    Carpenter's Conduct Caused Substantial Harm.

    When Carpenter's scheme finally imploded, his criminal conduct had caused seven victims, collectively, to lose approximately $9 million – money that they (falsely) had been told would be held in escrow but that, in truth, Carpenter misappropriated and traded. (PSR ¶ 172; Gov. Ex. 209). The victim impact statements submitted to Probation describe the resulting harm to these individuals. In addition to the obvious financial impact, Carpenter's conduct has caused substantial additional consequences. Two of the victims are in their eighties; one is in his mid-seventies. These three have been forced to spend some of the final years of their lives dealing with the worry and stress of having lost substantial amounts of their life savings. The remaining victims have experienced considerable harm as well, including one who had to struggle to find financing to replace the lost funds at the same time that he was being treated for cancer and dealing with the birth of a premature daughter. All have suffered collateral financial consequences, in the form of adverse tax penalties, increased financing costs, legal and accounting expenses, and the like – consequences that were foreseeable to Carpenter and that will not be covered by any order of restitution.

    C.    Carpenter Has Displayed No Remorse or Acceptance of Responsibility.

    Through it all, Carpenter had displayed no remorse. He has hired teams of lawyers to mount a bitter defense against parallel civil litigation that the victims filed against him, to wage an equally vigorous defense in this criminal case, and to blame anyone and everyone else for what has happened – from his brokers, who should have saved him from himself, to Martin

4

JLM038839

Paley, whom Carpenter characterizes as the "real" criminal, to government counsel, whose every

action (according to Carpenter) has been tainted by misconduct. Carpenter's transparent

purpose, in every motion he has filed, every continuance he has sought, and every appeal he has

pursued, has been to delay the ultimate day of reckoning for as long as possible, in the hope that

he will outlive and/or outlast his victims.

      D.     Carpenter Has Withheld Financial Information from Probation.

Consistent with the foregoing strategy, Carpenter has not been forthcoming in providing

financial information to Probation. Based on the information contained in the PSR, Carpenter

apparently claims liquid assets of less than $10,000, real estate assets of only $13,000 (held by

his wife), no business assets of any kind, no personal income (although his wife apparently

draws a salary from Benistar), three life insurance policies (characterized as assets of his wife),

and an outstanding civil judgment against him, all of which yields an alleged net worth of

*negative* $129,000. (PSR ¶¶ 148, 150-55).

The PSR reflects no disclosures by Carpenter concerning relevant tax returns (individual

or corporate), no disclosures concerning assets held in the name of his child (or other family

member) or in trust for his child (or other family member), no disclosures concerning the value

or the division of ownership interests in the numerous companies that he has established or with

which he has been associated (a list of those entities is attached at Exhibit 1), virtually no

disclosures concerning assets held in the name of his wife or for her present or future benefit,

and no disclosures concerning the assets on which he and his family have been living, continue

to live, or the sources of the money that he has been using to fund his civil and criminal defense.

According to letters that he has submitted to Probation, Carpenter distributes substantial

5

JLM038840

gifts to Benistar employees (many of whom have written letters on his behalf), makes sizeable

contributions to the prep school that he attended as a boy (and certain other causes) (PSR

¶146A), drives a Cadillac Escalade (with lesser SUV's leased for his wife and daughter) (PSR ¶

152), presumably has paid and continues to pay hundreds of thousands of dollars to his many

lawyers, and yet purportedly has not a single dollar with which to pay restitution.

    E.    Carpenter's Past History Reveals that His Conduct Here Is Not an Anomaly.

In his submissions to Probation, Carpenter has urged full consideration of his life history.

Towards that end, he has submitted approximately 40 supporting letters, which he characterizes

as reflecting, inter alia, a life of "hard work," "charity," and "ethical and law-abiding behavior."

(PSR at 73). It is difficult to evaluate such submissions. Over half are from employees of

Carpenter's business(es), with most of the remainder from family and friends. They plainly are

written to put the defendant in the best possible light. And yet they paint a picture materially at

odds with the conduct that gave rise to the defendant's conviction.

In an effort to probe beyond the letters, the government has conducted some rudimentary

public database searches. Those searches have revealed prior instances of sharp-elbowed

conduct that are tellingly consistent with the behavior displayed by Carpenter in this case, and

that offer insight into an aspect of his character not reflected in the letters he has submitted.

The longest running saga involves the case of Israel v. Carpenter, litigated primarily in

the United States District Court for the Southern District of New York from 1995 to 2004, which

arose out of an acrimonious parting of the ways between Carpenter and two former business

partners. The partners accused Carpenter of reneging on an agreement to pay them the value of

their ownership interests, and filed suit. See Israel v. Carpenter, 2000 WL 1376255 (S.D.N.Y.

JLM038841

(September 25, 2000). The court described a "long and rather tortured history" of litigation that, in the court's words, included conduct by Carpenter "toward the plaintiffs and others [that] has often been characterized by threats of retribution whenever someone takes a position that he perceives to be contrary to his interests." 2000 WL 1376255 at *7. The court then listed a series of examples of such "bullying" conduct by Carpenter, including threats of "Thermonuclear War" and "one last chance to get out before you and your family spend the next 7 years on the wrong side of a lawsuit." Id. Carpenter lost the case and, according to the factual summaries of various judicial decisions, apparently fought the nearly half-million dollar judgment (more, with interest) for years, through appeals, "frivolous" motions (see 2001 WL 1159631 (S.D.N.Y. October 1, 2001)), and questionable assertions concerning the nature and value of his assets. See 2002 WL 1424594 (S.D.N.Y. June 28, 2002). When in April, 2004, the plaintiffs finally located and obtained a writ of execution against property held by Carpenter in Florida, Carpenter promptly conveyed the land to his sister for $0, following which she proceeded to encumber it with mortgages held by various Carpenter-controlled businesses, presumably in an effort to so dissipate the value that the plaintiffs would effectively recover nothing. (See Property Transfer Records at Exhibit 2; PSR at 40).

Carpenter has employed similarly aggressive tactics in other disputes. E.g., Daniels v. Wayne Bursey, Daniel Carpenter, et al., 2004 WL 1144046, *1 (N.D. Ill. 2004) (deploring the parties' "level of invective," which the court described as having "far exceeded" virtually anything the judge had seen during years of practice or on the bench); Amresco v. John Olson, Daniel Carpenter, et al., 147 F.3d 179 (2d Cir. 1997) (detailing aggressive maneuvers employed by Carpenter in an attempt to evade claims (and dissolve an associated lien) filed against him).

7

JLM038842

Carpenter has exhibited similar behavior here, both in the greed and arrogance that motivated the conduct giving rise to his convictions, and the manner in which he has responded to the civil and criminal actions filed against him. If past is prologue, the dearth of financial information provided by Carpenter to Probation likely presages the next phase of this case, which will consist of Carpenter's fierce resistance to paying restitution.

All of the foregoing is equally relevant to assessing Carpenter's "history and characteristics." It indicates, unfortunately, that the conduct at issue in this case does not represent an anomalous occurrence.

## II.   **Application of the Sentencing Guidelines**

### A.   Statutory Maximums

The applicable statutory maximums on each of counts one through nineteen of the indictment are:

1. No more than five years imprisonment;
2. A fine of up to $250,000;
3. Special assessment of $100;
4. Three years supervised release; and
5. Mandatory restitution to the victims.

(PSR ¶¶ 156-173).

### B.   Guidelines Computation

The applicable Guidelines Manual, which was the Manual in effect at the time of the offense, is the November, 2000 edition. Application of this Manual yields the following Guidelines computations:

8

JLM038843

| Base Offense Level | 6 | U.S.S.G. §2F1.1(a) |
|---|---|---|
| Increase for Loss of More than $5 million and less than $10 million | 14 | U.S.S.G. §2F1.1(b)(1)(O) |
| More than minimal planning | 2 | U.S.S.G. §2F1.1(b)(2) |
| Abuse of position of trust | 2 | U.S.S.G. §3B1.3 |
| **FINAL OFFENSE LEVEL** | **24** | |
| *Guidelines Sentencing Range* | *51-63 months* | |
| *Restitution* | $9,040,686.00 | U.S.S.G. §5E1.1 |
| *Applicable Fine* | $10,000 - $100,000 | U.S.S.G. §5E1.2 |

Probation concurs with the foregoing computations. (PSR ¶¶ 101-113).

Carpenter disputes each of the enhancements as well as the restitution amount. For the reasons discussed below, his arguments are without merit.

1.    Loss/Restitution

Application Note 8 to U.S.S.G. §2F1.1 states that "loss is the value of the money, property, or services unlawfully taken." Here, the indictment charged and the jury convicted Carpenter of having engaged in a fraudulent scheme pursuant to which victims were induced to entrust money to BPE based, inter alia, on false representations that the money would be held in short term, fixed interest escrow accounts and returned to them so that they could complete their 1031 exchanges. The "value of the money . . . unlawfully taken" consists of the amount of the funds that the victims fraudulently were induced to entrust to Carpenter's company – funds that were never returned to them and that they never would have given BPE had they been told the money would be traded in options. That sum, collectively, for the seven victims referenced in the indictment, totals $9,040,686.00. (PSR ¶ 172; Gov. Ex. 209).

9

JLM038844

Carpenter strives to characterize the victims' $9 million loss as consequential damages flowing from extrinsic events for which he is not criminally culpable. (PSR at 78-81, 84-86). This argument is unavailing. There is nothing "consequential" or "extrinsic" about the $9 million amount. That figure represents the <u>direct</u> sum that the victims were fraudulently induced to give Carpenter's company and that he knowingly took, gambled, and lost in high risk options trading, contrary to the representations that had been made to the victims. Probation concurs in this assessment. (PSR at 81-82, 87).

There are substantial additional damages that the victims suffered over and above their $9 million in direct losses, including tax penalties, replacement financing costs, foregone interest, and attorney's fees. These additional damages, which are detailed in the victim impact statements, are not included in the government's loss or restitution computations.

Pursuant to 18 U.S.C. §§ 3663A and 3664(f)(1)(A), restitution is mandatory and shall be ordered in the full amount of each victim's loss. The PSR sets forth those loss amounts in paragraph 172.[2]

2.    More than Minimal Planning

Application Note 1(f) to U.S.S.G. § 1B1.1 states, in relevant part, that "'More than minimal planning' is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune. Consequently, this adjustment will

---

[2] The government notes that civil litigation and arbitration proceedings remain pending between, <u>inter alia</u>, certain of the victims and Merrill Lynch and PaineWebber. Pursuant to 18 U.S.C. § 3664(j)(1), if any of the victims ultimately receives compensation from any third party source, the court "shall order that restitution be paid to the person who provided . . . the compensation . . . provided that all restitution of victims . . . be paid . . . before any restitution is paid to such a provider of compensation." The government requests that the Court incorporate by reference into its restitution order the requirements of § 3664(j)(1).

10

JLM038845

apply especially frequently in property offenses."

Here, Carpenter's fraudulent conduct commenced no later than October, 1998, when he directly participated in inducing BPE's first client to entrust her funds to Carpenter's company based on false representations that the money would be held in a short term, fixed interest escrow account. In fact, Carpenter simultaneously, and without disclosure to that client or any other client, was opening up a speculative options trading account at Merrill Lynch into which he transferred and traded client funds. (Gov. Ex. 144).

Thereafter, Carpenter's conduct continued through the end of 2000, including, most notably, the period from April through December, 2000, when Carpenter, on virtually a daily basis, made aggressive, speculative bets on high risk options trades and lost millions of dollars in client funds, despite the repeated warnings of Merrill Lynch and, later, PaineWebber. (Gov. Exs. 148, 168). Such repeated acts, over an extended period of time, pursuant to a long running scheme in which clients were fraudulently induced to entrust their funds to Carpenter's company, constitute the essence of "more than minimal planning." See PSR ¶ 107. E.g., United States v. Colon-Munoz, 318 F.3d 348, 362-363 (1st Cir. 2003); United States v. Chapman, 241 F.3d 57, 61-62 (1st Cir. 2001).

   3.   Abuse of Position of Trust

Carpenter's conduct also falls squarely within the Guidelines enhancement applicable to offenses involving the abuse of a position of trust. The escrow relationship supposedly formed between BPE and its clients was, by definition, one of trust. Indeed, Benistar's web site included among its "Frequently Asked Questions" the following query: "Can I trust Benistar Property Exchange with my money?" (Gov. Ex. 185). The company's answer to that question was an

11

JLM038846

unequivocal "yes," backed by representations, assurances, and written commitments that client funds would be held in escrow in fixed interest accounts and then returned. Carpenter utilized his position as BPE Chairman, and the unfettered control that he exercised over BPE's accounts, to abuse that trust by misappropriating the money. His conduct was closely analogous to the example given in Application Note 1 to U.S.S.G. § 3B1.1, which states that the abuse of trust enhancement applies to situations such as the embezzlement of a client's funds by an attorney serving as a guardian.

Here, Carpenter, through his company, was serving as an escrow agent rather than as a guardian, but his conduct was the functional equivalent. He occupied a position of trust characterized by considerable unchecked authority over BPE's client funds, and he used that authority to facilitate his misappropriation of the monies that BPE had pledged to hold in escrow. The enhancement properly applies. See PSR ¶ 108.

## III.    The Government's Sentencing Recommendation

Pursuant to the foregoing guidelines computations, Carpenter's GSR is 51-63 months. The government recommends a sentence of 60 months, which falls in the upper quadrant of the applicable range, together with three years supervised release, a special assessment of $1,900, restitution in the amount of $9,040,686.00, and a fine of $75,000.

Without repeating the discussion set forth above, Carpenter's conduct was egregious; the harm inflicted was severe; and the defendant remains unrepentant, indeed, defiant in resisting all efforts to hold him accountable for his conduct and secure restitution for the victims.

12

JLM038847

IV.   **Other Sentencing Matters**

    A.      Oral Statements by Victims

       The government is informed that at least three and perhaps five of the victims in this case

wish to make an oral statement at the sentencing hearing either personally or through a

representative, pursuant to their rights under the Justice for All Act of 2004.  See 18 U.S.C.

§§ 3771(a)(4) and 3771(d)(1).  The government expects the statements to be brief.

    B.      Downward Departures

       Carpenter has not (yet) filed a motion for downward departure.  Based on defendant's

submissions to Probation, however (see PSR at 54-75), the government anticipates that

Carpenter will raise the following arguments.  In the event that Carpenter supplements the

arguments that he made to Probation with a formal departure motion, the government requests

the opportunity to file an opposition.

    1.      Carpenter's Offenses Do Not Fall Outside the "Heartland" (PSR at 54)

       The Sentencing Commission has approved of "heartland" departures under limited

circumstances, stating that it "does not foreclose the possibility of an extraordinary case that,

because of a combination of . . . characteristics or circumstances [not ordinarily relevant to a

departure], differs significantly from the 'heartland' cases covered by the guidelines in a way

that is important to the statutory purposes of sentencing, even though none of the characteristics

or circumstances individually distinguishes the case." U.S.S.G. § 5K2.0, commentary.  The

Sentencing Commission has emphasized, however, that cases where this kind of departure is

appropriate "will be extremely rare." U.S.S.G. § 5K2.0, commentary.

       This is not such a case.  The conduct for which Carpenter was charged and convicted – a

JLM038848

fraudulent scheme, which induced victims to entrust their funds to the defendant's control, followed by the defendant's misappropriation of those funds to engage in high risk, speculative trading – is not unique. That Carpenter failed in his attempts to enrich himself by speculating with other people's funds, and that he lost all the money, is all too common as well. No support exists for Carpenter's assertion that this case falls outside the "heartland."

    2.    The Loss Amount Does Not Overstate the Seriousness of the Offense (PSR at 56)

Carpenter advances two "loss overstates" arguments. Neither fits within the type of fact pattern that the Sentencing Commission or the First Circuit has recognized as potentially justifying a "loss overstates seriousness" departure.

First, the sentencing guidelines provide that, "*in a few instances*, the loss determined under subsection (b)(1) [the loss table] may overstate the seriousness of the offense." U.S.S.G. §2F1.1, app. note 11 (emphasis supplied). By way of example, the Sentencing Commission points to a situation such as an attempted scheme to defraud that was "so obviously fraudulent" that it never could have worked. In such circumstances, a Court may consider whether the loss overstates the seriousness of the offense. Id.

Here, of course, the loss numbers are not based on a mere attempt but rather on actual losses. Moreover, the losses resulted from Carpenter's intentional conduct in using client escrow funds to engage in speculative options trading whose substantial risks were repeatedly disclosed to him in warnings issued by Merrill Lynch and PaineWebber. Notwithstanding those warnings, notwithstanding the millions of dollars in trading losses that he suffered beginning in April, 2000, notwithstanding Merrill Lynch's termination of his trading privileges, and notwithstanding the enormous losses he thereafter continued to suffer at PaineWebber, Carpenter knowingly and

14

JLM038849

willfully persisted in gambling and losing client escrow monies in high risk options trades. By the fall of 2000, when virtually all of the victim funds at issue in this case were transmitted, misappropriated, traded, and lost, Carpenter cannot credibly claim ignorance, and he cannot credibly claim good faith – a defense on which the jury was instructed and which, through its verdict, it plainly rejected. Rather, the evidence established that Carpenter chose to increase the magnitude of his bets in the options market because, as he stated in his October 30, 2000 memorandum to Martin Paley (Gov. Ex. 184), handling the money prudently would not have yielded profits "worthy of [his] time." In no way do the losses overstate Carpenter's culpability in this case. His actions were knowing, they spanned a lengthy period of time, they were egregious, and they caused enormous harm.

Second, Carpenter's "multiple causation" argument is similarly without merit.[3] Carpenter cannot evade culpability for the victims' losses in this case by striving to blame them on "economic and political forces beyond [his] control." (PSR at 58). It was within Carpenter's control not to breach the representations made to BPE's clients that their funds would be held in escrow in fixed interest accounts; it was within his control not to misappropriate the monies, in an attempt to enrich himself, by gambling them in high risk stock options; and it was within his control to wake up to the enormous losses he suffered beginning in April, 2000, heed his brokers' repeated warnings, and put the remaining money (and all new money that subsequently came in) into the escrow accounts in which it should have been maintained from the outset. In

---

[3] The First Circuit has recognized that a downward departure may be warranted under U.S.S.G. § 2F1.1 where a fraudulent misrepresentation is "not the sole cause of the loss." United States v. Rostoff, 53 F.3d 398, 405 (1st Cir. 1995); see also United States v. Bennett, 60 F.3d 902, 905 (1st Cir. 1995).

JLM038850

sum, as the Probation Office observes, "the overwhelming contributing factor for the loss in this case was not the significant decline in the stock market, but rather the placement of BPE client funds in the speculative options market, a market in which the placement of client funds was neither intended nor authorized by BPE clients." (PSR at 60). Put succinctly, it is Carpenter's criminal conduct that caused the losses, and he bears full culpability for the entire amount.[4]

3.    Carpenter's Civic Contributions Do Not Warrant a Departure (PSR at 60)

Charitable work and community service are discouraged factors under the Sentencing Guidelines. U.S.S.G. § 5H1.11; United States v. DeMasi, 40 F.3d 1306, 1324 (1st Cir. 1994). Accordingly, such activities can serve as the basis for a downward departure only where the defendant's charitable deeds are truly extraordinary in nature. E.g., Koon v. United States, 518 U.S. 81, 92 (1996); United States v. Rivera, 994 F.2d 942, 948 (1st Cir. 1993). Carpenter fails to clear this threshold. The community contributions that he lists, which consist principally of various soccer and sports programs and donations to the prep school that he attended as a boy (see PSR ¶ 146A), are not "exceptional" for local businessmen, particularly one of Carpenter's wealth. As such, they do not justify a downward departure. E.g., United States v. Thurston, 358 F.3d 51, 79-81 (1st Cir. 2004) ("Those who donate large sums because they can should not gain an advantage over those who do not make such donations because they cannot."), remanded for further consideration in light of U.S. v. Booker, 125 S. Ct. 984 (2005); United States v. Morken, 133 F.3d 628, 630 (8th Cir. 1998) (defendant's community activities, which included service on

---

[4] The government also notes that the $9 million loss amount is close to the upper end of the applicable guidelines range. The Court would need to find the loss to be "overstated" by approximately 44%, from $9 million down to below $5 million, to drop to the next lower offense level. The facts do not support such a finding.

JLM038851

his church council and raising money for charity, although laudable, were neither exceptional

nor out of the ordinary for someone of the defendant's income and preeminence in his town);

United States v. Crouse, 145 F.3d 786, 792 (6th Cir. 1998) (similar); United States v. Kohlbach,

38 F.3d 832, 838 (6th Cir. 1994) (deeming it "usual and ordinary" in white-collar crimes

involving executives to find that a defendant was involved as a leader in community charities,

civic organizations, and church efforts); United States v. Haversat, 22 F.3d 790, 796 (8th Cir.

1994) (similar).

4.     No Departure Is Warranted Based on Harm to Third Parties (PSR at 61)

In United States v. Olbres, 99 F.3d 28 (1st Cir. 1996), the First Circuit held that a

sentencing court is permitted to consider "whether a case is so unusual as to warrant a downward

departure based on the loss of jobs to innocent employees occasioned by the imprisonment of the

defendant owner of a small business." Id. at 29; see also United States v. Milikowsky, 65 F.3d 4,

9 (2d Cir. 1995) ("departure may be warranted where . . . imprisonment would impose

extraordinary hardship on employees"). Although acknowledging the possibility of such a

departure, the First Circuit observed that:

> It is a rare case which does fall outside. As courts have
> recognized, incarceration of a defendant inevitably means that the
> defendant will no longer be employed in his previous position and
> that fact inevitably will have consequences . . . The mere fact that
> innocent others will themselves be disadvantaged by the
> defendants' imprisonment is not alone enough to take a case out of
> the heartland. These issues are matters of degree, involving
> qualitative and quantitative judgments.

Id. at 36. Other courts have similarly observed that such "business failure" departures should

rarely be granted. See United States v. Sharapan, 13 F.3d 781, 785 (3d Cir. 1994) (there is

"nothing extraordinary" about the claim that defendant's imprisonment "may cause harm to the

JLM038852

business and its employees; the same is presumably true in a great many cases in which the principal of a small business is jailed"); United States v. Rutana, 932 F.2d 1155, 1158 (6th Cir. 1991) (there is "nothing special" about an industrial polluter who happens to be an employer because the "very nature of the crime dictates that many defendants will likely be employers, whose imprisonment may potentially impose hardship upon their employees"). In short, ownership of a small business does not entitle one to an automatic get out of jail free card. A defendant must demonstrate the existence of facts that take his case outside the heartland of typical white collar defendants.

Carpenter has failed to do so here. The situation that he faces is the same as that posed in any other case where the principal of a small business is facing incarceration.

The government also notes the material inconsistency that exists between the assertions that Carpenter makes in support of his departure argument – that he is indispensable to Benistar's continued existence – and the representations that he has made in other contexts for other purposes. Carpenter has stated to Probation that he has removed himself from Benistar's daily operations (PSR ¶¶ 147-48). He states that his wife has had to convince clients that he is no longer affiliated with the company in order to secure the clients' business. (PSR ¶ 132). He lists no controlling or ownership interest in the business among his assets. (PSR ¶¶ 150-53).

Having made these representations, Carpenter cannot now assert that he is so integrally involved in the running of Benistar that the company will fail lest he receive a departure.

5. The Purposes of Sentencing Have Not Been Satisfied. (PSR at 64)

Carpenter has not served a day in prison. He has not paid a dime towards the $9 million in restitution that he owes. He exhibits no remorse, no repentance, and has accepted no

JLM038853

responsibility for the offenses for which he has been convicted. There seems little doubt that should he receive a departure of any kind, he will trumpet that as vindication for his insistence that he did nothing wrong. The purposes of sentencing have emphatically not been satisfied – not punishment, not deterrence, and not respect for the law.

6.     Carpenter Cannot Use Paley To Justify a Downward Departure (PSR at 66)

Carpenter's attempt to invoke Martin Paley as justification for a downward departure is factually and legally deficient.

As a factual matter, Carpenter and Paley are not similarly situated. Carpenter, not Paley, was responsible for handling the client escrow funds. Carpenter is the one who set up the undisclosed Merrill Lynch and PaineWebber trading accounts to engage in speculative/aggressive options trading. (Gov. Exs. 144-46, 164-66). He is the one who transferred client funds into those accounts and thereafter conducted the trading. (Gov. Exs. 150, 171). He received the warnings concerning the risks. (Gov. Exs. 145-46, 165-66). He received the account statements showing the magnitude of the losses. (Gov. Exs. 148, 168). He is the one who continued to trade notwithstanding the warnings and the losses.

Paley, by contrast, had no authority over the accounts and no involvement in the trading. His responsibilities involved the property exchange side of BPE's business, not the financial side. For the most part, clients wired their escrow monies directly into the Carpenter-controlled accounts. Paley left that money entirely in the hands of Carpenter and his company – precisely the same arrangement that Paley had used, without incident, with Nationwide Property

19

JLM038854

Exchange, the company with which he had been affiliated prior to Benistar. (Tr. 7:108).[5]

Consistent with the foregoing, Carpenter acknowledged in early January, 2001, during the throes of BPE's demise, that "It's definitely not Marty Paley's fault." (Gov. Ex. 114 and 114A). Upon the commencement of this case, however, Carpenter reversed course. Suddenly, Paley became the sole culpable party, and the focus of Carpenter's defense became breaking Paley down on cross-examination.

Many witnesses would not hold up well under such circumstances, and Paley did not. That Paley crumpled under a relentless cross-examination, however, does not render him the criminal conspirator that Carpenter seeks to portray. The two men's demeanor in the courtroom made plain who has the commanding personality and was in charge, and who was not. The evidence introduced at trial – which established that Carpenter's approval was required on all material matters and that he had final authority – corroborated that fact. (Gov. Ex. 179; Tr. 2:134, 3:52, 7:115-19, 7:126-28). Paley may have been – to use the vernacular – a dupe and perhaps even a dope, too quick to defer to an overbearing figure such as Carpenter and without the backbone to ask the questions he should have asked. That is not reason to charge him, however, much less treat him and Carpenter as similarly situated. They are not.

Carpenter's arguments also suffer from multiple legal deficiencies. As a matter of Guidelines law, the First Circuit has made clear that even if Carpenter and Paley were similarly

---

[5] Paley subsequently stated that he thought the clients' principal was safe – that he believed any trading in which Carpenter was engaged involved only the "spread" – i.e., the surplus interest resulting from the difference between the rate that Merrill Lynch and Paine Webber paid on the accounts, and the 3% or 6% that BPE was obligated to pay its clients. (Tr. 8:22-23.

JLM038855

situated co-defendants – which they are not – a departure is not warranted to equalize their two

outcomes. E.g., United States v. Wogan, 938 F.2d 1446, 1448-49 (1st Cir. 1991); see also

Thurston, 358 F.3d at 78. Whatever the law might be elsewhere, including in the Sixth and

Ninth Circuits (to which Carpenter heavily cites), the First Circuit has held that Congress'

objective in enacting the Sentencing Guidelines was to eliminate "*nationwide* disparity among

equivalent offenders." Id. at 1449 (emphasis in original). Contrary to this objective, reducing a

defendant's sentence below the GSR to equalize it with that of a co-defendant "promotes, rather

than reduces nationwide disparities" by creating a new disparity between the defendant's

sentence and "'that of all similarly situated defendants throughout the country.'" Id. (quoting

United States v. Joyner, 924 F.2d 454, 459-61 (2d Cir. 1991)). Congress' "chief concern," the

First Circuit concluded, "was to safeguard the macrocosm of the sentencing universe from

differential treatment, even if, occasionally, that valued prophylaxis might be attained at the

expense of some disparity within a particular microcosm of the sentencing universe." Id.

Post-Booker, the same reasoning applies with equal strength to 18 U.S.C. § 3553(a)(6),

which instructs courts to consider, in imposing sentence, "the need to avoid unwarranted

sentence disparities among defendants with similar records who have been found guilty of

similar conduct." The government submits that section 3553(a)(6) is most properly viewed as

safeguarding against disparities, per Wogan's language, across the "macrocosm of the sentencing

universe."

Finally, the government notes certain separation of powers concerns that are implicated

by Carpenter's arguments. Carpenter's contentions, as applied to this case, go beyond the issue

addressed in Wogan, which is whether one convicted defendant should receive a below-

JLM038856

Guidelines sentence because another convicted defendant benefitted from one. Rather, Carpenter effectively asks the Court to second-guess the government's charging decision and deem it an injustice – to be rectified by a departure – that Paley was not charged at all. Carpenter's request, which asks the Court to alter its sentence based on an assessment of a charging decision to which it was not privy, is unwarranted. Carpenter should be sentenced, as he was tried and convicted, on the basis of the conduct for which he is individually culpable.

      7.    <u>No Support Exists for a Family Circumstances Departure (PSR at 67)</u>

Carpenter also seeks a departure for "extraordinary family responsibilities," asserting that he has both a college-aged daughter and elderly parents to whom he provides assistance. This argument also is unavailing.

In <u>United States v. Pereira</u>, 272 F.3d 76 (1st Cir. 2001), the First Circuit made clear that family hardship is neither atypical nor unusual when a family member is incarcerated. For this reason, such hardships – without more – cannot justify a departure under U.S.S.G. § 5H1.6. <u>Pereira</u>, 272 F.3d at 80-83.

By way of illustration, the First Circuit cited in <u>Pereira</u> to a series of appellate cases in which considerable family hardships – both financial and emotional – had been deemed insufficient to take defendants out of the "heartland." The cases included situations such as: (1) the imprisonment of both the mother and father of a four-year old child, <u>United States v. Carr</u>, 932 F.2d 67 (1st Cir. 1991) (not extraordinary; vacating departure); (2) a defendant with a neurologically impaired nine-year old son and a wife with fragile mental health, <u>United States v. Rybicki</u>, 96 F.3d 754 (4th Cir. 1996) (not extraordinary; vacating departure); (3) a defendant who was a single mother and the sole provider for five children, one of whom had a substantial

22

JLM038857

neurological impairment, <u>United States v. Sweeting</u>, 213 F.3d 95 (3d Cir. 2000) (not

extraordinary; no departure); (4) a defendant who supported three children and had a wife with

depressive disorder and panic attacks, <u>United States v. Goff</u>, 20 F.3d 918, 921 (8th Cir. 1994)

(no departure warranted); and (5) a defendant who was a single mother with three children under

the age of four, where incarceration would require placing the children in foster care, <u>United

States v. Dyce</u>, 91 F.3d 1462 (D.C. Cir. 1996) (not extraordinary; vacating departure).

As the First Circuit held in <u>Pereira</u>, in view of the significant hardships that courts have

deemed to lie within the "heartland," Carpenter cannot supportably contend that his situation

should for some reason be found extraordinary. It is not. He has one child, who is in college.

And he has two siblings in the United States, including a sister in New York, who can assist in

taking care of his elderly parents. (PSR at 68).

    8.    <u>No Basis Exists for Carpenter's Claim of Government Misconduct</u> (PSR at 68)

The United States previously has addressed, at length, Carpenter's unsupported claims of

government misconduct. There were no discovery violations, no <u>Napue</u> violation, and no

shifting of prosecution theories mid-trial, to the purported detriment of Carpenter's theory of

defense. <u>See</u> Government's Opposition to Defendant's Motion to Set Aside the Verdict and

Grant a New Trial, at 5-10.

    9.    <u>No Departure is Warranted Based on the Totality of Circumstances</u> (PSR at 69)

Carpenter's request for a "combination" departure based on the "totality of the

circumstances" is equally unsupported.

The sentencing commission has approved of "combination" departures under limited

circumstances, stating that it "does not foreclose the possibility of an extraordinary case that,

JLM038858

because of a combination of . . . characteristics or circumstances [not ordinarily relevant to a departure], differs significantly from the 'heartland' cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case." U.S.S.G. § 5K2.0, commentary. The sentencing commission has emphasized, however, that cases where this kind of departure is appropriate "will be extremely rare." U.S.S.G. § 5K2.0, commentary.

This is not such a case. Carpenter was convicted in connection with a fraudulent scheme pursuant to which he misappropriated and traded client escrow funds in the options market in an effort to enrich himself. By all accounts, at the time of the offense, he ran a profitable business with ties to the local community. His apparent motive was to add to his wealth. Such facts are not unique, whether viewed in isolation or in combination. No downward departure is warranted. E.g., United States v. Rushby, 936 F.2d 41, 43 (1st Cir. 1991) (defendant's solid employment history and family responsibilities, "whether taken separately or together", did not justify a departure); see also United States v. DeBeir, 186 F.3d 561, 573-74 (4th Cir. 1999) (departure based on variety of factors, including defendant's education, strong employment history, efforts at rehabilitation and remorse, was abuse of discretion); United States v. Winters, 174 F.3d 478, 485 (5th Cir. 1999) (sentencing judge abused discretion by departing based on combination of factors, including defendant's 15-year employment history and family ties); United States v. Weise, 128 F.3d 672, 674-75 (8th Cir. 1997) (departure based on defendant's four and one half year employment record and fact that he supported four children was abuse of discretion).

JLM038859

C.     Section 3553(a) Factors

Carpenter's final sentencing arguments invoke the factors set forth in 18 U.S.C. §
3553(a) to contend that the Court should impose a sentence of probation, rather than the 51-63
months of imprisonment called for by the applicable Guidelines Sentencing Range. (PSR at 70-
74).

In support of this contention, Carpenter harkens back to virtually every theory of defense
that he advanced at trial and virtually every departure argument that he made to Probation. All
of it can be distilled into three basic assertions: (1) he committed no crime; (2) it's all Paley's
fault; and (3) he has suffered enough.

To these assertions, the government offers three responses: (1) Carpenter defrauded
seven individuals of $9 million in a scheme whose sole purpose was to enrich himself by putting
other people's money at risk; (2) the jury rejected every one of his defenses and convicted him
on all counts after a full trial; and (3) Carpenter has served no jail time, returned none of the $9
million, and given every indication that he will exhaust every civil and criminal avenue available
to him, hide every asset, and remain defiant and unrepentant to the end.

Carpenter has advanced no justification, either under a departure analysis or under
section 3553(a), for imposing a sentence below the applicable GSR. To the contrary,
Carpenter's conduct warrants a sentence in the upper quadrant of the range.

**Conclusion**

For the foregoing reasons, the United States requests that the Court impose a sentence of
60 months imprisonment, three years supervised release, a special assessment of $1,900,
restitution in the amount of $9,040,686.00, and a fine of $75,000.

25

JLM038860

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:

  **/s/ Michael J. Pineault**
Michael J. Pineault
Jonathan Mitchell
Assistant U.S. Attorneys
U.S. Courthouse, Suite 9200
1 Courthouse Way
Boston, MA 02210

Date: December 14, 2005

JLM038861

Government's Sentencing Memorandum

## **EXHIBIT 1**

### LIST OF COMPANIES[1]

Abigail Partners, LLC
Alaska Pacific Acquisition Group, Inc.
Alaska Pacific Corporation
Avon Capital LLC
Benefit Concepts, Inc.
Benefit Concepts New York, Inc.
Benefits Concepts Systems Inc.
BCNY, Inc.
BCNY Systems, Inc.
Benistar, Ltd.
Benistar Group, Ltd.
Benistar Corporation
Benistar Employer Services Trust Co., Inc.
Benistar Admin Services, Inc.
Benistar Insurance Group, Inc.
Benistar Capital, LLC
Benistar 419 Plan Services, Inc.
Benistar Step Plan Services, Inc.
Caroline Financial Group, Inc.
Cohen Family Charitable Foundation, Inc.
Florida Air, Inc.
Frace Carpenter & Co., Inc.
GIC Asset Management Corp.
Health Resource Organization, Inc.
National Telcom PCS, Inc.
National Telecom, Inc.
Nova Group Business Trust
The ESOP Group, Inc.
T.P.G. Group, Inc.
United Health Care Organization, Inc.
Voluntary Benefit Systems, Inc.

---

[1] Based on database searches conducted by the government to date, each of the above-listed entities appears to have been associated with Carpenter. It is unclear, at present, which of the entities remains active and what his current relationship with such entities might be.

JLM038862

# EXHIBIT 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10029-GAO |
| | ) | |
| DANIEL E. CARPENTER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## GOVERNMENT'S OPPOSITION
## TO THE DEFENDANT'S REQUEST TO TRAVEL INTERNATIONALLY

The government hereby opposes the "Defendant's Emergency Motion to Modify Conditions of Release to Allow International Travel and For Return of Passport" (Docket Number 361), in which Carpenter seeks the return of his passport and permission to travel internationally without limitation.  Carpenter's motion is materially identical to the one the Court denied before the second trial in this case, and it is the third time he has made the request.  *See* Docket Numbers 203 and 238.  He offers little reason to believe that circumstances now are so different as to warrant the extraordinary step of allowing an indicted, and now twice convicted, defendant to leave the United States during the pendency of his case.  The Court should reject Carpenter's motion for the same reasons it did last time.

First, possession of a passport and the freedom to travel internationally inherently elevate the risk of flight, particularly given the difficulty of tracking an individual's movements outside the United States and the number of countries who will not extradite for non-violent offenses.  It is thus rare for federal defendants to be permitted any international travel, and virtually unheard of for them to have, as Carpenter now seeks, unfettered access to their passport and an unrestricted right to travel whenever and wherever they wish.  The risk of international flight is

JLM038864

perhaps highest among white collar offenders like Carpenter, who have the means and the wherewithal to remain outside the United States for the long run. Indeed, just in the last year, two white collar offenders prosecuted in this courthouse fled the District after their convictions. *See United States v. Albania Deleon*, 07-CR-10277-NMG (arrest warrant issued on March 23, 2009); *United States v. Chuong Van Duong*, 03-CR-10363-RGS (arrest warrant issued on May 29, 2009).

Second, even if Carpenter's request were limited to the trips he wishes to take in the next few months, Carpenter offers little to substantiate their purported necessity. He does not explain in any detail why attending business conferences in England, or taking soccer trip to South Africa, are essential to his earning a living. Unlike other defendants who wish to have the court loosen their conditions of release so that they may work, Carpenter does not appear unable to foot his living expenses. His recent admission that he has spent over $10,000,000 on legal fees in connection with this case and related litigation suggests that money is not a problem for him in the way that it is for other defendants. *See* Docket Number 355, Exhibit 3 at 6. Moreover, Carpenter's travel is not restricted within the United States; he may travel anywhere in the country for either business or pleasure. He offers the Court no reason to conclude that suitable business opportunities are not available to him here.

Third, nothing has changed that would warrant revisiting his travel restrictions. If anything, Carpenter has a greater incentive to flee now, having been convicted on all counts by two different juries and facing a significant Guidelines sentencing range. To the extent that his motion argues that matters are now different on account of the evidence that Merrill Lynch recently produced to Carpenter, for the reasons set forth in the government's response to

2

JLM038865

Carpenter's new evidence motion (Docket Number 357), the new evidence does not alter the equation.

Fourth, as stated on other occasions, the government has serious concerns about the completeness and the truthfulness of Carpenter's representations to Probation and the Court about his assets and his business dealings. According to the PSR prepared after the first trial, Carpenter disclosed no personal income, no business holdings, no real estate assets, virtually no liquid assets, and a negative net worth. He also disclosed no significant assets held in the name of or for the benefit of his wife. Yet, as noted above, Carpenter now admits to spending over $10,000,00 in legal fees in recent years, and evidently has the means to travel extensively overseas.

These inconsistencies raise doubts about the veracity of Carpenter's assertions and his motivations in making them. Carpenter's faces a sizeable mandatory restitution obligation in this case, notwithstanding the third party payments to the exchangors. It is particularly telling that in his motion, he does not propose to post any collateral as a means of ensuring his return from his desired travel. As the government has stated before, there is thus ample reason to question whether Carpenter has hidden money, and whether the purpose of his seeking permission to travel internationally is to hide it overseas.

JLM038866

For all the foregoing reasons, the United States requests that the Court deny Carpenter's

motion seeking the return of his passport and permission to travel internationally.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
JACK PIROZZOLO
Assistant U.S. Attorneys

## Certificate of Service

I hereby certify that on this 14th day of April, 2010, I served on counsel of record in the foregoing matter the Government's Opposition to Defendant's Request to Travel Internationally, by means of the ECF system.

/s/ Jonathan F. Mitchell
Jonathan F. Mitchell

4

JLM038867

# EXHIBIT 8

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CASE NO. 11-1590-LTS-HBP


 UNIVERSITAS EDUCATION, LLC

            Plaintiff,


            VS.


 NOVA GROUP, INC., as trustee,

 sponsor and fiduciary of the

 CHARTER OAK TRUST WELFARE

 BENEFIT PLAN,

            Defendant.


            April 17, 2013

            10:00 a.m.

            DEPOSITION OF DANIEL E. CARPENTER




 REPORTED BY:

 MARY G. VAN DINA, Certified Court Reporter,

 Certified LiveNote Reporter.

1

2    April 17, 2013

3    10:00 a.m.

4

5             Deposition of DANIEL E. CARPENTER,

6    taken by Plaintiffs, pursuant to subpoena, at the

7    offices of LOEB & LOEB, LLP, 345 Park Avenue, New

8    York, New York, before MARY G. VAN DINA, a

9    Certified Shorthand Reporter and Notary Public

10   within and for the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            Daniel Carpenter 4/17/13

2    it to.

3         Q.    To whom have you rented the property?

4         A.    A number of employees of USB Group, as

5    well as Benistar.

6         Q.    Why was an LLC formed to take

7    ownership of the property?

8         A.    All of -- anything that I invested in

9    is either held in an LLC or it's held in a trust,

10   you know, for either estate planning purposes or

11   protection, you know, asset protection, you know,

12   type purposes, so that if something happens on

13   one property, people can only sue that property

14   and they cannot sue other properties that are

15   owned by different trusts or different LLCs.

16        Q.    Is part of your motivation also to

17   avoid being sued personally?

18        A.    I've been constantly sued since about

19   January 6th of 2001, so I've been under a

20   constant siege of lawsuits since early January of

21   2001.

22             MR. SIANO:  May I have a moment,

23        please?

24             MS. COLBATH:  Sure.

25             (Off-the-record discussion.)

1          Daniel Carpenter 4/17/13

2     BY MS. COLBATH:

3          Q.   What is the significance, if any, to

4     the January 26, 2001 date that you referenced in

5     your last answer?

6          A.   The company that I work for invested

7     money for Section 1031 tax-free exchanges, and I

8     lost a little over $8 million in the great stock

9     market fall of December of 2000, and shortly

10    thereafter, in January of 2001, there were a

11    number of lawsuits that started against the

12    company and me personally and that litigation is

13    still going on today in Boston.

14         Q.   Is that company you're referring to

15    Benistar Property Exchange?

16         A.   It's now called Boston Property

17    Exchange, but at that time it was Benistar

18    Property Exchange, but it's now Boston Property

19    Exchange, but at the time it was Benistar

20    Property Exchange Trust Company, but the name has

21    been changed to Boston Property Exchange.

22         Q.   Who were the shareholders of Caroline

23    Financial Group, Inc.?

24         A.   I don't know.

25         Q.   Who would know?

1              Daniel Carpenter 4/17/13

2   documents.

3              MR. SIANO:  Just a minute.

4              (Off-the-record discussion.)

5   BY MS. COLBATH:

6         Q.   And when you say you've signed over

7   200 documents like this, your reference is to

8   Moonstone 2.

9              Are you talking about over 200

10  documents like this at TD Banknorth?

11        A.   No, no, at various banks, at various

12  banks.

13        Q.   Do I understand you to be saying that

14  you've opened up over 200 bank accounts over the

15  last few years?

16        A.   Easily.

17        Q.   And other than opening bank accounts

18  at TD Banknorth, what other banks have you opened

19  bank accounts at?

20        A.   Well, what time period are you looking

21  at, from --

22        Q.   The time period that you referenced

23  when you said you had opened up over 200 bank

24  accounts.

25        A.   Okay.  Well, you know, there are at

1                    Daniel Carpenter 4/17/13

2      BY MS. COLBATH:

3          Q.    Where do you currently maintain bank

4      accounts for the businesses that you are involved

5      in?

6          A.    I personally don't have any bank

7      accounts right now.

8          Q.    Where do the businesses that you're

9      involved in maintain accounts currently?

10         A.    I would say most of the business that

11     I am actively involved with -- and none of the

12     businesses that I'm involved with are sham

13     companies, so I would say that most of them are

14     at Peoples.

15         Q.    Have you ever been involved in setting

16     up a bank account outside the United States?

17         A.    In the past ten years?  What time

18     frame?

19         Q.    The past 20 years.

20         A.    The past 20 years.  Not in the past 20

21     years.

22         Q.    Have you asked anyone else on your

23     behalf to set up an account outside the United

24     States in the past 20 years?

25         A.    No.

# EXHIBIT 9

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

THE PENN MUTUAL LIFE INSURANCE COMPANY,

                Plaintiff,    C.A. No.

   v.                   15-CV-01111(AJN)

KATHY KEHOE, as Trustee of the SICKNESS

ACCIDENT & DISABILITY INDEMNITY TRUST

2005; KATHY KEHOE, as Trustee of the

GRIST MILL TRUST DATED 10-1-03; and

UNIVERSITAS EDUCATION, LLC,

                Defendants.

- - - - - - - - - - - - - - - - - - x

LIFE INSURANCE COMPANY OF THE SOUTHWEST,

                Plaintiff,    C.A. No.

   v.                   15-CV-04594(AJN)

KATHY KEHOE, as Trustee of the GRIST

MILL TRUST DATED OCTOBER 1, 2003; and

UNIVERSITAS EDUCATION, LLC,

                Defendants.

- - - - - - - - - - - - - - - - - - x

   VIDEOTAPED DEPOSITION of DANIEL E. CARPENTER

      Donald W. Wyatt Detention Facility

   950 High Street, Central Falls, Rhode Island

Job 3165 Reporter: Michael O'Connor, RMR,CRR,CBC,CCP

1
2
3
4          Wednesday, April 13, 2016
5          9:53 a.m.
6
7          VIDEOTAPED DEPOSITION OF DANIEL E.
8    CARPENTER, at the Donald W. Wyatt Detention
9    Facility, 950 High Street, Central Falls, Rhode
10   Island, before Michael D. O'Connor, a Registered
11   Merit Reporter, Certified Realtime Reporter and
12   Certified Realtime Captioner, Notary Public in
13   and for the State of Rhode Island.
14
15
16
17
18
19
20
21
22
23
24
25

1    APPEARANCES:
2
3    COUNSEL FOR UNIVERSITAS EDUCATION, LLC:
4        LOEB & LOEB, LLP
5        345 Park Avenue
6        New York, New York 10154
7        (212) 407-4000
8        BY: PAULA K. COLBATH, ESQ.
9            pcolbath@loeb.com
10       BY: ALEX YOUNG, ESQ.
11           ayoung@loeb.com
12
13   COUNSEL FOR KATHY KEHOE:
14       HALLORAN & SAGE, LLP
15       315 Post Road West
16       Westport, Connecticut 06880
17       (203) 222-4303
18       BY: DAN E. LaBELLE, ESQ.
19           labelle@halloran-sage.com
20
21
22
23
24
25

1    APPEARANCES:
2
3    COUNSEL FOR DANIEL E. CARPENTER:
4        HURWITZ SAGARIN SLOSSBERG & KNUFF, LLC
5        147 North Broad Street
6        Milford, Connecticut 06460
7        (203) 877-8000
8        BY: LAWRENCE S. GROSSMAN, ESQ.
9            lgrossman@hssklaw.com
10       BY: DAVID C. SHUFRIN, ESQ.
11           dshufrin@hssklaw.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1              I N D E X
2    Deposition of:              Page
3    DANIEL E. CARPENTER
4    By Ms. Colbath                7
5
6
7            E X H I B I T S
8    No.                        Page
9    Exhibit 1   Chart bearing production number
10       SIMIONEMACCA02939              27
11   Exhibit 2   Ledger              282
12
13   (Ms. Colbath retained the original exhibits)
14
15
16
17
18
19
20
21
22
23
24
25

1    Holdings LLC for a moment. Can you identify for
2    me -- strike that.
3         Is the Carpenter Charitable Remainder
4    Trust one of the charitable trusts that's a
5    member of the Grist Mill Trust LLC?
6       A. I don't see Carpenter Charitable
7    Trust on here.
8       Q. You don't see it. My question to
9    you, sir, is you just identified and said there
10   are four to five charitable trusts which are the
11   members of Grist Mill Holdings, LLC. I'm asking
12   you if the Carpenter Charitable Remainder Trust
13   is one of those trusts, which is a member?
14      A. I don't believe so.
15      Q. And why not? What's the basis of
16   your belief?
17      A. Because I don't believe that the
18   Carpenter Charitable Trust has ever been an owner
19   of Grist Mill Holdings.
20      Q. Okay. Who are the trustees of the
21   Carpenter Charitable Remainder Trust?
22      A. Just myself.
23      Q. You're the sole trustee?
24      A. I'm the sole trustee.
25      Q. Were you the grantor?

1      A. Yes, I was the grantor, and I was the
2    sole trustee.
3      Q. Okay. Am I correct that the
4    remainder beneficiary of the Carpenter Charitable
5    Remainder Trust is -- I might get the name wrong,
6    but the Avon Old --
7      A. Avon Old Farm School.
8      Q. That's the remainder trustee,
9    correct?
10      A. That's the charitable trustee or the
11   charitable beneficiary, right.
12      Q. Are there any other beneficiaries of
13   the Carpenter Charitable Remainder Trust?
14      A. The income beneficiary is my wife.
15      Q. Can you identify for me the four or
16   five charitable trusts that are members of Grist
17   Mill Holdings, LLC?
18      MR. GROSSMAN: Objection. There's no
19   foundation to that question. You're assuming
20   that there's four or five.
21      MS. COLBATH: That's what the witness
22   testified to. Yes, the witness testified, when I
23   asked him who are the members --
24      MR. GROSSMAN: That's fine. If that
25   was the testimony, I apologize.

1      Q. So, Mr. Carpenter, the question is,
2    you testified a minute or two ago, when I asked
3    you about the members of Grist Mill Holdings LLC,
4    that the members were four or five charitable
5    trusts, and I'm asking you now to identify for me
6    those charitable trusts?
7      A. I know one of them was the Atlantic
8    Charitable Trust, one was the Avon Charitable
9    Trust, and one was the Alliance Charitable Trust,
10   and there was a Phoenix Charitable Trust, but
11   there's a fifth trust whose name I don't recall
12   that is not listed -- is not listed on this list.
13      Q. Would that fifth trust be known as
14   shorthand the Ace Trust?
15      A. No.
16      Q. Was it the Nova Trust?
17      A. No.
18      Q. Well, if in the course of today you
19   think of that fifth trust, if you let me know,
20   we'll put it on the record.
21      A. That would be fine.
22      Q. Would I be correct if -- strike that.
23      Are you the sole trustee and grantor
24   of the four trusts you just identified?
25      A. Yes, ma'am.

1      Q. And when were those trusts formed?
2      A. I don't recall the exact dates, but
3    all of the charitable trusts were formed in the
4    late '90s. So I would just be guessing, but I'm
5    going to say 1997, 1998.
6      Q. Okay. Who are the beneficiaries of
7    those four trusts? We're talking about the
8    Atlantic Charitable Trust, the Avon Charitable
9    Trust, the Phoenix Charitable Trust and the
10   Alliance Charitable Trust?
11      A. My wife is the income beneficiary,
12   and the charitable beneficiary for those trusts
13   is Avon Old Farm School in Avon, Connecticut.
14      Q. What are the current assets of the
15   Carpenter Charitable Remainder Trust?
16      A. I don't believe any of the trusts
17   have any assets.
18      Q. Have any of the trusts ever had any
19   assets?
20      A. Yes.
21      Q. Were the Atlantic, Avon, Alliance and
22   Phoenix Trusts all funded at the same time?
23      A. I don't believe -- I think they were
24   funded at different times with different amounts,
25   but I don't recall the amounts or the time of the

Hall of Fame Reporting
877-901-3376 - Schedule@HOFReporting.com

1  funding was.
2      Q. Do you recall the nature of the
3  assets that were used to fund those four
4  charitable trusts?
5      A. The "nature of the assets" meaning
6  cash or property?
7      Q. Correct.
8      A. It was just cash.
9      Q. Where did the cash come from?
10     A. It was my personal cash and
11 distributions from companies. But there was -- I
12 did a lot of charitable giving to Avon Old Farms,
13 and it was cash contributions from either me or
14 companies that I controlled.
15     Q. Do you recall any of the companies
16 that made distributions to you that you then used
17 to fund those four trusts?
18     A. No, I don't recall.
19     Q. What companies do you currently
20 control?
21     A. Right now, today, I would say that I
22 don't -- I don't recall any company right now.
23     Q. Okay. Do you recall what companies
24 -- well, have you given a -- when is the last
25 time you spoke with Matt Westcott?

1      A. In person or on the phone?
2      Q. Anything. Spoke to him.
3      A. About three weeks ago, I was speaking
4  to my wife, and he asked to say hi to me on the
5  phone. But that was the first time I talked to
6  Matt in over a year and a half.
7      Q. Does Mr. Westcott currently hold a
8  power of attorney from you?
9      A. I believe on certain matters he does.
10     Q. On what matters does Mr. Westcott
11 hold a power of attorney from you?
12     A. On filing certain tax returns on my
13 behalf.
14     Q. And tax returns -- strike that.
15     Tax returns for various entities?
16     A. Correct.
17     Q. And what entities does the power of
18 attorney extend to?
19     A. I'm not sure, but the entities that I
20 know that he's helping with are the Grist Mill
21 Partners, One & Three Mill Pond. Matt has helped
22 with each of those LLCs, owns a building, and
23 Matt has been basically helping with those
24 entities and taking care of all the filings, and
25 things of that sort, that need to be done.

1      Q. Have you authorized Mr. Westcott to
2  transact business for any entity other than Grist
3  Mill Partners and One & Three Mill Pond, LLC?
4      A. And my personal tax returns. I can't
5  think of any other entity -- I can't think of any
6  other entity that's active.
7      Q. Now, can you give me a description of
8  your employment history? I think you said you
9  started, you formed your own business, when you
10 were in law school.
11     So if we could start, you graduated
12 from Bowdoin in 1976. Give me as detailed as you
13 can an employment history from that date forward?
14     A. I was with -- I was with the
15 Farmington Valley Racquet Club working my way
16 through law school, and I was approached by
17 certain people with Northwestern Mutual, and they
18 suggested that I come to work for Northwestern
19 Mutual.
20     While I was in law school, I
21 developed an affinity for welfare benefit plans,
22 employee stock ownership plans, and the early
23 version of 401K, which was at that time called
24 cash or deferred arrangements.
25     I became involved with Northwestern

1  Mutual's advanced underwriting department, and
2  that led me to working with certain people at
3  Northwestern Mutual's home office. And they were
4  the people that introduced me to the folks at
5  Benefit Concepts, which at that time was in
6  California.
7      I was the individual who formed
8  Benefit Concepts in Connecticut and on the east
9  coast, and I helped grow the Benefit Concepts
10 organization.
11     Q. Okay. Were you an employee of
12 Northwestern Mutual?
13     A. When you're with an insurance
14 company, they always stress that you're an
15 independent contractor. But I did get 1099s and
16 I did get certain W-2 statements from
17 Northwestern Mutual.
18     But they stressed that being involved
19 with an insurance company, you're always an
20 independent contractor.
21     Q. Okay. What period of time did you
22 receive Form 1099s from Northwestern Mutual?
23     A. I would imagine from 1978 to 1983
24 when I left Northwestern Mutual.
25     Q. And was it during that same period of

```
1          A.  I don't believe so.
2          Q.  Have you personally ever owned an
3   interest in a corporation?
4          A.  I don't recall, but I can't remember
5   any personal interest.
6        * Q.  I think you told me at one of your
7   earlier depositions that you don't want to have
8   any assets in your individual name, correct?
9        * A.  That's from being in the estate
10  planning business and my experience, everything
11  that I've done in my career has been based on
12  keeping the -- whether it be estate planning, tax
13  planning or keeping assets secure from the hands
14  of creditors, everything I've done in my career
15  has basically been involved in protecting assets
16  and advising clients how they can do the same.
17         MS. COLBATH:  Can I have that answer
18  read back, and my question, too.
19        *(Reporter Read)
20         MR. GROSSMAN:  Mr. Carpenter,
21  Attorney Colbath asked a very simple, clear
22  question.  I think we all want to get out of here
23  at a reasonable hour.  Please just answer her
24  question as directly as possible.
25         MS. COLBATH:  Can you just reread the
```

```
1   question.
2          Q.  I think it was susceptible to a yes
3   or no.  If it's the type of thing you don't think
4   it's fair to say yes or no, tell me.  That's
5   difficult.  I think you gave me a beautiful
6   explanation of what you did for other clients,
7   and I'm interested today really about you.  If we
8   could have the question, and if you want to stand
9   on your last answer, just tell me, and I'll move
10  on.
11         (Reporter read back pending question)
12         A.  Correct.
13         Q.  Now, you referred to -- you said
14  Benefit Concepts, Inc. was owned by Carpenter
15  Group Limited, which you referred to as a
16  Carpenter entity, correct?
17         A.  Correct.
18         Q.  And that Carpenter Group Limited was
19  owned by a trust?
20         A.  Correct.
21         Q.  What trust owned Carpenter Group
22  Limited?
23         A.  It was Avon Charitable Trust.
24         Q.  Was that the same Avon Charitable
25  Trust that's a member of Grist Mill Holdings,
```

```
1   LLC?
2          A.  No.
3          Q.  So there are two Avon Charitable
4   Trusts, correct?
5          A.  Correct.
6          Q.  Do they both have the identical name?
7          A.  Yes.
8          Q.  Am I correct that the Avon Charitable
9   Trust, which is the owner of Carpenter Group
10  Limited, you are the sole trustee and grantor?
11         A.  Yes.
12         Q.  And would it be safe for me to assume
13  that the income beneficiary is Molly Carpenter,
14  and the remainder beneficiary is Avon Old Farm
15  School?
16         A.  Yes.
17         Q.  How many Avon Charitable Trusts are
18  there?
19         A.  Two.
20         Q.  How do you keep all of these trusts
21  straight and organized?  Not the best question,
22  but you get -- I get totally confused when I look
23  at all of the documents, keeping everything
24  straight.  How do you do it?
25         A.  The best answer that I can give you
```

```
1   is that I've always been interested in tax
2   advantage trusts.  I believe I was one of the
3   pioneers of charitable giving --
4          Q.  Sir, I don't really want to
5   interrupt, but we have limited time.  We came
6   quite a distance.  You and I can talk off line
7   some day when all of this is over and you can
8   tell me all about your pioneering experience.
9          I'm really going to ask you to focus
10  on what the question is.
11         MS. COLBATH:  If we could have it
12  read back.
13         Q.  It has nothing to do with your
14  pioneering certain things.  I totally appreciate
15  that and you've told me a lot about that, and
16  I've read your book and that's for another day.
17         MS. COLBATH:  Could we have the
18  question read back.
19         Q.  I don't mean to be disrespectful at
20  all, but I'm very sensitive to the circumstances
21  and our time limitation.  So I really want to
22  stay focused.
23         (Reporter read back pending question)
24         A.  I don't know.
25         Q.  Do you have people that work with you
```

Hall of Fame Reporting
877-901-3376 - Schedule@HOFReporting.com

1  to maintain the paperwork relating to all the
2  trusts?
3      A. No.
4      Q. When was Avon Charitable Trust II
5  funded?
6      A. I don't recall the exact date.
7      Q. Do you recall generally what assets
8  it was funded with?
9      A. Cash.
10     Q. And did the cash come from the same
11 sources as the other charitable trusts that we
12 spoke about, which you identified as your
13 personal cash and distributions from your
14 companies?
15     A. Yes.
16     Q. Do you recall, just again, just a
17 general order of magnitude, how much cash was the
18 second Avon Charitable Trust funded with?
19     A. I don't recall.
20     Q. And does the cash remain in the
21 trust?
22     A. I don't believe there's any cash left
23 in any of the trusts.
24     Q. And where did the cash go?
25     A. I don't recall.

1      Q. Well, Molly Carpenter is your wife,
2  correct?
3      A. Yes.
4      Q. What is her maiden name?
5      A. Hohengarten. H-o-h-e-n-g-a-r-t-e-n.
6      Q. She has a sister Mary, correct?
7      A. Correct.
8      Q. And Mary was married to Wayne Bursey,
9  correct?
10     A. Correct.
11     Q. Does she have any other siblings?
12     A. Yes.
13     Q. How many other siblings does she
14 have?
15     A. Three.
16     Q. Does she have a sister Kelly?
17     A. Yes.
18     Q. Is Kelly related to Mr. McGrath, Bill
19 McGrath, that is affiliated with Halloran & Sage?
20     A. I don't believe so.
21     Q. Is Kelly -- was she ever known as
22 Kelly McGrath?
23     A. Not to my knowledge.
24     Q. What's Kelly's middle name?
25     A. I have no idea.

1      Q. You said she had three siblings?
2      A. Yes.
3      Q. Mary, Kelly, and who's the third
4  sibling?
5      A. I said three other siblings. So it's
6  Michael, Carl, Kelly, Mary. So in addition to
7  Mary, there's three other siblings.
8      Q. Okay. So there's Carl, Michael,
9  Kelly and Mary, correct?
10     A. Yes.
11     Q. You have a brother named John and a
12 sister named Constance?
13     A. Yes.
14     Q. Do you have any other siblings?
15     A. Yes.
16     Q. I'm trying to search back in my
17 memory. Who I have missed? You have another
18 brother?
19     A. James.
20     Q. How many Atlantic Charitable Trusts
21 are there?
22     A. I believe there's only one.
23     Q. How many Alliance Charitable Trusts
24 are there?
25     A. I believe there's only one.

1      Q. How many Carpenter Charitable
2  Remainder Trusts are there?
3      A. I believe there's three.
4      Q. Are they all known by the identical
5  name?
6      A. I don't recall if the names of the
7  trusts are the exact same. My recollection is
8  that one of them is called the Carpenter Family
9  Trust and one of them is called the Daniel E.
10 Carpenter Charitable Remainder Trust. The third
11 one is probably a mixture of the two.
12     Q. A mixture of which two?
13     A. In other words, it's either Carpenter
14 Family Trust or the Daniel E. Carpenter Family
15 Trust, and I just don't recall the actual name.
16     Q. As you sit here today, you can't
17 remember the name of the third trust?
18     A. They were formed -- all three were
19 formed over 20 years ago. I don't have any files
20 with me, and you've just -- both you and my
21 attorney basically said stick to what you know
22 and say yes, no.
23     MR. GROSSMAN: First of all, Mr.
24 Carpenter, please do not discuss with Ms. Colbath
25 anything that you and I discussed. Attorney

1  Colbath has been good enough not to ask any
2  questions in that regard.  Please do not speak
3  about that.
4       Second, the question that Ms. Colbath
5  just asked you was, in fact, a yes or no
6  question, as she pointed out.  The question very
7  simply could have been answered yes or no.
8       I think it will help everything, if
9  possible, if a question like that is asked, if
10 you could answer yes or no.
11      THE WITNESS:  Understood.
12      Q.  The trust you just identified, the
13 Daniel E. Carpenter Remainder Trust, the trust
14 that's a mixture of Carpenter charitable --
15 Carpenter Family Remainder Trust and the Daniel
16 E. Carpenter Remainder Trust, what files would
17 you look at in order to determine what the
18 official names of those trusts are?
19      A.  The actual filing that was done with
20 the IRS.
21      Q.  And what filing is that?
22      A.  Any time you set up a charitable
23 remainder trust, you need to file a form with the
24 IRS that's called a split interest gift form.
25      Q.  Do each of the trusts that you've

1  identified, up to this point today, have written
2  trust instruments?
3       A.  Yes.
4       Q.  Where are those maintained?
5       A.  I don't know where they are right
6  now.
7       Q.  The three trusts that you just
8  identified, the Carpenter Charitable Remainder
9  Trust, the Daniel E. Carpenter Remainder Trust,
10 the Carpenter Family Remainder Trust, and then
11 there's one that's a mixture of the two, are you
12 the sole trustee and grantor of all of those
13 trusts?
14      A.  Yes, ma'am.
15      Q.  And is your wife, Molly Carpenter,
16 the income beneficiary for those trusts?
17      A.  Yes, ma'am.
18      Q.  And Avon Old Farm schools is the
19 remainder beneficiary, correct?
20      A.  The charitable beneficiary, yes.
21      Q.  Aside from Avon Old Farm schools and
22 your wife, Molly Carpenter, are there any other
23 beneficiaries of any of those trusts?
24      A.  No, ma'am.
25      Q.  Getting back to your employment

1  history.  Is Benefit Concepts, Inc. still in
2  business?
3       MR. GROSSMAN:  Objection.
4       Q.  I'm referring to the Delaware
5  corporation that you were involved in forming.
6       A.  What do you mean by is it still in
7  business?
8       Q.  Well, let me withdraw my question.
9       What was your relationship with
10 Benefit Concepts, Inc., if you had one?
11      A.  I was the chairman of Benefit
12 Concepts, Inc.
13      Q.  And when you say chairman, are you
14 using that word for shorthand for chairman of the
15 board?
16      A.  Yes.  In other words, when you set up
17 a corporation, I would be chairman and then also
18 secretary of the company.
19      Q.  Okay.  And was this the way -- when
20 you set up a company, you named yourself chairman
21 and secretary?
22      A.  Usually, yes.
23      Q.  And, you know, what were your
24 responsibilities as chairman and secretary?
25      A.  Basically just take care of filings

1  of the corporation.  I was like any other
2  entrepreneur.  Just conducting business as a
3  corporation.
4       Q.  And when you say "filings," you're
5  referring to corporate filings with secretaries
6  of states and tax filings?
7       A.  Yes, ma'am.
8       Q.  Did you work for Benefit Concepts,
9  Inc.?  Strike that and let me be more specific.
10      Were you ever an employee of Benefit
11 Concepts, Inc.?
12      A.  I don't know what you're referring to
13 as employee, but I don't remember getting a
14 paycheck from Benefit Concepts, Inc.  I might
15 have received a paycheck or a bonus.  I just
16 don't recall.
17      Q.  Well, Benefit Concepts, Inc. provided
18 services, correct?
19      A.  Correct.
20      Q.  Who did it provide services to?
21      A.  Small businesses.
22      Q.  And the small businesses that it
23 provided services to, were those businesses that
24 you had an interest or were they separate third
25 parties?

# EXHIBIT 10

# INVENTORY LISTING

CHASE FILE NO.: SB456878-F1

## Amanda Rossi/Daniel E Carpenter – Signatory

USB Client Services Inc.          Acct # ▮▮4590          Acct. Balance
$40.00

USB Client Services Inc.          Acct# ▮▮7371          Acct. Balance
$65.57

USB Client Services Inc          Acct# ▮▮8513          Acct. Balance
$0.00

Thermionics Employee Stock

Ownership Plan/ USB Client

Services Inc.          Acct. # ▮▮7363          Acct. Balance
$20.00

## Wayne Bursey/ Amanda Rossi/ Molly Carpenter - Signatory

Jefferson Trust          Acct# ▮▮0339          Acct. Balance
$107,812.75

## Amanda Rossi - Signatory

Thermionics Employee Stock

Ownership Plan          Acct# ▮▮2685          Acct. Balance
$1,139.34

## Molly Carpenter/ Wayne Bursey – Signatory

Cambridge Trust Welfare

JLM025368

| | | |
|---|---|---|
| Benefit Plan<br>$2,878.39 | Acct# ███ 3129 | Acct. Balance |
| MidAtlantic Trust<br>$174,178.52 | Acct# ███ 4442 | Acct. Balance |
| Long Term Care Trust | | |
| LTC Trust<br>$ 13,750.86 | Acct# ███ 5699 | Acct. Balance |
| Long Term Care Trust | | |
| LTC Trust<br>$ .01 | Acct# ███ 5702 | Acct. Balance |
| Long Term Care Trust | | |
| LTC Trust<br>$0.00 | Acct # ███ 5729 | Acct. Balance |
| Sadi Trust 2007<br>$61,601.87 | Acct # ███ 3327 | Acct Balance |
| Mcallen Health Care | | |
| Services Trust Benefit Plan | | |
| Advisors TTEE<br>$43,076.11 | Acct # ███ 4467 | Acct Balance |
| Split Dollar Trust/ | | |
| Hanover Benefit Plans LLC Acct# ███ 8479 | | Acct Balance |
| $176,407.11 | | |

Molly Carpenter – Signatory

| | | |
|---|---|---|
| Bestco Benefit Plans LLC<br>$817,764.60 | Acct# ███ 7930 | Acct. Balance |
| Bestco Benefit Plans LLC<br>$64,889.93 | Acct# ███ 3980 | Acct. Balance |
| Bestco Benefit Plans LLC<br>$0.00 | Acct# ███ 5710 | Acct. Balance |

JLM025369

Bestco Benefit Plans LLC
$18,549.95     Acct# ██ 6148     Acct. Balance

Bestco Benefit Plans LLC
$1,903.61     Acct# ██ 1072     Acct. Balance

Bestco Benefit Plans LLC
$271.44     Acct # ██ 4191     Acct. Balance

Bestco Benefit Plans LLC
$2,293,090.94     Acct# ██ 9279     Acct. Balance

Bestco Benefit Plans LLC
$1,525,268.68     Acct# ██ 9711     Acct. Balance

Bestco Benefit Plans LLC
$45,873.38     Acct # ██ 3415     Acct. Balance

Bestco Benefit Plans LLC
$26,809.21     Acct # ██ 3647     Acct. Balance

Bestco Benefit Plans LLC
$0.00     Acct # ██ 9237     Acct. Balance

Bestco Benefit Plans LLC
$12,108.89     Acct # ██ 4225     Acct. Balance

Bestco Benefit Plans LLC
$918.11     Acct# ██ 5565     Acct. Balance

Bestco Benefit Plans LLC     Acct # ██ 3165 Acct. Balance $0.00

Bestco Benefit Plans LLC     Acct # ██ 3166 Acct. Balance $0.00

Bestco Benefit Plans LLC
$1,308,073.78     Acct # ██ 3167 Acct. Balance

Bestco Benefit Plans LLC
$107,614.65     Acct # ██ 3168 Acct. Balance

Bestco Benefit Plans LLC
$7,039.65     Acct # ██ 3169 Acct. Balance

Bestco Benefit Plans LLC
$12,630.49     Acct # ██ 3173 Acct. Balance

Bestco Benefit Plans LLC
$3,868.01     Acct # ██ 3174 Acct. Balance

JLM025370



Bestco Benefit Plans LLC     Acct # ▓▓▓▓ 3175 Acct. Balance
$400,205.56

Bestco Benefit Plans LLC     Acct # ▓▓▓▓ 5865 Acct. Balance
$13,177.20

Bestco Benefit Plans LLC     Acct # ▓▓▓▓ 5867 Acct. Balance
$66,587.04

Life Five Welfare Benefit     Acct # ▓▓▓ 6835          Acct. Balance
$1,672.22

**Molly Carpenter/ Daniel Carpenter/ Amanda Rossini – signatory**

Benistar Client Services Inc/

Bpetco Litigation Group Inc.     Acct # ▓▓▓ 7926          Acct Balance
$1001.95

**Daniel Carpenter – signatory**

Benistar Client Services Inc./

Bpetco Litigation Group Inc.     Acct # ▓▓▓ 3489          Acct Balance
$24,355.45

USB Client Services Inc.         Acct # ▓▓▓ 4582          Acct Balance
$1,750.53

Alliance Charitable Remainder

Trust Daniel Carpenter TTE       Acct# ▓▓▓ 4824          Acct Balance
$9,930.00

Atlantic Charitable Remainder

Trust Daniel Carpenter TTE       Acct# ▓▓▓ 4832          Acct Balance
$9,933.00

Avon Charitable Remainder

Trust Daniel Carpenter TTE       Acct # ▓▓▓ 4840          Acct Balance
$9,983.00

Carpenter Charitable Remainder

JLM025371



Trust Daniel Carpenter TTE        Acct # ████ 4857        Acct Balance
    $49,983.00

Phoenix Charitable Remainder

Trust Daniel Carpenter TTE        Acct# ████ 4865        Acct Balance
    $9,983.00

**Some account have signatories in addition to those listed. Those signatories
are not indicated because they were not listed in the subpoena

JLM025372