# EXHIBIT
# 21

# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 3:13-CR-226(RNC) |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| DANIEL E. CARPENTER | ) |  |
|  | ) | OCTOBER 2, 2017 |

## DECLARATION OF DANIEL E. CARPENTER

I, **DANIEL E. CARPENTER**, being duly sworn and over eighteen years of age, state that:

1. Currently I, and my company Grist Mill Capital, LLC, have an action captioned as *Carpenter v. Koskinen*, No. 13-cv-00563 (SRU), in front of the Honorable Stefan Underhill.

2. In these proceedings before Judge Underhill, my attorneys took the depositions of Agent Shaun Schrader who drafted the constitutionally defective Search Warrant and other documents that were under seal for the April 20, 2010 raid of 100 Grist Mill Road, and Agent Kathy Enstrom who was the Agent in Charge of the constitutionally unlawful search and seizure of that day. I have just seen many of these newly discovered documents for the first time in connection with the July 2017 Depositions of Agents Schrader and Enstrom.

3. The Search Warrant drafted by Agent Schrader was constitutionally defective because it did not list any crime on the face of the warrant and did not list with particularity what was to be seized for the investigation of what crimes. The same is true with the Search Warrant drafted by Agent Lynn Allen for the raid of May 26, 2011, but discovery in that case under Judge Bolden has been stayed indefinitely pending the criminal action in this case.

4. In her deposition, Agent Enstrom after consulting her notes from that day (Attached as Exhibit One) confirmed that she only gave the one page Search Warrant to my wife and me. She did not give us a copy of the Search Warrant Application or the Search Warrant Affidavit though

I asked for a copy of the Search Warrant Affidavit repeatedly in front of a conference room filled with Benistar employees and federal agents as witnesses. Both the Schrader Search Warrant Application and the Search Warrant Affidavit were under seal.

5. In fact, after all of the people in the building had been herded into the conference room, all of the Benistar employees there heard me ask repeatedly for the Search Warrant Affidavit, and two of the government agents in the conference room came up behind me and looked over my shoulder at the one page warrant missing the Affidavit and said: "He's right, that's the way we do it in New York."

6. Prior to the Raid of 2010, there were two Summons Enforcement actions in front of Judge Chatigny and Magistrate Martinez. *See United States v. Bursey*, 3:09-mc-00272-RNC, and *United States v. Carpenter*, 3:08-mc-00111-RNC.

7. In his deposition, Agent Schrader actually admits that the main goal of the raid on 100 Grist Mill Road was to get the names of the Participating Employers and the Plan Participants that I and Wayne Bursey had refused to turn over. In reality, the only time my name is mentioned in the Schrader Affidavit was stating that I (and Wayne Bursey) had not fully complied with a decade long summons enforcement action. The truth is that the only information that I had not provided the government in answers to various subpoenas and summonses was the names of the Participating Employers and the Plan Participants from the Benistar 419 Plan, which stopped taking new Employers and Participants in December 2003.

8. Following the raid of April 20, 2010 there were 50-60 Employers who were audited costing these employers tens of millions of dollars in taxes and penalties – and the litigation and lawsuits concerning these employers continues to this very week.

9. For example, just last week an employer in Texas, suing a different 419 plan and trust, enclosed a copy of the Schrader Affidavit (despite it being under seal by Judge Covello's order) and a ruling from this Court (June 6, 2016 Opinion) in trying to suggest that I fraudulently controlled the Plan being sued in that case.

10. Agent Schrader disclosed during his deposition that the cause of the April 20, 2010 raid was information given by a Wisconsin insurance agent, Michael Tessier, about Guy Neumann because Tessier was involved with a Social Security fraud investigation concerning Lawrence Popp of Wisconsin. If one searches Lawrence Popp's name or "Social Security fraud in Wisconsin," you can still see the government tapes of Popp's fraud where he collected Social Security, claiming to be blind but he was filmed driving a car, working, and even water skiing.

11. Tessier arranged an insurance policy with the SADI Trust on Popp's life through Guy Neumann so that Popp could also defraud the SADI Trust by claiming he had become blind as well. I had no knowledge of this fraud or Popp's participation in the SADI Trust until Agent Schrader's Deposition and looking up Popp's case on Google.

12. My lack of involvement in the NOVA Benefit Plans is confirmed by the Schrader-Enstrom "Synopsis of the Case" attached as Exhibit Two. In describing the case to their higher-ups that had to sign off on the raid, my name is nowhere mentioned as being a part of the activity at 100 Grist Mill Road – criminal activity or otherwise – and Agent Schrader and Enstrom both stated that there are a number of companies at 100 Grist Mill Road – and Wayne Bursey runs them. See "Synopsis of the Case" attached as Exhibit Two.

13. Additionally, in his Search Warrant Plan of Operation page 8, Agent Schrader supposes there are several "legitimate" businesses located at 100 Grist Mill Road, including Rex Insurance Services, Inc. which was a Company founded and run by Guy Neumann. See Exhibit Three.

14. Significantly, Mr. Carpenter's name is not mentioned on the face of the Search Warrant, the Search Warrant Application, or in the "Synopsis of the Case."

15. More proof that the raid on 100 Grist Mill Road was the "Guy Neumann Investigation" and not the "Dan Carpenter" investigation can be found in the statements made by Stefan Cherneski and Kevin Slattery to federal agents on the day of the raid. These documents were just recently turned over to my attorneys in discovery in my lawsuit against Agents Schrader and Enstrom in Judge Underhill's court.

16. In the Cherneski April 20, 2010 statement, my role at 100 Grist Mill Road is not even discussed until Paragraph 29. See Cherneski Statement attached as Exhibit Four.

17. Similarly in Slattery's statement, my name is only mentioned in passing and Slattery was actually screaming for help because he thought his life was in danger. Slattery confirmed his fear and the illegal conduct of government agents that day in his recent deposition taken by the government. Significantly, Slattery states in Paragraph 18 that I "left Benistar in 2004." See Slattery statement attached as Exhibit Five. Obviously this statement by Slattery on April 20, 2010 constitutes newly-discovered, material and exculpatory *Brady* evidence, that certainly contradicts many of the erroneous conclusions made by the Court in its June 6, 2016 Opinion.

18. The "Synopsis of the Case" and the Slattery and Cherneski Statements confirm the truth of this case that I stepped down from all things Benistar in January 2004 – before my pending indictment in Boston in February 2004. The only people scheduled for interviews that day were Cherneski, Slattery, and Belding. Significantly, Guy Neumann, the target of the investigation, was lured to a coffee shop in Hartford, and Wayne Bursey was stopped from coming to the office at the end of Grist Mill Road. According to Agent Schrader, I was not to be interviewed at all that day. (Schrader Depo. at 118).

-4-

19. Thus there was no "probable cause" based on Agent Schrader's own Affidavit and certainly not in the section of Agent Schrader's Affidavit quoted in the government's Opposition Brief Doc. 285 at 18-22 where once again my name is not even mentioned or referenced anywhere.

20. As there was no "probable cause" to raid **my building** and **my office** much less seize my three cell phones, there can be no doubt that the search and seizure of my person on April 20, 2010 was particularly unreasonable as well as non-particularized and overbroad, because in addition to 100 boxes of ARIA and Grist Mill Capital files, the Agents seized 40 boxes marked "Attorney Client Privileged" dealing with my case in Boston. The Agents also took my personal tax returns and personal information having nothing to do with the "Guy Neumann Investigation" or NOVA Benefit Plans.

21. Since the Julio La Rosa Declaration (attached as Exhibit Six) says that as of May 2010, there was no criminal investigation as to myself and Wayne Bursey, and my name was not mentioned in either the "Synopsis of the Case" or the Search Warrant or the Search Warrant Application, and I am only mentioned in passing in the Cherneski and Slattery statements given to federal agents that day, the Court needs to reconsider both its conclusions in its June 6, 2016 Opinion (Doc. 212) that I controlled all of the Benistar entities as well as the December 2015 denial of my Motion to Suppress (Doc. 155) based on the fact that the April 20, 2010 Search Warrant lacked probable cause, particularity, and was clearly **overbroad** as it relates to the search of my office and the seizure of my person, my property, and my cell phones.

22. The boxes taken from Halloran & Sage pursuant to AUSA Novick's May 25, 2011 Subpoena have not been returned even as of this week. See List of Boxes taken and list of boxes still not returned seven years after the raid of April 20, 2010 and six years after the raid of May

26, 2011 attached as Exhibit Seven. These are separate Fourth Amendment violations in and of themselves.

23. Moreover, the Cherneski Statement (Exhibit Four) confirms that not only did I not control all of the "Benistar Entities" as the Court erroneously concluded in its Opinion of June 6, 2016; it also shows my main activity was with a company called ARIA. The Julio La Rosa Declaration (Exhibit Six) confirms that I was not suspected of any crime as of April 20, 2010, therefore any search of **my office** lacked "probable cause" as a matter of law; and the Schrader-Enstrom "Synopsis of the Case" (Exhibit Two) does not even mention my name and states that Wayne Bursey controls the NOVA Benefit Plans. Finally, the newly-discovered Slattery Statement confirms my testimony that I left Benistar in January 2004, and did not have any day-to-day active role in the Benistar entities or the Nova Benefit Plans. See Exhibit Five at paragraph 18. This lack of "probable cause" on top of the lack of particularity on the face of the Search Warrant, combined with the overbreadth of the search itself, mandates a complete review by this Court of the unconstitutional search and seizure of **my office** in **my building** on April 20, 2010.

24. Furthermore, the Schrader Search Warrant Plan (Exhibit Three) suggests that Rex Insurance Services, Inc. is one of the only "legitimate "businesses located at 100 Grist Mill Road, but that business was owned and controlled by Guy Neumann, who was the subject of the investigation leading to the raid of April 20, 2010. This is significant because Rex was the **only** business at 100 Grist Mill Road involved in the sale of life insurance policies to banks and investors. See the Court's Opinion (Doc. 212) citing my emails to Chad Gerdes, introducing Guy Neumann to Chad Gerdes and discussing the potential sale of Rex policies. Don Trudeau working with Ridgewood was after the September 30, 2010 foreclosure agreement when

Ridgewood took over all of the Charter Oak policies. At this late date, I have not applied for or sold any life insurance policies to any investors, nor did I ever have the ability to sell any of the Charter Oak Trust policies to anyone but the insured, and only with the written permission of Christiana Bank as the Insurance Trustee, which was protecting Ridgewood's interests in the policies, not mine. No evidence was adduced at my trial showing my name on any Charter Oak Trust insurance policy application or showing my involvement in the application process for any policy with any of the carriers.

25. Therefore, since my name was not mentioned in the Schrader-Enstrom "Synopsis of the Case" and my name is not mentioned in any of the Subpoenas involved in this case including the Grand Jury Subpoenas of April 20, 2010 and May 26, 2011 and the AUSA Novick Subpoena to Halloran & Sage of May 25, 2011, it should be clear that **my office** in **my building** should not have been searched, and I should not have been "seized" during either of the two raids at 100 Grist Mill Road.

26. In fact, Agent Schrader confirms as much in his Deposition where he states that I was "not a target of the Search Warrant" (Schrader Deposition at 77); agents were "instructed not to interview me" (Schrader Deposition at 118); and Agent Schrader made it clear that he "wasn't looking to seize" me (Schrader Deposition at 124).

27. Agent Schrader also makes it clear in his Deposition that the true goal of the raid was to secure the names of the Plan Participants in the various 419 Plans despite the fact that both of the Summons Enforcement Actions were in front of Judge Chatigny and Magistrate Martinez. Getting those names was "why we wanted to do the Search Warrant." (Schrader Deposition at 127). Clearly that is not a legitimate use for an IRS Search Warrant as it is prohibited by the IRS Manual, and it is extremely doubtful that Magistrate Smith would have approved a search

warrant seeking to do an end run around two Summons Enforcement actions in front of Judge Chatigny and Magistrate Martinez.

28. Since my name was not mentioned on the face of either Search Warrant nor in any of the three Subpoenas involved in the two raids, nor the Search Warrant Synopsis of the Case, and since the true facts of the reason for the raid of April 20, 2010 were not disclosed to Magistrate Smith, there was no "probable cause" to search my office at 100 Grist Mill Road or to seize my three cell phones (none of which was a Blackberry) or to seize me personally as I was escorted at gun point from my office to the conference room and then was escorted back to my office by two armed federal agents to seize those cell phones – all without probable cause and a valid Search Warrant. Therefore, any and all files, emails, or any other documents seized from **my office** in **my building** are all "fruits of the poisonous tree" that should cause this Court to reconsider its original order and now grant my Motion to Suppress as to all evidence seized from 100 Grist Mill Road from both raids.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 2nd day of October, 2017.

DANIEL E. CARPENTER

Sworn to before me this
2nd day of October, 2017

Notary Public
My commission expires JASON J. CONCATELLI
(Notary seal/stamp) *NOTARY PUBLIC*
MY COMMISSION EXPIRES MAR. 31, 2022

-8-

# EXHIBIT
# 22

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
                                                    :
                                                    :
THE PENN MUTUAL LIFE INSURANCE                      :
COMPANY,                                            :
                                                    :   No. 15-CV-01111 (AJN)
                    Plaintiff,                      :
                                                    :
                                                    :
        -against-                                   :   **AFFIDAVIT OF J. EDWARD**
                                                    :   **WAESCHE**
KATHY KEHOE, as Trustee of the                      :
SICKNESS ACCIDENT & DISABILITY                      :
INDEMNITY TRUST 2005; KATHY                         :
KEHOE, as Trustee of the GRIST MILL                 :
TRUST DATED 10-1-03; and UNIVERSITAS                :
EDUCATION LLC,                                      :
                                                    :
                    Defendants.                     :
                                                    :
----------------------------------------------------------X
                                                    :
                                                    :
LIFE INSURANCE COMPANY OF THE                       :
SOUTHWEST,                                          :
                                                    :
                                                    :   No. 15-CV-04594 (AJN)
                    Plaintiff,                      :
                                                    :
                                                    :
        -against-                                   :
                                                    :
KATHY KEHOE, as Trustee of the GRIST                :
MILL TRUST DATED OCTOBER 1, 2003;                   :
and UNIVERSITAS EDUCATION LLC,                      :
                                                    :
                    Defendants.                     :
                                                    :
                                                    :
                                                    :
                                                    :
----------------------------------------------------------X

        STATE OF CONNECTICUT  )

        COUNTY OF FAIRFIELD      )

        I, J. Edward Waesche, being duly sworn, state:

1.  I have authorized my attorney, James Filan, to accept service of a subpoena on my behalf served by Third-Party Defendant Universitas Education, LLC ("Universitas") in these consolidated actions. The subpoena requires my attendance at a deposition in these matters.

2.  I have reviewed the pleadings in these actions, including the complaints and the answers filed by all parties (collectively, the "Pleadings").

3.  If called to testify in these actions, I would assert my Fifth Amendment right against self-incrimination in response to all substantive questions, including, without limitation, questions related to the following subjects:

- The allegations and/or denials made in the Pleadings;

- The formation, operation, solicitation of participants, and activities of: (i) the Grist Mill Trust Welfare Benefit Plan (the "Grist Mill Plan"); (ii) the Sickness, Accident & Disability Indemnity Trust (the "SADI Plan"); (iii) SADI 2005; (iv) the SADI Trust dtd 10-1-03; (v) the SADI 2007 Trust; (vi) the Grist Mill Survivorship TR dtd 10-1-04; (vii) the Charter Oak Trust Welfare Benefit Plan (the "Charter Oak Trust"); (viii) the Benistar 419 Plan & Trust; (ix) the GMT Living Benefits TR dtd 10-1-05; (x) the Nutmeg Trust dtd 10-1-03; (xi) the McAllen Healthcare Svcs Trust 10-01-08; (xii) the Long Term Care Trust dtd 10-1-03; (xiii) the Jefferson Trust dtd 10-1-10; (xiv) the Life One Plan & Trust dtd 9-30-04; (xv) the Life One Trust; (xvi) the Life Five Plan & Trust dtd 9-30-04; (xvii) the Life Five Trust; and (xviii) the Survivorship Plan & TR dtd 9-30-04 (collectively, the "Carpenter Plans"). As used herein, the term "Carpenter Plans" includes any amendments to the identified "Carpenter Plans," as well as any other employee welfare benefit plan involving Daniel E. Carpenter ("Carpenter");

- Commissions (or other monies and payments) received or paid with respect to any life insurance policy or annuity owned or secured by, or in connection with, any Carpenter Plan (and/or paid to any member of the Carpenter Family[1] or any Carpenter Entity[2]);

---

[1] The "Carpenter Family" refers to Carpenter; Molly Carpenter; Kathy Kehoe; Wayne Bursey (now deceased); Donald Trudeau; Charles J. Induddi Westcott; Jack E. Robinson; Donna Wayne; Caroline Carpenter Meckel; Ineke Murphy; Shawndrika Stevens-Gardner; Donna Dawson; Matthew Westcott; Joseph Castagno; Amanda Rossi; Robert Pacini; Stefan Cherneski; Andrew Varner; Paul E. Martin; and/or Guy Neumann.

[2] "Carpenter Entity" or "Carpenter Entities" refers to 1&3 Mill Pond Partners LLC; 41 Church Street Partners LLC; Alliance Charitable Remainder Trust; American Captive Services, Inc.; American Fiduciary Services, Inc.; Atlantic Charitable Remainder Trust; Audit Risk Indemnity Association LLC; ARIA, LLC, Avon Capital, LLC; Avon Charitable Remainder Trust; Avon Old Farm School; BASI; BCNY Litigation Group, LLC; Benefit Concepts Advisors, LLC; Benefit Concepts, Inc.; Benefit Concepts New York; Benefit Plan Advisors, LLC; Benistar; Benistar 419 Plan Services, Inc.; Benistar 419 Plan & Trust (the "Benistar Plan"); Benistar Client Services, Inc.; Benistar Corporation; Benistar Employer Services Trust Corporation; Benistar Financial Group; Benistar Financial Group LLC; Benistar Group Ltd.; Benistar Insurance Group, Inc.; Benistar Insurance Group Holdings, LLC;

- The activities of the Carpenter Family and the Carpenter Entities and my involvement with either;

- The formation, operation, and activities of Benefit Plan Advisors, LLC, Nova Benefit Plans, LLC, Nova Group, Inc. and/or Hanover Benefit Plans, LLC, or any other entity or person who served as a plan sponsor, named fiduciary, administrator, and/or trustee of a Carpenter Plan;

- Business relationships between and among me, and any and all members of the Carpenter Family;

- Other persons and/or entities who have been involved in or with the Carpenter Plans, the Carpenter Entities, and/or the Carpenter Family, and their respective roles in same;

- All transactions undertaken in connection with any Carpenter Plan, including all monies and/or assets assigned, sold, pledged, or otherwise transferred to/from any Carpenter Plan;

- All entities controlled by Carpenter, including the Carpenter Plans, that operated out of 100 Grist Mill Road, Simsbury, Connecticut; 10 Tower Lane, Avon, Connecticut; 300 Stamford Place, Stamford, Connecticut; and/or 2187 Atlantic Street, Stamford, Connecticut;

- The origination, transfer, assignment, pledge and/or sale of any life insurance policy or annuity owned by any Carpenter Plan, and any payments of premiums on any such policy or annuity, including, without limitation, the following: (i) Policy No. 008170968, issued by The Penn Mutual Life Insurance Company ("Penn Mutual") in 2005, insuring the life of Mr. Lawrence O. Fischer ("Mr. Fischer"); (ii) Policy No. 008199632, issued by Penn Mutual in 2007, insuring the life of Mr. Fischer; (iii) Policy No. LS0147497, issued by Life Insurance Company of The Southwest in 2007, insuring the life of Mr. Fischer; (iv) Policy No. 546103549, issued by Jefferson Pilot, insuring the life of Keith Kornovich; and (v) Policy No. 546103551, issued by Jefferson Pilot, insuring the life of Mark Kornovich; and

---

Benistar Ltd.; Benistar Media Group, Inc.; Benistar Property Exchange Trust Company; Benistar Property Exchange Trust Company, Inc.; Benistar Publishing, Inc.; Benistar Reinsurance Services Group, Inc.; Birch Hill Partners, LLC; BPETCO Litigation Group; Cambridge Trust; Essex Trust; Capital City Partners, LLC; Carpenter Charitable Remainder Trust (or any similar named trust); Carpenter Financial Group; Caroline Financial Group, Inc.; Charter Oak Trust; Charter Oak Trust 2009; Charter Oak Trust Welfare Benefit Plan ("Charter Oak Trust"); DSP Holdings, LLC; Greenwich Bay Management LLC; Grist Mill Capital, LLC; Grist Mill Holdings, LLC; Grist Mill Partners, LLC; Grist Mill Plan; Grist Mill Trust (GMT) Living Benefits Trust; Grist Mill Trust-Physicians; Grist Mill Trust (GMT) Survivorship Trust; Grist Mill Trust Welfare Benefit Plan (the "Grist Mill Plan"); Hanover Trust Company; Jefferson Trust; Life Five Welfare Benefit Trust; Life One Welfare Benefit Trust; Long Term Care Trust; McAllen Healthcare Services Trust; Mid Atlantic Trust; MidAtlantic Trust; Moonstone Partners, LLC; Natural Benefit Alliance LLC; NBPS, Inc.; Nova Benefit Plans, LLC; Nova Group Holdings, LLC; Nova Group, Inc.; Nova Living Benefits Trust; Nova Partners; Nutmeg Trust; Phoenix Capital Management, LLC; Phoenix Charitable Remainder Trust; Rex Insurance Services; SDM Holdings, LLC; Seir Hill Partners, LLC; Sickness, Accident & Disability Indemnity Trust; Sickness, Accident, Disability Indemnity Trust 2005 (the "SADI Plan"); Sickness, Accident, Disability Indemnity Trust 2007; Split Dollar Trust; Step Plan Services, Inc.; STEP Plan & Trust; Survivorship Welfare Benefit Trust; TPG Group, Inc.; USB Underwriter Services, Inc.; U.S. Benefits Group, Inc.; U.S. Property Exchange; Wilcox Street Partners LLC; Worthy Investments; and/or Zone Partners LLC.

- The disposition of the $30 million in life insurance death benefits paid by The Lincoln National Life Insurance Company to the Charter Oak Trust in May 2009, including all transfers made to entities formed, controlled or operated, directly or indirectly, by any member of the Carpenter Family, including Carpenter and/or Molly Carpenter, and the current whereabouts of such monies.

4. I recognize that this Court may draw adverse inferences against members of the Carpenter Family, the Carpenter Entities, and the Carpenter Plans, including Third-Party Defendants Grist Mill Plan and SADI Plan, as a result of my assertion of my Fifth Amendment right against self-incrimination.

J. Edward Waesche

Sworn to before me this
14th day of January, 2016

Erin E. McGee
NOTARY PUBLIC Public
State of Connecticut
My Commission Expires Sept. 30, 2017

4

# EXHIBIT 23

# BRIEF CARMEN & KLEIMAN, LLP
### ATTORNEYS AT LAW
805 THIRD AVENUE
NEW YORK, NEW YORK 10022

MATTHEW J. BRIEF
RICHARD E. CARMEN
IRA KLEIMAN*

www.briefjustice.com

* ALSO ADMITTED IN THE DISTRICT OF COLUMBIA

TELEPHONE
(212) 758-6160
(212) 832-5570

FACSIMILE
(212) 832-1747
(212) 832-7221

October 18, 2013

The Honorable Laura Taylor Swain
United States District Judge
United States District Court
500 Pearl Street
New York, NY 10007

      **Re:**    **Universitas Education, LLC v. Nova Group, Inc.**
             **(S.D.N.Y. 11-CV-1590-LTS-HBP)**

Dear Judge Swain:

      We write as counsel for Nova Group, Inc. ("Nova"), to follow up on our prior letter to the Court (Docket Number 296) in regard to that part of the Court's Order, dated September 30, 2013, (Docket Number 295) which ordered Nova to deposit the judgment amount of $30,181,880.30 with the Clerk of the Court.

      With the full cooperation of the entities involved, we have continued our review of the accounts of Grist Mill Capital, Avon Capital, Carpenter Financial Group, Phoenix Capital, and the Grist Mill Trust in an effort to comply with the Court's Order. Attached hereto as Exhibit A are the bank statements of the foregoing entities from May - September, 2013. Except for Carpenter Financial Group and the Grist Mill Trust, none of the other entities have, or have had since at least May, 2013, anything other than negligible amounts in their accounts. The Phoenix Capital Account was closed in March, 2013.

      As we mentioned in our prior correspondence (Docket Number 296), the term "transferee entity" is not defined in the Court's Order. We have therefore defined the term expansively in an attempt to comply with the Order. Thus, in tracing the flow of the Sash Spencer proceeds, we have determined that an additional entity, the Carpenter Charitable Remainder Trust, could arguably be considered a "transferee entity" because of a transfer from Grist Mill Holdings, LLC. Attached as Exhibit B are the bank statements for the Carpenter Charitable Remainder Trust for the period May-September, 2013. We have contacted the foregoing entities (and their counsel, where applicable) and urged that any monies shown in the accounts be immediately transferred to Nova and/or deposited into Court.

s:\lk\litigation\nova\ltrcourt101813 sancord.doc

# BRIEF CARMEN & KLEIMAN, LLP
### ATTORNEYS AT LAW

October 18, 2013
Page 2

      Additionally, in our prior letter to the Court dated October 4, 2013 (Docket Number 296) we made reference to a Nova entity incorporated in Connecticut in 2010.  Upon further review, it appears that there was not a separate entity so incorporated at that time.  Rather, the Nova Group Inc. incorporated in Delaware registered as a foreign corporation in Connecticut.  We regret the error.

      Thank you for your attention to this matter.

Respectfully submitted,

Ira Kleiman

cc:  All counsel (via e-mail)

# EXHIBIT B



**CHASE**

JPMorgan Chase Bank, N.A.
P O Box 659754
San Antonio, TX 78265-9754

March 09, 2013 through April 08, 2013
Account Number:     ████████4857

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | Chase.com |
| Service Center: | 1-800-935-9935 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-877-312-4273 |
| International Calls: | 1-713-262-1679 |

00041460 DRE 802 143 09913 NNNNNNNNNYNN T 1 000000000 06 0000
CARPENTER CHARITABLE REMAINDER TRUST
DANIEL E CARPENTER TRUSTEE
DANIEL E CARPENTER TRUSTEE
100 GRIST MILL LN
SIMSBURY CT 06070-2484

## CHECKING SUMMARY    Chase Better Banking Checking

| | AMOUNT |
|---|---|
| Beginning Balance | $49,983.00 |
| Ending Balance | $49,983.00 |

There has been no activity on your account during this statement period. You may not receive a statement through the mail in the future if there is no activity on your account. You can always view your account activity and statement by logging on to your account through chase.com. If you have questions, please call us at the number on this statement.

Good News. Your Monthly Service Fee was waived because you had at least a $1,500 balance in your Chase Better Banking Checking account at the end of the business day before the last day of your statement period or an average daily balance of $5,000 in qualifying linked deposits, investments, credit cards, mortgage and other loans during your statement period.

Page 1 of 4

# CHASE ◯

JPMorgan Chase Bank, N.A.
P O Box 659754
San Antonio, TX 78265-9754

April 09, 2013 through May 08, 2013

Account Number: ████████████4857

## CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Website: | Chase.com |
| Service Center: | 1-800-935-9935 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Español: | 1-877-312-4273 |
| International Calls: | 1-713-262-1679 |

00009379 DRE 802 143 12913 NNNNNNNNNNNN T 1 000000000 06 0000
CARPENTER CHARITABLE REMAINDER TRUST
DANIEL E CARPENTER TRUSTEE
DANIEL E CARPENTER TRUSTEE
100 GRIST MILL LN
SIMSBURY CT 06070-2484

We have reduced our Legal Processing Fee.
On March 24, 2013, we reduced the Legal Processing Fee to a maximum of $75 per order.
This fee is assessed for the processing of any garnishment, tax levy, or other court or
administrative order against an account. This change will be reflected in your account
agreement; all other terms remain the same. If you have questions, please call us at the
telephone number listed on this statement or visit your nearest Chase branch.

## CHECKING SUMMARY    Chase Better Banking Checking

| | AMOUNT |
|---|---|
| Beginning Balance | $49,983.00 |
| Ending Balance | $49,983.00 |

There has been no activity on your account during this statement period. You may not receive a statement through the mail
in the future if there is no activity on your account. You can always view your account activity and statement by logging on
to your account through chase.com. If you have questions, please call us at the number on this statement.

Good News. Your Monthly Service Fee was waived because you had at least a $1,500 balance in your Chase Better
Banking Checking account at the end of the business day before the last day of your statement period or an average daily
balance of $5,000 in qualifying linked deposits, investments, credit cards, mortgage and other loans during your statement
period.



Page 1 of 2



# CHASE ◯

JPMorgan Chase Bank, N.A.
P O Box 659754
San Antonio, TX 78265-9754

May 09, 2013 through June 10, 2013
Account Number: ●●●●●●●●●●4857

## CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | Chase.com |
| Service Center: | 1-800-935-9935 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-877-312-4273 |
| International Calls: | 1-713-262-1679 |

00010506 DRE 802 143 16213 NNNNNNYNYNNN T  1 000000000 06 0000
CARPENTER CHARITABLE REMAINDER TRUST
DANIEL E CARPENTER TRUSTEE
DANIEL E CARPENTER TRUSTEE
100 GRIST MILL LN
SIMSBURY CT 06070-2484

---

## CHECKING SUMMARY   Chase Better Banking Checking

| | AMOUNT |
|---|---|
| Beginning Balance | $49,983.00 |
| Ending Balance | $49,983.00 |

There has been no activity on your account during this statement period. You may not receive a statement through the mail in the future if there is no activity on your account. You can always view your account activity and statement by logging on to your account through chase.com. If you have questions, please call us at the number on this statement.

Good News. Your Monthly Service Fee was waived because you had at least a $1,500 balance in your Chase Better Banking Checking account at the end of the business day before the last day of your statement period or an average daily balance of $5,000 in qualifying linked deposits, investments, credit cards, mortgage and other loans during your statement period.

# CHASE 

JPMorgan Chase Bank, N.A.
P O Box 659754
San Antonio, TX 78265-9754

June 11, 2013 through July 09, 2013

Account Number: ●●●●●●●●4857



## CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | Chase.com |
| Service Center: | 1-800-935-9935 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-877-312-4273 |
| International Calls: | 1-713-262-1679 |

00007000 DRE 802 143 19113 NNNNNNNNNNN T 1 000000000 06 0000
CARPENTER CHARITABLE REMAINDER TRUST
DANIEL E CARPENTER TRUSTEE
DANIEL E CARPENTER TRUSTEE
100 GRIST MILL LN
SIMSBURY CT 06070-2484

## We're clarifying a transaction and fee description

We're clarifying a transaction and fee description that we use on account statements and online activity.
Starting July 22, 2013, if you cash a check and it's returned to us without being paid, we will identify:
- The transaction as **Cashed Check Returned,** and
- The related fee as Cashed Check Returned Fee (not all checking products are charged a fee for this transaction but for those that are, this fee will still be $12).

**This is not a new transaction type or fee,** just a clearer description of this type of account activity. Today, we describe both deposited and cashed items that are returned to us without being paid as Deposited Item Returned. After July 22, we will use this description only for deposited checks that are returned.

All of the terms and conditions of your account remain the same. If you have questions, please call us toll-free at the number on this statement or visit any Chase branch.

## CHECKING SUMMARY | Chase Better Banking Checking

| | AMOUNT |
|---|---|
| **Beginning Balance** | $49,983.00 |
| **Ending Balance** | $49,983.00 |

There has been no activity on your account during this statement period. You may not receive a statement through the mail in the future if there is no activity on your account. You can always view your account activity and statement by logging on to your account through chase.com. If you have questions, please call us at the number on this statement.

Good News. Your Monthly Service Fee was waived because you had at least a $1,500 balance in your Chase Better Banking Checking account at the end of the business day before the last day of your statement period or an average daily balance of $5,000 in qualifying linked deposits, investments, credit cards, mortgage and other loans during your statement period.



**CHASE**

JPMorgan Chase Bank, N.A.
P O Box 659754
San Antonio, TX 78265-9754

July 10, 2013 through August 08, 2013
Account Number: ████████ 4857



00008706 DRE 802 143 22113 NNNNNNNNNNN T 1 000000000 06 0000
CARPENTER CHARITABLE REMAINDER TRUST
DANIEL E CARPENTER TRUSTEE
DANIEL E CARPENTER TRUSTEE
100 GRIST MILL LN
SIMSBURY CT 06070-2484

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | Chase.com |
| Service Center: | 1-800-935-9935 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-877-312-4273 |
| International Calls: | 1-713-262-1679 |

We are limiting our Returned Item fees.

Good News! We will charge only one Returned Item fee for any payment request we return unpaid more than once per month, even if the biller submits the same request multiple times. This is just one of the ways that we are working to make banking easier and less expensive for our customers.

We are here to help. If you have any questions, please call us at the number on this statement or visit your nearest branch.

## CHECKING SUMMARY   Chase Better Banking Checking

| | AMOUNT |
|---|---|
| Beginning Balance | $49,983.00 |
| Ending Balance | $49,983.00 |

There has been no activity on your account during this statement period. You may not receive a statement through the mail in the future if there is no activity on your account. You can always view your account activity and statement by logging on to your account through chase.com. If you have questions, please call us at the number on this statement.

Good News. Your Monthly Service Fee was waived because you had at least a $1,500 balance in your Chase Better Banking Checking account at the end of the business day before the last day of your statement period or an average daily balance of $5,000 in qualifying linked deposits, investments, credit cards, mortgage and other loans during your statement period.

# CHASE ⬡

JPMorgan Chase Bank, N.A.
P O Box 659754
San Antonio, TX 78265-9754

August 09, 2013 through September 10, 2013

Account Number: ████ 4857

## CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | Chase.com |
| Service Center: | 1-800-935-9935 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-877-312-4273 |
| International Calls: | 1-713-262-1679 |

00008156 DRE 802 143 25413 NNNNNNNNNNN T 1 000000000,06 0000
CARPENTER CHARITABLE REMAINDER TRUST
DANIEL E CARPENTER TRUSTEE
DANIEL E CARPENTER TRUSTEE
100 GRIST MILL LN
SIMSBURY CT 06070-2484

## Deposit Account Agreement Update

We will update Section H in our Deposit Account Agreement titled Closing Your Account.
Effective July 21, 2013, if you have pending transactions on your account,
or are overdrawn, we may not immediately close the account. However, if you ask us,
we will restrict additional withdrawals from your account, other than the pending
transactions. We will not pay any interest on the account after we have restricted
your account.

This change will be reflected in your account agreement; all other terms remain the same.
If you have questions, please call us at the telephone number listed on this account
statement or visit the nearest Chase branch.

## CHECKING SUMMARY   Chase Better Banking Checking

| | AMOUNT |
|---|---|
| Beginning Balance | $49,983.00 |
| Ending Balance | $49,983.00 |

There has been no activity on your account during this statement period. You may not receive a statement through the mail
in the future if there is no activity on your account. You can always view your account activity and statement by logging on
to your account through chase.com. If you have questions, please call us at the number on this statement.

Good News. Your Monthly Service Fee was waived because you had at least a $1,500 balance in your Chase Better
Banking Checking account at the end of the business day before the last day of your statement period or an average daily
balance of $5,000 in qualifying linked deposits, investments, credit cards, mortgage and other loans during your statement
period.

# EXHIBIT 24

Page 1

AMERICAN ARBITRATION ASSOCIATION
--------------------------------------

In the Matter of the Arbitration

between

LIFE INSURANCE FUND ELITE TRUST,

Claimant,

-and-

AVON CAPITAL, LLC,

Respondent.

AAA File No. 01-140000-0577

--------------------------------------

October 30, 2015
10:00 a.m.

Otterbourg P.C.
230 Park Avenue
New York, New York

B e f o r e :
CHARLES MOXLEY,
Arbitrator

Reported by:
Joseph R. Danyo

HUDSON REPORTING & VIDEO        1-800-310-1769

Page 2

1
2    A P P E A R A N C E S :
3
     OTTERBOURG P.C.
4        Attorneys for Claimant
         230 Park Avenue
5        New York, New York 10169-9100
6    By:  PETER FELDMAN, ESQ.
         JOHN BOUGIAMAS, ESQ.
7
8
     LEYDEN & MAIN LEGAL GROUP, P.C.
9        Attorneys for Respondent
         243 Tresser Boulevard
10       17th Floor
         Stamford, Connecticut 06901
11
     By:  JACK E. ROBINSON, ESQ.
12
13
     K&L GATES LLP
14       Attorneys for Wells Fargo Bank N.A.
         600 N. King Street
15       Wilmington, Delaware 19801
16   By:  ANDREW SKOUVAKIS, ESQ.
         (Via Teleconference)
17
18
19   Also Present:
20       CHRISTOPHER YOUNG (Via Teleconference)
21       RICHARD BARBASH
22       DONALD TRUDEAU
23          ~oOo~
24
25

Page 3

1        Proceedings
2        THE ARBITRATOR:  Good morning,
3    everybody.  This is the hearing in an
4    American Arbitration Association case
5    between Life Insurance Fund Elite Trust,
6    claimant, and Avon Capital, LLC.  We have
7    been working on this case for quite a long
8    time.  I have been on the phone with counsel
9    for I think it is close to a year, so I am
10   glad we are at this point where we are
11   starting the hearing, and I guess we're good
12   to go.  Why don't we have appearances from
13   everyone.
14       MR. FELDMAN:  Peter Feldman, Otterbourg
15   P.C. on behalf of the claimant.
16       MR. BOUGIAMAS:  John Bougiamas,
17   Otterbourg P.C. on behalf of the claimant as
18   well.
19       MR. ROBINSON:  Jack Robinson, Leyden &
20   Main Legal Group on behalf of the respondent
21   Avon Capital.
22       THE ARBITRATOR:  Mr. Trudeau, do you
23   want to identify yourself?
24       MR. TRUDEAU:  Don Trudeau for Avon
25   Capital.

Page 4

1        Proceedings
2        THE ARBITRATOR:  Okay.  I think we said
3    in the last conference call that counsel
4    could make opening statements if they
5    wanted, and we were contemplating something
6    relatively brief, 15 or 20 minutes, if that
7    works for everybody.  And we also said I
8    think Mr. Robinson said he may reserve,
9    which he is entitled to do.
10       MR. FELDMAN:  Just before we get there,
11   I have two other things.  One is we have
12   presented to you the joint exhibits of the
13   claimant and the respondent, the three
14   binders that are before you.
15       THE ARBITRATOR:  I see that.  Thank you.
16       MR. FELDMAN:  And those we have agreed
17   will be admitted into evidence.
18       THE ARBITRATOR:  They are hereby
19   admitted.
20       MR. ROBINSON:  Are you going to admit
21   all of them or are you just going to admit
22   ones you reference?
23       MR. FELDMAN:  No, I thought we were
24   going to admit all of them.
25       MR. ROBINSON:  No objection.

1 (Pages 1 to 4)

Page 93

Young

1
2      Q.  In fact, right next to their names it
3    says as special common member or as common member,
4    correct, or as managing member?
5      A.  Yes, it does say that.
6      Q.  So if you remember, in your testimony
7    with Mr. Feldman, Wells Fargo wired $35 million to
8    these three parties, correct?
9      A.  That's correct.
10      Q.  So isn't it safe to assume that in
11    return for the $35 million that these parties
12    received, that they gave up something?
13      A.  Well, I don't want to assume anything.
14    What I stated was --
15      Q.  Excuse me.  Hold on.
16      THE ARBITRATOR:  Let him finish.
17      Excuse me, Mr. Young, could you just go
18    back and repeat yourself.  The court
19    reporter needs to hear you and having
20    difficulty at that moment.
21      MR. ROBINSON:  I will withdraw the
22    question if I may and restate.
23      THE ARBITRATOR:  All right.  Go ahead.
24      Q.  Strike that last question, Mr. Young.
25    What do you think those three parties received in

Page 94

Young

1
2    return for the 35 million?
3      MR. FELDMAN:  Objection as to form.  I
4      think you should restate that.  I don't
5      think it came out the way you wanted to ask
6      it.  It is backwards.
7      Q.  I am going to restate the question again
8    on the advice of Mr. Feldman.  In your view, based
9    on your position at Wells Fargo and familiarity
10    with the documents, what do you believe these three
11    parties that I just mentioned received in return
12    for the $35 million that Wells Fargo wired to these
13    three parties?
14      A.  I can only assume that these parties
15    were part of potentially this agreement that I am
16    looking at here, and the $35 million of the money
17    that they received, the allocations that they
18    received, were for -- well, I don't want to assume.
19      Q.  Do you know?
20      A.  I do not know.
21      Q.  Well, would it surprise you if I told
22    you that Avon ended up owning all of the membership
23    interests of the LLC, because Wells Fargo wired
24    $35 million to these original LLC members?  Would
25    that surprise you?

Page 95

Trudeau

1
2      A.  It would not surprise me.  Again, I was
3    not privileged to that information.
4      MR. ROBINSON:  One minute, please, Mr.
5      Moxley.
6      (Discussion off the record)
7      MR. ROBINSON:  No further questions.
8    Thank you.
9      MR. FELDMAN:  I have no questions of
10    this witness.
11      THE ARBITRATOR:  Okay.  Who is next?
12      MR. ROBINSON:  Mr. Trudeau.
13      MR. FELDMAN:  Mr. Young, Mr. Trudeau is
14    about to testify.  We're just going to have
15    to reconfigure in the room here, so he has
16    to move seats.  That is all that is going
17    on.
18      MR. ROBINSON:  It is now 11 o'clock so
19    we can go for an hour, I would think, before
20    lunch.
21      THE ARBITRATOR:  Sure.
22    D O N A L D   T R U D E A U, having been first duly
23    sworn by Joseph R. Danyo, a Notary Public, was
24    examined and testified as follows:
25    EXAMINATION BY MR. ROBINSON:

Page 96

Trudeau

1
2      Q.  Please state your name.
3      A.  Don Trudeau.
4      Q.  With respect to this arbitration, what
5    is your position?
6      A.  I am here as a representative of Avon
7    Capital, LLC.
8      Q.  What is your address, by the way?
9      A.  My home address?
10      Q.  Or business address.
11      A.  25 Seir Hill Road, Norwalk, Connecticut.
12      Q.  You have heard the testimony today
13    regarding these documents.  Do these documents
14    paint the entire full picture of what happened with
15    respect to this transaction?
16      A.  I'm not precisely sure which documents
17    you are talking about.  If you are just talking
18    about the documents --
19      Q.  The PSA and the bills of sale.
20      A.  They do not.
21      Q.  All right.  Well, what was the
22    transaction?
23      A.  Avon Capital was approached by
24    representatives of Life Fund Elite to consider a
25    transaction where it provided life assets, and I

24  (Pages 93 to 96)

Trudeau

1
2    it's just in color.
3         MR. FELDMAN:  I got it.
4    Q.  All right, Mr. Trudeau, if you could
5    continue referencing Exhibit 61 as needed to try to
6    explain what this transaction, quote unquote, was.
7         THE ARBITRATOR:  Just for my
8         understanding, you are talking about a
9         transaction.  This is talking, this exhibit
10        refers to a restructuring overview.  Is this
11        a restructuring of a relationship you
12        already had or from your perspective was
13        this something new?
14        THE WITNESS:  This was something new
15        from Avon's perspective, and this was the
16        proposed structure that Avon was initially
17        entering into with the fund.
18   Q.  By the way, why is it called a
19   restructuring overview?  So it is the fund that is
20   doing the restructuring, not Avon, right?
21        A.  Yes.  The fund is restructuring, and the
22   restructuring in particular relates to a couple of
23   elements.  The first element is a restructuring of
24   the current investor members in the fund.  Those
25   are represented in the box in the far right, far

Trudeau

1
2    upper right, which is actually below the halfway
3    part of it where it says current life members Orix
4    LS, Swiss Re and Bounty.
5    Q.  So continue, please.  Explain, for
6    example, let's start with the two boxes, the
7    current life members in Avon.  What is going on
8    there?
9         A.  So the hub of the transaction is as
10   follows.  Life Insurance Fund Elite, as I said, was
11   an existing fund.  It had existing assets in the
12   fund.  It had an existing line with HSH Nordbank in
13   terms of a credit facility, and it had an existing
14   structure through which it held those assets.  This
15   Life Insurance Fund Elite Trust.
16        The proposed transaction was designed
17   basically to swap out the current members, the
18   current equity members in the fund.
19   Q.  By the way, the fund we refer to as the
20   LLC, correct?
21        A.  Correct.
22        MR. FELDMAN:  Let's all agree because it
23        goes back and forth.  LLC and the fund, we
24        all mean the same thing, which is Life
25        Insurance Fund Elite LLC.

Trudeau

1
2         THE WITNESS:  Right.
3         MR. ROBINSON:  Right.
4         MR. FELDMAN:  And the Trust, which is
5         sometimes called the Life Trust and
6         sometimes just the Trust, refers to Life
7         Insurance Fund Elite Trust.
8         THE WITNESS:  Correct.
9         MR. FELDMAN:  Okay, just so we have the
10        nomenclature.
11        THE WITNESS:  That's right.
12        MR. FELDMAN:  Great.  Thanks.
13   A.  So again, in this pictorial
14   representation, what is illustrated here, I think
15   effectively, is that the fund as a source of
16   liquidity would contribute to Avon $30 million.
17   The use of those funds would be to acquire the
18   membership interests from the current life equity
19   members, specifically Orix, Swiss Re and Bounty.
20   In exchange --
21        THE ARBITRATOR:  I'm sorry.  So the fund
22        would contribute to Avon how much?  Is that
23        here?
24        THE WITNESS:  Yes, 30 million.  It is
25        the top arrow going from the Trust to Avon.

Trudeau

1
2         THE ARBITRATOR:  I see.
3    A.  Then in turn Avon would make payment to
4    those members, the current members, who would be
5    gone.  They are basically out of the fund at that
6    point.
7         So each of these aspects were attractive
8    because the current members actually had
9    contributed more cash than they were getting back
10   for their memberships.  It was attractive to Avon
11   because it contributed policies to the fund.  This
12   says 40 policies.  That number is bracketed.  I
13   don't know that that is accurate in any sense, but
14   there were some number of policies that would
15   equate to $30 million in value.  It would be
16   contributed from Avon to the fund in exchange for
17   this $30 million in cash.
18   Q.  Let me try to summarize then.  So you
19   have heard testimony that Wells Fargo wired
20   $35 million to Orix, Swiss Re and a third party.
21   That was in essence the money that came from the
22   fund to pay off the old members?
23        A.  Yes.  That's right.  I'm not sure if
24   there is any materiality to that, but this
25   engineered structure obviously was agreed to by

Trudeau

1
2  Avon, but was structured, controlled entirely by
3  the fund's management and informed by the fund's
4  consultant and their various counsel.
5      Q.  I understand that, but my specific
6  question is the 35 million that was wired, in
7  return Avon received 100 percent of the fund's
8  membership interests?
9      A.  That's right.
10     Q.  Okay.  Then my second question is on the
11 bottom as part of this transaction, there was a
12 purchase and sale agreement.  Is that the PSA that
13 we have been referring to?
14     A.  That was the initial PSA that we
15 referred to.  That was the first one that we looked
16 at.  I don't remember what the exhibit number is,
17 but it is one of the early exhibit numbers.  2 or
18 4.
19     THE ARBITRATOR:  Counsel, you used a
20 number 35 million, which is different from
21 the chart, but you are saying -- let me just
22 ask you why are you using 35?
23     MR. ROBINSON:  Because that is the
24 amount that was wired.
25     Q.  Mr. Trudeau, I am assuming, because on

Trudeau

1
2  the chart 30 is in brackets, the real number is 35,
3  because that is what was wired, correct?
4      A.  That's correct, and that adjustment
5  simply reflects the amount of value that was
6  ascribed to the initially proposed schedule of
7  policies.
8      THE ARBITRATOR:  So what you are
9  testifying to, if I understand you, is that
10 you were Avon, you got $35 million or
11 actually you directed, you were going to get
12 it from Trust, and you directed that it be
13 sent out to Orix, Swiss Re and Bounty, who
14 were the current members of the LLC?
15     THE WITNESS:  Yes, and just so I'm
16 precise, I don't want to add confusion, but
17 to be precise, Avon consented to this
18 arrangement.  What ended up happening, and
19 it may be important later as we go through
20 this, is that underneath Avon, which is not
21 reflected here, counsel for Avon created a
22 special purpose vehicle called Avon Capital
23 Holdings, LLC into which 100 percent of the
24 membership interests went.  The reason for
25 that was that it was an entirely

Trudeau

1
2  bankrupt-remote entity and intended to be
3  creditor-proof, so all that happened was
4  that the fund switched out members.  They
5  needed to get rid of Orix, Swiss Re and
6  Bounty, and they wanted to get rid of them
7  at a meaningful discount, so there was some
8  pressure to do this as quickly as possible.
9  The fund did that.
10     There was a PSA that outlined all of the
11 assets.  This is a critically important
12 thing that we are going to discuss in a
13 second.  There was a schedule of assets that
14 the fund initially looked at to make these
15 valuations.  They didn't do a full formal
16 evaluation.  We are going to go through that
17 in a little bit of detail.
18     So the membership interests then were
19 transferred to the special purpose vehicle.
20 The Trust was instructed to wire directly to
21 the fund members.  That amount is reflected
22 here as 30 million.  In actuality, as Jack
23 referenced, it became 35 million, and there
24 was some initial schedule that reflected not
25 40 policies but some number of policies that

Trudeau

1
2  equated to this $35 million in value.
3      As soon as that was done, these fund
4  members disappeared, and then the follow-up,
5  and I will keep going with the rest of the
6  transaction in a second, but the follow-up,
7  which we can go to right after we finish the
8  transaction, the follow-up was that the fund
9  needed to review in its entirety each of
10 these assets to make sure that it had a
11 formal valuation that it could accept into
12 the fund and that fit the criteria of the
13 fund's principal creditor.
14     So what has been discussed so far is
15 entirely about Wells Fargo, and Wells Fargo
16 had an important role as the trustee of the
17 Trust.  However, it was a custodian.  It was
18 a custodian who as I think opposing counsel
19 points out, its role was to enforce the
20 tenets of the Trust for those beneficiaries.
21 It didn't guide anything.  It didn't make
22 these decisions of its own accord.  I have
23 never spoken to, by the way, or no
24 representative that I am aware of from Avon
25 spoke to them, but their role was to

New York
Connecticut

Hudson Reporting & Video
Nationwide 1-800-310-1769

New Jersey
Pennsylvania

Page 133

Trudeau

2  transaction. They would, the fund is the
3  they, would issue an additional membership
4  interest in exchange for the contribution of
5  this, so I mean it can only be two things.
6  It is either you pay me for it, right, so
7  that is an equal clear transaction, or it is
8  a capital account. I am giving it to you to
9  bolster your capital account.
10       THE ARBITRATOR: So in terms of what you
11  did is you delivered policies, and you got a
12  capital account in the LLC that owned the
13  assets after the transaction?
14       THE WITNESS: That's right.
15       Q. Then, to continue that line, when GWG
16  fell out and you delivered more policies, you had
17  an increase in your capital account for doing that?
18       A. That's right. But the only reason for
19  that second in kind thing was because they weren't
20  there. Otherwise we wouldn't have done that. So
21  what is important to note here or two things, I
22  think. One, just to clarify, so Avon did not
23  manage these assets directly.
24       THE ARBITRATOR: Even before?
25       THE WITNESS: Even before.

Page 134

Trudeau

2       A. It held them some in an offshore entity
3  called Tranen. Some were managed in another
4  facility, Ridgewood Asset Management, but these
5  were more expensive capital structures that were
6  much more tactical in nature and where the cost of
7  capital there was 15, 18, 20 percent as opposed to
8  six or seven-year, whatever it was, five-year
9  remaining on 2 percent.
10       THE ARBITRATOR: So when you talked
11  about switching out the death person, you
12  meant that from Avon's perspective you got
13  rid of these other outfits that you were
14  using for management and for funding, and
15  you were in a position now through the fund
16  to take advantage of the HSH Nordbank
17  facility, which was a much more advantageous
18  facility?
19       THE WITNESS: That's right, and this is
20  the main point, so there is a universe of
21  assets. If you reject that universe of
22  assets, it is not as though Avon has another
23  universe of assets to pull from. So when
24  over time those assets were rejected, Avon
25  broadened its fulfillment activities to

Page 135

Trudeau

2  those assets that were beyond its direct
3  ownership or control.
4       THE ARBITRATOR: And why is that?
5  Because the fund -- well, explain that. I
6  don't follow that.
7       THE WITNESS: Avon sends them 40
8  policies, they reject 20, I have got to
9  replace 20. I have another ten I can give
10  you, but then I don't have the other ten.
11  So what to be done? So we went to get these
12  other ten, and not to make too fine a point
13  of it, I don't want to get yet to this level
14  of detail, but each of these policies, even
15  the ones that Avon controlled directly, if
16  it takes you 30, 60, 90 days, sometimes
17  more, and the reason it would take you more
18  is if you needed to do a life expectancy
19  review, so they would say they are
20  tentatively in the fund, listed at some
21  value, while that is happening, the fund is
22  not paying those premiums. Somebody has to
23  pay those premiums.
24       So if they were Avon's, they were under
25  Avon's control, great, that's fine, but if

Page 136

Trudeau

2  they are someone else's, they're someone
3  else's management or they're subject to some
4  other facility, they need to be paid. If
5  they are not paid, the policy lapses. It is
6  just black and white. I mean there is no
7  way to transfer that obligation from the
8  agreement between Avon and Life Elite to an
9  insurance company or to a third party, and
10  in some of those cases even those were
11  rejected or they went back and forth.
12       I mean not to pick on a particular one,
13  but since there was a little time spent with
14  the expert on Blau, Blau went back and forth
15  for that very same reason. I don't remember
16  precisely, but I think that Blau was one of
17  the policies that was in at the very end
18  eventually, so eventually it did make it in
19  after being in and out and back and forth.
20       And I didn't follow exactly his
21  accounting for it, but you can see that on
22  the schedule it went in, it was valued at a
23  million 5, and then it came back, and we
24  owed him 2 million. So we lost 500,000 even
25  though we did nothing, and then it comes

34  (Pages 133 to 136)

# EXHIBIT 25

United States District Court
District of Massachusetts

```
                              )
JOSEPH IANTOSCA, Individually )
and as Trustee of the Faxon   )
Heights Apartments Realty Trust )
and Fern Realty Trust, BELRIDGE )   Civil Action No.
CORPORATION, GAIL A. CAHALY,  )     08-11785-NMG
JEFFREY M. JOHNSTON, BELLEMORE )
ASSOCIATES, LLC, and          )
MASSACHUSETTS LUMBER COMPANY, )
INC.                          )
                              )
          Plaintiffs,         )
                              )
          v.                  )
BENISTAR ADMIN SERVICES, INC., )
DANIEL CARPENTER, MOLLY       )
CARPENTER, BENISTAR PROPERTY  )
EXCHANGE TRUST COMPANY, INC., )
BENISTAR LTD., BENISTAR EMPLOYER )
SERVICES TRUST CORPORATION,   )
CARPENTER FINANCIAL GROUP, LLC, )
STEP PLAN SERVICE INC., BENISTAR )
INSURANCE GROUP, INC., and    )
BENISTAR 419 PLAN SERVICES INC. )
                              )
          Defendants.         )
                              )
TRAVELERS INSURANCE COMPANY and )
CERTAIN UNDERWRITERS AT LLOYDS, )
LONDON                        )
                              )
          Reach and Apply     )
          Defendants.         )
                              )
```

**MEMORANDUM & ORDER**

GORTON, J.

In this case to recover a Massachusetts state court

judgment, the plaintiffs have filed a motion for a preliminary

injunction to prevent certain reach and apply defendants from
disbursing settlement proceeds resulting from litigation in
Pennsylvania.

I.   **Background**

A.   **Factual Background**

Plaintiffs claim that they are judgment creditors of several
of the defendants in an aggregate of $20 million.  That judgment
("the Cahaly Judgment") is the product of an action in the
Massachusetts Superior Court, Suffolk County, ("the Cahaly
Litigation") in which it was held that several of the defendants
improperly invested plaintiffs' escrowed funds.

Defendants Benistar Property Exchange Trust Company, Daniel
Carpenter, Molly Carpenter, Benistar Admin Services, Inc.
("BASI"), Benistar Ltd, Benistar Employer Services Trust
Corporation and Carpenter Financial Group, LLC (together "the
Original Defendants") were parties to the Cahaly Litigation and
are subject to the resulting judgment.  The remaining defendants
in this lawsuit, Benistar Insurance Group, Benistar 419 Plan
Services, Inc. and Step Plan Services Inc. ("Step") (together
"the New Defendants"), were not parties to the Cahaly Litigation.

Plaintiffs' allege that 1) the defendants have recently
settled a Pennsylvania lawsuit brought by the defendants ("the
Step Plan Settlement") and 2) Travelers Insurance Company and
Certain Underwriters of Lloyds, London ("the Reach and Apply

-2-

Defendants") are poised to deliver the proceeds of the Step Plan Settlement to one of the defendants.  Plaintiffs seek to reach and apply those proceeds in satisfaction of the Cahaly Judgment.

Defendant Step is the administrator of the Step Plan ("the Plan"), a multiple employer welfare benefit plan subject to ERISA.  The Plan provides severance, disability and death benefits to the beneficiaries of covered employees of participating employers.  Step asserts that 1) the entire Step Plan Settlement is payable to it and not to any of the Original Defendants, 2) it is acting solely on behalf of the Plan in the Pennsylvania litigation and 3) the Plan is the anticipated beneficiary of the Step Plan Settlement.

The Reach and Apply Defendants have been temporarily restrained, by order of this Court, from distributing any of the proceeds of the Step Plan Settlement to Step or to any other defendant.  Plaintiffs now seek to convert that order into a preliminary injunction.

**B.   Procedural History**

Plaintiffs originally filed this suit in Suffolk Superior Court and obtained an ex parte, temporary restraining order enjoining the Reach and Apply Defendants from conveying or disposing of any property of the defendants with respect to the Step Plan Settlement.  Following the entry of that order defendants removed the case to federal court and, subsequently,

-3-

filed motions to dismiss.  Those motions, which are opposed, are

not addressed in this Memorandum and Order which, instead, deals

only with plaintiffs' motion for a preliminary injunction.

On October 28, 2008, the plaintiffs moved this Court to

extend the State Court's temporary restraining order.  Following

a hearing, this Court entered its own temporary restraining order

("the TRO").  Contemporaneously, plaintiffs moved for a

preliminary injunction which defendants oppose.  A hearing on

that motion was held on November 14, 2008, at the conclusion of

which the Court extended the TRO for one week.

### III. **Motion for Preliminary Injunction**

####      **A.    Legal Standard**

To obtain preliminary injunctive relief under Fed. R. Civ.

P. 65, a movant must demonstrate:

> (1) a substantial likelihood of success on the merits;
>
> (2) a significant risk of irreparable harm if the
> injunction is withheld;
>
> (3) a favorable balance of hardships; and
>
> (4) a fit (or lack of friction) between the injunction
> and the public interest.

Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003)

(citation omitted).  Likelihood of success on the merits is the

critical factor in the analysis.  Weaver v. Henderson, 984 F.2d

11, 12 (1st Cir. 1993) (citations omitted).

-4-

_____**B.**   **Application**

   **1.**   **Likelihood of Success on the Merits**

   This Court finds that plaintiffs have shown a likelihood of
success on the merits with respect to both the Original
Defendants and the New Defendants, including Step.

_____**a.**   **The Original Defendants**

   The Original Defendants are, by definition, subject to the
Cahaly Judgment and plaintiffs have, therefore, demonstrated that
they will likely succeed on the merits of their reach and apply
claims with respect to those defendants.  Although the Original
Defendants respond that Step is the "sole payee" of the Step Plan
Settlement, this Court finds that argument to be unpersuasive.
First, it appears likely that plaintiffs will be able to prove
that Step is the sole payee of the Step Plan Settlement only
because the several defendants (which are plaintiffs in the
Pennsylvania lawsuit) have requested that the settlement be so
structured.  Were an injunction to omit the Original Defendants,
nothing would prevent a restructuring of the settlement to
designate one or all of those defendants as payees.  Furthermore,
if Step is, in fact, the sole payee of the Step Plan Settlement,
the Original Defendants will suffer no harm from the entry of a
preliminary injunction against them.

_____**b.**   **Defendant Step**

_____Plaintiffs have also demonstrated, to this Court's

-5-

satisfaction, a likelihood of success on the merits with respect
to their claim against defendant Step.___

_____            i.   **Corporate Disregard**

Because recovery against Step would undoubtedly depend upon
the application to it of the doctrine of corporate disregard, an
examination of that doctrine is essential.  In deciding whether
to disregard the corporate form, Massachusetts courts consider
the following 12 factors: 1) common ownership, 2) pervasive
control, 3) confused intermingling of business assets, 4) thin
capitalization, 5) nonobservance of corporate formalities, 6)
absence of corporate records, 7) non-payment of dividends, 8)
insolvency at the time of the litigated transaction, 9) the
siphoning away of corporate funds by the dominant shareholder,
10) non-function of officers and directors, 11) the use of the
corporation for transactions of the dominant shareholders and 12)
the use of the corporation in promoting fraud.  Scott v. NG U.S.
1, Inc., 450 Mass. 760, 768 (2008) (citation omitted).
Consideration of these factors with respect to the defendant Step
demonstrates that plaintiffs have shown that, in all likelihood,
the doctrine of corporate disregard applies.

Step's purported president, Wayne Bursey ("Bursey"), has
submitted an affidavit in which he states that Step 1) "fully
observes" corporate formalities, 2) maintains "abundant"
corporate records, 3) is not thinly capitalized and 4) does not

intermingle its business with the business of other Benistar companies. This Court, however, has serious reservations about the credibility of that affidavit in light of Bursey's deposition testimony given in April, 2007, in connection with the Pennsylvania lawsuit that resulted in the Step Plan Settlement. In his deposition, Bursey testified that Step a) had no board of directors or shareholders, b) did not hold annual meetings, c) did not have a corporate minute book, d) had an annual income of "literally zero" and e) had no financial statements because there was "literally no business to keep records of".

Moreover, other factors demonstrate a likelihood that Step has disregarded the corporate form. In his affidavit Bursey admits that Step pays no dividends and the fact that the defendants have requested the entire Step Plan Settlement be made payable to Step can be construed as evidence that Step is using the corporate form to perpetrate a fraud. Step's assertion that it is entitled to the entire settlement proceeds because it is the entity that paid the majority of the legal fees in the Pennsylvania lawsuit is inconsistent with Bursey's testimony that Step has no annual income and no business.[1] The assertion that Step paid abundant legal fees at a time when it had "literally zero" income and "no business to keep records of," belies its

---

[1]Although there is no indication that it would change this Court's analysis, evidence of Step's payment of legal fees which was requested for in camera review has not been forthcoming.

-7-

denial of the intermingling of corporate assets.

This Court finds that plaintiffs have demonstrated that the doctrine of corporate disregard will, in all likelihood, be found applicable to the defendant Step.  Whether that finding demonstrates a likelihood of success on the merits of plaintiffs claim against Step depends, in turn, upon whether the Cahaly Judgment in any way precludes plaintiffs from holding Step liable for that judgment.

### ii.  The Cahaly Judgment

The Cahaly Litigation proceeded in three phases.  In Phase I a jury found the defendants Benistar Property Exchange Trust Co., Inc., Daniel Carpenter, Martin Paley and Molly Carpenter liable for their conduct with respect to certain investments of plaintiffs' funds.  In Phase II, then Superior Court Judge Margot Botsford concluded that all the named defendants except Molly Carpenter were liable for violations of the Consumer Protection Act, M.G.L. c. 93A.  Phase III was a bench trial on the plaintiffs' claims of corporate disregard.  In that Phase, Judge Botsford determined that, pursuant to the doctrine of corporate disregard, Benistar Ltd., BASI, Benistar Employer Services Trust Corporation and Carpenter Financial Group, LLC were all liable for the judgments entered against the other defendants in Phases I and II.

Subsequently, a final judgment was entered against all of

-8-

the Original Defendants.  It is the final paragraph of that
judgment, however, that, according to Step, precludes the
plaintiffs from applying the doctrine of corporate disregard to
it.  That paragraph states:

> 8.    The Claims of All Plaintiffs Against the
>       Defendants Jane Doe Affiliates and Subsidiaries of
>       Benistar Defendants and Jane Doe Entities
>       controlled by Daniel Carpenter:
>
>       [It is ORDERED and ADJUDGED] [t]hat judgment enter
>       against all the plaintiffs and in favor of the
>       defendants Jane Doe Affiliates and Subsidiaries of
>       Benistar Defendants and Jane Doe Entities controlled by
>       Daniel Carpenter on all the plaintiffs' claims against
>       these defendants, and that all such claims be
>       dismissed.

If the defendant Step is considered to be a "Jane Doe" affiliate
or subsidiary, the Cahaly Judgment appears to have dismissed with
prejudice the plaintiffs' claims against it.  Those claims would
necessarily include plaintiffs' claim of corporate disregard.
Defendant Step contends that the subject paragraph precludes the
plaintiffs from enforcing the Cahaly Judgment against it.

This Court is unconvinced.  It seems doubtful that the
Cahaly Judgment was intended to foreclose prospectively
plaintiffs' ability to enforce that judgment against an entity
later determined to be an alter ego of the Original Defendants.
Nor is it clear that the Cahaly Judgment has preclusive effect
over plaintiffs' present claim.  Nevertheless, this Court is
reluctant to over-interpret state court judgments.  Therefore, as
a condition of the continuation of the preliminary injunction to

-9-

be enforced by this Memorandum and Order, this Court will require
the plaintiffs to exercise due diligence to obtain a
clarification of the Cahaly Judgment from the Suffolk Superior
Court and periodically to update this Court on the progress of
that effort.

### 2. Irreparable Harm

Plaintiffs have also shown that, with respect to both the
Original Defendants and the defendant Step, there is a risk of
irreparable harm if an injunction is not imposed. Where the
relief sought is monetary, irreparable harm requires a showing
that a defendant may dissipate or conceal assets. Micro Signal
Research, Inc. v. Otus, 417 F.3d 28, 31 (1st Cir. 2005) (citation
omitted).

Here the Court readily determines, by reference to the
opinion in the Cahaly Litigation, that the doctrine of corporate
disregard applies to the Original Defendants. This determination
is based, at least in part, on the earlier finding that those
entities abused the corporate form. In light of that finding,
and this Court's own determination that Step is likely abusing
the corporate form, the Court is satisfied that there is a
substantial risk that, unless enjoined, the defendants will
dissipate or conceal the assets of the Step Plan Settlement.
Consequently, plaintiffs have demonstrated irreparable harm in
the absence of an injunction.

-10-

### 3.   Balance of Hardships and Public Interest

Finally, this Court concludes that the plaintiffs have adequately shown that, as judgment creditors, the balance of hardships weighs in their favor.  The harm to defendants resulting from a temporary delay in collecting the Step Plan Settlement is outweighed by the risk that plaintiffs may be unable to satisfy their judgment.  Furthermore, ensuring that assets about to be disbursed to judgment debtors remain available to their creditors is in the public interest.

ORDER

In accordance with the foregoing, plaintiffs' motion for preliminary injunction (Docket No. 20) is **ALLOWED** and a preliminary injunction in the form attached hereto will be entered.


**So ordered.**

                                    /s/ Nathaniel M. Gorton
                                    Nathaniel M. Gorton
                                    United States District Judge


Dated: November 21, 2008

# EXHIBIT 26

**From:** Michael Barnett [mbarnett@loeb.com]
**Sent:** Monday, May 05, 2014 1:13 PM
**To:** michael@mstaylorlaw.com
**Subject:** FW: BPETCO w-9 Litigation Group for New Check sent Feb 7, 2014


Michael Barnett
Attorney At Law
Loeb & Loeb LLP
345 Park Avenue | New York, NY 10154
Direct Dial: 212.407.4163 | Fax: 212.656.1554 | E-mail: mbarnett@loeb.com

Los Angeles | New York | Chicago | Nashville | Washington, DC | Beijing | Hong Kong | www.loeb.com

---------------------------------------------------------------------
CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail
messages attached to it may contain confidential information that is legally privileged. If you are
not the intended recipient, or a person responsible for delivering it to the intended recipient,
you are hereby notified that any disclosure, copying, distribution or use of any of the information
contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this
transmission in error, please immediately notify the sender. Please destroy the original
transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb
LLP.
---------------------------------------------------------------------

-----Original Message-----
From: DCarpenter US Benefits [mailto:dcarpenter@usbgi.com]
Sent: Thursday, May 01, 2014 12:04 PM
To: 'Michael A. Zamat'; jamesyellen@yahoo.com; Joseph M. Pastore III; Kolovos, Peter
Cc: DCarpenter US Benefits
Subject: RE: BPETCO w-9 Litigation Group for New Check sent Feb 7, 2014

Mike:

This is official notice to you and Joe that Pastore Dailey is terminated from representing BPETCO
in any way shape or form.  Your services are no longer required......and we will deal directly with
Merrill.

Please do not interfere with our collecting the money due to BPETCO Litigation Group, LLC as it is
your negligence to date that has prevented us from collecting the money.  Judge Swain certainly
does not have jurisdiction over BPETCO....nor does any court in Boston.

Please govern yourselves accordingly,

Dan

-----Original Message-----
From: Michael A. Zamat [mailto:MZamat@psdlaw.net]
Sent: Thursday, May 01, 2014 11:25 AM
To: DCarpenter US Benefits; jamesyellen@yahoo.com; Joseph M. Pastore III
Subject: RE: BPETCO w-9 Litigation Group for New Check sent Feb 7, 2014

Dan:

JLM042051

I believe Joe emailed you last week about this.  He informed you then that we cannot turn the check over to BPETCO because Judge Swain has specifically enjoined us from doing so.  We specifically asked her not to - in fact, we requested that we be allowed to deliver the money to BPETCO.  We were not so allowed.  Instead, she has ordered us to have the money deposited in a financial institution, and we have been working on doing so.  Judge Swain has ordered that the corpus be placed an escrow or attorney trust account (see attached order, also sent to you last week).  The check is currently made out to BPETCO and, as we have told you, we cannot negotiate the check if it is not made out to our firm as it will have to be deposited in our firm's trust or escrow account.

I am also attaching a letter that we sent to Peter Kolovos regarding this matter which outlines what needs to be done here.  You will see that, per the Court order, we suggested that Merrill issue a new check payable to Pastore & Dailey LLC in trust for BPETCO or initiate a wire pursuant to Section 5(a) of the Settlement Agreement.  Peter has told us that he will issue such a check as long as you and we sign a short amendment to the Settlement Agreement.

As you know, the payment cannot be made directly to BPETCO per Judge Swain's order and the Massachusetts TRO proceedings.

Please let us know if you will sign the amendment which will allow our firm to hold the funds and so that they can be deposited into an escrow or trust account.

Michael A. Zamat, Esq.
Counsel
PASTORE & DAILEY LLC
4 High Ridge Park, Third Floor
Stamford, CT 06905
203.658.8461 (p) / 203.348.0852 (f)
www.psdlaw.net
MZamat@psdlaw.net

_____
IRS Circular 230 Disclosure:  To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.
Confidentiality Notice:  This email message and all included attachments is being sent by a lawyer or on behalf of a lawyer, and is intended only for the addressee. The information contained in this email may be confidential and/or privileged. If you are not the named addressee, you are not authorized to read, print, copy, retain copies of, or disseminate this email in any manner. If you have received this email in error, please notify the sender immediately and delete any and all copies of the email message and all attachments included therein.


-----Original Message-----
From: DCarpenter US Benefits [mailto:dcarpenter@usbgi.com]
Sent: Thursday, May 01, 2014 10:16 AM
To: jamesyellen@yahoo.com; Michael A. Zamat; Joseph M. Pastore III
Cc: DCarpenter US Benefits
Subject: FW: BPETCO w-9 Litigation Group for New Check sent Feb 7, 2014

To All:

Let's get the check made out to the CORRECT party this time, and I will pick up the check at Wilmer Hale and save Joe the trouble....This is very easy to do......please have Merrill follow instructions this time......no reason to have Pastore Dailey involved

Please see below........and do not blow it this time....first time mistake......this time enemy action.....

Thanks,

Dan

-----Original Message-----
From: DCarpenter US Benefits
Sent: Friday, February 07, 2014 12:17 PM
To: Joseph M. Pastore III (Jpastore@psdlaw.net); Michael A. Zamat (MZamat@psdlaw.net)
Cc: DCarpenter US Benefits
Subject: FW: BPETCO w-9 Litigation Group

Thanks Mike

-----Original Message-----
From: Michael A. Zamat [mailto:MZamat@psdlaw.net]
Sent: Friday, February 07, 2014 12:16 PM
To: DCarpenter US Benefits
Subject: FW: BPETCO w-9

This is BPETCO Litigation Group W9.

Michael A. Zamat, Esq.
Counsel
PASTORE & DAILEY LLC
4 High Ridge Park, Third Floor
Stamford, CT 06905
203.658.8461 (p) / 203.348.0852 (f)
www.psdlaw.net
MZamat@psdlaw.net

_____
IRS Circular 230 Disclosure:  To ensure compliance with requirements imposed by the IRS, we inform
you that any U.S. federal tax advice contained in this communication (including any attachments) is
not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties
under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any
transaction or matter addressed herein.
Confidentiality Notice:  This email message and all included attachments is being sent by a lawyer
or on behalf of a lawyer, and is intended only for the addressee. The information contained in this
email may be confidential and/or privileged. If you are not the named addressee, you are not
authorized to read, print, copy, retain copies of, or disseminate this email in any manner. If you
have received this email in error, please notify the sender immediately and delete any and all
copies of the email message and all attachments included therein.

-----Original Message-----
From: DCarpenter US Benefits [mailto:dcarpenter@usbgi.com]
Sent: Thursday, January 30, 2014 6:01 PM
To: Michael A. Zamat; Joseph M. Pastore III
Subject: FW: BPETCO w-9

Did you receive???

JLM042053

# EXHIBIT 27

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release ("Settlement Agreement") is entered into as of this 8th day of June, 2011, by and among The Penn Mutual Life Insurance Company ("Penn Mutual"), the Charter Oak Trust, by and through Nova Group, Inc., its trustee ("Charter Oak"), Wayne H. Bursey, and J. Edward Waesche ("Waesche") (collectively referred to as the "Parties," and any one individually as a "Party").

WHEREAS, on or about September 26, 2008, Penn Mutual issued life insurance Policy No. 8214580, with a face amount of $4,000,000.00, insuring the life of Teresa Martinez, with Charter Oak as the owner and beneficiary (the "Martinez Policy");

WHEREAS, on or about June 10, 2008, Penn Mutual issued life insurance Policy No. 8211012, with a face amount of $7,500,000.00, insuring the life of Patricia Biermaier, with Charter Oak as the owner and beneficiary (the "Biermaier Policy");

WHEREAS, on or about August 1, 2008, Penn Mutual issued life insurance Policy No. 8214705, with a face amount of $5,000,000.00, insuring the life of Miriam Knobloch, with Charter Oak as the owner and beneficiary (the "Knobloch Policy");

WHEREAS, on or about September 18, 2009, Penn Mutual issued life insurance Policy No. 8229381, with a face amount of $2,000,000.00, insuring the life of Marvin Carrin, with Charter Oak as the owner and beneficiary (the "Carrin Policy");

WHEREAS, Charter Oak is currently the sole owner and beneficiary of the Martinez Policy, the Biermaier Policy, the Knobloch Policy, and the Carrin Policy (collectively, the "Policies");

-1-

JLM032116

WHEREAS, on or about September 24, 2010, Penn Mutual commenced an action against Charter Oak and Waesche, *inter alia*, in the United States District Court for the District of Connecticut (the "Martinez Litigation");

WHEREAS, on or about May 12, 2010, Penn Mutual commenced an action against Charter Oak and Waesche, *inter alia*, in the Superior Court of the State of Connecticut (the "Biermaier Litigation");

WHEREAS, on or about July 29, 2010, Penn Mutual commenced an action against Charter Oak and Waesche, *inter alia*, in the Supreme Court of the State of New York, County of New York (the "Knobloch Litigation");

WHEREAS, Penn Mutual intended to commence an action against Charter Oak and Waesche, *inter alia*, in which Penn Mutual would seek a declaration that the Carrin Policy is void *ab initio* and that Penn Mutual may retain some or all of the premiums paid on the Carrin Policy ("Anticipated Carrin Litigation");

WHEREAS, to avoid further litigation and to minimize the costs and expenses in regard thereto, and without any admission by any of the Parties hereto as to any wrongdoing or liability, the Parties wish to resolve the disputes between them, as set forth below; and

WHEREAS, all of the foregoing recitals are incorporated into the covenants of this Agreement as if set forth herein at length.

NOW, THEREFORE, in consideration of the mutual agreements, covenants, conditions, and representations set forth below, and other good and valuable consideration, the Parties agree as follows:

-2-

JLM032117

1.     **Voiding and Rescission of the Policies.**  Effective as of the date that the Settlement Agreement is executed by the last Party hereto, the Policies shall be deemed rescinded, canceled, void as if never issued, and of no force and effect.

2.     **Consideration.**  Expressly conditioned upon the releases, preservation of claims and dismissal set forth herein, Penn Mutual will pay $600,000.00 (the "Settlement Payment") to Charter Oak within ten (10) days following Penn Mutual's receipt of a fully executed copy of this Settlement Agreement.  The Settlement Payment will be deemed received by the Trust upon delivery of the Settlement Payment, sent by overnight mail, to Joseph M. Pastore, III Fox Rothschild LLP, One Landmark Square, 21st Floor, Stamford, CT 06901.  At Charter Oak's request, and for its benefit and convenience, the check for the Settlement Payment shall be made payable to "Grist Mill Capital, LLC."

3.     **Dismissal of Litigation.**  Within ten (10) days following receipt of a fully executed copy of this Settlement Agreement by all Parties, counsel for Penn Mutual shall promptly submit to the respective Courts Stipulations for the Dismissal of the Martinez Litigation, the Biermaier Litigation, and the Knobloch Litigation, with prejudice, without costs, and with the Parties bearing their respective attorneys' fees and costs.  The forms of the proposed Stipulations of Dismissal are attached as Exhibits A, B, and C.  Additionally, Penn Mutual agrees to forego forever and not to pursue the Anticipated Carrin Litigation.

4.     **Penn Mutual's Release of Claims.**  For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Penn Mutual, on behalf of itself and all its predecessors, successors, assigns, affiliates, agents and attorneys (collectively, the "Penn Mutual Releasors"), forever releases, remises, acquits, and discharges, and covenants not to sue the Charter Oak Trust, Nova Group, Inc., as trustee of the Charter Oak Trust, Wayne H. Bursey, J.

-3-

STI 28776v3 05/31/11

JLM032118

Edward Waesche, and their respective successors, assigns, affiliates, agents, attorneys, trustees, and their respective lenders, creditors and beneficiaries (collectively, the "Trust Releasees"), from and with respect to all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, forfeitures, claims and demands whatsoever, of whatever nature, kind or description, in law, admiralty or equity, whether fixed or contingent, known or unknown, matured or unmatured, foreseen or unforeseen, and whether or not yet accrued or asserted, which as against the Trust Releasees the Penn Mutual Releasors ever had, now have or hereafter can, shall or may have for, upon or by reason of any matter, cause or thing arising from or relating to the Policies, as of the execution of this Settlement Agreement, except the rights and duties of the Parties under this Settlement Agreement, which shall remain in full force and effect. It is expressly understood that the releases set forth in this paragraph relate only to claims that arise from the Policies, and no other causes of action.

5. **Charter Oak Trust's Release of Claims.** For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Charter Oak Trust, Nova Group, Inc., as trustee of the Charter Oak Trust, Wayne H. Bursey, and J. Edward Waesche, on behalf of themselves and their predecessors, successors, assigns, affiliates, agents, attorneys, trustees, and their respective lenders, creditors, and beneficiaries (collectively, the "Trust Releasors"), forever release, remise, acquit, and discharge, and covenant not to sue Penn Mutual and its grantors, predecessors, successors, assigns and beneficiaries as well as its respective past, present or future agents and representatives (collectively, the "Penn Mutual Releasees"), from and with respect to all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds,

-4-

JLM032119

bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, forfeitures, claims and demands whatsoever, of whatever nature, kind or description, in law, admiralty or equity, whether fixed or contingent, known or unknown, matured or unmatured, foreseen or unforeseen, and whether or not yet accrued or asserted, which as against the Penn Mutual Releasees the Trust Releasors ever had, now have or hereafter can, shall or may have for, upon or by reason of any matter, cause or thing arising from or relating to the Policies, as of the execution of this Settlement Agreement, except the rights and duties of the Parties under this Settlement Agreement, which shall remain in full force and effect. It is expressly understood that the releases set forth in this paragraph relate only to claims that arise from the Policies, and no other causes of action.

6. **Preservation of Claims.** It is specifically understood that this is not an agreement to release any claims, demands, or causes of action that Penn Mutual has or may have against anyone other than the Trust Releasees or any claims, demands, or causes of action unrelated to the Policies that Penn Mutual has or may have against the Trust Releasees. Similarly, this is not an agreement to release any other claims, demands, and causes of action related to the Policies that the Trust Releasors may have against any party other than the Penn Mutual Releasees or any other claims, demands, and causes of action against Penn Mutual that are unrelated to the Policies. Said claims, demands, and causes of action are specifically reserved and retained.

7. **Confidentiality.** This Settlement Agreement, and its existence, terms and negotiation shall be confidential; provided that each Party may disclose this Settlement Agreement, or its terms, as is necessary or appropriate: (i) to its members, officers, directors, employees, agents, beneficiaries, creditors, independent contractors; (ii) to its legal counsel,

-5-

JLM032120

accountants, reinsurers, and/or tax advisors, and, if applicable, to its internal and external auditors, compliance personnel and regulators; (iii) to respond to a valid subpoena or other legal process, a request for information from regulatory and/or governmental authorities, or otherwise as required by law; (iv) to its successors and assigns; (v) to make any necessary tax filings, informational disclosures and/or other filings with regulatory and/or governmental authorities that are required by law; and (vi) as may be necessary to perform or enforce this Settlement Agreement. To the extent allowed by law, the Parties will notify each other in writing of the receipt of any legal process, subpoena, court order, administrative order or other request seeking or requiring disclosure of any information that is subject to the confidentiality provisions of this Settlement Agreement ("Disclosure Request"); provided, however, such notification shall not be required with respect to any such disclosure by the Parties to their respective attorneys or to their internal or external auditors, compliance personnel, creditors, regulators or, in the case of Penn Mutual, its reinsurers. Such notification shall be made within the earlier of five (5) calendar days of receipt or 48 hours before disclosure is required in response to the paper(s) received. If any Disclosure Request is received and any materials thereunder must be produced in less than 48 hours from such receipt, notification must be made in writing to the Parties as soon as practicable after such receipt.

8.     **Attorneys' Fees and Costs.** The Parties hereto expressly understand and agree that all attorneys' fees and any and all costs and expenses relating to the prosecution and defense of the Litigation shall be borne by the respective Parties and will not be recovered by any of said Parties from any of the other Parties.

9.     **No Transfer of Claims or Interests.** Each Party represents that it has not assigned, transferred, or conveyed all or any portion of the Released Claims as set forth herein.

-6-

JLM032121

Charter Oak further represents that it has never assigned, transferred, or conveyed all or any interest in Charter Oak or any interest in any of the Policies to any other individual, entity, or third-party. Charter Oak further warrants that it is the sole owner and beneficiary of the Policies.

      **10.**    **Notice.** Any notice, payment, demand or communication required or permitted to be given by any provision of this Settlement Agreement shall be in writing and shall be deemed to have been given when delivered personally or by facsimile (with a confirming copy sent within one (1) day by any other means described in this paragraph) to the party designated to receive such notice, or on the date following the day sent by overnight courier or on the third (3rd) day after the same is sent by certified mail, postage and charges prepaid, directed to the following addresses or to such other or additional addresses as any party might designate by written notice to the other Parties:

To Penn Mutual:

        The Penn Mutual Life Insurance Company
        c/o Franklin Best, Esq.
        600 Dresher Road
        Horsham, PA  19044

    With a copy to:

        James Hoffman, Esq.
        Drinker Biddle and Reath LLP
        One Logan Square, Ste. 2000
        Philadelphia, PA  19103

To Charter Oak and Waesche:

        Grist Mill Capital, LLC
        c/o Amanda Rossi
        Grist Mill Plaza
        100 Grist Mill Road
        Simsbury, CT 06070

JLM032122

With a copy to:

> Joseph M. Pastore, III
> Fox Rothschild LLP
> One Landmark Square, 21st Floor
> Stamford, CT 06901

11.     **No Admissions, Prevailing Party or Evidentiary Effect.** Each Party hereto denies and disclaims any wrongdoing or liability of any kind whatsoever, and enters into this Settlement Agreement solely for the purpose of avoiding further expense, uncertainty and inconvenience. No Party hereto shall be deemed to be a prevailing Party for any purpose. No Party hereto shall be entitled to any attorneys' fees or costs from the other, and each side shall bear its own fees and costs. Neither this Settlement Agreement, nor the execution and acceptance of this Settlement Agreement, nor anything contained in this Settlement Agreement, shall constitute, be presumed, construed, or deemed to be, or shall be cited or used by any Party against any other Party as, an admission of any kind, or evidence as to the strength or merit or lack of merit of any claim of liability, fault, wrongdoing, misconduct or impropriety of any kind by any Party to this Settlement Agreement.

12.     **Complete Agreement.** This Settlement Agreement constitutes the entire agreement among the Parties hereto pertaining to the subject matter contained in it. This Settlement Agreement supersedes all prior and contemporaneous representations and understandings of the Parties. No supplement, modification, or amendment to the Settlement Agreement shall be binding unless executed in a writing signed by all the Parties hereto, expressly stating that modification is intended.

13.     **Binding, Authorized, Voluntary, and Knowing Agreement.** Nova Group, Inc., by and through its President, Wayne H. Bursey, represents that it is the current Trustee of the

-8-

STI 28776v3 05/31/11

JLM032123

Charter Oak Trust. Each Party hereto represents and warrants that this Settlement Agreement constitutes such Party's legal, valid and binding obligation, enforceable against such Party, and its successors and assigns, in accordance with its terms. Each of the undersigneds, who executes this Settlement Agreement on behalf of an entity, represents and warrants that such undersigned is fully authorized to so act on that entity's behalf. Each Party acknowledges that it enters into this Settlement Agreement voluntarily, following consultation with such Party's own legal counsel. Each Party represents and warrants that no other releases or settlements are necessary from any other person or entity to release and discharge completely the other Parties from the claims specified herein.

14.    **Indemnification.**

Charter Oak expressly covenants and agrees to indemnify and hold harmless Penn Mutual against loss from any and all claims, demands, causes of action or actions, in law or in equity, that may hereafter at any time be made, asserted or brought by any Party or third party against Penn Mutual with regard to the Policies. This indemnity shall include all reasonable attorney's fees, costs, and expenses incurred in conjunction with asserting a claim for defense and indemnity pursuant to this Agreement.

15.    **Waiver of Breach.** No breach of any provision hereof can be waived except in writing by the Party against whom enforcement of the waiver is sought. Waiver of one breach of any provision hereof shall not be deemed to be a waiver of any other breach of the same or any other provision hereof. Failure on the part of any Party hereto to complain of any act or failure to act of any other Party or to declare any other Party in default hereunder, irrespective of how long such failure continues, shall not constitute a waiver of the right of such Party hereunder. The failure of a Party at any time or times to require performance of or to enforce any provision

-9-

JLM032124

of this Settlement Agreement shall in no manner affect such Party's right at a later time to enforce the same or any other provision of this Settlement Agreement; and no purported waiver by a Party of any condition of, or any breach of any provision contained in, this Settlement Agreement shall be effective unless embodied in a writing signed by an authorized representative of such Party.

16. **No Presumption Against Drafter.** The undersigned Parties have cooperated in the drafting and preparation of this Settlement Agreement. In any construction to be made of this Settlement Agreement, no presumption shall arise to any Party by virtue of participation in the drafting hereof.

17. **Headings.** Headings in this Settlement Agreement are included for convenience of reference only, and shall not constitute a part of this Settlement Agreement for any other purpose, nor affect its construction or interpretation in any way.

18. **Authority.** Each of the Parties to this Settlement Agreement represents and warrants to the other Parties that it has the full power, capacity, and authority to enter into this Settlement Agreement, that it has not sold, assigned, or in any manner transferred any claims which it ever had against the other Parties to any third party, and that no other releases or settlements from any other person or entity are needed for it to release and discharge completely the other Parties from the claims specified herein.

19. **Representation.** Each Party represents, acknowledges and warrants that it has been represented in negotiations for, and in the preparation of, this Settlement Agreement by counsel of its choosing. Each Party represents and warrants that each has read this Settlement Agreement or has had it read or explained by counsel, that it understands and is fully aware of its contents and legal effect, that it is voluntarily entering into this Settlement Agreement after

-10-

JLM032125

consultation with counsel, and that the person or persons signing this Settlement Agreement on its behalf have been duly authorized to do so.

20.     **Severability.**  Should any part, term, or provision of this Settlement Agreement be declared or determined by any Court or body of competent jurisdiction to be illegal, invalid, or unenforceable, the legality, validity, and enforceability of the remaining parts, terms, or provisions shall not be affected thereby and said illegal, unenforceable or invalid part, term or provision shall not be deemed to be a part of this Settlement Agreement.  The Parties further agree that in the event that the Settlement Agreement is held to be invalid, illegal or unenforceable and, in such event, the Litigation may be reinstated and the Parties waive any and all right to object to the reinstatement of the Litigation or the assertion of the causes of action therein on the grounds of the expiration of the statute of limitations, statute of repose, or contestability provision.

21.     **Governing Law.**  This Settlement Agreement and all questions relating to its validity, interpretation, performance and enforcement shall be governed by and construed in accordance with the laws of Connecticut.  The Court in the Martinez Litigation shall have continuing jurisdiction in connection with this Settlement Agreement and any breach thereof. Any legal proceeding of any nature brought by any Party, at any time, against the other to enforce any right or obligation under this Settlement Agreement, or arising out of any matter pertaining to this Settlement Agreement, shall be submitted exclusively to the Court in the Martinez Litigation.  The Parties expressly waive all rights to a trial by jury for any matter regarding and/or relating to the Settlement Agreement.

22.     **Counterparts.**  This Settlement Agreement may be signed in counterparts, and when each Party has signed and delivered one such counterpart or copy thereof, each counterpart

-11-

JLM032126

or copy shall be deemed an original and, when taken together with the other signed counterparts or copies, shall constitute one integrated contract, which shall be binding upon and effective as to all Parties. Facsimile signatures of the Parties shall have the same effect as original signatures.

IN WITNESS WHEREOF, each of the Parties has executed this Settlement Agreement as of the date shown next to their signature.

**The Penn Mutual Life Insurance Company**

By: _____

Dated: _June 8_ , 2011

**The Charter Oak Trust**
**By:   Wayne H. Bursey, as President of Nova Group, Inc., trustee of the Charter Oak Trust**

By: _____

Dated: _____, 2011

**J. Edward Waesche**

By: _____

Dated: _____, 2011

-12-

JLM032127

**Wayne H. Bursey**

By: _____

Dated: _____, 2011

-13-

JLM032128

# EXHIBIT 28

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
UNIVERSITAS EDUCATION, LLC,

              Judgment Creditor,       :

            -against-            :

NOVA GROUP, INC., as trustee, sponsor and   :
fiduciary of THE CHARTER OAK TRUST
WELFARE BENEFIT PLAN,           :

             Judgment Debtor,        Case Nos. 11 CV 1590-LTS-HBP and
                                        11-8726-LTS

          -and-

Daniel E. Carpenter, Charter Oak Trust Welfare
Benefit Plan, Grist Mill Capital, LLC, Grist Mill
Holdings, LLC, the Grist Mill Trust Welfare
Benefit Plan, Avon Capital, LLC, Hanover Trust
Company, Carpenter Financial Group and Phoenix
Capital Management, LLC,

             Respondents.
-------------------------------------------------------------X

### DECLARATION OF MICHAEL BARNETT
### IN SUPPORT OF UNIVERSITAS EDUCATION, LLC'S MOTION FOR
### <u>A PRELIMINARY INJUNCTION, PERMANENT INJUNCTION AND TURNOVER</u>

      **MICHAEL BARNETT**, an attorney admitted to practice law in this Court, declares the

following under penalty of perjury pursuant to 28 U.S.C. §1746:

      1.      I am an associate at Loeb & Loeb LLP, attorneys for Universitas Education, LLC

("Universitas"), the Petitioner/Judgment Creditor in the above-captioned proceeding.

### <u>INTRODUCTION</u>

      2.      I respectfully make this declaration pursuant to Local Rule 6.1(d) and in support

of Universitas' motion, brought by Order to Show Cause, pursuant to Fed. R. Civ. P. 65(a), Fed.

R. Civ. P. 69, N.Y. C.P.L.R § 5225(b) and the Court's Individual Practice Rule A(4)(b), for a preliminary and then permanent injunction, and turnover of certain monies and assets.

3. This motion is brought against Daniel E. Carpenter, an officer, shareholder and/or manager of Judgment Debtor Nova Group, Inc. ("Nova"), and the following entities – Nova, the Charter Oak Trust Welfare Benefit Plan (the "Charter Oak Trust" and "Charter Oak Trust 2009"), Grist Mill Capital, LLC ("Grist Mill Capital"), Grist Mill Holdings, LLC ("Grist Mill Holdings"), the Grist Mill Trust Welfare Benefit Plan ("Grist Mill Trust"), Avon Capital, LLC ("Avon Capital"), Hanover Trust Company ("Hanover"), Carpenter Financial Group ("Carpenter Financial"), Phoenix Capital Management, LLC ("Phoenix"), and subsequent transferees and entities affiliated with Mr. Carpenter but unknown to Universitas at this time (collectively the "Respondents").

4. Universitas is proceeding by Order to Show Cause against Mr. Carpenter, against whom it seeks a preliminary injunction, a permanent injunction and turnover Order.

5. Universitas is proceeding by Notice of Motion against the remaining Respondents, against which it seeks permanent (but not preliminary) injunctions and turnover Orders.

6. By this motion, Universitas requests an Order directing the Respondents to each turn over (and/or transfer, assign, or arrange to be transferred or assigned) to Universitas money and/or assets that were improperly transferred to them; these monies and/or assets originated with, or belong to, Nova and/or the Charter Oak Trust.

7. Universitas requests that the Court make the turnover order applicable to all subsequent transferees of the Respondents that are controlled, directly or indirectly, by Mr. Carpenter.  For the reasons set forth below and in Universitas' accompanying memorandum of

law, Universitas requests that the Respondents be ordered to turn over monies or other assets in

the following amounts[1]:

- Grist Mill Capital – $31,263,842.75

- Daniel E. Carpenter – $26,776,834.94[2]

- Grist Mill Holdings – $21,000,000.00

- Carpenter Financial – $11,140,000.00

- Avon Capital – $6,710,065.92

- Phoenix – $5,000,000.00

- Grist Mill Trust – $4,487,007.81

- Hanover – $1,200,000.00

8.      Universitas also seeks a preliminary injunction against Mr. Carpenter, enjoining

him from, directly or indirectly, causing, making, permitting or suffering any sale, assignment or

transfer of, or any interference with, any asset or property of his, and any asset or property of any

company, corporation or entity (including any trusts) in which he has a direct or indirect interest

or control; provided that Mr. Carpenter be permitted to expend and/or transfer up to $20,000.00

per month for ordinary expenses of his or one of his entities, with any such payments or transfers

to be reported, in writing, to Universitas' counsel within seven (7) days of such payment/transfer

being made.

---

[1] The total amount actually turned over would of course be limited to the amount of
Universitas' judgment.

[2] The amount sought from Mr. Carpenter is the total amount siphoned from Nova as
Trustee of the Charter Oak Trust ($31,263,842.75), less the amount of this money that was
improperly transferred to the Grist Mill Trust ($4,487,007.81).  Universitas does not at this time
claim that the Grist Mill Trust is an alter ego of Mr. Carpenter, although the transfers of Charter
Oak Trust funds to Grist Mill Trust were improper and should result in a turnover Order against
the Grist Mill Trust in the amount of $4,487,007.81.

3

9.     Additionally, Universitas seeks a permanent injunction prohibiting further transfers of assets of the Respondents – including any asset or property of Mr. Carpenter's, and any asset or property of any company, corporation or entity (including any trusts) in which he has a direct or indirect interest or control – until Universitas' judgment is satisfied in full.  These assets include the following life insurance policies owned or held by the Charter Oak Trust (identified by insured last name, insurance carrier and policy number):

- Collins – PHL Variable Insurance Policy No. 975 279 51
- Paulsrud – PHL Variable Insurance Policy No. 975 294 11
- Robertson – PHL Variable Insurance Policy No. 975 295 60
- Zahner – PHL Variable Insurance Policy No. 975 293 42
- Bolton – Lincoln Life Policy No. JJ7121879
- Clinard – Lincoln Life Policy No. JJ7105688
- Lowry – Lincoln Life Policy No. JJ7130995
- Nordin – Lincoln Life Policy No. JJ7075457

10.     The Charter Oak Trust owns (or once owned) policies insuring the lives of several hundred individuals.  These policies are assets of the Charter Oak Trust that can be used to satisfy Universitas' judgment against Nova.  Universitas therefore also seeks an Order directing the retitling of any insurance policies that were previously held by the Charter Oak Trust but improperly transferred to another entity controlled by Mr. Carpenter.  One such policy is a policy issued by Sun Life Financial insuring the life of a woman with the last name Amsterdam (Policy Number 020158601).

11.     Finally, as discussed below, there are four (4) Charter Oak Trust policies that were issued by PHL Variable Insurance Company ("PHL") and are the subject of litigation

between the Charter Oak Trust and PHL.  Universitas seeks an Order directing that Universitas directly receive any monies or assets that PHL (or any of its affiliates) may pay to the Charter Oak Trust, or that the Charter Oak Trust or any of its affiliates receive, in respect of these 4 policies.

## UNIVERSITAS FACES THE RISK OF IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION AGAINST MR. CARPENTER

12.     Universitas has not previously moved for a preliminary injunction against Mr. Carpenter with respect to the subject matter of this motion for turnover.  On March 4, 2013, Universitas moved for, and the Court granted on consent, a preliminary injunction against Mr. Carpenter, his wife Molly Carpenter and Moonstone Partners, LLC (a company the Carpenters control), with respect to insurance monies payable for property damage to a Rhode Island oceanfront home that Universitas believes was improperly purchased with misappropriated Nova/Charter Oak Trust funds.  See Dkt. No. 219.[3]

13.     Universitas' request for an Order to Show Cause against Mr. Carpenter – as opposed to its proceeding by Notice of Motion, which it is doing for the remaining Respondents – is attributable to Mr. Carpenter's attempting to transfer assets out of the rightful possession of Nova/Charter Oak Trust following the entry of judgment and service of Restraining Notices. Additionally, as discussed below, Mr. Carpenter faces the risk of a reinstatement of a prior, vacated conviction on fraud charges, as well as a grand jury indictment in the District of Connecticut.  Either of these events could cause Mr. Carpenter to further transfer, expend or conceal money that should be used to satisfy Universitas' judgment.  Also, since Mr. Carpenter

---

[3] Unless otherwise stated, all references to docket entries are for those in Case No. 11-1590-LTS-HBP.

has a demonstrable tendency to commingle the assets of his various entities, there is also the possibility that if his overturned conviction in the District of Massachusetts is reinstated, money that should be used to satisfy Universitas' judgment could be seized by the Government for penal or restitutionary purposes. In sum, the potential imminence of Mr. Carpenter's being indicted or of going to prison increases the urgency of this motion.  Just last week, Nova's counsel, responding to the Court's Order that Nova deposit the judgment amount into the Court no later than October 4, claimed that neither Nova nor the Charter Oak Trust had the assets necessary to comply with the Order; and that the Carpenter-controlled entities to which Mr. Carpenter transferred Universitas' money in 2009 no longer have the money.  See **Exhibit 53** ("Such cash and assets are no longer under the control of the judgment debtor or of the transferee entities"). These disclosures reinforce Mr. Carpenter's liability as an alter ego of the transferee entities and the necessity of a preliminary injunction enjoining the transfer of all assets controlled directly or indirectly by Mr. Carpenter, through a shell entity or otherwise.

14.    Nova, the Charter Oak Trust and Grist Mill Capital are already subject to Restraining Notices that should prevent them and their principals from transferring assets that could be used to satisfy Universitas' judgment.  Yet representatives of these companies – upon information and belief, at Mr. Carpenter's direction – have contacted insurance companies and other parties in an attempt to designate Grist Mill Capital (a company Mr. Carpenter controls) as the owner of certain policies that are owned by the Charter Oak Trust.  This is a blatant violation of the Restraining Notices that Universitas issued, and an attempt to frustrate Universitas' collection of its judgment.

15.     Attached as **Exhibit 1** is a true and complete copy of a Restraining Notice, dated June 22, 2012, that was served on Nova and the Charter Oak Trust, as well as an Affidavit of Service for this Restraining Notice.

16.     Attached as **Exhibit 2** is a true and complete copy of a Restraining Notice, dated June 22, 2012, that was served on Grist Mill Capital, as well as an Affidavit of Service for this Restraining Notice.

17.     On March 29, 2013, several weeks after this Court issued an Order to Show Cause on Universitas' turnover motion brought in relation to the Carpenters' Rhode Island vacation home (dkt. no. 219), a Nova representative wrote to Sun Life Financial seeking to change the owner and beneficiary of a Sun Life policy (insuring the life of Ms. Amsterdam), from the Charter Oak Trust to Mr. Carpenter's Grist Mill Capital.  Attached as **Exhibit 3** is a true and complete copy of the March 29, 2013 letter from Ms. Murphy to Sun Life Financial.

18.     On May 16, 2013, a week after the Court held its hearing on Universitas' turnover motion related to the Rhode Island home, Wayne H. Bursey, who is related by marriage to Mr. Carpenter[4], wrote to Lincoln National Life Insurance Company ("Lincoln Life") seeking to change the owner and beneficiaries of four Lincoln Life policies, from the Charter Oak Trust to Grist Mill Capital.  Attached as **Exhibit 4** is a true and complete copy of the correspondence between Mr. Bursey and Lincoln Life that Universitas has received.[5]  Based on the July 30, 2013

---

[4] Mr. Bursey is married to the sister of Molly Carpenter, Daniel Carpenter's wife.

[5] Mr. Bursey's correspondence shows that he continues to operate Nova and the Charter Oak Trust, even though Nova's counsel said back in August 2012 that Mr. Bursey had resigned (see **Exhibit 5** attached – a true and complete copy of an August 30, 2012 letter from Joseph M. Pastore, III to me).  Mr. Bursey has asserted his Fifth Amendment right against self-incrimination with regard to all matters pertaining to Nova, the Charter Oak Trust, Grist Mill Capital and the Grist Mill Trust (see **Exhibit 6** attached – a true and correct copy of a May 8, 2013 letter from Mr. Bursey's attorney, Stephen V. Manning, to the Court).

letter from Lincoln Life to Mr. Bursey (see **Exhibit 4**), we believe that Mr. Bursey was unsuccessful in his attempt to effect a transfer of the policies to Grist Mill Capital.

19.     Without an injunction, Mr. Carpenter, having already arranged for the transfer of more than $30 million out of the rightful possession of Nova and the Charter Oak Trust, will continue to direct the efforts of individuals such as Mr. Bursey and Ms. Murphy to transfer the ownership of insurance policies to Grist Mill Capital. Unless a preliminary injunction issues, Mr. Carpenter will continue to transfer Universitas' money among the dozens if not several hundred entities that he has created, having already, as documented in these papers, transferred Universitas' money across a half-dozen entities in the year 2009 alone. Mr. Carpenter is also likely spending or otherwise using money that could be used to satisfy Universitas' judgment. Universitas faces irreparable harm because each diminishment of the assets controlled by Mr. Carpenter (whether in his name or the name of one of his many entities) increases the likelihood that Universitas will not be able to collect on its judgment.

20.     Pursuant to the Court's Individual Practice Rule A(4)(b), requiring that "the applicant [for a preliminary injunction] provide a copy of the proposed Order to Show Cause and all supporting papers to the opposing party before presenting the application to Chambers," Universitas provided advanced drafts of its papers to counsel for the various Respondents on September 5. Since then, respective counsel for Universitas and the Respondents have had extensive communications, both written and over the phone, about a possible Order to Show Cause entered on consent. These communications did not result in such a stipulated Order, however, because Mr. Carpenter's counsel would not agree to a preliminary injunction as broad as the one Universitas is seeking. Universitas now proceeds against Mr. Carpenter by Order to Show Cause, and against the other Respondents by Notice of Motion. After deciding to proceed

by Order to Show Cause against Mr. Carpenter alone, Universitas sent advanced drafts of its

revised, proposed Order to Show Cause and supporting papers to Anthony J. Siano, Mr.

Carpenter's attorney, on October 4 and again on October 8.

## FACTUAL BACKGROUND

### Daniel E. Carpenter

21.     An insurance agent by profession, Mr. Carpenter is an attorney by training whose

license to practice law was suspended by the State of Connecticut in 2009.  Attached as **Exhibit**

**7** is a true and complete copy of a January 6, 2009 Order from the Connecticut Superior Court

suspending Mr. Carpenter's law license.

22.     Mr. Carpenter has twice been found guilty of mail and wire fraud by juries in the

District of Massachusetts (in 2005 and 2008, respectively), on the same allegations of having

misappropriated client escrow funds.  Both times, the trial judge in the case overturned the guilty

verdicts.  The government is presently appealing the overturning of the second guilty verdict to

the First Circuit, with the appeal scheduled for oral argument on November 7.   See U.S. v.

Carpenter, Case No. 04-10029-GAO (D. Mass.), Case No. 11-2131 (1st Cir.).

23.     Mr. Carpenter is also a target of a federal grand jury investigation in Connecticut,

arising from the activities of the Charter Oak Trust.  Attached as **Exhibit 8** is a true and complete

copy of a District of Connecticut Search and Seizure Warrant, dated May 25, 2011, executed in

connection with a search of an office building that Mr. Carpenter (through one of his companies)

owns at 100 Grist Mill Road in Simsbury, Connecticut.  Mr. Carpenter is first among the targets

listed.

24.     Magistrate Judge Pitman, in a report dated July 11, 2013, recommended that Mr. Carpenter, as a Nova officer or manager, be sanctioned for Nova's failure to comply with the Court's August 17, 2012 on post-judgment discovery.  See Dkt. No. 278.

25.     In a sentencing memorandum submitted by the United States following Mr. Carpenter's first (and ultimately overturned) conviction, the government alleged that Mr. Carpenter had withheld personal financial information from the U.S. Probation Office, and that he claimed a net worth of negative $129,000, even though he was (at the time) making substantial gifts to some of his employees and his prep school, and could afford to pay hundreds of thousands of dollars to his lawyers.  Attached as **Exhibit 9** is a true and complete copy of the December 14, 2005 sentencing memorandum submitted by the United States in U.S. v. Carpenter, Case No. 04-10029-GAO (D. Mass.).

26.     After Mr. Carpenter was found guilty for a second time on the same fraud charges in 2008, he requested permission to travel overseas while awaiting sentencing.  The Government opposed his request, noting, among other things, "serious concerns about the completeness and truthfulness of Carpenter's representations to Probation and the Court about his assets and his business dealings."  Specifically, according to prosecutors:

> Carpenter disclosed no personal income, no business holdings, no real estate assets, virtually no liquid assets, and a negative net worth.  He also disclosed no significant assets held in the name of or for the benefit of his wife. Yet, as noted above, Carpenter now admits to spending over $10,000,000 in legal fees in recent years, and evidently has the means to travel extensively overseas.

Attached as **Exhibit 10** is a true and complete copy of the Government's Opposition to Mr. Carpenter's Request to Travel Internationally, dated April 14, 2010, and filed in U.S. v. Carpenter, Case No. 04-10029-GAO (D. Mass.).

27.     Mr. Carpenter admits that he does not maintain any bank accounts in his own name.  **Exhibit 47**, April 17 Tr. at 26:3-7.  Yet Mr. Carpenter has acknowledged having "easily" opened at least 200 bank accounts in the last few years.  **Exhibit 47**, April 17 Tr. at 23:13-16.  These accounts have been presumably opened in the names of the numerous entities that Mr. Carpenter controls.

28.     The December 14, 2005 sentencing memorandum submitted by the Government (**Exhibit 9**) also claims that Mr. Carpenter had (even at that time, eight years ago) a history of attempts to evade the enforcement of civil judgments against him and his companies.  The memorandum includes the following as an example (at page 7 of **Exhibit 9**):

> When in April, 2004, the plaintiffs [in another case] finally located and obtained a writ of execution against property held by Carpenter in Florida, Carpenter promptly conveyed the land to his sister for $0, following which she proceeded to encumber it with mortgages held by various Carpenter-controlled businesses, presumably in an effort to so dissipate the value that the plaintiffs would effectively recover nothing.

29.     Mr. Carpenter has formed, or arranged for the formation of, scores, if not several hundred, companies, corporations and trusts.  Universitas has come across several dozen of these entities alone in its effort to discover what Mr. Carpenter did with Universitas' money after he arranged for it to be transferred out of the Charter Oak Trust.  These entities include Grist Mill Capital, Grist Mill Holdings, Hanover, Carpenter Financial, Phoenix, Audit Risk Indemnity Association, LLC, SADI Trust, Capital City Partners, LLC,  Benefit Concepts, Inc., Benefit Concepts Advisors, LLC, Benefit Concepts New York, Benistar 419 Plan Services, Benistar Client Services, Inc., Benistar Insurance Group, Benistar Insurance Group Holdings, LLC, BCNY Litigation Group, LLC, BPETCO Litigation Group, Birch Hill Partners, Carpenter Financial Group Welfare Benefit Trust, Nova Benefit Plans, LLC, Nova Group Holdings, LLC, Nova Partners, U.S. Benefits Group, Inc. and Worthy Investments, LLC.  <u>See also</u> **Exhibit 9**

11

(last page of 2005 sentencing memorandum noting that Mr. Carpenter was at that time associated with at least 30 entities).

30. These entities, all of which claim an address of 100 Grist Mill Road in Simsbury, Connecticut (where Mr. Carpenter, through one of his companies, owns an office building), have confusingly interwoven chains of ownership. For instance, a limited liability company might have two members, both of which are themselves companies or corporations, and each of which is owned by other companies or corporations. For instance, at his April 17, 2013 deposition in this action, Mr. Carpenter testified that he controls Grist Mill Capital through his control of Grist Mill Capital's two members, Grist Mill Holdings and Caroline Financial Group. **Exhibit 47**, April 17 Tr. at 16:24-25, 17:1-5. Attached as **Exhibit 11** is a matrix prepared several years ago by Mr. Carpenter's accountants at Simione Macca & Larrow LLP, showing the ownership structure of several dozen entities.

31. I draw the Court's attention to these entities not in an attempt to authoritatively describe the extent of Mr. Carpenter's tangled web of entities, but to demonstrate how thick the web is and why a preliminary injunction of the type Universitas is seeking is warranted.

32. Mr. Carpenter is not shy about his conduct. For instance, in a deposition in this action, he admitted that Nova is a "shell corporation"; that Grist Mill Holdings, LLC is his "alter ego" for collecting insurance commissions; and that in an effort to avoid creditors, he arranged for one of his companies, Moonstone Partners, LLC, to give a mortgage on property it owned to another one of his companies, Hanover Trust Company, 15 months after the property was purchased. **Exhibit 47**, April 17 Tr. at 47:15-18, 76:2-5, 124:3-25.

33. In addition, at a deposition in this action on April 17, 2013, Mr. Carpenter gave the following testimony:

All of – anything that I invested in is either held in an LLC or it's held in a trust, you know, for either estate planning purposes or protection, you know, asset protection, you know, type purposes, so that if something happens on one property, people can only sue that property and they cannot sue other properties that are owned by different trusts or different LLCs.

**Exhibit 47,** April 17 Tr. at 13:6-15.

### <u>Universitas is a Judgment Creditor and Beneficiary</u>

34.     Universitas is the beneficiary of the Charter Oak Trust in relation to two life insurance policies placed into the Trust by the late Sash A. Spencer, formerly the CEO of Holding Capital Group, Inc.  Mr. Spencer named Universitas the sole, irrevocable beneficiary of a Charter Oak Trust death benefit comprising the proceeds payable under two Lincoln Life policies totaling $30 million.  6/5/12 Court Order at 1-2 (dkt. no. 40).

35.     Nova is a Delaware corporation that purports to act as Trustee of the Charter Oak Trust.

36.     In May 2009, following Mr. Spencer's death in June 2008, Lincoln Life paid $30.7 million (including interest on the policy proceeds) to Mr. Bursey, Nova's President, who also purported to act as a Trustee of the Charter Oak Trust.  6/5/12 Court Order at 2.  Attached as **Exhibit 12** are true and complete copies of checks issued by Lincoln Life to Mr. Bursey as Trustee of the Charter Oak Trust, as payment on the two Lincoln Life policies insuring Mr. Spencer's life.  Attached as **Exhibit 13** is a true and complete copy of Nova's August 28, 2012 filing with the Connecticut Secretary of State, showing Mr. Bursey to be Nova's President (as well as Mr. Carpenter's wife, Molly, to be Nova's Treasurer).  Attached as **Exhibit 14** are true and complete copies of Nova filings with the Delaware Secretary of State, showing Mr. Carpenter to be Nova's Chairman.  <u>See also</u> **Exhibit 15** (true and complete copy of a July 12, 2013 Report and Recommendation, issued by Magistrate Judge Pitman, finding Mr. Bursey and

Mr. Carpenter to both be officers and/or managers of Nova and recommending that they be held in contempt for Nova's violation of a Court Order on discovery).

37.     Lincoln Life's payment of $30.7 million to the Charter Oak Trust in May 2009 came after Mr. Bursey, in 2008 and 2009, wrote several letters to the insurance carrier imploring it to pay out the insurance proceeds so that the Charter Oak Trust could pay Universitas.  The following are excerpts from Bursey's letters, written to induce Lincoln Life to pay out on the Spencer policies:

> "Mr. Spencer … decided to pass on a charitable legacy to his foundation Universitas Education, LLC as the beneficiary of his life insurance and he elected to entrust that responsibility to our Charter Oak Trust in order to make that happen. It is shameful that we cannot proceed with his desires as expeditiously as he would have expected if he were alive today."

> "You must understand that we have a charity to pay and no one can understand Lincoln's delay at this point."

Attached as **Exhibit 16** are true and complete copies of letters that Mr. Bursey wrote to Lincoln Life, dated October 22, 2008, December 11, 2008, March 6, 2009, April 22, 2009 and April 27, 2009, respectively.

38.     Following Lincoln Life's payment to the Charter Oak Trust in May 2009, Nova refused to pay any portion of the death benefit to Universitas.  6/5/12 Court Order at 2.

39.     By Arbitration Award dated January 24, 2011, Arbitrator Peter L. Altieri, Esq. held Nova liable to Universitas for a total of $26,525,535.88.  6/5/12 Court Order at 2.  The Arbitration Award required Nova to deposit this amount in the escrow account of its then-lead law firm, Updike Kelly & Spellacy, P.C.  Nova refused to do so.

40.     This Court confirmed the Arbitration Award on June 5, 2012 (dkt. no. 40), awarding Universitas pre-judgment interest at an annual rate of ten percent (10%) and entering judgment on June 7 for Universitas in the amount of $30,181,880.30 (dkt. no. 41).

41.     Following the entry of judgment, Nova has refused to pay anything to Universitas. On October 4, 2013, Nova's attorney wrote to the Court claiming that Nova is unable to comply with the Court's September 30, 2013 Order to deposit the judgment amount with the Court. **Exhibit 53**.

## IMPROPER TRANSFERS OF UNIVERSITAS' MONEY

42.     Through subpoenas to third parties, most importantly to TD Bank, Universitas has discovered that Mr. Bursey, the President of Nova, initially deposited the $30.7 million received from Lincoln Life into a TD Bank account standing in the name of the Charter Oak Trust (Account No. 424 277 4548); the deposit occurred on or about May 18, 2009. Mr. Bursey was the only signatory on this account standing in the Charter Oak Trust's name (Account No. 424 277 4548). Attached as **Exhibit 17** are true and complete copies of TD Bank documents showing Mr. Bursey to be the only signatory on Account No. 424 277 4548, as well as Mr. Bursey's deposit of $30.7 million into Account No. 424 277 4548, on or about May 18, 2009.

43.     Although Mr. Bursey was the only signatory on the Charter Oak Trust account, Mr. Carpenter helped arrange for that account to be opened. Attached as **Exhibit 18** is a true and complete copy of a May 2009 e-mail exchange, produced by Grist Mill Capital pursuant to Court Order, documenting Mr. Carpenter's unsuccessful attempt to open a Charter Oak Trust account at Bank of America. Upon refusing to provide Bank of America with "Know Your Customer" disclosures as a condition of opening an account for the Charter Oak Trust, Mr. Carpenter informed Bank of America that "we have" opened Charter Oak Trust accounts at two other banks, presumably including TD Bank.

44.     Within 5 months of the May 2009 deposit into the Charter Oak Trust, Mr. Bursey and Mr. Carpenter – who at the time was awaiting sentencing following a second criminal trial

15

that ended in multiple guilty verdicts – transferred all of Universitas' money to TD Bank accounts standing in the names of other entities in Mr. Carpenter's control, including Grist Mill Capital, Grist Mill Holdings, Avon Capital, Carpenter Financial and Hanover.  These other entities share the same business address as Nova (100 Grist Mill Road in Simsbury, Connecticut) and are all run by Mr. Carpenter.  The TD Bank accounts of these entities all had Mr. Carpenter as a signatory, and were opened soon after Lincoln Life's payment of $30.7 million to the Charter Oak Trust for Universitas' benefit.

45.    The opening of these myriad accounts in the names of different companies allowed Mr. Carpenter to disperse Universitas' money after he received about $30.7 million from Mr. Bursey.  The transfers of this money, from the Charter Oak Trust to entities that Mr. Carpenter controls, were made without consideration, and have no valid basis, particularly since Mr. Bursey and Carpenter were supposed to be holding this money in trust for Universitas.  And, despite the validity of these transfers being the central issue on a prior turnover motion made by Universitas (dkt. no. 219), neither Mr. Carpenter nor anyone else has been able to provide a valid, documented basis for the transfers.

46.    Almost all of Universitas' money was initially transferred to Grist Mill Capital, a company that Mr. Carpenter readily acknowledges he controls.  **Exhibit 47**, April 17 Tr. at 16:24-25, 17:1-5  At a deposition of Grist Mill Capital pursuant to Fed. R. Civ. P. 30(b)(6), the company's authorized agent and deposition designee, Peter A. Goldman, could not explain why the Charter Oak Trust was making separate transfers in the amounts of  $8,677,276.75, $2,186,566.00 and $19,800,000.00 to Grist Mill Capital in the months following Lincoln Life's payment to the Charter Oak Trust.  Attached as **Exhibit 19** is a true copy of an excerpt from the transcription of the April 30, 2013 deposition of Mr. Goldman.

16

47.    Mr. Goldman also testified at the July 26, 2013 deposition of Nova and the Charter Oak Trust, as an authorized agent and deposition designee of both of these entities.  At this deposition, Mr. Goldman testified that Grist Mill Capital never loaned the Charter Oak Trust any money for the purposes of making premium payments on the Spencer policies.  Mr. Goldman also testified that, to his knowledge, no employee ever benefitted from the Charter Oak Trust, even though the Trust purports to be an employee welfare benefit plan.  Attached as **Exhibit 20** is a true copy of an excerpt from the transcription of the July 26, 2013 deposition of Mr. Goldman.

### Specific transfers

48.    On or about May 21, 2009, Mr. Bursey transferred $8,677,276.75 from the Charter Oak Trust's TD Bank account (Account No. 424 277 4548) into a TD Bank account standing in the name of Grist Mill Capital (Account No. 424 277 4712).  Attached as **Exhibit 21** are true and complete copies of TD Bank documents showing this transfer of $8,677,276.75.

49.    On or about May 26, 2009, Mr. Bursey transferred $2,186,566.00 from the Charter Oak Trust's TD Bank account (Account No. 424 277 4548) into the same Grist Mill Capital account (Account No. 424 277 4712).  Attached as **Exhibit 22** are true and complete copies of TD Bank documents showing this transfer of $2,186,566.00.

50.    These two deposits, from the Charter Oak Trust account (which held only Universitas' money paid by Lincoln Life) to the Grist Mill Capital account, represent the only two sources of funds for the Grist Mill Capital account during May 2009 and June 2009.  Attached as **Exhibit 23** are true and complete copies of the May 2009 and June 2009 monthly account statements for the Grist Mill Capital account (Account No. 424 277 4712), showing that in these months the only monies it had on deposit came from money held by the Charter Oak

17

Trust for the benefit of Universitas. Attached as **Exhibit 24** is a true and complete copy of the account-opening document for the Grist Mill Capital account at TD Bank with the Account Number 424 277 4712, listing Mr. Carpenter as a signatory on this account.

51. On or about May 22, 2009, Mr. Carpenter transferred $2,100,000.00 from the Grist Mill Capital account (Account No. 424 277 4712) to the Grist Mill Holdings account (Account No. 424-261-7136). Attached as **Exhibit 25** is a true and complete copy of the account-opening document for the Grist Mill Holding account at TD Bank with the Account Number 424 261 7136, listing Mr. Carpenter as a signatory on this account. Attached as **Exhibit 26** are true and complete copies of a TD Bank document showing this transfer of $2,100,000.00. This money, $2,100,000.00, originated with the Charter Oak Trust, since the only funds that Grist Mill Capital had on deposit in May and June 2009 are the result of the transfers it received from the Charter Oak Trust (of $8,677,276.75 and $2,186,566.00, respectively).

52. On or about June 9, 2009, Mr. Carpenter transferred $2,833,568.64 from the Grist Mill Capital account (Account No. 424 277 4712) to a JP Morgan account standing in the name of the Grist Mill Trust (JP Morgan Account No. 904 028 488). Attached as **Exhibit 27** are true and complete copies of a TD Bank document showing this transfer of $2,833,568.64. This money, $2,833,568.64, originated with the Charter Oak Trust, since the only funds that Grist Mill Capital had on deposit in May and June 2009 are the result of the transfers it received from the Charter Oak Trust (of $8,677,276.75 and $2,186,566.00, respectively).

53. Also on or about June 9, 2009, Mr. Carpenter transferred an additional $965,314.17 from the Grist Mill Capital account (Account No. 424 277 4712) to a JP Morgan account standing in the name of the Grist Mill Trust (JP Morgan Account No. 904 028 488). Attached as **Exhibit 28** are true and complete copies of a TD Bank document showing this

transfer of $965,314.17. This money, $965,314.17, originated with the Charter Oak Trust, since the only funds that Grist Mill Capital had on deposit in May and June 2009 are the result of the transfers it received from the Charter Oak Trust (of $8,677,276.75 and $2,186,566.00, respectively).

54.     To reiterate, when Grist Mill Capital transferred a total $3,798,882.81 to the Grist Mill Trust on June 9, 2009, it was transferring money that originated from Lincoln Life's payment of $30.7 million to the Charter Oak Trust, since the only money that Grist Mill Capital had in its account came from deposits of $8,677,276.75 and $2,186,566, respectively, both of which came from the Charter Oak Trust account at TD Bank (account number 424 277 4548).

55.     On or about July 15, 2009, Mr. Carpenter transferred $1,200,000.00 from the Grist Mill Holdings account (Account No. 424-261-7136) to the Hanover account (Account No. 4725 632 940). This money, $1,200,000.00, originated with the Charter Oak Trust, since Grist Mill Holdings' money came from Grist Mill Capital, which in turn received its money from the Charter Oak Trust. Attached as **Exhibit 29** is a true and complete copy of a partial TD Bank account statement for Hanover for the month of July 2009 that shows the transfer. Attached as **Exhibit 30** is a true and complete copy of the account-opening document for the Hanover account at TD Bank with the Account Number 4725 632 940, listing Mr. Carpenter as a signatory on this account.

56.     On or about October 27, 2009, Mr. Bursey transferred $19,800,000.00 from the Charter Oak Trust's TD Bank account (Account No. 424 277 4548) into the Grist Mill Capital account (Account No. 424 277 4712). Attached as **Exhibit 31** are true and complete copies of TD Bank documents showing this transfer of $19,800,000.00.

57.     At the time of this transfer of $19,800,000.00, the Charter Oak Trust had not received any other deposits aside from the Lincoln Life payments in May 2009 (see **Exhibit 32** attached for true and complete copies of monthly account statements for May 2009 to October 2009).  This money, $19,800,000.00, was supposed to have been held in trust for Universitas; instead it was transferred to Grist Mill Capital – and Grist Mill Capital's corporate agent has no idea why (see **Exhibit 19**).  In fact, for this transfer of $19,800,000.00, Grist Mill Capital's general ledger describes it as "unknown depo" (meaning, "unknown deposit").  Attached as **Exhibit 33** is a true and complete copy of the part of Grist Mill Capital's general ledger that contains this description.

58.     On October 28, 2009, the day after the transfer of $19,800,000.00 from the Charter Oak Trust to Grist Mill Capital, Mr. Carpenter transferred $19,000,000.00 from the Grist Mill Capital account (Account No. 424 277 4712) to the Grist Mill Holdings account (Account No. 424-261-7136).  Attached as **Exhibit 34** are true and complete copies of TD Bank documents showing this transfer of $19,000,000.00, which is of course traceable to the $19,800,000.00 transfer from the Charter Oak Trust to Grist Mill Capital that occurred the previous day.

59.     On or about November 12, 2009, Mr. Carpenter transferred $6,710,065.92 from the Grist Mill Capital account (Account No. 424 277 4712) to the Avon Capital account at TD Bank (Account No. 424 277 4689).  Attached as **Exhibit 35** are true and complete copies of TD Bank documents showing this transfer of $6,710,065.92.  Attached as **Exhibit 36** is a true and complete copy of the account-opening document for the Avon Capital account at TD Bank with the Account Number 424 277 4689, listing Mr. Carpenter as a signatory on this account.

60.     On or about November 12, 2009, Mr. Carpenter transferred $4,140,000.00 from the Grist Mill Holdings account (Account No. 424 261 7136) to the Carpenter Financial account at TD Bank (Account No. 424 277 4697).  Attached as **Exhibit 37** are true and complete copies of TD Bank documents showing this transfer of $4,140,000.00.  Attached as **Exhibit 38** is a true and complete copy of the account-opening document for the Carpenter Financial account at TD Bank with the Account Number 424 277 4697, listing Mr. Carpenter as a signatory on this account.

61.     On or about December 3, 2009, Mr. Carpenter transferred $7,000,000.00 from the Grist Mill Holdings account (Account No. 424 261 7136) to the Carpenter Financial account at TD Bank (Account No. 424 277 4697).  Attached as **Exhibit 39** are true and complete copies of TD Bank documents showing this transfer of $7,000,000.00.

62.     On or about December 3, 2009, Mr. Carpenter transferred $5,000,000.00 from the Carpenter Financial account (Account No. 424 277 4697) to the Phoenix account at TD Bank (Account No. 424 277 4671).  Attached as **Exhibit 40** are true and complete copies of TD Bank documents showing this transfer of $5,000,000.00.  Attached as **Exhibit 41** is a true and complete copy of the account-opening document for the Phoenix account at TD Bank with the Account Number 424 277 4671, listing Mr. Carpenter as a signatory on this account.

63.     On or about December 3, 2009, Mr. Carpenter transferred $510,000.00 from the Grist Mill Capital account (Account No. 424 277 4712) to a JP Morgan account standing in the name of the Grist Mill Trust (JP Morgan Account No. 904 028 488).  Attached as **Exhibit 42** are true and complete copies of a TD Bank document showing this transfer of $510,000.00.

64.     Also on or about December 3, 2009, Mr. Carpenter transferred an additional $178,125.00 from the Grist Mill Capital account (Account No. 424 277 4712) to a JP Morgan

account standing in the name of the Grist Mill Trust (JP Morgan Account No. 904 028 488).

Attached as **Exhibit 43** are true and complete copies of a TD Bank document showing this

transfer of $178,125.00.

65.     Mr. Carpenter tried to prevent Universitas from learning about any of the bank

transfers described above.  When Universitas subpoenaed TD Bank following the entry of

judgment on June 7, 2012, Nova's then-attorney, Joseph M. Pastore, III, moved to quash the

subpoena (dkt. no. 56).  The Court denied this motion on August 17 (dkt. no. 133), and this

month sanctioned Mr. Pastore for filing this and other motions (dkt. no. 293).  Both Mr. Pastore

and Mr. Carpenter, moreover, each wrote letters to TD Bank threatening it with criminal

prosecution if it complied with Universitas' subpoenas.  Attached as **Exhibit 44** are true and

complete copies of these letters from Mr. Pastore and Mr. Carpenter, respectively.  Mr.

Carpenter further sought to fight disclosure of the transfers by arranging for the filing a lawsuit

against Universitas and TD Bank in Connecticut Superior Court.  (The lawsuit, which named

Grist Mill Capital, Grist Mill Holdings and Phoenix as the plaintiffs, was withdrawn within a

month of filing, before the court took any action.  See Grist Mill Capital, LLC v. TD Bank et al.,

Case No. 12-6037179-S (Conn. Super. Ct.)).   As Magistrate Judge Pitman has noted, Nova has

"resisted all efforts" to enforce Universitas' judgment in this action, and Nova's principals and

attorneys have improperly threatened third parties from which Universitas has sought discovery.

11/21/12 Order at 1-2, 8 (dkt. no. 176).

**Grist Mill Trust Transfers**

66.     In numerous communications with Universitas' counsel, counsel for the Grist

Mill Trust has asserted that the transfers of $2,833,568.64 and $965,314.17, respectively, from

Grist Mill Capital to Grist Mill Trust (see **Exhibits 27-28**), were loan repayments.  Attached as

**Exhibit 45** are documents furnished to Universitas' counsel that purport to be documentation of two loan agreements (dated August 11, 2006 and October 1, 2007, respectively) between Grist Mill Capital and the Grist Mill Trust.

67.     **Exhibit 45** shows that for each of the two alleged loans, Mr. Carpenter signed on behalf of Grist Mill Capital, and Mr. Bursey signed on behalf of the Grist Mill Trust.

68.     With respect to the above-documented transfers of money, from Grist Mill Capital to the Grist Mill Trust, these transfers are fraudulent and have no valid basis, particularly since they were made by Mr. Bursey and Mr. Carpenter, the people who made the initial transfers from the Charter Oak Trust to Grist Mill Capital, and who knew that the money being transferred by Grist Mill Capital to the Grist Mill Trust should have stayed in the Charter Oak Trust for Universitas' benefit.

69.     Additionally, counsel for the Grist Mill Trust has asserted that the transfers of $510,000.00 and $178,125.00, respectively, on December 3, 2009, were also loan repayments by Grist Mill Capital.  Attached as **Exhibit 46** are documents furnished to Universitas' counsel that purport to be documentation of the loans to which these December 2009 transfers relate.

70.     These December transfers, from Grist Mill Capital to the Grist Mill Trust, were also fraudulent and have no valid basis, for the reasons stated above and in Universitas' memorandum of law accompanying this declaration.

## MR. CARPENTER CONTROLS THE ENTITIES THAT
## IMPROPERLY TRANSFERRED AND RECEIVED UNIVERSITAS' MONEY

71.     Aside from arguably the Grist Mill Trust, Mr. Carpenter is an alter ego of the entities to which Universitas' money was transferred. In fact, in a recent letter to the Court, Nova's attorney Ira Kleiman discussed how Universitas' money was transferred first to Grist

Mill Capital, and then to Grist Mill Holdings, Avon Capital, Carpenter Financial Group, Phoenix

Capital and the Grist Mill Trust.  See **Exhibit 53**.  Mr. Kleiman represented to the Court that

"Mr. Carpenter is not in control of at least one of these entities," and then only discussed how

Mr. Carpenter (allegedly) does not control the Grist Mill Trust.  The upshot is that Mr. Carpenter

is an alter ego of all of the entities mentioned by Mr. Kleiman, except for the Grist Mill Trust

(which Mr. Carpenter nonetheless controls, as a Trustee, along with his wife and Mr. Bursey).

72.     Attached as **Exhibit 47** is a true copy of excerpts from the transcription of the

April 17, 2013 deposition of Mr. Carpenter in this litigation.  At his deposition, as reflected in

the excerpts contained within **Exhibit 47**, Mr. Carpenter testified that:

a.      Nova is a "shell corp." (April 17 Tr. at 76:2-5);

b.      He is the chairman and secretary of Carpenter Financial

(April 17 Tr. at 35:6-13);

c.      Grist Mill Holdings is Mr. Carpenter's "alter ego" (April 17 Tr. at 47:15-

18);

d.      He controls Grist Mill Capital through his control of Grist Mill Capital's

two members, Grist Mill Holdings and Caroline Financial Group (April

17 Tr. at 16:24-25, 17:1-5);

e.      Grist Mill Capital seized millions of dollars from a Charter Oak Trust

bank account (April 17 Tr. at 90:18-25, 91:2-6);

f.      He is the sole officer/director of both the Hanover and Phoenix

companies (April 17 Tr. at 27:13-20, 34:21-24, 35:6-25, 56:22-25, 57:2-

4);

24

g.   He is the Chairman of, the only officer of, and the only person affiliated
     with, Caroline Financial Group, Inc. ("Caroline Financial")
     (April 17 Tr. at 8:5-10, 14:22-25, 15:2-25, 16:2-4);

h.   The number of entities for which Caroline is the managing member and
     tax matters partner was "too numerous to mention" (April 17 Tr. at 16:15-
     23);

i.   He arranged for Hanover to hold a mortgage on real property owned by
     Moonstone Partners, LLC, another company of his, as protection against
     his Boston-based creditors (April 17 Tr. at 124:3-25)

At his first deposition in October 2012, Mr. Carpenter asserted his Fifth Amendment right

against self-incrimination in response to most if not all questions about Nova, the Charter Oak

Trust and Grist Mill Capital.

73.   Mr. Carpenter also controls Avon Capital, as evidenced by **Exhibit 36**, containing

a true and complete copy of documents that Mr. Carpenter submitted to TD Bank in May 2009

when he opened an account in Avon Capital's name. These documents show Mr. Carpenter to

be Chairman of Avon's Managing Member, which is Grist Mill Capital.

74.   Mr. Carpenter, his wife Molly Carpenter and Mr. Bursey are all Trustees of the

Grist Mill Trust, as demonstrated by **Exhibits 48-49**, containing, respectively, a true and

complete copy of a JP Morgan account opening document for the Grist Mill Trust (listing Ms.

Carpenter and Mr. Bursey as Trustees), as well as a copy of a life insurance policy owned by the

Grist Mill Trust (which is signed by Mr. Carpenter and lists him as a Trustee).

75.   At a May 9, 2013 hearing in this action, Mr. Carpenter disclaimed any official

role at the Grist Mill Trust, although he did acknowledge that the Grist Mill Trust often consults

him on tax matters (which is easy enough to do since he owns and works out of the building
from which the Grist Mill Trust is operated).  Attached as **Exhibit 50** (May 9 Tr. at 35:8-16) is a
true copy of excerpts from the transcription of the Mr. Carpenter's May 9, 2013 testimony in this
litigation.

76.     At the May 9 hearing, Mr. Carpenter also testified that the Grist Mill Trust had
"excess cash," with "hundreds of millions of dollars coming in every year."  **Exhibit 50**, April
17 Tr. at 43:12-16.

77.     In response to being subpoenaed to testify at the May 9 hearing on Universitas'
turnover motion, Mr. Bursey, by letter to the Court, asserted his Fifth Amendment right against
self-incrimination in response to all questions about the following topics (among others):

- Mr. Bursey's role in the Charter Oak Trust, Nova, Grist Mill Trust, Grist Mill Capital,
  LLC and related entities; and

- Mr. Carpenter's role in Nova, the Charter Oak Trust, Grist Mill Trust, Grist Mill
  Capital and related entities.

See **Exhibit 6**.

78.     Nova's principals have also arranged for monies belonging to the Charter Oak
Trust to bypass the Charter Oak Trust entirely.  For instance, in June 2011, the Charter Oak Trust
settled a federal lawsuit that the Penn Mutual Life Insurance Company ("Penn Mutual") brought
against it relating to a policy insuring the life of someone with the last name Martinez (Policy
No. 8214580), which policy the Charter Oak Trust owned.  As part of the settlement, Penn
Mutual agreed to settle the lawsuit for a payment of $600,000 to the Charter Oak Trust – except
that when Penn Mutual issued the $600,000 check, Nova arranged for that check to be made
payable to Grist Mill Capital, rather than the Charter Oak Trust, even though Grist Mill Capital

was not a party to the litigation being settled.  Attached as **Exhibit 51** is a true and complete copy of a Stipulation of Dismissal with Prejudice, dated June 9, 2011, filed in the litigation between Penn Mutual and the Charter Oak Trust (indicating, among other things, that Grist Mill Capital was not a party to the litigation).  Attached as **Exhibit 52** is a true and complete copy of a $600,000 check, dated June 7, 2011, issued by Penn Mutual to Grist Mill Capital, as part of the resolution of the litigation between the Charter Oak Trust and Penn Mutual.

79.     Attached as **Exhibit 53** is a true and complete copy of an October 4, 2013 letter from Nova's counsel, Ira Kleiman, to the Court (exhibit to the letter omitted).


Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and complete.

Dated: New York, New York
       October 9, 2013

                                        /s/ Michael Barnett            .
                                          MICHAEL BARNETT

# EXHIBIT 29

08E11     ATH     46DS     H411000123

GRIST MILL CAPITAL, LLC
100 GRIST MILL ROAD
SIMSBURY, CT 06070

**HOME OFFICE USE ONLY**

PAYEE:                    ATH 08E11 46DS H411000123
GRIST MILL CAPITAL, LLC         06-07-11
100 GRIST MILL ROAD
SIMSBURY, CT 06070      CHECK #1038855 ATTACHED FOR ****600,000.00

RETURN OF PREMIUM
POLICY NUMBERS
8214580, 8211012,
8214705, 8229381,
THE ATTACHED CHECK IS FULL PAYMENT OF AMOUNT DUE AS
SHOWN ABOVE. PLEASE CASH OR DEPOSIT WITHIN 30 DAYS.

PENN MUTUAL

---

DETACH AND RETAIN FOR YOUR RECORDS

**A PennMutual Company**

THE PENN MUTUAL LIFE INSURANCE COMPANY
INDEPENDENCE SQUARE, PHILADELPHIA, PA 19172

| | DATE | 50-162 | CHECK NUMBER |
|---|---|---|---|
| | JUN 07, 2011 | 433 | 1038855 |

08E11     ATH     46DS     H411000123

EXACTLY     *Six hundred thousand and 00/100 Dollars*

PAY
TO:
GRIST MILL CAPITAL, LLC
100 GRIST MILL ROAD
SIMSBURY, CT 06070

VOID
6 MONTHS AFTER
DATE OF ISSUE

*****$600,000.00

PNC BANK, NA
JEANNETTE, PA

*Patricia M. Chiarlaro*
ASSISTANT TREASURER

⑈1038855⑈ ⑆043301627⑆ 10046907444⑈

JLM032134

# EXHIBIT 30

NOTICE OF SHERIFF'S SALE

NOTICE IS HEREBY GIVEN That pursuant to a Writ of Execution issued in the Circuit Court of Nassau County, Florida on the 2nd day of April, 2004, in the cause wherein DONALD M. ISRAEL and MARK T. TAYLOR are Plaintiffs and DANIEL E. CARPENTER, BENEFITS CONCEPTS OF NEW YORK, INC. and VOLUNTARY BENEFITS SYSTEMS, INC., are defendants, being Case No. 02-132-CA in said Court. I, W.R. "RAY" GEIGER, as Sheriff of Nassau County, Florida, have levied upon all the right, title and interest of the above named defendant, DANIEL E. CARPENTER, in and to the following described property, lying and situated in Nassau County, Florida, to-wit: That certain condominium parcel located in Nassau County, Florida, composed of VILLA UNIT NUMBER 1009, and an undivided share in those common elements appurtenant thereto, as specified in, described in and subject to the covenants, conditions, restrictions, terms and other provisions of that Declaration of Condominium for CAPTAIN'S COURT VILLAS, A CONDOMINIUM, made by sponsor, Amelia Island Company, a Delaware corporation qualified to conduct business in Florida, pursuant to Chapter 711 of the Florida Statutes, which is recorded in the public records of Nassau County, Florida, in Official Records Book 177, page 607, said Declaration of Condominium being made a part hereof by specific reference.
On the 28th day of December, 2004, at the FRONT DOOR OF THE PATROL HEADQUARTERS OF THE NASSAU COUNTY DETENTION FACILITY, located at 76001 BOBBY MOORE CIRCLE, in the City of Yulee, Nassau County, Florida, at the hour of 1:00 p.m., or as soon possible thereafter, I will offer for sale all the defendant's right, title and interest in said property at public outcry and will sell the same, subject to all prior liens, encumbrances and judgments, if any, to the highest and best bidder or bidders for CASH, the proceeds to be applied as far as may be to the payment of costs and the satisfaction of the above described executions.
W.R. "RAY" GEIGER, AS SHERIFF
OF NASSAU COUNTY, FLORIDA
IN ACCORDANCE WITH THE AMERICANS WITH DISABILITIES ACT, PERSONS WITH DISABILITIES ONLY NEEDING SPECIAL ACCOMMODATION TO PARTICIPATE IN THIS PROCEEDING SHOULD CONTACT THE NASSAU COUNTY SHERIFF'S OFFICE, 50 BOBBY MOORE CIRCLE, YULEE, FLORIDA 32097, (904) 225-0331, NOT LATER THAN SEVEN (7) DAYS PRIOR TO THE PROCEEDING. IF HEARING IMPAIRED, PLEASE CONTACT (TDD) 1-800-955-8771, OR VOICE (V) 1-800-955-8770, VIA FLORIDA RELAY SERVICE.
4t 12-01-08-15-22-2004
3948

Print

Case 3:04-cv-00288-JAM Document 130-5 Filed 06/01/20 Page 93 of 97
Case 3:04-cv-10029-GAO Document 130-5 Filed 12/24/05 Page 3 of 7

Page 1 of 1

 *Print Delivery*

Print Window | Close Window

Document 2 of 5
### *** THIS DATA IS FOR INFORMATION PURPOSES ONLY ***

### PROPERTY TRANSFER RECORD FOR NASSAU COUNTY, FL

**Buyer:** CARPENTER, CONSTANCE A (Individual(s))

**Buyer Mailing Address:** PO BOX 8087, **AMELIA ISLAND,** FL **32034**

**Seller:** CARPENTER, DANIEL E

**Property Address: 1009 CAPTAINS CT, AMELIA ISLAND,** FL **32034**

************************** SALES INFORMATION ****************************

**Sale Date:** 5/20/2004

**Recorded Date:** 5/21/2004

County Transfer Tax: $ 0.70

**Book/Page:** 1232/615

**Document Number:** 200417838

**Deed Type:** INTRA-FAMILY TRANSACTION

**Assessor's Parcel Number:** 01-6N-29-V14A-1009-0000

**Legal Description:** UNIT: 1009; SUBDIVISION: CAPTAINS COURT VILLAS; RECORDER'S MAP REFERENCE: OR177 PG607

************************** PROPERTY DESCRIPTION ***************************

**Land Use:** CONDOMINIUM

Print                                                                                                                Page 1 of 1

Case 2:04-cv-00729-GAO   Document 130-5   Filed 06/01/20   Page 94 of 97
Case 1:04-cv-10029-GAO   Document 130-5   Filed 02/24/05   Page 4 of 7



Print Window | Close Window

Document 24 of 40
**THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY**

**CERTIFICATION CAN ONLY BE OBTAINED THROUGH THE ISSUING GOVERNMENT AGENCY**

FLORIDA DEPARTMENT OF STATE

**Company Name: NTS PROPERTIES,** INC.

**Mailing Address:**
1009 CAPTAIN'S COURT
FERNANDINA BEACH, FL 32034

**Type:** DOMESTIC FOR PROFIT

**Status:** ACTIVE

**Filing Date:** 8/25/2004

**State or Country of Incorporation:** FLORIDA

**Registered Agent:** CORPORATION SERVICE COMPANY

**Registered Office:**
1201 HAYS STREET
TALLAHASSEE, FL 32301

**Federal Employer ID Number:** 201550065

**Filing Number:** P04000123000

**Officers, Directors:**
CONSTANCE A CARPENTER
DIRECTOR
1009 CAPTAIN'S COURT
FERNANDINA BEACH, FL 32034

Print

Case 3:04-cv-00788-CAU  Document 130-5  Filed 06/01/20  Page 95 of 97
Case 1:04-cv-10029-GAO  Document 130-5  Filed 12/24/05  Page 5 of 7

Page 1 of 1



Print Window | Close Window

Document 5 of 5
*** THIS DATA IS FOR INFORMATION PURPOSES ONLY ***

PROPERTY TRANSFER RECORD FOR NASSAU COUNTY, FL

**Buyer:** NTS PROPERTIES INC (Company/Corporation)

**Buyer Mailing Address: 1009 CAPTAINS CT, AMELIA ISLAND, FL 32034**

**Seller:** CARPENTER, CONSTANCE A

**Property Address: 1009 CAPTAINS CT, AMELIA ISLAND, FL 32034**

***************************** SALES INFORMATION *****************************

**Sale Date:** 9/23/2004

**Recorded Date:** 9/24/2004

**Book/Page:** 1261/1251

**Document Number:** 200432553

**Deed Type:** WARRANTY DEED

**Assessor's Parcel Number:** 01-6N-29-V14A-1009-0000

**Legal Description:** UNIT: 1009; SUBDIVISION: CAPTAINS COURT VILLAS; RECORDER'S MAP REFERENCE: OR177 PG607

************************** PROPERTY DESCRIPTION **************************

**Land Use:** CONDOMINIUM



Print Window | Close Window

Document 1 of 5
**\*\*\* THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY \*\*\***

**MORTGAGE RECORD FOR** NASSAU COUNTY, **FL**

**Borrower(s):** CARPENTER, CONSTANCE A

**Property Address: 1009 CAPTAINS CT, AMELIA ISLAND, FL 32034**

**Property Use:** CONDOMINIUM UNIT

**\*\*\*\*\*\*\*\*\*\* RECORDER'S INFORMATION \*\*\*\*\*\*\*\*\*\***

**Recording Date:** 9/24/2004

**Book/Page:** 1261/1249

**Document Number:** 200432552

**Assessor's Parcel Number:** 01-6N-29-V14A-1009-0000

**Legal Description:** UNIT: 1009; SUBDIVISION: CAPTAINS COURT VILLAS

**\*\*\*\*\*\*\*\*\*\* MORTGAGE INFORMATION \*\*\*\*\*\*\*\*\*\***

**Mortgage Type:** NON-PURCHASE MONEY

**Lender:** BENEFIT CONCEPTS NEW YORK INC

**Lender Type:** OTHER (COMPANY OR CORP.)

**Loan Amount:** $ 100,000

**Loan Type:** UNDETERMINED

**\*\*\*\*\*\*\*\*\*\* GEOGRAPHICAL INFORMATION \*\*\*\*\*\*\*\*\*\***

**MSA:** Jacksonville, FL MSA (3600)
Nassau County, Florida (FIPS=12089)
(360012089)

 LexisNexis™   *Print Delivery*

Print Window | Close Window

Document 4 of 5
### *** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

### MORTGAGE RECORD FOR NASSAU COUNTY, FL

**Borrower(s):** NTS PROPERTIES INC (Company/Corporation)

**Property Address: 1009 CAPTAINS CT, AMELIA ISLAND, FL 32034**

**Property Use:** CONDOMINIUM UNIT

### ********** RECORDER'S INFORMATION **********

**Recording Date:** 12/23/2004

**Book/Page:** 1283/957

**Document Number:** 200443417

**Assessor's Parcel Number:** 01-6N-29-V14A-1009-0000

**Legal Description:** UNIT: 1009; SUBDIVISION: CAPTAINS COURT VILLAS

### ********** MORTGAGE INFORMATION **********

**Mortgage Type:** NON-PURCHASE MONEY

**Lender:** BENEFIT CONCEPTS NEW YORK INC

**Lender Type:** OTHER (COMPANY OR CORP.)

**Loan Amount:** $ 500,000

**Loan Type:** UNDETERMINED

### ********** GEOGRAPHICAL INFORMATION **********

**MSA:** Jacksonville, FL MSA (3600)
   Nassau County, Florida (FIPS=12089)
   (360012089)