# EXHIBIT 31

527

# COMMONWEALTH OF MASSACHUSETTS
## BUSINESS LITIGATION SESSION

SUFFOLK, SS.

SUPERIOR COURT
CONSOLIDATED C.A. NOS.
01-0116-B.L.S.; 01-299-B.L.S.;
01-0330-B.L.S.; 01-0681-B.L.S.;
01-1882 B.L.S.
NORFOLK SUPERIOR COURT
C.A. No. 01-00075
MIDDLESEX SUPERIOR COURT
C.A. No. 01-1647

GAIL A. CAHALY & others[1]
Consolidated Plaintiffs,

vs.

BENISTAR PROPERTY EXCHANGE TRUST CO., INC. & others,[2]
Consolidated Defendants, and

TRAVELERS CASUALTY AND SURETY OF AMERICA & others,[3]
Consolidated Reach and Apply Defendants, and

PAINEWEBBER, INC., & others[4]
Consolidated Trustee Process Defendants

## MEMORANDUM AND ORDER ON THE DEFENDANTS', MOLLY CARPENTER, DANIEL CARPENTER AND BENISTAR LTD., MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND INSUFFICIENCY OF SERVICE OF PROCESS (P#29) AND PLAINTIFF'S CROSS-MOTION TO STRIKE THE AFFIDAVITS OF MARTIN PALEY, DANIEL CARPENTER AND MOLLY CARPENTER IN FURTHER OPPOSITION TO THE MOTION TO DISMISS OF BENISTAR LTD., DANIEL CARPENTER AND MOLLY CARPENTER (P#32)

[1] Jeffrey M. Johnston, Massachusetts Lumber Company, Inc., Joseph Iantosca, Byron Darling, R& B Enterprises, Inc. and Bellemore Associates, LLC.

[2] Benistar, Ltd., Martin L. Paley, Daniel E. Carpenter, Esq., Molly Carpenter and Painewebber, Inc.

[3] Painewebber, Inc., Merrill Lynch, and Pierce Fenner & Smith, Inc.

[4] Merrill Lynch, Pierce, Fenner & Smith, Inc., First Union Bank and Citizens Bank.

## INTRODUCTION

This is a consolidated action brought by Gail Cahaly ("Cahaly"), Jeffrey M. Johnston ("Johnston"), Massachusetts Lumber Co., Inc. ("Mass. Lumber"), R&B Enterprises, Inc. ("R&B"), Byron Darling ("Darling"), Bellmore Associates, LLC ("Bellmore") and Joseph Iantosca, individually and as Trustee of Belridge Corporation ("Iantosca") (collectively "Plaintiffs") against Benistar Property Exchange Trust Co., Inc. ("Benistar"), Benistar, Ltd. ("Limited"), Martin L. Paley ("Paley"), Daniel E. Carpenter, Esq. ("Daniel" or "Carpenter"), and Molly Carpenter ("Molly") alleging, *inter alia*, claims for breach of contract, conversion, deceit and violation of G.L. c. 93A.[5]

This matter is before the court on the motion to dismiss for lack of personal jurisdiction of defendants Limited, Daniel E. Carpenter, Esq., and Molly Carpenter (collectively "defendants"), pursuant to Mass. R. Civ. P. 12 (b)(2). Molly Carpenter and Daniel Carpenter (collectively "Carpenters") have also moved to dismiss the suit brought by Mass. Lumber pursuant to Mass. R. Civ. P. 12(b) (5), insufficiency of process. After hearing and review, for the reasons discussed below, the defendants' Motion to Dismiss for Lack of Jurisdiction Over the Person and Insufficiency of Process is <u>DENIED</u>.

The plaintiffs have moved to strike defendants' affidavits filed in support of their motion to dismiss. After two hearings and careful review of the parties' submissions, that motion is <u>ALLOWED</u>.

---

[5] This action is now comprised of seven separate complaints. Accordingly, not all plaintiffs have alleged the same claims against the same parties. This court, however, lists the counts and parties together for the sake of judicial economy.

<u>BACKGROUND</u>

The uncontroverted evidence, in addition to the facts pleaded in the complaint (which may be taken for the purposes of this motion as true), establish the following:[6, 7]

Limited is one of the largest 419 Trust Plan Administrators in the country.[8] Daniel Carpenter is the sole officer, director and shareholder of Limited. Limited is incorporated in Delaware and has operated in offices located in Stamford and Simsbury, Connecticut. It is also the parent company of Benistar, which is incorporated in Delaware with a principal place of business located in Newton, Massachusetts. Benistar, now defunct, is a corporation that served as the intermediary for like-kind exchanges under Section 1031 of the Internal Revenue Code. The majority of exchanges conducted by Benistar concerned Massachusetts residents and property.

Originally, Benistar's certificate of incorporation listed its principal place of business as Limited's office. This was later amended on January 12, 2001, just days after the filing of the initial complaint, to 233 Needham Street, Newton, Massachusetts. Carpenter asserts that he is Chairman and Secretary of both Benistar and Limited, and that Paley is President of Benistar.

The plaintiffs gave Benistar large sums of money in order to secure like-kind exchange tax benefits under § 1031 of the Internal Revenue Code. Prior to the exchanges in question, the plaintiffs were informed that some or all of the money held for the subsequent like-kind

---

[6]"A determination of jurisdiction--or the lack of it--may rest on the facts alleged in the complaint." <u>Kleinerman</u> v. <u>Morse</u>, 26 Mass. App. Ct. 819, 821 n. 4 (1989); see <u>Gunner</u> v. <u>Elmwood Dodge, Inc.</u>, 24 Mass. App. Ct. 96, 96 (1984).

[7] The court does not take into consideration Molly, Daniel or Paley's affidavits as they are stricken. See <i>infra</i> at 10.

[8] The parties do not define for the court what a 419 Trust Plan Administrator is.

3

## 530

exchange was gone. Benistar or one of its principals or entities, or all of them, is alleged to have lost or misused the plaintiffs' money. Specifically, the complaints allege that Benistar agreed to maintain the plaintiffs' monies in a segregated escrow account. Notwithstanding their fiduciary duties, Paley and the Carpenters deposited plaintiffs' funds into a margin brokerage account at PaineWebber. The plaintiffs allege that the defendants used the plaintiffs' monies to fund trading transactions in Benistar's brokerage account. When the value of defendants' investments fell with the decline in the stock market, PaineWebber called in its margin. Benistar was unable to satisfy the margin call and PaineWebber swept Benistar's margin account (which now has a negative balance) to satisfy the margin call.

According to the complaints, there has been a confused intermingling of the officers, directors, employees and businesses of Benistar and Limited.[9] For instance, as set forth in the various complaints, Paley represented to various plaintiffs that it was safe to entrust real estate sale proceeds with Benistar because it had Limited's financial backing and Limited held a fidelity bond for the benefit of itself and its subsidiaries. The plaintiffs' submissions further show that Limited's Web site stated that Benistar was part of Limited and that "we protect your assets." Plaintiffs were informed by Benistar that they could mail checks to Limited. This, they believe, shows a further confusion between the companies. PaineWebber documents submitted by the plaintiffs also purport to show intermingling of funds of the Benistar entities. Namely, the documents indicate that monies from Benistar's account were transferred into Benistar Admin. Services, a Limited subsidiary, and $2 million dollars of funds were commingled between Benistar and another Limited subsidiary, Benistar Employer Services Trust Corporation.

---

[9] Bellemore First Amended Complaint, ¶ 36.

4

Limited, in the various complaints and submissions, is alleged to control Benistar, or at very least, to have assisted Benistar in its day-to-day operations.[10] Limited itself is alleged to have participated directly in the scheme to defraud plaintiffs and controlled the deposit and withdrawal of all client funds from the PaineWebber accounts.[11] For its services, Limited took ten percent of the Benistar fees. Limited is also alleged to have "continuously and systematically transact[ed] business in Massachusetts, including the marketing and sale of its services in Massachusetts both directly and through its subsidiary, Benistar Property." All wire transfers of Benistar money were handled in Connecticut.

A Limited press release dated October 1, 1998, stated that it was incorporating Benistar into its tax planning strategies. Further, the release stated that "we [Limited] now have, under one roof, a selection of the most powerful tax-savings tools in the country."

a. Daniel Carpenter

According to the complaints, Carpenter is alleged to control both Limited and Benistar.[12] Carpenter claims to be only the Chairman and Secretary of both Benistar and Limited. On PaineWebber account applications, however, Carpenter identified himself as President, Secretary and Chairman of Benistar.

Carpenter was the individual who transferred client funds from another account into the PaineWebber accounts.[13] He and his wife were the only persons authorized to act on these accounts. On some days, he would execute as many as fifty option trades per day.[14] Carpenter

---

[10] For example, Limited is alleged to have handled wire transfers for Benistar.
[11] Bellemore First Amended Complaint, ¶ 34.
[12] Bellemore First Amended Complaint, ¶ 37.
[13] Bellemore First Amended Complaint, ¶ 38.
[14] Bellemore First Amended Complaint, ¶ 48.

allegedly did this without the plaintiffs' knowledge or consent in order to gain personally from the profits procured with the plaintiffs' money. He was the person in charge of handling wire transfers and the management of Benistar exchange money.

Carpenter has also traveled to this forum to conduct business. On January 3, 2001, Carpenter and Paley met with Mr. Cahaly (Cahaly's husband) and Iantosca in Massachusetts to inform him their money was either lost in the stock market or had been swept by PaineWebber.[15]

On April 3, 2001, Carpenter was deposed by the plaintiffs. Except for questions about his name and residential address, he refused to answer a single question, asserting his Fifth Amendment privilege. In response to the following and other questions, Carpenter responded, "I hereby invoke all privileges pursuant to the applicable provisions of the United States Constitution, the Massachusetts Declaration of Rights and the Connecticut Constitution:"

> Q: Isn't it true, Mr. Carpenter, that you personally provided promotional material to each of the Plaintiffs—and by the Plaintiffs I mean the Plaintiffs in this consolidated action that we are here for today—to induce them to have Benistar Property Exchange perform tax-free exchange services?

> Q: Now, Mr. Carpenter, with respect to all the statements made in Exhibit 18, Benistar Limited's promotional material and in Benistar Limited's web site that we have discussed this morning, all those statements were intended to induce the Plaintiffs in this action to deposit proceeds from real estate transactions with Benistar Property Exchange pending completion of the like-kind exchange, isn't that true?

> Q: Isn't it true that you personally controlled the Merril Lynch and PaineWebber trading accounts?

> Q: Isn't it true, Mr. Carpenter, that since losing $9 million of the Plaintiffs' funds you have shut down Benistar Property Exchange?

> Q: Isn't it true, Mr. Carpenter that you personally have stripped and siphoned all of the assets from Benistar Property Exchange?

---

[15] Iantosca Second Amended Complaint ¶ 20.

6

Case 3:80-cv-00789-JAM   Document 465   Filed 06/01/08   Page 8 of 66
Case 1:08-cv-11785-NMG   Document 46-5   Filed 11/16/08   Page 2 of 40

533

Q: Isn't it true, Mr. Carpenter, that by January 5, 2001, you personally had gambled and lost almost $9 million of the Plaintiffs' funds?

Q: Isn't it true, Mr. Carpenter, that you personally caused Benistar Property Exchange to breach the exchange agreements with each of the Plaintiffs?

Q: Isn't it true, Mr. Carpenter, that you and your company Benistar Limited owed each of the Plaintiffs in this action fiduciary duties with respect to their funds?

Q: Isn't it true, Mr. Carpenter, that each of the Benistar Defendants in this action—by that I mean yourself, your wife, Mr. Paley, Benistar Property exchange and Benistar Limited—conspired to commit fraud against the Plaintiffs and jointly engaged in acts and omissions intentionally designed to defraud the Plaintiffs?

Q: Isn't it true, Mr. Carpenter, that you admit each and every fact contained in Mrs. Cahaly's complaint, which is Exhibit 20?

Q: Mr. Carpenter, isn't it true that you transacted business on behalf of Benistar Property Exchange in the Commonwealth of Massachusetts?

Q: Isn't it true, Mr. Carpenter, that the funds of Mr. Iantosca and the other Plaintiff in this action which were deposited in funds in the name of Benistar Property Exchange were intermingled with other business entities in which you are associated?

Q: Mr. Iantosca and the other Plaintiffs' funds were commingled with funds of Benistar Property Limited, isn't that correct?

Q: The funds were commingled with each and every other business entity in which you are involved, isn't that right?

Q: And you diverted those profits from the Benistar Property account into you own personal account, isn't that right?

To date, Daniel Carpenter refuses to testify on any issue, including personal jurisdiction.

b. Martin Paley

Martin Paley worked at Benistar's office in Massachusetts. Paley's business card has a Connecticut phone number that rings at Limited's offices. He also has a voice mailbox that can be accessed through Limited. Paley, a Massachusetts resident, does not join in the motion to

dismiss for lack of personal jurisdiction. An affidavit from Paley, however, is submitted in support of this motion, despite the fact that he too refused to testify at deposition on Fifth Amendment grounds.

Paley, on behalf of Benistar, is alleged, to have represented to various plaintiffs that it was safe to entrust real estate sale proceeds to Benistar because it had Limited's backing.[16]

c.   Molly Carpenter

Daniel's spouse, Molly Carpenter, has also been sued by some of the plaintiffs. Much like her husband, she refused to testify at her April 11, 2001 deposition.

Molly Carpenter was asked at deposition, *inter alia*, whether she: was "involved in the trading of securities" with plaintiffs' money; was "involved in a scheme to defraud the plaintiffs;" traveled "to Massachusetts as an employee of Benistar Property;" worked as an employee "of Benistar Property" or "Benistar Limited;" personally converted the plaintiffs' money; "specifically act[ed] as an employee of Benistar Property and an employee of Benistar Limited or other Benistar entities to commit a breach of contract;" made any fraudulent representations to plaintiffs, as an employee of one of the Benistar entities; personally "used plaintiffs' funds for her own purposes"; and "personally traded [plaintiffs'] money." Molly Carpenter also refused to answer questions concerning her personal involvement in setting up a shell corporation; whether she falsely stated in her affidavit that she never "exercised ownership of, dominion, or control over plaintiff's money;" whether she signed documents authorizing her to manage the plaintiff's funds; and her authority as signatory on the PaineWebber account. To each question, she responded, "I hereby invoke the spousal exclusions and spousal privileges and

---

[16] Iantosca Second Amended Complaint ¶ 25.

all rights under Massachusetts General Laws, Chapter 233, Section 20, as well as all other applicable privileges."

Molly Carpenter's signature appears in a signature block labeled "Signature of Officer" in the corporate resolutions on the Benistar account with PaineWebber. Under the Corporate Resolutions, the Carpenters, as the named corporate officers, were "authorized to act on behalf of the Corporation with respect to opening an account, to execute on behalf of the Corporation any and all relevant documents, including, but not limited to documents granting a limited or general power of attorney that delegates authority (including discretionary authority) over the account, margin agreements and/or option agreement and to deal with PaineWebber in connection with all aspects of said account with no limits as to the amount (hereinafter called "Authorized Person.")." Molly is alleged to have acted as Treasurer and Managing Director of Benistar Property, Benistar Ltd. and Benistar Employer Services in connection with opening and maintenance of the accounts at PaineWebber and Merrill Lynch.[17]  She is also alleged to have personally converted the plaintiffs' money.[18]

Molly and Daniel Carpenter were both named on the PaineWebber margin account, and each was authorized to act on behalf of Benistar with respect to that account. The plaintiffs' funds, over which Molly had authority to act, were used by the defendants to fund securities trading transactions and were applied to deficiencies in the margin account.

---

[17] Iantosca Second Amended Complaint ¶ 22.

[18] Iantosca Second Amended Complaint ¶ 39.

9

## 536

### PROCEDURAL BACKGROUND

After Molly and Daniel refused to answer any questions at deposition, including those relating to personal jurisdiction, this court held a hearing to assess whether this forum had jurisdiction over the defendants Limited, Molly and Daniel. On the record before the court, at that time, the court could not determine whether the plaintiffs had sustained their burden of establishing personal jurisdiction. Accordingly, the court deferred ruling on the matter pending jurisdictional discovery and submittal of deposition transcripts.

Following this court's order, dated April 30, 2001, at least one plaintiff sought to depose Daniel Carpenter, Molly Carpenter and a Rule 30(b) designee of Limited on "the issues raised in the motion to dismiss and the assertions set forth in the affidavits that have been submitted by Daniel Carpenter and Martin Paley relative to the business of Benistar Ltd." Counsel for the Benistar defendants refused to produce witnesses for the requested depositions on the grounds that they did not feel that the court's order "contemplate[d] the useless exercise of re-deposing the Carpenters, asking them the same questions relating to jurisdiction and eliciting the same responses."

### DISCUSSION

I. Service of Process

The defendants first assert that Mass. Lumber's claims against them should be dismissed pursuant to Mass. R. Civ. P. 12(b)(5), for insufficiency of service of process. The defendants assert that these claims should be dismissed because they have not been served with the summons and complaint. The Summons was served upon the defendants and filed with the case. According to G.L. c. 223A, § 6 and Mass. R. Civ. P. 4, service upon a party outside the

10

Commonwealth may be made in several ways, including in the manner prescribed by the law of the place in which the service is made.[19] Service was properly effectuated under Connecticut law. See General Statutes § 52-57 ("process in any civil action shall be served by leaving a true and attested copy of it...with the defendant, or at his usual place of abode, in this state"). Because service was properly rendered under Connecticut law, the Rule 12(b)(5) motion to dismiss shall be denied. Furthermore, absent material prejudice of the substantial rights of the party served, the court may in its discretion allow process or proof of service to be amended. See Mass. R. Civ. P. 4(g). There has been no demonstrated prejudice in this case, thus, any error would be corrected by an amended service.

For these reasons, the defendant's motion to dismiss for insufficiency of service shall be denied.

II. <u>Motion to Strike</u> (P#32)

As a preliminary matter to the motion to dismiss for lack of personal jurisdiction, this court must first decide Plaintiffs' Cross Motion to Strike the Affidavits of Martin Paley, Daniel Carpenter and Molly Carpenter in Further Opposition to the Motion to Dismiss of Benistar Ltd., Daniel Carpenter and Molly Carpenter. In support of its motion to dismiss for lack of personal jurisdiction, the defendants appended affidavits from Martin Paley, Daniel Carpenter and Molly Carpenter. In these affidavits, all of the defendants essentially assert that Limited does not transact business in Massachusetts; has not intermingled funds; and has nothing to do with Benistar. Further, the affidavits state that Molly Carpenter has no affiliation with Benistar and both Daniel and Molly have no sufficient connections, for purposes of personal jurisdiction, with

---

[19] Service outside this Commonwealth may be made "in the manner prescribed by the law of the

Case 3:20-cv-00759-JAM   Document 40-5   Filed 06/01/20   Page 13 of 66
Case 1:08-cv-11758-NMG   Document 40-5   Filed 02/10/08   Page 13 of 40

538

this forum.

The plaintiffs are moving to strike these affidavits because the defendants uniformly refused to answer any questions, excluding name and address, on the basis of Fifth Amendment and/or spousal privilege. More specifically, the plaintiffs argue that these affidavits should be stricken because the defendants cannot rely on their own sworn testimony as evidence and then refuse to answer questions on the same subject matter based upon the Fifth Amendment. Defendants counter that the motion to strike the affidavits should be denied because the court has a duty to accommodate the defendants' Fifth Amendment interests; Martin Paley did not join the motion to dismiss; striking the affidavits would impermissibly punish the defendants for their legitimate invocation of their rights; and Molly Carpenter was exercising her spousal privileges and not her Fifth Amendment protections.

Defendants assert that jurisdiction against them is improper and introduce evidence on the issue. Yet, when the plaintiffs attempt to test the sufficiency of the allegations, the defendants hide behind the Fifth Amendment. The defendants have attempted to support its position that jurisdiction is improper based on the defendants' own self-serving assertions—that were never subjected to cross-examination. The defendants cannot selectively assert their Fifth Amendment privileges.

"The privilege against self-incrimination may be raised in civil as well as in criminal proceedings and applies not only at trial, but during the discovery process as well." S.E.C. v. Graystone Nash, Inc., 25 F.3d 187, 190 (3rd Cir. 1994). However, "a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of

place in which the service in any of its courts of general jurisdiction." G.L. c. 223A, § 6 (a)(2).

Case 3:20-cv-00759-JAM   Document 405   Filed 06/01/20   Page 43 of 60
Case 1:08-cv-1785-NMG   Document 405   Filed 06/10/08   Page 14 of 40

**539**

the privilege against self-incrimination." <u>United States</u> v. <u>Rylander</u>, 460 U.S. 752, 759 (1983) (quotations omitted).  The defendants cannot state their account of the "facts" only when they wished to do so, and at the same time shield this account from scrutiny by invoking the Fifth Amendment.  See <u>U.S.</u> v. <u>Parcels of Land</u>, 903 F.2d 36, 43 (1st Cir. 1990) (affiant's affidavit stricken where he invoked Fifth Amendment, shielding testimony in affidavit from scrutiny).

In a parallel case, <u>In re Vitamins Antitrust Litigation</u>, 120 F. Supp.2d 58 (D.C. 2000), the court struck the defendant's sworn affidavit in support of his motion to dismiss for lack of personal jurisdiction where he refused to be subjected to examination on that issue on the basis of the Fifth Amendment.  <u>Id.</u> at 67.  The Fifth Amendment is "not a 'positive invitation to mutilate the truth a party offers to tell.' " <u>Lawson</u> v. <u>Murray</u>, 837 F.2d 653, 656 (4th Cir. 1988), cert den., 488 U.S. 831 (1988).

Striking an affidavit under these circumstances "does appear to be the typical remedy where a party has submitted an affidavit and thereafter asserts his Fifth Amendment privilege." <u>In Re Vitamins Antitrust Litigation</u>, 120 F.Supp. 2d at 67; see <u>In re Edmond</u>, 934 F.2d 1304, 1308 (4th Cir. 1991) (affirming district court which struck Edmonds affidavit in support of his motion for summary judgment after asserting the Fifth Amendment during discovery);[20] see also <u>United States</u> v. <u>Akuffo</u>, 7 F.3d 226, 1993 W.L. 385170 (4th Cir. 1993) (court struck affidavit in support of motion for summary judgment because defendant refused to participate in discovery based on Fifth Amendment assertions); <u>Traficant</u> v. <u>Comm'r of I.R.S.</u>, 884 F.2d 258, 265 (6th Cir. 1989) (taxpayer, who asserted privilege against self-incrimination in interrogatories, was

---

[20] The lower court in <u>Edmond</u> noted that he could not "have peanut butter on both sides of his bread." <u>Edmond</u>, 934 F.2d at 1307.  Although such a statement is somewhat simplistic, it properly and succinctly explains the rationale for striking the affidavit.

Case 3:20-cv-00759-JAM Document 40-5 Filed 06/01/08 Page 14 of 60
Case 1:08-cv-01785-NMG Document 40-5 Filed 02/10/08 Page 15 of 66

540

prohibited from introducing any evidence which, if he had not invoked the privilege, the Government would reasonably have been able to attain); Pedrina v. Chun, 906 F.Supp. 1377, 1398 (D. Haw. 1995), cert den, 520 U.S. 1268 (1997) (holding that party may not rely on its own testimony or affidavits to support its version of disputed fact issue in connection with summary judgment motion where party has asserted Fifth Amendment right not to answer questions concerning that very issue); U.S. v. Incorporated Village of Island Park, 888 F.Supp. 419, 433-432 (E.D. NY 1995) (holding that because of potential for abuse of privilege against self-incrimination by defendants who use it to obstruct discovery only to waive it and subject the plaintiff to surprise testimony at trial, courts recognize appropriateness of imposing sanctions for civil defendant's assertion of the privilege during discovery; decision to assert privilege during pre-trial depositions may be valid grounds for precluding defendant from testifying at trial, as well as for striking affidavits opposing summary judgment motions).

Plaintiffs' argument to strike the affidavits echoes arguments often made in cases in which the defendant has invoked the Fifth Amendment to refuse to respond to cross-examination questions. See Edmond, 934 F.2d at 1308. In such cases, courts routinely strike the testimony. Id.; U.S. v. Incorporated Village of Island Park, 888 F. Supp. at 431 (well-settled principle that a defendant's direct testimony should be stricken if he invokes privilege against self-incrimination on cross-examination to shield testimony from scrutiny). The court should strike the affidavit where the defendants have refused to answer any discovery questions based upon privilege.

a. Assertion that striking the affidavits would impermissibly punish the defendants for legitimate invocation of their rights

Defendants contend that striking the affidavits would impermissibly punish them for

Case 3:20-cv-00768-JAM   Document 435   Filed 06/01/06   Page 16 of 66
Case 1:08-cv-12783-NMG   Document 405   Filed 04/10/08   Page 15 of 40

541

invoking their rights.[21]  This court disagrees.  A court may properly strike evidence under these

circumstances in civil litigation so long as the "costs imposed in exchange for the assertion of the

Fifth Amendment privilege…are not so high as to force abandonment of the privilege."

Traficant, 884 F.2d at 265; see Wansong v. Wansong, 395 Mass. 154, 156 (1985).

In the present case, it may be assumed that the defendants had a valid basis for not

wanting to testify prior to any potential criminal proceedings.  The fact that valid concerns

weighed on both sides of their dilemma does not indicate that the defendants are being punished

for making the choice they made.  In many civil cases the burden placed on a person's silence

may be unavoidable.  On the civil side, there are consequences for the exercise of the right

against self-incrimination.  The assertion of the privilege may even disadvantage a party.  See

Serafino v. Hasbro, Inc., 82 F.3d 515, 518 (1st Cir. 1996).  Not "every undesirable consequence

which may flow from the exercise of the privilege against self-incrimination can [properly] be

characterized as a penalty." Mello v. Hingham Mut. Fire Ins. Co., 421 Mass. 333, 338 (1995)

(quoting Flint v. Mullen, 499 F.2d 100, 104 (1st Cir. 1974) (citations omitted)).

Here, striking the affidavit is not so coercive that it makes the privilege "costly."  Cf.

Baxter v. Palmigiano, 425 U.S. 308, 310 (1976) (adverse inference did not impose

unconstitutional cost).  Rather, striking the affidavit places the parties on level playing field.

---

[21] Defendants cite to S.E.C. v. Graystone Nash, Inc., 25 F.3d at 190-191, 192, for the proposition
that the court should not automatically strike the affidavits.  As that case properly notes,
sanctions may be given for refusal to answer questions on the grounds of privilege.  Id.  "In a
civil trial, a party's invocation of the privilege may be proper, but it does not take place in a
vacuum; the rights of the other litigant are entitled to consideration as well." Id.  The exercise of
the privilege against self-incrimination may not be too costly.  That does not mean that it must be
costless.  Id. at 191.  Here, the court does not automatically strike the affidavit upon the
defendants' assertions of privilege. But, rather, it carefully weighed all the relevant factors and
costs of asserting the privilege prior to striking any affidavits.

b. Assertion that Molly's affidavit should not be stricken on ground that she is not asserting Fifth Amendment privilege

Defendants assert that Molly's affidavit should not be stricken as she is asserting her spousal privileges and not her Fifth Amendment rights. Molly Carpenter's personal contacts with this forum do not appear to be protected under the spousal privilege. "There is no privilege for a spouse not to testify against the other spouse in a civil action, 'even if that testimony may be highly destructive of the marital relationship.'" Paul J. Liacos, Massachusetts Evidence 13.2.2 (6th ed. 1994) (quoting Three Juveniles v. Commonwealth, 390 Mass. 357, 361 (1983)).[22]

Nevertheless, even if there is a spousal privilege, Molly's affidavit may be stricken as if she asserted the Fifth Amendment. See Phillips v. Deihm, 541 N.W. 2d 566, 574 (Mich. App. 1995) (proper to draw adverse inference from assertion of spousal privilege for same reasons it is proper to draw such an inference from the invocation of the Fifth Amendment privileges). Invocation of the spousal privilege in the civil context raises the same dilemma as that posed by the Fifth Amendment.

c. Accommodation

"In a civil context, where systemically, the parties are on a somewhat equal footing, one party's assertion of his constitutional right should not obliterate another party's right to a fair proceeding." Serafino, 82 F.3d at 518. Thus, this court has a duty when confronted with an invocation of a party's Fifth Amendment privilege in a civil case "to strive to accommodate a party's Fifth Amendment interests while at the same time being careful to ensure that the opposing party is not unduly disadvantaged." In re Vitamins Antitrust Litigation, 120 F. Supp.

---

[22] The defendants, here, are claiming that Molly cannot answer any questions because all conversations are private. This claim is not substantiated. At this juncture, the court sees no

Case 3:20-cv-00769-JAM Document 435 Filed 06/01/20 Page 18 of 66
Case 1:08-cv-12783-NMG Document 40-5 Filed 01/10/08 Page 17 of 40
543

2d. at 67 (quotations omitted); see <u>Serafino</u>, 82 F.3d at 518; <u>United States Trust Co. of New York</u>
v. <u>Herriot</u>, 10 Mass. App. Ct. 313, 317 (1980) ("[t]he judge's task is to balance any prejudice to
the other civil litigants which might result…against the potential harm to the party claiming the
privilege if he is compelled to choose between defending the civil action and protecting himself
from criminal prosecution.")

In ascertaining whether to the strike the affidavits, this court "must carefully balance the
interests of the party claiming protection against self-incrimination and the adversary's
entitlement to equitable treatment. Because the privilege is constitutionally based, the detriment
to the party asserting it should be no more than is necessary to prevent unfair and unnecessary
prejudice to the other side." <u>S.E.C.</u> v. <u>Graystone Nash, Inc.</u>, 25 F.3d at 192. "[T]he Fifth
Amendment privilege should be upheld unless defendants have substantial need for particular
information and there is no other less burdensome effective means of obtaining it." <u>Id.</u> at 518.

After balancing the relevant factors, this court concludes that the proper remedy is to
strike the affidavits. The invocation of the Fifth Amendment and spousal privileges pose
substantial problems for the plaintiffs who are deprived of a source of information that might be
determinative in ascertaining jurisdiction. Information concerning each defendant's own
personal conduct in this forum is within the control of each respective person. Here, plaintiffs
are placed at a disadvantage by the defendants' failure to testify and submission of materials on
those very same subject matters that they refused to testify upon. Accordingly, striking the
affidavits assists in the "fair determination" of the case, but still strives to accommodate the
defendants' privileges.

---

evidence that any question elicited private conversations.

d. <u>No prejudice</u>

Defendants wrongly assert that the affidavits should be stricken because plaintiffs suffer no prejudice from the affidavits. They argue that the plaintiffs suffer no prejudice on the ground that there is no jurisdiction. This circular argument ignores the fact that the affidavits are self-serving and prejudicial. The affidavits would cause the court to receive one-sided information that would not be subject to attack. The defendants cannot defeat a motion to strike on that basis.

e. <u>Assertion that Paley's affidavit should not be stricken because he is not resisting jurisdiction</u>

Next, defendants argue that it would be improper to strike Paley's affidavit because he is not challenging jurisdiction. However, the relevant question in ascertaining whether the affidavit should be stricken is not whether he is challenging jurisdiction; but rather, whether the opposing party is unduly disadvantaged as a result of his one-sided testimony. Paley's affidavit is plagued by the same problems presented as those resulting from the Carpenter affidavits. Namely, Paley asserts that jurisdiction against his other co-defendants is improper and introduces evidence on the issue. Yet, when the plaintiffs attempt to test the sufficiency of these allegations, he refuses to allow that testimony to be examined based upon the Fifth Amendment.[23]

"By selectively asserting [] the Fifth Amendment privilege, [the defendants] attempt[] to insure that [their] unquestioned, unverified affidavit would be the only version [of the

---

[23] Defendants also argue that Paley's affidavit should not be stricken because his affidavit was submitted in support of the motion to dissolve the TROs and in opposition to plaintiff's motion for prejudgment security. This court shall strike this affidavit for use in this motion to dismiss. Unlike the prior motion, this motion was brought by his other co-defendants and not the plaintiffs. It is of no consequence that Paley did not bring this motion. The same rationale applies to Paley as to the other defendants because Paley would gain a tactical advantage if the motion were allowed—at least as to the conspiracy claim.

18

Case 3:20-cv-00738-JAM  Document 435  Filed 06/01/20  Page 29 of 66
Case 1:08-cv-11784-NMG  Document 435  Filed 02/10/08  Page 19 of 40
545

testimony]." Edmond, 934 F.2d at 1308. "[T]he Fifth Amendment privilege cannot be invoked as a shield to oppose depositions while discarding it for the limited purpose of making a statement to support a [motion to dismiss for lack of personal jurisdiction]." Id. Accordingly, plaintiffs' joint motion to strike the affidavits shall be allowed as the defendants cannot use the Fifth Amendment "as an insurmountable barrier to shield [themselves] from the opposition's inquiries during discovery only impale his accusers with that same testimony." U.S. v. Sixty Thousand Dollars in U.S. Currency, 763 F.Supp. 909, 914 (E.D. Mich. 1991). The affidavits of Daniel Carpenter, Molly Carpenter and Martin Paley shall be and they are stricken.

### III. Adverse inferences

Invocation of the Fifth Amendment privileges in civil cases may be used to draw an adverse inference against the party refusing to testify. See Shafnacker v. Raymond James & Assoc., 425 Mass. 724, 735 (1997); see also Baxter, 425 U.S. at 318; Paul J. Liacos, Massachusetts Evidence 13.13.6 (6th ed. 1994). "In a civil action, a reasonable inference adverse to a party may be drawn from the refusal of that party to testify on the grounds of self-incrimination." Labor Relations Comm'n v. Fall River Educators' Ass'n, 382 Mass. 465, 471 (1981); see also Shafnacker, 425 Mass. at 735. An adverse inference may even be inferred against a corporate entity when an employee has invoked the privilege. Shafnacker, 425 Mass. at 735.

"No inferences can be drawn, however, unless a case adverse to the interest of the party affected is presented so that failure of a party to testify would be a fair subject of comment." Custody of Two Minors, 396 Mass. 610, 616 (1986). The adverse inference drawn from the silence of a party is insufficient, "by itself, to meet the opponent's burden of proof." Id. Rather,

Case 3:20-cv-09769-JAM Document 405 Filed 06/01/06 Page 21 of 66
Case 1:08-cv-12785-NMG Document 405 Filed 06/01/06 Page 21 of 66
546

the opposing party must produce "independent corroborative evidence of the matters to be inferred before liability will be imposed." U.S. v. Incorporated Village of Island Park, 888 F. Supp. at 431. Defendant's silence must be weighed in light of other evidence rather than leading directly to the conclusion of liability. LaSalle Bank Lake View v. Seguban, 54 F.3d 387, 391 (7th Cir. 1995).

The privilege against self-incrimination not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant but also permits him not to answer official questions put to him in any other proceeding, civil, criminal, formal or informal, where the answers might incriminate him in future criminal proceedings. Allen v. Illinois, 478 U.S. 364, 368 (1995). The Fifth Amendment, however, does not prohibit drawing adverse inferences against parties to civil proceedings when they refuse to testify in response to probative evidence offered against them. Baxter, 425 U.S. at 318. Nor does the Fifth Amendment preclude the inference where the privilege is claimed by a party to a civil case. Id.

"Therefore, after striking [the] affidavit, the Court may draw [] adverse inference[s] from [their] refusal to answer plaintiffs' questions about [their] jurisdictional contacts when resolving his Motion to Dismiss," where there is probative evidence offered against them. See In re Vitamins Antitrust Litigation, 120 F.Supp.2d at 68.[24]

IV. Personal Jurisdiction

The defendants have asserted that this court does not have specific or general jurisdiction over them and thus, this motion to dismiss must be allowed. The plaintiffs contend that, taking the allegations in the complaint as true, the evidence in the light most favorable to them, and any

---

[24] This court is not basing jurisdiction exclusively upon adverse inferences.

Case 3:20-cv-00759-JAM Document 40-5 Filed 06/01/20 Page 22 of 66
Case 1:08-cv-10783-NMG Document 40-5 Filed 01/10/08 Page 21 of 40

547

adverse inferences drawn from the defendants' failure to answer discovery questions, this court may properly exercise jurisdiction over the defendants.

Whether this court has personal jurisdiction over non-residents requires the court to answer two questions. First, does the court have jurisdiction under the Massachusetts long-arm statute? See G.L. c. 223A, §§ 3(a)-(h). Second, would the court's exercise of jurisdiction be consistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution? Tatro v. Manor Care, Inc., 416 Mass. 763, 767 (1994); Connecticut Nat. Bank. v. Hoover Treated Wood Products, Inc., 37 Mass. App. Ct. 231, 233 (1994). The plaintiff has the burden of demonstrating these requirements and "the statute is to be read with much generosity of breadth." Telco Communications, Inc. v. New Jersey State Firemen's Mut. Benev. Ass'n, 41 Mass App. Ct. 225, 229 (1996). "When the assertion is challenged under Mass. R. Civ. P. 12(b)(2), it is the plaintiff's burden to establish sufficient facts on which to base jurisdiction." Morrill v. Tong, 390 Mass. 120, 129 (1983). Jurisdiction over the person may be either specific or general. General jurisdiction is acquired where there are "continuous and systematic" contacts with the forum state. LTX Corp. v. Daewoo Corp., 979 F. Supp. 51, 58 (D. Mass. 1997). To obtain specific jurisdiction under the long-arm statute, the cause of action must "arise from" the conduct upon which long-arm jurisdiction is sought. See Carlson Corp. v. Univ. of Vermont, 380 Mass. 102, 106 (1988); Heins v. Wilhelm Loh Wetzlar Optical Machinery GMBH & Co. KG, 26 Mass. App. Ct. 14, 22 (1988). The court may exercise specific jurisdiction over a defendant in a suit arising out of or related to the defendant's contact with the forum. Id.

A. Long-arm Statute

"Divining personal jurisdiction is more an art than a science." Sawtelle v. Farrell, 70

# 548

F.3d 1381, 1388 (1st Cir. 1995) (internal citations and quotations omitted). Whether jurisdiction

will be found is a determination sensitive to the particular facts of each case. Morrill, 390 Mass.

at 129. This court must construe the Massachusetts long-arm statute broadly in order to

effectuate the Commonwealth's legitimate desire to protect its citizens. Bartow v. Extec Screens

and Crusher, Ltd., 53 F. Supp. 2d 518, 521 (D.Mass 1999). The Massachusetts long-arm statute

provides in relevant part:

> A court may exercise personal jurisdiction over a person, who acts directly or by
> an agent, as to a cause of action in law or equity arising from the person's
>
> (a) transacting any business in this commonwealth;
> (b) contracting to supply services or things in this commonwealth;
> (c) causing tortious injury by an act or omission in this commonwealth;
> (d) causing tortious injury in this commonwealth by an act or omission outside
> this commonwealth if he regularly does or solicits business, or engages in any
> other persistent course of conduct, or derives substantial revenue from goods used
> or consumed or services rendered, in this commonwealth....

G.L. c. 223A, § 3 (2000).

1. Daniel Carpenter

The plaintiffs claim that several subsections of the long-arm statute, any one of which

individually may satisfy the first prong of this court's analysis, confers jurisdiction over Daniel

Carpenter. Specifically, they claim that Sections 3 (a), (c), and (d) of the long-arm statute

provide this court with jurisdiction over Daniel.

a) Section 3(a)

i) Transacting Business in this Commonwealth

Section 3(a), the "transacting any business" clause, permits the court's exercise of

jurisdiction "if the defendant...transacted any business in the Commonwealth, and if the alleged

22

## 550

Massachusetts. <u>United Elec. Workers</u> v. <u>163 Pleasant Street Corp.</u>, 960 F.2d 1080, 1087 (1st Cir. 1992). Actual physical presence of a defendant in this jurisdiction is not required to acquire personal jurisdiction under the "transacting business" clause. <u>Good Hope Indus., Inc.</u>, 378 Mass. at 11; see also <u>Tatro</u>, 416 Mass. at 768.

In the absence of any independent basis for jurisdiction, an individual's mere status as an officer or director of a corporation conducting business in Massachusetts is generally insufficient for a Massachusetts court to exercise jurisdiction over the person. <u>Roy</u> v. <u>Roy</u>, 47 Mass. App. Ct. 921, 921 (1999). Personal jurisdiction over a corporation does not automatically confer personal jurisdiction over its officers and directors. <u>Kleinerman</u> v. <u>Morse</u>, 26 Mass. App. Ct. 819, 824 (1989). A corporate officer's active participation in a corporation's in-state activities, however, may confer personal jurisdiction. <u>Id</u>. An officer's "[a]ctive entrepreneurial or managerial conduct in the State where jurisdiction is asserted will cause jurisdiction to attach." <u>Id.</u>

Daniel has a number of contacts with the forum. He is listed as both the chairman and secretary of Limited and Benistar. On January 3, 2001, Daniel traveled to this forum to inform Cahaly's husband that Cahaly's money was gone. Daniel was responsible for the management of the Massachusetts' residents' funds solicited in Massachusetts. All monies collected from Benistar went through Daniel's hands in Connecticut. Based on his active control over Benistar, it is proper to confer jurisdiction over him.

Daniel was transacting business in this Commonwealth and purposefully availed himself of the privileges and protection of this forum sufficient to meet the "transacting business" requirement of Section 3(a). "As used in the statute the term 'transacting business' does not require purely commercial activity but is used to embrace any purposeful actions performed in

24

## 551

Massachusetts." <u>Johnson</u> v. <u>Witkowski</u>, 30 Mass. App. Ct. 697, 713 (1991).

Contrary to Daniel's argument, jurisdiction over him is not improper because he, for the most part, managed Benistar from Connecticut. "Modern technology has taken us far beyond the point where two men must stand in each other's physical presence to transact business. Widespread use of the telephone and the mails make[s] actual physical presence unnecessary in many cases." <u>Good Hope Industries, Inc.</u>, 378 Mass. at 11 (citation omitted). Here, Carpenter participated in commercial activity and committed purposeful acts in this forum.

Moreover, taking adverse inferences from Daniel's deposition, it may be inferred, *inter alia*, that he personally had gambled and lost almost $9 million of the Plaintiffs' funds; transacted business for Benistar in Massachusetts; personally solicited plaintiffs through providing promotional materials; intermingled Benistar funds with his other business entities, including Limited; shut down and stripped Benistar; personally caused Benistar to breach the contractual agreements with plaintiffs; and diverted profits from the Benistar Property account into his own personal account. There can be no doubt that these activities would constitute transacting business under Section 3(a). These activities also show the pervasive control he had over Benistar, which also warrants the exercise of jurisdiction in this forum. <u>Kleinerman</u>, 26 Mass. App. Ct. at 824.

The defendants assert that no adverse inference can be drawn from any of the deposition testimony because an adverse inference would be unreasonable.[26] They argue that it is

---

[26] Defendants assert that no adverse inferences should be drawn against the other defendants from Paley's failure to testify. Without deciding whether such an inference may be drawn, this court has not done so. See <u>Lenz</u> v. <u>Metropolitan Property & Casualty</u>, 2001 Mass. App. Div. 52 (adverse inference drawn against insured from non-party witness' invocation of privilege against self-incrimination where witnesses were closely aligned with insured).

Case 3:20-cv-00769-JAM   Document 435   Filed 06/01/20   Page 25 of 66
Case 1:08-cv-12783-NMG   Document 405   Filed 04/01/08   Page 25 of 40

552

unreasonable to make such inferences where they have appended affidavits to show otherwise. These affidavits, however, have been stricken; thus, any adverse inference would not be unreasonable on that basis.

The defendants also say that it would be unreasonable for the court to draw any adverse inferences on the issue of personal jurisdiction because plaintiffs' own interrogatories prove that defendants had no contact with the forum. After review, however, of the interrogatories, this court disagrees. Interrogatory answers, simply put, are not the only basis to show jurisdiction. Even so, some of the interrogatory answers highlight Daniel Carpenter's contacts with Massachusetts.

Carpenter's status as an officer does not insulate him from liability because Massachusetts does not recognize the "fiduciary shield" or "corporate shield" doctrines. See Johnson Creative Arts, Inc. v. Wool Masters, Inc., 573 F. Supp. 1106, 1111 (D.Mass. 1983) (aware of no Massachusetts case that "has adopted the fiduciary shield doctrine as a limitation on the reach of the Massachusetts long-arm statute."). Rather, long-arm jurisdiction over an individual "may be predicated on activities undertaken in a corporate capacity without regard to whether the individual is an 'alter ego' for the corporation." Yankee Group, Inc. v. Yamashita, 678 F.Supp. 20, 22 (D.Mass. 1988).

After reviewing all of the relevant factors, this court finds that the plaintiffs have established sufficient facts on which to base that Daniel Carpenter was transacting business in this forum for purposes of Section 3(a) of the long-arm statute. Carpenter's active management of, and "plenary control" over, see Kleinerman, 26 Mass. App. Ct. at 823, Benistar and the

553

plaintiffs' funds is sufficient to impose jurisdiction.[27] Moreover, where a defendant, such as

Carpenter, seeks to participate in or has an effect on the economic life of the Commonwealth, he

may be found to have transacted business here.  Carlson Corp. v. Univ. of Vermont, 380 Mass.

102, 107 (1980) ("[w]here the non-resident defendants' contacts with Massachusetts had

substantial consequence in this state, personal jurisdiction found, notwithstanding the absence of

actual physical presence in Massachusetts.")  The uncontroverted allegations show that Carpenter

personally, managed the funds and transacted business in this forum.

ii) The "Arising from" Requirement

For purposes of the Section 3(a) of the Massachusetts long-arm statute, "a claim arises

from a defendant's transaction of business in the forum State if the claim was made possible by,

or lies in the wake of, the transaction of business in the forum State." Tatro, 416 Mass. at 771.

The "arising from" clause in Section 3(a) of the Massachusetts long-arm statute is to be construed

generously in favor of asserting personal jurisdiction.  Lyle Richards Intern., Ltd. v. Ashworth,

Inc., 132 F.3d 111, 114 (1st Cir. 1997).  "The fact that the claim sounds in tort and that the

business transacted is contractual in character is not determinative, for 'the contractual contact is

a "but for" causative factor for the tort since it brought the parties within tortious "striking

distance" of each other.' "  Connecticut Nat. Bank v. Hoover Treated Wood Products, Inc., 37

Mass. App. Ct. 231, 235 (1994) (quoting Tatro, 416 Mass. at 770) (quoting in turn from Prejean

v. Sonatrach, Inc., 652 F.2d 1260, 1270 n. 21 (5th Cir. 1981)).

The test is whether the cause of action arises from the contacts with this forum.  The court

---

[27] Persistent and pervasive business conduct and control "obviates the need to itemize and weigh
small acts to decide whether they add up to transacting business in the Commonwealth."
Kleinerman, 26 Mass. App. Ct. at 823.

27

## 554

applies a "but for" causation test which looks at whether defendant's contacts with this forum constitute "the first step in a train of events" that resulted in the injury. Tatro, 416 Mass. at 770. The relevant question then is whether Daniel Carpenter's contacts with the forum constituted the first step resulting in the injury.

The plaintiffs have put forth a *prima facie* showing that Carpenter's contacts with this forum were the first step in a "train of events" that caused their injury. More specifically, had Carpenter not solicited, contracted, and transacted business with the plaintiffs in this forum then surely we would not be in this posture today. Given the generous construction of the "arising from" clause, which favors asserting personal jurisdiction, this court agrees with the plaintiffs that their claims arise out of Carpenter's business contacts with this Commonwealth.

This court is satisfied that the plaintiffs have made the requisite *prima facie* showing under Section 3(a) as to Daniel Carpenter.

### b) Section 3(d)

It is also likely that the facts of this case bring it within § 3(d) of the long-arm statute as well. Under § 3(d), the court has personal jurisdiction over: a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's causing tortious injuries in this commonwealth by an act or omission outside this commonwealth if he [1] regularly does or solicits business, or [2] engages in any other persistent course of conduct, or [3] derives substantial revenue from goods used or consumed or services rendered, in this commonwealth.

The first element under § 3(d) requires the plaintiffs to demonstrate that Daniel Carpenter's acts or omissions caused tortious injury inside the Commonwealth. Cunningham v. Adrox, Inc., 40 Mass. App. Ct. 279, 281 (1996). Here, the plaintiffs have alleged fraud and

28

## 555

misrepresentation against Carpenter. See Kolikof v. Samuelson, 488 F.Supp. 881, 884 (D.Mass. 1980).[28]

The plaintiffs must next show that Carpenter either "regularly does or solicits business" in this forum, or "engages in any other persistent course of conduct" in Massachusetts, or "derived substantial revenue from goods used or consumed or services rendered" in Massachusetts. "Because this clause is disjunctive, only one of its prongs needs to be satisfied." Noonan v. Winston Co., 135 F.3d 85, 91 (1st Cir. 1998); Heins, 26 Mass. App. Ct. at 20. This court finds that plaintiffs have made such a *prima facie* showing based on the adverse inferences together with other probative evidence.

Here, the adverse inferences show that Carpenter regularly solicited business in this forum. It may further be drawn from his failure to testify that he personally gave promotional material to all plaintiffs; controlled Benistar, which regularly did business in this Commonwealth, such that it was his alter ego[29]; transacted business on behalf of Benistar; and commingled assets between the Benistar-Limited entities. Carpenter personally controlled Benistar and received, through another one of his entities, ten percent of all Benistar revenues.[30]

---

[28] The plaintiffs feel the impact of the defendants' actions in this forum.

[29] See generally, In Personam Jurisdiction Over Nonresident Director of Forum Corporation Under Long-Arms Statutes, 100 A.L.R.3d 1108 (1980).

[30] Under the law of this forum, it is well settled that "substantial revenue" is neither an absolute amount nor an absolute percentage of total sales. Keds Corp. v. Renee Int'l Trading Corp., 888 F.2d 215, 219 (1st Cir. 1989) (citing Heins, 26 Mass. App. Ct. at 21 n. 5). "All that is required is literal satisfaction of the statutory requirement." Id. The "substantial revenue requirement" has been satisfied in circumstances less compelling than the ones here. See Keds Corp., 888 F.2d at 219 (the sale of 6,000 pairs of shoes for $15,000 meets the "substantial revenue" requirement); Kolikof v. Samuelson, 488 F.Supp. 881, 884 (D.Mass. 1980) (derives substantial revenue in Commonwealth where at least 3.2% of total sales have been made in Massachusetts); Mark v. Obear and Sons, Inc., 313 F. Supp. 373, 375-376 (D. Mass. 1970) ($5,000 or 0.5% of total sales

## 556

For these reasons, assuming the contacts comport with due process requirements, the motion to dismiss the claims against Daniel Carpenter for lack of personal jurisdiction shall be denied.[31]

### 2. Limited

Limited has also transacted business in this Commonwealth sufficient for purposes of §3(a) of the long-arm statute. "Significant exercise of control by an out-of-State parent corporation over a subsidiary and significant intermingling of officers and directors between parent and subsidiary have served to establish jurisdiction in the State where the subsidiary is conducting its business operations." Kleinerman, 26 Mass. App. Ct. at 823 (citing Willis v. American Permac, Inc., 541 F. Supp. 118, 122 (D. Mass. 1982)).

Adverse inferences may also be drawn against a corporate entity when its officers refuse

---

is "substantial revenue" for purposes of Section 3(d) of the Massachusetts long-arm statute—"[a] contrary finding would tend to defeat the legislative purpose of protecting the rights of the citizens of the State.").

[31] It is also likely, as plaintiffs assert, that the facts of this case bring it within Section 3(c) as well. Johnson, 30 Mass. App. Ct. at 713; Burtner v. Burham, 13 Mass. App. Ct. 158, 163 (1982) ('[W]here a defendant knowingly sends into a state a false statement, intending that is should there be relied upon to the injury of a resident of that state, he has for jurisdictional purposes acted within that state." (quotations and citations omitted)). Here, defendant Carpenter allegedly made fraudulent statements to plaintiffs with respect to their monies and how it would be held. These statements, in turn, were the first step in a train of events causing the plaintiffs' injuries.

to testify on behalf of the entity. Shafnacker, 425 Mass. at 736. In some circumstances, adverse inferences may be drawn against an employer where an employee invokes a privilege. Id. Here, it is proper to draw adverse inferences based upon Daniel Carpenter, Molly Carpenter, and Paley's invocation of a privilege.

The uncontroverted evidence and adverse inferences from the Carpenters and Paley's refusal to testify show a significant intermingling of officers, and funds between the parent, Limited, and subsidiary, Benistar, so as to warrant the exercise of personal jurisdiction over Limited. For instance, Paley represented to the plaintiffs that it was safe to entrust real estate sale proceeds with Benistar because it had Limited's backing. It may also be inferred from Carpenter's invocation of the privilege against self-incrimination that Limited's Web site and promotional materials were intended to induce plaintiffs to enter into a business relationship with Benistar.

The plaintiffs' submissions further show that Limited's Web site stated that Benistar is part of Limited and that "we protect your assets." The plaintiffs were also told that they could mail checks to Limited. PaineWebber documents submitted by the plaintiffs also purport to show intermingling of the Benistar entities. The documents reflect that monies from Benistar's account were transferred into Benistr Admin. Services, a Limited subsidiary, and $2 million dollars of funds were commingled between Benistar and another Limited subsidiary, Benistar Employer Services Trust Corporation.

Limited, in the various complaints and submissions, is alleged to control Benistar, or at very least, to have assisted Benistar in its day-to-day operations. An adverse inference drawn from Carpenter's failure to testify is that Limited itself has directly participated in the scheme to

31

## 558

defraud plaintiffs and control the deposit and withdrawal of all client funds from the PaineWebber accounts. For its services, Limited took ten percent of the Benistar fees. All wire transfers of Benistar money were handled in Connecticut.

Based on the significant exercise of control by an out-of-State parent corporation, Limited, over a subsidiary, Benistar, and significant intermingling of officers and directors between parent and subsidiary, the plaintiffs have established a *prima facie* showing that jurisdiction exists in this forum.

In contrast, defendants claim that jurisdiction over Limited is improper because Limited did not exercise control over Benistar and there was no confusion concerning Carpenter's position. This position is asserted through the defendants' affidavits, which are stricken.

Limited may also be subject to jurisdiction based on Section 3(d). It is alleged that Limited committed the torts of misrepresentation and fraud. Accordingly, the court must next look to whether Limited "regularly d[id] or solicit[ed] business" in this forum, or "engage[d] in any other persistent course of conduct," to satisfy the second prong § 3(d). An adverse inference, in addition to all of the prior evidence set forth above, may be drawn that Limited regularly did business in this forum. Moreover, Limited has also solicited business through their Web site, which is one factor in ascertaining whether it regularly did or solicited business in this forum. This court is not basing jurisdiction in this forum solely on the basis of Limited's Internet Web site. The Web site, however, has been used as one factor in ascertaining whether the defendants are regularly soliciting business for purposes of §3(d). Other courts have found that personal jurisdiction exists based on Internet Web sites. See Richard E. Kaye, Internet Web Site Activities of Nonresident Person or Corporation as Conferring Personal Jurisdiction under Long-

# 559

Arm Statutes and Due Process Clause, 81 A.L.R. 5th 41 (2000) ("Internet Web Site Activities").

For example, a computer consulting company was found to regularly solicit business in this

Commonwealth, for purposes of Section 3(d) of the long-arm statute, where it maintained an

Internet Web site that could be continuously accessed by Massachusetts residents, and a part of

its advertising listed another Massachusetts company as one of its new customers, who had

company name recognition in the Commonwealth. Hasbro Inc., v. Clue Computing, Inc., 994 F.

Supp. 34, 39 (D. Mass. 1997). Moreover, in Northern Light Technology, Inc. v. Northern Lights

Club, 97 F.Supp.2d 96, 105-106 (D. Mass. 2000), the court found that defendants, who operated

a Web site that enticed users to post a link on the site or to advertise on the site, were "regularly

soliciting" business under Section 3(d). "The traditional territorial notions of personal

jurisdiction…have been tested in recent years by technological advances, including commercial

uses of the Internet and the World Wide Web," Internet Web Site Activities, 81 A.L.R. 5th at 61,

often with mixed results depending on the facts and circumstances of the case. See B. Boland

and D. Gwin, The Internet and Personal Jurisdiction Under the Constitution: in what state,

exactly is the Internet Located?, 44 B.B.J. January/February 2000, 16. Limited maintains that

jurisdiction in this case should not be grounded upon the Internet Web sites because the site is

purely passive. Even still, a line of cases has emerged which finds that the creation of a passive

Web site is one factor to establish personal jurisdiction with the forum. See Better Boating

Ass'n, Inc. v. BMG Chart Products, Inc., Civil No. 97-3738E (Suffolk Super. Ct. July 10, 1998)

(defendant's advertisement over World Wide Web and in national trade magazines are factors,

among others, in asserting personal jurisdiction); Internet Web Site Activities, 81 A.L.R. 5th at

78-85 (citing cases in which a passive Web site plus additional contacts with forum state

33

## 560

provided sufficient bases for assertion of personal jurisdiction).

Defendants append passages of AT&T and FleetBoston Financial Web sites to show that other companies list subsidiaries on their Web sites; thus, jurisdiction on this basis alone would not be proper. However, that does not answer the relevant question of whether that would confer jurisdiction—i.e. is the site passive; is the site interactive, etc. Moreover, this court is not conferring jurisdiction over Limited on the Web site alone.

Here, Limited's Web site has a section devoted to Benistar. The Web site solicits business and directs visitors to contact Paley directly through a toll-free number. The Web site further states that potential customers may trust Benistar with their money because Benistar is "part of Limited." Although, not determinative of jurisdiction, the Internet Web site may be used as one factor in ascertaining whether jurisdiction is proper. More specifically, as a factor to determine that Benistar regularly does or solicits business in this forum.

Accordingly, jurisdiction over Limited may be conferred. Based on these facts, coupled with the adverse inferences, this court concludes that requirements of Section 3(d) are satisfied and this court may exercise jurisdiction over Limited.

### 3. Molly Carpenter

Defendants assert that the court may not exercise jurisdiction over Molly. They argue that the sole jurisdictional allegation against her is that she signed the corporate resolution. She argues that she did not sign such a form and, thus, the motion to dismiss should be allowed. In the alterative, they argue that having authority to control the account "falls far short of an allegation that she did anything with respect to the account that harmed Mass. Lumber in any manner." The defendants also argue that this court cannot base jurisdiction, in whole or in part,

34

## 561

by virtue of her position as an officer because she claims that she is not an officer.

Defendants also assert that it is improper to draw adverse inferences from the assertion of the spousal privilege. Defendants cite to <u>U.S.</u> v. <u>Premises Known as 281 Syosset Woodbury Road</u>, 71 F.3d 1067, 1071 n. 3 (2d Cir. 1995), for the proposition that no adverse inferences may be drawn from the assertion of the spousal privilege. In that case, in a footnote, the court states that it need not consider whether it may draw adverse inferences because the privilege is not available. <u>Id.</u> The court went on to note, "that in the context of the adverse spousal testimony privilege, any possible inference would refer to the activities of another party, while in the Fifth Amendment context, where such inferences are permitted in civil suits, the inferences refer to the activities of the person who fails to testify." <u>Id.</u> While that may be a factor in a routine assertion of spousal privilege, it is not here. Molly is a named party, who refused to testify regarding her own contacts and not that of her spouse. In such a case, the proper assertion of the privilege may be the Fifth Amendment, rather than the spousal privilege. Here, the court has only drawn inferences against Molly from questions of her own activities and not that of her spouse. Thus, the rationale behind refusing to extend adverse inferences in the civil context based on the spousal privilege does not apply.

In any event, adverse inferences may be drawn from the assertion of the spousal privilege. See <u>Phillips</u> v. <u>Deihm</u>, 541 N.W. 2d 566 (Mich. App. 1995) (proper to draw adverse inference from the invocation of spousal privilege similarly to invocation of the Fifth Amendment privilege). The defendants cite to <u>Commonwealth</u> v. <u>Labbe</u>, 6 Mass. App. Ct. 73, 79 (1978) for the position that adverse inferences may not be drawn from the assertion of the spousal privilege. However, that case is inapposite as it deals with the criminal—and not civil—context.

35

## 562

Defendants say that it would be unreasonable to draw an adverse inference from her invocation of her spousal privilege in response to questions as to whether she did sign the form because she appended an affidavit saying she did not sign the document. Similarly, she argues that no adverse inference may be drawn that she had any involvement with Benistar because she says otherwise in her affidavit. Since the affidavit has been stricken, the court may draw these adverse inferences.

Molly Carpenter's refusal to testify supports inferences that she was "involved in the trading of securities" with plaintiff's money; was "involved in a scheme to defraud the plaintiff;" traveled "to Massachusetts as an employee of Benistar Property;" worked as an employee "of Beinistar Property" or "Benistar Limited;" personally converted the plaintiffs' money; "specifically act[ed] as an employee of Benistar Property and an employee of Benistar Limited or other Benistar entities to commit a breach of contract;" made fraudulent representations to plaintiffs as an employee of one of the Benistar entities; personally "used plaintiffs' funds for her own purposes;" and "personally traded [plainitffs'] money." It may also be inferred that Molly Carpenter was personally involved in setting up a shell corporation and falsely stated in her affidavit that she never "exercised ownership of, dominion, or control over plaintiffs' money." Molly's signature appears in a signature block labeled "Signature of Officer" in the corporate resolutions on the Benistar account with PaineWebber. She was also named as a corporate officer in that document and was authorized to act on the PaineWebber account.

Based on the adverse inferences, together with the uncontroverted evidence, Molly Carpenter transacted business for purposes of Section 3(a).

## 563

B. Due Process

Even "[i]f the literal requirements of the [long-arm] statute are satisfied, it also must be established that 'the exercise of jurisdiction under State law [is] consistent with basic due process requirements mandated by the United States Constitution." Tatro, 416 Mass. at 767 (citation omitted). The defendants' contacts with Massachusetts are also clearly sufficient to satisfy constitutional Due Process standards. See id. Jurisdiction is proper if the defendants also had minimum contacts with the forum state at the time of filing the complaint, such that "the assertion of jurisdiction over [defendants would] not offend 'traditional notions of fair play and substantial justice.' " Tatro, 416 Mass. at 773 (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). "In practical terms, this means that an assertion of jurisdiction must be tested for its reasonableness, taking into account such factors as the burden on the defendant of litigating in the plaintiff's chosen forum, the forum state's interest in adjudicating the dispute, and the plaintiff's interest in obtaining relief." Tatro, 416 Mass. at 773. The minimum contacts test is neither mechanical nor quantitative; instead, a question of reasonableness is presented.

Due process requirements are satisfied only if the defendant had fair warning that he could he hailed into this court. "This 'fair warning' required by the due process clause 'that a particular activity may subject [an individual] to the jurisdiction of a foreign sovereign," Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985) (quoting Stevens, J., concurring in Shaffer v. Heitner, 433 U.S. 186, 218 (1977)), " is satisfied if the defendant has "purposefully directed" his activities at residents of the forum,' " Teleco Communication, Inc., 41 Mass. App. Ct. at 233 (quoting Burger King, 471 U.S. at 472) (quoting from Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984)). "For the purpose of [the court's] examination here, these considerations

## 564

coalesce around the following inquiry: whether there was some minimum contact with the Commonwealth which resulted from an affirmative, intentional act of the defendant, such that it is fair and reasonable to require the defendant to come into the State to defend the action." <u>Good Hope Indus. Inc.</u>, 378 Mass. at 7.

The defendants here did not participate in an isolated transaction without commercial consequences in this forum. <u>Id.</u> at 9. Nor are the defendants' many contacts fortuitous. Rather, the defendants undertook purposeful activity in the forum--through visiting the forum, soliciting Massachusetts business, and controlling a Massachusetts corporation—such that the defendants are not unsuspecting defendants, who would be surprised by being hailed into court here.

It is not unreasonable to require defendants, who allegedly misappropriated over $8 million dollars of Massachusetts's residents' money, to defend themselves in this forum. Based on the various activities in Massachusetts, all defendants have purposefully availed themselves of the privilege of conducting activities here.

"Once it has been decided that a defendant purposefully established minimum contacts within the forum State, the contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." <u>Burger King Corp.</u>, 471 U.S. at 476 (quotation omitted). In determining whether this requirement is met the court should look to the "Gestalt factors", namely, 1) the defendant's burden in appearing in the court; (2) the Commonwealth's interest in hearing the suit; (3) the plaintiffs' convenience and interest in effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interest of all interested states in promoting substantive social policies. <u>Id.</u> at 476-77. "The Gestalt factors are

38

## 565

not ends in themselves, but they are, collectively, a means of assisting the courts in achieving substantial justice." Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 209 (1st Cir. 1994).

After reviewing all the relevant factors, this court concludes that it is fair and reasonable to compel the defendants to defend themselves in Massachusetts. First, Daniel (and an adverse inference may be drawn that Molly, also) traveled to this forum on numerous occasions to conduct business. Secondly, this forum has an interest in this suit because citizens of this commonwealth have allegedly been harmed by the defendants' misappropriation of millions of dollars. This leads to the third factor, and this court finds that it is more convenient for the resident plaintiffs to pursue this action in Massachusetts. Finally, this forum has an interest in protecting its citizens. The "Gestalt factors," taken together, weigh in favor of the plaintiffs.

The Carpenters and Limited had on-going business dealings in this Commonwealth or had specific contacts with this forum that make it not unfair for them to be subject to jurisdiction here. By initiating and executing its business transactions in the Commonwealth, the defendants have "purposefully avail[ed] [themselves] of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958). The defendants have "not shown that the burden placed upon it by the need to defend a suit in Massachusetts outweighs the Commonwealth's manifest interest in providing effect means of redress for its residents." Balloon Bouquets, Inc., 18 Mass. App. Ct. at 937 (1984) (citations and quotations omitted).

Here, requiring the defendants to defend this action in Massachusetts comports with due process.

## 566

### V.   Consequences for invocation of privileges

The defendants, here, may not refuse to answer questions regarding jurisdiction on the ground of privilege, and at the same time seek to avoid jurisdiction because the plaintiffs have been unable to submit information on the issues defendants refused to testify upon.  See Mello v. Hingham Mutual Fire Insurance Co., 421 Mass. 333, 338 (1995).  On the one hand, they argue that the case should be dismissed for lack of personal jurisdiction and submit affidavits to support this position.  Yet, when they are asked questions about personal jurisdiction they refuse to answer them citing Fifth Amendment rights and the "spousal privilege."  In such circumstances, the court may estop the defendants from bringing a motion to dismiss for lack of personal jurisdiction to promote fairness.

"[T]he requirement of personal jurisdiction may be intentionally waived, or for various reasons a defendant may be estopped from raising the issue."  Ins. Corp. of Ireland v. Compagnie des Bauxites, 102 S.Ct. 2099, 2105 (1982).  A plaintiff may demonstrate personal jurisdiction through historical facts—"i.e., certain factual showings will have legal consequences—but this is not the only way in which the personal jurisdiction of the court may arise."  Id.  "The action of the defendant may amount to a legal submission to the jurisdiction of the court, whether voluntary or not."  Id. (Court held that personal jurisdiction may be established, without violating due process, on the basis of failure to comply with jurisdictional discovery.).

Here, it would be proper to estop the defendants from asserting that jurisdiction is improper.  The defendants' actions in refusing to answer questions regarding jurisdiction and using that refusal to gain a tactical advantage would be unfair.  See Serafino, 82 F.3d at 518 (proper to

40

## 567

dismiss case for failure to answer discovery questions). Although this may be an undesirable consequence, it does not violate the privilege against self-incrimination. Accordingly, the motion to dismiss could be denied on this wholly independent and adequate ground.

<u>ORDER</u>

For the foregoing reasons, this court <u>DENIES</u> the motion to dismiss for lack of personal jurisdiction of defendants Daniel Carpenter, Molly Carpenter and Limited. In addition, the court <u>ALLOWS</u> the cross-motion of the plaintiffs to strike the affidavits of Martin Paley, Daniel Carpenter and Molly Carpenter in further opposition to the defendants' motion to dismiss for lack of personal jurisdiction.

Nonnie S. Burnes
Justice of the Superior Court

Dated: November 21, 2001

41

# EXHIBIT 32

The Assessor's office is responsible for the maintenance of records on the ownership of properties. Assessments are computed at 70% of the estimated market value of real property at the time of the last revaluation which was 2017.



Information on the Property Records for the Municipality of Simsbury was last updated on 5/27/2020.

## Property Summary Information

Parcel Data And Values | Building ▾ | Outbuildings | Sales

### Parcel Information

| Location: | 18 POND SIDE LANE | Property Use: | Residential | Primary Use: | Residential |
|---|---|---|---|---|---|
| Unique ID: | 30927601 | Map Block Lot: | D11 151 011 | Acres: | 1.03 |
| 490 Acres: | 0.00 | Zone: | R-40 | Volume / Page: | 0465/1023 |
| Developers Map / Lot: | | Census: | 4662020 | | |

### Value Information

| | Appraised Value | Assessed Value |
|---|---|---|
| Land | 142,462 | 99,730 |
| Buildings | 273,602 | 191,520 |
| Detached Outbuildings | 14,716 | 10,300 |
| Total | 430,780 | 301,550 |

### Owner's Information

**Owner's Data**

CARPENTER MOLLY
18 POND SIDE LANE
SIMSBURY CT 06070

Back To Search    Print View

# EXHIBIT
# 33



The Assessor's office is responsible for the maintenance of records on the ownership of properties. Assessments are computed at 70% of the estimated market value of real property at the time of the last revaluation which was 2017.

Information on the Property Records for the Municipality of Simsbury was last updated on 5/27/2020.

## Property Summary Information

**Parcel Data And Values** | **Building** ▾ | **Outbuildings** | **Sales**

### Parcel Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Location: | 100 GRIST MILL ROAD | Property Use: | Office | Primary Use: | Office Building |
| Unique ID: | 30568993 | Map Block Lot: | G11 103 005-25 | Acres: | 8.82 |
| 490 Acres: | 0.00 | Zone: | I-2 | Volume / Page: | 0743/0390 |
| Developers Map / Lot: | | Census: | 4663000 | | |

### Value Information

| | Appraised Value | Assessed Value |
|---|---|---|
| Land | 892,584 | 624,810 |
| Buildings | 1,422,232 | 995,560 |
| Detached Outbuildings | 85,184 | 59,630 |
| Total | 2,400,000 | 1,680,000 |

### Owner's Information

**Owner's Data**

GRIST MILL PARTNERS LLC
28 TOWER LANE SUITE 100
AVON CT 06001

Back To Search    Print View

Information Published With Permission From The Assessor

# EXHIBIT 34

.

| | |
|---|---|
| **From:** | Michael Barnett <mbarnett@loeb.com> |
| **Sent:** | Monday, May 05, 2014 1:14 PM |
| **To:** | michael@mstaylorlaw.com |
| **Subject:** | FW: BPETCO w-9 Litigation Group for New Check sent Feb 7, 2014 |

Michael Barnett
Attorney At Law
Loeb & Loeb LLP
345 Park Avenue | New York, NY 10154
Direct Dial: 212.407.4163 | Fax: 212.656.1554 | E-mail: mbarnett@loeb.com

Los Angeles | New York | Chicago | Nashville | Washington, DC | Beijing | Hong Kong | www.loeb.com

------------------------------------------------------------------------
CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.
------------------------------------------------------------------------

-----Original Message-----
From: DCarpenter US Benefits [mailto:dcarpenter@usbgi.com]
Sent: Thursday, May 01, 2014 11:55 AM
To: Kolovos, Peter; jamesyellen@yahoo.com
Cc: DCarpenter US Benefits
Subject: FW: BPETCO w-9 Litigation Group for New Check sent Feb 7, 2014

Peter:

Please see below......unless the check is made payable to BPETCO Litigation Group, LLC.......WE will consider Merrill in breach of the Settlement Agreement.  Joe and Pastore Dailey no longer represent BPETCO.   Please disregard their letter to you.  I have enclosed the original W-9 Form for BPETCO.  See below that BPETCO Litigation Group, LLC was ALWAYS the intended payee on the check.

Once you have the check prepared to BPETCO Litigation Group, LLC.......you can send it to me or Jim Yellen and I will pick it up from Jim.

Thank you for your attention to this.

Dan

JLM042054

-----Original Message-----
From: DCarpenter US Benefits
Sent: Thursday, May 01, 2014 10:16 AM
To: jamesyellen@yahoo.com; Michael A. Zamat (MZamat@psdlaw.net); Joseph M. Pastore III (Jpastore@psdlaw.net)
Cc: DCarpenter US Benefits
Subject: FW: BPETCO w-9 Litigation Group for New Check sent Feb 7, 2014

To All:

Let's get the check made out to the CORRECT party this time, and I will pick up the check at Wilmer Hale and save Joe the trouble....This is very easy to do......please have Merrill follow instructions this time......no reason to have Pastore Dailey involved

Please see below........and do not blow it this time....first time mistake......this time enemy action.....

Thanks,

Dan

-----Original Message-----
From: DCarpenter US Benefits
Sent: Friday, February 07, 2014 12:17 PM
To: Joseph M. Pastore III (Jpastore@psdlaw.net); Michael A. Zamat (MZamat@psdlaw.net)
Cc: DCarpenter US Benefits
Subject: FW: BPETCO w-9 Litigation Group

Thanks Mike

-----Original Message-----
From: Michael A. Zamat [mailto:MZamat@psdlaw.net]
Sent: Friday, February 07, 2014 12:16 PM
To: DCarpenter US Benefits
Subject: FW: BPETCO w-9

This is BPETCO Litigation Group W9.

Michael A. Zamat, Esq.
Counsel
PASTORE & DAILEY LLC
4 High Ridge Park, Third Floor
Stamford, CT 06905
203.658.8461 (p) / 203.348.0852 (f)
www.psdlaw.net
MZamat@psdlaw.net

_____

IRS Circular 230 Disclosure:  To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.
Confidentiality Notice:  This email message and all included attachments is being sent by a lawyer or on behalf of a lawyer, and is intended only for the addressee. The information contained in this email may be confidential and/or privileged. If you are not the named addressee, you are not authorized to read, print, copy, retain copies of, or

disseminate this email in any manner. If you have received this email in error, please notify the sender immediately and delete any and all copies of the email message and all attachments included therein.

-----Original Message-----
From: DCarpenter US Benefits [mailto:dcarpenter@usbgi.com]
Sent: Thursday, January 30, 2014 6:01 PM
To: Michael A. Zamat; Joseph M. Pastore III
Subject: FW: BPETCO w-9

Did you receive???

JLM042056

# EXHIBIT 35

**Banknorth, N.A.**
Connecticut    5:28 pm

## NEW NON-PERSONAL ACCOUNT

| | | |
|---|---|---|
| ACCOUNT #: ████6200 | TYPE OF ACCOUNT: Business Preferred Checking | CATEGORY: N/A - DDA |
| TIN CODE: 1 - TIN | TYPE CODE: 710 | CD RATE:    CD MATURITY DATE: |
| TAX ID #: ████19511 | SOURCE CODE: 4 Cash | CHECKS WILL BE: Safekept by Bank |
| BRANCH #: 507 | DATE OPENED: 02/13/2004 | BANK REPRESENTATIVE: Heather L Simpkin |

**Account Officer Information** (Complete only if an officer will be assigned to this account)
Officer Number: _____ Officer Name: _____ Telephone: _____

**BUSINESS NAME:**     TIN:     **ADDRESS(ES):**

1. Grist Mill Partners, LLC    ████49511    LEGAL/STREET ADDRESS
   Benistar Plaza  100 Grist Mill Rd
2. _____    Simsbury, CT 06070
3. _____    MAILING ADDRESS (IF DIFFERENT)
4. _____    Benistar Plaza  100 Grist Mill Rd

Business Phone: 860-408-7000    Simsbury, CT 06070

Business Type*:   Limited Liability Corporation (LLC)     NCPS Verification: Ref. #: 21222871

**What is the type/nature of this business?** (Describe products/services the company provides)
Real Estate Holding Company

**Anticipated Deposit Activity:**
Number of Deposits Per Week: 1     Average Amount of Deposit: $ 6,250.00

**Anticipated Monthly Wire Transfer Activity:**
Do you expect to send or receive wire transfers on a regular basis? No    Average Amount of incoming wires: $ _____
If "Yes, indicate type (check all that apply) ☐ Domestic   ☐ Foreign **    Average Amount of outgoing wires: $ _____
** If Foreign is checked, indicate what country(ies) to which / from which wire transfers will be sent/received:

**Money Service Business Questionnaire** (If the response to any of the following questions is "Yes" and you have questions, call Branch Support)

| | |
|---|---|
| Do you issue or sell money orders, traveler's cheques or stored value cards? | No |
| Do you wire or otherwise transmit money for your customers? | No |
| Does your primary business activity include exchanging foreign currency for a fee? | No |
| Do you engage in check cashing? (Do you cash third party checks for a fee?) | No |

**Additional Account Verification:**
☐ Business/Entity Documentation    ☐ Visual Inspection of Business    ☒ Thank You Letter/Card Sent
☐ Previous Bank: _____
(Enter Name of Previous Bank)

### IMPORTANT INFORMATION

Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account.

The undersigned acknowledge(s) receipt of the Deposit Account Agreement, as well as the fee schedule and rates, which govern my/our accounts with the Bank. My/our use of this account shall evidence my/our acceptance of the terms and conditions as set forth in the Deposit Account Agreement and the fee schedule, as the same may be amended from time to time.

The undersigned, both individually and on behalf of the account owner, if different, hereby authorize(s) the Bank to, from time to time, request consumer reports containing references about me/use from third parties, such as a consumer reporting agency. In connection with opening and maintaining this account. If you (the Bank) are unable to open a deposit account, you will provide me/us with an additional notice containing data regarding the consumer reporting agency.

I/we have been notified that Banknorth Connecticut is a division of Banknorth, N.A. I/We are aware that for FDIC insurance purposes, my/our deposits at Banknorth Connecticut are not separately insured from any deposits I/we have at any other division of Banknorth, N.A.

Under penalty of perjury, the undersigned certify(ies) that:
1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. person (including a U.S. resident alien).

Certification Instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return or for any other reason. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

**Information on Business Representative Opening Account**    New Business Customer
Daniel E. Carpenter     ████4417     ████1954
Name     Date of Birth
18 Pondside Ln Simsbury, CT  06070
Legal Address (if different from account owner)
18 Pondside Ln Simsbury, CT  06070
Mailing Address (if different from account owner)

Identification
Primary ID     Type     Number     Expiration Date:
ID #1: Valid State Drivers License w/Photo    ████8    06/23/04    NCPS Verification:
ID #2: N/A    N/A    N/A    21222871

X _Daniel E. Carpenter_     * I certify that the business type disclosed above is accurate to the best of my knowledge.
Signature of Business Representative Opening Account

| | | | | |
|---|---|---|---|---|
| X _Daniel E. Carpenter_ | Daniel E. Carpenter | | ████4417 | Ref. #: 21222871 |
| Signature | Print Name | Date | SSN | NCPS Verification |
| X _____ | _____ | _____ | _____ | Enter Ref. # or Select |
| Signature | Print Name | Date | SSN | NCPS Verification |
| X _____ | _____ | _____ | _____ | Enter Ref. # or Select |
| Signature | Print Name | Date | SSN | NCPS Verification |
| X _____ | _____ | _____ | _____ | Enter Ref. # or Select |
| Signature | Print Name | Date | SSN | NCPS Verification |

**For Deposit Operations Use Only**
SIC: 6531     Entered By: _____

CT Non-Personal Account Form  11/2003

Page 1 of 1    DØ1    NO.778    PEOPLE'S UNITED AUOH + DOC VIEW    14:20    12-06-2010

12/6/2012    http://infostorm/ViewStarWebServiceClient/DocumentViewHandler.ashx?req=dia&typ...

Print

JLM041363

**Peoples United Bank Business Signature Card**

Account # ▮▮▮▮ 038

**Account Type**    Business Advantage Checking

**Account Title** Grist Mill Partners, LLC      LLC
          Daniel E Carpenter      OWN
          Amanda Rossi          SIG

**Business Owner and Authorized Signer Information:** The owner of the business account, whose TIN is certified below is an owner, managing member, general partner, authorized officer or principal of the business and an authorized signer on the account pursuant to the legal documents submitted to People's United Bank. By designating a person as a signer below, owner(s)s represents and warrants to People's United Bank the person has the authority to act on behalf of the business with respect to the account.
By signing this signature card I/we have received a copy of the Business Deposit Account Contract, Business Schedule of Deposit Account Charges and Business Account Schedule of Interest and agree to the terms and conditions contained therein as they may be modified from time to time. I/we and will agree to waive our right to a trial by jury in any legal action, proceeding or counterclaims arising out of or in connection with the account. By selecting the M$/ATM checkbox below, you authorize People's United to order an ATM Card and/or MasterMoney Debit Card on your behalf for this account.

| | | |
|---|---|---|
| Signature 1 | ☐ M$ /ATM | Signature 4 ☐ M$ /ATM |
| Signature 2 _(signature)_ | ☐ M$ /ATM | Signature 5 ☐ M$ /ATM |
| Signature 3 | ☐ M$ /ATM | Signature 6 ☐ M$ /ATM |

| | | |
|---|---|---|
| **Name 1:** Grist Mill Partners, LLC | | **Name 4:** |
| **Relationship:** LLC | | Relationship |
| **Address:** | TIN (Certification Required) ▮▮▮▮9511 | TIN: |
| 100 Grist Mill Rd | DOB: | DOB: |
| Simsbury CT 06070 | | |
| **Name 2:** Daniel E Carpenter | TIN: ▮▮▮▮8417 | **Name 5:** |
| **Relationship:** Owner | DOB: | Relationship |
| **Address:** | | Address: |
| 1008 Captians Ct | | TIN: |
| Fernandina Beach FL 32034 | | DOB: |
| **Name 3:** Amanda Rossi | TIN: ▮▮▮▮423 | **Name 6:** |
| **Relationship:** Signer | DOB: | Relationship |
| **Address:** | | Address: |
| 191 Parker Rd | | TIN: |
| Somers CT 06071-2222 | | DOB: |

Grist Mill Partners, LLC
Daniel E Carpenter

Account Mailing Address:

     100 Grist Mill Rd
     Simsbury CT 06070

The following exception condition exists on this account:

**CERTIFICATION OF TAXPAYER IDENTIFICATION NUMBER**

As a duly authorized representative of the business identified above and speaking on behalf of the business, I certify, under penalties of perjury that (1) the number shown on this form is my correct taxpayer identification number and (2)(a) I am not subject to backup withholding as a result of a failure to report an interest or dividends, or (b) I have not been notified by the Internal Revenue Service(IRS) that I am subject to backup withholding, and (3) I am a U.S. person (including a U.S. resident has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. person (including a U.S. resident alien). You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return

I am exempt from backup withholding because I am an: (Check one if applicable):
     ☐ Exempt Payee      ☐ Non-Resident Alien
     (Form W-9 is required)      (Form W-8 is required)

Signature: _(signature)_      Date: 12-2-10
          Employee           Branch

Management Approval:

CHEX systems called by: _(signature)_ 17344

| | | | |
|---|---|---|---|
| Opened | 12/02/2010 | Employee 17344 | Branch 0000175 |
| CS2 | | | |

Last Updated
(Title Change)

# EXHIBIT 36

# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DANIEL CARPENTER and | : | |
| GRIST MILL CAPITAL, LLC, | : | CASE NO. 3:13-cv-563 (SRU) |
| | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | |
| | : | |
| | : | |
| COMMISSIONER, INTERNAL REVENUE | : | |
| SERVICE, JOHN KOSKINEN, SHAUN | : | |
| SCHRADER, VICTOR SONG, and JANE | : | |
| AND JOHN DOES 1 TO 72, | : | |
| | : | |
| Defendants. | : | April 25, 2017 |

## PLAINTIFF DANIEL CARPENTER'S RESPONSES AND
## OBJECTIONS TO DEFENDANT SHAUN SCHRADER'S
## INTERROGATORIES DATED MARCH 7, 2017

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and Local Civil Rule 26, the plaintiff Daniel Carpenter ("Plaintiff"), by and through his undersigned counsel, hereby objects and responds to the First Set of Interrogatories and Requests for Production by the defendant Shaun Schrader dated March 7, 2017.

## INTERROGATORIES

1. Please identify all employees who were present during the search warrant execution conducted at 100 Grist Mill Road on April 20, 2010.  Please list the individual's full name, employer and job title on April 20, 2010, mailing address, telephone number, and e-mail address (if known).

   **OBJECTION:  Plaintiff objects to this interrogatory insofar as telephone numbers and e-mail addresses are outside the scope of information contemplated in Local Rule 26(c)(3).**

   **RESPONSE:  Notwithstanding and without waiving this objection:**

   **Daniel Carpenter, who was Chairman of Grist Mill Capital, LLC (contact through Plaintiff's counsel)**

   **Molly Carpenter, who was Chairman and CEO of Benistar Administrative Services, Inc. (contact through Plaintiff's counsel)**

**The following were employees of Benistar Administrative Services, Inc., and their present address is unknown:**

   **Stefan Cherneski,
   Kevin Slattery**

**The following were employees of Benistar Administrative Services, Inc., and their present address is 10 Tower Lane, Avon, CT 06001, 860-408-7000:**

**Joseph Castagno**
**Donna Dawson**
**Jennifer Dougherty**
**Shaundra Farley**
**Timothy Ford**
**Shawndrika Gardner**
**Tasha Gardner**
**Barbara Korfel**
**Caroline Meckel**
**Jane Moticka**
**Ineke Murphy**
**Amanda Rossi**
**June Tomby Smith**
**Donna Wayne**
**Amber Wills**

THE PLAINTIFF
DANIEL CARPENTER

By: /s/ Jeffrey P. Nichols
David A. Slossberg (ct13116)
Jeffrey P. Nichols (ct29547)
HURWITZ SAGARIN SLOSSBERG &
KNUFF, LLC
147 North Broad Street
Milford, CT 06460
Telephone: (203) 877-8000
Fax: (203) 878-9800
JNichols@hssklaw.com
DSlossberg@hssklaw.com

16

# EXHIBIT 37

# APPLICATION FOR CERTIFICATE OF AUTHORITY
## FOREIGN CORPORATION
Office of the Secretary of the State

**MAILING ADDRESS:**
Commercial Recording Division
Connecticut Secretary of the State
P.O. Box 150470
Hartford, CT 06115-0470
860-509-6003

**DELIVERY ADDRESS:**
Commercial Recording Division
Connecticut Secretary of the State
30 Trinity Street
Hartford, CT 06106
860-509-6003

FILING #0003879800 PG  01 OF  03 VOL B-01258
FILED 03/05/2009 08:30 AM PAGE  02428
SECRETARY OF THE STATE
CONNECTICUT SECRETARY OF THE STATE

Space For Office Use Only

Please contact the Department or Revenue Services or your tax advisor as to any potential tax liability relating to your business.

**1. NAME OF CORPORATION IN ITS STATE OR COUNTRY OF FORMATION:**

Benistar Admin Services, Inc.

**2. THE CORPORATION'S NAME IS <u>NOT AVAILABLE</u> FOR USE IN CONNECTICUT. THE CORPORATION SHALL, THEREFORE, TRANSACT BUSINESS IN CONNECTICUT UNDER THE FOLLOWING NAME:**
*(Complete only if the name of the corporation is not available for use in Connecticut)*

**3. CHECK EITHER A OR B**

  X  A. The corporation is organized for profit.       _____ B. The corporation is nonprofit.

**4. STATE/COUNTRY OF INCORPORATION:**
Delaware

**5. DATE OF INCORPORATION:**
07/18/1997

**6. DURATION: (CHECK ONE)**   X PERPETUAL       _____OTHER (SPECIFY)_____

**7. DATE CORPORATION BEGAN TRANSACTING BUSINESS/CONDUCTING AFFAIRS IN CONNECTICUT:**

  01  /  01 / 2009
MONTH   DAY   YEAR

**8. PRINCIPAL OFFICE ADDRESS OF THE CORPORATION:**
100 Grist Mill Road
Simsbury, Ct 06070

**9. MAILING ADDRESS OF THE CORPORATION:**
100 Grist Mill Road
Simsbury, Ct 06070

| 10. OFFICERS | | | |
|---|---|---|---|
| NAME | TITLE | RESIDENCE ADDRESS | BUSINESS ADDRESS |
| Don Trudeau | President | 100 Grist Mill Rd. Simsbury, Ct 06070 | 100 Grist Mill Rd. Simsbury, Ct 06070 |
| Donna Wayne | Vice-President | 100 Grist Mill Rd. Simsbury, Ct 06070 | 100 Grist Mill Rd. Simsbury, Ct 06070 |

Note: If additional space is needed, please reference an 8 1/2 X 11 attachment

FILING #0003879800 PG  02 OF  03 VOL B-01258
FILED 03/05/2009 08:30 AM PAGE  02429
SECRETARY OF THE STATE
CONNECTICUT SECRETARY OF THE STATE

## 11. DIRECTORS

| NAME | RESIDENCE ADDRESS | BUSINESS ADDRESS |
|------|-------------------|------------------|
| Molly Carpenter | 100 Grist Mill Rd.<br>Simsbury, Ct 06070 | 100 Grist Mill Rd.<br>Simsbury, Ct 06070 |
|  |  |  |
|  |  |  |
|  |  |  |

**12. Appointment of Registered Agent for Service of Process**
(Check A or complete B)

A. _**X**_   The corporation appoints the Secretary of the State of Connecticut and his successors in office to be its agent upon whom any process, in any action or proceeding against it, may be served.

B.  Print or type name of agent

Business address: (P.O. Box unacceptable)

Residence address: (P.O. Box unacceptable)

Acceptance of Appointment

_____
**Signature of Agent**

## 13. EXECUTION

Dated this _02_ day of _18_ , 20 _09_ .

| Molly Carpenter | Chairman | Molly Carpenter |
|-----------------|----------|-----------------|
| **Print or type name of signatory** | **Capacity of signatory** | **Signature** |

Rev.08/24/2007

# EXHIBIT 38

**GRIST MILL CAPITAL, LLC**
100 Grist Mill Road
Simsbury, CT 06070
(860) 408-7000
(860) 408-7005 (fax)

December 21, 2006

**Via E-Mail & Federal Express**

Louis W. Geibel
Vice President
Christiana Corporate Services, Inc.
1314 King Street
Wilmington, DE 19801

Re:   **Charter Oak Trust and Grist Mill Capital, LLC**

Dear Lou:

**Charter Oak Trust**

Please open immediately a *corporate trust account* in the name of **Charter Oak Trust**. It's Taxpayer Identification Number is ███**5830**. It's address is as follows:

> Charter Oak Trust
> 100 Grist Mill Road
> Simsbury, CT 06070
> Attn: Amanda Rossi

Contact information is as follows: (860) 408-7000, (860) 408-7005 (fax), arossi@benistar.com. The authorized signatories on the account shall be Wayne H. Bursey, Molly Carpenter, and Jack E. Robinson.

**Grist Mill Capital, LLC**

Please open immediately a *custody account* in the name of **Grist Mill Capital, LLC**. It's Taxpayer Identification Number is ███**7868**. It's address is as follows:

> Grist Mill Capital, LLC
> 100 Grist Mill Road
> Simsbury, CT 06070
> Attn: Amanda Rossi

Contact information is as follows: (860) 408-7000, (860) 408-7005 (fax), arossi@benistar.com. The authorized signatories on the account shall be Wayne H. Bursey, Molly Carpenter, and Jack E. Robinson. I have enclosed the requested documentation regarding this account.

**Avon Capital, LLC**

Please open immediately a *custody account* in the name of **Avon Capital, LLC**. It's Taxpayer Identification Number is ███**6827**. It's address is as follows:

> Avon Capital, LLC
> 100 Grist Mill Road
> Simsbury, CT 06070
> Attn: Amanda Rossi

Contact information is as follows: (860) 408-7000, (860) 408-7005 (fax), arossi@benistar.com. The authorized signatories on the account shall be Wayne H. Bursey, Molly Carpenter, and Jack E. Robinson. I have enclosed the requested documentation regarding this account.

Let me know if you need anything further and thanks for your assistance.

Sincerely,

Jack E. Robinson
Manager

Enclosures

# EXHIBIT 39

(Page 1 of 1)

**TD Banknorth**                                    ## NEW NON-PERSONAL ACCOUNT

REGION: TD Banknorth CT Mid-All                    DATE OPENED: 05/20/2009

ACCOUNT #: ▊▊4663          TYPE OF ACCOUNT: IM   Business Convenience Checking

TAX ID #: ▊▊7866           TYPE CODE: 720         CATEGORY: Non-Personal Checking

BRANCH #: 507              BANK REPRESENTATIVE: Carolyn M Starr

**Account Officer Information** (Complete only if an officer will be assigned to this account)

Officer Number: _____  Officer Name: _____  Telephone: _____

BUSINESS NAME/ADDRESS:                    TIN:

NOVA GROUP INC                            ▊▊7866        BUSINESS PHONE: (860) 408-7000

100 GRIST MILL ROAD

SIMSBURY, CT            USA        06070

eFunds Verification: _____    If Existing Customer, Enter the RM Number: ▊▊▊▊▊

Account Relationship: Corporation or LLC-2 Signers

Additional Account Verification: *Certificate of*
☒ Business/Entity Documentation:  *Enter per action* State Website Report & Resolution/Consent

☐ Previous Bank: _____    ☐ Visual Inspection of Business
              (Enter Name of Previous Bank)

### IMPORTANT INFORMATION

Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account.

The undersigned acknowledge(s) receipt of the Deposit Account Agreement and Fee Schedule which govern my/our accounts with the Bank. My/our use of this account shall evidence my/our acceptance of the terms and conditions as set forth in the Deposit Account Agreement and Fee Schedule as the same may be amended from time to time.

The undersigned, both individually and on behalf of the account owner, if different, hereby authorize(s) the Bank to, from time to time, request consumer reports containing references about me/us from third parties, such as a consumer reporting agency, in connection with opening and maintaining this account. If you (the Bank) are unable to open a deposit account, you will provide me/us with an additional notice containing data regarding the consumer reporting agency.

I/We acknowledge and understand that TD Banknorth and TD Bank are trade names of TD Bank, N.A. I/We further acknowledge and understand that for FDIC insurance purposes, my/our deposits are not separately insured from any other deposits I/we may have at TD Banknorth and/or TD Bank.

This section does not apply to U.S. non-resident aliens. Under penalty of perjury, the undersigned certify(ies) that:
1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. person (including a U.S. resident, alien).

Certification Instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return or for any other reason. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

X _Daniel E Carpenter_ (signature)   DANIEL E CARPENTER   ▊▊▊   ▊▊417
Signature                            Print Name          Date of Birth   SSN   eFunds Verification
Date Signed: 5/21/09                 If Existing Personal Customer, Enter the RM Number: ▊▊▊▊▊

X _____ (signature)                AMANDA ROSSI          ▊▊▊   ▊1423
Signature                            Print Name          Date of Birth   SSN   eFunds Verification
Date Signed: 5/21/09                 If Existing Personal Customer, Enter the RM Number: ▊▊▊▊▊

X _____                    _____         _____   _____
Signature                            Print Name          Date of Birth   SSN   eFunds Verification
Date Signed: _____                 If Existing Personal Customer, Enter the RM Number: _____

X _____                    _____         _____   _____
Signature                            Print Name          Date of Birth   SSN   eFunds Verification
Date Signed: _____                 If Existing Personal Customer, Enter the RM Number: _____

**For Deposit Operations Use Only**

SIC: _____        Entered By: _____

Rev. 11/2008

# EXHIBIT 40

**TD Banknorth**

# NEW NON-PERSONAL ACCOUNT

| | | | |
|---|---|---|---|
| **REGION:** | TD Banknorth CT Mid-Atl | **DATE OPENED:** | 05/20/2009 |
| **ACCOUNT #:** | ▮4697 | **TYPE OF ACCOUNT:** | IM  Business Convenience Checking |
| **TAX ID #:** | ▮5689 | **TYPE CODE:** 720 | **CATEGORY:** Non-Personal Checking |
| **BRANCH #:** | 507 | **BANK REPRESENTATIVE:** | Carolyn M Starr |

**Account Officer Information** (Complete *only if* an officer will be assigned to this account)

Officer Number: _____    Officer Name: _____    **Telephone:** _____

**BUSINESS NAME/ADDRESS:**                TIN:

CARPENTER FINANCIAL GROUP, INC.            ▮5689

100 GRIST MILL RD.                    **BUSINESS PHONE:** (860) 408-7000

SIMSBURY, CT          USA          06070

**eFunds Verification:** _____    If Existing Customer, Enter the RM Number: ▮▮▮▮

**Account Relationship:** Corporation or LLC-2 Signers

**Additional Account Verification:** *Certificate of Incorporation*

☒ Business/Entity Documentation: ~~Certified Formation Docs~~ & Resolution/Consent

☐ Previous Bank: _____    ☐ Visual Inspection of Business
    (Enter Name of Previous Bank)

## IMPORTANT INFORMATION

Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account.

The undersigned acknowledge(s) receipt of the Deposit Account Agreement and Fee Schedule which govern my/our accounts with the Bank. My/our use of this account shall evidence my/our acceptance of the terms and conditions as set forth in the Deposit Account Agreement and Fee Schedule as the same may be amended from time to time.

The undersigned, both individually and on behalf of the account owner, if different, hereby authorize(s) the Bank to, from time to time, request consumer reports containing references about me/us from third parties, such as a consumer reporting agency, in connection with opening and maintaining this account. If you (the Bank) are unable to open a deposit account, you will provide me/us with an additional notice containing data regarding the consumer reporting agency.

I/We acknowledge and understand that TD Banknorth and TD Bank are trade names of TD Bank, N.A. I/We further acknowledge and understand that for FDIC insurance purposes, my/our deposits are not separately insured from any other deposits I/we may have at TD Banknorth and/or TD Bank.

This section does not apply to U.S. non-resident aliens. Under penalty of perjury, the undersigned certify(ies) that:
1.  The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2.  I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3.  I am a U.S. person (including a U.S. resident, alien).

**Certification Instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return or for any other reason. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

X *Daniel E Carpenter*    DANIEL E CARPENTER
    Signature        Print Name        Date of Birth    SSN ▮4417    eFunds Verification
Date Signed: 5/21/09            If Existing Personal Customer, Enter the RM Number: ▮▮▮

X *Amanda Rossi*        AMANDA ROSSI
    Signature        Print Name        Date of Birth    SSN ▮1423    eFunds Verification
Date Signed: 5/21/09            If Existing Personal Customer, Enter the RM Number: ▮▮▮

X _____        _____
    Signature        Print Name        Date of Birth    SSN    eFunds Verification
Date Signed: _____            If Existing Personal Customer, Enter the RM Number: _____

X _____        _____
    Signature        Print Name        Date of Birth    SSN    eFunds Verification
Date Signed: _____            If Existing Personal Customer, Enter the RM Number: _____

**For Deposit Operations Use Only**

SIC: _____        Entered By: _____

Rev. 11/2008

TD-UNIVERSITAS 0897