## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNIVERSITAS EDUCATION, LLC | : | CIVIL ACTION NO. |
| | : | |
| Plaintiff | : | 3:20-cv-00738-JAM |
| | : | |
| v. | : | |
| | : | |
| BENISTAR, et al. | : | |
| | : | |
| Defendants | : | JUNE 26, 2020 |

### DEFENDANT GRIST MILL PARTNERS, LLC'S MEMORANDUM OF LAW IN OPPOSITION TO APPLICATION FOR PREJUDGMENT REMEDY

Defendant Grist Mill Partners, LLC ("GM Partners"), submits the following memorandum of law in opposition to the Application for *Ex Parte*[1] Prejudgment Remedy (ECF No. 9, the "PJR Application"), filed by plaintiff, Universitas Education, LLC (the "Plaintiff" or "Universitas").

## I.    INTRODUCTION

The Court should deny the PJR Application because GM Partners is a *bona fide* stand-alone business that had no involvement with the Spencer life insurance proceeds or anything else related to the substance of this case.  GM Partners is a single asset real estate company.  The only payments it received during the time periods at issue (May 2009 to December 2010) were rents.  Further, Plaintiff has not alleged, nor will be able to prove, that GM Partners received or retained any funds related to the Spencer life insurance proceeds.

---

[1] On June 4, 2020 (ECF No. 22) the Court (Spector, USMJ) denied the requested *ex parte* relief and scheduled this matter for a hearing.

## II.   FACTS AND BACKGROUND

### A.   Procedural History

Plaintiff initiated this case pursuant to a Complaint dated May 28, 2020.  ECF No. 1.

Thereafter, Plaintiff filed its PJR Application together with a memorandum of law in support

thereof.  ECF No. 9-1 (the "Plf. PJR Memo.").  The Court issued a scheduling order setting June

26, 2020 as the date by which defendants had to file response briefs.  ECF No. 34.

### B.   Grist Mill Partners, LLC

GM Partners' only assets are (a) the real estate located at 100 Grist Mill Road, Simsbury,

Connecticut (the "Property") and (b) cash receipts from rent payments by tenants.  GM Partners

purchased the Property in 2007.  Tax Assessors Card, ECF No. 13 at p. 45 of 66.  The Property is

subject to a mortgage. with approximately $1,779,482.93 is still due and owing.  Mortgage,

Exhibit A; June 2020 Mortgage Statement, Exhibit B.

The Property is presently vacant.  From 2014 until December 2019, the entire Property

was leased by Curaleaf, LLC. Curaleaf Lease, Exhibit C.  In connection with its lease, Curaleaf

undertook substantial construction to convert the Property for its specific use as a medical

marijuana cultivation and processing facility.    Prior to 2014, the Property was the office

building inhabited by co-defendant, Benistar Admin Services, Inc. ("BASI").  The Town of

Simsbury has valued the Property, for purposes of real estate tax assessment purposes at

$2,400,000.  However, given that the Property is vacant and the effects of COVID-19 on the real

estate market, it is unlikely that the Property is worth anywhere near $2,400,000.

### C.   The Universitas Litigation

The underlying facts that led to Plaintiff's judgment are set forth in *Universitas Educ.,*

*LLC v. Nova Group, Inc.*, 2013 WL 6123104, at *1 (S.D.N.Y. Nov. 20, 2013) (the "Nova

Case").[2]  In short, in the Nova Case the United States District Court for the Southern District of New York (Swain, USDJ), confirmed an arbitration award in favor of Plaintiff in the amount of $26,525,535.98 (the "Judgment").  The crux of Plaintiff's case during the arbitration was that it should have received insurance proceeds (based on life insurance policies purchased by Sash A. Spencer), which were determined to have been wrongfully diverted by Daniel Carpenter by way of a series of transfers.   The district court also held that "Mr. Carpenter caused the Life Insurance Proceeds to be transferred to and through entities that he controlled, either directly or indirectly, including Moonstone, for the personal benefit of Mr. Carpenter and his affiliates."  *Id.* at *7.  Beginning in 2013, Plaintiff commenced post-judgment collection proceedings.

No evidence had been adduced in any of the various lawsuits or pleadings filed by Plaintiff that could support a finding that GM Partners had any part in receiving, holding, or disbursing funds related to the Spencer life insurance policies.  The Application and Complaint merely allege, and only in a conclusory manner, that Mr. Carpenter "controls" GM Partners or uses it for some unexplained nefarious purpose.  Plf. PJR Memo. at 9; Complaint at ¶¶ 112-115, 202.

III.   **LAW AND ARGUMENT**

A.     **Prejudgment Remedies Generally**

"Because the right to a prejudgment remedy is in derogation of the common law, the statutory scheme governing prejudgment remedies must be strictly construed.  Section 52–278d(a) clearly mandates that, in seeking a prejudgment remedy, a plaintiff must show probable cause that a judgment will issue in an amount equal to, or greater than, the amount of the prejudgment remedy

---

[2] Previously Judge Swain had confirmed the underlying arbitration.  *See Universitas Educ., LLC v. Nova Group, Inc.*, 2012 WL 2045942 (S.D.N.Y. Jun. 5, 2012), *aff'd,* 513 Fed. Appx. 62 (2d Cir. 2013).  The arbitration was originally commenced in 2010 and heard in January 2011.  *Id.* at *1.

sought. General Statutes § 52–278d(a).  *TES Franchising, LLC v. Feldman*, 286 Conn. 132, 147,

(2008) (internal quotation omitted).  "[T]to justify issuance of a prejudgment remedy, probable

cause must be established both as to the merits of the cause of action and as to the amount of the

requested attachment.  That dual requirement ensures that a person is not deprived of the use of

property without due process of law."  *Kinsale, LLC v. Tombari*, 95 Conn. App. 472, 482, (2006)

(Flynn, J., dissenting).  "Civil probable cause constitutes a bona fide belief in the existence of the

facts essential under the law for the action and such as would warrant a person of ordinary caution,

prudence and judgment, under the circumstances, in advancing the action."  *Tyler v. Schnabel*, 34

Conn. App. 216, 219–20 (1994).  The court's role in such a hearing is to determine probable

success by weighing probabilities.  *Pfeifer v. Legault & Son Const.*, 2006 WL 3290545, at *1

(Conn. Super. Ct. Oct. 26, 2006).  On an application for prejudgment remedy, it is plaintiff's

burden to establish probable cause to pierce the veil of a corporation.  *Meneo v. Patrick*, 2007 WL

1053511, at *1 (Conn. Super. Ct. Mar. 23, 2007)

   **B.     Plaintiff Has Failed to State a Claim for "Veil Piercing" and Instead Seeks
            Impermissible Reverse Veil Piercing**

       Plaintiff failed to state a legally cognizable claim in this case.  First, reverse veil piercing

is not recognized as a cause of action or remedy under either Delaware or Connecticut law.[3]

Second, Plaintiff's constructive trust claim is merely a rehashed version of its reverse veil

piercing argument.  "Traditionally, [veil] piercing is aimed at holding corporate shareholders

liable."  *In re Glick*, 568 B.R. 634, 659 (Bankr. N.D. Ill. 2017).  Reverse veil piercing seeks to

---

[3] Arguably, either Delaware of Connecticut law could apply in this case.  Plaintiff asserts that Delaware law applies because Grist Mill is a Delaware LLC.  However, all of the events took place in Connecticut, and GM Partners is located in Connecticut.  For purposes of this case, a choice of law analysis is not necessary as the result is the same under both Delaware or Connecticut law.

hold a business liable for the debt of its owner.  *Id*.; *see Comm. Of Environmental Protection v. State Five Industrial Park, Inc.*, 304 Conn. 128, 131 n.4, 139-142, (2012).[4]

Here, Plaintiff seeks to hold GM Partners, a single purpose real estate entity, liable for the debts of Mr. Carpenter, even though Mr. Carpenter is an owner of GM Partners.  Thus, Plaintiff must plead and provide its right to reverse pierce the corporate veil of every entity between GM Partners and Mr. Carpenter, some of which are not even  parties to this litigation.

### 1.  Connecticut Law

Connecticut law bars reverse veil piercing claims.  Conn. Gen. Stat. § 33-673c ("No domestic entity shall be responsible for a debt, obligation or other liability of an interest holder of such entity based upon a reverse veil piercing doctrine, claim or remedy.")  Thus, if Connecticut law applies, this case should simply be dismissed as to GM Partners.

### 2.  Delaware Law

No Delaware court has ever recognized reverse veil piercing to be a cognizable cause of action.  "Not only has Delaware never accepted reverse piercing, but the general tenor of Delaware corporate law suggests its acceptance would be doubtful. Delaware has an exceptionally strong policy of respecting the corporate form."  *In re ALT Hotel, LLC*, 479 B.R. 781, 802 (Bankr. N.D. Ill. 2012).  Plaintiff's PJR Memo. does not cite any Delaware case or statute that suggests Delaware is poised to approve the use of reverse veil piercing.  Instead, it references courts of other jurisdictions and only discusses traditional veil piercing under the identity and instrumentality rules.  Plf. PJR Memo. at 7-8.

*                         *                         *

---

[4] "In a traditional veil piercing case, a litigant requests that a court disregard the existence of a corporate entity so that the litigant can reach the assets of a corporate insider, usually a majority shareholder.  In a reverse piercing action, however, the claimant seeks to reach the assets of a corporation or some other business entity ... to satisfy claims or a judgment obtained against a corporate insider."  *Id.* at 139 (internal punctuation omitted).

Knowing no such cause of action exists, Plaintiff did not brief any entitlement to relief under a reverse veil piercing theory.  It just – falsely – asserts its claim to be traditional veil piercing.  It is not.  Accordingly, the Court should deny Plaintiff's PJR Application.

**C.**      **Plaintiff's Claims are Time-Barred**

Plaintiff waited more than 7 years to pursue its claims against GM Partners.  Thus, Plaintiff's claims are time barred.  "[A] party seeking equitable relief is barred by laches if it has engaged in unreasonable delay and if the delay has prejudiced the party against whom such relief is sought." *Stuart & Sons, L.P. v. Curtis Pub. Co.*, 456 F. Supp. 2d 336, 347 (D. Conn. 2006).  A plaintiff's delay is unreasonable if the plaintiff had information that would normally lead it to bring suit but delayed the filings for an unreasonable amount of time.  *Id.*  A district court may decide the issue of laches when "the subordinate facts found make such a conclusion inevitable as a matter of law."  *Id.* (citation omitted).

A plaintiff's delay in bringing a claim results in prejudice to the defendant if "it would be inequitable, in light of a change in [the defendant's] position, to allow [the] claim to proceed or because the delay makes it difficult to garner evidence to vindicate his or her rights." *Robins Island Pres. Fund v. Southold Dev. Corp.*, 959 F.2d 409, 423 (2d Cir.1992). Prejudice can result from many things, such as "the death of witnesses or on account of fading memories or stale evidence." *Stone v. Williams*, 873 F.2d 620, 625 (2d Cir. 1989).

Wayne Bursey, the key witness, integral to the disbursement of the Spencer insurance proceeds and who was well-known to Universitas died in 2015. Indeed, the United States District Court for the Southern District of New York concluded in its August 2014 judgment against Daniel Carpenter that Bursey, who was President of Nova and Trustee of the Charter Oak Trust, "was Mr. Carpenter's confederate in the fraudulent transfers found in the [district court's first

transfer order]." *Universitas Educ., LLC v. Nova Grp., Inc.*, 2014 WL 3883371, at \*2 (S.D.N.Y.

Aug. 7, 2014) (emphasis added).   The Court noted further:

> Despite the fact that Mr. Bursey had earlier acknowledged a
> fiduciary duty to pay [Universitas] the trust funds, he proceeded to
> transfer the entire amount of the Insurance Proceeds to Grist Mill
> [Holdings[5]] over a period of six months while wrongly denying
> [Universitas'] claims." (November Order at 18.) The Court further
> found that this transfer was designed to fraudulently benefit Mr.
> Carpenter.

*Id.*

The district court's findings clearly suggest that the transfer had nothing to do with GM

Partners.  As described in the district court ruling above, the Spencer insurance proceeds were

paid to the Charter Oak Trust in May 2009 and then transferred to entities *other than GM

Partners*.  There is no discussion of, or reference to, GM Partners.

Plaintiff has litigated various post-judgment proceedings since 2013, yet, delayed

bringing the instant claims for seven years.  Given that Wayne Bursey has since died, GM

Partners has been substantially prejudiced given he was the central figure in this controversy,

given that it was he who transferred the Spencer insurance proceeds from the Charter Oak Trust

into the control of Daniel Carpenter.  If Mr. Bursey were alive, it is likely he would testify that

GM Partners had nothing to do with those transfers.  Accordingly, GM Partners has been

prejudiced by Plaintiff's unwarranted delay in commencing this action compounded by the death

of Mr. Bursey.  Therefore, the doctrine of laches applies, and this case should be dismissed.

### D.    Collateral Estoppel Cannot Apply in this Case

"[T]he preclusive effect of a state court determination in a subsequent federal action is

determined by the rules of the state where the prior action occurred." *In re Sokol*, 113 F.3d 303,

306 (2d Cir. 1997). Likewise, "[t]he preclusive effect of a judgment rendered by a federal court

---

[5] Not GM Partners.

sitting in diversity is determined by the law of the state in which the rendering court sat." *Stinnett v. Delta Air Lines, Inc*., 803 F. App'x 505, 508 n.3 (2d Cir. 2020). However, "federal law governs the collateral estoppel effect of a federal criminal conviction in a subsequent diversity action." *Gelb v. Royal Globe Ins. Co*., 798 F.2d 38, 43 (2d Cir. 1986), *cert. denied*, 480 U.S. 948 (1987).[6]

Nonmutual offensive collateral estoppel, a form of issue preclusion, "preclude[s] a defendant from relitigating an issue the defendant has previously litigated and lost to another plaintiff." *Bifolck v. Philip Morris USA Inc*., 936 F.3d 74, 79 (2d Cir. 2019) (citation omitted). To invoke this doctrine, a plaintiff must satisfy four conditions: (1) the issues in both proceedings must be identical, (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits. *Id*. (citation omitted).[7]  Plaintiff cannot meet *any* of the requirements under *Bifolck* to invoke collateral estoppel.

Use of offensive collateral estoppel "must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged." *Faulkner v. Nat'l Geographic Enterprises Inc*., 409 F.3d 26, 37 (2d Cir.), *cert. denied*, 546 U.S. 1076 (2005). Further, "in order to blunt the fear that nonmutual offensive collateral estoppel may be unfair to a

---

[6] Thus, contrary to Plaintiff's argument (Plf. PJR Memo. at 8), *In re Kilroy*, 357 B.R. 411 (Bankr. S.D. Tex. 2006)(applying Delaware law) and *Harrison v. Soroof Int'l, Inc*. 320 F. Supp. 3d 602 (D. Del. 2018)(same), are inapposite.

[7] The Massachusetts law of nonmutual collateral estoppel is substantially similar. There must be "an identity of issues, a finding adverse to the party against whom it is being asserted, and a judgment by a court or tribunal of competent jurisdiction…. A defendant must also have a full and fair opportunity to litigate the issue in the first action." *In re Cohen*, 435 Mass. 7, 15, 805 (2001).  Massachusetts law is referenced because the cases that Plaintiff seeks to use for collateral estoppel effect applied Massachusetts law.

defendant or fail to promote judicial economy, district courts must ensure that application of the doctrine is not unfair." *Bifolk,* 936 F.3d at 80. Thus, when applying the doctrine would be unfair to the defendant, "a trial judge should not allow [it]." *Id.* (citation omitted). *See In re Cohen*, 435 Mass. 7, 16 (2001)(stating that, under Massachusetts law, fairness to the opponent is "the decisive consideration" in determining whether to apply offensive collateral estoppel.)

Plaintiff, thus, cannot use an estoppel argument to overcome its legally insufficient claims.  Plaintiff relies on the findings in three cases: (1) *Cahaly v. Benistar Prop. Exh. Trust Co., Inc.*, No. 01-0116BLS2 (Mass. Super. Ct. Sept. 23, 2003); (2) *Iantosca v. Benistar Admin. Services, Inc.*, No. 08-cv-11785 (NMG)(D. Mass. June 21, 2013); and (3) *United States v. Carpenter*, 190 F. Supp. 3d 260 (D. Conn. 2016). None of these cases satisfies the requirements for collateral estoppel.

The courts' findings in *Cahaly*, *Iantosca*, and *Carpenter* do not satisfy the requisite elements for offensive collateral estoppel. GM Partners was not a party or judgment debtor in any of those cases.  GM Partners did not "actually litigate," nor did the respective courts "actually decide," the specific issue of whether the court should pierce the corporate veil to reach it *under the facts of those cases*. Identicality of issues "is concerned not with claims or ... causes of action as a whole, … but with *issues*—single, certain and material point[s] arising out of the allegations and contentions of the parties …." *Bifolk*, 936 F.3d at 80–81 (empahasis in the original; citations and quotation marks omitted). "[D]isregarding corporate separateness as an equitable remedy is one that differs with the circumstances of each case." *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988).

An alter-ego claim "turns on the facts of the owner's operation of the corporation and its relationship *to the alleged victim*." *Kertesz v. Korn*, 698 F.3d 89, 91 (2d Cir. 2012) (emphasis

added). Further, veil piercing determinations are fact specific, complex, and often "involve questions of motive and intent." *Hyundai-Wia Mach. Am. Corp. v. Rouette*, No. 3:10-CV-2020 JCH, 2013 WL 395474, at *8 (D. Conn. Jan. 31, 2013) (citation omitted); *see Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995). "[S]o too the results of an earlier resolution of an issue may simply be wrong." *S.E.C. v. Monarch Funding Corp*., 192 F.3d 295, 304 (2d Cir. 1999).

Universitas was not a plaintiff, party, or judgment creditor in *Cahaly* or *Iantosca.* The plaintiffs in those cases were investors who had contracted with a different Benistar entity as a qualified intermediary "to hold their funds in escrow while they engaged in tax-advantaged 'like-kind' property exchanges in accordance with Internal Revenue Code, 26 U.S.C. § 1031." *Cahaly v. Benistar Prop. Exch. Tr. Co*., 451 Mass. 343, 345 (2008). There, plaintiffs claimed that the defendants had breached their contractual and fiduciary duties by depositing the funds in margin accounts and then using those funds to engage in uncovered option trading that resulted in losses. *Id*. None of these facts and transactions involved Universitas, Sash Spencer or the insurance proceeds at issue here. Further, the transactions at issue in *Cahaly* occurred nearly ten years before the vastly different transactions at issue in this case between Nova Group, Inc., Sash Spencer and Universitas.

As noted, the *Cahaly* court applied Massachusetts' traditional "alter ego" approach to hold a parent company liable for the acts of a subsidiary.  Here, Plaintiff is attempting to use reverse veil piercing to hold a company liable for debts of an alleged owner.  Massachusetts does not recognize reverse veil piercing either.  *Shea v. Millett*, 2019 WL 184074, at *3 (D. Mass. Jan. 14, 2019) ("The Massachusetts Supreme Judicial Court has never explicitly, or even inferentially, adopted reverse veil piercing in any form.")

Finally, even if Plaintiff could satisfy the elements for offensive collateral estoppel, it would be unfair and inequitable to apply it here. Plaintiff was not a judgment creditor in *Cahaly* or *Iantosca*. Those courts did not determine Plaintiff's rights or the defendants' obligations and/or liability to Plaintiff.  Further, the specific equities allowing the plaintiffs in those cases to pierce the corporate veil are not the same here.  Essentially, Plaintiff asks for permission not to have to prove its case based on different facts, different plaintiffs, and different defendants.  *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330 (1979) (stating that offensive collateral estoppel is unfair and should not be allowed where amount in controversy in the first case is far less than amount at stake in second case, and thus, a defendant  may have had "little incentive to defend [the first suit] vigorously, particularly if future suits are not foreseeable.").

E.      **Plaintiff Cannot Demonstrate Probable Cause on the Merits to Permit a Prejudgment Remedy to Enter**

1.      **Plaintiff Cannot Demonstrate that GM Partners Did Anything Wrong**

Assuming, *arguendo*, the Court elects to apply a traditional veil-piercing analysis under Delaware law to this case, the Plaintiff's Application should still be denied.  "In … an appropriate case, a party wronged by actions taken by an owner shielded by the veil of a corporate shell may exercise its equitable right to pierce that screen and skewer the corporate owner."  *David v. Mast*, 1999 WL 135244 (Del. Ch. Mar. 2, 1999) (internal quotations omitted). The Delaware Supreme Court has stated that the corporate form may be disregarded "in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it, are involved."  *Pauley Petroleum Inc. v. Cont'l Oil Co.*, 43 Del.Ch. 516, 239 A.2d 629, 633 (1968) (distinction between the entity and its owner "may be disregarded" to require an owner to answer for the entity's debts).  A court may impose personal liability on a corporation's owner when

there is fraud or the corporation "is in fact a mere instrumentality or alter ego of its owner." *Wilson v. Thorn Energy, LLC*, 787 F. Supp. 2d 286, 294 (S.D.N.Y. 2011), *citing NetJets Aviation, Inc. v. LHC Commc'ns, LLC,* 537 F.3d 168, 176 (2d Cir. 2008).

As for the alter ego test, the Second Circuit, in *NetJets Aviation*, applied Delaware law and condensed the standard for an alter-ego piercing claim into a two-pronged test, which asks "(1) whether the entities in question operated as a single economic entity, and (2) whether there was an overall element of injustice or unfairness." *Id.* at 177.  "[A] plaintiff need not prove that there was actual fraud but must show a mingling of the operations of the entity and its owner plus an overall element of injustice or unfairness." *Id.* at 176 (internal quotation marks and citations omitted); *see also id.* at 177 (plaintiff is not required to show that the entity "was created with fraud or unfairness in mind;" rather, it is "sufficient to prove that it was so used").

A court's analysis under the alter ego theory of piercing the corporate veil should begin with "an examination of factors which reveal how the corporation operates and the particular defendant's relationship to that operation." *Id.* at 176–77 (internal quotation marks omitted).  To that end, the court should consider the following factors:

> whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*Harco Nat. Ins. Co. v. Green Farms. Inc.*, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989) (quoting *United States v. Golden Acres, Inc.* 702 F. Supp. 1097, 1104 (D. Del.1988)), *aff'd* 879 F.2d 857 & 879 F.2d 860 (3d Cir.1989)).  No single factor can justify a finding of alter ego

sufficient to pierce the corporate veil, but instead, "some combination of them [is] required" and "an overall element of injustice or unfairness must always be present, as well." *Id.*

For the second part of the alter ego test under Delaware law, courts look at whether there was an overall element of injustice or unfairness to pierce the corporate veil. The claimed injustice must consist of more than merely the tort or breach of contract that forms the basis for a complaint. *NetJets Aviation*, 537 F.2d at 183 (citations omitted).

Here, GM Partners operated as a real estate holding company. Nothing in the Application or Complaint suggest it had anything to do with, or received any money from, the Spencer life insurance proceeds. None of the *Harco* factors support Plaintiff's claim that GM Partners was not a *bona fide* independent company. Further, there is no evidence that GM Partners was used to perpetrate any fraud or fraud-like activities. Accordingly, since Plaintiff cannot prove that GM Partners was used in any improper manner, any veil piercing, or reverse veil piercing, claim against it should fail.

### 2.   Plaintiff Cannot Establish the Requirements of a Constructive Trust

#### a.   Plaintiff Cannot Trace Any Spencer Life Insurance Proceeds to GM Partners

Assuming, *arguendo*, that the Court treats the Fifth Count (constructive trust) as a claim for relief independent of the veil piercing claims, the Application should still be denied[8] because

---

[8] GM Partners also assumes, *arguendo*, the Court will treat the Fifth Count as a valid cause of action even though a "[c]onstructive trust is an equitable remedy which may be imposed in circumstances where unjust enrichment has occurred and certain other requirements are met." *Reed v. McCready*, 2014 WL 2854001, at *3, 7 (Conn. Super. May 16, 2014) (dismissing constructive trust pled as a cause of action: "a constructive trust is deemed to arise or be imposed as a result of actions which constitute unjust enrichment or fraud."); *Coan v. Dunne*, 2019 WL 1976146, at *5 (D. Conn. May 3, 2019) ("[a] constructive trust is a remedy, not an independent substantive cause of action. *Carney v. Lopez*, 933 F. Supp. 2d 365, 384 (D. Conn. 2013) (dismissing claim for constructive trust and converting it to a request for a remedy). Constructive trusts are designed to prevent unjust enrichment, and '[a] claimant entitled to restitution from property may obtain restitution from any traceable product of that property, without regard to subsequent changes of form.' *Town of New Hartford v. Conn. Res. Recovery Auth.*, 291 Conn. 433, 466 (2009).'"

Plaintiff cannot offer any evidence that any Spencer life insurance proceeds were transferred to GM Partners.

"When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *United States v. $2,350,000.00 In Lieu of One Parcel of Prop. Located at 895 Lake Ave. Greenwich, Connecticut*, 718 F. Supp. 2d 215, 227 (D. Conn. 2010) (citation omitted). A constructive trust thus arises "where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." *Id*. (citation omitted). Once the court determines that a constructive trust *could* be imposed, "the question then becomes whether this equitable remedy *ought* to be imposed." *Id*. (emphasis added). "The trial court may recognize the existence of the constructive trust and, nevertheless, decline to order the conveyance or other disposition of the property in satisfaction of the debt." *Id*. (citation omitted)

"It is hornbook law before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his property into a product in the hands of the wrongdoer." *In re Handy & Harman Ref. Group*, 266 B.R. 24, 27 (Bankr. D. Conn. 2001); *United States v. Benitez*, 779 F.2d 135, 140 (2d Cir. 1985)). "The beneficiary of a constructive trust does not have an interest superior to the trustee's in every asset the trustee holds, but only in those assets held in constructive trust or traceable to such assets." *Id*. at 227–28 (*quoting United States v. Schwimmer*, 968 F.2d 1570, 1583 (2d Cir. 1992)). Thus, "an entity who wishes to have a constructive trust established on its behalf must be able to trace its funds to the property over which the trust will be established." *Id*.; *In re A.N. Frieda Diamonds, Inc.*, 2020 WL 2059907, at *19 (Bankr. S.D.N.Y. Apr. 29, 2020) (same; collecting cases).

Here, Plaintiff has not provided evidence to suggest that GM Partners received any of the Spencer life insurance proceeds.  Thus, even if constructive trust were a cause of action (which it is not) the amount of the remedy would be limited to amount of transfers of the Spencer life insurance proceeds *traceable* to GM Partners.  *Baltas v. Frenis*, No. 3:18 CV 1168 (WWE), 2019 WL 1552915, at *6 (D. Conn. Apr. 10, 2019) (district court considering prejudgment remedy will "consider not only the validity of the plaintiff's claim but also the amount that is being sought.").  Accordingly, before the Court even considers entering a prejudgment remedy, which it should not, Plaintiff must fully account for everything it has already recovered *and* identify the precise funds that were wrongfully received by GM Partners.

### b.      Plaintiff's "Constructive Trust" Claim is Time-Barred

Plaintiff failed to commence an action against GM Partners within any statute of limitations applicable to an unjust enrichment claim.  Because Plaintiff's Fifth Count (constructive trust) must be construed as a remedy for unjust enrichment, the longest statute of limitations[9] is 6 years: "[b]ecause unjust enrichment is a form of contract action, often called quasi-contract, the court concludes that the most applicable statute in this case is the six-year contract statute."  *Flaherty v. Borough of Naugatuck*, 2007 WL 586788, at *3 (Conn. Super. Feb. 2, 2007).  Alternatively, if the Court were to apply the doctrine of laches, as set forth above, GMP Partners has been prejudiced by the death of Mr. Bursey.  And, courts may look to the applicable statute of limitations for determining whether laches applies.  *Weisse v. Riccio*, 2018 WL 10094271, at *7 (Conn. Super. Jun. 5, 2018) (courts may look to statutes of limitation as persuasive authority when considering laches).

---

[9] GM Partners acknowledges that whether a claim for unjust enrichment is legal or equitable is subject to debate. Regardless of whether a statute of limitations or laches applies, commencing an action more than 7 years the Nova Case is too long.  This is particularly true since Plaintiff knows full well where the Spencer life insurance proceeds went and none was to GR Partners.

Here, the underlying conduct took place in 2009 and the Judgment was obtained in 2013. If GM Partners were part of some improper scheme, certainly it would have been implicated before now.  Accordingly, the claims against GM Partners should be time barred.

## IV.   <u>CONCLUSION</u>

For the above stated reasons, the Court should deny the Application and enter such other relief as is just and proper.

THE DEFENDANT
GRIST MILL PARTNERS, LLC

By:    /s/ Jeffrey M. Sklarz_____
       Lawrence S. Grossman (ct15790)
       Jeffrey M. Sklarz (ct20938)
       Green & Sklarz LLC
       One Audubon Street, Third Floor
       New Haven, CT 06511
       (203) 285-8545
       Fax: (203) 823-4546
       lgrossman@gs-lawfirm.com
       jsklarz@gs-lawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date set forth below a copy of the foregoing was served by CMECF and/or mail on anyone unable to accept electronic filing.  Parties may access this filing through the Court's CM/ECF System.

Date: June 26, 2020

       /s/ Jeffrey M. Sklarz_____

# Exhibit A

Doc ID: 000501000046 Type: LAN
BK 743 PG 398-443

## MORTGAGE DEED AND SECURITY AGREEMENT

TO ALL PEOPLE TO WHOM THESE PRESENTS SHALL COME, G R E E T I N GS:

KNOW YE **GRIST MILL PARTNERS, LLC**, a Delaware limited liability company, with an office at 100 Grist Mill Road, Simsbury, Connecticut 06070 ("**Grantor**"), for the consideration of One and 00/100 Dollar ($1.00) and other valuable consideration received to its full satisfaction of **TD BANKNORTH, N.A.**, a national banking association with an office at 102 West Main Street, New Britain, Connecticut 06050-0174 ("**Grantee**"), does give, grant, bargain, sell and confirm unto the said Grantee, its successors and assigns forever, that certain parcel of land, with the buildings and improvements now or hereafter placed thereon, known as **100 Grist Mill Road, Simsbury, Connecticut** as more particularly bounded and described on **Exhibit A** attached hereto and made a part hereof ("**Premises**");

Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining, and the reversion or reversions, remainder and remainders, rents, issues and profits thereof;

Together with all right, title and interest of the Grantor, if any, in and to the land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the above-described Premises;

Together with all the buildings and improvements now or hereafter placed on the Premises, and all fixtures, appliances, machinery and equipment now or hereafter installed, and all the appurtenances thereto, thereon or therein;

Together with any and all awards or payments, including interest thereon, and the right to receive the same, which may be made with respect to the Premises as a result of (a) the exercise of the right of eminent domain; (b) the alteration of the grade of any street; or (c) any other injury to, or decrease in, the value of the Premises, to the extent of all amounts which may be secured by this Mortgage at the date of receipt of any such award or payment by the Grantee.

To have and to hold the above granted and bargained Premises, with the appurtenances thereof, unto it, the said Grantee, its successors and assigns forever, to it and their own proper use and behoof.  And also, the said Grantor does, for itself, its successors and assigns, covenant with the said Grantee, its successors and assigns, that at and until the ensealing of these presents, it is well seized of the Premises as a good, indefeasible estate in FEE SIMPLE; and has good right to bargain and sell the same in manner and form as is above written; and that the same are free and clear of all encumbrances whatsoever, except as set forth in the title policy insuring Grantee's interest in the Premises.

And furthermore, the said Grantor does, by these presents, bind itself and its successors and assigns forever to WARRANT AND DEFEND the above granted and bargained Premises to it, the said Grantee, its successors and assigns, against all claims and demands whatsoever, except as aforesaid.

THE CONDITION OF THIS DEED is such that:

WHEREAS Grantor has executed and delivered to Grantee its Promissory Note of even date herewith in the original principal amount of THREE MILLION TWO HUNDRED THOUSAND DOLLARS ($3,200,000.00) ("**Note**"), a copy of which Note is attached hereto and made a part hereof as **Exhibit B**; and

WHEREAS Grantor and Grantee have entered into an ISDA Master Agreement of even date herewith together with the schedules and documents related thereto, which provides for interest rate protection and may result in additional indebtedness of the Grantor ("**SWAP Agreement**"), a copy of which SWAP Agreement is attached hereto and made a part hereof as **Exhibit C**. The Note and SWAP Agreement are at times hereafter referred to as the "Obligations ".

GRANTOR AND GRANTEE COVENANT AS FOLLOWS:

1.      Payment of Indebtedness.  The Grantor shall pay the indebtedness evidenced by the Obligations, the interest thereon and all other charges due thereunder in lawful money of the United States at the time and in the manner set forth therein, subject to applicable grace periods.

2.      Payment of Taxes and Assessments.  The Grantor shall pay all taxes, assessments, water rates, sewer rents, utility charges and other charges, and any liens prior to the lien of this Mortgage now or hereafter assessed or liens on or levied against the Premises or any part thereof, and in case of default in the payment thereof when the same shall be due and payable, it shall be lawful for the Grantee, without notice or demand, to pay the same or any of them; and the monies paid by the Grantee in discharge of taxes, assessments, water rates, sewer rents, utility charges and other charges, and prior liens shall be a lien on the Premises added to the amount of the Note and secured by this Mortgage, payable on demand, with interest at the rate set forth in the Note secured hereby from the time of payment of the same; and upon request of the Grantee, the Grantor shall exhibit to the Grantee receipts for the payment of all items specified in this Paragraph prior to the date when the same shall become delinquent.

3.      Tax Escrow.  At the Grantee's option, Grantor shall pay to the Grantee together with, and in addition to, the monthly installments of principal and interest provided in the Note, on the date provided for the first payment of principal and interest in the Note, and on the first day of each month thereafter until the Note has been fully

8/30/2007                                    -2-

paid, a sum equal to one-twelfth (1/12) of the yearly taxes assessed against the Premises as estimated by the Grantee. The Grantee shall hold said sums in a non-interest-bearing account, in trust, to pay said taxes in the manner and to the extent permitted by law when the same become due and payable in each year. If the total payments made by the Grantor to the Grantee on account of said taxes, up to the time when the same become due and payable, shall exceed the amount of payment for said taxes actually made by the Grantee, such excess shall be credited by the Grantee on the next subsequent payment or payments to become due from the Grantor to the Grantee on account of said taxes. If, however, said payments shall not be sufficient to pay said taxes when the same become due and payable, then the Grantor agrees to pay to the Grantee the amount necessary to make up the deficiency upon demand by the Grantee. In case of default in the performance of any of the agreements or provisions contained in the SWAP Agreement, Note or this Mortgage, the Grantee may, at its option, at any time after such default, apply the balance remaining of the sums so accumulated as a credit against the principal or interest of the Mortgage indebtedness, or both.

4.   Condemnation. Notwithstanding any taking by eminent domain, alteration of the grade of any street or other injury to, or decrease in, value of the Premises by any public or quasi-public authority or corporation, the Grantor shall continue to pay interest on the entire principal sum then secured and all payments required by the Obligations until any such award or payment shall have been actually received by the Grantee, and any reduction in the principal sum resulting from the application by the Grantee of such award or payment as hereinafter set forth shall be deemed to take effect only on the date of such receipt; said award or payment may, at the option of the Grantee, be retained and applied by the Grantee toward payment of the monies secured by this Mortgage, or be paid over wholly or in part to the Grantor for the purpose of altering, restoring or rebuilding any part of the Premises which may have been altered, damaged or destroyed as a result of any such taking, alteration of grade or other injury to the Premises, or for any other purpose or object satisfactory to the Grantee, but the Grantee shall not be obligated to see to the application of any amount paid over to the Grantor; and that if, prior to the receipt by the Grantee of such award or payment, the Premises shall have been sold on foreclosure of this Mortgage, the Grantee shall have the right to receive said award or payment to the extent of any deficiency found to be due upon such sale, with legal interest thereon.

5.   Insurance. The Grantor shall keep the Premises insured for the benefit of the Grantee against loss or damage by fire, lightning, windstorm, hail, explosion, riot, riot attending a strike, civil commotion, aircraft, vehicles, smoke, pollutants, war risks, if available, demolition, if required, and other so-called extended coverage risks and other hazards, casualties and contingencies as may be required by the Grantee from time to time, provide flood insurance in an amount equal to the full replacement cost of the improvements on the Premises, and provide coverage of not less than the coverage en-compassed by Fire, Extended Coverage, and Vandalism and Malicious Mischief perils

8/30/2007                                    -3-

broadened to include the so-called "All Risk of Physical Loss", all in format approved by the Grantee and in sufficient amounts to prevent the application of any insurance policy co-insurance contribution on any loss and shall in no event be less than the appraised value of existing improvements on the Premises.  All insurance herein provided for shall be obtained by the Grantor (notwithstanding the procurement of other insurance policies by other persons or parties and relating to the Premises) and carried in companies approved by the Grantee, and all policies, including additional and renewal policies, marked "premiums paid" and containing an agreement by the insurer that the policy shall not be canceled or materially changed without at least thirty (30) days' prior written notice to the Grantee, shall be delivered to the Grantee, and all renewal policies, including additional and renewal policies, shall be payable, in case of loss or damage, to the Grantee as first mortgagee, and shall contain the standard non-contributing mortgagee clause entitling the Grantee to collect all proceeds payable under all such insurance, as well as standard waiver of subrogation endorsement, and waiver of other endorsements, as the Grantee may require, all to be in form acceptable to the Grantee. In the event of any loss, the Grantor will give immediate notice to the Grantee.  Grantor hereby authorizes the Grantee, at its option, to collect, adjust and compromise any losses under any of the insurance policies, to endorse the Grantor's name on any document or instrument in payment of any insured loss and, after deducting the costs of collection, to apply the proceeds, at the Grantee's sole option, as follows:  (i) as a credit upon the indebtedness secured hereby, whether or not the same shall be then due and payable, in which event, the lien of this Mortgage shall be affected only by a reduction thereof in any amount equal to the amount so applied as a credit, or (ii) to repairing or restoring the Premises or any part thereof, in which event, the Grantee shall not be obligated to see to the proper application thereof, nor shall the amount so released or used be deemed a payment on any indebtedness secured hereby. All such insurance proceeds shall be disbursed by Grantee to Grantor as work progresses in the same manner, and subject to the same fee schedule, as used by Grantee for construction loans.  Grantor shall obtain, carry and maintain Comprehensive General Liability Insurance covering the Premises in an amount of no less than Four Million  Dollars ($4,000,000.00) bodily injury and/or property damage on each property, per occurrence and Rent Interruption Insurance in an amount equal to the aggregate rent under the lease or leases of the Premises for one year. Said insurance shall be with companies approved by the Grantee. Grantor shall provide Grantee with Certificates of Insurance containing provisions designating the Grantee as an additional insured party and providing for not less than thirty (30) days written notice to the Grantee prior to any material change or cancellation of said Liability Insurance.

6.    <u>Compliance With Laws</u>.  The Grantor shall maintain the Premises in good condition and repair, shall not commit or suffer any waste of the Premises, and shall comply with, or cause to be complied with, all statutes, ordinances and requirements of any governmental authority relating to the Premises; and the Grantor shall promptly repair, restore, replace or rebuild any part of the Premises now or hereafter subject to the lien of this mortgage which may be damaged or destroyed by any casualty

8/30/2007                                    -4-

whatsoever or which may be affected by any condemnation or eminent domain proceeding, provided Grantee makes available any insurance, condemnation or eminent domain proceeds to repair, restore, replace or rebuild the damaged, destroyed or affected portion of the Premises. The Grantor shall complete and pay for, within a reasonable time, any structure at any time in the process of construction on the Premises; and the Grantor shall not initiate, join in, or consent to, any change in any private restrictive covenant or private restrictions limiting or defining the uses which may be made of the Premises or any part thereof, without the written consent of the Grantee.

7.    <u>Alterations</u>. The Grantor agrees that no building or other property now or hereafter covered by the lien of this Mortgage shall be removed, demolished or materially altered hereunder without the prior written consent of the Grantee, which consent shall not be unreasonably withheld, conditioned or delayed, except that the Grantor shall have the right, without such consent, to remove and dispose of, free from the lien of this Mortgage, such equipment as from time to time may become worn out or obsolete; provided that, simultaneously with, or prior to, such removal, any such equipment shall be replaced with other equipment of a value at least equal to that of the replaced equipment and free from any title retention or security agreement or other encumbrance, and by such removal and replacement, the Grantor shall be deemed to have subjected such equipment to the lien of this Mortgage.

8.    <u>Rents and Security Deposits</u>. The Grantor shall not collect rent or license fees of any kind more than thirty (30) days in advance of its due date under any and all leases for any part of the Premises, without the approval of the Grantee herein in writing; and in the event such approval is given, the Grantor agrees to deposit said rents with the Grantee. Any and all tenant's or other users' security deposits, in excess of an amount equal to one month's rent or charges under any and all leases or licenses for any part of the Premises, shall be deposited and pledged so that they cannot be used by the Grantor without the consent of the Grantee, and in the event of foreclosure of this Mortgage, these deposits shall be transferred to the Grantee, if title is acquired by the Grantee, or to the purchaser in the event of a foreclosure sale.

9.    <u>Assignment of Rents</u>. The Grantor agrees that, in case of default in any of the payments stipulated in any of  the Obligations or in case of default in any of the Grantor's covenants and agreements set forth in any of the Obligations or this Mortgage, the Grantee is hereby authorized and empowered, by its servants, agents or attorneys, to take possession of, and enter upon, the Premises, and to collect and receive the rents, license fees,  and any income therefrom, and to apply so much of said rents, license fees  and income as may be required in the necessary expenses of running the Premises, including attorneys' fees, management agent's fees and, if the Grantee manages the Premises with its own employees, an amount equal to the customary management agent's fees charged for similar property in the area where the Premises are located, and to apply the balance of said rents and income to the payment of the amounts due under the Obligations or in payment of taxes assessed against the

8/30/2007                -5-

Premises, or both. And for this purpose and in case of such default, the Grantor hereby assigns, transfers and sets over to the Grantee the rents and income accruing from the Premises. Nothing contained in the foregoing provision shall impair or affect any right or remedy which the Grantee might now or hereafter have, were it not for such provision, but the rights herein given shall be in addition to any others which the Grantee may have hereunder.

10. <u>Receiver of Rents</u>. The Grantee, in any action to foreclose this Mortgage or upon the actual or threatened waste to any part of the Premises or upon default of the observance or performance of any covenant or agreement of the Grantor hereunder, shall be at liberty to apply for the appointment of a receiver of the rents and profits of the Premises, including without limitation all parking license revenue, without notice and shall be entitled to the appointment of such a receiver as a matter of right, without consideration of the value of the Premises as security for the amounts due the Grantee or the solvency of any person or corporation liable for the payment of such amounts.

11. <u>Entry</u>. The Grantee and any persons authorized by the Grantee shall have the right to enter and inspect the Premises at all reasonable times.

12. <u>Appraisal</u>. At any time during the term of the Obligations, if there exists an event of default, as defined in the Note, SWAP Agreement or herein, or if, in the Grantee's reasonable judgment, a material deterioration in values or market conditions exists, Grantee shall have the option to obtain an appraisal of the Premises at Grantor's expense.

13. <u>Tax Returns, Financial Statements and Bank Accounts</u>. The Grantor shall, at its own expense, furnish Grantee with:

(a) A signed copy of Grantor's current annual federal tax return within 15 days of its filing;

(b) A signed copy of each guarantor's current annual federal tax return within 15 days of its filing;

(c) A signed current personal financial statement, on Grantee's form, by Daniel E. Carpenter within 14 months of the receipt of the last statement;

(d) A fiscal year end financial statement within 120 days of fiscal year end for Caroline Financial Group, Inc. and Carpenter Financial Group, Inc.;

(d) A signed copy of a federal tax return within 15 days of filing and a fiscal year end financial statement within 120 days of fiscal year end for Benistar Admin Services, Inc., a corporation which has agreed to lease a portion of the Premises;

8/30/2007                                      -6-

(e) An annual rent roll within 30 days of calendar year end;

(f) Such other financial information as and when Grantee may reasonably require.

In addition, Grantor shall cause Grantor's operating accounts to be maintained with Grantee throughout the term of this mortgage.

14.   Debt Service Coverage.  Grantor shall maintain a minimum annual debt service coverage ratio, defined as Net Operating Income divided by annual debt service expense, of not less than 1.25X ("DSCR"), which DSCR shall be tested annually at Grantor's fiscal year end.

15.   Title.  If title to the Premises shall vest in anyone other than the Grantor, or if Grantor mortgages, leases, or encumbers the Premises or any part thereof without first obtaining the written consent of the Grantee, the whole of Obligations hereby secured shall immediately become due and payable at the option of the Grantee.

16.   Default.  The whole of the Obligations hereby secured shall become due at the option of the Grantee: (a) after default in the payment of any installment of principal and/or of interest as set forth in the Note;  or (b) after default in any of Grantor's obligations under the SWAP Agreement; or (c) after default, after applicable notice and cure periods, under any of the terms of this Mortgage; or (d) after default for thirty (30) days following written notice and demand in the payment of any tax, water rate or assessment prior to the occurrence of a penalty, additional interest or the acceleration of any future installments; or (e) upon default in keeping in force the insurance required herein; or (f) after default for thirty (30) days following written notice and demand, either in delivering the policies of insurance herein described or referred to or in reimbursing the Grantee for premiums paid on such insurance, as herein provided; or (g) after default for thirty (30) days following notice and demand in the payment of any installment which may then be due or delinquent for any assessment for local improvement for which an official bill has been issued by the appropriate authorities and which may now or hereafter affect the Premises and may be or become payable in installments; or (h) upon the actual or threatened waste, removal or demolition of, or material alteration to, any part of the Premises; or (i) upon assignment by the Grantor of the whole or any part of the rents, income or profits arising from the Premises without the written consent of the Grantee; (j) should Grantor sell, lease, encumber or otherwise convey or transfer any of its interest in or ownership of any part of  the Premises without the prior written consent of the Grantee or be deprived of either title or possession or control of any part of the Premises by process or operation of law or order of court;  or (k) should any Grantor change its Articles of Organization or Operating Agreement  or dissolve  its existence as a Delaware  limited liability company, or should there be any change in the ownership, management or control of Grantor without the prior written consent of the Grantee; or (l) should Grantor  be involved as a debtor pursuant to the

bankruptcy laws of the United States, or if any proceeding shall be instituted on any lien or mortgage of any kind effecting the Premises, or should Grantor be judged to be bankrupt or insolvent, or should a judgment lien, execution or similar process be levied against the Premises and any of the aforesaid not be released or otherwise vacated for a period of sixty (60) days; or (m) upon election by the Grantee to accelerate maturity of said principal sum pursuant to the provisions of the Note or of any other instrument which may be held by the Grantee as additional security for the Note; or (n) failure to meet the DSCR required herein; or (o) failure to maintain the required operating accounts with Grantee; or (p) failure to timely provide requested financial information, including but not limited to tax returns and financial statements; (q) should any misrepresentation, misstatement or omission of fact made herein or any other document or statement given in connection herewith by any Grantor prove to have existed when made in any material respect; or (r) after default under any other promissory note or evidence of indebtedness by Grantor, whether such debt now exists or hereafter arises, in favor of the Grantee; or (s) upon default following thirty (30) days written notice and demand in the performance of any Grantor's covenants or agreements in any other mortgage or other security instrument on the Premises.

17.    Late Charges.  The Grantee may collect a "late charge" not to exceed an amount equal to six percent (6%) of any installment of interest or principal under any Obligation or any payment of insurance and taxes due hereunder which is not paid within fifteen (15) days of the due date thereof to cover the extra expenses involved in handling such delinquent payment.

18.    Costs.  The Grantor shall pay all reasonable costs, expenses and attor-neys' fees incurred by the Grantee in protecting or sustaining the lien of this Mortgage.

19.    No Waiver.  Any failure by the Grantee to insist upon the strict perfor-mance by the Grantor of any of the terms and provisions hereof shall not be deemed to be a waiver of any of the terms and provisions hereof, and the Grantee, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by the Grantor of any and all of the terms and provisions of this Mortgage and the Obligations secured hereby to be performed by the Grantor; and neither the Grantor nor any other person now or hereafter obligated for the payment of the whole or any part of the sums now or hereafter secured by this Mortgage shall be relieved of such obligation by reason of the failure of the Grantee to comply with any request of the Grantor or of any other person so obligated to take action to foreclose this Mortgage or otherwise enforce any of the provisions of this Mortgage or of any obligation secured by this Mortgage; or by reason of the release, regardless of consideration, of the whole or any part of the security held for the indebtedness secured by this Mortgage; or by reason of any agreement or stipulation between any subsequent owner or owners of the Premises and the Grantee extending the time of payment or modifying the terms of any of the Obligations or this Mortgage without first having obtained the consent of the Grantor or such other person; and in the latter event, the Grantor and all such other persons shall

continue liable to make such payments according to the terms of any such agreement of extension or modification unless expressly released and discharged in writing by the Grantee; and regardless of consideration and without the necessity for any notice to, or consent by, the holder of any subordinate lien of the Premises, the Grantee may release the obligation of anyone at any time liable for any of the Obligations secured by this Mortgage or any part of the security held for the indebtedness and may extend the time of payment or otherwise modify the terms of the Note, SWAP Agreement and/or Mortgage without, as to the security or the remainder thereof, in anyway impairing or affecting the lien of this Mortgage or the priority of such lien, as security for the payment of any of the Obligations as it may be so extended or modified, over any subordinate lien; and the holder of any subordinate lien shall have no right to terminate any lease affecting the Premises, whether or not such lease be subordinate to this Mortgage; and the Grantee may resort, for the payment of the indebtedness secured hereby, to any other security therefor held by the Grantee in such order and manner as the Grantee may elect.

20.   Self-Help.  In the event of any default in the performance of any of the Grantor's covenants or agreements herein, the Grantee may, at its option, perform the same, and the cost thereof, with interest at the rate set forth in the Note secured hereby, shall immediately be due from the Grantor to the Grantee and secured by this Mortgage.

21.   No Marshaling.  The Grantee shall not be compelled to release or be prevented from foreclosing or enforcing this Mortgage upon all or any part of the Premises, unless the entire debt and all items hereby secured shall be paid in lawful money as aforesaid; and shall not be required to accept any part or parts of the said property, as distinguished from the entire whole thereof, as payment of or upon the said debt to the extent of the value of such part or parts; and shall not be compelled to accept or allow any apportionment of the said debt to or among any separate parts of the said property.

22.   Remedies Cumulative.  Upon default, the Grantee may, at its option, foreclose this Mortgage for any portion of the debt or any other Obligations secured thereby which are then due and payable, subject to the continuing lien of this Mortgage for the balance not then due, but nothing in this paragraph contained shall impair or affect any right or remedy which the Grantee might now or hereafter have, were it not for this paragraph, but the right herein given shall be in addition to any others which the Grantee may have hereunder.

23.   Notices.  A demand upon, or notice to, the Grantor shall be sufficient notice and shall be effective if deposited in the mail addressed to the Grantor at the last address furnished in writing to the Grantee, or directed to the address at which the Grantee customarily communicates with the Grantor. If the Grantor consists of more than one person, a demand upon, or notice to, any one of the grantors shall constitute

notice to all the grantors. Any notice to the Grantee hereunder shall be effective only upon its receipt by the Grantee.

24.    Security Agreement.  This Mortgage shall constitute a Security Agreement as defined under the Connecticut Uniform Commercial Code, as amended, and the Grantor hereby grants to the Grantee, and the Grantee has and may enforce a security interest in, all fixtures and equipment now or hereafter installed on the Premises, and all appurtenances thereto, thereon or therein, used in the operation  or maintenance of the building and physical plant excluding, however, any such items of property which are owned by Grantor and used in its manufacturing operations and any such items of property owned by tenants and which, according to the terms of any applicable lease, may be removed by such tenants at the expiration of the lease term ("Collateral"), in addition to the lien hereby imposed upon the same as a part of the real estate.  Grantor agrees to do whatever Grantee may request from time to time by way of obtaining, executing, delivering and filing financing statements, assignments, landlord's or mortgagee's waivers, and other notices and amendments and renewals thereof, and take any and all steps and observe such formalities as Grantee may request in order to create and maintain a valid and enforceable lien upon, pledge of, and first priority security interest in, any and all of the Collateral. Grantor hereby irrevocably authorizes the Grantee at any time and from time to time to file in any Uniform Commercial Code jurisdiction, without Grantor's signature, any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of the Grantor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Connecticut Uniform Commercial Code or such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by the Connecticut Uniform Commercial Code for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Grantor is an organization, the type of organization and any organization identification number issued to the Grantor and, (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as extracted collateral, a sufficient description of real property to which the Collateral relates. The Grantor agrees to furnish any such information to the Grantee promptly upon request. All charges, expenses and fees Grantee may incur in filing any of the foregoing, together with reasonable costs and expenses of any lien search required by Grantee, and any taxes relating thereto, shall be charged to the Grantor and added to the obligations secured by this Mortgage.

25.    Environmental Matters.

a.    Definitions.  The term "Polluting Substance" shall mean any hazardous, ignitable, corrosive, caustic, reactive, toxic, or polluting waste or substance including (without limiting the generality of the foregoing) any of the following:  "hazardous waste" (as defined in the regulations adopted under RCRA, defined below); oil or petroleum products; "chemical liquids or solid, liquid

8/30/2007                                    -10-

or gaseous products" (as those terms are used in the Superlien Statute, defined below); asbestos; polychlorinated biphenyls; formaldehyde compounds; explosives; and radioactive materials. The term "Environmental Law" shall mean any statutory, regulatory, or decisional law pertaining to protection of human health or the environment or to any Polluting Substance, including (without limiting the generality of the foregoing) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"); the Resource Conservation and Recovery Act of 1976 ("RCRA"); and Title 22a "Environmental Protection" of the Connecticut General Statutes, including particularly Sections 22a-448 through 22a-457 of the Connecticut General Statutes; as any of them may be amended from time to time, with the regulations promulgated thereunder. The term "release" as used herein shall include both the meaning specified in CERCLA and a "spill" as defined in Section 22a-452c of the Connecticut General Statutes. In the event any Environmental Law is amended to broaden the meaning of any term defined thereby, such broader meaning shall apply subsequent to the effective date of such amendment.

b.    Representations and Warranties.  Grantor represents and warrants that Grantor and those persons having a legal or beneficial interest in Grantor: (i) have not been involved in operations at the Premises involving any Polluting Substances except in compliance with Environmental Laws; (ii) have not caused any release of a Polluting Substance at or affecting the Premises, or any contiguous land included in the property description of the Premises within three years; (iii) after due inquiry,  know of no Polluting Substance located on or affecting the Premises or any contiguous land included in the property description of the Premises within three years or any other properties adjacent to the Premises; (iv) have not permitted any tenant or occupant of the Premises to engage in any activity involving any Polluting Substance other than in compliance with all applicable laws and regulations; (v) have not received any notice, order, claim, or demand from any governmental authority under any Environmental Law except as previously disclosed to Grantee in writing; and (vi) Grantor has disclosed to Grantee all information it has as to whether there are any Polluting Substances located on or affecting the Premises.

Grantor further represents and warrants to Grantee that, to the best of its knowledge: (i) the Premises and Grantor are not in violation of or subject to any existing, pending, or threatened investigation or inquiry by any governmental authority or any response costs or remedial obligations under any Environmental Law, and this representation and warranty would continue to be true and correct following disclosure to the applicable governmental authorities of all relevant facts, conditions, and circumstances, if any, pertaining to the Premises; and (ii) Grantor has not obtained and is not required to obtain any permits, licenses, or similar authorizations to construct, occupy, operate, or use any buildings,

8/30/2007                                        -11-

improvements, fixtures, and equipment forming a part of the Premises by reason of any Environmental Law.

c.   Covenants and Agreements.   Grantor covenants and agrees that: (i) Grantor will not release any Polluting Substance on the Premises or on any properties adjacent to the Premises; (ii) Grantor will not become involved, and will not permit any tenant or occupant of the Premises to become involved, in operations at the Premises involving unlawful use of Polluting Substances or any other activity that would violate any Environmental Law or that could lead to the imposition on Grantor of liability under any Environmental Law; (iii) Grantor at its own expense will comply with all recommendations made by Grantee by separate writing given in connection with this Mortgage within the time periods set forth therein; (iv) Grantor, at its sole cost and expense, will comply strictly and in all respects with the requirements of all Environmental Laws; (v) Grantor will notify Grantee promptly in the event of the presence or release of any Polluting Substance at or affecting the Premises and give to Grantee a copy of any notice of violations of any Environmental Law received by Grantor; (vi) in the event any Polluting Substance is found at the Premises, Grantor will immediately contain and remove the same in compliance with all Environmental Laws and pay immediately when due the cost of removal of such Polluting Substance; (vii) Grantor will keep the Premises free and clear of any lien imposed pursuant to any Environmental Law; and (viii) Grantor will include in all future leases of any portion of the Premises provisions requiring compliance with all Environmental Laws and reporting of information regarding such compliance to Grantor and Grantee.

d.   Site Assessments.   Grantor agrees to permit Grantee, at Grantee's election and in its sole discretion, but with notice to Grantor and at Grantor's expense, from time to time, to cause additional environmental site assessments of the Premises to be undertaken. An environmental site assessment may include a detailed visual inspection of the Premises, including, without limitation, all storage areas, storage tanks, drains, dry wells, and leaching areas, as well as the taking of samples of soil, surface water, and ground water and such other investigation or analysis as is necessary or appropriate for a complete assessment of the compliance of the Premises and the use and operation thereof with all Environmental Laws.

e.   Indemnity.   Except to the extent that any environmental matter arises out of the affirmative wrongful act of Grantee or its agents, Grantor further covenants and agrees unconditionally and absolutely to defend, indemnify, and forever hold Grantee harmless from and against all fines, charges, fees, response costs, losses, liabilities, damages, diminutions in value, costs and expenses, causes of actions, suits, claims, demands, and judgments of any nature suffered or incurred by Grantee and arising out of or in connection with:

8/30/2007                                              -12-

      i.      the presence, or any release, of any Polluting Substance at or affecting the Premises;

      ii.      the application, or any claim of application, of any Environmental Law to the Premises or the operation thereof, including any requirement for clean-up of any Polluting Substance or the assertion of any lien because of any release;

      iii.      any failure by Grantor to comply with the terms of any order of the Connecticut Department of Environmental Protection or any other federal, state, or municipal governmental authority under any Environmental Law; and

      iv.      any inaccuracy in the representations and warranties made by Grantor in paragraph b. above.

Such expenses shall include (without limiting the generality of the foregoing) engineers' and attorneys' fees and the costs of any environmental audits or other tests required by Grantee in its discretion to ascertain whether any Polluting Substance is present at or affects the Premises. Such losses shall include the assertion of any lien relating to any release at or affecting the Premises or any other land included in the same property description with the Premises at any time within three (3) years prior to such release.

f.      Survival. This indemnity shall extend to Grantee as holder of the Mortgage, mortgagee in possession, or as successor in interest to Grantor as owner of the Premises by virtue of foreclosure or acceptance of a deed in lieu of foreclosure and shall survive the repayment of the Loan Documents and the cancellation, release, or discharge of this Mortgage.

26.      Miscellaneous.

a.      Definitions. Wherever used in this Mortgage, unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, the word "Grantor" shall mean "grantor and/or any subsequent owner or owners of the Premises"; the word "Grantee" shall mean "grantees or any subsequent holder or holders of this Mortgage"; the word "person" shall mean "an individual, corporation, partnership or unincorporated association"; and the word "Premises" shall include the real estate hereinbefore described, together with all equipment, condemnation awards and any other rights or property interest at any time made subject to the lien of this Mortgage by the terms hereof;

b.    <u>Joint and Several Obligation.</u>  If there shall be more than "Grantor" of this Mortgage, then the obligations of all Grantors hereunder shall be joint and several.

c.    <u>Genders</u>.  Pronouns of any gender shall include the other genders, and either the singular or plural shall include the other;

d.    <u>Partial Invalidity</u>.  The invalidity of one or more of the phrases, sentences, clauses or Sections of this Mortgage shall not affect the validity of the remaining portions of the Mortgage;

e.    <u>Connecticut Law</u>.  This Mortgage shall be governed by, construed and enforced in accordance with the laws of the State of Connecticut;

f.    <u>Modification</u>.  This Mortgage may not be amended in any respect, except by a further agreement in writing, signed by all parties;

g.    <u>Successors and Assigns</u>.  The rights and covenants contained in this Mortgage shall run with the land, be binding upon and inure to the benefit of the heirs, successors and assigns of the parties.


NOW, THEREFORE, if the Grantor shall pay the Note according to its tenor, and if all agreements contained in the Note and herein contained are fully kept and performed, then this Deed shall be void, otherwise to remain in full force and effect.

SIGNED this 30th day of August, 2007.

Witnessed by:

Jack Robinson

T. J. Donohue

GRIST MILL PARTNERS, LLC
By: Caroline Financial Group, Inc.
Its Managing Member


By: _____
Daniel E. Carpenter
Its Chairman

STATE OF CONNECTICUT          )
                             ) ss.   FARMINGTON
COUNTY OF HARTFORD           )

The foregoing instrument was acknowledged before me this 30th day of August, 2007 by
Daniel E. Carpenter,  as Chairman of Caroline Financial Group, Inc., a Delaware
corporation, the Managing Member of Grist Mill Partners, LLC, a Delaware limited
liability company, on behalf of the company.

_____
T. J. Donohue, Jr.
Commissioner of the Superior Court

8/30/2007                              -15-

EXHIBIT A
PREMISES DESCRIPTION

The land referred to in this Commitment is described as follows:

All that certain piece or parcel of land, with the buildings and improvements thereon and appurtenances thereto, known as No. 100 Grist Mill Road, situated in the Town of Simsbury, County of Hartford and State of Connecticut, being shown on a certain survey entitled "Resurvey Map Parcel 25  Land Owned by Ensign-Bickford Realty Corporation  Easterly of Grist Mill Road  Simsbury, Connecticut  Scale 1" = 40' November 1997", revised 7-23-07, made by Hodge Surveying Associates, P.C., which survey is on file in the Simsbury Land Records.  Said premises are more particularly bounded and described as follows:

Beginning at a point on the easterly streetline of Grist Mill Road, said point being the southwesterly corner of the herein described parcel; thence in a northerly direction along the easterly streetline of Grist Mill Road along a curve to the left having a radius of 2182.68 feet, a distance of 50.49 feet to a point; thence S 89° 14' 42" E, a distance of 182.33 feet to a point; thence N 65° 28' 04" E, a distance of 280.59 feet to a point; thence N 2° 44' 27" W, a distance of 160.70 feet to a point; thence N 79° 06' 32" E, a distance of 120.00 feet to a point; thence N 10° 15' 04" E, a distance of 151.05 feet to a point; thence S 72° 27' 29" E, a distance of 275.05 feet to a point; thence S 77° 04' 33" E, a distance of 80.16 feet to a point; thence N 42° 44' 29" E, a distance of 405.00 feet to a point in the center of Hop Brook; thence S 52° 58' 15" E, a distance of 341.25 feet to a point; thence S 10° 58' 40" W, a distance of 14.00 feet to a point; thence N 73° 55' 26" W, a distance of 205.35 feet to a point; thence S 3° 39' 30" W, a distance of 304.99 feet to a point; thence S 6° 21' 18" W, a distance of 261.31 feet to a point; thence N 78° 35' 13" W, a distance of 770.84 feet to a point; thence S 65° 28' 04" W, a disatnce if 291.81 feet to a point; thence N 89° 14' 42" W, a distance of 186.50 feet to the point and place of beginning.

Together with the easements set forth in a Declaration of Easements, Covenants and Restrictions for Theh Powder Forest Business Park dated December 2, 1983 and recorded in Volume 271 at Page 546 of the Simsbury Land Records; amended by virtue of an Amended and Restated Declaration of Easements, Covenants and Restrictions for The Powder Forest Business Park dated December 8, 1997 and recorded in Volume 479 at Page 795 of the said Land Records; as affected by a Certification Under Declaration by Ensign-Bickford Realty Corporation dated January 6, 1998 and recorded in Volume 481 at Page 116 of the said Land Records; as further amended by virtue of a Second Amendment to Declaration of Easements, Covenants and Restrictions for the Powder Forest Business Park dated Novemnber 17, 2000 and recorded in Volume 533 at Page 227 of the said Land Records; as further affected by a Partial Termination of Declaration of Easements, Covenants and Restrictions for the Powder Forest Business Park dated May 2, 2003 and recorded in Volume 618 at Page 678 of the said Land Records; as further amended by virtue of a Third Amendment to Amended and Restated Declaration of Easements, Covenants and Restrictions for the Powder Forest Business Park dated June 7, 2005 and recorded in Volume 690 at Page 419 of the said Land Records.

Exhibit B
**PROMISSORY NOTE**

$3,200,000.00                    Farmington, Connecticut                    August 30, 2007

FOR VALUE RECEIVED **GRIST MILL PARTNERS, LLC** a Delaware limited liability company with an office at 100 Grist Mill Road, Simsbury, Connecticut 06070 ("Borrower"), promises to pay to the order of **TD BANKNORTH, N.A.**, a national banking association ("Lender"), with an office at 102 West Main Street, New Britain, Connecticut 06050-0174, or at such other place as the holder hereof may designate in writing, the principal sum of THREE MILLION TWO HUNDRED THOUSAND DOLLARS ($3,200,000.00) ("Loan") with interest from the date hereof on the unpaid balance until paid at the rate set forth below, together with all taxes levied or assessed upon that sum against the payee or the holder of this Note, and all costs of collection, including reasonable attorneys' fees incurred in an action to collect this Note, to foreclose the Mortgage Deed and Security Agreement on property known as 100 Grist Mill Road, Simsbury , Connecticut ("Premises") of even date herewith securing the same ("Mortgage"), or in realizing on or disposing of collateral given under any mortgage or other security agreement securing this Note, or in protecting or sustaining the lien of the Mortgage. The interest charged hereunder shall be computed on the basis of a 360-day year, and interest shall be due and payable for the actual number of days in the period for which interest is being charged. Effective upon default which is not cured with ten (10) days from occurrence, interest shall accrue from such date until paid at the rate otherwise in effect hereunder plus five percent (5%).

The initial rate charged hereunder shall be an adjustable annual rate equal to one hundred seventy-five (175) basis points (or 1.75%) above the One Month London Interbank Offering Rate ("One Month LIBOR"). Such adjustments shall become effective on the first day of each month beginning October 1, 2007. Lender shall not be required to notify Borrower of adjustments in said interest rate.

The "One Month LIBOR" means the rate for deposits in U.S. Dollars for a period equal to one month, as such rate appears on Telerate Page 3750 as of 11:00 AM, London time, on the day that is two Business Days prior to the adjustment date. If such rate does not appear on Telerate Page 3750, the rate for that adjustment date will be the arithmetic mean of the rates quoted by major banks in London, selected by TD Banknorth, N.A., for a period equal to one month, as of 11:00 AM London time, on the day that is two Business Days prior to the adjustment date.

"Telerate Page 3750" means the display designated as "Page 3750" on the Dow Jones Telerate Service (or such other page as may replace Page 3750 on that service or such other service as may be nominated by the British Bankers' Association as the information vendor for

Page 1 of 5

the purpose of displaying British Bankers' Association Interest Settlement Rates for U.S. Dollar Deposits).

"Business Day" means a day (other than Saturday, Sunday or holiday) on which Lender is open and conducting its customary banking transactions in the State of Connecticut. The "Following Business Day Convention" means the convention for adjusting any relevant date that would otherwise fall on a day that is not a Business Day so that the date will be the first following day that is a Business Day.

The Borrower agrees, at its own expense, to furnish Lender with:(a)  A signed copy of Borrower's current annual federal tax return each year, within 15 days of its filing; (b)  A signed copy of each guarantor's current annual federal tax return within 15 days of its filing; (c)  A signed current personal financial statement, on Lender's form, by Daniel E. Carpenter within 14 months of the last statement; (d)  A fiscal year end financial statement within 120 days of fiscal year end for Caroline Financial Group, Ltd. and Carpenter Financial Group, Inc.; (e) A signed copy of the current annual federal tax return within 15 days of filing and a fiscal year end financial statement within 120 days of fiscal year end for Benistar Admin Services, Inc., a Delaware corporation, which has agreed to lease a portion of the premises; and  (e)  Such other financial information as and when Lender may reasonably require.  The foregoing items (a) through (e), inclusive, are hereafter referred to as "Financial Reporting Requirements".

**Upon Borrower's and Guarantors' failure to satisfy any of the foregoing Financial Reporting Requirements at any time, or from time to time, during the term of this Note the interest rate charged hereunder shall increase to an adjustable annual rate equal to two hundred ten (210) basis points (or 2.10%) above the One Month LIBOR, as adjusted in accordance with the procedure set forth above, until such time as the default is cured to Lender's satisfaction and, in addition, Lender shall retain all other rights and remedies available to it on account of such default.**

The principal and interest shall be due and payable as follows:

Payment of accrued interest together with a principal payment in accordance with the attached Principal Payment Schedule, based upon a twenty year amortization, shall be due and payable commencing October 1, 2007 and continuing on the first day of every month thereafter through and including September 1, 2022 ("**Maturity Date**"), subject to adjustment in accordance with the Following Business Day Convention. **The entire outstanding principal due hereunder and all accrued interest, if any, shall be due and payable on the Maturity Date, if not sooner paid.**

All payments shall be in lawful money of the United States in immediately available funds.

In the event of any default in the payment of this Note, and if such default continues for ten (10) days, or in the event of any default in the performance of any of the other conditions or

stipulations of this Note, and if such default continues for thirty (30) days and after notice of such default from Lender, or an event of default beyond any grace or cure period, if applicable, as set forth in the Mortgage, Loan Agreement, Collateral Assignment of Leases and Rentals, or any other instrument securing this Note and the Loan Agreement ("Loan Documents"), all of which are hereby made a part of this Note as if herein set forth, then, at the option of the holder of this Note, the entire amount of principal and interest remaining unpaid shall immediately become due and payable, without notice, except as set forth in the Mortgage.

The undersigned agrees to pay to the holder hereof a monthly "late charge" equal to six percent (6%) of each installment not received by the holder hereof within ten (10) days after the installment is due.

Borrower may prepay this Note in whole or in part without penalty or premium, except as follows: if the Borrower or Guarantor accepts and uses replacement financing from another financial institution or financing source and terminates its lending relationship with the Bank within two (2) years from the date of this Note, a termination fee equal to three (3%) percent of the original principal amount of this Note will be paid and, in addition, any prepayment, at any time, will also be subject to the provisions of the ISDA Master Agreement and all schedules and documents related thereto, as executed together herewith, which may result in a payment due thereunder on account of the prepayment.

The undersigned, and any endorsers or guarantors of this Note, give the holder a lien and right of setoff of all the undersigned's liabilities upon and against all the deposits, credits and property of the undersigned, endorsers or guarantors other than the premises mortgaged to secure this Note and any collateral of the undersigned, endorser or guarantor now or hereafter in the possession or control of the holder or in transit to it; the holder may, at any time following and during the continuance of a default or Event of Default under the Loan Documents or under the ISMA Master Agreement between Borrower and Lender as executed in connection with the Loan, apply the same, or any part thereof, to any liability of the undersigned even though unmatured.

**BORROWER AND EACH AND ALL ENDORSERS AND ANY GUARANTORS OF THIS NOTE ACKNOWLEDGE THAT THE LOAN EVIDENCED BY THIS NOTE IS A COMMERCIAL TRANSACTION AND WAIVE THEIR RIGHTS TO: (1) NOTICE AND HEARING UNDER CHAPTER 903A OF THE CONNECTICUT GENERAL STATUTES, OR AS OTHERWISE ALLOWED BY ANY STATE OR FEDERAL LAW WITH RESPECT TO ANY PREJUDGMENT REMEDY WHICH LENDER MAY DESIRE TO USE, AND (2) REQUEST THAT LENDER POST A BOND, WITH OR WITHOUT SURETY, TO PROTECT BORROWER OR ANY ENDORSER OR GUARANTOR OF THIS NOTE AGAINST DAMAGES THAT MAY BE CAUSED BY ANY PREJUDGMENT REMEDY SOUGHT OR OBTAINED BY LENDER BY VIRTUE OF ANY DEFAULT OR PROVISION OF THIS NOTE OR ANY LOAN DOCUMENT SECURING THE NOTE,** and further waive diligence, demand, presentment for payment, notice of non-payment, protest and notice of protest, and notice of any renewals or extensions of

this Note, and all rights under any statute of limitations, and agree that the time for payment of this Note may be extended at the Lender's sole discretion, without impairing their liability thereon, and further consent to the release of all or any part of the security for payment hereof at the discretion of Lender, or the release of any party liable for the obligation without affecting the liability of the other parties hereto.  Any delay on the part of the Lender exercising any right hereunder shall not operate as a waiver of any such right, and any waiver granted for one occasion shall not operate as a waiver in the event of any subsequent default.

If there shall be more than one maker of this Note, the obligations of the undersigned shall be joint and several.

This Note shall be governed by and construed in accordance with the laws of the State of Connecticut.

GRIST MILL PARTNERS, LLC
By: Caroline Financial Group, Inc.
Its Managing Member


By: ___/s/_____
Daniel E. Carpenter
Its Chairman

Page 4 of 5

**PRINCIPAL PAYMENT SCHEDULE**

Page 5 of 5

# Principal Payment Schedule

| | Start Date | End Date/Pmt Date | Principal Outstanding | Principal Due |
|---|---|---|---|---|
| 1 | 8/30/2007 | 10/1/2007 | $3,200,000.00 | $5,718.00 |
| 2 | 10/1/2007 | 11/1/2007 | $3,194,282.00 | $5,718.00 |
| 3 | 11/1/2007 | 12/1/2007 | $3,188,564.00 | $5,718.00 |
| 4 | 12/1/2007 | 1/1/2008 | $3,182,846.00 | $5,718.00 |
| 5 | 1/1/2008 | 2/1/2008 | $3,177,128.00 | $5,718.00 |
| 6 | 2/1/2008 | 3/1/2008 | $3,171,410.00 | $5,718.00 |
| 7 | 3/1/2008 | 4/1/2008 | $3,165,692.00 | $5,718.00 |
| 8 | 4/1/2008 | 5/1/2008 | $3,159,974.00 | $5,718.00 |
| 9 | 5/1/2008 | 6/1/2008 | $3,154,256.00 | $5,718.00 |
| 10 | 6/1/2008 | 7/1/2008 | $3,148,538.00 | $5,718.00 |
| 11 | 7/1/2008 | 8/1/2008 | $3,142,820.00 | $5,718.00 |
| 12 | 8/1/2008 | 9/1/2008 | $3,137,102.00 | $5,718.00 |
| 13 | 9/1/2008 | 10/1/2008 | $3,131,384.00 | $6,219.00 |
| 14 | 10/1/2008 | 11/1/2008 | $3,125,165.00 | $6,219.00 |
| 15 | 11/1/2008 | 12/1/2008 | $3,118,946.00 | $6,219.00 |
| 16 | 12/1/2008 | 1/1/2009 | $3,112,727.00 | $6,219.00 |
| 17 | 1/1/2009 | 2/1/2009 | $3,106,508.00 | $6,219.00 |
| 18 | 2/1/2009 | 3/1/2009 | $3,100,289.00 | $6,219.00 |
| 19 | 3/1/2009 | 4/1/2009 | $3,094,070.00 | $6,219.00 |
| 20 | 4/1/2009 | 5/1/2009 | $3,087,851.00 | $6,219.00 |
| 21 | 5/1/2009 | 6/1/2009 | $3,081,632.00 | $6,219.00 |
| 22 | 6/1/2009 | 7/1/2009 | $3,075,413.00 | $6,219.00 |
| 23 | 7/1/2009 | 8/1/2009 | $3,069,194.00 | $6,219.00 |
| 24 | 8/1/2009 | 9/1/2009 | $3,062,975.00 | $6,219.00 |
| 25 | 9/1/2009 | 10/1/2009 | $3,056,756.00 | $6,702.00 |
| 26 | 10/1/2009 | 11/1/2009 | $3,050,054.00 | $6,702.00 |
| 27 | 11/1/2009 | 12/1/2009 | $3,043,352.00 | $6,702.00 |
| 28 | 12/1/2009 | 1/1/2010 | $3,036,650.00 | $6,702.00 |
| 29 | 1/1/2010 | 2/1/2010 | $3,029,948.00 | $6,702.00 |
| 30 | 2/1/2010 | 3/1/2010 | $3,023,246.00 | $6,702.00 |
| 31 | 3/1/2010 | 4/1/2010 | $3,016,544.00 | $6,702.00 |
| 32 | 4/1/2010 | 5/1/2010 | $3,009,842.00 | $6,702.00 |
| 33 | 5/1/2010 | 6/1/2010 | $3,003,140.00 | $6,702.00 |
| 34 | 6/1/2010 | 7/1/2010 | $2,996,438.00 | $6,702.00 |
| 35 | 7/1/2010 | 8/1/2010 | $2,989,736.00 | $6,702.00 |
| 36 | 8/1/2010 | 9/1/2010 | $2,983,034.00 | $6,702.00 |
| 37 | 9/1/2010 | 10/1/2010 | $2,976,332.00 | $7,222.00 |
| 38 | 10/1/2010 | 11/1/2010 | $2,969,110.00 | $7,222.00 |
| 39 | 11/1/2010 | 12/1/2010 | $2,961,888.00 | $7,222.00 |
| 40 | 12/1/2010 | 1/1/2011 | $2,954,666.00 | $7,222.00 |
| 41 | 1/1/2011 | 2/1/2011 | $2,947,444.00 | $7,222.00 |
| 42 | 2/1/2011 | 3/1/2011 | $2,940,222.00 | $7,222.00 |
| 43 | 3/1/2011 | 4/1/2011 | $2,933,000.00 | $7,222.00 |
| 44 | 4/1/2011 | 5/1/2011 | $2,925,778.00 | $7,222.00 |
| 45 | 5/1/2011 | 6/1/2011 | $2,918,556.00 | $7,222.00 |
| 46 | 6/1/2011 | 7/1/2011 | $2,911,334.00 | $7,222.00 |
| 47 | 7/1/2011 | 8/1/2011 | $2,904,112.00 | $7,222.00 |
| 48 | 8/1/2011 | 9/1/2011 | $2,896,890.00 | $7,222.00 |

## Principal Payment Schedule

|  | Start Date | End Date/Pmt Date | Principal Outstanding | Principal Due |
|---|---|---|---|---|
| 49 | 9/1/2011 | 10/1/2011 | $2,889,668.00 | $7,732.00 |
| 50 | 10/1/2011 | 11/1/2011 | $2,881,936.00 | $7,732.00 |
| 51 | 11/1/2011 | 12/1/2011 | $2,874,204.00 | $7,732.00 |
| 52 | 12/1/2011 | 1/1/2012 | $2,866,472.00 | $7,732.00 |
| 53 | 1/1/2012 | 2/1/2012 | $2,858,740.00 | $7,732.00 |
| 54 | 2/1/2012 | 3/1/2012 | $2,851,008.00 | $7,732.00 |
| 55 | 3/1/2012 | 4/1/2012 | $2,843,276.00 | $7,732.00 |
| 56 | 4/1/2012 | 5/1/2012 | $2,835,544.00 | $7,732.00 |
| 57 | 5/1/2012 | 6/1/2012 | $2,827,812.00 | $7,732.00 |
| 58 | 6/1/2012 | 7/1/2012 | $2,820,080.00 | $7,732.00 |
| 59 | 7/1/2012 | 8/1/2012 | $2,812,348.00 | $7,732.00 |
| 60 | 8/1/2012 | 9/1/2012 | $2,804,616.00 | $7,732.00 |
| 61 | 9/1/2012 | 10/1/2012 | $2,796,884.00 | $8,383.00 |
| 62 | 10/1/2012 | 11/1/2012 | $2,788,501.00 | $8,383.00 |
| 63 | 11/1/2012 | 12/1/2012 | $2,780,118.00 | $8,383.00 |
| 64 | 12/1/2012 | 1/1/2013 | $2,771,735.00 | $8,383.00 |
| 65 | 1/1/2013 | 2/1/2013 | $2,763,352.00 | $8,383.00 |
| 66 | 2/1/2013 | 3/1/2013 | $2,754,969.00 | $8,383.00 |
| 67 | 3/1/2013 | 4/1/2013 | $2,746,586.00 | $8,383.00 |
| 68 | 4/1/2013 | 5/1/2013 | $2,738,203.00 | $8,383.00 |
| 69 | 5/1/2013 | 6/1/2013 | $2,729,820.00 | $8,383.00 |
| 70 | 6/1/2013 | 7/1/2013 | $2,721,437.00 | $8,383.00 |
| 71 | 7/1/2013 | 8/1/2013 | $2,713,054.00 | $8,383.00 |
| 72 | 8/1/2013 | 9/1/2013 | $2,704,671.00 | $8,383.00 |
| 73 | 9/1/2013 | 10/1/2013 | $2,696,288.00 | $9,035.00 |
| 74 | 10/1/2013 | 11/1/2013 | $2,687,253.00 | $9,035.00 |
| 75 | 11/1/2013 | 12/1/2013 | $2,678,218.00 | $9,035.00 |
| 76 | 12/1/2013 | 1/1/2014 | $2,669,183.00 | $9,035.00 |
| 77 | 1/1/2014 | 2/1/2014 | $2,660,148.00 | $9,035.00 |
| 78 | 2/1/2014 | 3/1/2014 | $2,651,113.00 | $9,035.00 |
| 79 | 3/1/2014 | 4/1/2014 | $2,642,078.00 | $9,035.00 |
| 80 | 4/1/2014 | 5/1/2014 | $2,633,043.00 | $9,035.00 |
| 81 | 5/1/2014 | 6/1/2014 | $2,624,008.00 | $9,035.00 |
| 82 | 6/1/2014 | 7/1/2014 | $2,614,973.00 | $9,035.00 |
| 83 | 7/1/2014 | 8/1/2014 | $2,605,938.00 | $9,035.00 |
| 84 | 8/1/2014 | 9/1/2014 | $2,596,903.00 | $9,035.00 |
| 85 | 9/1/2014 | 10/1/2014 | $2,587,868.00 | $9,736.00 |
| 86 | 10/1/2014 | 11/1/2014 | $2,578,132.00 | $9,736.00 |
| 87 | 11/1/2014 | 12/1/2014 | $2,568,396.00 | $9,736.00 |
| 88 | 12/1/2014 | 1/1/2015 | $2,558,660.00 | $9,736.00 |
| 89 | 1/1/2015 | 2/1/2015 | $2,548,924.00 | $9,736.00 |
| 90 | 2/1/2015 | 3/1/2015 | $2,539,188.00 | $9,736.00 |
| 91 | 3/1/2015 | 4/1/2015 | $2,529,452.00 | $9,736.00 |
| 92 | 4/1/2015 | 5/1/2015 | $2,519,716.00 | $9,736.00 |
| 93 | 5/1/2015 | 6/1/2015 | $2,509,980.00 | $9,736.00 |
| 94 | 6/1/2015 | 7/1/2015 | $2,500,244.00 | $9,736.00 |
| 95 | 7/1/2015 | 8/1/2015 | $2,490,508.00 | $9,736.00 |
| 96 | 8/1/2015 | 9/1/2015 | $2,480,772.00 | $9,736.00 |

# Principal Payment Schedule

|  | Start Date | End Date/Pmt Date | Principal Outstanding | Principal Due |
|---|---|---|---|---|
| 97 | 9/1/2015 | 10/1/2015 | $2,471,036.00 | $10,449.00 |
| 98 | 10/1/2015 | 11/1/2015 | $2,460,587.00 | $10,449.00 |
| 99 | 11/1/2015 | 12/1/2015 | $2,450,138.00 | $10,449.00 |
| 100 | 12/1/2015 | 1/1/2016 | $2,439,689.00 | $10,449.00 |
| 101 | 1/1/2016 | 2/1/2016 | $2,429,240.00 | $10,449.00 |
| 102 | 2/1/2016 | 3/1/2016 | $2,418,791.00 | $10,449.00 |
| 103 | 3/1/2016 | 4/1/2016 | $2,408,342.00 | $10,449.00 |
| 104 | 4/1/2016 | 5/1/2016 | $2,397,893.00 | $10,449.00 |
| 105 | 5/1/2016 | 6/1/2016 | $2,387,444.00 | $10,449.00 |
| 106 | 6/1/2016 | 7/1/2016 | $2,376,995.00 | $10,449.00 |
| 107 | 7/1/2016 | 8/1/2016 | $2,366,546.00 | $10,449.00 |
| 108 | 8/1/2016 | 9/1/2016 | $2,356,097.00 | $10,449.00 |
| 109 | 9/1/2016 | 10/1/2016 | $2,345,648.00 | $11,304.00 |
| 110 | 10/1/2016 | 11/1/2016 | $2,334,344.00 | $11,304.00 |
| 111 | 11/1/2016 | 12/1/2016 | $2,323,040.00 | $11,304.00 |
| 112 | 12/1/2016 | 1/1/2017 | $2,311,736.00 | $11,304.00 |
| 113 | 1/1/2017 | 2/1/2017 | $2,300,432.00 | $11,304.00 |
| 114 | 2/1/2017 | 3/1/2017 | $2,289,128.00 | $11,304.00 |
| 115 | 3/1/2017 | 4/1/2017 | $2,277,824.00 | $11,304.00 |
| 116 | 4/1/2017 | 5/1/2017 | $2,266,520.00 | $11,304.00 |
| 117 | 5/1/2017 | 6/1/2017 | $2,255,216.00 | $11,304.00 |
| 118 | 6/1/2017 | 7/1/2017 | $2,243,912.00 | $11,304.00 |
| 119 | 7/1/2017 | 8/1/2017 | $2,232,608.00 | $11,304.00 |
| 120 | 8/1/2017 | 9/1/2017 | $2,221,304.00 | $11,304.00 |
| 121 | 9/1/2017 | 10/1/2017 | $2,210,000.00 | $12,182.00 |
| 122 | 10/1/2017 | 11/1/2017 | $2,197,818.00 | $12,182.00 |
| 123 | 11/1/2017 | 12/1/2017 | $2,185,636.00 | $12,182.00 |
| 124 | 12/1/2017 | 1/1/2018 | $2,173,454.00 | $12,182.00 |
| 125 | 1/1/2018 | 2/1/2018 | $2,161,272.00 | $12,182.00 |
| 126 | 2/1/2018 | 3/1/2018 | $2,149,090.00 | $12,182.00 |
| 127 | 3/1/2018 | 4/1/2018 | $2,136,908.00 | $12,182.00 |
| 128 | 4/1/2018 | 5/1/2018 | $2,124,726.00 | $12,182.00 |
| 129 | 5/1/2018 | 6/1/2018 | $2,112,544.00 | $12,182.00 |
| 130 | 6/1/2018 | 7/1/2018 | $2,100,362.00 | $12,182.00 |
| 131 | 7/1/2018 | 8/1/2018 | $2,088,180.00 | $12,182.00 |
| 132 | 8/1/2018 | 9/1/2018 | $2,075,998.00 | $12,182.00 |
| 133 | 9/1/2018 | 10/1/2018 | $2,063,816.00 | $13,128.00 |
| 134 | 10/1/2018 | 11/1/2018 | $2,050,688.00 | $13,128.00 |
| 135 | 11/1/2018 | 12/1/2018 | $2,037,560.00 | $13,128.00 |
| 136 | 12/1/2018 | 1/1/2019 | $2,024,432.00 | $13,128.00 |
| 137 | 1/1/2019 | 2/1/2019 | $2,011,304.00 | $13,128.00 |
| 138 | 2/1/2019 | 3/1/2019 | $1,998,176.00 | $13,128.00 |
| 139 | 3/1/2019 | 4/1/2019 | $1,985,048.00 | $13,128.00 |
| 140 | 4/1/2019 | 5/1/2019 | $1,971,920.00 | $13,128.00 |
| 141 | 5/1/2019 | 6/1/2019 | $1,958,792.00 | $13,128.00 |
| 142 | 6/1/2019 | 7/1/2019 | $1,945,664.00 | $13,128.00 |
| 143 | 7/1/2019 | 8/1/2019 | $1,932,536.00 | $13,128.00 |
| 144 | 8/1/2019 | 9/1/2019 | $1,919,408.00 | $13,128.00 |

## Principal Payment Schedule

| | Start Date | End Date/Pmt Date | Principal Outstanding | Principal Due |
|---|---|---|---|---|
| 145 | 9/1/2019 | 10/1/2019 | $1,906,280.00 | $14,115.00 |
| 146 | 10/1/2019 | 11/1/2019 | $1,892,165.00 | $14,115.00 |
| 147 | 11/1/2019 | 12/1/2019 | $1,878,050.00 | $14,115.00 |
| 148 | 12/1/2019 | 1/1/2020 | $1,863,935.00 | $14,115.00 |
| 149 | 1/1/2020 | 2/1/2020 | $1,849,820.00 | $14,115.00 |
| 150 | 2/1/2020 | 3/1/2020 | $1,835,705.00 | $14,115.00 |
| 151 | 3/1/2020 | 4/1/2020 | $1,821,590.00 | $14,115.00 |
| 152 | 4/1/2020 | 5/1/2020 | $1,807,475.00 | $14,115.00 |
| 153 | 5/1/2020 | 6/1/2020 | $1,793,360.00 | $14,115.00 |
| 154 | 6/1/2020 | 7/1/2020 | $1,779,245.00 | $14,115.00 |
| 155 | 7/1/2020 | 8/1/2020 | $1,765,130.00 | $14,115.00 |
| 156 | 8/1/2020 | 9/1/2020 | $1,751,015.00 | $14,115.00 |
| 157 | 9/1/2020 | 10/1/2020 | $1,736,900.00 | $15,243.00 |
| 158 | 10/1/2020 | 11/1/2020 | $1,721,657.00 | $15,243.00 |
| 159 | 11/1/2020 | 12/1/2020 | $1,706,414.00 | $15,243.00 |
| 160 | 12/1/2020 | 1/1/2021 | $1,691,171.00 | $15,243.00 |
| 161 | 1/1/2021 | 2/1/2021 | $1,675,928.00 | $15,243.00 |
| 162 | 2/1/2021 | 3/1/2021 | $1,660,685.00 | $15,243.00 |
| 163 | 3/1/2021 | 4/1/2021 | $1,645,442.00 | $15,243.00 |
| 164 | 4/1/2021 | 5/1/2021 | $1,630,199.00 | $15,243.00 |
| 165 | 5/1/2021 | 6/1/2021 | $1,614,956.00 | $15,243.00 |
| 166 | 6/1/2021 | 7/1/2021 | $1,599,713.00 | $15,243.00 |
| 167 | 7/1/2021 | 8/1/2021 | $1,584,470.00 | $15,243.00 |
| 168 | 8/1/2021 | 9/1/2021 | $1,569,227.00 | $15,243.00 |
| 169 | 9/1/2021 | 10/1/2021 | $1,553,984.00 | $16,427.00 |
| 170 | 10/1/2021 | 11/1/2021 | $1,537,557.00 | $16,427.00 |
| 171 | 11/1/2021 | 12/1/2021 | $1,521,130.00 | $16,427.00 |
| 172 | 12/1/2021 | 1/1/2022 | $1,504,703.00 | $16,427.00 |
| 173 | 1/1/2022 | 2/1/2022 | $1,488,276.00 | $16,427.00 |
| 174 | 2/1/2022 | 3/1/2022 | $1,471,849.00 | $16,427.00 |
| 175 | 3/1/2022 | 4/1/2022 | $1,455,422.00 | $16,427.00 |
| 176 | 4/1/2022 | 5/1/2022 | $1,438,995.00 | $16,427.00 |
| 177 | 5/1/2022 | 6/1/2022 | $1,422,568.00 | $16,427.00 |
| 178 | 6/1/2022 | 7/1/2022 | $1,406,141.00 | $16,427.00 |
| 179 | 7/1/2022 | 8/1/2022 | $1,389,714.00 | $16,427.00 |
| 180 | 8/1/2022 | 9/1/2022 | $1,373,287.00 | $1,373,287.00 |

EXHIBIT C

 **Banknorth**

TD Banknorth, N.A.
Derivative Products

(Local Currency-Single Jurisdiction)

# ISDA®



International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of _____August 30, 2007_____

_____TD BANKNORTH, N.A._____     and     _____GRIST MILL PARTNERS, LLC_____

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: --

**1.      Interpretation**

(a)      *Definitions*.  The terms defined in Section 12 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency*.  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between  the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)      *Single Agreement*.  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.      Obligations**

(a)      *General Conditions*.

(i)  Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)  Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant confirmation or elsewhere in this Agreement.

(iii)  Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or potential event of default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

**ID Banknorth**

(b)      *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)      *Netting.* If on any date amounts would otherwise be payable: --

      (i) in the same currency; and

      (ii) in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of branches or offices through which the parties make and receive payments or deliveries.

(d)      *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.      Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into) that: --

(a)      *Basic Representations.*

      (i) *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

      (ii) *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

      (iii) *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

      (iv) *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been

**Banknorth**

obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v) *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)     *Absence of Certain Events*.  No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)     *Absence of Litigation*.  There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)     *Accuracy of Specified Information*.  All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

**4.     Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party: --

(a)     *Furnish Specified Information*.  It will deliver to the other party any forms, documents or certificates specified in the Schedule or any Confirmation by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)     *Maintain Authorisations*.  It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)     *Comply with Laws*.  It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform it obligations under this Agreement or any Credit Support Document to which it is a party.

**5.     Events of Default and Termination Events**

(a)     *Events of Default*.  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party: --

(i) *Failure to Pay or Deliver*.  Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii) *Breach of Agreement*.  Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) or to give notice of a Termination Event) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii) *Credit Support Default*.

 **Banknorth**

(1) Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2) the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3) the party of such Credit Support Provider Disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity, of such Credit Support Document;

(iv) *Misrepresentation*. A representation made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v) *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi) *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: --

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant

ISDA®1992
Second Printing

 **Banknorth**

to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: --

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b) *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, and if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (ii) below or an Additional Termination Event if the event is specified pursuant to (iii) below: --

(i) *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b) for such party (which will be the Affected Party): --

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction.

(ii) *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the credit worthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(iii) *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

**ISDA®1992**
Second Printing

**TD Banknorth**

(c)    *Event of Default and Illegality*.  If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

**6.    Early Termination**

(a)    *Right to Terminate Following Event of Default*.  If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions.  If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event*.

(i) *Notice*.  If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii) *Two Affected Parties*.  If an Illegality under Section 5(b)(i)(1) occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iii) *Right to Terminate*.  If: --

(1) an agreement under Section 6(b)(ii) has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality other than that referred to in Section 6(b)(ii), a Credit Event Upon Merger or an Additional Termination Event occurs,

either party in the case of an Illegality, any Affected Party in the case of an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    *Effect of Designation*.

(i)  If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)  Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(d) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement.  The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    *Calculations*.

(i)  *Statement*.  On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid.  In

# ⓣ Banknorth

the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii) *Payment Date*. An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment), from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e) *Payments on Early Termination*. If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i) *Events of Default*. If the Early Termination Date results from an Event of Default: --

(1) *First Method and Market Quotation*. If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party over (B) the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss*. If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation*. If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect to the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii) *Termination Events*. If the Early Termination Date results from Termination Event: --

(1) *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties*. If there are two Affected Parties: --

**ID Banknorth**

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (1) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Unpaid Amounts owing to X less (II) the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii) *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv) *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7.    Transfer

Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: --

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8.    Miscellaneous

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

ISDA®1992
Second Printing

**TD Banknorth**

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)     *No Waiver of Rights*.  A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)     *Headings*.  The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**9.     Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**10.    Notices**

(a)     *Effectiveness*.  Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated: --

(i)  if in writing and delivered in person or by courier, on the date it is delivered;

(ii)  if sent by telex, on the date the recipient's answerback is received;

(iii)  if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)  if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)  if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)     *Change of Addresses*.  Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**11.    Governing Law and Jurisdiction**

(a)     *Governing Law*.  This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)     *Jurisdiction*.  With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably: --

9

**TD Banknorth**

(i) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in its Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)      *Waiver of Immunities*.  Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdictions of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 12.     Definitions

As used in this Agreement: --

"*Additional Termination Event*" has the meaning specified in Section 5(b).

"*Affected Party*" has the meaning specified in Section 5(b).

"*Affected Transactions*" means (a) with respect to any Termination Event consisting of an Illegality, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

"*Affiliate*" means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person.  For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"*Applicable Rate*" means: --

(a)      in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)      in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)      in respect of all other obligations payable or deliverable (or which would have been but for

Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)      in all other cases, the Termination Rate.

"*consent*" includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

"*Credit Event Upon Merger*" has the meaning specified in Section 5(b).

"*Credit Support Document*" means any agreement or instrument that is specified as such in this Agreement.

"*Credit Support Provider*" has the meaning specified in the Schedule.

ISDA®1992
Second Printing

 **Banknorth**

"**Default Rate**" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

"**Defaulting Party**" has the meanings specified in Section 6(a).

"**Early Termination Date**" means the date determined in accordance with Section 6(a) or 6(b)(iii).

"**Event of Default**" has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

"**Illegality**" has the meaning specified in Section 5(b).

"**law**" includes any treaty, law, rule or regulation and "**lawful**" or "**unlawful**" will be construed accordingly.

"**Local Business Day**" means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

"**Loss**" means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respected of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 9. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

"**Market Quotation**" means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided,

ISDA®1992
Second Printing

**ID Banknorth**

the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

"*Non-default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

"*Non-defaulting Party*" has the meaning specified in Section 6(a).

"*Potential Event of Default*" means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"*Reference Market-makers*" means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding where to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

"*Scheduled Payment Date*" means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

"*Set-off*" means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payers.

"*Settlement Amount*" means, with respect to a party and any Early Termination Date, the sum of: --

(a)    the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

"*Specified Entity*" has the meaning specified in the Schedule.

"*Specified Indebtedness*" means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

"*Specified Transaction*" means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

"*Terminated Transactions*" means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination applies, immediately before that Early Termination Date).

"*Termination Event*" means an Illegality or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

ISDA®1992
Second Printing



**Banknorth**

TD Banknorth, N.A.
Derivative Products

**"Termination Rate"** means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

**"Unpaid Amounts"** owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate.  Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed.  The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective date specified below with effect from the date specified on the first page of this document.

| TD BANKNORTH, N.A. | GRIST MILL PARTNERS, LLC |
|---|---|
| (Name of party) | (Name of Party) |
|  | By: Caroline Financial Group, ‡ ‡ INC |
|  | Its: Managing Member |
| By: /S/ | By: /S/ |
| Name:  David G. Strouse | Name:  Daniel E. Carpenter |
| Title:  Vice President | Title:  Chairman |
| Date: | Date: |

13

**TD Banknorth**

TD Banknorth, N.A.
Derivative Products

# SCHEDULE

to the

# ISDA MASTER AGREEMENT

This is the Schedule to that certain ISDA Master Agreement dated as of August 30, 2007 between TD Banknorth, N.A., a national banking association under the laws of the United States ("Party A") and Grist Mill Partners, LLC, a Delaware limited liability company ("Party B").

## PART 1

### Termination Provisions

(A)   "Specified Entity" means in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v) | Affiliates |
| Section 5(a)(vi) | Not Applicable |
| Section 5(a)(vii) | Not Applicable |
| Section 5(b)(ii) | Not Applicable |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v) | Affiliates |
| Section 5(a)(vi) | Affiliates |
| Section 5(a)(vii) | Affiliates |
| Section 5(b)(ii) | Affiliates |

(B)   "Specified Transaction" will have the meaning specified in Section 12 of this Agreement. For purposes of Section 5(a)(v) of the Agreement, the definition of "Specified Transaction" in Section 12 of the Agreement shall be amended by adding ", repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, agreement for the purchase, sale or transfer of any Commodity or any other commodity trading transaction" after the words "currency option" in the eighth line thereof.  For this purpose, the term "Commodity" means any tangible or intangible commodity of any type or description (including, without limitation, petroleum, natural gas, natural gas liquids, and byproducts thereof).

(C)   The "Cross-Default" provisions of Section 5(a)(vi) of this Agreement will apply to Party A and to Party B but shall exclude any default that results solely from wire transfer difficulties or an error or omission of an administrative or operational nature (so long as sufficient funds are available to the relevant party on the relevant date), but only if payment is made within three Business Days after such transfer difficulties have been corrected or the error or omission has been discovered.

"Specified Indebtedness" will have the meaning specified in Section 12 and shall include, with respect to Party B, any obligation (whether present or future, contingent or otherwise) for the payment or repayment of money, including, without limitation, any obligation or indebtedness owed by Party B to Party A; and with respect to Party A such term shall not include obligations in respect of deposits received in the ordinary course of Party A's banking business.

"Threshold Amount" means with respect to Party A, 3% of Shareholders' Equity and with respect to Party B, any amount with respect to Specified Indebtedness.

"Shareholders' Equity" means, with respect to an entity, at any time, the sum (as shown in its most recent annual audited financial statements) of (i) its capital stock (including preferred stock

14

**TD Banknorth**

outstanding), taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles.

(D)    The "Credit Event Upon Merger" provisions of Section 5(b)(ii) of this Agreement will apply to Party A and to Party B.

(E)    The "Automatic Early Termination" provision of Section 6(a) of this Agreement will not apply to Party A or to Party B.

(F)    Payments on Early Termination.  For the purpose of Section 6(e) of this Agreement:  (i) Loss will apply and (ii) Second Method will apply.

(G)    Additional Termination Event will apply.  Each of the following shall constitute an Additional Termination Event for which Party B shall be the sole Affected Party:

(a) Party B has repaid all amounts owed to Party A under that $3,200,000.00 Promissory Note dated of or near even date herewith (as amended, supplemented or modified the "Note") and Party A has no further obligation to provide any additional credit extension to Party B under the Note, (b) the Note is terminated or otherwise ceases to be in effect, or (c) Party A for any reason ceases to be a lender thereunder.

## PART 2

### Agreement to Deliver Documents

For the purposes of Section 4(a) of this Agreement, the parties agree that the following documents will be delivered:

| Party Required to Deliver Document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B | Operating Agreement and certificate of Manager/Managing Member authorizing the execution, delivery and performance of this Agreement and each Confirmation | Concurrent with the execution of this Agreement and upon request with respect to Confirmations | Yes |
| Party B | Specimen signature(s) of Manager(s)/Managing Member(s) authorized on behalf of the party to execute and deliver this Agreement and each Confirmation | Concurrent with the execution of this Agreement and upon request with respect to Confirmations | Yes |
| Party B | An opinion of counsel to Party B in a form satisfactory to Party A | Concurrent with the execution of this Agreement | No |
| Party B and Party A | The Credit Support document(s), if any, listed in Part 3, Section (C) | Concurrent with the execution of this Agreement | Yes |
| Party B | IRS Form W-9, or any successor form thereto | Concurrent with the execution of this Agreement, promptly upon reasonable demand by Party A and promptly upon learning that any such form previously provided by | Yes |

15

 **Banknorth**                                        TD Banknorth, N.A.
                                                         Derivative Products

| Party Required to Deliver Document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | | Party B has become obsolete or incorrect. | |
| Party B | Such other documents as Party A may reasonably request in connection with each transaction. | Promptly upon request. | Yes |

## PART 3

### Miscellaneous

(A)     <u>Addresses for Notices</u>.  For the purpose of Section 10(a) of this Agreement:

Address for notices or communications to Party B:

Address:     Grist Mill Partners, LLC
             100 Grist Mill Road
             Simsbury, CT  06070
             Fax No.:  To be provided
             Phone No.:  To be provided
             Attention:  Daniel E. Carpenter

Address for notices or communications to Party A:

Address:     TD Banknorth, N.A.
             511 Congress Street
             Portland, ME  04101
             Fax No.:  (207) 756-6885
             Phone No.:  (207) 756-6895
             Attention:  Derivatives Documentation Group

(B)     <u>Calculation Agent</u>.  The Calculation Agent is Party A.  No failure by Party A to perform any duties of the Calculation Agent under this Agreement shall be construed as an Event of Default under this Agreement.

(C)     <u>Credit Support Document</u>.

Credit Support Document means, in relation to Party A:  Not applicable.

Credit Support Document means, in relation to Party B:  Any agreement and instrument, now or hereafter existing, of any kind or nature which secures, guarantees or otherwise provides direct or indirect assurance of payment or performance of any existing or future obligation of Party B under this Agreement, made by or on behalf of any person or entity (including, without limiting the generality of the foregoing, any credit or loan agreement, note, reimbursement agreement, security agreement, mortgage, pledge agreement, assignment of rents or any other agreement or instrument granting any lien, security interest, assignment, charge or encumbrance to secure any such obligation, any guaranty, suretyship, letter of credit or subordination agreement relating to any such obligation and any "keep well" or other financial support agreement relating to Party B or any Credit Support Provider), in favor of Party A or any of its Affiliates, including, without limitation, the following documents:

              (i) the Note, and

16

**TD Banknorth**

TD Banknorth, N.A.
Derivative Products

(ii) the Mortgage Deed and Security Agreement between Party A and Party B dated of or near even date herewith, as the same may be amended, supplemented, modified, renewed, replaced, consolidated, substituted or extended from time to time.

Party B agrees that the collateral securing the obligations of Party B to Party A described in the Credit Support Document(s) shall also secure the obligations of Party B to Party A under this Agreement, whether now existing or incurred hereafter, and such collateral shall enjoy the same priority as any security granted to secure senior indebtedness of Party B. The obligations of Party B to Party A under this Agreement shall rank pari-passu with all other obligations described in the Credit Support Document(s).

The covenants, terms and provisions of, including all representations and warranties of Party B contained in the Note, as in effect as of the date of this Agreement, are hereby incorporated by reference in, and made part of, this Agreement to the same extent as if such covenants, terms, and provisions were set forth in full herein. In the event of any inconsistency between the covenants, terms and provisions of the Note and this Agreement, the covenants, terms, and provisions of this Agreement shall govern. Party B hereby agrees that, during the period commencing with the date of this Agreement through and including such date on which all of Party B's obligations under this Agreement are fully performed, Party B will (a) observe, perform, and fulfill each and every such covenant, term, and provision applicable to Party B, as such covenants, terms, and provisions, may be amended from time to time after the date of this Agreement with the consent of Party A, and (b) deliver to Party A at the address for notices to Party A provided in this agreement, each notice, document, certificate or other writing that Party B is obligated to furnish to any other party to the Note. Subject to Part 1(G)(i) of this Schedule, in the event the Note terminates or becomes no longer binding on Party A prior to the termination of this Agreement and any Transactions outstanding hereunder, such covenants, terms, and provisions (other than those requiring payments in respect of amounts owned under the Note) will remain in force and effect for purposes of this Agreement as though set forth in full herein until the date on which all of Party B's obligations under this Agreement are fully performed and this Agreement is terminated.

(D)     Credit Support Provider.

Credit Support Provider means in relation to Party A: None.

Credit Support Provider means in relation to Party B:  Any person or entity (other than Party B), that now or hereafter secures, guarantees or otherwise provides assurance of payment or performance of any existing or future obligation of Party B under this Agreement or any Credit Support Document, including but not limited to, the following persons and/or entities: Daniel E. Carpenter.

(E)     Governing Law.  This Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrine.

(F)     Netting of Payments. Subparagraph (ii) of Section 2(c) of this Agreement will apply to the Transactions.

(G)     "Affiliate" will have the meaning specified in Section 12 of this Agreement and shall exclude any broker/dealer affiliates with respect to Party A.

**PART 4**

**Other Provisions**

(A)     Confirmations.  Notwithstanding anything to the contrary in this Agreement:

(i)  The parties hereto agree that with respect to each Transaction hereunder a legally binding agreement shall exist from the moment that the parties hereto agree on the essential terms of such Transaction, which the parties anticipate will occur by telephone.

**ID** **Banknorth**

(ii)  For each Transaction Party A and Party B agree to enter into hereunder, Party A shall promptly send to Party B a Confirmation setting forth the terms of such Transaction. Party B shall execute and return the Confirmation to Party A or request correction of any error within three Business Days of receipt. Failure of Party B to respond within such period shall not affect the validity or enforceability of such Transaction and shall be deemed to be an affirmation of such terms.

(B)  <u>Consent to Recording</u>.  Each party (i) consents to the recording of the telephone conversations of trading, marketing, and other relevant personnel of the parties in connection with this Agreement or any potential Transaction and (ii) agrees that such recording may be submitted in evidence to any court or in any proceedings with respect to this Agreement or any Transaction hereunder.

(C)  <u>Definitions</u>.  For each Transaction (unless otherwise specified in the relevant Confirmation for that Transaction) all provisions of the 2000 ISDA Definitions as published by the International Swaps & Derivatives Association, Inc. (formerly the International Swaps Dealers Association, Inc.), including the Annex to the 2000 ISDA Definitions (the "Definitions"), are hereby incorporated by this reference into this Agreement and shall form a part hereof as if set forth in full herein.  In the event of any inconsistency between the provisions of this Agreement and the Definitions, this Agreement will prevail.

Any reference to a:

(i)  "Swap Transaction" in the Definitions is deemed to be a reference to a "Transaction" for the purpose of interpreting this Agreement or any Confirmation; and

(ii)  "Transaction" in this Agreement or any Confirmation is deemed to be a reference to a "Swap Transaction" for the purpose of interpreting the Definitions.

(D)  <u>Notice of Event of Default</u>. Each party agrees, upon learning of the occurrence of any event or commencement of any condition that constitutes (or that with the giving of notice or passage of time or both would constitute) an Event of Default with respect to that party, promptly to give the other party notice of such event or condition (or, in lieu of giving notice of such event or condition in the case of an event or condition that with the giving of notice or passage of time or both would constitute an Event of Default or Termination Event with respect to the party, to cause such event or condition to cease to exist before becoming an Event of Default or Termination Event).

(E)  <u>Additional Representations</u>.  Section 3 of this Agreement is hereby amended by adding at the end thereof the following subsections (e) through (i):

"(e)  ***Eligible Contract Participant***.  It is an "eligible contract participant" as that term is defined in Section 1(a)(12) of the Commodity Exchange Act (7 U.S.C. 1(a)(12)) and was not formed solely for the purposes of constituting an "eligible contract participant."

"(f)  ***Line of Business***.  It has entered into this Agreement (including each Transaction evidenced hereby) in conjunction with its line of business (including financial intermediation services) or the financing of its business."

"(g)  ***No Agency***.  It is entering into this Agreement, any Credit Support Document to which it is a party, each Transaction and any other documentation relating to this Agreement or any Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise)."

"(h)  ***Creditworthiness***.  The economic terms of this Agreement, and Credit Support Document to which it is a party, and each Transaction have been individually tailored and negotiated by it, and the creditworthiness of the other party was a material consideration in its entering into or determining the terms of this Agreement, such Credit Support document, and such Transaction."

"(i)  Party B makes the following representation (which shall be deemed repeated on any date on which any Transactions under this Agreement are outstanding):

18

 **Banknorth**

it is a limited liability company formed under the laws of the State of Delaware and agrees to provide Party A with an IRS Form W-9 (or successor form) upon execution and delivery of the Agreement; (ii) promptly upon reasonable demand by Party A; and (iii) promptly upon learning that any Form W-9 (or successor form) previously provided has become obsolete or incorrect."

(F)   <u>Right of Setoff</u>.  Section 6 of this Agreement is amended by adding the following new Section 6(f):

"(f)   *Set-off*. Any amount (the "Early Termination Amount") payable under Section 6(e) by one party ("Party X") to the other party that is either the Defaulting Party or the sole Affected Party in the case where a Termination Event under Section 5(b)(ii) or 5(b)(iii) has occurred ("Party Y"), will, at the option of Party X (and without prior notice to Party Y), be reduced by its set-off against any amount(s) (the "Other Agreement Amount") payable (whether at such time or in the future or upon the occurrence of a contingency) by Party Y to Party X (irrespective of the currency, place of payment or booking office of the obligation) under any other agreement(s) between Party X and Party Y or instrument(s) or undertaking(s) issued or executed by one party to, or in favor of, the other party (and the Other Agreement Amount will be discharged promptly and in all respects to the extent it is so set-off). Party X will give notice to the other party of any set-off effected under this Section 6(f).

For this purpose, either the Early Termination Amount or the Other Agreement Amount (or the relevant portion of such amounts) may be converted by Party X into the currency in which the other is denominated at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the relevant currency.

If an obligation is unascertained, Party X may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section 6(f) shall be effective to create a charge or other security interest. This Section shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise)."

(G)   <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of the Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.  The parties hereto shall endeavor in good faith negotiations to replace the prohibited or unenforceable provision with a valid provision, the economic effect of which comes as close as possible to that of the prohibited or unenforceable provision.

(H)   <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY TRIAL OR LITIGATION ARISING OUT OF OR IN CONNECTION WITH ANY TRANSACTION OR THIS AGREEMENT.

(I)   <u>No Reliance</u>.  In connection with the negotiation of and entering into this Agreement, any Credit Support Document and each Transaction (i) the other party hereto is not acting as a fiduciary or a financial or investment advisor for it; (ii) it is not relying upon any advice, counsel or representations (whether written or oral) of the other party hereto other than the representations expressly set forth in this Agreement, in such Credit Support Document and in any Confirmation; (iii) the other party hereto has not given to it any advice or counsel as to the expected or projected success, return, performance, result, consequence or benefit (either legal, regulatory, tax, financial, accounting, or otherwise) of this Agreement, such Credit Support Document or such Transaction; (iv) it has consulted with its own legal, regulatory, tax, business, investment financial and accounting advisors to the extent it has deemed necessary and has made its own investment, hedging, and trading decisions (including decisions regarding the suitability of such Transaction pursuant to

19

**TD Banknorth**

this Agreement) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the other party hereto; (v) it has determined that the rates, prices, or amounts and other terms of such Transaction in the indicative quotations (if any) provided by the other party hereto reflect those in the relevant market for similar transactions, and all trading decisions have been the result of arms length negotiations between the parties; (vi) it is entering into this Agreement, such Credit Support Document and such Transaction with a full understanding of all of the terms, conditions and risks thereof (economic and otherwise), and it is capable of assuming and willing to assume (financially and otherwise) those risks; and (vii) it is a sophisticated investor.

     (J)    <u>Events of Default</u>. Section 5 of this Agreement is hereby amended as follows:

         (i)    <u>Credit Support Default</u>. Section 5(a)(iii) of this Agreement is hereby amended by the addition of "or if there is no applicable grace period, one Local Business Day after notice of such failure is given to the party or Credit Support Provider (as the case may be)" after "elapsed" in the fourth line thereof.

         (ii)    <u>Default under Specified Transaction</u>. Section 5(a)(v) of this Agreement is hereby amended by the substitution of "(or such default continues for at least one Local Business Day if there is no applicable notice requirement or grace period)" for the parenthetical clause in the seventh and eighth lines thereof.

     (K)    <u>Escrow</u>. If by reason of the time difference between the cities in which payments are to be made or otherwise, it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may at its option and in its sole discretion notify the other party that payments on that date are to be made in escrow. In this case deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instruction (i) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (ii) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it in escrow. The party that elects to have payments made in escrow shall pay the costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not released by 5:00 p.m. local time on the date it is deposited for any reason other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

Signature page follows.

 **Banknorth**

TD Banknorth, N.A.
Derivative Products

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

| "Party A" | "Party B" |
|---|---|
| TD BANKNORTH, N.A. | GRIST MILL PARTNERS, LLC |
| | By: Caroline Financial Group, _Inc_ |
| | Its: Managing Member |
| By: /S/ | By: /S/ |
| Name: David G. Strouse | Name: Daniel E. Carpenter |
| Its: Vice President | Its: Chairman |
| Date: | Date: |

Received for Record at Simsbury, CT
On 08/30/2007 At 4:28:43 pm
Caroline B. Kelly, Town Clerk

21

Exhibit B

**TD Bank**
America's Most Convenient Bank®

Please Return This Portion   P.O. Box 5600
With Your Remittance To:   Lewiston, ME 04243-5600

```
*** BILLING NOTICE ***
BILL DATE 05-19-20
DUE DATE  06-01-20
ACCT
```

███████████████

6680-MTD17000052020495167-100000



```
GRIST MILL PARTNERS LLC
C/O WESTCOTT FINANCIAL GROUP INC
35 TOWER LANE
AVON CT  06001
```

```
PRINCIPAL                          $14,115.00
INTEREST                            $3,248.75

TOTAL AMOUNT DUE                   $17,363.75
CHARGED TO ACCT                    $17,363.75
REMITTANCE AMOUNT                       $.00
```

Total
Amount Enclosed   **$**

⑆5240⑈0730⑆ ████████████ ⑈

---

**TD Bank**
America's Most Convenient Bank®

6680-1-2

THIS NOTICE IS FOR YOUR RECORDS ONLY.  PAYMENT WILL BE DEDUCTED ACCORDING TO YOUR AGREEMENT.

*** BILLING NOTICE ***

```
PRINCIPAL        =      $14,115.00      ACCOUNT NO. ████████████████
INTEREST         =       $3,248.75

TOTAL AMOUNT DUE =      $17,363.75

DUE DATE 06-01-20                       MATURITY DATE 09-01-22
```

```
       TOTAL FINANCE CHARGES PAID LAST YEAR 2019      $80,051.60

   **** IF YOU HAVE ANY QUESTIONS ABOUT YOUR BILL, PLEASE CALL YOUR ACCOUNT   ****
   **** OFFICER.                                                              ****
   ****                                                                       ****
   ****                                                                       ****
```

| DATE | TRANSACTION DESCRIPTION | TRANSACTION AMOUNT | LOAN BALANCE | NO DAYS | INTEREST RATE | INTEREST ACCRUED |
|------|------------------------|--------------------|-----------|-----|-----------|--------------|
| 05-01-20 | BALANCE FORWARD | | 1,793,597.93 | | 2.73450 | 4,087.16 |
| 05-01-20 | INTEREST PAID | | 1,793,597.93 | | 2.12013 | -4,087.16 |
| 05-01-20 | PRINCIPAL PAID | 14,115.00 | 1,779,482.93 | | 2.12013 | |
| 05-01-20 | RATE CHANGE | | | | 2.12013 | |
| 06-01-20 | INTEREST ACCRUAL | | 1,779,482.93 | 31 | 2.12013 | 3,248.75 |

```
BALANCE                               1,779,482.93

CHARGE ACCT XXXXXXXXXXXXX6200  ON 06-01-20    TOTAL CHARGED                     17,363.75
LATE CHARGE TO BE ASSESSED ON 06-15-20            1,041.83
```

TDBN-034 08/16                                                          MEMBER FDIC

Exhibit C

LEASE

by and between

GRIST MILL PARTNERS, LLC

and

CURALEAF, LLC

February 11, 2014

100 Grist Mill Road
Simsbury, Connecticut

12728415-v8

## LEASE WITH OPTION TO PURCHASE

THIS LEASE WITH OPTION TO PURCHASE ("Lease") made the 11th day of February, 2014 (the "Effective Date"), by and between GRIST MILL PARTNERS, LLC, a Delaware limited liability company ("Landlord") with an address at 100 GRIST MILL ROAD, SIMSBURY, CT 06070, and CURALEAF, LLC, a Connecticut limited liability company ("Tenant") with an office at 145 DOUBLING ROAD, GREENWICH, CT 06830.

This Lease is entered into in accordance with the binding fully executed Letter of Intent dated November 5, 2013, as amended on January 8, 2014 and fully executed by the parties on January 9, 2014 (attached hereto as Exhibit 1) (the "Letter of Intent").

### WITNESSETH:

1.    PREMISES.

1.1.    Demise.  In consideration of the rents and covenants herein set forth, Landlord hereby leases to Tenant and Tenant hereby rents from Landlord the premises as defined in Section 1.2 below; TO HAVE AND TO HOLD the Premises unto Tenant, its successors and assigns, for and during the Term (as hereinafter defined), upon and subject to the provisions of this Lease.

1.2.    Leased Premises.  Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the space (the "Premises") consisting of: (i) the piece or parcel of land situated in the Town of Simsbury, County of Hartford and State of Connecticut more commonly known as 100 Grist Mill Road, Simsbury, Connecticut, and as more particularly described in Exhibit 1.2 attached hereto and made a part hereof, together with the easements, rights, and appurtenances thereto belonging or appertaining (the "Land"); (ii) the existing building located on the Land, together with any other improvements, fixtures, machinery or equipment and appurtenances thereto (the "Building"); and (iii) the improved parking area, walkways, accessways, driveways and landscaped and improved exterior areas located on the Land.  Landlord hereby represents that the Land is a tax parcel, shown as Map G11, Block 103, and Lot 005-25 of the Simsbury Tax Assessor's Records, separate from all other tax parcels, and is a legally subdivided lot or parcel under the relevant rules and regulations of the Town of Simsbury.

1.3.    The Powder Forest® Business Park Covenants.  The Premises are located in The Powder Forest® Business Park (the "Park") and are leased to Tenant subject to that certain Declaration of Easements, Covenants, and Restrictions Powder Forest® Business Park Simsbury, Connecticut, dated December 2, 1983, recorded in Volume 271 at Page 546 of the Simsbury Land Records, as amended and restated by a certain Amended and Restated Declaration of Easements, Covenants and Restrictions For The Powder Forest® Business Park, dated the 8th day of December, 1997, recorded in Volume 479 at 795 of the Simsbury Land Records, and as amended by Second Amendment to Declaration of Easements, Covenants and Restrictions For The Powder Forest® Business Park, dated as of the 17th day of November, 2000, recorded in Volume 533, Page 227 of the Simsbury Land Records (as so amended and restated, the "Powder Forest® Business Park Covenants").

1.4   **Common Areas**.

(a)   The Premises are leased to Tenant together with the Common Areas including the right to use parking areas from time to time located on the Land.

(b)   As used in this Lease, the term **"Common Areas"** shall mean all areas, sidewalks, parking areas, access roads and drives, driveways, landscaped areas, truck service ways, and pedestrian walkways, facilities, equipment and signs.

2.   **RENT**.

2.1.   **Payment of Rent**.

(a)   Tenant shall pay to or for the benefit of Landlord, as Rent during each year of the Term, Base Rent and Additional Rent as provided in this Article 2. All payments of Rent and any Additional Rent, except for third-party payments as provided under Section 2.3 of this Lease, shall be paid in U.S. Dollars, by means of wire transfer, to the account of Grist Mill Partners, LLC at TD Bank, N.A. Rent for any month only a portion of which is included in the Term shall be prorated based on the number of days in that month that are included in the Term.

(b)   As used in this Lease, the following terms shall have the following meanings:

(i)   **"Rent"** shall mean Base Rent plus Additional Rent.

(ii)   **"Base Rent"** shall mean the amounts payable by Tenant pursuant to Section 2.2 of this Lease.

(iii)   **"Additional Rent"** shall mean all amounts payable by Tenant pursuant to this Lease, other than Base Rent.

(iv)   **"Lease Year"** shall mean (A) the twelve (12) month period commencing on the first day of the calendar month immediately succeeding the calendar month in which the Commencement Date occurs, unless the Commencement Date occurs on the first day of any calendar month, in which event such twelve (12) month period shall commence on the Commencement Date, and (B) each twelve (12) month period commencing on each anniversary of the first day of the twelve (12) month period identified in the immediately preceding clause (A); provided, however, that (x) if the Commencement Date does not occur on the first day of any calendar month, then the first Lease Year shall also include the period of time from the Commencement Date until the first day of the calendar month immediately succeeding the calendar month in which the Commencement Date occurs, and (y) if this Lease expires or is cancelled or terminated prior to the end of any such twelve (12) month period, then the then-current Lease Year shall end upon such expiration, cancellation or termination.

2

(v)     "**Commencement Date**" shall mean the date when all state and municipal permits and approvals for the Tenant to operate its business have been granted and any applicable appeal periods therefore have expired, and the building has been fully vacated by any tenants in place on the date hereof. Landlord shall have a minimum of ninety (90) days, but no more than one hundred eighty (180) days from the Effective Date, to turn over the Premises free and clear of all other tenants or occupants. Notwithstanding the foregoing, and subject to Section 17.3 of this Lease, Landlord shall, within thirty (30) days after the Effective Date, vacate and turn over the Clean Room Space (as that term is defined herein) for use and inspection by Tenant in accordance with the terms of Section 17.3; provided, however, Landlord shall provide Tenant with access to the Clean Room Space as of the Effective Date, which access shall be provided through the Facilities Manager (as herein defined).

(vi)    "**Expiration Date**" shall mean: (A) the date five years from the Commencement Date; or (B) if the Term is extended pursuant to Article 18 of this Lease, the tenth (10th) anniversary of the Commencement Date; or (C) if Tenant exercises its Option pursuant to <u>Section 3.2</u> hereof, the date of the Closing of the purchase and sale of the Premises pursuant to the Option.

(vii)   "**Prime Rate**" shall mean, as of the date of any determination thereof pursuant to this Lease, the prime rate most-recently published in the Money Market Column of *The Wall Street Journal*.

(viii)  "**Tax Year**" shall mean each consecutive twelve (12) month period commencing July 1 and ending on the immediately following June 30.

**2.2.    Base Rent**.  Except as modified herein, beginning on the Commencement Date and ending on the last day of the twenty-fourth full calendar month of the Term, Tenant shall pay to Landlord rent (the "<u>Base Rent</u>") at the annual rate of Seven Hundred Twenty Thousand and No/100 Dollars ($720,000.00), payable in equal monthly payments of Sixty Thousand and No/100 Dollars ($60,000.00), in advance on the first day of each calendar month during the Term, at Landlord's address set forth above, or at such other address as Landlord may specify by written notice to Tenant from time to time. Except as modified herein, beginning on the first day of the twenty-fifth full calendar month of the Term and ending on the last day of the sixtieth full calendar month of the Term, Tenant shall pay to Landlord Base Rent at the annual rate of One Million Four Hundred Forty Thousand and No/100 Dollars ($1,440,000.00), payable in equal monthly payments of One Hundred Twenty Thousand and No/100 Dollars ($120,000.00), in accordance with the terms herein.

**2.3.    Taxes and Operating Expenses**

(a)     **Operating Expenses**.  Tenant covenants and agrees to pay directly during the Term of the Lease, all operating expenses of the Lease premises, including any and all personal property taxes on the Premises, but excluding any real property taxes on the Premises, and to hold landlord harmless and indemnify it for all loss cause or damage it may suffer by reason of Tenant's failure to

3

pay said sums. Likewise Tenant shall reimburse Landlord for any real property taxes on the Premises which are assessed and billed by reason of Tenant improvements to the Premises which result in assessment of taxes upon the Premises which are in excess of the amounts which would be due had Tenant not made such improvements.

(b)    **Utility and Other Services**.  Tenant shall pay or cause to be paid, directly to the utilities and suppliers, all charges for sewer, water, electrical, janitorial, telephone, or other service used in or rendered or supplied to the Premises for Tenant's benefit throughout the Term, and to indemnify Landlord and save it harmless against any liability or damages on such account.

(c)    **Taxes**.  Landlord shall be responsible for and shall pay all real property taxes levied upon the Premises, provided that it shall be reimbursed by Tenant for all amounts apportionable to Tenant improvements as provided in paragraph (a) above.

(d)    **Contesting Tax Assessments**.  If Tenant shall at any time object to any tax imposed upon the Premises during the Term as being excessive or otherwise unjust, Tenant shall have the right but not the obligation to contest, at its expense, said tax in the manner provided by law.  Any proceeding or action to contest any such tax shall, if required by law, be filed in the name of Landlord, and Landlord shall cooperate in such efforts and assist Tenant in any manner reasonably requested by it, including making available to Tenant detailed information with respect to the Premises and its tenants as any of the same may bear upon Tenant's efforts to contest such tax.  All of such proceedings shall be under the direct control of Tenant and its counsel.

(e)    **Landlord's Recoupment of Expenses for Contesting Taxes**.  To the extent that Landlord incurs costs or expenses in connection with such proceedings, such reasonable actual costs or expenses shall be reimbursable to Landlord upon Landlord's submitting to Tenant its statement subject to Tenant's audit and approval, not more frequently than quarterly.

(f)    **Tax Savings**.  Any tax savings resulting from any such proceedings shall first be used to pay the reasonable expenses which Tenant shall incur under this Article, and the balance, if any, shall be allocated to reduce taxes for the period or periods for which the refund was obtained or to which the tax savings shall apply, in accordance with the final determination of such contest.

2.4.    **Late Charges; Dishonored Checks**.  If any Rent (or any installment thereof) required to be paid to Landlord under this Lease is not paid in full within ten (10) days after the same shall be due, or if any payment required to be made to Landlord under this Lease on demand is not paid in full within ten (10) days after demand, then (a) a late fee equal to five percent (5%) of the overdue amount shall be immediately due and payable by Tenant as Additional Rent, and (b) at Landlord's option, interest shall accrue on the overdue amount, from the due date thereof until the date of payment, at the greater of (i) twelve percent (12%) *per annum*, or (ii) three percentage points (3%) above the Prime Rate in effect on the due date thereof; provided, however, that in no event shall that interest rate exceed the highest rate *per annum* permitted by applicable law.  Any such interest shall be due and payable on demand.  This provision, or payment by Tenant hereunder,

4

or action taken by Landlord hereunder shall not diminish or abrogate Tenant's duty to pay Rent when due, or Landlord's rights to declare an event of default for late payment as provided elsewhere in this Lease.

If any check given to Landlord by Tenant shall not be honored by the bank upon which it is drawn, Landlord, at its option, may require that all payments by Tenant to Landlord over the succeeding twelve (12) months be made by certified check or wire transfer. Tenant shall also be responsible for all costs and fees incurred by Landlord in connection with a dishonored check. Landlord's exercise of the remedies available to it under this Section 2.4 shall not preclude Landlord from exercising any of the other rights and remedies available to Landlord under this Lease, at law, or in equity (including, but not limited to, the late charge provided for in Section 2.4 above).

2.5.    **Covenant to Pay Rent.**  All Rent (and all installments thereof) shall be due at the time or times stipulated in this Lease and shall be due and payable in full, without prior notice or demand (except in the case of any payment payable on demand as provided in this Lease) and without abatement, reduction, recoupment, offset or deduction (except as otherwise specifically provided in this Lease). Tenant's covenant to pay Rent shall at all times exist as an independent covenant.

2.6.    **Nonpayment of Rent.**  In the event of nonpayment of Additional Rent, Landlord shall have the rights and remedies herein provided for in the case of nonpayment of Rent.

2.7.    **Rubbish Removal and Storage.**  Tenant shall keep all garbage and refuse in the types of containers reasonably specified by Landlord, and shall keep all refuse inside the Premises prepared for collection in the manner reasonably specified by Landlord. In the event that Landlord provides a service for the pick-up of refuse and garbage, Tenant shall use the same at Landlord's cost.

2.8    **Security Deposit/Surety.**  Landlord acknowledges that it has received from Tenant the sum of Two Hundred Forty Thousand and 00/100 Dollars ($240,000.00) in cash, by means of wire transfer, to the account of Grist Mill Partners, LLC at TD Bank, N.A., set forth in Section 2.1(a) above (the "Security Deposit"). The Security Deposit will be held by Landlord, as security and without any obligation to segregate the security Deposit from other funds held by Landlord, for and during the Term, which deposit shall be returned to Tenant, within thirty (30) days after the expiration of the term of this Lease or the earlier termination of this Lease in accordance with the terms herein, provided there exists no breach of any undertaking of Tenant, or upon the sale of the Premises pursuant to the Option provided in Section 3 herein. If all or any part of the Security Deposit shall be applied to an obligation of Tenant hereunder, Tenant shall immediately upon request by Landlord restore the Security Deposit to its original amount. Tenant shall not have the right to call upon Landlord to apply all or any part of the Security Deposit to cure any default or fulfill any obligation of Tenant, but such use shall be solely in the discretion of Landlord. Provided that Landlord gives Tenant notice of the name of such grantee or transferee, upon any conveyance by Landlord of its interest under this Lease, the Security Deposit shall be delivered by Landlord to Landlord's grantee or transferee. Upon written confirmation of

5

any such delivery by Landlord's grantee or transferee, Tenant hereby releases Landlord herein named of any and all liability with respect to the Security Deposit, its application and return, and Tenant agrees to look solely to such grantee or transferee. This provision shall also apply to subsequent grantees and transferees. Tenant acknowledges and agrees that, in light of the nature of the Tenant's business and the extent to which the Tenant's improvements to the Premises have a single purpose and render it unusable for any other purpose, the Security Deposit is a commercially reasonable requirement of the Landlord.

3.     **TERM; OPTION TO PURCHASE.**

   **3.1     Term.**  Unless extended or terminated as hereinafter provided, the initial term of this Lease ("**Term**") shall be for a period of five (5) years commencing on the Commencement Date and ending at 11:59 p.m. (Eastern Standard time) on the Expiration Date or on the date of any earlier cancellation or termination of this Lease pursuant to this Lease or pursuant to applicable law or mutual written agreement of Landlord and Tenant.  The Term of this Lease may be extended at the election of Tenant in accordance with Article 18.

   **3.2     Option to Purchase.**  Provided Tenant is not in default under this Lease and this Lease is then in effect, Tenant shall have the sole and exclusive option to purchase the Premises during the Term of this Lease (as such Term may be extended pursuant to Article 18).  Subject to the further provisions of this Section 3.2 and **Exhibit 3.2** attached hereto and made a part hereof (the "**Option**"), the purchase price shall be $5,000,000.00, less the Option Deposit (as defined below), plus the Option Fee (as defined below), if any, less the Clean Room Excess Costs (as that term is defined in Section 17.3), if any (the "**Purchase Price**").  In order to exercise this Option, Tenant must notify Landlord in writing of its exercise of this Option not later than thirty (30) days prior to the date of the Closing (as defined herein) (the "**Option Notice**") and, at the time of such notification, must pay to Landlord a nonrefundable deposit of ten percent (10%) of the Purchase Price (the "**Option Deposit**").  At Closing (as defined below), the Option Deposit and the Clean Room Excess Costs, if any, shall be credited against the Purchase Price.  Within sixty (60) days after the date of such notice, Tenant must purchase the Premises for the Purchase Price, by bank check or wire transfer, at time of Closing.

   If the Option Notice is made on or before the last day of the twenty-fourth full calendar month of the Term, the Tenant shall tender to Landlord a fee (the "**Option Fee**") concurrently with the delivery of the Option Notice, which fee shall be equal to the sum obtained by multiplying (a) Sixty Thousand and NO/100 ($60,000.00) Dollars by (b) the number of full calendar months having elapsed in the time period commencing on the Commencement Date and ending on the date of the Option Notice, provided that Tenant shall not be required to tender to Landlord an Option Fee if the Option Notice is made after the last day of the twenty-fourth full calendar month of the Term.  The Option Notice shall specify therein a date not later than one hundred twenty (120) days following the date of the Option Notice for the closing of the purchase and sale contemplated in this Option (the "**Closing**").

6

At Closing the Landlord shall convey marketable title subject only to such easements and restrictions as of record appear. The deed of conveyance to the Premises shall be a full covenant Warranty Deed in the usual Connecticut form, which shall be duly executed, acknowledged and delivered. Landlord shall pay the applicable conveyance taxes to the State of Connecticut and to the town in which the Premises are located. Landlord shall sign all necessary affidavits, shall provide a transferor's tax identification number, and shall cooperate with the Tenant to insure compliance with federal foreign transfer laws (FIRPTA). The Closing shall take place at the office of the Landlord's attorney at which time the Landlord will deliver a deed to said Premises upon payment of the aforementioned Purchase Price.

Adjustments of taxes, sewer and water and the like shall be in accordance with the closing customs of the local bar association. In the event the conveyance of the Premises to the Tenant is subject to the provisions of Connecticut General Statutes Sections 22a-134 et seq., as the same may be hereafter modified or amended, or any similar local, state or federal laws, ordinances or regulations respecting the transfer of premises on which or from which there has been pollution of any nature, then, except for pollution caused by Tenant, its agents, contractors or affiliates after the Commencement Date of this Lease, Landlord shall be required to perform or pay for any cleanup or remediation and make any filings, certifications or undertakings with respect to such pollution, including but not limited to any filings, certifications or undertakings required to be made to the Connecticut Department of Energy and Environmental Protection, the U.S. Environmental Protection Agency, or any other or similar governmental agency or entity; all of which cleanup, remediation, filings, certifications and undertakings, and the costs and expenses thereof, shall be the sole obligation of the Landlord.

This Option may be exercised by any assignee of this Lease or any successor in interest to Tenant without the permission of the Landlord, provided however, that said assignee shall pay the entire Purchase Price set forth above in cash at the time of closing.

Except for Landlord performing its obligations required under that certain Mortgage Deed recorded in Volume 743 at Page 398 et seq. and that certain Collateral Assignment of Leases and Rentals recorded in Volume 743 at Page 444 et seq. of the Simsbury Land Records, during the Term, Landlord shall not otherwise transfer, assign, grant, convey, encumber, hypothecate, amend or permit to be encumbered in any way the Premises or this Lease (any such event, a "Prohibited Landlord Transfer") without the prior written consent of Tenant which may be withheld by Tenant in Tenant's absolute discretion. Landlord shall advise Tenant in writing of any Prohibited Landlord Transfer promptly upon learning thereof and shall also advise Tenant in writing of the proposed actions Landlord intends to take to cure the Prohibited Landlord Transfer. Notwithstanding the foregoing, Landlord reserves the right to transfer, assign, grant, convey, encumber or permit to be encumbered in any way the Premises or this Lease in connection with any utilities servicing the Premises or the Building and approved in advance by Tenant and Landlord, provided that there is no encumbrance filed in the public records of the Town or the State that would preclude Tenant from obtaining marketable title to the Premises and the Building.

7

4.    QUIET ENJOYMENT.

Landlord covenants it has good and sufficient title to the Premises and full right and authority to make this Lease. Landlord covenants and agrees that if, and so long as, Tenant pays all Rent and observes and performs all provisions of this Lease required to be observed and performed by Tenant, Tenant's quiet and peaceful enjoyment of the Premises during the Term shall not be disturbed or interfered with by Landlord or any person claiming by, through or under Landlord.

5.    LANDLORD'S ACCESS TO PREMISES

5.1.    Landlord hereby acknowledges that because Tenant is intending to become a licensed medical marijuana producer pursuant to the State of Connecticut Regulations issued by the Department of Consumer Protection ("DCP") (Sections 21a-408-1 through 21a-408-70, inclusive (the "Regulations")) it will be subject to the Regulations that limit access by non-licensed individuals to the Premises and further acknowledges that, notwithstanding any of the terms and conditions of the Lease, the Landlord shall have limited access to the Premises pursuant to Section 21a-408-20 and Section 21a-408-53(f) and (g) of the Regulations. The Lease shall be interpreted to include all such restrictions imposed by the Regulations. Any access permitted to the Landlord will be subject to review and approval by the DCP and will be subordinate to the rights and controls imposed by the Regulations.

5.2.    Subject to the foregoing requirements and prior approval by DCP as required by the Regulations, the Landlord and Tenant acknowledge that Prescott Construction Management, LLC shall act as the designated facilities manager ("Facilities Manager") (attention Kevin West and Kevin Lazich), but either Landlord or Tenant may change the Facilities Manager upon 90 days advance written notice to the other party and to the then designated Facilities Manager. The replacement Facilities Manager must be approved by the party not choosing to replace the prior Facilities Manager. Such approval shall not be unreasonably withheld.

5.3    Nothing contained in this Article 5 shall be deemed or construed to impose upon Landlord any obligation, responsibility or liability whatsoever for the care, supervision or repair of the Premises or Building, other than as provided in this Lease.

5.4.    Notwithstanding any contrary in this Lease, the provisions of this Article 5 shall supersede any inconsistent provisions of this Lease concerning access to the Premises by Landlord, its agents, employees or contractors, and the Facilities Manager.

8

6.        WASTE; YIELDING UP; ETC.

6.1      Waste.  Tenant agrees to commit no waste at the Premises.

6.2      Yielding Up.  At the end of the Term (as it may be extended pursuant to Article 18): (a) Tenant shall quit and surrender the Premises in as good state and condition as reasonable use and wear thereof will permit or in its "as is" condition if this Lease has been terminated in accordance with Articles 11 or 12; (b) Tenant shall remove its furniture, art work, personal property and trade fixtures installed by Tenant, and shall restore any damage caused by that removal;. (c) Tenant may, at its option, remove any other equipment or fixtures that it shall have installed which are specific to and required for the conduct of its proposed business at the Premises.

6.3.     Damage.      All damage or injury to the Premises and to its fixtures, appurtenances and equipment or to the Building and its fixtures, appurtenances and equipment caused by Tenant moving property, fixtures or equipment in or out of the Premises or Building or caused by the negligence or intentional wrongful acts or omissions of Tenant, its servants, employees, agents, visitors and licensees shall be repaired, promptly by Tenant at its sole cost and expense to the reasonable satisfaction of Landlord.

## MAINTENANCE, REPAIR AND ALTERATIONS; SIGNS.

7.1.     Landlord and Tenant Repair.

(a)      Throughout the Term, Landlord shall keep and maintain the Premises, all systems serving the Building and all structural components of the Building (including the roof) in good order, condition and repair (reasonable wear and tear excepted) and in such order, condition and repair as shall be required to comply with all applicable laws and all requirements of insurance carriers and any applicable Board of Underwriters, Rating Bureau or similar body, making all necessary structural repairs and replacements required in connection therewith.  Tenant shall (i) maintain and repair the heating, ventilation and air conditioning systems serving the Premises in good working order and condition and cause those systems to maintain reasonably comfortable temperatures in the Premises, (ii) maintain and repair the electrical, plumbing and other systems (including special purpose systems installed by Tenant for Tenant's sole use) serving the Premises in good working order and condition, and (iii) maintain and repair the Common Areas and keep the Common Areas in good and orderly condition and repair (reasonable wear and tear excepted).  If any such repair is required by reason of the negligence or intentional wrongful acts or omissions of Tenant or of any of its contractors, employees or customers or other person using the Premises with Tenant's consent, or Tenant's failure to perform any of its obligations under this Lease, then Landlord may, at its option direct the Facilities Manager to make such repair and add the cost thereof to the Rent which shall thereafter become due.  Landlord agrees that Tenant shall have unrestricted access, without prior consent of Landlord, to the roof for the purpose of carrying out Tenant's obligations set forth in this Section.  Landlord's obligations under this subsection are subject to Tenant's maintenance and repair obligations under this Lease and the provisions of Articles 11 and 12 of this Lease.

9

(b)     In carrying out any work required or authorized pursuant to this Lease, Landlord shall direct the Facilities Manager to use reasonable efforts to avoid unreasonable interference or interruption of Tenant's business operations and Tenant's use and enjoyment of the Premises. Subject to that obligation, (i) Landlord may, during the progress of any work in or on the Premises authorized pursuant to this Lease, keep and store upon the Premises all necessary materials, tools and equipment without the same constituting a constructive eviction of Tenant in whole or in part, (ii) the Rent shall not abate while any such work is in progress by reason of loss or interruption of Tenant's business or otherwise, (iii) Landlord shall not be liable for inconvenience, annoyance, disturbance, loss of business or other damage to Tenant by reason of the performance of any such work or on account of bringing materials, supplies and equipment into or through the Premises during the course of any such work in or on the Premises (except to the extent cause by Landlord's or its agents or contractors, negligence or intentional wrongful acts or omissions), and (iv) the obligations of Tenant under this Lease shall not thereby be affected in any manner whatsoever.

(c)     Tenant, at its own cost and expense and in addition to the obligations contained in (a) above, shall keep and maintain in good order, condition and repair the Premises and every part thereof (including fixtures and equipment therein, and interior walls, floors and ceilings), reasonable wear and tear excepted and subject to Landlord's maintenance, repair, replacement and restoration obligations under this Lease and the provisions of Articles 11 and 12 of this Lease. All material and labor supplied by Tenant in performing its obligations under this subsection shall be of the kind and quality at least equal to the original work.

(d)     If any repairs required to be made by Tenant hereunder are not made within thirty (30) days after written notice delivered to Tenant by Landlord, or if such repairs are of a nature that they cannot be completed within thirty (30) days, then if Tenant, within such thirty (30) day period has not commenced such repair or having commenced such repairs, thereafter fails to diligently complete such repairs, then Landlord may, at its option, direct the Facilities Manager to make such repairs without liability to Tenant for any loss or damage which may result to its stock or business by reason of such repairs, and Tenant shall pay to Landlord, as Additional Rent, upon demand, the reasonable cost of such repairs plus interest from the date of payment by Landlord until repaid by Tenant.

(e)     Notwithstanding anything herein to the contrary, Tenant shall not be responsible for (and Landlord shall be solely responsible for) replacement of any structural item, including without limitation, all equipment, facilities, pipes, lines and systems (including without limitation the heating, ventilation and air conditioning systems) serving the Premises and the Building, and all interior and exterior and structural elements of the Building, including without limitation. the doors. walls, windows, glass. ceilings. floors, foundation. and roof.

(f)     Except as provided in this Lease, Landlord shall have no obligation to repair or maintain the Premises.

7.2.   **Tenant's Alterations.**

(a)     Upon full execution of this Lease. and in accordance with the terms of this Lease,

10

Tenant shall diligently pursue obtaining all necessary building permits, licenses and other governmental approvals necessary in connection with the build-out of the plans attached hereto as **Exhibit 7.2**, which plans conform to the special permit approval obtained by Tenant from the Town of Simsbury and the medical marijuana production facility license issued by the State of Connecticut Department of Consumer Protection to Tenant ("Tenant's Initial Alterations"). Notwithstanding anything herein to the contrary, upon execution of this Lease, Landlord is deemed to have approved all plans in connection with Tenant's Initial Alterations.

(b)    Tenant, at its sole cost and expense, shall have the right, during the Term of this Lease, to make such alterations, changes and/or improvements (individually and collectively, "Alterations") to the interior of the Premises as Tenant may deem necessary for its use and business, including Tenant's Initial Alterations; provided, however, Landlord's consent shall be obtained prior to (i) any Alterations to the interior costing in excess of $20,000 in any twelve-month period; (ii) any Alterations to the interior visible from the exterior of the Premises; (iii) any structural Alterations; (iv) any Alterations to any interior walls (whether or not load-bearing); (v) any Alterations to any electrical, plumbing or mechanical systems (including, but not limited to, the heating, ventilating and air conditioning systems) costing in excess of $75,000 in any twelve month period; (vi) any increase in the size of the Premises (including, but not limited to, the construction or expansion of any mezzanine); or (viii) any work on or affecting the roof of the Premises (including, but not limited to, the replacement of a heating, ventilating and air conditioning unit). Additionally, in connection with any Alterations by Tenant, Tenant, at its sole cost and expense, shall (i) timely secure all building permits, licenses and other governmental approvals necessary for the performance and completion of its Alterations (and provide Landlord with copies of all such documents); (ii) otherwise comply with all laws relating to the performance and completion of said Alterations; (iii) provide and pay for all water, sewer, electricity, heat and any other utilities used by Tenant or its agents for the performance of Alterations on the Premises; (iv) prior to the commencement of Alterations, obtain all insurance coverage required under this Lease (together with workers' compensation insurance as required by Laws); (v) ensure that all materials, equipment and appliances used in Alterations and all trade fixtures installed are new and first quality items; and (vi), if applicable, complete such Alterations in accordance with plans and specifications approved by Landlord.  Tenant shall not employ any unfit person or anyone not skilled in the job he is performing and, if applicable, Tenant shall name Landlord a party beneficiary in the above mentioned insurance.  Tenant shall be directly responsible for any and all damages resulting from any violation of the terms of this Section 7.2, and Tenant shall be responsible for reimbursing Landlord for any repairs and restoration required in connection with any Tenant Alterations.  Except as set forth herein, Tenant shall not be permitted to make any Alterations to the exterior of the Premises.  Notwithstanding the foregoing, nothing herein shall require Tenant to repair, maintain, or replace any or all of the mechanical or structural elements of the Premises and Building that are included in Landlord's obligations under Section 7.1 of this Lease.

11

(c)     In connection with any Alterations with respect to which Landlord's prior consent is required pursuant to this Section, Tenant shall (i) prepare, at its sole cost and expense, complete plans and specifications for all such Alterations (the "Plans"), (ii) have the Plans signed and sealed by Tenant's licensed architect, and (iii) submit the Plans to Landlord or Landlord's designated representative for approval, which approval shall not be unreasonably withheld, conditioned or delayed, prior to commencement of any Alterations. If Landlord does not provide approval within fifteen (15) days after receipt of the Plans, Landlord shall be deemed to have approved the Plans.

(d)     All construction work done by Tenant or Landlord within the Premises or in the Building shall be performed in good workmanlike manner in compliance with all governmental requirements and Laws, in compliance with all the provisions of this Lease and at such times and in such manner as to cause a minimum of interference with other construction in progress and with the transaction of business in the Building.

7.3.    **Signs.**  Tenant will not place or suffer to be placed or maintained on the exterior of the Premises or Building or within the Common Areas any sign, lettering, advertising matter or similar thing of any kind, and will not place or maintain any sign, lettering, advertising matter, decoration or similar thing on any door or window of the Premises without first obtaining Landlord's written approval therefor. Tenant will maintain any such approved sign, lettering, advertising matter, decoration or similar thing in good condition and repair at all times (reasonable wear and tear excepted). Tenant understands and agrees that all signs installed by or on its behalf must also be reviewed and approved by the Town of Simsbury, at Tenant's cost and expense, and must be permitted under the Powder Forest® Business Park Covenants. If Tenant shall do any of the foregoing acts in contravention of this provision, then Landlord shall have the right to remove any such sign, lettering, advertising matter, decoration or similar thing, and restore the affected portion of the Building to the condition thereof prior to such act, and the cost of such removal and restoration shall be paid by Tenant as an additional charge. Notwithstanding the foregoing, Tenant shall be entitled to install signage at its sole cost and expense affixed to the exterior of the Building above the main entrance to the Premises provided: (i) Tenant obtains Landlord's prior written consent (which shall not be unreasonably withheld, delayed or conditioned), (ii) such signage is authorized by applicable laws and ordinances, and (iii) such signage is in compliance with the Powder Forest® Business Park Covenants. Tenant agrees to diligently pursue, and to cause its agents to diligently pursue, all necessary permits to install signage approved by Landlord pursuant to this Section 7.3 (or not required to be approved) on the exterior of the Building, including the obtaining of a sign variance if necessary, and Landlord shall cooperate with Tenant in the installation of this signage, provided such efforts on the part of Landlord do not entail unusual or unreasonable costs or expenses or require Landlord to undertake or participate in litigation or similar proceedings. Landlord agrees that, so long as Tenant or any affiliate of Tenant occupies space in the Building, the monument sign located at the intersection of Grist Mill Road and the entrance drive on the Premises shall contain no lettering other than "100 Grist Mill".

8.    **USE OF PREMISES.**

Except as otherwise provided in the following sentence of this Article 8; Tenant shall use and occupy the Premises only for the purpose of producing medical cannabis and related products and for any lawful purposes incidental thereto (the "Intended Uses"). Such use by Tenant shall not be grounds for default under this Lease. Tenant shall not use the Premises for any other purpose whatsoever except with the prior written consent of Landlord.

9.    **COMPLIANCE WITH LAWS.**

9.1.    **Tenant Indemnity.** Except for the negligence or intentional wrongful acts or omissions of Landlord, its agents, contractors or employees, Tenant shall indemnify Landlord and save it harmless from suits, actions, damages, liability and expense in connection with loss of life, personal injury or property damage arising from or out of the occupancy or use by Tenant, its agents, contractors or employees of the Premises or the Building. In the event that Landlord shall, without fault on its, part be made a party to any litigation commenced by or against Tenant on account of the occupancy or use by Tenant, its agents, contractors or employees of the Premises or the Building, Tenant shall protect and hold Landlord harmless and shall pay all Landlord's reasonable costs, expenses and attorneys' fees in connection therewith.

9.2.    **Tenant Insurance.** At all times during the Term, Tenant shall pay all premiums for and maintain in effect with an insurance company or companies reasonably acceptable to Landlord, policies of insurance for the benefit of Landlord and Tenant, as their interests may appear, as follows:

(a)    Insurance covering Tenant's trade fixtures, furniture, furnishings, equipment and other installations of Tenant not otherwise covered under Landlord's insurance coverage as described in Section 9.7 herein providing protection to the extent of not less than the full replacement cost thereof against all casualties included under standard insurance industry practices within the classification "Fire and Extended Coverage, Vandalism and Malicious Mischief," and insurance covering sprinkler leakage; and

(b)    Automobile Liability Insurance, covering all owned and hired automobiles to be used by Tenant for business purposes, should be procured with the following minimum limits: Bodily Injury and Property Damage $1,000,000 each occurrence, $1,000,000 aggregate; and

(c)    Comprehensive public liability insurance in the amount of at least Two Million Dollars ($2,000,000) for any occurrence resulting in bodily or personal injury to or the death of one person and consequential damages arising therefrom, in the amount of at least Two Million Dollars ($2,000,000) for any occurrence resulting in bodily injury and personal injury to or the death of more than one person and consequential damages arising therefrom and comprehensive property damage insurance covering liability for damage to all property in the amount of at least Two Million Dollars ($2,000,000) for each occurrence.

13

9.3    Tenant will furnish to Landlord prior to Tenant entering on the Premises copies of policies or certificates of insurance evidencing coverages required by this Lease. All policies required hereunder shall contain an endorsement providing that the insurer will not cancel, fail to renew or materially change the coverage of said policy or policies without first giving ten (10) days' prior written notice thereof to Landlord.

9.4    **Landlord Indemnity.**  Except for the negligence or intentional wrongful acts or omissions of Tenant, its agents, contractors or employees, Landlord shall indemnify Tenant and save it harmless from suits, actions, damages, liability and expense in connection with loss of life, personal injury or property damage arising from or out of the occupancy or use by Landlord its agents, contractors or employees of the Premises or the Building. In the event that Tenant shall, without fault on its part, be made a party to any litigation commenced by or against Landlord on account of events concerning the occupancy or use by Landlord its agents, contractors or employees of the Premises or the Building, Landlord shall protect and hold Tenant harmless and shall pay all Tenant's reasonable costs, expenses and attorneys' fees in connection therewith.

9.5    **Landlord's Insurance.**  Landlord shall keep the Land and Building and the fixtures appurtenances and equipment therein (other than Tenant's property) insured in the name and for the benefit of Landlord and the holders of mortgages on the Land and Building as their interests may appear, against all risks normally insured against in the usual fire and extended coverage policies written in Connecticut, including vandalism and malicious mischief, in an amount at least equal to one hundred percent (100%) of the full insurance replacement value thereof, exclusive of foundations, with a deductible of no less than One Thousand and 00/100 Dollars ($1,000.00). Landlord shall further carry comprehensive general liability insurance in an amount of not less than Two Million Dollars ($2,000,000) for injury or loss of life to one person in one accident and not less than Two Million Dollars ($2,000,000) for property damage in any one occurrence in or about the Premises.

9.6    **Waiver of Subrogation.**  Notwithstanding anything to the contrary in this Lease, Landlord and Tenant hereby waive and release each other of and from any and all rights of recovery, claims, actions, or causes of action against each other or their agents, officers, partners, representatives, employees, servants, contractors and invitees for any loss or damage that may occur to the Premises, the Building, improvements or fixtures therein or thereon, or any personal property within the Premises, from any cause whatsoever which would be covered by an insurance required to be carried by Tenant or Landlord pursuant to this Section, or which actually is insured against under the terms of an all-risk fire and extended coverage insurance policy, regardless of cause or origin, including the negligence of Landlord or Tenant or their agents, officers, partners, representatives, servants, employees, contractors, or invitees.

14

10.    ASSIGNMENT, SUBLETTING, HYPOTHECATION AND TRANSFER OF LEASE.

10.1.   _Assignment and Subletting._  Except as herein provided and as provided in Section 10.3. Tenant shall not transfer, assign, sublet, enter into license or concession agreements, change ownership of, mortgage or hypothecate this Lease or Tenant's interest in and to all or any part of the Premises without first procuring the written consent of Landlord, which consent Landlord shall not unreasonably withhold, delay or condition.  Any attempted or purported transfer, assignment, subletting, license or concession agreement, change of ownership, mortgage or hypothecation (hereinafter "**Transfer**") without Landlord's written consent pursuant to this Section 10.1 or Section 10.3 shall be void ab initio and confer no rights upon any third person.  The consent by Landlord to any Transfer shall not constitute a waiver of the necessity for such consent to any subsequent Transfer.  Nothing herein contained shall relieve Tenant from its covenants and obligations for the Term.  Tenant agrees to reimburse Landlord for Landlord's reasonable attorney's fees and expenses incurred in conjunction with the processing and documentation of any such requested Transfer of this Lease or Tenant's interest in and to the Premises.

10.2.   **Documentation Required.**  Each Transfer to which there has been consent shall be by an instrument in writing in form reasonably satisfactory to Landlord, and shall be executed by Tenant and the transferee, assignee, sublessee, licensee, concessionaire or mortgagee ("**Transferee**") in each instance, as the case may be.  Each Transferee shall agree in writing for the benefit of Landlord herein to assume, to be bound by, and to perform the provisions of this Lease to be done, kept and performed by Tenant, including the payment of all amounts due or to become due under this Lease directly to Landlord.  Failure to first obtain in writing Landlord's consent or failure to comply with the provisions of this Article 10 shall operate to prevent any such Transfer from becoming effective.

10.3.   **Affiliate.**  Tenant may assign this Lease, grant possession to, or sublet all or any portion of the Premises to an Affiliate, without Landlord's prior written consent; provided, however, if either or both of April Arrasate or Eileen Konieczny are employed by Tenant, then either or both, as the case may be, must first consent to such assignment for it to be effective.  An "**Affiliate**" shall mean any person controlling, controlled by or under common control with Tenant, or any entity resulting from a merger or consolidation with Tenant or which acquires all or substantially all Tenant's assets.

10.4.   "**Tenant" Shall Include Approved Assignees and Subtenants.**  In the event that Tenant assigns this Lease to an Affiliate or Landlord shall agree to any Transfer of Tenant's interest in this Lease, then the term "Tenant" shall thereafter be deemed to include, without further reference, the party to whom such interest is transferred, and such party shall assume all rights and obligations of Tenant under this Lease, including without limitation the Option set forth in Section 3 of this Lease.  If the Lease be assigned or if the Premises or any part thereof be occupied by anybody other than Tenant, then Landlord may collect rent from the assignee or occupant and apply the net amount collected to the rent herein reserved, but no such assignment, subletting, occupancy or collection shall be deemed a waiver of any of the provisions of this

15

Lease or the acceptance of the assignee, subtenant or occupant as Tenant or as a release of Tenant from the further performance of the provisions of this Lease. Notwithstanding any assignment or sublease, Tenant shall remain fully liable and shall not be released from performing any of the provisions of this Lease.

10.5. **"Tenant" Liability Joint and Several** If there shall be more than one Tenant they shall all be bound jointly and severally by the provisions of this Lease and the word "Tenant" shall be deemed and taken to mean each and every person or party mentioned as a Tenant herein, be the same one or more; and if there shall be more than one Tenant, any notice required or permitted by the provisions of this Lease may be given by or to any one thereof. No rights, however, shall inure to the benefit of any assignee of Tenant unless the assignment to such assignee has been approved by Landlord in writing as aforesaid.

10.6. **Successor to Landlord's Interest: Liability of Landlord.** The term "Landlord," as used in this Lease, shall be limited to mean the party executing this Lease as Landlord, its successors and assigns, and in the event of any transfer or transfers of the interest of Landlord in the Premises, the said Landlord (and in case of any subsequent transfers or conveyances, the then grantor) shall be automatically freed and relieved from and after the date of such transfer or conveyance of all liability as respects the performance of any provisions of this Lease on the part of said Landlord thereafter to be performed, provided that any amount then due and payable to Tenant by Landlord, or the then grantor, under any provisions of this Lease, shall be paid to Tenant. Landlord and Tenant agree that the provisions of this Lease to be kept and observed by Landlord shall, subject as aforesaid, be binding on Landlord, its successors and assigns, only during and in respect of their respective successive periods of ownership. Further, Landlord's liability under this Lease shall be limited to and include only the interest of Landlord in the Premises.

11. **DAMAGE AND DESTRUCTION**

11.1 **Partial Damage**. In the event that the Premises shall be partially damaged by fire or other casualty, the damage shall be repaired by and at the expense of Landlord as quickly as possible, but in no event later than forty-five (45) days from the date of damage, and the Base Rent and Additional Rent shall be abated and apportioned from the date of such damage until such repairs are fully completed, according to the affected portion of the Premises; provided, however, in respect of such alterations, decorations, additions and improvements, originally made or installed by Tenant at Tenant's expense, as shall have been damaged by such fire or other casualty and which (in the reasonable judgment of Landlord) can more effectively be repaired as an integral part of the repair work on the Premises, that the repairs to such Tenant's alterations, decorations, additions and improvements shall be performed by Landlord but at Tenant's expense, subject to Tenant's prior written approval. All repairs to and replacements of property that Tenant is entitled to remove as provided in this Section 7.2 of this Lease shall be made by and at the expense of Tenant. Notwithstanding the foregoing, if Landlord or any mortgagee of the Building or the Land shall be unable to collect the insurance proceeds (including rent insurance proceeds) applicable to such damage because of some negligent action or negligent inaction on the part of Tenant, or the employees, licensees or invitees of Tenant, the

16

cost of repairing such damage shall be paid by Tenant and there shall be no abatement of rent. Landlord shall not be liable for delays in the making of any such repairs which are due to governmental regulation, casualties and strikes, unavailability of labor and materials, and other causes beyond the reasonable control of Landlord, nor shall Landlord be liable for any inconvenience or annoyance to Tenant or injury to the business of Tenant resulting from delays, beyond the reasonable control of Landlord, in repairing such damage. If any part of the Premises shall have been permanently rendered unfit for use and occupation hereunder by reason of such damage, the Base Rent and Additional Rent shall be abated according to the nature and extent to which the Premises shall have been so rendered unfit. Promptly after the casualty Landlord shall begin and shall thereafter diligently pursue to completion the work required to restore the Premises to the condition they were in immediately prior to the occurrence of the casualty so the Premises are again fully usable for the Intended Uses.

11.2    **Restoration Notice**. Landlord shall notify Tenant in writing within fifteen (15) days after the casualty stating its best estimation of how long the restoration of the Premises will take. If (i) Landlord fails to notify Tenant within the fifteen (15)-day period; or (ii) Landlord notifies Tenant within such period that the Premises cannot be fully restored within sixty (60) days from such casualty; or (iii) within sixty (60) days after the casualty the Premises have not yet been fully restored; then in any of such cases Tenant may, at its option, either (i) elect to exercise the Option or (ii) terminate this Lease by a written notice to Landlord not later than fifteen (15) days after the expiration of said sixty (60) days, in which event this Lease shall terminate as of the effective date set forth in Tenant's notice to Landlord and the Base Rent and Additional Rent shall continue to be apportioned according to the affected portion of the Premises until the effective date of cancellation, and shall cease as of such effective date. In such event Landlord shall promptly refund to Tenant any Base Rent or Additional Rent paid in advance.

11.3    **Casualty During Last Twelve Months**. If (i) the Premises are so damaged by fire or other casualty (whether or not insured) at any time during the last twelve (12) months of the Term or any extension or renewal, and the cost to repair such damage is reasonably estimated to exceed one-half of the total yearly rent payable hereunder for the period from the estimated date of restoration until the Expiration Date, or (ii) the Building (whether or not including any portion of the Premises) is so damaged by fire or other casualty (whether or not insured) that substantial alteration or reconstruction or demolition of the Building shall in Landlord's reasonable judgment be required, then and in either of such events, Landlord shall deliver a notice to Tenant to provide an explanation of the same (the "Significant Casualty Notice") and, upon receipt of such Significant Casualty Notice, Tenant may, at its option, either (i) elect to exercise the Option or (ii) terminate this Lease by a written notice to Landlord which shall be given by Tenant to Landlord within sixty (60) days following such fire or other casualty, the effective termination date which shall be not less than thirty (30) days after the day on which such Significant Casualty Notice is received by Tenant. In the event of any termination, this Lease and the Term shall expire as of such effective termination date as though that were the Expiration Date and the Rent shall be apportioned as of such date; and if the Premises or any part thereof shall have been rendered unfit for use and occupation by reason of such damage the rent for the period from the date of the fire or other casualty to the effective termination date, or a just

17

and proportionate part thereof, according to the nature and extent to which the Premises shall have been so rendered unfit, shall be abated. The proceeds of any insurance carried by Landlord and the rights of Landlord and Tenant under this Section to such proceeds shall at all times be subject and subordinate to the rights of the holder of any first mortgage on the Land and Building.

11.4   **Total Destruction**.  If the Premises are totally damaged by fire or other casualty or rendered substantially unusable for the Intended Uses, this Lease shall terminate as of the date of such casualty at the election of either party, written notice of such election to be given to the other party within thirty (30) days after such casualty, provided that prior to any such termination Tenant shall first have the opportunity to exercise the Option. In the event of any such casualty, Base Rent and Additional Rent shall cease as of the date of such casualty, and Landlord shall refund to Tenant any Base Rent or Additional Rent paid in advance. If neither party elects to terminate this Lease, Landlord shall rebuild and restore the Premises as quickly as possible to the condition they were in immediately prior to the occurrence of the casualty, provided that if the Premises are not fully restored within ninety (90) days from the date of the casualty, Tenant shall have the option, but not the obligation, to either (i) exercise the Option or (ii) terminate this Lease.

12.   CONDEMNATION

12.1   **Entire Taking**. In the event that the whole of the Premises shall be taken under the power of eminent domain, this Lease shall thereupon terminate as of the date possession shall be so taken.

12.2   **Partial Taking of Building**. If more than twenty percent (20%) the floor area of the Building, whether or not any portion of the Premises is taken as aforesaid, or more than forty percent (40%) of parking spaces on the Land shall be taken as aforesaid, then Tenant may, by written notice to Landlord, either (i) elect to exercise the Option or (ii) terminate this Lease. The termination shall be effective as of the date possession is taken.

12.3   **Partial Taking of Premises**. In the event that a portion of the Premises shall be taken under the power of eminent domain. Tenant may, by written notice to Landlord, either (i) elect to exercise the Option or (ii) terminate this Lease within six (6) months of the taking date. In the event that this Lease is not so terminated, Landlord shall, upon receipt of the award in condemnation, restore the reduced Premises as far as practicable to the condition existing just prior to such taking, and the Base Rent and Additional Rent shall thereafter be equitably abated, but Landlord shall not be required to spend for such work an amount in excess of the amount received by Landlord as damages for the part of the Premises so taken. "Amount received by Landlord" shall mean that part of the award in condemnation that is free and clear to Landlord of any collection by mortgagees. Tenant, at its own cost and expense shall, restore all exterior signs, trade fixtures, equipment, furniture, furnishings and other installations of personalty of Tenant which are not taken to as near its former condition as the circumstances will permit. In the event of a Partial Taking. all provisions of this Lease shall remain in full force and effect.

18

12.4    **Condemnation Award**. In the event the Premises or any part thereof shall be taken or condemned for any public or quasi-public use or purpose by any competent authority in condemnation proceedings or by any right of eminent domain, the entire award for the Land and the Building shall belong to Landlord without any deduction therefrom for any present or future estate of Tenant. Notwithstanding the foregoing, Tenant shall have the right to appear at any condemnation proceeding to claim any separate award with respect to the value of Tenant's fixtures, improvements, furniture, partitions, equipment, relocation expenses, and loss of business.

12.5    **Temporary Taking**. If there is a taking of the Premises for temporary use arising out of a temporary emergency or other temporary situation, this Lease shall continue in full force and effect, and Tenant shall continue to comply with Tenant's obligations under this Lease, except to the extent compliance shall be rendered impossible or impracticable by reason of the taking, and Tenant shall be entitled to the award for its interest.

13.    **DEFAULT.**

13.1.   **Tenant Default**.  The following events shall each be deemed a "Tenant Default" under this Lease:

13.1.1 The failure of Tenant to pay any installment of Base Rent or Additional Rent within ten (10) days after Tenant's receipt of prior written notice of such failure from Landlord;.

13.1.2 Tenant's license obtained from the Connecticut Department of Consumer Protection under Connecticut General Statutes § 21a-408 *et seq.* shall be revoked, expire or otherwise be terminated or suspended by the Connecticut State Department of Consumer Protection, provided that any remedies available to Landlord by reason of default under this Section shall be stayed throughout the entirety of all administrative and judicial appeal proceedings and applicable appeal periods related to said license.

13.2.   **Tenant's Default: Notice to Tenant: Remedies**.

(a)     If Tenant fails to pay any Base Rent or Additional Rent or other payment due hereunder within ten (10) days after the date that such payment is due or, if after thirty (30) days' written notice provided by Landlord, Tenant fails to perform any other of the provisions of this Lease to be observed or performed by Tenant (if such provision or obligation hereof cannot be performed within thirty (30) days then if Tenant fails within said thirty (30) day period to commence and thereafter to diligently and continually pursue its obligation hereunder) then, at any time during the continuance of any one or more of such events (sometimes hereinafter referred to as an "**event of default**"), Landlord may elect to terminate this Lease, provided that, prior to any termination, Tenant shall first have the opportunity to bring the rent current and exercise the Option as set forth in Section 3 of this Lease. Only in the event that Tenant does not elect to bring the rent current and exercise the Option, and Landlord elects to terminate this Lease, this Lease shall terminate and come to an end on the date specified in a notice of

cancellation from Landlord to Tenant, and Tenant shall quit and surrender the Premises to Landlord as if the Term ended by the expiration of the time fixed herein, but Tenant shall remain liable for all sums accruing prior to the termination of this Lease. Notwithstanding any grace period provided hereunder, Tenant shall be in default if, three (3) times during any Lease Year Tenant fails to pay Rent on the date that it is due.

(b)    If an event of default occurs and is then continuing, and if Landlord elects not to terminate this Lease, then (a) Landlord shall have the immediate right, pursuant to legal process, if any be applicable, to either pay any sums or do any act on behalf of Tenant, in order to cure an event of default by Tenant, and any sums expended by Tenant to Landlord, together with interest thereon shall be immediately due and payable by Tenant to Landlord, or (b) Landlord may, pursuant to legal process, if any be applicable, re-enter the Premises and Landlord may remove all persons and property from the Premises and such property may be removed and stored in a public warehouse or elsewhere at the cost of, and for the account of, Tenant without Landlord being deemed guilty of trespass or becoming liable for any loss or damage which may be occasioned thereby.

13.3.    Re-Letting; Landlord's Damages. Should Landlord elect to re-enter or should it take possession pursuant to legal proceedings or pursuant to any notice provided for by law, it may make such alterations and repairs as may be necessary in order to relet the Premises or any part thereof, for such term or terms (which may be for a term extending beyond the Term) and at such rentals and upon such other terms and conditions as Landlord in its sole discretion may deem advisable and upon each such reletting all rentals received by Landlord from such reletting shall be applied (a) first, to the payment of any indebtedness other than Rent due hereunder from Tenant to Landlord, (b) second, to the payment of the cost of any such alterations and repairs, and (c) third, to the payment of Rent due and unpaid hereunder, and any amount remaining shall be held by Landlord and applied in payment of future Rent as the same may become due and payable hereunder. If such rentals received from such reletting during any month be less than the Rent to be paid during that month by Tenant hereunder, then Tenant shall pay any such deficiency to Landlord. Such deficiency shall be calculated and paid monthly, first from the Security Deposit, to the extent that any sums remain available, and thereafter directly from the Tenant and any guarantor. Landlord may recover from Tenant, from time to time, all damages it may incur by reason of Tenant's default, including the cost of recovering the Premises, reasonable attorneys' fees and the worth, at the time of such termination, of the excess, if any, of the amount of Rent and charges equivalent to rent reserved in this Lease for the remainder of the Term over the then reasonable rental value of the Premises for the remainder of the stated Term, all of which amount shall be immediately due and payable from Tenant to Landlord.

20

13.4    **Landlord Events of Default**.   The following events shall each be deemed a "Landlord Default" under this Lease:

13.4.1  The occurrence of an (i) Event of Bankruptcy or (ii) any failure by Landlord to perform any obligation under this Lease where such event or failure shall continue for more than thirty (30) days after Tenant's written notice of such event or failure (the "Default Notice") is received by Landlord and Landlord shall fail to provide a response to the Default Notice specifying the actions undertaken or to be undertaken to effect a cure within thirty (30) days after receipt of the Default Notice, or shall respond to the Default Notice but shall fail to effect the cure specified in such response shall be an event of default by Landlord; provided, however, that Landlord shall not be in default with respect to any matter referred to in a Default Notice which is susceptible of cure but cannot be reasonably cured within said thirty (30)-day period, so long as Landlord responds to the Default Notice and sets out a reasonable plan and schedule to effect a cure and thereafter makes reasonable efforts to complete the same in accordance with such schedule. "Event of Bankruptcy" shall mean any of the following: (a) if a receiver or custodian is appointed for all or a substantial portion of Landlord's property or assets, which appointment is not dismissed within one hundred eighty (180) days; (b) if Landlord files a voluntary petition under the United States Bankruptcy Code or any other bankruptcy or insolvency laws, which petition is not withdrawn within thirty (30) days; (c) if there is an involuntary petition filed against Landlord as the subject debtor under the United States Bankruptcy Code or any other bankruptcy or insolvency laws, which is not dismissed within one hundred eighty (180) days of filing, or which results in the issuance of an order for relief against the debtor; or (d) if Landlord makes or consents to an assignment of its assets, in whole or in part, for the benefit of creditors, or a common law composition of creditors, which assignment is not withdrawn in thirty (30) days.

13.5    **Tenant Remedies**.  Except as otherwise provided in this Lease, and subject to the provisions of Section 25.7 of this Lease, if a Landlord Default occurs, Tenant shall be entitled to pursue its rights and remedies pursuant to this Lease or as may otherwise be available at law or in equity.

13.6.   **Waiver of Trial by Jury; Counterclaims**. The parties hereby waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises and/or any claim of injury or damage. In the event Landlord commences any proceedings for nonpayment of Base Rent or any other charge due hereunder, Tenant will not interpose any counterclaim, except compulsory counterclaims. This shall not be construed as a waiver of Tenant's right to assert such claims in any separate action brought by Tenant.

13.7.   **Other Rights and Remedies**.  Tenant hereby expressly waives any and all rights of redemption granted by, or under present or future, laws in the event of Tenant being evicted or dispossessed for any cause or in the event of Landlord obtaining possession of the Premises by reason of the violation by Tenant of any of the provisions of this Lease or otherwise.

In the event of a breach or threatened breach by Tenant or Landlord of any provision of this Lease, then the other party shall have the right of injunction as if other remedies were not provided for herein.

The rights and remedies given to Landlord and Tenant in this Lease are distinct, separate and cumulative remedies, and the exercise of any of them shall not be deemed to exclude Landlord's right to exercise any or all of the others or those which may be permitted at law or in equity.

**13.8.   Force Majeure.**  Landlord and/or Tenant shall be excused for the period of any delay and shall not be deemed in default with respect to the performance of any of the provisions of this Lease, except for the payment of monetary obligations, when prevented from so doing by cause or causes beyond Landlord's control or Tenant's control, as the case may be, which shall include all labor disputes, governmental regulations or controls, fire or other casualty, inability to obtain any material or services, or reasonable substitute for said materials or services, acts of God or any other cause, whether similar or dissimilar to the foregoing, not within the reasonable control of Landlord and/or Tenant.

## 14.   HOLDOVER BY TENANT.

**14.1.   Rent in the Event of Holdover.**  In the event that Tenant shall hold the Premises after the expiration of the Term (as it may be extended pursuant to Article 18) without the express written consent of Landlord, such holding shall be deemed to have created a tenancy from month to month terminable on thirty (30) days' written notice by either party to the other. With the exception of those items set forth in this Article 14, all of the provisions of this Lease shall govern in the event of a holdover.  Monthly rental during any such holdover period shall be $120,000 per month together with all other additional charges provided for by this Lease.

**14.2.   Liability in the Event of Holdover.**  If Tenant fails to surrender the Premises upon the termination of this Lease, then Tenant shall, in addition to any other liabilities to Landlord accruing therefrom, indemnify and hold Landlord harmless from loss or liability resulting from such failure, including any claims made by any succeeding tenant founded on such failure.

22

15.   **LANDLORD'S RIGHT TO PERFORM TENANT'S COVENANTS.**

If Tenant shall fail to make any payment or perform any other act to be performed or observed by Tenant under the provisions of this Lease, then (subject to applicable grace and cure periods) Landlord may, but not be obligated so to do, make any such payment or perform any such act for the account of Tenant except as limited by state law relating to medical cannabis. To the extent that Landlord's rights under this Article require access to the Premises, such access shall be subject to the provisions of Article V of this Lease. If Landlord makes any expenditure or incurs any obligations for the payment of money in connection therewith, such sums, together with interest thereon at the Prime Rate in effect at the time of such payment, shall be deemed Additional Rent and shall be payable to Landlord on demand.

16.   **INDEMNIFICATIONS, REPRESENTATIONS AND WARRANTIES**

16.1.   **Tenant Indemnity.**

(a)   **Indemnification**.   Except for the negligence or intentional wrongful acts or omissions of Landlord, its agents, contractors or employees, or related to the lawfulness of the Tenant's Intended Use of the Premises for production of licensed medical cannabis, Tenant shall indemnify Landlord and save it harmless from suits, actions, damages, liability and expense in connection with loss of life, personal injury or property damage arising from or out of any occurrence in, upon, at or from the Premises or the occupancy or use by Tenant of the Premises;

(b)   **Tenant's Property at Tenant's Risk**.   Tenant shall store its property in and shall occupy the Premises at its own risk; Landlord shall not be responsible or liable at any time for any loss or damage to Tenant's, equipment, fixtures or other personal property of Tenant or to Tenant's business, unless caused by the negligence or intentional wrongful acts or omissions of Landlord or by any breach of Landlord's obligations under this Lease;

(c)   **Landlord Not Liable**.   Landlord shall not be responsible or liable to Tenant, or to those claiming by, through or under Tenant, that may be occasioned solely by or through the acts or omissions of persons occupying adjacent, connecting, or adjoining Premises, or by or from the negligence or intentional wrongful acts or omissions of any other occupant of the Building; and

(d)   **Notification of Landlord by Tenant in Case of Accident**.   Providing Tenant has knowledge of same, Tenant shall give prompt notice to Landlord in case of fire or accidents in the Premises or in the Building and of defects therein or in any fixtures or equipment.

(e)   **Litigation Involving Tenant**.   In case Landlord shall without fault on its part be made a party to any litigation commenced by or against Tenant on account of events occurring on or about the Premises, Tenant shall protect and hold Landlord harmless and shall pay all Landlord's reasonable costs, expenses and attorneys' fees in connection therewith.

(f)   **Limitation of Liability**.   Notwithstanding anything set forth in this Lease to the contrary, neither Landlord nor its members, nor any officer or director of any entity comprising Landlord, shall be personally liable for the breach of any of the provisions of this Lease. Such

23

exculpation of personal liability is absolute and unconditional, and shall survive the termination of this Lease.

16.2.  **Landlord Indemnity.**  Except for the negligence or intentional wrongful acts or omissions of Tenant, its agents, contractors or employees, Landlord shall indemnify Tenant and save it harmless from suits, actions, damages, liability and expense in connection with loss of life, personal injury or property damage arising from or out of any occurrence in, upon, at or from the Common Areas.

16.3.  **Landlord Representations and Warranties.**  Landlord represents and warrants to Tenant that the statements contained in this Section 16.3 are true and correct as of the date hereof.

(a)  **Organization and Qualification of Landlord.**  Landlord is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Delaware and has full limited liability company power and authority to own, operate or lease the properties and assets now owned, operated or leased by it.  Landlord is duly licensed or qualified to do business and is in good standing under the laws of the State of Connecticut.

(b)  **Authority of Landlord.**  Landlord has full limited liability company power and authority to enter into this Lease with Option to Purchase to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by Landlord of this Lease with Option to Purchase the performance by Landlord of its obligations hereunder and thereunder and the consummation by Landlord of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability company action on the part of Landlord.  This Agreement has been duly executed and delivered by Landlord, and (assuming due authorization, execution and delivery by Tenant) this Agreement constitutes a legal, valid and binding obligation of Landlord enforceable against Landlord in accordance with its terms. When the Option Notice is exercised and delivered to Landlord (assuming due authorization, execution and delivery by each other party thereto), such Option will constitute a legal and binding obligation of Landlord enforceable against it in accordance with its terms.

(c)  **No Conflicts: Consents.**  The execution, delivery and performance by Landlord of this Lease with Option to Purchase and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate formation, limited liability company agreement or other organizational documents of Landlord; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order; (c) require the consent, notice or other action by any person, entity or Governmental Authority under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both,

24

would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any contract, agreement, permit or authorization to which Landlord is a party or by which Landlord or the Premises is bound or to which the Premises is subject; or (d) result in the creation or imposition of any charge, claim, lien (statutory or other), option, security interest, mortgage or restriction of any kind on the Premises. No consent, approval, permit or authorization of, registration, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Landlord in connection with the execution and delivery of this Lease with Option to Purchase and the consummation of the transactions contemplated hereby and thereby. For purposes of this Agreement:

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

(d)     <u>Legal Proceedings; Governmental Orders.</u>

There are no claims, actions, causes of action, demands, lawsuits, arbitrations, inquiries, audits, notices of violation, proceedings, litigation, citations, summons, subpoenas or investigations of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity ("**Actions**"), pending or threatened against or by Landlord (i) relating to or affecting the Premises; or (ii) that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Lease with Option to Purchase. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Actions. There are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against, relating to or affecting the Premises.

17.   <u>CONSTRUCTION; DISCHARGE OF LIENS</u>.

17.1.   <u>Construction of Premises</u>.  All construction costs are to be borne by Tenant. Tenant agrees that Landlord is delivering the Premises in its "as-is", "where is" condition. Tenant shall be obligated to construct and complete full height firewall partitions separating the so-called "<u>Clean Room Space</u>" within the Building in the location shown in **Exhibit 17.1** attached hereto and made a part hereof, which Clean Room Space will be used for production of medical cannabis and related products, from the remainder of the Premises. Tenant shall, with due diligence, undertake all such work and perform such other work as shall be necessary or appropriate in order to prepare the Premises for Tenant's occupancy.  Prior to commencing any such work on the Premises, Tenant shall notify Landlord in writing of all contractors, subcontractors, material men and other workers or persons who Tenant shall employ, use or hire to perform the Tenant's Work at or to the Premises.

17.2.   <u>Discharge of Liens</u>.  Tenant shall keep the Premises free of mechanics' or other liens by reason of work, labor, services or materials supplied or claimed to have been supplied to Tenant, or anyone holding the Premises, or any part thereof, through or under Tenant.  If any such lien or notice thereof shall at any time be filed, then Tenant shall cause the same to be discharged of record either by payment or in such other manner as may be prescribed by law or bond to the satisfaction of Landlord.  If Tenant shall fail to discharge any lien, then, in addition to any other right or remedy of Landlord resulting from such default, Landlord may, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or by procuring the discharge of such lien in such manner as is, or may be, prescribed by law.  Tenant shall repay Landlord, as Additional Rent, all sums disbursed or deposited by Landlord pursuant to the foregoing provisions of this Section 17.2, including interest and the costs, expenses and reasonable attorneys' fees incurred by Landlord in connection therewith.

17.3.   <u>Clean Room</u>.  Pursuant to the terms of this Lease, Landlord shall vacate and turn over the Clean Room Space to Tenant within thirty (30) days after the Effective Date of this Lease.  Notwithstanding any provision herein to the contrary, if, upon inspection of the Clean Room Space, Tenant determines, in its sole but reasonable discretion, that the existing electrical and other equipment in the Clean Room Space (the "<u>Clean Room Equipment</u>") does not meet the requirements for Tenant's Intended Uses of the Premises as set forth in Section 8 of this Lease, then Tenant shall spend up to Fifty Thousand and NO/100 Dollars ($50,000.00) to repair the Clean Room Space to meet the requirements for Tenant's use of the Premises as set forth in Section 8 of this Lease.  If, after Tenant completes such initial repairs, Tenant determines, in its sole but reasonable discretion, that the Clean Room Space continues not to meet the requirements for Tenant's Intended Uses of the Premises as set forth in Section 8 of this Lease, Tenant shall provide Landlord with a written notice (the "<u>Clean Room Notice</u>") identifying said deficiencies and identifying the required changes to the Clean Room Space.  Upon receipt of such Clean Room Notice, Landlord agrees that, if and only if the Tenant exercises the Option, Landlord will reduce the Purchase Price by up to One Hundred Thousand and no/100 Dollars ($100,000) for that portion of the costs to repair the Clean Room Space (the "<u>Clean Room Excess Costs</u>") in excess of the initial Fifty Thousand and NO/100 Dollars ($50,000.00) expended by Tenant

26

pursuant to this Section. Notwithstanding anything to the contrary, nothing in this Section shall otherwise alter the rights and obligations of Landlord or Tenant under this Lease.

18.   **OPTION TO EXTEND**.

So long as Tenant is not in default hereunder beyond any applicable grace or cure period, Tenant shall have the right to extend the Term for one period of five (5) years, provided that Tenant shall give Landlord written notice of the exercise of its election to extend at least six (6) months prior to the expiration of the initial Term of this Lease. In the event of an extension as aforesaid, all of the terms of the Lease set forth herein shall remain in full force and effect. After the exercise by Tenant of such option to extend, the word "Term" or any equivalent expression shall mean the Term as so extended. The annual Base Rent for the extension Term shall be One Million Four Hundred Forty Thousand and No/100 Dollars ($1,440,000.00), payable in equal monthly payments of One Hundred Twenty Thousand and No/100 Dollars ($120,000.00). in accordance with the terms of this Lease.

19.   **NOTICES**.

All notices, consents, waivers or other communications which this Lease requires or permits either party to give to the other shall be in writing and shall be deemed to have been given when delivered personally or by courier service or three days after having been deposited in the United States Mail as first-class certified or registered mail, postage prepaid, addressed as follows:

If to Landlord:    Grist Mill Partners, LLC
                   Attn:  Mr. Matthew Westcott
                   1-3 Mill Pond Lane
                   Simsbury, CT 06070

                   with copies to:

                   Halloran & Sage LLP
                   Attn: Richard P. Roberts, Esq.
                   One Goodwin Square
                   Hartford, CT 06103

If to Tenant:      CuraLeaf, LLC
                   Attn: Robert Birnbaum
                   145 Doubling Road
                   Greenwich, CT  06830

27

With copies to:      Robinson & Cole LLP
                            Attn: Brian R. Smith, Esq.
                            280 Trumbull Street
                            Hartford, CT 06103

or to Landlord and Tenant at such other address or to such other persons as each of them may designate by notice duly given in accordance with this Article 19 to the other party.

## 20.  LIABILITY OF LANDLORD.

Landlord shall not be liable for any loss or damage to any property of Tenant by reason of theft or illegal entry unless caused by Landlord's negligence or intentional wrongful acts or omissions. Landlord shall not be liable for any injury or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water, rain or snow or leaks from any part of said Building or from the pipes, appliances, or plumbing works or from the roof, street or sub-surface or from any other place or by dampness or by any other cause of whatsoever nature unless caused by Landlord's negligence or intentional wrongful acts or omissions; nor shall Landlord be liable for any such damage caused by other tenants in the Building unless caused by Landlord's negligence or intentional wrongful acts or omissions.

## 21.  SERVICES TO BE PROVIDED BY LANDLORD.

[INTENTIONALLY OMITTED]

## 22.  LANDLORD'S INABILITY TO PERFORM.

If Landlord is delayed in the performance of any provision of this Lease, because of any of the following causes: acts of the other party, unusual action of the elements, war, riot, strikes, lockouts, labor disputes, inability to procure or general shortage of labor, materials or merchandise in the normal channels of trade, delay in transportation, delay in inspections, governmental action or inaction where action is required, including but not limited to delay that is directly attributable to restrictions imposed by the Connecticut Department of Consumer Protection due to Tenant's business use, or any other cause beyond the reasonable control of Landlord, whether similar or dissimilar to the foregoing (financial inability, imprudent management or negligence excepted) – then such performance shall be excused for the period of the delay and the period for such performance shall be extended for a period equivalent to the period of such delay, except that the foregoing shall in no way affect Tenant's obligation to pay Rent, as provided herein, or the length of the Term.

28

23.    SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT; COVENANT NOT TO SUBORDINATE.

Other than the Mortgage and Collateral Assignment of Leases and Rentals in favor of TD Banknorth, N.A. referenced above, Landlord covenants not to further pledge, hypothecate or subordinate the Lease to any mortgage or ground lease that may now or hereafter affect the Premises. Upon Tenant's written request Landlord shall use its best efforts to secure a non-disturbance agreement from its existing mortgagee.

24.    BROKERS.

24.1.    **Brokerage Representations.** Tenant represents and warrants to Landlord that no broker or agent, other than Richard Correia, dealt with Tenant in connection with the Premises or this Lease. Landlord represents and warrants to Tenant that Landlord has not entered into any brokerage or agency agreement relating to the Premises or this Lease and that Landlord has not otherwise dealt with any broker or agent in connection with the Premises or this Lease, other than Richard Correia. Landlord agrees to pay all commissions and brokerage fees, if any, payable to Richard Correia in connection with the Premises or this Lease.

24.2.    **Brokerage Indemnification.** Landlord shall indemnify and hold harmless Tenant from and against any and all losses, liabilities, claims, damages, costs and expenses (including reasonable attorneys' fees) that may be imposed upon, asserted against or incurred or suffered by Tenant by reason of any breach of Landlord's representation and warranty set forth in Section 24.1. Tenant shall indemnify and hold harmless Landlord from and against any and all losses, liabilities, claims, damages, costs and expenses (including reasonable attorneys' fees) that may be imposed upon, asserted against or incurred or suffered by Landlord by reason of any breach of Tenant's representation and warranty set forth in Section 24.1.

25.    MISCELLANEOUS.

25.1.    **Changes.** Neither this Lease nor any provision hereof may be changed, waived, released, discharged, withdrawn, revoked, canceled or terminated orally or by any action or inaction. Any such change, waiver, release, discharge, withdrawal, revocation, cancellation or termination shall be effective only if set forth in a written document signed by the person against whom enforcement of that change, waiver, release, discharge, withdrawal, revocation, cancellation or termination is sought and then shall be effective only to the extent specifically provided in that document.

25.2.    **Successors and Assigns.** Except as otherwise provided in this Lease, the provisions of this Lease shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. Each reference in this Lease to Landlord or Tenant shall be deemed also to refer to their respective successors and assigns.

25.3.    **Exhibits; Captions.** The Exhibits attached hereto are incorporated in and made a part of this Lease by this reference. The organization of this Lease into Articles, Sections, subsections, paragraphs and other subdivisions, and the use of captions, headings and numerical

and alphabetical designations for those Articles, Sections, subsections, paragraphs and other subdivisions, are for convenience of reference only. Those captions, headings and designations shall not be considered to be a part of this Lease and shall not be deemed or construed to define, limit, expand or otherwise modify or affect the scope or meaning of this Lease or any provision set forth herein.

25.4.  **Governing Law**.  This Lease shall be governed in all respects by the laws of the State of Connecticut, without regard to principles of conflicts of law.

25.5.  **Severability**.  All rights, powers, privileges and remedies provided in this Lease may be exercised only to the extent necessary so they will not render this Lease invalid, illegal or unenforceable.  If any provision of this Lease shall be determined to be invalid, illegal or unenforceable, in whole or in part or in any respect, or if any provision of this Lease would operate to invalidate this Lease, then that provision alone shall be deemed to be null and void, and the remaining provisions of this Lease shall continue in full force and effect and shall not be impaired or otherwise affected in any way.

25.6.  **Counterparts**.  This Lease may be executed in one or more identical counterparts, each of which shall be deemed to be an original, and all of which, taken together, shall be deemed to be one and the same document.  Signature pages may be detached from multiple separate counterparts without impairing the legal effect thereof and may be attached to a single counterpart so that all signature pages are physically attached to the same document.

25.7.  **Dispute Resolution and Arbitration**.  In the event any dispute involving this Lease arises between the parties (excepting non-payment of Rent), they shall negotiate a resolution of the dispute at a meeting of the principals called for that purpose.  If the dispute cannot be resolved by negotiation, then the parties shall submit the matter to binding arbitration under the standard rules of the American Arbitration Association.  Any hearing in connection with such arbitration shall be held at a location in Hartford County, Connecticut designated by the American Arbitration Association.  Landlord and Tenant shall attempt to agree upon a mutually acceptable arbitrator within ten (10) business days after submitting the matter to arbitration.  If an arbitrator cannot be mutually selected, then each party shall select an arbitrator and the two selected arbitrators shall mutually select a third arbitrator to conduct the arbitration.  Judgment upon the award rendered by the arbitration may be entered in any court of competent jurisdiction and may be enforced in accordance with the laws of the State of Connecticut.  Each of the parties shall bear its own expenses in connection with any such arbitration (including its own attorneys' fees and costs of production of evidence), but the parties shall equally share all arbitrator compensation, the cost (if any) of renting a hearing room and all American Arbitration Association administrative charges and fees.  The provisions of this Section 25.7 shall not be binding on any person succeeding to all or part of Landlord's interest in the Premises by reason of the exercise of any remedy provided for in any mortgage covering the Premises, the Building or the Park.

25.8.  **Time of Essence**.  Time is of the essence with respect to the performance of each of the provisions of this Lease.

25.9. <u>Use of Certain Terms</u>.  As used in this Lease, the term **"person"** means any natural person, sole proprietorship, partnership, limited partnership, limited liability partnership, joint venture, association, trust, estate, limited liability company, corporation (whether or not organized for profit), financial institution, government (and any agency, instrumentality or political subdivision thereof) or other entity, authority or organization of any kind, whether acting for himself, herself or itself or in a representative capacity.  Each reference in this Lease to any gender shall be deemed also to refer to any other gender, and each reference in this Lease to "Dollars" or "$" shall be deemed to refer to the lawful currency of The United States of America.  As used in this Lease, unless the context clearly requires otherwise, (a) the singular shall be deemed to include the plural and *vice versa*, (b) the words "herein," "hereof," "hereunder," "hereinafter" and "hereto" and words of similar import shall be deemed to refer to this Lease as a whole and not to any particular Article, Section, paragraph or other subdivision, and (c) the words "include" and "including" shall be deemed to be followed by the words "without limitation."  Each reference in this Lease to the provisions of this Lease or the provisions of any other document or instrument shall be deemed to refer to any and all covenants, agreements, terms, conditions and other provisions hereof or thereof.  Each reference in this Lease to the fees or other compensation of any agents, contractors, attorneys or other representatives of any person shall be deemed also to include their respective expenses and disbursements.  Each reference in this Lease to any specific statute or regulation or to any specific statutory or regulatory compilation shall be deemed to include any and all amendments, substitutions or replacements thereto or therefor, as well as any similar statutory or regulatory provision or compilation that may hereafter be enacted by any governmental or quasi-governmental authority.

25.10. <u>Relationship of Parties</u>.  The relationship of Landlord and Tenant as established by this Lease is solely that of a landlord and tenant of real property.  Nothing set forth in this Lease shall be deemed or construed to create a partnership, joint venture or other entity or association, a tenancy in common, joint tenancy or co-ownership of any kind, a relationship of principal and agent or any other form of relationship other than that of a landlord and tenant of real property.  Without limiting the generality of the foregoing, nothing set forth in this Lease shall be deemed or construed to make either party liable for the debts incurred by the other in the conduct of its business.

25.11. <u>Entire Agreement</u>.  This Lease contains the entire agreement between the parties and supersedes any prior understandings, agreements (including the Letter of Intent), or representations by or between the parties, written or oral, with respect to the subject matter hereof.

26.    <u>NOTICE OF LEASE</u>.

Neither party shall record this Lease without the prior written approval of the other.  The parties acknowledge that this agreement is a material term of this Lease.  However, at the request of either party, Landlord and Tenant shall execute, for recording, a Notice of Lease in form attached as **Exhibit 26**, which form is acceptable to Landlord and Tenant.  Tenant shall bear the cost of recording the Notice of Lease.

31

27.   COMMERCIAL TRANSACTION.

THE PARTIES ACKNOWLEDGE THAT THIS LEASE IS A COMMERCIAL TRANSACTION, AS THAT TERM IS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a. IN THE EVENT LEGAL ACTION IS BROUGHT BY EITHER PARTY AGAINST THE OTHER IN CONNECTION WITH THIS LEASE, THE PARTY AGAINST WHOM THAT ACTION IS BROUGHT HEREBY WAIVES, TO THE EXTENT ALLOWED UNDER CHAPTER 903a OF THE CONNECTICUT GENERAL STATUTES OR OTHER APPLICABLE LAW, ALL RIGHTS TO NOTICE AND PRIOR COURT HEARING WITH RESPECT TO ANY PREJUDGMENT REMEDY THAT THE PARTY BRINGING THAT ACTION MAY DESIRE TO PURSUE.

*[Remainder of page intentionally blank; next page is signature page]*

32

IN WITNESS WHEREOF, each of the parties hereto has caused this Lease to be executed and delivered on its behalf as of the day and year first above written.

Signed and delivered in the presence of:

*Richard P. Roberts*

LANDLORD:

**GRIST MILL PARTNERS, LLC**
By Caroline Financial Group, Inc.
Its Managing Member
By _____
Matthew Westcott
President of Its Managing Member
Duly Authorized

Signed and delivered in the presence of:

Matthew J. Guenci, Jr.

Valerie Renee Morris-Harris

TENANT:

**CURALEAF, LLC**

By _____
Robert Birnbaum
Its Manager
Duly Authorized

STATE OF CONNECTICUT    )
                               ) ss: Simsbury

COUNTY OF HARTFORD     )

       On this _lttl_ day of _February_____, 2014, personally appeared Matthew Westcott, President of Caroline Financial Group, Inc., Managing Member of **Grist Mill Partners, LLC**, a Delaware limited liability company, signer of the foregoing instrument, and acknowledged the same to be his free act and deed as such managing member and the free act and deed of said limited liability company.

                                    Commissioner of the Superior Court/
                                    Notary Public
                                    My Commission Expires:

> JASON J. CONCATELLI
> Notary Public, State of Connecticut
> My Commission Expires March 31, 2017

STATE OF CONNECTICUT    )
                               ) ss: ~~Simsbury~~ Hartford

COUNTY OF HARTFORD     )

       On this _11th_ day of _Febru___, 2014, personally appeared Robert Birnbaum, Manager of **CuraLeaf, LLC**, a Connecticut limited liability company, signer of the foregoing instrument, and acknowledged the same to be his free act and deed as such managing member and the free act and deed of said limited liability company.

                                    Commissioner of the Superior Court/
                                    Notary Public
                                    My Commission Expires:  2/28/17

> SHERRY STRICKLAND
> NOTARY PUBLIC
> MY COMMISSION EXPIRES FEB. 28, 2017

EXHIBIT 1

COPY OF LETTER OF INTENT

November 5 , 2013


Mr. Daniel E. Carpenter
Grist Mill Partners, LLC
100 Grist Mill Road
Simsbury, CT 06070

Re:  Term Sheet By And Between Grist Mill Partners LLC a Delaware LLC--
     Landlord ("GMP") and curaleaf LLC a Connecticut LLC--Tenant
     ("CuraLeaf")

Dear Mr. Carpenter:

The following business terms describe generally the terms and conditions of the
proposed lease with option to purchase the real property and improvements of 100
Grist Mill Road, Simsbury, Connecticut described in a deed recorded at Vol. 743
Page 390 of the Simsbury Land Records.  If you agree to these terms, please
countersign below and return a copy to me by November 8, 2013.

CuraLeaf is seeking the lease for purposes of producing medical marijuana.  As a
precondition to entry into the lease with option to purchase, CuraLeaf must seek and
obtain a Producer License from the State of Connecticut's Department of Consumer
Protection.

As part of the application process, GMP agrees to certify to the State Department of
Consumer Protection that it consents to CuraLeaf operating a production facility on
the premises as provided in the form attached to this letter.

Provided the foregoing precondition is met, the parties will enter into a lease with
option to purchase under the following terms and conditions:

1.  The lease shall be for the entire building and the land of 100 Grist Mill Road,
    Simsbury, Connecticut.  See Map G11 Block 103 and Lot 005-25 of the
    Simsbury Tax Assessor's Records and as more particularly described in
    Volume 743 Page 390 of the Simsbury Land Records.

2.  The initial lease term shall be for five (5) years from the Rent Commencement
    Date.  The Rent Commencement Date shall be that date when all permits and
    approvals to operate have been granted, and the appeal periods have expired,
    and the building has been fully vacated.  GMP shall have a minimum of three

12548393-v2

Mr. Daniel E. Carpenter
November   , 2013
Page 2

(3) months but no more than six (6) months to turn over the building and land free of all other tenants or occupants.

3.  There shall be one 5-year renewal option.

4.  For the first 24 months after the Rent Commencement Date, rent shall be $60,000 per month. Thereafter rent shall be $120,000 per month or 7.5% of CuraLeaf's gross sales of the product grown at the leasehold site, whichever is greater. To effectuate this provision, CuraLeaf shall pay rent in the sum of $120,000 per month. Every six months, there will be a true-up to determine if 7.5% of the gross sales exceeds this sum and any additional rent shall be paid within 30 days thereafter. GMP will have audit rights as to gross sales of the product every six months.

5.  CuraLeaf shall have an exclusive option to buy the leasehold premises during the term of the Lease for the sum of $5 Million. This option may be exercised at any time during the term of the initial lease or renewal upon 30 days prior written notice.

6.  If the option is exercised in the 24-month period immediately following the Rent Commencement Date, then GMP shall be entitled to an additional sum above the $5 Million purchase price equal to $60,000 for each month prior to the expiration of the initial 24 months of the lease term.

7.  The cost of the proposed renovations to the existing building shall be borne solely by CuraLeaf. CuraLeaf shall be responsible for utilities, maintenance and repair but not for replacement of structural items such as the roof, HVAC or foundation.

8.  GMP shall pay all real estate taxes as and when due.

9.  The parties agree that the lease with option to purchase shall not be subordinate to any mortgage, pledge or hypothecation by GMP and it will take such measures as may be necessary to make the lease superior to any recorded pledges, mortgages, etc. as a precondition of the effectiveness of the lease with option to purchase.

Mr. Daniel E. Carpenter
November 5, 2013
Page 3

10. The parties agree that the lease with purchase option shall be construed in
accordance with the laws of the State of Connecticut and shall be binding
upon and inure to the benefit of GMP, CuraLeaf and their respective
successors and assigns.

Sincerely,

CURALEAF LLC

Robert Birnbaum

AGREED & ACCEPTED THIS 6th DAY OF November 2013
SUBJECT TO REVIEW AND APPROVAL OF LEASE
WITH OPTION TO PURCHASE

GRIST MILL PARTNERS LLC

Dan Carpenter · Chairman of its managing member

Date: November 6th 2013

January 8, 2014

Mr. Daniel E. Carpenter
Grist Mill Partners, LLC
100 Grist Mill Road
Simsbury, CT 06070

Re:    Amended Term Sheet By and Between Grist Mill Partners LLC, a Delaware
       LLC—Landlord ("GMP") and CuraLeaf LLC, a Connecticut LLC—Tenant
       ("CuraLeaf")

Dear Mr. Carpenter:

The following business terms describe generally the terms and conditions of the
proposed lease with opinion to purchase the real property and improvements of 100
Grist Mill Road, Simsbury, Connecticut described in a deed recorded at Vol. 743 Page
390 of the Simsbury Land Records. This letter is intended to amend and restate the
terms agreed to in a letter dated as of November 5, 2013. If you agree to these terms,
please countersign below and return a copy to me as soon as possible.

CuraLeaf is seeking the lease for purposes of producing medical marijuana. As a
precondition to entry into the lease with option to purchase, CuraLeaf must seek and
obtain a Producer License from the State of Connecticut's Department of Consumer
Protection.

As part of the application process, GMP agrees to certify to the State Department of
Consumer Protection that it consents to CuraLeaf operating a production facility on the
premises as provided in the form attached to this letter.

Provided the foregoing precondition is met, the parties will enter into a lease with option
to purchase under the following terms and conditions:

   1.   The lease shall be for the entire building and the land of 100 Grist Mill Road,
        Simsbury, Connecticut. See Map G11 Block 103 and Lot 005-25 of the
        Simsbury Tax Assessor's Records and as more particularly described in
        Volume 743 Page 390 of the Simsbury Land Records.

Mr. Daniel E. Carpenter
January 8, 2014
Page 2 of 3

2. The initial lease term shall be for five (5) years from the Rent Commencement
   Date. The Rent Commencement Date shall be that date when all permits and
   approval to operate have been granted, and the appeal periods have expired,
   and the building has been fully vacated. GMP shall have a minimum of three
   (3) months but no more than six (6) months to turn over the building and land
   free of all other tenants or occupants.

3. There shall be one 5-year renewal option.

4. For the first 24 months after the Rent Commencement Date, rent shall be
   $60,000 per month. Thereafter rent shall be $120,000 per month.

5. CuraLeaf shall have an exclusive option to buy the leasehold premises during
   the term of the lease for the sum of $5 Million. This option may be exercised
   at any time during the term of the initial lease or renewal upon 30 days' prior
   written notice.

6. If the option is exercised in the 24-month period immediately following the
   Rent Commencement Date, then GMP shall be entitled to an additional sum
   above the $5 Million purchase price equal to $60,000 for each month prior to
   the expiration of the initial 24-months of the lease term.

7. The cost of the proposed renovations to the existing building shall be borne
   solely by CuraLeaf. CuraLeaf shall be responsible for utilities, maintenance
   and repair but not for replacement of structural items such as the roof, HVAC
   or foundation.

8. GMP shall pay all real estate taxes as and when due.

9. The parties agree that the lease with option to purchase shall be subordinate
   to any mortgage, pledge or hypothecation by GMP and it will take such
   measures as may be necessary to make the lease superior to any recorded
   pledges, mortgages, etc. as a precondition of the effectiveness of the lease
   with option to purchase.

Mr. Daniel E. Carpenter
January 8, 2014
Page 3 of 3

10. The parties agree that the lease with purchase option shall be construed in
    accordance with the laws of the State of Connecticut and shall be binding
    upon and inure to the benefit of GMP, CuraLeaf and their respective
    successors and assigns.

Sincerely,

CURALEAF LLC

Robert Birnbaum

AGREED & ACCEPTED
THIS 9th DAY OF JANUARY, 2014
SUBJECT TO REVIEW AND APPROVAL
OF LEASE WITH OPTION TO PURCHASE

GRIST MILL PARTNERS LLC

Daniel E. Carpenter

Date: 1-8-14

3163652v.1

EXHIBIT 1.2

LEGAL DESCRIPTION OF LAND

EXHIBIT 1.2

LEGAL DESCRIPTION
100 GRISTMILL

That certain piece or parcel of land, with the improvements thereon and appurtenances
thereto, known as No. 100 Grist Mill Road in the Town of Simsbury, County of Hartford,
and State of Connecticut, being shown on a certain map or plan entitled "Rearway Map
Parcel 25 Land Owned by ENSIGN-BICKFORD REALTY CORPORATION Easterly of
Grist Mill Road Simsbury, Connecticut Sheets 1 of 2 and 2 of 2 Scale 1" = 40' November
1997 Hodge Surveying Associates, P. C. ... Francis A. Richard, L. S. - #13351", which map
or plan is to be filed in the Office of the Simsbury Town Clerk, reference to which is hereby
made, and being more particularly bounded and described as follows:

Beginning at a point on the easterly streetline of Grist Mill Road said point being the
southwesterly corner of the herein described parcel, thence in a northerly direction along the
easterly streetline of Grist Mill Road along a curve to the left having a radius of 2182.68
feet, a distance of 50.49 feet to a point; thence S 89°-14'- 42" E a distance of 182.33 feet
to a point; thence N 65° - 28'- 04" E a distance of 280.59 feet to a point; thence N 2° - 44'-
27" W a distance of 160.70 feet to a point; thence N 79° - 06'- 32" E a distance of 120.00
feet to a point; thence N 10° - 15' - 04" E a distance of 151.05 feet to a point; thence S 72°
- 27'- 29" E a distance of 275.05 feet to a point; thence S 77° - 04'- 33" E a distance of
80.16 feet to a point; thence N 42° - 44'- 29" E a distance of 405.00 feet to a point in the
center of Hop Brook; thence south 52°-58'-15" E, a distance of 341.25 feet to a point;
thence S 10° - 58'- 40" W a distance of 14.00 feet to a point; thence N 73° - 55'- 26" W a
distance of 205.35 feet to a point; thence S 3° - 39'- 30" W a distance of 304.59 feet to a
point; thence S 6° - 21'- 18" W a distance of 261.31 feet to a point; thence N 78 °- 35'- 13"
W a distance of 770.84 feet to a point; thence S 65° - 28'- 04" W a distance of 291.81 feet
to a point; thence N 89° -14'-42" W a distance of 186.50 feet to the point and place of ---
beginning."

TOGETHER WITH an easement, in common with others, for ingress and egress across
Grist Mill Road, so called, being a strip of land approximately sixty feet in width and more
particularly bounded and described as set forth on Schedule A-1 attached hereto and made a
part hereof, for all purposes for which a public road may be used, until such time as said
Grist Mill Road shall be accepted as a public road.

TOGETHER WITH all right, title and interest, if any, arising under that certain Declaration
of Easements, Covenants, and Restrictions for The Powder Forest Business Park dated
December 2, 1983 and recorded December 9, 1983, in Volume 271, Page 546 of the
Simsbury Land Records as amended by Amended and Restated Declaration of Easements,
Covenants and Restriction for The Powder Forest Business Park dated December 8, 1997, and
recorded in Volume 479 at Page 795 of the said Land Records.

Received for Record at Simsbury, CT
On 08/30/2007 M 4:23:43 pm

EXHIBIT 3.2

TERMS OF TENANT'S PURCHASE OF THE PREMISES

1.    Purchase and Sale.    Upon the exercise of the Option by Tenant in accordance with Section 3 of the Lease, Landlord agrees to sell the Premises to Tenant, and Tenant agrees to purchase the Premises from Landlord, subject to those exceptions and other matters set forth in Section 3.2 of the Lease , upon the terms and conditions set forth herein.

2.    Purchase Price.    The purchase price for the Premises (the "Purchase Price"), which shall be paid by Tenant to Landlord at the Closing in immediately available funds, shall be FIVE MILLION AND NO/100 ($5,000,000.00) Dollars, less the Option Deposit, plus the Option Fee, if any, less the Clean Room Excess Costs, if any.    ~~none past 24 months~~

3.    Title to be Conveyed.    Landlord shall, at the Closing (as hereinafter defined), convey to Tenant or its nominee, by good and sufficient warranty deed, marketable fee simple title to the Premises free and clear of all liens and encumbrances whatsoever, except as such may appear of record as of the Effective Date of the Lease.    Landlord covenants and agrees that during the term of the Option it will not create or permit to be created any title encumbrances (including restrictions, easements, licenses, agreements, leases or tenancies) with respect to the Premises without the consent of Tenant.

4.    Closing; Possession.    The Closing shall be held at the offices of Landlord's attorney upon the closing date specified in Tenant's Option Notice, or at such other time and/or place as shall be mutually agreed upon by the parties. Landlord shall deliver actual and exclusive possession and occupancy of the Premises, free from all leases, tenancies and rights of persons now or formerly in possession of the Premises, with the exception of the Lease, to Tenant as of time of Closing.

5.    Costs.    Landlord shall be responsible for payment of the conveyance taxes due the State and the Town of Simsbury in connection with the recording of the deed to the Premises. Tenant shall pay the recording fees for recording the deed to the Premises.

6.    Default.    Because the anticipated damages are uncertain in amount and difficult to prove, because the parties hereto wish to liquidate said damages in advance, and because the aggregate sum of the Option Fee paid and to be paid in accordance with the Option is not greatly disproportionate to the damage reasonably to be anticipated in the event of breach by Tenant, it is further agreed that if the Tenant shall exercise the Option and fail to pay the full Purchase Price, and Landlord is not in default under the Lease, then Tenant shall forfeit all claims against Landlord hereunder with respect to the Option, but Tenant shall retain all other rights and privileges Tenant may have under the Lease.    Landlord shall accept the Option Fee as liquidated damages. Any portion of the Option Fee actually received and retained by Landlord under the Lease shall be credited against the liquidated damages sum. Upon the payment of such sum, the rights, responsibilities, and liabilities of the parties under the Lease and this Option shall be reinstated at such time as though Tenant had not exercised the Option.    If Landlord defaults

under the Terms of this Option, Tenant shall be entitled to pursue its rights and remedies pursuant to the Lease or as may otherwise be available at law or in equity.

7. <u>Transfer Act</u>.

7.1.    Landlord shall be fully responsible for any and all costs and obligations related to or arising under the Connecticut Transfer Act, Conn. Gen Statutes Section 22a-134 *et seq*. (the "<u>Transfer Act</u>") with respect to the Premises, the Land and the Building, regardless of whether compliance with the Transfer Act is required by virtue of the terms of the Lease, the exercise of this Option by the Tenant or otherwise except for acts of the Tenant upon and after the Commencement Date of the Lease that solely causes the Premises to become subject to the Transfer Act. Landlord shall otherwise fully release, indemnify and hold Tenant harmless with respect to the Transfer Act.

7.2.    If, at any time, the Connecticut Department of Energy & Environmental Protection ("DEEP"), Landlord, Tenant, or any of its consultants or advisors, determines that the Premises is subject to the provisions of the Transfer Act, then, except as otherwise provided in Section 7.1 above, Landlord shall, at its sole cost and expense: (i) fully and timely comply with the provisions of the Transfer Act; (ii) prepare and execute all documents and forms required by the Transfer Act, including any Environmental Condition Assessment Form ("ECAF"), in form and substance satisfactory to Tenant; (iii) pay all fees related to or arising under the Transfer Act; and (iv) execute any Form III (as defined in the Transfer Act) as the "certifying party" (as defined in the Transfer Act). In the event Tenant acquires title to the Premises, and subject to the full and timely performance of Landlord's release, indemnification, hold harmless and performance obligations with respect to the Transfer Act, Landlord agrees to be bound by the reasonable judgments and determinations of Tenant and its consultants and advisors on all matters relating to the Transfer Act, including (A) the determination of the type of filing required by the Transfer Act (i.e., Form I, II, III or IV), and (B) the calculation of the fees and payments required by the Transfer Act. Landlord shall provide Tenant with copies of all documents required by this Section 7.2 no later than ten (10) days before the Closing, and with copies of all filings and correspondence with the DEEP related to the Transfer Act within ten (10) days of sending or receiving same.

7.3.    Landlord shall be responsible for and shall fully release, indemnify and hold Tenant harmless from any and all costs, liabilities, demands, claims, civil or criminal actions, or causes of action, civil or criminal penalties, fines, losses, liens, assessments, damages, liabilities, costs, disbursements, expenses or fees of any kind or any nature (including all clean-up costs and attorneys' fees) which may at any time be imposed upon, incurred by or asserted or awarded against Tenant arising out of or on account of (i) Landlord's failure to timely and fully comply with the provisions of this Section 7.3, whether due to any action or omission of Tenant; (ii) environmental conditions at, on, under, migrating from the Premises or the Building, (iii) a violation or alleged violation of any applicable Environmental Law, or non-compliance with any applicable permit with respect to the Premises or the Building, (iv) the presence of any Hazardous Substance, or a release of any Hazardous Substance: (1) on, at, under, or to the Premises or the

Building: or (2) on any property within the vicinity of the Premises or the Building from the Premises or the Project or in any way related to activities at any time conducted on or related to the Building or the Project, (v) being a potentially responsible party under the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, *et seq.*) or any State analogue thereto, related to activities conducted on the Premises by Tenant or related to the Building; (vi) the Transfer Act, or (vii) human or environmental exposure to any Hazardous Substance, noises, vibrations or nuisances of whatever kind to the extent the same arises from the condition of the Premises or the Building, or the occupancy, use, or operation thereof.  "Environmental Law" shall mean any federal, state or local, statute, act, law, ordinance, rule, regulation, order or permit pertaining to the environment, whether now or hereafter enacted, including: (i) the Clean Air Act, 42 U.S.C. Section 7901 et seq.; (ii) the Federal Water Pollution Act of 1972; (iii) The Clean Water Act, 33 U.S.C. Section 407 et seq.; (iv) the Resource Conversation and Recovery Act of 1976, 42 U.S.C. Section 6901 et seq.; (v) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601, as amended by the Superfund Amendments and Reauthorization Act of 1986 (Pub. L. 99-499, 100 Stat 1613, 1986); (vi) the Toxic Substances Control Act, 15 U.S.C. Section 2601; and (vii) any similar statute, law, ordinance, rule, regulation or order adopted in the jurisdiction in which the Premises is located at any time whether before or after the execution of the Lease (including, in each instance, any amendments or extensions thereof and any rules or regulations issued pursuant to said Environmental Laws). "Hazardous Substance" shall mean any hazardous or toxic substance as defined in any Environmental Law or in any rule, regulation or order issued pursuant to any Environmental Law.

7.4.    The provisions of this Section 7 shall survive the expiration or termination of the Lease or the Closing without limitation.

8.    Closing Obligations.  At Closing, Landlord shall deliver the following to Buyer:

8.1.    Warranty Deed.  A fully executed, witnessed and acknowledged Connecticut form warranty deed naming the Tenant or its nominee as grantee, properly executed in form for recording.

8.2.    Conveyance Taxes.  Properly completed and executed State and municipal conveyance tax statements for filing with the appropriate Town Clerk, together with checks, at Landlord's expense, to the order of the appropriate officers in payment of such taxes.

8.3.    Title Affidavits.  An affidavit signed by Landlord and stating that (a) no work has been performed or materials supplied on Landlord's behalf or direction within the ninety (90) day period preceding the Closing (or unconditional and properly executed lien waivers of the same in lieu thereof, where applicable), and (b) with the exception of Tenant, there are no tenants or other parties in possession of the Premises, in a form acceptable to Tenant's title insurance company, and such other documents executed in

such form as Tenant's title insurance company and Tenant's lender shall reasonably require.

8.4.   *FIRPTA*. The appropriate affidavit or certification in compliance with the Foreign Investment in Real Property Tax Act ("FIRPTA"). If Landlord is unable to provide the appropriate affidavit or certification, then Landlord shall prepare and execute the required forms for withholding a portion of the Purchase Price, and authorize Tenant to remit a portion of the Purchase Price to the Internal Revenue Service at Closing.

8.5.   1099. The appropriate affidavits and documents in compliance with Section 6045 of the Internal Revenue Code and the regulations promulgated thereunder, if required.

8.6.   Transfer Act Forms. All documents and forms required by the Transfer Act, in accordance with Section 7 of this Option.

8.7.   Notices. Any notice or other communication in connection with this Option shall be made in accordance with Section 19 of the Lease.

9.   Miscellaneous.

9.1.   Entire Agreement. The Lease and this Option (including all exhibits attached thereto) represents the entire understanding between the parties with respect to the subject matter of the Lease and this Option, and all prior agreements and understandings between the parties with respect to the subject matter of the Lease and this Option shall be deemed merged in the Lease and this Option.

9.2.   No Oral Amendment or Modification. No amendments, waivers or modifications of this Option shall be made or deemed to have been made unless in writing executed by both Landlord and Tenant.

9.3.   Binding Effect. This Option shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and assigns.

9.4.   Captions for Convenience. All headings and captions used in this Option are for convenience only and are of no meaning in the interpretation or effect of this Option.

9.5.   Applicable Law. This Option shall be interpreted and enforced according to the laws of the State of Connecticut.

9.6.   No Waivers. Any waiver of a breach of any provision contained in this Option must be in writing to be valid and enforceable. No waiver of breach shall be deemed a waiver of any preceding or succeeding breach, nor of any other breach of a provision contained in this Option.

9.7.   Construction. Landlord and Tenant hereby acknowledge that both parties participated equally in the negotiation of this Option and that, accordingly, no court

construing this Option shall construe it more stringently against one party than against the other, regardless of which party's counsel drafted this Option.

9.8.    <u>Capitalized Terms</u>.  Capitalized terms not herein defined shall have the meaning ascribed to them in the Lease.

EXHIBIT 7.2

PLANS FOR TENANT'S INITIAL ALTERATIONS



CuraLeaf Medical Marijuana
Production Facility
Former Existing Ensign Bickford Office/Tech. Building

SITE PLAN

100 Grist Mill Road
Simsbury, CT

L1

Coldham & Hartman Architects

EXHIBIT 17.1

CLEAN ROOM SPACE



FIRST FLOOR PLAN

ENSIGN-BICKFORD REALTY CORPORATION
73 West Street, P.O. Box 715
Simsbury, CT, 06070-0711

100 GRIST MILL ROAD

AVON, CONNECTICUT

A-1
FIRST FLOOR
PLAN

EXHIBIT 26

FORM OF NOTICE OF LEASE

This instrument is a Notice of Lease pursuant to Section 47-19 of the Connecticut General Statutes. The statutory information is as follows:

1.    Parties to the Lease:

    (a)    The landlord is Grist Mill Partners, LLC ("Landlord"), a Delaware limited liability company having an address of 1-3 Mill Pond Lane, Simsbury, Connecticut 06070.

    (b)    The tenant is CuraLeaf, LLC ("Tenant"), a Connecticut limited liability company having an address of 145 Doubling Road, Greenwich, Connecticut 06830.

2.    Lease:

The Landlord and Tenant entered into a Lease with Option to Purchase dated as of February ___, 2014 (the "Lease").

3.    Term of Lease:

The initial term of the Lease commences no later than August __, 2014 and terminates no later than _____ ___, 2019.

4.    Leased Premises:

The premises leased to the Tenant pursuant to the Lease is that certain real property and the improvements thereon owned by Landlord situated in the Town of Simsbury and more particularly described on Exhibit A attached hereto and made a part hereof.

5.    Right of Renewal:

One (1) term of five (5) years.

6.    Option to Purchase:

The Tenant has the option to purchase the Leased Premises during a period of time commencing on the date set forth on the Lease and ending upon the earlier of the expiration or termination of the Lease, in accordance with the terms and conditions set forth in the Lease.

7.    Filing:

The Lease shall be on file at the offices of Tenant and Landlord set forth above.

SIGNATURE PAGE FOLLOWS

## FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (this "Amendment") is made as of November 1, 2014, by and among GRIST MILL PARTNERS, LLC, a Delaware limited liability company having an address of 35 Tower Lane, Avon, CT 06001 ("Landlord") and CURALEAF, LLC, a Connecticut limited liability company having an address of 145 Doubling Road, Greenwich, CT 06830 ("Tenant").

## W I T N E S S E T H :

WHEREAS, Landlord is the fee owner of the real property and improvements commonly known as 100 Grist Mill Road, Simsbury, Connecticut (the "Premises");

WHEREAS, Landlord and Tenant are parties to that certain Lease with Option to Purchase dated as of February 11, 2014 (the "Lease") by which Landlord leases to Tenant the Premises;

WHEREAS, Landlord wishes to amend the provision of the Lease directing the account into which the Rent is to be paid by Tenant;

NOW, THEREFORE, in consideration of the premises, and other good and valuable consideration the parties agree as follows:

1.      Section 2.1(a) of the Lease is hereby amended to provide as follows:

"(a)    Tenant shall pay to or for the benefit of Landlord, as Rent during each year of the Term, Base Rent and Additional Rent as provided in this Article 2. All payments of Rent and any Additional Rent, except for third-party payments as provided under Section 2.3 of this Lease, shall be paid in U.S. Dollars, by means of check payable to Landlord at the address provided herein, or, at Tenant's option, by means of wire transfer to the account of Grist Mill Partners, LLC at First Niagara Bank. Landlord may designate a different bank to which payments by wire transfer should be sent upon not less than twenty-one (21) days' prior written notice given in accordance with Article 19 of this Lease. Rent for any month only a portion of which is included in the Term shall be prorated based on the number of days in that month that are included in the Term."

2.      Except as modified by this Amendment, the Lease and all covenants, agreements, terms and conditions thereof shall remain in full force and effect and are hereby in all respects ratified and confirmed. In the event of any conflict or inconsistency between the Lease and this Amendment, this Amendment shall govern and control, anything contained in the Lease to the contrary notwithstanding.

Case 3:20-cv-00738-JAM   Document 53   Filed 06/26/20   Page 122 of 127

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment to Lease as of the day and year first above written.

Landlord:                                         Tenant:
GRIST MILL PARTNERS, LLC                          CURALEAF, LLC


By: _Matthew Westcott_____            By: _____
Name:  Matthew Westcott                   Name:  Robert Birnbaum
Title: President of Managing              Title: Manager
Duly Authorized    Member                 Duly Authorized


STATE OF CONNECTICUT   }
                       } ss.
COUNTY OF HARTFORD     }

On this, the _10th_ day of November, 2014, before me, personally appeared _Mathew Westcott_ to me known, who, being duly sworn by me, did depose and say that he is an authorized representative of GRIST MILL PARTNERS, LLC, the limited liability company described in and which executed the foregoing instrument; and that he/she signed his/her name thereto by authority of the members of said company.

                              _____
                              Commissioner of the Superior Court
                              Notary Public
                              My Commission Expires: _____

                              JASON J. CONCATELLI
                              Notary Public, State of Connecticut
                              My Commission Expires March 31, 2017


STATE OF CONNECTICUT   }
                       } ss.
COUNTY OF              }

On this, the _13TH_ day of November, 2014, before me, personally appeared _Robert Birnbaum known_ to me known, who, being duly sworn by me, did depose and say that he is an authorized representative of CURALEAF, LLC, the limited liability company described in and which executed the foregoing instrument; and that he signed his name thereto by authority of the members of said company.

                              _____
                              Commissioner of the Superior Court
                              Notary Public
                              My Commission Expires: _____

3508757v.1

## SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE (this "Amendment") is made as of July _____, 2016, by and among GRIST MILL PARTNERS, LLC, a Delaware limited liability company having an address of 35 Tower Lane, Avon, CT 06001 ("Landlord") and CURALEAF, LLC, a Connecticut limited liability company having an address of 145 Doubling Road, Greenwich, CT 06830 ("Tenant").

W I T N E S S E T H :

WHEREAS, Landlord is the fee owner of the real property and improvements commonly known as 100 Grist Mill Road, Simsbury, Connecticut (the "Premises");

WHEREAS, Landlord and Tenant are parties to that certain Lease with Option to Purchase dated as of February 11, 2014 (the "Lease") by which Landlord leases to Tenant the Premises;

WHEREAS, Landlord and Tenant wish to amend certain terms and conditions of the Lease as more particularly set forth below, including without limitation the provision of the Lease concerning the increase in the Base Rent that is to take place in the twenty-fifth full calendar month after the Commencement Date of the Lease; and

NOW, THEREFORE, in consideration of the premises, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.   Capitalized terms used and not otherwise defined in this Amendment shall have the meanings ascribed to those terms in the Lease.

2.   Landlord and Tenant acknowledge and agree that the Commencement Date under the Lease occurred on or about February 11, 2014.

3.   Section 2.2 of the Lease is hereby deleted in its entirety and replaced with the following:

"**2.2    Base Rent.**  Except as modified herein, beginning on the Commencement Date and ending on the last day of the twenty-fourth full calendar month of the Term Tenant shall pay to Landlord rent (the "Base Rent") at the annual rate of Seven Hundred Twenty Thousand and no/100 Dollars ($720,000.00), payable in equal monthly payments of Sixty Thousand and no/100 Dollars ($60,000.00), in advance of the first day of each calendar month during the Term, at Landlord's address set forth above, or at such other address as Landlord may specify by written notice to Tenant from time to time.

Except as modified herein, commencing on the first day of the thirty-seventh full calendar month of the Term, the Base Rent shall be increased to an annual rate of Seven Hundred Thirty-Nine Thousand Two Hundred and no/100 Dollars ($739,200.00), payable in equal monthly installments of Sixty-One Thousand Six

Hundred and no/100 Dollars ($61,600.00), payable in the same manner as provided above.

Except as modified herein, commencing on the first day of the forty-ninth full calendar month of the Term, the Base Rent shall be increased to an annual rate of Seven Hundred Fifty-Eight Thousand Four Hundred and no/100 Dollars ($758,400), payable in equal monthly installments of Sixty-Three Thousand Two Hundred and no/100 Dollars ($63,200.00), payable in the same manner as provided above.

4.       Article 18 of the Lease is hereby deleted in its entirety and replaced with the following:

"**18.     OPTION TO EXTEND**.

So long as Tenant is not in default hereunder beyond any applicable grace or cure period, Tenant shall have the right to extend the Term for one period of five (5) years, provided that Tenant shall give Landlord written notice of the exercise of its election to extend at least six (6) months prior to the expiration of the initial Term of this Lease.  In the event of an extension as aforesaid, all of the terms of the Lease set forth herein shall remain in full force and effect.  After the exercise by Tenant of such option to extend, the word "Term" or any equivalent expression shall mean the Term as so extended.  The annual Base Rent for the first twelve (12) month period of the extension Term shall be Seven Hundred Seventy-Seven Thousand Six Hundred and no/100 Dollars ($777,600.00), payable in equal monthly installments of Sixty-Four Thousand Eight Hundred and no/100 Dollars ($64,800.00), and such annual Base Rent shall be subject to per annum escalation during the extension Term, commencing on the first day of the thirteenth calendar month of the extension Term, in accordance with the following rental schedule."

| Rental Year | Annual Rent | Monthly rent | Monthly rental increase amount |
|---|---|---|---|
| 3 | $720,000 | $60,000 | $0.00 |
| 4 | $739,200 | $61,600 | $1,600 |
| 5 | $758,400 | $63,200 | $1,600 |
| Extension Period | | | |
| 6 | $777,600 | $64,800 | $1,600 |
| 7 | $796,800 | $66,400 | $1,600 |

| | | | |
|---|---|---|---|
| 8 | $816,000 | $68,000 | $1,600 |
| 9 | $835,200 | $69,600 | $1,600 |
| 10 | $854,400 | $71,200 | $1,600 |

5.  Notwithstanding anything to the contrary in the Lease, Landlord acknowledges and agrees that, subject to Landlord's right to review and consent to the plans and specifications for Tenant Alterations as set forth in Section 7.2 of the Lease, Tenant shall have the right to (i) do a full interior demolition of the portion of the Premises which has not been fit out by Tenant as of the date of this Amendment and (ii) fit out such area as additional cultivation area.

6.  Landlord acknowledges and agrees that it is currently holding the sum of Two Hundred Forty and 00/100 Dollars ($240,000) as the Security Deposit under the Lease.  Notwithstanding anything to the contrary in Lease, Landlord covenants and agrees that: (i) the Security Deposit shall be held in a segregated account and not comingled with funds belonging to Landlord; (ii) Landlord will, upon request and from time to time, provide Tenant with proof that the Security Deposit is being held as required under the Lease, as modified by this Amendment; and (iii) it will not later than six months before the expiration of the Extension Term, place the Security Deposit in escrow with a third-party escrow agent reasonably acceptable to Tenant and pursuant to a commercially-reasonable form of three party (Landlord, Tenant, and escrow agent) escrow agreement reasonably acceptable to Tenant which provides that escrow agent shall hold such sum and disburse the same in accordance with the terms and conditions of the Lease or the written agreement of Landlord and Tenant.  .

7.  Except as modified by this Amendment, the Lease and all covenants, agreements, terms and conditions thereof shall remain in full force and effect and are hereby in all respects ratified and confirmed.  In the event of any conflict or inconsistency between the Lease and this Amendment, this Amendment shall govern and control, anything contained in the Lease to the contrary notwithstanding.

8.  This Amendment may be signed and executed in one or more counterparts, each of which shall be deemed an original and all of which, together, shall constitute one Amendment.  Delivery of an executed counterpart of a signature page of this Amendment by facsimile or email shall be effective as delivery of an originally executed counterpart of this Amendment.

*[Remainder of page intentionally left blank; signatures to follow.]*

IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment to Lease as of the day and year first above written.

Landlord:  
GRIST MILL PARTNERS, LLC

Tenant:  
CURALEAF, LLC

By:_____  
    Name:  
    Title:  
    Duly Authorized

By:_____  
    Name: ANDREW SIEGHART  
    Title:  
    Duly Authorized

STATE OF CONNECTICUT  }  
                        } ss.  
COUNTY OF HARTFORD  }

On this, the _____ day of July 2016, before me, personally appeared _____ to me known, who, being duly sworn by me, did depose and say that he is an authorized representative of GRIST MILL PARTNERS, LLC, the limited liability company described in and which executed the foregoing instrument; and that he/she signed his/her name thereto by authority of the members of said company.

_____  
Commissioner of the Superior Court  
Notary Public  
My Commission Expires:

STATE OF CONNECTICUT  }  
                        } ss.  
COUNTY OF  }

On this, the 25th day of July 2016, before me, personally appeared Andrew Sieghart to me known, who, being duly sworn by me, did depose and say that he is an authorized representative of CURALEAF, LLC, the limited liability company described in and which executed the foregoing instrument; and that he signed his name thereto by authority of the members of said company.

_____ 7/25/16  
Commissioner of the Superior Court  
Notary Public  
My Commission Expires:

SHAQUEMA C PETRIE  
Notary Public  
Connecticut  
My Commission Expires Jul 31, 2017

25600/2/3512461.1

4341524v.1

IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment to Lease as of the day and year first above written.

Landlord:                                                Tenant:
GRIST MILL PARTNERS, LLC                  CURALEAF, LLC


By: _____                    By: _____
Name: Matthew Westcott                            Name:
Title: President of Managing Member        Title:
Duly Authorized                                          Duly Authorized


STATE OF CONNECTICUT  }
                                            } ss. Avon
COUNTY OF HARTFORD   }


        On this, the 25th day of July 2016, before me, personally appeared Matthew Westcott to me known, who, being duly sworn by me, did depose and say that he is an authorized representative of GRIST MILL PARTNERS, LLC, the limited liability company described in and which executed the foregoing instrument; and that he/she signed his/her name thereto by authority of the members of said company.

                                    _____
                                    Commissioner of the Superior Court
                                    Notary Public
                                    My Commission Expires: 3-31-17

                                    JASON J. CONCATELLI
                                    Notary Public, State of Connecticut
                                    My Commission Expires March 31, 2017

STATE OF CONNECTICUT  }
                                           } ss.
COUNTY OF                   }


        On this, the _____ day of July 2016, before me, personally appeared _____ to me known, who, being duly sworn by me, did depose and say that he is an authorized representative of CURALEAF, LLC, the limited liability company described in and which executed the foregoing instrument; and that he signed his name thereto by authority of the members of said company.

                                    _____
                                    Commissioner of the Superior Court
                                    Notary Public
                                    My Commission Expires:

4341524v.1