# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DANIEL E. CARPENTER,
BENISTAR 419 PLAN SERVICES, INC.,
BENISTAR ADMIN SERVICES, INC.,
BENISTAR EMPLOYER SERVICES TRUST CORP.,

Civil Action No. _____

                              Plaintiffs,

APRIL 19, 2013

-against-

UNITED STATES OF AMERICA acting through
COMMISSIONER OF INTERNAL REVENUE,

                              Defendant.

## COMPLAINT

Plaintiffs, by their attorneys, as and for their Complaint against the United States of America, acting through the Commissioner of Internal Revenue ("the Commissioner") allege:

### Jurisdiction, Venue and Nature of Action

1. This action for Declaratory Judgment pursuant to 28 U.S.C. § 2201(a) arises out of the imposition of penalties under Internal Revenue Code ("IRC") § 6708, as amended by the American Jobs Creation Act of 2004, § 817(a), P.L. 108-357, 10/22/2004 ("AJCA").

2. This Court has jurisdiction of these claims for relief by virtue of 28 U.S.C. § 1331.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e).

4. In this action, Plaintiffs seek a declaration that they are not, and never have been, "material advisors" as defined in IRC § 6111 and, as such, are not subject to penalties under § 6708; and that the Benistar 419 Plan ("Benistar 419 Plan" or the "Plan") is a welfare benefit plan under IRC § 419(e) that qualifies under IRC § 419A(f)(6), so all contributions made by the participating employers are immediately deductible, and is not a "listed" or reportable transaction. Plaintiffs also seek the return of their property pursuant to § 41(g) of the Federal Rules of Criminal Procedure.

5.    Plaintiffs bring this action because they have been arbitrarily, capriciously, and erroneously assessed <u>penalties</u> under IRC § 6708 without grounds and without any due process whatsoever.  Plaintiffs have challenged this assessment on the grounds that they are not now nor have they ever been "material advisors" with respect to a "reportable transaction" under any possible definition of those terms.  In connection with these penalty assessments, the Internal Revenue Service (the "IRS") filed tax liens against each of the Plaintiffs.

6.    If, as more fully set forth below, the Plaintiffs are not "material advisors" to the Benistar 419 Plan, the penalties imposed on them must be abated whether or not the Benistar 419 Plan qualifies under IRC § 419A(f)(6); conversely, if the Benistar 419 Plan qualifies under that section, it is not a "reportable transaction," in which case the penalties imposed upon Plaintiffs must be abated even if the Plaintiffs were material advisors.

### The Parties

7.    The Plaintiffs are corporations organized under the laws of the State of Delaware or Connecticut, and one individual, Daniel E. Carpenter ("Mr. Carpenter").  Mr. Carpenter resides in the State of Connecticut, and the corporations maintain their principal places of business in Simsbury, Connecticut.

8.    Plaintiff Benistar Admin Services, Inc. ("BASI") has had no involvement whatsoever with the Benistar 419 Plan since year-end 2000.  Prior to 2001, BASI had served as a mere clerical administrator of the Plan.

9.    Plaintiff Benistar Employer Services Trust Corporation ("BESTCO") was the sponsor of the Benistar 419 Advantage Plan, which ceased to exist as of December 31, 2001.  BESTCO was also the sponsor of the BISYS Advantage Plan through December 31, 2000, at which

time BISYS removed that plan from BESTCO's administration and sponsorship. Since January 1, 2001, BESTCO, like BASI, has had no involvement with the Plan.

10.     Plaintiff Benistar 419 Plan Services, Inc. ("Benistar 419 Plan Services") functioned merely as the Benistar 419 Plan sponsor and administrator, and in such capacity it does not now, nor has it ever, provided any tax advice to the Benistar 419 Plan participants or participating employers or been paid anything for serving as the Benistar 419 Plan sponsor.

11.     Plaintiff Carpenter was Chairman of Benistar 419 Plan Services, Inc. but stepped down from that position in January of 2004 – fully 10 months prior to the enactment of the penalties under the AJCA that have been assessed against him and the other Plaintiffs. Mr. Carpenter does not now, nor did he ever, provide tax advice to Benistar 419 Plan participants or has ever been paid anything for acting as the Chairman of Benistar 419 Plan Services, the Benistar 419 Plan Sponsor.

12.     Defendant is the United States of America, acting through its Commissioner of Internal Revenue of the United States.

<u>The Anti-Injunction & Declaratory Judgment Acts Do Not Preclude This Complaint</u>

13.     United States Code § 2201 provides that, with certain exceptions, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declarations" "where there exists an actual case or controversy."

14.     An exception contained in § 2201 precludes this remedy "with respect to Federal <u>taxes</u> other than actions brought under Section 7428 of the Internal Revenue Code of 1986." (Emphasis added).

15.     Similarly, the Anti-Injunction Act (26 U.S.C. § 7421) provides that "no suit for the purpose of restraining the assessment or collection of any <u>tax</u> shall be maintained in any court by any person …." (Emphasis added).

16.     The purpose of this tax limitation on the scope of the Declaratory Judgment Act and the Anti-Injunction Act is to prevent disruptions in the federal revenue process, not to limit judicial review of a matter solely because it is somehow related to taxes. <u>Joslin v. Secretary of Dept. of the Treas.</u>, 616 F. Supp. 1023 (D. Utah 1985). Where, as here, a statute requires the doing of an act and as a sanction imposes a pecuniary punishment for the failure to do such act then it is a penalty, and not a tax. <u>Consumers & Producers Assn. v. State of Okla.</u>, 48 AFTR2d 81-5679 (1981). In other words, a penalty is an exaction imposed by statute as a punishment. <u>United States v. LaFranca</u>, 282 U.S. 568, 572 (1931). A <u>tax</u> is subject to the Anti-Injunction Act, whereas a penalty is not. <u>National Federation of Independent Business v. Sibelius</u>, 132 S. Ct. 2566, 2584 (2012) ("In light of the Code's consistent distinction between the terms 'tax' and 'assessable penalty' … [the Secretary's] authority to assess taxes includes the authority to assess penalties, but it does not equate assessable penalties to taxes for other purposes.").

17.     IRC § 6111, as amended, requires each "material advisor" with respect to any "reportable transaction" to maintain lists in such form as the Secretary of the Treasury may prescribe.

18.     Under § 6111, as amended, any material advisor who fails to maintain a list of investors in potentially abusive tax shelters or reportable transactions and to make that list available to the IRS on its written request within 20 business days after the date of the request is liable for a $10,000 per day <u>penalty</u> for that failure after the 20th day. <u>See</u> § 6708(a)(1) (as amended by the AJCA).

19.     As it is specifically provided by statute that the exaction imposed on a "material advisor" who does not comply is a penalty and not a tax, such exaction is not subject to the Anti-Injunction Act (IRC § 7421) or the Declaratory Judgment Act (28 USC § 2201(a)).

The Penalties

20.     On August 10, 2009, an Internal Revenue Agent sent letters to each of the Plaintiffs, copies of which are annexed hereto as **Exhibit A**.  The letters are entitled "Re § 6708 Penalty." (Emphasis added).

21.     In its first sentence of each letter, the Internal Revenue Agent who authored them confirmed that the IRS was seeking to collect a penalty assessed against Plaintiffs:  "Enclosed are the Forms 886-A Explanation of Items relating to a penalty assessed against you in the amount of... under I.R.C. § 6708."  (Emphasis added).

22.     The amounts of the penalties varied.  For Mr. Carpenter it was $740,000; for BASI it was $1,120,000; for BESTCO it was $740,000; and for Benistar 419 Plan Services it was $1,120,000.  In total, nearly $5,000,000 in penalties were charged to four entities and one person, all at 100 Grist Mill Road involving the Benistar 419 Plan.  According to the Government Accountability Office, the Plaintiffs were the only Americans hit with these egregious penalties after 2007.  And, over 93% ($4,840,000) of the $5,200,000 in unabated § 6708 penalties assessed since 2005 belong to Mr. Carpenter and entities related to the Benistar 419 Plan.  See **Exhibit B**.

23.     Plaintiffs dispute the assessments of the penalties as they have never acted as a "material advisor" to a "reportable transaction"; in fact, the Benistar 419 Plan is a welfare benefit plan as defined under IRC § 419(e) that qualifies for favorable tax treatment under IRC § 419A(f)(6) and, as such, the Plan cannot be a reportable transaction.

5

24.     As reflected in the Explanation of Items contained in the letters to the Plaintiffs, the penalties being assessed were for the tax year ending December 31, 2002, and such penalties were assessed on the alleged grounds that Plaintiffs were "associated with the Benistar 419 Advantage Plan."

25.     More particularly, the purported grounds for the assessment against Plaintiffs are that Plaintiffs were "material advisors" with respect to the Benistar 419 Plan; that the Benistar 419 Plan was a reportable transaction; and that, as "material advisors" to such Plan pursuant to IRC §6111, Plaintiffs had a list keeping requirement under IRC §6112.

26.     As more fully set forth herein, Plaintiffs were not "material advisors" with respect to the Plan; and, in any event, the Plan was not a "reportable transaction" or a "listed transaction" at any time in its existence.

<u>The Raid</u>

27.     On April 20, 2010 -- in a "commando-like" raid and illegal search of the offices located at 100 Grist Mill Road in Simsbury, Connecticut (the "Raid") -- some 70-plus IRS Criminal Investigation Division agents wearing black Kevlar bullet-proof vests and fully armed with automatic weapons, herded the employees of the various companies then at the office building located at 100 Grist Mill Road into a conference room and illegally searched their offices and interrogated them.  The raid was doubly unnecessary and objectionable given that lawful disputes regarding the subject matter of the search were pending in this very Court.

28.     During the Raid, the IRS seized some 400 boxes of documents and other property belonging to, among others, the Plaintiffs, even though some of the Plaintiffs are not listed in the Search Warrant.  A simple search of the IRS's own records -- or any number of publicly-available sources -- would have made it clear that the premises searched are leased by BASI and by none of

the other entities listed in the Search Warrant. Significantly, BASI itself is not listed in the search warrant. (A copy of the search warrant is annexed hereto as **Exhibit C**).

29. Further, and despite an order of this Court to the contrary, only a handful of boxes have been returned by the IRS, and over 200 boxes taken belong to the Benistar 419 Plan, which stopped taking new employers as of December 31, 2003, almost ten years ago.

30. Despite the fact that the Raid took place nearly three years ago, no legal proceedings whatsoever have been undertaken based on the documentation seized during the Raid, and none of the Benistar 419 Plan's property, nor Mr. Carpenter's personal property has been returned.

31. Through this action, Plaintiff seeks the return of all of the documents that were wrongfully seized by CID in the raid, as well as several declarations that the Plans were, in fact, operated legally and in accordance with all tax laws and that the contributions made to the Plans were fully-deductible by the participating employers that made the contributions.

<u>The Penalties And The Liens</u>

32. On July 8, 2010, the Plaintiffs formally protested the determinations set forth in the letters dated August 10, 2009 authored by Revenue Agent Charles Clark assessing the penalties to Alexander Toibman, an Appeals Officer of the Internal Revenue Service.

33. In that letter, a copy of which is annexed as **Exhibit D** hereto, the author, Ira B. Stechel, Esq. of Wormser, Kiely, Galef & Jacobs LLP, explained in detail why the penalties imposed were improper.

34. Despite numerous letters protesting the imposition of penalties, on or about August 12, 2010, the IRS imposed liens on the property of each of the Plaintiffs in the amount of the penalties assessed against each, but no hearings were ever held.

35.     On or about May 28, 2012, the IRS impounded a tax refund due to Mr. Carpenter in the amount of $18,400 purportedly as a partial offset of the IRC § 6708 penalty imposed on him.

36.     On March 30, 2011, Plaintiff BASI – whose business was jeopardized by the lien – commenced an action in this Court seeking a determination that, as it was not a "material advisor" to a reportable transaction, the tax lien filed by the IRS and the penalty itself should be abated.

37.     That action was necessitated not only because the lien jeopardized BASI's business, but also because the hearing requested by all of the Plaintiffs had not even been scheduled by that time (and, as set out in ¶ 128, no such hearing was ever held).

38.     In the foregoing litigation, BASI sought, among other things, a preliminary injunction.  Although the preliminary injunction was not granted, this Court (Hall, J.) did conclude that, for the years commencing in February 2003 and after, BASI was not a material advisor with respect to the Benistar 419 Plan, because no one at Benistar or 100 Grist Mill Road had issued any type of tax statement.  The Court did not, however, rule on the question whether BASI was a material advisor for prior years, including 2002 (the year for which penalties had been imposed).

39.     Moreover, and as conceded by the Tax Court in Cadwell v. Comr., 136 T.C. 38, *17 (2011) aff'd 109 AFTR 2d 2012-2693 (4th Cir. 2012), while the Tax Court has decided several cases regarding Section 419A(f)(6) plans (including the Benistar 419 Plan), the Tax Court has never decided whether any Section 419A(f)(6) plan met the requirements of that Section.

<u>A Case or Controversy Exists</u>

40.     Under the circumstances described in ¶¶ 11 through 39, an actual case or controversy exists, and a Declaratory Judgment is the most effective and economical manner in which to proceed to resolve this dispute, and this dispute is ripe for adjudication.

## FIRST CLAIM FOR RELIEF

### There Was No Basis for the Penalty Assessment as Plaintiffs are Not and Never Were "Material Advisors"

41.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 40 as if fully set forth hereat.

42.     The requirements to be a "material advisor" as defined under IRC § 6111 make clear why Plaintiffs could not possibly be and may not be deemed to be material advisors to the Plan:

a. Plaintiffs did not provide any material aid, assistance or advice with respect to organizing, managing, promoting, selling, implementing, insuring or carrying out any reportable transaction;

b. Plaintiffs do not give any tax advice nor have they written any tax opinions or made any "tax statements";

c. Plaintiffs have never been paid anything for giving tax advice;

d. Plaintiffs have not been paid anything -- much less the threshold amounts of $250,000 or $25,000 for -- giving tax advice with respect to a reportable transaction;

e. Plaintiffs are not in the business of giving "tax advice" or making "tax statements";

f. Plaintiffs have never received a commission or payment of any kind for providing "insurance" to a reportable transaction;

g. Plaintiffs are not directly or indirectly related to anyone that meets any of the above criteria; and

h. Plaintiffs have never been anything other than an affiliate to an employee benefit plan that provides death benefits for the families of the covered employees of participating employers.

43.     Since Plaintiffs cannot be considered "material advisors" under IRC § 6111, neither Plaintiffs nor any of their officers, employees, or affiliates have ever been responsible for maintaining a list as described under IRC § 6112(a).

44.     As Plaintiffs are not required to maintain a list under IRC § 6112(a), neither they nor any of their employees can be held accountable for any failure to maintain a list that would lead to any form of penalty under IRC § 6708.

45.     IRC § 6708 also provides that "[n]o penalty shall be imposed by paragraph (1) with respect to the failure [to maintain or file a form or list] if such failure is due to reasonable cause." As Plaintiffs are not required to file a form or maintain a list because they are not "material advisors." Plaintiffs have the ultimate "reasonable cause" and no penalty can be assessed against Plaintiffs on these grounds.

46.     Even assuming that Plaintiffs did somehow meet the definition of a "Material Advisor" in 2002 (the year for which the penalties are being allegedly assessed) -- which they did not -- the IRC § 6708 penalties that the Commissioner seeks to collect came into effect only with the passage of the AJCA on October 22, 2004 and affects only taxable years ending <u>after</u> October 22, 2004 for material advisors promoting the sale of reportable transactions after that date. The Benistar 419 Plan stopped taking in new participating employers as of December 31, 2003.

47.     In fact, the IRS's own website states that it was first updated to add the new requirements under IRC § 6112, including the new penalty under IRC § 6708, in December 2007. The website states that the statute of limitations for assessing a penalty under IRC § 6708 is three years. Thus, for Plaintiffs, the statute of limitations for failure to provide a list for 2002 ran out <u>seven years ago</u>.

48.     Further, the penalty was assessed in 2009, <u>seven</u> <u>years</u> after the year for which penalties have been assessed. The penalty in 2002 was for organizers of "abusive" tax shelters only and was $50 per day up to a maximum of $50,000.

10

49.     Plaintiffs were never organizers of an "abusive" tax shelter or, indeed, any tax shelter.

50.     Moreover, the Treasury's own regulations clearly limit the penalty to "material advisors" that "make a tax statement under Reg. § 301.6111-3 **on or after August 3, 2007**."  Treas. Reg. § 301.6112-1(g) (emphasis added).  Even if the Plaintiffs were "material advisors" -- which they are not -- they certainly have made no tax statement on or after August 3, 2007, or at any time. The Benistar 419 Plan stopped taking new participating employers after December 31, 2003, a full 10 months before the AJCA was passed into law on October 22, 2004; and four years before the new rules were added to the Regulations.

### SECOND CLAIM FOR RELIEF

**There Was No Basis for the Penalty Assessment as the Benistar
419 Plan Is Not and Has Never Been a Reportable Transaction**

51.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1-50 as if fully set forth hereat.

52.     Even if Plaintiffs met the definition of "material advisors" with respect to the Benistar 419 Plan, they would not be subject to a penalty under IRC § 6708 inasmuch as the Benistar 419 Plan is not, and has never been, a reportable transaction.

A.     The Benistar 419 Plan

53.     The Benistar 419 Plan is a fully insured multiple-employer welfare benefit plan under IRC § 419(e) that complies with the requirements of IRC § 419A(f)(6) and, consequently, is exempt from the funding, contribution and deduction limitations of IRC §§ 419 and 419A.

54.     The Plan's sponsor, Benistar 419 Plan Services, is an entity that performs no function other than serving as Plan Sponsor, Named Fiduciary, Trustee and administrator and itself is unrelated to any employer participating in the Plan (a "Participating Employer").

55.     The Plan provides only death benefits to eligible employees of Participating Employers under the Plan.  Upon joining the Plan, a Participating Employer executes an adoption agreement, which identifies those employees who are eligible to participate in the Plan and the amount of their death benefit.

56.     The cost to a Participating Employer of providing the death benefit is computed by reference to the table set forth at Reg. § 1.79-3(d)(2) and the actuarial calculations described in Code Section 7702.

57.     Once the amount of the death benefit and its cost has been determined, both are fixed and cannot be subsequently adjusted by either the Participating Employer or the Plan Sponsor.

58.     The costs paid to the Plan by a Participating Employer for Plan benefits, which are required to be paid in a single payment at the time of entry into the Plan, are irrevocable, and are not returned, refunded or rebated to an employer.

59.     Moreover, no employer is, directly or indirectly, a beneficiary of any insurance policy owned by the Benistar 419 Plan, since the Plan and the trust under the Plan that holds the Plan's assets thereunder (the "Trust") are named as both the owner and the beneficiary of all insurance policies that are purchased within the Plan.

60.     The benefits that are promised under the Plan are fully reinsured through the Plan's purchase of individual life insurance policies on the lives of covered employees.

61.     These life insurance policies are "cash value" policies, typically "universal life" or "variable life."  The purchase of such insurance by a plan under IRC § 419A(f)(6) is expressly sanctioned by the Treasury regulations.  See Treas. Reg. § 1.419A(f)(6)-1; the Preamble to Treasury Decision 9079 (July 16, 2003) (which adopted the Treasury regulations); Tax Court decisions (see, for example, Booth v. Comr., 108 T.C. 524 (1997)).

12

62.     The Plan's benefits are payable to the beneficiary or family member of a covered employee of a Participating Employer only in the event of the employee's death and are provided only so long as that individual remains a covered employee of the Participating Employer.

63.     In the event of the employee's separation from service of a Participating Employer or the Participating Employer's termination of the Plan, the benefits under the Plan are forfeited except to the extent conversion rights exist under State law or the Covered Employee purchases the policy at fair market value under the guidelines set forth in Rev. Proc. 2005-25, 2005-1 C.B. 962.  Any gains arising by way of such forfeiture (i.e., from the sale or surrender of policies covering such terminated employees) belong to the Trust and are used to cover Trust expenses.

64.     The Benistar 419 Plan currently has, and always has had, at least 10 Participating Employers, and no Participating Employer normally contributes more than 10% of the total amount of the aggregate contributions to the Plan.

65.     The Plan maintains no separate accounting or "experience-rating arrangements" for its Participating Employers.

66.     Unlike the case in <u>Booth</u>, all of the assets in the Trust are available at all times to pay all claims under the Benistar 419 Plan.

67.     The Plan Sponsor files a single Form 5500 with the IRS on behalf of the Plan as a whole.

B.      <u>The List Maintenance Requirements Are Inapplicable to the Benistar 419 Plan</u>

68.     Section 817(a) of AJCA amended IRC § 6112 in numerous respects for years after October 22, 2004.  Prior to such amendments, IRC § 6112 had provided list maintenance requirements only for "organizers" and "sellers" of potentially abusive tax shelters and Benistar.

69.    Under IRC § 6112(a), as amended, each material advisor of a reportable transaction was required to maintain a list that not only identifies advisees, but also contains such other information as the Treasury Secretary may require.

70.    The pre-AJCA definition of an "abusive" tax shelter under former IRC § 6111 of the Code reflects that no valid welfare benefit plan could ever meet the 2-to-1 write off requirement of former IRC § 6111(c) or the registered security and confidentiality requirements of former IRC § 6111(d).

71.    Under post-AJCA law, an arrangement is deemed to be a "reportable transaction" only if it is described in Treas. Reg. § 1.6011-4(b)(2)-(7).  Thus, to be considered a reportable transaction, one of the following criteria under the regulations or proposed regulations must be met:

1.    The transaction is the same or substantially similar to a listed transaction;

2.    The taxpayer has participated in the transaction under conditions of confidentiality;

3.    The taxpayer has obtained or been provided with contractual protection that it will be entitled to a refund of fees if the intended tax consequences are not sustained;

4     The transaction results in a Section 165 tax loss in excess of $10 million for a corporation or $2 million for individuals, partnership, without corporate partners, and S corporations;

5.    A transaction has been identified by the IRS as a transaction of interest; and

6.    A transaction is one for which a taxpayer pays a fee to a patent holder or its agent for the right to use a tax planning method.  Claiming a tax credit exceeding $250,000 if the underlying asset giving rise to the credit is held by the taxpayer for 45 days or less.

The only criterion of the foregoing six that the IRS has ever claimed is applicable to the Benistar 419 Plan is the first: i.e., that the Plan is "substantially similar" to a "listed transaction."

14

72.     A listed transaction is defined as any transaction that is the same or substantially similar to one of the types of transactions that the IRS has determined in published guidance to be tax avoidance transactions.  (Treas. Reg. § 1.6011-4(b)(2)).

73.     The term "substantially similar" includes any transaction that is expected to result in the same or similar types of tax consequences and that is either factually similar or based on the same or similar tax strategy.  (Treas. Reg. § 1.6011-4(c)(4)).

74.     The IRS has most recently enumerated all currently listed transactions in Notice 2009-59.  Notice 2009-59 includes as a listed transaction an arrangement that is "the same or substantially similar" to the one described in Notice 95-34.  However, the Plan is altogether dissimilar to the arrangement described in Notice 95-34 in each of the four specific features set forth in that Notice.

75.     Thus, the Plan cannot be substantially similar to an arrangement described in Notice 95-34, and therefore is not "substantially similar" to **any** of the enumerated "listed" transactions as first delineated in IRS Notice 2000-15 and updated most recently in IRS Notice 2009-59.

76.     Notice 2009-59, like its immediate predecessors, Notice 2004-67 and Notice 2003-76, is consistent with all prior compilations of listed transactions that have been published by the IRS that describe as listed transactions only those IRC § 419A(f)(6) plans containing the four specific design flaws set forth in Notice 95-34.  These defects specifically relate to plans that purport to qualify under IRC § 419A(f)(6), but provide deferred compensation instead of welfare benefits, fail to cover at least 10 employers, are experience-rated, and provide for the deductibility of prepaid costs.

C.     The Plan Does Not Provide Deferred Compensation

77.     The reported cases in which the IRS has taken the position that a welfare benefit plan is actually a deferred compensation plan (subject to the rules of IRC § 404) have all concerned severance benefit plans, and not death benefit plans, such as the Benistar 419 Plan.  See, e.g., Wellons v. Comr., 31 F.2d 569 (7th Cir. 1994) (cited in Notice 95-34 and Booth v. Comr., 108 T.C. 524 (1997) (decided after the promulgation of Notice 95-34)).

78.     The plan in Wellons is distinguishable from the Plan in that the court's decision in Wellons, finding that plan to provide deferred compensation, was predicated on the fact that under the plan in that case, which contained a vesting schedule, there existed a certainty that payments would be made to all employees after a certain period of time regardless of the reason for termination, just like a pension plan.  Moreover, the benefits were based upon salary and length of service, which the court found to be hallmarks of plans subject to IRC § 404.

79.     The Benistar 419 Plan (i) provides only death benefits; (ii) does not allow for vesting; (iii) distributes benefits only when a participant dies (i.e., when a covered employee dies while employed by a Participating Employer; (iv) provides for the forfeiture of benefits; (v) does not refund forfeitures to the individual employers which paid the premiums for the forfeited benefits; and (vi) does not use forfeited policies or contributions to reduce an individual employer's future contributions.

80.     A plan that provides solely welfare benefits is not a plan of deferred compensation if benefits cannot vest and there can be no certainty that employees will receive benefits through the mere passage of time rather than through the occurrence of an event, such as death, which is the only event that causes the payment of benefits from the Benistar 419 Plan.

81.     The Plan complies with these requirements.

82.     Specifically, in the event an employee's employment is terminated, benefits under the Plan are forfeited, except to the extent the employee is granted conversion rights under State law.

83.     Additionally, in the event a Participating Employer should terminate participation in the Benistar 419 Plan, the covered employees are permitted the opportunity to continue the death benefit by acquiring the insurance policies on their lives for an amount equal to the value of those policies as determined under the formula created by Rev. Proc. 2005-25.

84.     Based upon the foregoing, the Plan is a plan providing solely welfare benefits and is not a plan of deferred compensation.

D.     The Plan is a 10-or-More Employer Plan as Described in IRC § 419A(f)(6)

85.     The Benistar 419 Plan currently has, and always has had, at least 10 participating employers, and no participating employer normally contributes more than 10% of the total amount of the aggregate contributions to the Plan.

86.     The Benistar 419 Plan maintains no separate accounting for the Participating Employers, and all of the assets in the Trust are available at all times to pay all claims under the Plan and, as detailed below, there is no experience-rating arrangement allowed between the Plan and its participating employers.

87.     The Benistar 419 Plan Sponsor files a single Form 5500 with the Service on behalf of the Plan as a whole.

88.     Accordingly, the Plan qualifies as a 10-or-more plan as described under IRC § 419A(f)(6).

E.    The Plan is Not Experience-Rated

89.    Under the Benistar 419 Plan's method of operations, it is not an "experience rated arrangement," as defined in the relevant case law and the Treasury regulations.

90.    In Booth, which is the only decided case to ever discuss the term "experience-rated" in the context of IRC § 419A(f)(6), the Tax Court disallowed the taxpayer's contribution to the § 419A(f)(6) plan then in question on the basis that such plan maintained a separate account for each participating employer in that plan, with the result that each employer's contribution benefited primarily its own employee group.

91.    As such, a covered employee could not look to all of the assets in the trust under that plan to pay his promised benefit, but could only look to his own employer's contributions.

92.    This, the Tax Court in Booth held, was contrary to one of the key elements of a § 419A(f)(6) plan, which is the shifting of the risk of loss from a participating employer to the plan and the use of the pool of funds within the plan by the group of 10 or more employers within the Plan to pay the claims of all covered employees under the plan.

93.    The Benistar 419 Plan achieves the risk shifting required under the Regulations by making all of the assets in the Trust available at all times to pay any and all claims under the Plan.

94.    In particular: (a) contributions of all Participating Employers to the Plan are irrevocable and are available to provide death benefits for any covered employee under the Plan, regardless of which employer employs the covered employee; (b) under the Plan, the Trust is both the owner and the beneficiary of all life insurance policies acquired on individual employees; and (c) the Plan as a whole is accountable for experience losses and is the beneficiary of experience gains.

95.     The Benistar 419 Plan also adheres to the precise requirements of the Treasury regulations which were issued in 2003.  Specifically, (a) the Treasury regulations provide (at Reg. § 1.419A(f)(6)-1(b)(1)) that a plan maintains an experience rated arrangement if there is any period of time for which the relationship of contributions under the Plan to the benefits or other amounts payable under the Plan is or can be expected to be based, in whole or in part, on the benefits experience or overall experience of a Participating Employer of one or more employees of that employer; and (b) the Regulations further provide that such an arrangement can exist either as a result of an "adjustment of contributions" or an "adjustment of benefits," both terms as defined, respectively, at Reg. §§ 1.419A(f)(6)-1(b)(2) and (3).

96.     The provisions of the Plan do not afford any Participating Employer the right to a refund, credit or additional benefits and do not allow for adjusting the costs for contributions to, or benefits for, covered employees based either upon claims experience or investment experience.

97.     In no event are contributions to or employee benefits payable by the Plan affected by the experience of a separate account maintained for a Participating Employer.  Contributions to the Plan are based on actuarial calculations of insurance rates, which are determined by general actuarial principles and calculations and are not unique to any specific Participating Employer.

98.     No Participating Employer has any discretion to contribute either more or less than the amount determined by the Plan Sponsor utilizing the actuarial calculations described above, and all assets of the Trust are available to satisfy all claims of covered employees and their beneficiaries.

99.     Accordingly, the Benistar 419 Plan is a valid IRC § 419A(f)(6) plan and does not represent in any manner an "experience-rated arrangement."

F.    The Plan Involves No Prepaid Expenses

100.    Under IRC § 162, a taxpayer may deduct expenses paid as compensation for personal services provided in the course of carrying on a trade or business, as long as the compensation is an ordinary and necessary expense.  The IRS has agreed that death benefits under a welfare benefit plan represent a benefit described in Reg. § 1.162-10(a) and hence contributions to fund such benefits are deductible under IRC § 162.

101.    In 1984, Congress enacted IRC §§ 419 and 419A to place limitations on the amounts that employers can deduct for contributions to an employee welfare benefit plan.  In enacting these provisions, Congress carved out an exception in IRC § 419A(f)(6), which generally exempts an employer from the limitations imposed by IRC  §§ 419 and 419A.  The IRC § 419A(f)(6) exception provides that the rules of IRC §§ 419 and 419A do not apply if -- as is the case here -- the plan has more than ten employers and no employer normally contributes more than 10% in any year.

102.    A Participating Employer, when joining the Benistar 419 Plan, determines the amount of the death benefit to be provided for each eligible employee, and the Plan Sponsor determines the cost to the Participating Employer to provide the specified death benefit by reference to the term insurance rates at Reg. § 1.79-3(d)(2).

103.    Once the amount of death benefit has been determined by the Participating Employer and the cost for that benefit has been determined by the Plan Sponsor, both amounts are fixed and cannot be changed or adjusted by either the Participating Employer or by the Plan Sponsor.

104.    Furthermore, because these rates are determined by general actuarial principles and calculations and are not unique to any specific Participating Employer or group of Participating Employers, no Participating Employer has any discretion to contribute either more or less than the

amount determined by the Plan Sponsor utilizing the aforementioned actuarial calculations. Thus, the payment by a Participating Employer to the Plan involves no prepaid expense.

105.    Consequently, the Benistar 419 Plan is neither the same nor substantially similar to the arrangement described in Notice 95-34 and is therefore not a listed transaction.

106.    As the Plan is not a "listed" transaction, there are no "material advisors" as defined under IRC § 6111 who are required by IRC § 6112 to maintain a list of their clients. Therefore, there can be no penalty under IRC § 6708 as a matter of law.

## THIRD CLAIM FOR RELIEF

### The Taxpayers Had Reasonable Cause Under IRC § 6708(b)

107.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1-106 as if fully set forth hereat.

108.    IRC § 6708(b) provides for full abatement of the penalty in the event the taxpayers had "reasonable cause."

109.    IRC § 6664(c)(1) provides that no penalty shall be imposed under IRC § 6662(a) with respect to any portion of an underpayment if it is shown that there was reasonable cause therefor and the taxpayer acted in good faith. Whether the taxpayer acted with reasonable cause and in good faith is determined on a case-by-case basis taking into account all of the pertinent facts and circumstances. Treas. Reg. § 1.6664-4(b).

110.    Relevant factors include the taxpayer's efforts to assess his or her proper tax liability, the knowledge and experience of the taxpayer, and reliance on the advice of a professional, such as an accountant.

21

111.    Moreover, an honest misunderstanding of fact or law that is reasonable in light of the experience, knowledge, and education of the taxpayer may indicate reasonable cause and good faith.

112.    In any case, reliance on professional advice "constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Treas. Reg. § 1.6664-4(b).

113.    As evidenced by the foregoing, a taxpayer's good faith reliance on the advice of a competent tax advisor can constitute reasonable cause to abate the accuracy-related penalty, and this is evidenced not only by the regulations, but also by the Internal Revenue Manual ("IRM") and by case law.  See IRM, Administrative, Part (20)310 (recently renumbered as IRM 120.1 but substantively unchanged).  As set forth at former IRM (20)333.7:

> Reasonable cause may be established if the taxpayer claims reliance on the advice of a competent tax advisor, i.e., tax attorney, certified or licensed public accountant or enrolled agent.  This may constitute reasonable cause if the taxpayer contacted a tax advisor who is competent on the specific tax matter and the taxpayer furnished necessary and relevant information, but was incorrectly advised. Further, the taxpayer exercised ordinary business care and prudence in determining whether to secure further advice, based on the taxpayer's own information and knowledge.

114.    The Benistar 419 Plan was advised by the prominent law firm of Edwards & Angell, who were fully knowledgeable of all relevant matters involved here, over the course of four opinion letters spanning several years' time that the Plan, qualified under IRC § 419A(f)(6), that the Plan was not at all any form of tax shelter or reportable transaction, that Notice 95-34 was inapplicable thereto, and consequently, that there were no material advisors or list maintenance requirements applicable to the Benistar 419 Plan.

115. Furthermore, the advisor's conclusions were reasonable and in accord with the law. Thus, counsel's advice in these cases represents reasonable cause.

> As the United States Supreme Court has stated in this context:
>
> When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. "Ordinary business care and prudence" do not demand such actions.

United States v. Boyle, 469 U.S. 241, 251 (1985).

116. Even beyond the Plaintiffs' demonstrated reliance on their advisors, the IRM further provides for the abatement of penalties based on a taxpayer's absence of knowledge of the law where coupled with other relevant circumstances. See former IRM (20)333.5, stating:

> where difficult and complex issues are involved and there is no Service guidance with respect to the issue, reasonable persons might well differ as to the appropriate tax treatment of the issue. Therefore, the taxpayer may have reasonable cause for noncompliance if the taxpayer's position is taken in good faith.

117. There was absolutely no guidance from the IRS with respect to IRC § 419A(f)(6) from 1984, the date of the provision's enactment, until mid-2002, when proposed regulations were issued.

118. In light of the Plaintiffs' attempts to comply with the law, and the fact that they were not material advisors for any reportable transaction, Part (20)333.5 provides additional grounds for "reasonable cause," and, accordingly, the proposed penalties should be abated. Additionally, the Commissioner bears the triple burdens of proof, production and appropriateness of the penalty to be assessed under IRC § 7491(c) because of Congressionally-mandated protections of the American

Taxpayer created by the IRS Restructuring and Reform Act of 1998, P.L. 105-206, § 3001, 98th Cong., 1st Sess. (1998).

## FOURTH CLAIM FOR RELIEF

### The Due Process Rights of Plaintiffs Advisors Are Abridged
### By the Imposition of the Post-AJCA Penalty Provisions

119.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1-118 as if fully set forth hereat

120.    Applying the post-AJCA version of IRC § 6708 retroactively to taxable years prior to 2004 violates the Due Process rights of any person or entity determined to have list maintenance obligations in 2002 insofar as there was no fair warning to Plaintiffs that the AJCA would drastically modify the list maintenance requirements and the amount of penalty attributable thereto. See McBoyle v. United States, 283 U.S. 25 (1931) and United States v. Bass, 404 U.S. 336 (1971). The need for fair warning is especially acute in the context of tax statutes that impose severe penalties for failing to observe an obligation upon persons that were not required to perform any actions at the time of the alleged omission.  The Supreme Court has said that the law should be so clear that a citizen should have no question as to what the law states:

> [I]t is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.  To make the warning fair, so far as possible the line should be clear.

McBoyle v. United States, 283 U.S. 25, 27 (1931).

121.    As the court noted in United States v. Councilman, 418 F.3d 67, 84 (1st Cir. 2005), the unforeseeably expansive interpretation doctrine "principally bars unforeseeable and retroactive judicial expansion of narrow and precise statutory language."   "In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at

the relevant time that the defendant's conduct was [sanctionable]." United States v. Lanier, 520 U.S. 259, 267 (1997).

122.    Here, the unforeseeable and significant expansion of the penalty in 2004 and its retroactive application to Plaintiffs' alleged omissions in **2002** and earlier years has resulted in a grossly unjust assessment upon Plaintiffs, in violation of the Due Process Clause.

123.    Moreover, courts may not rely on extra-textual considerations to construe an unclear tax statute against a taxpayer. "Because construction of a [any] statute must be guided by the need for fair warning, it is rare that legislative history or statutory policies will support a construction of a statute broader than that clearly warranted by the text." Crandon v. United States, 494 U.S. 152, 160 (1990); see also United States v. Santos, 553 U.S. 507 (2008) ("The rule of lenity requires ambiguous [tax] laws to be interpreted in favor of the defendants subjected to them."); United States v. Emmons, 410 U.S. 396, 411 (1973) ("this being a [penalty] statute, it must be strictly construed, and any ambiguity must be resolved in favor of lenity.").

124.    By reason of the foregoing, the IRS cannot retroactively expand Section 6708 to apply the post-AJCA penalty computations or definitions not even created until **after** August 3, 2007, to Plaintiffs' 2002 taxable year.  The plain language of the legislative history provides that such version of the statute is effective for transactions with respect to which material aid, assistance or advice (as defined under the post-AJCA version of IRC §6111) is provided **after** October 22, 2004.  Applying the broad interpretation that this statute retroactively applies to Benistar 419 Plan Service's taxable year 2002 violates a taxpayer's right to fair warning.  The Benistar 419 Plan stopped accepting new Participating Employers as of December 31, 2003, a full 10 months before the passage of the AJCA in October of 2004.

125.     Plaintiffs had no fair warning that failing to maintain a list in 2002 could result in a penalty in an amount which would not be determined by IRS fiat until 2009.  Accordingly, the retroactive application of the penalty under the post-AJCA version of IRC § 6708 violates the Due Process Clause and the *ex post facto* clause of the Constitution of the United States, as applied in this case, is clearly an illegal Bill of Attainder as a penalty only asserted against people affiliated with the Benistar 419 Plan.

## FIFTH CLAIM FOR RELIEF

### The Lien was Improperly Filed

126.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1-125 as if fully set forth hereat

127.     On May 12, 2010, Daniel E. Carpenter submitted a protest by letter to Internal Revenue Agent Charles Clark on behalf of himself and "the Benistar entities."  (A copy of that letter is annexed as **Exhibit E** hereto).

128.     In that letter, Mr. Carpenter described, among other things, (i) why the Plaintiffs were not "material advisors" with respect to the Benistar 419 Plan; (ii) why the Benistar 419 Plan was not a "listed" or "reportable" transaction; (iii) why the Benistar 419 Plan was not substantially similar to a plan as described in Notice 95-34; and (iv) why the assessment of the penalties against Plaintiffs was untimely.

129.     On July 8, 2010, Plaintiffs' counsel submitted a formal Protest of the IRS's determinations by letter to IRS Appeals Officer Alexander Toibman, at Mr. Toibman's request.  At or about the same time, Plaintiffs have also sought assistance from the National Taxpayer Advocate's Office.

130.   In the Protest Letter, a copy of which is annexed as **Exhibit D**, Attorney Ira B. Stechel described at length why the penalties assessed against Plaintiffs were baseless and entirely improper.  Among other things, the Protest demonstrated that (i) Plaintiffs were not "material advisors"; (ii) the list maintenance requirement of IRC § 6112 is inapplicable to Plaintiffs; (iii) the Benistar 419 Plan is neither an abusive tax shelter nor a reportable transaction; (iv) the Benistar 419 Plan does not exhibit the specific flaws enumerated in Notice 95-34; (v) the Benistar 419 Plan qualifies under IRC § 419A(f)(6); and (vi) Plaintiffs meet the "reasonable cause" standard for full abatement of the penalty even if otherwise applicable.

131.   No hearing on Plaintiffs' protest was ever held, and Plaintiffs' appeal was never adjudicated by any IRS Appeals Officer.

132.   On August 2, 2010, the Government sent a Final Notice of Intent to Levy (though there were <u>no</u> previous notices).

133.   The Notice instructed that Plaintiffs had **<u>30 days</u>** to request a Collection Due Process hearing by completing the enclosed Form 12153, *Request for a Collection Due Process or Equivalent Hearing*.

134.   Plaintiffs requested the Collection Due Process ("CDP") hearing **<u>within 10 days</u>** by letter dated August 12, 2010.

135.   Not waiting for the full 30-day deadline provided in the Notice, and only ten days after the IRS sent the Final Notice regarding its intent to levy on Plaintiffs' property, the White Plains, New York IRS office issued a notice of federal tax lien filing to Plaintiffs on August 12, 2010, stating it had filed a notice of federal tax lien against it with the Town Clerk of Simsbury, Connecticut and with the Secretary of the State of Connecticut.

136.    Plaintiffs have filed timely requests for a CDP hearing in response to these filings of notices of tax lien by letter dated August 17, 2010.

137.    National Taxpayer Advocate Nina E. Olson noted in her 2010 annual report to Congress (a copy of which is attached as **Exhibit F**) that when the IRS files a notice of federal tax lien, the taxpayer's creditworthiness can be badly damaged for the long-term.  She also noted that the lien filings are picked up by the three credit rating agencies and remain on the taxpayer's credit report for seven years from the date a tax liability is resolved, or longer if it is not resolved.  A tax lien is particularly devastating for a small business, as it can cut off its access to credit altogether.

138.    Under the forgoing circumstances, an actual case or controversy exists.  A declaratory judgment is the most effective and economical manner in which to proceed to resolve this dispute, and this dispute is ripe for adjudication.

## Relief Sought

**WHEREFORE**, and for all of the foregoing reasons, this Court should:

    i.  hold that, as this dispute involves a penalty, and not a tax, the Anti-Injunction Act does not apply;

    ii.  hold that a case or controversy exists;

    iii.  declare that Plaintiffs are not, and never have been Material Advisors;

    iv.  declare that the Benistar 419 Plan is not substantially similar to a plan as described in Notice 95-34 and is not a "listed" or "reportable" transaction;

    v.  declare that the Benistar 419 Plan qualifies as a welfare benefit plan as defined under IRC § 419(e) and as described under IRC § 419A(f)(6), and therefore all contributions made to the Plan are tax deductible in their entirety;

    vi.  declare that all penalties regarding the Benistar 419 Plan were improperly assessed and are void ab initio;

    vii.  declare that, even if any penalty was not void ab initio; the imposition of the penalty assessed is void as an ex post facto penalty and as a bill of attainder;

    viii.  declare that, even if any penalty assessment is not void, the failure to pay is subject to a defense based on reasonable cause;

    ix.  declare that the liens were improperly filed and are invalid as a matter of law;

    x.  require the withdrawal of the lien against the property of Mr. Carpenter and anyone else assessed penalties in regard to the Benistar 419 Plan;

      xi.  award Plaintiffs their costs and attorneys fees associated with this matter.

Dated:  April 19, 2013
         Stamford, Connecticut

                          DANIEL E. CARPENTER,
                          BENISTAR 419 PLAN SERVICES, INC.,
                          BENISTAR ADMIN SERVICES, INC.,
                          BENISTAR EMPLOYER SERVICES TRUST
                          CORP.

                          As Local Counsel

                          By: _____
                          Joseph M. Pastore III (ct11431)
                          PASTORE & DAILEY LLC
                          4 High Ridge Park, 3rd Floor
                          Stamford, CT 06905
                          (203) 658-8455
                          (203) 348-0852 (fax)
                          E-mail:  jpastore@psdlaw.net

                          and

                          As Lead Counsel

                              Ira Stechel (*pro hac admission to be sought*)
                            John Morin (*pro hac admission to be sought*)
                            Wormser, Kiely, Galef & Jacobs LLP
                            825 Third Avenue
                            New York, New York 10022
                            (212) 573-0609
                            (212) 687-5703 (fax)

                        *Its Counsel*