**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNIVERSITAS EDUCATION, LLC | : | CIVIL ACTION NO. |
| | : | |
| Plaintiff | : | 3:20-cv-00738-JAM |
| | : | |
| v. | : | |
| | : | |
| BENISTAR, et al. | : | |
| | : | |
| Defendants | : | SEPTEMBER 25, 2020 |

---

**DEFENDANT GRIST MILL PARTNERS, LLC'S**
**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFF'S CONTINGENT MOTION TO AMEND COMPLAINT**

---

RESPECTFULLY SUBMITTED,

THE DEFENDANT
GRIST MILL PARTNERS, LLC

Lawrence S. Grossman (ct15790)
Jeffrey M. Sklarz (ct20938)
Green & Sklarz LLC
One Audubon Street, Third Floor
New Haven, CT 06511
(203) 285-8545
Fax: (203) 823-4546
lgrossman@gs-lawfirm.com
jsklarz@gs-lawfirm.com

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................   1

II.     FACTS AND BACKGROUND .........................................................   1

        A.  Procedural History ................................................................   1

        B.  Factual Background ...............................................................   1

III.    LAW AND ARGUMENT ...................................................................   3

        A.  Motions to Amend and Add Parties Pursuant to Fed. R.
            Civ P. 15 and 21 ....................................................................   3

        B.  Plaintiff Has Not Filed or Served a Proposed Amended Complaint .......   4

        C.  There Is No Such Pleading as a "Contingent" Motion to Amend ...........   4

IV.     CONCLUSION ...................................................................................   5

# TABLE OF AUTHORITIES

**Cases**

*Callan* v. *Paulson*, 2009 U.S. Dist. LEXIS 31987 (D. Conn. Apr. 15, 2009) ................................ 5

*Carter* v. *Revine*, 2017 U.S. Dist. LEXIS 73350 (D. Conn. May 15, 2017) ................................ 5

*Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 2d 258 (D. Conn. 2012) ................................ 3

*Germano* v. *Cook*, 2020 U.S. Dist. LEXIS 8340 (D. Conn. Jan. 17, 2020) ................................ 4

*Universitas Educ., LLC v. Nova Group, Inc.*, 2012 WL 2045942 (S.D.N.Y. Jun. 5, 2012), *aff'd,* 513 Fed. Appx. 62 (2d Cir. 2013) .......................................................................... 2

*Universitas Educ., LLC v. Nova Group, Inc.*, 2013 WL 6123104 (S.D.N.Y. Nov. 20, 2013) ....... 2

**Rules**

D. Conn. L. R. Civ. P. 7(f) ................................................................................................... 3, 4, 5

Fed. R. Civ. P. 15 ...................................................................................................................... 4

Fed. R. Civ. P. 15(a)(1)(B) ........................................................................................................ 3

Fed. R. Civ. P. 15(a)(2) .......................................................................................................... 3, 4

Fed. R. Civ. P. 15(a)(3) .............................................................................................................. 3

Fed. R. Civ. P. 21 ....................................................................................................................... 3

**Treatises**

*Practice Under Rule 21—Motion to Add or Drop a Party*, 7 Fed. Prac. & Proc. Civ. § 1688 (3d ed. 2020) .................................................................................................................. 3

Defendant Grist Mill Partners, LLC ("GMP"), submits the following memorandum of law in opposition to the *Contingent Motion to Amend Complaint* (ECF No. 88, the "Motion") filed by plaintiff, Universitas Education, LLC (the "Plaintiff" or "Universitas").

## I.   **INTRODUCTION**

The Court should deny the Motion because it is procedurally improper.  There is no such rule affording a plaintiff the ability to amend a complaint on a "contingent" basis.  Even if there was, Plaintiff failed to append a proposed amended complaint to its Motion, thereby rendering the Motion fatally defective.  As a result of Plaintiff's failure to include the proposed amended complaint to its motion, GMP cannot address any specific amendments Plaintiff may be contemplating because it is not clear what claims or parties Plaintiff may seek to add in any future amended complaint.  GMP has a right to defend itself in this case based on the facts *alleged* and the law.  Plaintiff cannot be permitted to make up procedures based on rhetoric or set up a trial by ambush.

## II.   **FACTS AND BACKGROUND**

### A.   **Procedural History**

Plaintiff initiated this action on May 28, 2020.  On July 31, 2020, GMP filed its *Motion to Dismiss Complaint* (the "GMP MTD").  ECF No. 72.  On September 4, 2020, Plaintiff filed its Motion seeking to amend the Complaint on a contingent basis, should GMP prevail on its motion to dismiss.

### B.   **Factual Background**

The underlying facts that led to Plaintiff's judgment are set forth in *Universitas Educ., LLC*

*v. Nova Group, Inc.*, 2013 WL 6123104, at *1 (S.D.N.Y. Nov. 20, 2013) (the "Nova Case").[1]  In short, in the Nova Case, the United States District Court for the Southern District of New York (Swain, U.S.D.J.), confirmed an arbitration award in favor of Plaintiff in the amount of $26,525,535.98 (the "Judgment").  The crux of Plaintiff's case in the arbitration was that it should have received insurance proceeds (based on life insurance policies purchased on the life of Sash A. Spencer), which were determined to have been wrongfully diverted by Daniel Carpenter through a series of transfers.  The District Court also held that "Mr. Carpenter caused the Life Insurance Proceeds to be transferred to and through entities that he controlled, either directly or indirectly, including Moonstone, for the personal benefit of Mr. Carpenter and his affiliates."  *Id.* at *7.  Beginning in 2013, Plaintiff commenced post-judgment collection proceedings.  Complaint at ¶¶ 27-56, 173.

In sum, the Complaint sets forth legal conclusions, unsupported by any factual allegations, that Mr. Carpenter "controls" GMP.  GMP is a single-asset real estate entity, that owns commercial property – purchased prior to Sash Spencer procuring any insurance.  The real estate located at 100 Grist Mill Road, Simsbury, Connecticut (the "Property"), is subject to a purchase money mortgage.  Plaintiff alleges no facts in the Complaint nor does it explain within its *Memorandum of Law in Opposition to Grist Mill Partners, LLC's Motion to Dismiss* (ECF No. 91, the "Mem. Op. MTD") how GMP did anything improper.  Rather, Plaintiff rhetorically concludes that since Daniel Carpenter undertook illegal activities, so must have GMP.[2]   As set forth in the

---

[1] Previously Judge Swain had confirmed the underlying arbitration award.  *See Universitas Educ., LLC v. Nova Group, Inc.*, 2012 WL 2045942 (S.D.N.Y. Jun. 5, 2012), *aff'd*, 513 Fed. Appx. 62 (2d Cir. 2013).  The arbitration was originally commenced in 2010 and heard in January 2011.  *Id*. at *1.

[2] "Universitas alleges that [GMP] is one of the sham entities Mr. Carpenter created to shield his personal assets from creditors."  Mem. Op. MTD at 10 (page references in filed documents are to the header created by CMECF rather than the page number at the bottom of the page).

*Memorandum of Law in Support* of GMP's MTD, ECF No. 73, the purchase of the Property pre-dated Sash Spencer dying by several years and there are no facts setting forth how GMP was used by Mr. Carpenter to perpetrate any fraud or misconduct whatsoever.   Essentially, Plaintiff's argument is one of "guilt by association" and nothing more.

III.   **LAW AND ARGUMENT**

   A.   **Motions to Amend and Add Parties Pursuant to Fed. R. Civ. P. 15 and 21**

   Pursuant to Fed. R. Civ. P. 15(a)(1)(B), a plaintiff may amend its complaint as a matter of right upon the filing a motion to dismiss under Fed. R. Civ. P. 12(b).  A plaintiff may also amend its complaint with leave of the Court pursuant to Fed. R. Civ. P. 15(a)(2).  Generally, leave is to be "freely give[n] when justice so requires."  *Id.*  However, for a party to properly respond to an amended complaint, the plaintiff must serve a proposed amended complaint.  Fed. R. Civ. P. 15(a)(3); D. Conn. L. R. Civ. P. 7(f).

   Pursuant to Fed. R. Civ. P. 21 parties may be added or dropped from a case.  "The grant or denial of a motion to bring in or to drop a party lies in the discretion of the judge.  Further, the court may grant a particular motion with conditions imposed."  *Practice Under Rule 21—Motion to Add or Drop a Party*, 7 Fed. Prac. & Proc. Civ. § 1688 (3d ed. 2020).  Similarly, the decision of whether or not to sever a claim lies within the discretion of the judge:

> In exercising its discretion to decide whether to sever a claim, a court should weigh the following factors: whether "(1) the claims arise out of the same transaction or occurrence; (2) the claims present some common question of law or fact; (3) settlement of the claims or judicial economy [would] be facilitated; (4) prejudice [would] be avoided; and (5) different witnesses and documentary proof [would be] required for the separate claims." *Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 2d 258, 263-66 (D. Conn. 2012) (citation omitted).

*Germano* v. *Cook*, 2020 U.S. Dist. LEXIS 8340, at *36 (D. Conn. Jan. 17, 2020).  Therefore, when adding claims against new parties, the focus should be on whether the claims relate to the same common core of facts as the pending action.

### B.    Plaintiff Has Not Filed or Served a Proposed Amended Complaint

Plaintiff did not file an amended complaint as of right in response to GMP's MTD.  Plaintiff has not filed, or served, a proposed amended complaint along with its Motion, in derogation of the express language of D. Conn. L. R. Civ. P. 7(f), which states that in cases in which the movant is represented by counsel, a motion to amend pleadings ***shall*** "be accompanied by both a redlined version of the proposed amended pleading showing the changes proposed against the current pleading and a clean version of the proposed amended pleading."  Thus, Plaintiff's Motion is procedurally defective.  The motion is also defective under Fed. R. Civ. P. 15, which pegs the non-movant's response date to a proposed amended complaint to "14 days after service of the amended pleading…."  Here, no "amended pleading" was served.

### C.    There Is No Such Pleading as a "Contingent" Motion to Amend

Plaintiff appears to be seeking leave to, sometime in the future, file an amended complaint which has not yet been drafted and shared with Defendants or the Court.  There is no provision in the Fed. R. Civ. P. for such a "contingent" motion to amend.  If the Motion is viewed as being made pursuant to Fed. R. Civ. P. 15(a)(2), seeking leave to amend, again, no proposed amended complaint has been provided.  Thus, it is impossible to gauge how GMP should respond as the "additional facts" contained in the Motion, which appear unrelated to claims alleged against GMP.

Plaintiff cites *Carter* v. *Revine*, 2017 U.S. Dist. LEXIS 73350, at *5 (D. Conn. May 15, 2017)[3] for the proposition that a "contingent" motion to amend is an appropriate pleading in this case. First, the plaintiff in *Carter* was *pro se*, thus, courts will generally allow more informal filings. *Callan* v. *Paulson*, 2009 U.S. Dist. LEXIS 31987, at *15 (D. Conn. Apr. 15, 2009) ("It is well established Second Circuit precedent that a *pro se* complaint is adequately pled if its allegations, liberally construed, could conceivably give rise to a viable claim.") (Internal citations and punctuation omitted).[4] Second, the *pro se* plaintiff "only seeks leave to amend the Second Amended Complaint to replace the now known Lt. Mauvinchi with Matuszcza." *Id.* at *49. Third, unlike here, the plaintiff in *Carter* "does not seek to add additional counts or facts…." *Id.* at 53.

The "additional facts" identify claims against parties and non-parties based on new facts. Even if a "contingent" amendment is a permissible pleading, the instant Motion must fail because no proposed amended complaint has been annexed to the Motion and it unclear whether any of the "additional facts" are being alleged against GMP.

IV. **CONCLUSION**

For the above stated reasons, the Court should deny the Motion and enter such other relief as is just and proper.

---

[3] "On the same day Carter also filed a Motion to Amend the Amended Complaint contingent upon the Court denying Defendant's Motion for Summary Judgment."

[4] The lesser pleading standard for *pro se* litigants is actually embedded in D. Conn. L. R. 7(f), which does not require *pro se* litigants to append clean and redlined versions of their proposed amended pleadings to motions seeking permission to file same.

THE DEFENDANT
GRIST MILL PARTNERS, LLC


By:    /s/ Jeffrey M. Sklarz
            Lawrence S. Grossman (ct15790)
            Jeffrey M. Sklarz (ct20938)
            Green & Sklarz LLC
            One Audubon Street, Third Floor
            New Haven, CT 06511
            (203) 285-8545
            Fax: (203) 823-4546
            lgrossman@gs-lawfirm.com
            jsklarz@gs-lawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date set forth below a copy of the foregoing was served by CMECF and/or mail on anyone unable to accept electronic filing.  Parties may access this filing through the Court's CM/ECF System.

Date: September 25, 2020

/s/ Jeffrey M. Sklarz

Unreported Cases

✚ Positive
As of: September 25, 2020 4:19 PM Z

# *Callan v. Paulson*

United States District Court for the District of Connecticut

April 15, 2009, Decided; April 15, 2009, Filed

3:08-cv-01625 (CSH)

**Reporter**
2009 U.S. Dist. LEXIS 31987 *; 103 A.F.T.R.2d (RIA) 2009-1803

Thomas A. Callan, Plaintiff, v. Henry M. Paulson, Secretary of the Treasury, et al., Defendants.

## Core Terms

counts, TREASON, rights, pro se, conspiracy, frivolous, appears, returns

## Case Summary

### Procedural Posture

Defendant United States (IRS) moved to dismiss a complaint filed by plaintiff taxpayer for failure to comply with *Fed. R. Civ. P. 8(a)(2)* and *8(d)(1)*.

### Overview

Plaintiff filed the lawsuit in response to IRS letters alleging that plaintiff owed unpaid taxes and related penalties and had failed to file returns for 2006 and 2007. After filing tax returns for the omitted years that reflected no gross income, plaintiff filed a complaint asserting claims under *18 U.S.C.S. § 4*, denying that his birth in Connecticut rendered him a United States citizen, arguing that the IRS had concocted a straw man scheme to extract money from persons such as plaintiff, and charging the IRS with fraud, extortion, conspiracy and racketeering. The IRS moved to dismiss per *Rule 8*. The court ruled that relief would be granted if plaintiff did

not file an amended complaint within 30 days. Noting that while plaintiff might be able to prepare a complaint that complied with *Rule 8* and did not contain frivolous claims, that the same could not be derived from the mass of verbiage contained in the present complaint. Nor did plaintiff's pro se status save his complaint because even under the most relaxed pleading standard, the current complaint did not satisfy minimum pleading criteria. That failure to provide a clear and succinct basis for the claims justified dismissal.

### Outcome

The court granted the motion to dismiss with prejudice but held the ruling in abeyance for 30 days to allow plaintiff to amend his complaint to cure the deficiencies identified therein.

## LexisNexis® Headnotes

Criminal Law & Procedure > ... > Obstruction of Administration of Justice > Misprision of Felony > Elements

Criminal Law & Procedure > ... > Obstruction of Administration of Justice > Misprision of Felony > General Overview

Criminal Law & Procedure > ... > Obstruction of Administration of Justice > Misprision of Felony > Penalties

2009 U.S. Dist. LEXIS 31987, *31987

**HN1**[⬇] **Misprision of Felony, Elements**

See *18 U.S.C.S. § 4*.

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

**HN2**[⬇] **Complaints, Requirements for Complaint**

*Fed. R. Civ. P. 8* provides in part that a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. *Fed. R. Civ. P. 8(a)(2)*. In addition, *Rule 8(d)(1)* provides that each allegation of a pleading must be simple, concise, and direct.

Civil Procedure > ... > Pleadings > Complaints > General Overview

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

**HN3**[⬇] **Pleadings, Complaints**

The purpose of *Fed. R. Civ. P. 8* is to ensure that courts and adverse parties can understand a claim and frame a response to it. The statement should be plain because the principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial. The statement should be short because unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage. When a complaint fails to comply with these requirements, the district court has the power to dismiss the complaint.

Civil Procedure > ... > Pleadings > Complaints > General Overview

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Civil Procedure > ... > Pleadings > Amendment of

Pleadings > Leave of Court

**HN4**[⬇] **Pleadings, Complaints**

Dismissal under *Fed. R. Civ. P. 8* is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised. In the Second Circuit, if a district court dismisses the complaint for failure to comply with *Rule 8*, it generally should afford the plaintiff leave to amend.

Civil Procedure > Parties > Pro Se Litigants > General Overview

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

Civil Procedure > Parties > Pro Se Litigants > Pleading Standards

**HN5**[⬇] **Parties, Pro Se Litigants**

It is well established Second Circuit precedent that a pro se complaint is adequately pleaded if its allegations, liberally construed, could conceivably give rise to a viable claim. District courts must interpret pro se pleadings liberally, to raise the strongest arguments they suggest, but pro se litigants must comply with the minimal standards of notice pleading required in *Fed. R. Civ. P. 8(a)*.

**Counsel:** [*1] Thomas A. Callan, Plaintiff, Pro se, Wallingford, CT.

For Henry M. Paulson, Jr., Sec of the Treasury, Stephen Fowler, R.A. Mitchell, Defendants: Karen E. Wozniak, LEAD ATTORNEYS, U.S. Department of Justice, Tax Division, Washington, DC.

For United States of America, Defendant: Karen E. Wozniak, LEAD ATTORNEY, U.S. Department of Justice, Washington, DC.

**Judges:** Charles S. Haight, Jr., Senior United States District Judge.

**Opinion by:** Charles S. Haight, Jr.

# Opinion

MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge:

## I. Background

In August of 2008, the Internal Revenue Service sent Thomas A. Callan ("Callan") [1] a series of letters alleging that he owed large sums in penalties and unpaid taxes. Callan began this action in October of 2008, apparently in response to those letters. The government moves to dismiss the complaint for failure to comply with *Rules 8(a)(2)* and *8(d)(1) of the Federal Rules of Civil Procedure*.

The record consists only of those documents submitted by Callan and is not a complete administrative record. But from an examination of this limited record, it appears that on August 27, 2008, the IRS sent Callan a "Letter 1058," a final "Notice of Intent To Levy," which asserted that Callan owed $ 131,034.64, mostly in unpaid taxes, penalties, and interest for his 2001, 2002, 2003, and 2004 tax returns, as well as items labeled "CIVPEN" -- presumably penalties -- for the years 2000, 2001, and 2002. [doc. # 3-3] at 2-3. The next day, on August 28, 2008, the IRS sent Callan a "Letter 3174" alleging that he owed $ 31,034.65, most of which was unpaid taxes and interest from Callan's 2001 tax return,

as well as the same penalties mentioned on the previous letter. [doc. # 3-2] at 2-3. That same day, the IRS also sent a Letter 729, stating that Callan had not filed tax returns for the 2006 and 2007 calendar years. [doc. # 3-3] at 4-5. The next day, on August 29, 2008, the IRS sent Callan a Letter 3172, "Notice **[*3]** of Federal Tax Lien Filing and Your Right to a Hearing Under *IRC 6320*." [doc. # 3-4] at 12-13. That letter sought back taxes, penalties, and interest for tax years 2001 through 2004, and penalties for the years 2000, 2001, and 2002.

On September 27, 2008, Callan signed two tax returns, Form 1040EZ, that purported to describe his tax liability for the years 2006 and 2007. [doc. # 3-5] at 11-12. Those returns listed his 2006 adjusted gross income as "No taxable income" and his 2007 adjusted gross income as "None." [2] *Id.* Callan apparently submitted

---

[2] Callan apparently relies on several theories to deny tax liability. At least one of those theories is described in the opinion dismissing his other federal action:

> In his "Motion to Rule for Plaintiff," Plaintiff states that he was not born in the United States, but rather Connecticut, and as such is not subject to the jurisdiction of the "bankrupt Corporation of the United States." Plaintiff believes **[*4]** that by using "ALL CAPS" for names on official documents such as birth certificates and driver's licenses, the United States has created "straw men" or fictional people whom it uses to extract tax payments from individuals like Plaintiff. Plaintiff argues that a "name written in ALL-CAPITAL-LETTERS is not a sentient, flesh and blood human being. It is a corporation, fiction or deceased person." According to Plaintiff, "[t]he actual bottom line of this is, All [sic] assets generated BY and THROUGH my straw man account, BASED on my existence and personal value and credit, BELONGS TO ME." Plaintiff believes he has zero tax liability. He seeks "to move on in life without the molestation, frivolous, groundless and illegal actions of the Defendant organization as they continue to kill the country and funnel monies out of the economy of the United States of America under a guise."

*2007 U.S. Dist. LEXIS 12403, 2007 WL 552219 at *2* (citations omitted).

That description is consistent with the letters and pleadings Callan has filed in this case, wherein he has described himself in a variety of ways, including "Thomas A Callan Expatriated January 2009," [doc. # 16] at 2, "Thomas A Callan (Not a substantiated taxpayer)" [doc. **[*5]** # 12] at 3, "Thomas A. Callan sovereign individual, UCC-1," [doc. # 3-2] at 31, and "Thomas A Callan -- Natural Born American, Not within the

---

[1] Callan's dispute with the IRS has brought him into federal district courts on at least one prior occasion. One of his recent letters to the IRS states that "Mr. Callan has had cases filed in court and not received satisfactory answers." Letter from Thomas A. Callan to Stephan Fowler (Sept. 29, 2008) [doc. **[*2]** #3-6] at 11. It appears likely to this Court that Callan was the plaintiff in *Callan v. Internal Rev. Serv. Comm'r, No. 06-1024-PHX-DGC (LOA), 2007 U.S. Dist. LEXIS 12403, 2007 WL 552219 (D. Ariz. Feb. 20, 2007)*.

those returns to the IRS, along with several letters in response to the IRS's inquiries. *See, e.g.,* [doc. # 3-5] at 16-28; [doc. # 3-6] at 2-9; [doc. # 12 at 4]. Callan also instituted this action approximately one month later, on October 21, 2008.

On January 19, 2009, and probably on several other occasions as well, the IRS sent Callan a letter notifying him that "we have determined that the information you filed . . . is frivolous and there is no basis in the law for your position." [3] [doc. # 16] at 24. This determination resulted from Callan's reliance on positions that were either identified as frivolous under *IRC § 6702*, "reflect[ed] a desire to delay or impede the administration of federal tax laws," or both. *Id.*

In this action, Callan claims to be acting pursuant to *18 U.S.C. § 4*, which states:

---

Jurisdiction according to *IRC 7701* and or USC 7701; not defined as a taxpayer; no defined income and thus no source of income; All Rights Reserved.," [doc. # 3-3] at 11, presumably in furtherance of his position that "[t]he status of being a 'U.S. national' rather than a 'U.S. citizen' relieves persons from federal tax liability under 'U.S. citizen' status." [doc. # 3-2] at 26.

[3] This Court makes no ruling at this time on whether Callan's legal positions are frivolous, because the positions are not presented in a straightforward way. But whether or not his legal theories are [*6] frivolous, it is clear to the Court that his communications with the IRS, like his pleadings in this case, were liberally interlaced with irrelevancies. For example, in one of his letters to the IRS dated approximately two months after this case was filed, Callan wrote the following:

Your letter is a blatant disregard for the present ongoing case that has been lodged as a Common Law Proceeding in the County of New Haven, US District Court. Your fraudulent liens are related to Taxpayers of which the IRS has not produced any evidence, of good will or fraudulent. Please extract your phalanges from the sigmoid us and regard jurisdiction as related to Title 26 IRC 7701 as the Mr. Callan is very aware of where Washington District of Columbia, Puerto Rico and the Virgin Islands are located. The above named human being Mr. Callan made it clear that he is not a taxpayer and demands that the IRS produce any relevant facts that might be of interest, or the IRS are just jack boot THUGS and playground robbers, lacking ethics, proper procedure and would probably have been hung for the treasonous, traitorous actions during the late 1700's & or tarred. The Jankos and Leprechaun training schools of [*7] 1976 are still known to many.

[doc. # 12 at 4].

*HN1*[↑] Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

*See* Complaint [doc. # 3] at 1. Callan appears to believe that (1) he has actual knowledge (2) of the commission of a felony (3) that is "cognizable by a court of the United States."

But Callan's filings are lengthy and tangled, with overlapping accusations and inconsistent numbering. Looking only at his Complaint, he appears to allege at least nine causes of action (for malfeasance of office, slavery, treason, fraud, extortion, attempted robbery, false documents, conspiracy, and racketeering), Compl. at 6-8, but he also asserts four independently numbered "Counts," which allege deprivations of constitutional rights. Compl. at 10. Furthermore, he asserts a series of "damages" for constitutional deprivations as well as for violations [*8] of criminal statutes. Those "damages" total $ 3,240,000. Compl. at 11.

In his opposition to the government's motion to dismiss, Callan claims to summarize his previous claims, but in fact asserts a plethora of new claims, including "counts" that are wholly inconsistent with the similarly numbered counts in the Complaint. *See* Pl.'s Opp'n [doc. # 16] at 10-14. Even within the same document, he has two paragraphs labeled "COUNT 1." On page 10, Count 1 is for "refus[al] to answer basic questions of the Plaintiff," but on page 11, Count 1 is for a violation of due process. *Id.* Over the next three pages, Callan alleges a total of 61 counts, (numbered Counts 1-2, and then Counts 1-59). *Id.* Those 61 counts appear to include (in different order) the thirteen original counts from the Complaint (nine unnumbered, plus Counts 1-4), but many more appear with no explanation or context.

Even if the Court ignores Callan's inappropriately labeled "counts," it is unclear exactly which facts and legal theories form the basis of Callan's complaint. At the highest level, the gravamen of the complaint appears to be the following:

-DENIED A RIGHT to due process of law. Such denials include but are not limited [*9] to the right to work, the right to receive just reward of labors, denying access to the multiple Constitutional rights and specifically acting against the PLAINTIFF under a color of official right. It is a "taking action"

denying the right to personal property violating the provisions of the state Constitutional provision and under the *Fourth* and *Fifth amendments to the Constitution of the United States*.

… The numerous IRS DEFENDANTS, [4] acted against that due process by acting in a criminal conspiracy to defraud the PLAINTIFF Affiant of his rights and property, WITHOUT ANY KIND OF LAWFUL JUDGMENT, VALID COMMERCIAL PAPERWORK, CONTRACTS OR PROOF OF CLAIMS. The DEFENDANTS are therefore guilty of denying the PLAINTIFF Thomas A Callan, every constitutional protection afforded---an act of TREASON (defined below), an act of a MIXED DOMESTIC WAR during a time of war.

Pl.'s Opp'n ("Motion 5 -- Not To Dismiss") [doc. # 16] at 5. Callan also charges the defendants with the following crimes:

-MALFEASANCE OF OFFICE. By such wrongful action, these individuals have acted with malfeasance of office in conspiracy with and as IRS Agents. They deliberately, knowingly and willfully violated said rights of **[*10]** the PLAINTIFF and are guilty of misconduct in office, whether public or private.

-SLAVERY. . . . The DEFENDANTS acting based upon the unsupported frauds of the IRS, have denied the past and present rights to "fortunes" earned by the labors of the PLAINTIFF. . . . By such actions, these DEFENDANTS have destroyed the right to life, liberty and property by such taking of personal property and repeated threats of or without due process of law, reducing the Affiant to the condition of an unemployed slave that is and directly related to. As such, these are in fact in violation of the State and Federal Constitutions that abolished slavery. Regard of the *Thirteenth*

*Amendment* is considered.

-TREASON. Treason is defined as the assault against the authority to which one owes allegiance. . . . The numerous DEFENDANTS have willfully violated the basic fundamental principles this Country was founded upon, and therefore condoned the acts of TREASON by so-called government officials and the IRS against the Undersigned, making the defendants liable for such acts of TREASON by refusing to stop such actions against the PLAINTIFF . . . when they had the power and authority to do so.

*Id.* at 6-7. [5] As I have **[*11]** already mentioned, Callan also accuses the defendants of fraud, extortion, attempted robbery, "[a]ccepting and or providing false documents," conspiracy, and racketeering violations. *Id.* at 7-8.

In sum, Callan appears to believe that the government of the United States is a far-flung conspiracy, possibly based overseas, intent upon violating the rights of those within its borders:

Under the trappings of "democracy," the flag, "law and order" the Constitution etc., Americans have been duped into administering and submitting to their own subjugation, bankruptcy, enslavement, and the elimination of their rights, freedom, and country. The people have been reduced to peonage and involuntary servitude under a fraudulent, tyrannical, and seditious foreign oligarchy whose express intent is to institute and establish a dictatorship over the people and their posterity through private, commercial one world-government (i.e. "The New World Order").

*Id.* at 10.

## II. Discussion

In its Motion To Dismiss, the government has made no attempt to illuminate the source of its dispute with Callan. Instead, it moves to dismiss the Complaint for failing to comply with *Federal Rule of Civil Procedure 8(a)(2)* and *(d)(1)*. The government seeks dismissal because the complaint "is over fourteen single-spaced

---

[4] The United States of America has appeared on behalf of the individually named defendants and alleges that those defendants, even if named in their official capacities, are not properly named as defendants. The government contends that this suit "is against the sovereign" because "the relief sought affects the actions of the defendant in his capacity as a federal employee." Def.'s Motion [doc. # 13] at 1 n.1 (citing *Jackman v. D'Agostino, 669 F. Supp. 43, 46 (D. Conn. 1987)*; *Melechinsky v. Sect'y of the Air Force, No. H-82-735, 1983 U.S. Dist. LEXIS 19107, 1983 WL 1609, * 1 (D. Conn. Feb. 18, 1983))*. Because I dismiss the Complaint on Rule 8 grounds, I need not reach the question of whether those defendants are proper parties to this lawsuit in any capacity.

---

[5] The allegations of treason appear to stem from Callan's belief that the Attorney General and Secretary of the Treasury, as delegates to the International Criminal Police Organization, more commonly known as "INTERPOL," have "renounce[d] their allegiance" to the United **[*12]** States. Compl. at 9.

pages long with no numbered paragraphs and includes over two hundred fifty unnumbered **[*13]** pages of exhibits," and because it "is replete with absurd and frivolous statements, which are . . . incomprehensible." Def.'s Mem. [doc. # 13-2] at 1-2 (footnotes omitted).

## A. The Standard Under *Rule 8*

**HN2**[↑] *Rule 8 of the Federal Rules of Civil Procedure* provides, in relevant part, that a complaint "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. In addition, *Rule 8(d)(1)* provides that "[e]ach allegation [of a pleading] must be simple, concise, and direct." **HN3**[↑] The purpose of *Rule 8* is to ensure that courts and adverse parties can understand a claim and frame a response to it.

The Second Circuit has observed that:

> The statement should be plain because the principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial. The statement should be short because "unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage."

*Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988)* (quoting **[*14]** 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1281, at 365 (1969)) (additional internal brackets and citations omitted); *see also Roberto's Fruit Market, Inc. v. Schaffer, 13 F. Supp. 2d 390, 397 (E.D.N.Y. 1998)* (setting forth a similar analysis and collecting cases). When a complaint fails to comply with these requirements, the district court has the power to dismiss the complaint. *Simmons v. Abruzzo, 49 F.3d 83, 86-87 (2d Cir. 1995)* (citing *Salahuddin, 861 F.2d at 42*).

**HN4**[↑] "Dismissal, however, is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Simmons, 49 F.3d at 86-87* (quoting *Salahuddin, 861 F.2d at 42*). The Second Circuit has instructed that if the District Court dismisses the complaint for failure to comply with *Rule 8*, it generally should afford the plaintiff leave to amend. *Salahuddin, 861 F.2d at 42*. (citing 5 C. Charles A. Wright & Arthur R. Miller, Federal Practice and

Procedure § 1281, at 366-67; 2A Moore's Federal Practice P 8.13, at 8-81 to 8-82 n. 38).

In *Salahuddin*, the Court of Appeals found that the district court acted within **[*15]** its discretion in dismissing a complaint spanning "15 single-spaced pages and contain[ing] explicit descriptions of 20-odd defendants." *861 F.2d at 43*. Nevertheless, the Court of Appeals assigned error to the district court's failure to permit leave to amend, since, despite its length, the complaint "clearly plead[ed] at least some claims that cannot be termed frivolous on their face." *Id.*

In this case, it may be possible for Callan to assert, in a complaint complying with *Rule 8*, constitutional claims that are not frivolous on their face. But it is impossible to extract such claims from the "mass of verbiage" contained in the present Complaint.

Furthermore, Callan's status as a *pro se* plaintiff does not save his Complaint. **HN5**[↑] It is well established Second Circuit precedent that a *pro se* complaint is adequately pled if its allegations, liberally construed, could "conceivably give rise to a viable claim." *Phillips v. Girdich, 408 F.3d 124, 130 (2d Cir. 2005)*. District courts must interpret *pro se* pleadings liberally, to raise the strongest arguments they suggest. *Abbas v. Dixon, 480 F.3d 636, 639 (2d Cir. 2007)*. But even with the relaxed standards afforded to *pro se* plaintiffs, it is "pointedly **[*16]** clear that the complaint . . . runs afoul of *Rule 8*." *Lonesome v. Lebedeff, 141 F.R.D. 397, 398 (E.D.N.Y. 1992)*; *see also Moll v. Carter, 179 F.R.D. 609 (D. Kan. 1998)* (citing cases in the Tenth Circuit for the propositions that *pro se* pleadings are "liberally construe[d]" but that "*pro se* litigants must comply with the minimal standards of notice pleading required in *Rule 8(a)*").

## III. Conclusion

Callan's Complaint is dismissed, without prejudice, for failure to provide a clear and succinct basis for and summary of his claims.

In dismissing this Complaint, the Court acknowledges that Mr. Callan is clearly motivated by a sense of justice and fairness in his intense personal commitment to this matter. [6] He also has demonstrated verbal fluency and

---

[6] Callan's Complaint alleges that he has lost three years' worth of earnings, and devoted more than a thousand hours, to his troubles with the IRS. [doc. # 3] at 11.

an ability to digest vast quantities of literature pertaining the nation's tax laws and their history.

But a judicial complaint is not the place for a historical exegesis. In describing the facts and legal theories that support his complaint, Callan should be brief and specific. Examples **[*17]** of the brief and specific claims that are sufficient to institute a federal action are published as an appendix to the Federal Rules of Civil Procedure, in Forms 10 through 21. *See* Fed R. Civ. P. app. Forms 10-21, *available at* http://www.uscourts.gov/rules/cvforms2.htm. Although his claims may not fall into any of the models provided in that appendix, Callan can still use those examples as a model of the brevity and precision that a legal complaint should display.

Callan is granted leave to file an amended complaint within thirty (30) days of this ruling. If Callan does not amend his Complaint within thirty days, this action will be dismissed with prejudice, Callan's further motions [docs. ## 12, 13, 17, 18, 19] will be dismissed as moot, and the Clerk will be instructed to close the file.

Dated: New Haven, Connecticut

April 15, 2009

*/s/ Charles S. Haight, Jr.*

Charles S. Haight, Jr.

Senior United States District Judge

---

 Caution
As of: September 25, 2020 4:28 PM Z

## *Carter v. Revine*

United States District Court for the District of Connecticut

May 15, 2017, Decided; May 15, 2017, Filed

Civil Action No. 3:14-CV-01553 (VLB)

**Reporter**
2017 U.S. Dist. LEXIS 73350 *; 2017 WL 2111594

SHAQUON CARTER, Plaintiff, v. DR. REVINE, et al., Defendant.

**Prior History:** *Carter v. Revine, 2015 U.S. Dist. LEXIS 135815 (D. Conn., Oct. 6, 2015)*

## Core Terms

grievance, inmate, Directive, administrative remedy, summary judgment, exhausted, staff, amended complaint, medical staff, requests, Amend, box, corrections officer, grievance process, transferred, log, housed, thumb, health services, summary judgment motion, discovery, time period, declaration, parties, pain, grievance procedure, orthopedics, unavailable, deposition, deliberate indifference

**Counsel:** **[*1]** For Shaquon Carter, Plaintiff: Anthony W. Pignatiello, The Upton Law Firm, LLC, New Britain, CT.

**Judges:** Hon. Vanessa L. Bryant, United States District Judge.

**Opinion by:** Vanessa L. Bryant

## Opinion

[EDITOR'S NOTE: THIS DOCUMENT IS MISSING TEXT. THE LEXIS SERVICE WILL PLACE THE TEXT ON-LINE UPON RECEIPT.]

MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT AND GRANTING MOTION FOR LEAVE TO AMEND AMENDED COMPLAINT [DKTS. 45 & 52]

Plaintiff Shaquon Carter ("Carter"), an individual incarcerated by the Connecticut Department of Correction ("DOC"), seeks monetary damages for purported *Eighth Amendment* violations relating to Defendants' failure to facilitate and provide him with medical treatment of his fractured thumb while he was located in the Restrictive Housing Unit ("RHU") for twelve days. The current named Defendants are Dr. Revine, Captain James Watson ("Watson"), Deputy Warden Denise Walker ("Walker"), Lieutenant Julie Stewart ("Stewart"), Captain Edward Guzman ("Guzman"), Lieutenant Mauvinchi, Lieutenant Scott Hadlock ("Hadlock"), and Jane Does 1-7 (collectively, "Defendants"). Presently before the Court are Defendants' Motion for Summary Judgment and Plaintiff's Motion to Amend the Second Amended **[*2]** Complaint contingent upon the Court's summary judgment ruling. For the reasons stated herein, the Court DENIES in part and GRANTS in part Defendants' Motion for Summary Judgment and GRANTS Plaintiff's Motion to Amend the Second Amended Complaint.

BACKGROUND

I. Relevant Procedural History

Carter filed his initial Complaint *pro se* on October 20, 2014, bringing claims of lost property, excessive force,

2017 U.S. Dist. LEXIS 73350, *2

deliberate indifference to personal safety, and deliberate indifference to serious medical needs. [*See* Dkt. 1 (Compl.)]. On October 2, 2015, counsel entered an appearance on Carter's behalf. [*See* Dkt. 9 (Pignatiello Notice of Appearance)]. Four days later, the Court entered its Initial Review Order allowing claims against Defendants Revine, Watson, Walker, and Guzman to proceed and granting leave to amend the complaint to plausibly allege claims for deprivation of property, excessive force, and deliberate indifference to his safety; identify how the remaining two Defendants acted with deliberate indifference to his serious medical needs; and name any new Defendants who also may have been involved by who are not specifically named in the caption. [*See* Dkt. 12 (Initial Review Order), at 1]. Counsel timely filed the Amended **[*3]** Complaint on November 9, 2015. [*See* Dkt. 17 (Am. Compl.)].

On January 15, 2016, Defendants filed a Motion to Dismiss the Amended Complaint in part, pursuant to *Fed. R. Civ. P. 16(b)(1)* and *12(b)(6)*. [*See* Dkt. 26-1 (Mot. Dismiss)]. Upon direction by the Court, Defendants re-filed the Motion to Dismiss to comport with the Court's Chambers Practices. [*See* Dkt. 28 (Order); Dkt. 29 (Am. Mot. Dismiss)]. Specifically, Defendants argued (1) the Court lacked subject matter jurisdiction over all claims brought against Defendants in their official capacities; and (2) the Amended Complaint failed to state a claim for (a) intentional infliction of emotional distress against all Defendants, and (b) deliberate indifference to a serious medical need against Dr. Revine. *Id.* at 2. Defendants did not challenge Carter's claim for money damages alleging deliberate indifference to serious medical needs against Defendants Watson, Walker, Guzman, Stewart, Mauvinchi, Hadlock, and Jane Does 1-7. *Id.* at 4. On February 9, 2016, the Court granted in part and denied in part the Amended Motion to Dismiss, dismissing only the claims against Defendants in their official capacities. [*See* Dkt. 31 (Order)].

By leave of the Court, Carter amended his complaint a second **[*4]** time on February 24, 2016, to remove the claims against Defendants in their official capacities. [*See* Dkt. 36 (Second Am. Compl.)]. This Second Amended Complaint is now the operative complaint and names as Defendants Revine, Watson, Walker, Guzman, Stewart, Mauvinchi, Hadlock, and Jane Does 1-7 in their official capacities only. Defendants filed the Answer on March 8, 2016. [*See* Dkt. 38 (Answer)].

In compliance with the Court's operative Scheduling Order, [Dkt. 43 (Am. Scheduling Order)], Defendants

filed the Motion for Summary Judgment on October 3, 2016. [Dkt. 45-1 (Mot. Summ. J.)]. First, Defendants argue that summary judgment should be granted as to Jane Does 1-7 because Carter never submitted a discovery request for their identities. *Id.* at 6. Second, Defendants argue summary judgment should be granted as to Dr. Revine and Lt. Mauvinchi because there is no record of their employment and they have not been served. *Id.* at 6-7. Third, Defendants argue summary judgment is warranted as to all other Defendants because Carter failed to exhaust his administrative remedies as required under the Prison Litigation Reform Act and Administrative Directives 8.9 and 9.6. *See id.* at 7-9. Carter filed his Objection to the **[*5]** Motion for Summary Judgment on November 3, 2016. [Dkt. 51-1 (Opp'n Mot. Dismiss)].

On the same day Carter also filed a Motion to Amend the Amended Complaint contingent upon the Court denying Defendant's Motion for Summary Judgment. *See id.*; Dkt. 52 (Second Mot. Amend)]. Specifically, Carter requests leave to amend the Second Amended Complaint to correctly identify three Defendants and make the following changes: (1) Dr. Revine to Dr. Ruez, (2) Lt. Mauvinchi to Lt. Matuszczak, and (3) Jane Doe 1 to Cheryl Estrom. [Dkt. 52, at 1-2]. Carter also requests leave to remove Jane Does 2-7. *Id.* at 2.

Both the Motion for Summary Judgment and the Motion for Leave to Amend the Amended Complaint are now fully briefed. Below the Court first addresses the Motion for Summary Judgment as the Motion for Leave to Amend is dependent upon its outcome.

II. Facts

On October 20, 2005, Carter was admitted to Manson Youth Center under the custody of the Department of Correction. [Dkt. 45-2 (*Local Rule 56(a)(1)* Stmt., ¶ 1; Dkt. 51-2 (*Local Rule 56(a)(2)* Stmt.), ¶ 1]. From 2005 to 2011, on multiple occasions Carter has been discharged, readmitted, and transferred among different correctional institutions. [Dkt. 45-2, ¶ 2; Dkt. 51-2, ¶ 2]. Since March 13, 2012, **[*6]** the DOC has transferred Carter to different correctional institutions a total of 12 times. [Dkt. 45-2, ¶ 3; Dkt. 51-2, ¶ 3]. Carter attended an Inmate Orientation upon each new transfer wherein he received information about certain administrative remedies and obtained the Inmate Handbook. [*See* Dkt. 45-2, ¶¶ 4-6; Dkt. 51-2, ¶¶ 4-6]. Carter acknowledges the Inmate Handbook explains inmate grievance procedures. [*See* Dkt. 45-4 (Defs.' Ex. B, Carter Dep.), at 12:19-21]. Carter filed inmate grievances prior to 2014. [Dkt. 45-2, ¶ 7; Dkt. 51-2, ¶ 7].

2017 U.S. Dist. LEXIS 73350, *6

The DOC transferred Carter from MacDougall-Walker Correctional Institution ("MacDougall-Walker") to Cheshire Correctional Institution ("Cheshire") on February 18, 2014. [Dkt. 45-3 (Deveau Aff.), at 63]. A few weeks later on March 6, 2014, Carter became involved in a physical altercation with another inmate. [Dkt. 45-2, ¶ 8; Dkt. 51-2, ¶ 8]. That same day Carter pleaded guilty to fighting and as a result was placed in punitive segregation in the Restrictive Housing Unit ("RHU") for twelve days until March 18, 2014. [Dkt. 45-4, at 14:14-15:2; *see* Dkt. 45-3, at 72].

Upon Carter's arrival in the RHU, a woman identified by the Defendants as Nurse Cheryl Estrom visited **[\*7]** his cell, which is captured on video. [Dkt. 45-2, ¶ 13; Dkt. 51-2, ¶ 13]. The video indicates Estrom's visit and examination of Carter for injuries lasted under two minutes. [Dkt. 51-5 (Pl.'s Ex. C, Code Blue Video), at 11:19-end]. Estrom asked Carter to show her his injuries through the hole in the door. Carter presented his left hand and forearm up to his elbow through the hole. *Id.* at 11:50-56. Carter verbally stated his "left arm" was injured but also indicated through physical gesture that he was injured in his hand and wrist region. *Id.* at 12:05-12:13. After making this gesture, Estrom asked him to make a fist with his left hand. *Id.* at 12:14. Carter loosely bent his four fingers into his palm but did not bend his thumb, which remained straight. *Id.* at 12:14-23. Estrom did not ask Carter if he was able to make a fist or to bend his thumb. *Id.* During this evaluation Estrom looked at but did not palpate Carter's left arm, hand, or wrist. She asked to see "the other arm," but did not ask him to make a fist with his right hand. *Id.* at 12:16-22. Again, Estrom looked at but did not palpate his "other arm." She subsequently completed a Medical Incident Report (Form CN 6602). [Dkt. 45-5 **[\*8]** (Defs.' Ex. C, Incident Report), at 39]. Under the "Injury description" box, Estrom wrote in relevant part, "My L arm hurts." *Id.* She wrote under "Observations/remarks," "Wrists neg. L arm no abrasions or contusions. Full ROM[1] of hand, wrist, & elbow. R ear outer aspect 1/2" round superficial abrasion." *Id.*

A. *Carter's Experience While Housed in the RHU*

On July 20, 2016, Carter submitted to a deposition by Defendants' counsel in which Plaintiff's counsel did not ask any questions. [Dkt. No. 45-4]. He testified that

every single day between March 6, 2014, and March 18, 2014, he told members of the medical staff and correctional officers he had an injury. *Id.* at 16:11-23. Specifically, Carter testified that he told correctional officers Watson, *id.* at 25:7-11, Walker, *id.* at 26:4-10, Guzman, *id.* at 26:13-20, Stewart, *id.* at 26:22-27:9, and Mauvinchi, *id.* at 12-18, about his injury.

Carter also testified that he filed grievances at Cheshire, stating specifically, "[T]here was at least three at Cheshire Correctional because I had to follow the chain of command, so I can't just file the grievances, and I wasn't there long enough to do enough of them." *Id.* at 28:19-29:2. Carter did not testify to the date on **[\*9]** which he filed these grievances, to whom they were addressed, the type of grievance he filed, or in which box the grievances were placed. Nor did he offer into evidence the receipt or response to any grievance. He only claims to have handed a written *medical request* to Stewart to "put it in the box for medical," *id.* at 26:22-27:1, but otherwise there is no information on the record about exactly how any of the alleged grievances were filed.[2]

Regarding the content, Carter testified that he filed three grievances. First, he claims he filed a grievance claiming he showed an unidentified nurse his injury, told her he was in pain, requested medical treatment, but was not treated. *Id.* at 18:9-14. He testified that he did not receive a response and that he did not appeal the nonresponse because he did not know that he could. *Id.* at 18:15-19. He also testified that he received Inmate Handbooks and orientations describing the grievance process at each facility to which he had been transferred. *Id.* at 10:13-18. Second, he testified that he filed a grievance claiming he informed medical staff that he injured his thumb or hand, but they did not help him. *Id.* at 16:25-17:3. Third, he claims that **[\*10]** he told Captain Watson, other correctional officers, or the Deputy Warden that he was in pain due to his thumb injury but the correctional officer failed to get him medical assistance. *Id.* at 19:25-20:6. Carter testified that he did not receive a response to this grievance and did not file an appeal. *Id.* at 20:7-11.

Carter also testified that he never filed a grievance claiming that he asked a correction officer to contact the medical department for him but that his request was ignored. *Id.* at 21:4-8. He admitted that he never filed a

---

[1] The Court presumes "ROM" means "range of motion," as indicated in Defendants' *Local Rule 56(a)(1)* Statement and admitted by Plaintiff in the *Local Rule 56(a)(2)* Statement. [*See* Dkt. 45-2, ¶ 12; Dkt. 51-2, ¶ 12].

[2] The Court surmises that Carter may be synonymously referring to medical requests, inmate request forms, and grievances.

grievance claiming he told Ms. Mathews from mental health his thumb was injured and he needed medical attention, but she failed to procure such assistance. *Id.* at 21:22-22:2.

Three months after his deposition on October 21, 2016, Carter signed and submitted an affidavit addressing the time period he spent in the RHU, which contradicts some aspects of his deposition testimony. In it Carter avers facts not included in his deposition testimony. [*See* Dkt. 51-6 (Pl.'s Ex. D, Carter Aff.)]. He states that between March 6, 2014, and March 17, 2014, he wrote six Inmate Request Forms ("CN 9601 Forms") requesting medical treatment and that he gave them to Mulligan, **[\*11]** Deko, and other available employees because he did not have access to the boxes to personally submit them. *Id.* ¶ 6. He believes the RHU protocol requires all paperwork to be left on Watson's desk for submission by him. *Id.* ¶ 7. Carter's declaration does not state the reason he did not have access to the grievance deposit box or the provision of the Inmate Handbook of other DOC pronouncement which led him to believe he could file a grievance by leaving it on Watson's desk. Administrative Directive 9.6, Inmate Administrative Remedies, ("Directive 9.6") instead requires all grievances to be "submitted by depositing them in a locked box clearly marked as 'Administrative Remedies'" and that "[t]he Unit Administrator shall ensure that an adequate number of collection boxes are accessible within the facility." [*See* Dkt. 45-13 (Defs.' Ex. J, Administrative Directive 9.6), § 5(C)]. Directive 9.6 also provides that "[a]ny inmate who needs assistance in using the Inmate Administrative Remedies Process shall receive assistance upon request." *Id.* at § 5(B)(1).

Carter's affidavit further states that he learned on March 12, 2014, that no medical requests had been submitted on his behalf. *Id.* ¶ 8. On March 17, 2014, he submitted **[\*12]** an Inmate Administrative Remedy Form ("CN 9602 Form") as a "written grievance in reference to the lack of response to my requests for medical" and that he handed the form to Deko. *Id.* ¶ 10. He wrote a supplemental letter to Walker about the lack of medical care and also handed it to Deko, although he received no response. *Id.*

Carter offers a statement purportedly authored by Inmate William Jones. [Dkt. 51-11 (Pl.'s Ex. I, Jones Statement)]. The statement is signed but undated and states, "I am writing this statement on my own free will. I attest that nobody forced me to write this statement. I attest that the facts of this statement are true as I remember." *Id.* The statement is neither sworn nor

made under penalty of perjury. On a motion for summary judgment the Court may accept only evidence admissible under the rules of Evidence. *Fed. R. Civ. P. 56(c)*; *see Raskin v. Wyatt Co., 125 F.3d 55 (2d Cir. 1997)*; *Welch-Rubin v. Sandals Corp., No. 3:03CV481 (MRK), 2004 U.S. Dist. LEXIS 22112, 2004 WL 2472280, at *1-2 (D. Conn. Oct. 20, 2004)* (admitting affidavits); *see also Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181 (9th Cir.1988)* (finding declaration did not properly lay foundation for testimonial document when it merely claimed to the document was a "[t]rue and correct cop[y]"). *Rule 56(c)* expressly permits the Court to consider affidavits or declarations. *Fed. R. Civ. P. 56(c)*. When, under any United States law or any other rule such as **[\*13]** the Federal Rules of Evidence, a matter is required to be supported by a sworn declaration or an affidavit, the matter alternatively may be proven by the unsworn declaration or statement, subscribed by the maker as "true under penalty of perjury," provided that it is dated and signed and contains substantially the following language: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date)." *28 U.S.C. § 1746*. This provision "allows a written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit." *Fed. R. Civ. P. 56(c)* advisory committee's note to 2010 amendment.

Both Carter's affidavit and Jones's statement were submitted through Carter's attorney. Unlike Carter's affidavit, Jones's statement is inadmissible as it does not substantially comply with *28 U.S.C. § 1746*. *Compare Reynolds v. Sealift, Inc., 311 Fed. Appx. 422, 425 (2d Cir. 2009)* (upholding district court's decision to exclude four unsworn affidavits lacking a precise date) *to LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 65-66 (2d Cir. 1999)* (acknowledging the letter "substantially complied" when it was signed, dated, and stated, "Under penalty of perjury, I make the statements contained herein"); **[\*14]** *Monahan v. NRA Grp. L.L.C., No. 3:10-CV-00638 (JCH), 2011 U.S. Dist. LEXIS 99753, 2011 WL 3901877, at *2 n.5 (D. Conn. Sept. 6, 2011)* (excluding "affidavit" that was not dated, notarized, or signed under penalty of perjury as it did not meet requirements for sworn affidavit or unsworn declaration). The Court presumes Plaintiff's counsel knows the difference between the two and submitted the most persuasive material in opposition to summary judgment that he had available. Accordingly, the Court finds that it would be

futile to withhold its decision on summary judgment to afford counsel an opportunity to obtain an affidavit or declaration.

B. *Medical Treatment for Carter's Injury*

The clinical record indicates medical staff attended to Carter on March 14, 2014, eight days after he entered the RHU and was examined by Estrom. There is nothing in the record explaining what prompted this examination. The record states the following:

[TEXT REDACTED BY THE COURT]

[Dkt. 47 (Defs.' Ex. E, Sealed), at 145].[3] The only written record in evidence of any medical request during his time in the RHU is his request for a mental health consultation documented on March 10, 2014, which does not reference his swollen left thumb or hand. [*See* Dkt. 45-2, ¶ 15; Dkt. 51-2, ¶ 15].

Carter's hand was first **[*15]** examined by a physician on March 18, 2014. On that date he was examined by Dr. Ruez who ordered X-rays, wrapped Carter's left hand in an ACE bandage, and prescribed Motrin for pain. [Dkt. 45-2, ¶ 16; Dkt. 51-2, ¶ 16]. The X-ray results indicated a fracture on the base of the first metacarpal of his left hand. [Dkt. 45-2, ¶ 17; Dkt. 51-2, ¶ 17].

On March 19, 2014, the DOC transferred Carter from Cheshire to Corrigan-Radgowski Correctional Center ("Corrigan-Radgowski"). [Dkt. 45-2, ¶ 17; Dkt. 51-2, ¶ 17]. One week later on March 26, 2014, the URC reviewed and approved of a request for Carter to receive an expedited orthopedic evaluation of his left hand.[4] [Dkt. 47, at 111]. The URC review form contains a clinician signature and Carter's signature dated April 3, 2014, acknowledging the following: "URC Decision to be Reviewed by Facility MD and Discussed with Inmate Before Filling." *Id.* These signatures indicate that nearly a month after his first complaint, on April 3, 2014, the URC approved the request for Carter to be examined by an orthopedics specialist. [*See* Dkt. 45-2, ¶ 19; Dkt. 51-2, ¶ 19].

More than one week after the URC approval and five weeks after his initial complaint, on April **[*16]** 11, 2014, orthopedics specialist, examined Carter's left hand. [Dkt. 45-2, ¶ 20; Dkt. 51-2, ¶ 20]. He made the following

assessment:

[TEXT REDACTED BY THE COURT] I had a long discussion with him explaining that five weeks status post his injury, which <u>could have readily been treated with a closed pinning if we could have gone into it acutely, would be quite a challenging operation due to the small size of the bony fragments, the amount of healing that has already taken place, and the chance that we could</u> comminute even further the small bony fragments or make him worse. [TEXT REDACTED BY THE COURT] <u>I did explain to him that he could develop arthritis of the thumb carpal metacarpal joint whether we operate on him or whether we do not operate on him,</u> [TEXT REDACTED BY THE COURT]

[Dkt. 47, at 112-13 (emphasis added)]. The orthopedics specialist recommended a [TEXT REDACTED BY THE COURT] *Id.* at 113.

C. *Carter's Experience Post-Treatment*

Carter testified that in addition to the grievances filed at Cheshire, he also filed two grievances at Corrigan-Radgowski to address his persistent pain and receive different and more effective pain medication. [Dkt. 45-2, ¶ 25; Dkt. 51-2, ¶ 25]. The record contains **[*17]** an CN 9601 Form submitted to "Grievance Coordinator" on September 4, 2014, wherein he stated, "I have filed Grievances in Corrigan and in Cheshire for any property being missing by (CO. Viera — Cheshire) and on medical in Cheshire because of my thumb being broken but <u>because</u> they (Cheshire) didn't do anything to fix or help me with the pain for 11 days. Can you let me know if they are being processed?" [Dkt. 51-13 (Pl.'s Ex. K, Inmate Request Form 9/4/14), at 2]. Staff King responded, "You must write to that facility. If you got a receipt for Corrigan I could check on that." *Id.* On September 10, 2014, Carter filed another CN 9601 Form with Cheshire stating, "(I have sent a letter) and now I am waiting on a request to see if my (Grievance was processed?) I don't remember the date but sometime between (March 6th to the 19th.) [sic] Also, I'm not sure what to do from here because I'm not in the same facility." [Dkt. 51-15 (Pl.'s Ex. M, Inmate Request Form 9/10/14), at 2].

Carter then filed a grievance on September 20, 2014, by filling out a CN 9602 Form stating he was "unable to get surgery done due to the delay of medical treatment by Cheshire C.I." and that he was "trying to get the **[*18]** pain to go away and medical isn't doing enough." [Dkt.

---

[3] All redacted information refers to content appearing in sealed documents that is not otherwise quoted by the Plaintiff.

[4] The URC request does not make clear who ordered the review.

54-14 (Pl.'s Ex. L, Grievance), at 3].[5] The grievance indicates it was received on October 5, 2014, and on October 20, 2014, APRN L'Heureux wrote the following: "Discussed trial of Naprosyn x 30 days to ↓ thumb discomfort." Id. The nurse did not check either of the two boxes indicating he had exhausted DOC's Administrative Remedies or that the matter could be appealed. Id.

Defendants submitted three grievance logs: (1) Cheshire's Directive 9.6 grievance log between February 18, 2014, and March 19, 2014 (the time period Carter was housed at Cheshire), [Dkt. 45-8 (Defs.' Ex. F, Cheshire 9.6 Grievance Log)]; (2) Cheshire's Directive 8.9 grievance log between March 1, 2014 and April 30, 2014,[6] [Dkt. 45-9 (Defs.' Ex. G, Cheshire 8.9 Grievance Log)]; and (3) Corrigan's 9.6 grievance log between March 19, 2014, and June 12, 2015 (the time period Carter was housed at Corrigan), [Dkt. 45-10]. None of these logs contain any grievances filed by Carter during the respective time periods. Notably, these grievance logs would not have documented Carter's informal resolution requests filed through the CN 9601 Forms. [See Dkt. 45-13, [*19] § 6(P) (stating a grievance log shall be maintained for each "level," but

--------

[5] Kimberly Daly, the Administrative Remedies Coordinator at Corrigan-Radgowski, submitted an affidavit stating that she is "the keeper of records of all inmate grievances and grievance appeals, and maintain[s] the grievance log at Corrigan Correctional Institution as set forth in DOC Administrative Directive 9.6 § 6(P) (August 15, 2013)." [Dkt. 45-10 (Defs.' Ex. H, Daly Aff.), at ¶¶ 2-3]. Daly attested that "on July 5, 2016, [she] reviewed records of all grievance filings and grievance appeals at Corrigan Correctional Institute from March 19, 2014 to June 12, 2015. During this period, Inmate Shaquon Carter, No. 335275, did not file any grievances." Id. at ¶ 4. The parties dispute whether Carter's filing of the grievance on September 20, 2014, is evidence that Daly's affidavit is misleading or incorrect. The Court notes that CN 9602 Form may be used to file a custodial grievance under Administrative Directive 9.6 or a health services grievance under Administrative Directive 8.9. See Dkt. 51-9 (Pl.'s Ex. G, Inmate Requests for Non-Emergency Health Services), at 2; see generally Dkt. 45-13]. As Carter's grievance does not specify the type of grievance and there is no evidence showing into which box he submitted the grievance, the Court need not make a determination as to whether the affidavit is misleading or incorrect. In addition, it is not clear that Daly should not have reviewed additional records to determine whether grievances were filed after June 12, 2015, as King's statement indicates that an inmate may file a grievance in which he is no longer housed.

[6] The reason for selecting this time period is unknown to the Court.

Levels 1-3 do not include informal written requests filed with CN 9601 Forms); Dkt. 45-14, § 13 (requiring an electronic log to be maintained for Health Services Review requests and appeals, which do not include written requests utilizing CN 9601 Forms)].

On June 12, 2015, the DOC transferred Carter again, this time to Enfield Correctional Institution ("Enfield"). [Dkt. 45-3, at 63]. Carter remained at Enfield until recently when he was transferred to Carl Robinson Correctional Institution. [Dkt. 51-2, ¶ 3].

III. Administrative Directives

Defendants claim that Directive 9.6 applies to Carter's claims against the correctional officers and Directive 8.9 applies to Carter's claims against the medical staff.

A. Directive 9.6

Directive 9.6 "provide[s] a means for an inmate to seek formal review of an issue relating to any aspect of an inmate's confinement that is subject to the Commissioner's authority," and it "enables the Department to identify individual and systemic problems, to resolve legitimate complaints in a timely manner and to facilitate the accomplishment of its mission." [Dkt. 45-13, § 1]. First, Directive 9.6 requires an inmate [*20] to go through an Informal Resolution process by attempting to resolve the issue verbally with the appropriate staff member or supervisor/manager. See id., § 6(A). Should this effort fail to resolve the issue, the inmate must file a written request by submitting a CN 9601 Form and the response will be administered within 15 days. See id. An inmate who is "not satisfied with the informal resolution offered" or who does not receive a timely response may file a grievance by submitting a CN 9602 Form and either (1) attaching the CN 9601 Form and response or (2) explaining why the CN 9601 Form is not attached. Id., § 6(C). The Directive does not require the CN 9602 Form to be accompanied by a receipt for the CN 9601 Form.[7] See id. The Unit Administrator shall then make the Level 1 Review decision within 30 days, and after this date the inmate may appeal for Level 2 Review any denial, rejection, or failure to timely respond. Id., § 6(C), (I), (K).

--------

[7] Directive 9.6 requires the Administrative Remedies Coordinator to "complete and forward CN 9603 Administrative Remedy Receipt to the inmate and place a copy of the receipt in the appropriate file." Id., § 5(D)(5). The record does not contain a copy of the CN 9603 Receipt, and as such the Court cannot determine to which stage of the remedy process the Receipt applies.

2017 U.S. Dist. LEXIS 73350, *20

Within 30 days the District Administrator shall render a decision, which exhausts the administrative process for all grievances except those challenging (1) Department level policy, (2) the integrity of the grievance procedure, or (3) timeliness of the decision. *Id.*, § 6(L). **[*21]** Any disposition regarding these three exceptions may be appealed to the Commissioner or a designee for Level 3 Review. *Id.*

Section 5(C) provides that all grievances and appeals must be placed in an Administrative Remedies box to be collected by the Unit Administrator, and there are to be "an adequate number of collection boxes . . . accessible within the facility." Furthermore, the Administrative Remedies Coordinator shall "ensure that current administrative remedy forms are available in all housing units." *Id.*, § 5(D)(2).

In addition to the grievance procedure, Directive 9.6 also provides that "[e]ach inmate in the Department's custody shall have access" to the Directive and that "[a]ny inmate who needs assistance in using the Inmate Administrative Remedies Process shall receive assistance upon request." *Id.*, § 5(B)(1).

B. Directive 8.9

Administrative Directive 8.9, Administrative Remedy for Health Services ("Directive 8.9") "establish[es] a Health Services Review procedure as the administrative remedy for all health services to enable an inmate to seek formal review of any health care provision, practice, diagnosis or treatment," which thereby "enables the Department to identify individual and systemic problems, to resolve health care **[*22]** issues in a timely manner and to facilitate the accomplishment of its mission." [Dkt. 45-14 (Defs.' Ex. L, Directive 8.9), § 1]. First, "[t]he inmate must attempt to resolve the issue face to face with the appropriate staff member or with a supervisor via written request utilizing CN 9601 Inmate Request Form." *Id.*, § 10. If after 15 business days of receiving the written request a response is not made, an inmate may then file a CN 9602 Inmate Administrative Remedy Form for further review. *See id.* Depending on whether the inmate seeks review of (1) a diagnosis or treatment, or (2) an administrative issue, different procedure follows.

Under § 11 of Directive 8.9, an inmate may seek review of a *diagnosis or treatment* as outlined in § 9(A) and file a CN 9602 Form to "apply for a Health Services Review if informal resolution via inmate request was unsuccessful." *Id.* A possible result from filing a CN 9602 Form is that the case may be referred to the

Utilization Review Committee that engages in the "process by which requests for specialty care, treatment, services, and/or diagnostic testing is reviewed for approval based on standardized guidelines." *Id.*, § 3(K). Directive 8.9 does not contain a statute of limitations **[*23]** for filing a CN 9602 Form under this provision.

In addition to § 11 of Directive 8.9, § 12 provides a process for inmates seeking "review of a *practice, procedure*, *administrative provision* or *policy*, or an allegation of *improper conduct* by a health services provider" under § 9(B). *Id.*, § 12. Like the policy under § 11, an inmate may submit a CN 9602 Form. *Id.* "The inmate should provide a concise statement of what he/she believes to be wrong and how he/she has been affected." *Id.* The HSR Coordinator must evaluate, investigate, and decide the request for review within 30 days. *Id.*, § 12(A). If dissatisfied, the inmate may appeal within 10 business days by completing a CN 8901 Appeal of Health Services Review Form and placing it into the Health Services box.[8] *Id.*, § 12(B). A contracted health services provider will then decide the appeal within 15 days. *Id.*, § 12(C). If the appeal pertains to compliance, the provider's decision exhausts the health services review process. *Id.*, § 12(C). If the appeal pertains to a health services policy of the Department, the inmate may then appeal to the DOC Director of Health Services within 10 business days of receipt of the provider's decision, who must respond within 30 days of receipt of the appeal. **[*24]** *Id.*, § 12(D). The decision of DOC Director of Health Services renders the inmate's review process exhausted. *Id.*

IV. Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010)*. "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *Matsushita Elec. Indus. Co.,*

---

[8] Unlike Directive 9.6, Directive 8.9 does not provide an opportunity to appeal as a matter of course should the Coordinator fail to respond within the 30 days.

2017 U.S. Dist. LEXIS 73350, *24

*Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).* "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315—16 (2d Cir. 2006)* (internal quotation marks and citation omitted).

A plaintiff opposing summary judgment "cannot defeat the motion by relying on the allegations in his pleading . . . or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cty. of Orange, 84 F.3d 511, 518 (2d Cir. 1996)* (internal citation omitted). "At the summary judgment stage of the proceeding, [a plaintiff is] required to present admissible evidence in support of [his] allegations; **[*25]** allegations alone, without evidence to back them up, are not sufficient." *Welch-Rubin v. Sandals Corp., 2004 U.S. Dist. LEXIS 22112, 2004 WL 2472280, at *1* (citing *id. at 518);* see *Martinez v. Connecticut, State Library, 817 F. Supp. 2d 28, 37 (D. Conn. 2011).* In other words, a party opposing summary judgment must produce more than "a 'scintilla of evidence,'" i.e., the evidence must be sufficient for "'a jury to properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" *Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 726-27 (2d Cir. 2010)* (quoting *Anderson, 477 U.S. at 251-52*). In asserting a genuine dispute of material fact a party may cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." *Fed. R. Civ. P. 56(c)(1).* A party may also support their assertion by "showing that the materials cited do not establish the absence . . . of a genuine dispute." *Id.* Cited documents must consist of either "(1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." *Local R. Civ. P. 56(a)(3);* see also *Fed. R. Civ. P. 56(c)(4).* Upon the production of such evidence, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).*

V. Discussion

Defendants argues that Carter failed **[*26]** to exhaust his administrative remedies before filing suit. Defendants also argue that summary judgment be granted in favor of Jane Does 1-7, Dr. Revine, and

Lieutenant Mauvinchi as they have not yet been properly identified or served. The parties do not address the merits of the deliberate indifference claim.[9]

A. Exhaustion of Administrative Remedies

*Section 1997e of Title 42 of the United States Code* governs actions brought by prison inmates. This section provides that "[n]o action shall be brought with respect to prison conditions under *section 1983* of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *42 U.S.C. § 1997e(a).* This subsection applies to all claims regarding prison life. See *Porter v. Nussle, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002).* *Section 1997e* requires exhaustion of any available administrative remedies, regardless of whether they provide the relief the inmate seeks. See *Booth v. Churner, 532 U.S. 731, 741, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001).* A claim is not exhausted until the inmate complies with all administrative deadlines and procedures. See *Woodford v. Ngo, 548 U.S. 81, 90, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006).* Informal efforts to put prison officials on notice of inmate concerns do not satisfy the exhaustion requirement. See *Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007).* If the deadline to file a grievance has passed, an unexhausted claim is barred from federal **[*27]** court. See *Woodford, 548 U.S. at 95.*

The exhaustion requirement, however, may be excused when the remedy is not available in practice even if it is "officially on the books." See *Ross v. Blake, 136 S. Ct. 1850, 1858-59, 195 L. Ed. 2d 117 (2016);* *Harvin v. Chapdelaine, No. 3:16-cv-1616 (VAB), 2016 U.S. Dist. LEXIS 170509, 2016 WL 7197363, at *1 (D. Conn. Dec. 9, 2016)* (same). This means that "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Ross, 136 S. Ct. at 1859* (quoting *Booth, 532 U.S. at 738*). The United States

---

[9] The Court will not address the merits of the deliberate indifference claim as Carter did not have notice that he had to come forward with all his evidence. See *Celotex Corp. v. Catrett, 477 U.S. 317, 326, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)* ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence."); *Pugh v. Goord, 345 F.3d 121, 125-25 (2d Cir. 2003)* (opining that summary judgment is never appropriate "where no party has moved for summary judgment and no notice was given by the court").

Supreme Court has established three circumstances under which an inmate need not exhaust the administrative procedure as it is deemed unavailable: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) when a procedure is "so opaque that it becomes, practically speaking, incapable of use;" or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id. at 1859-60; see Williams v. Ford, No. 3:14-cv-1181 (VAB), 2017 U.S. Dist. LEXIS 37746, 2017 WL 1025661, at *4 (D. Conn. Mar. 16, 2017)*.

"Whether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual **[*28]** elements." *Hubbs v. Suffolk Cty. Sheriff's Dep't, 788 F.3d 54, 59 (2d Cir. 2015); Williams v. Corr. Officer Priatno, 829 F.3d 118, 123 (2d Cir. 2016)* (determining that the applicability of the *Ross v. Blake* "unavailability" exceptions lies "entirely within the context of whether administrative remedies were actually available to the aggrieved inmate."). The failure to exhaust administrative remedies under *42 U.S.C. § 1997e* is an affirmative defense. *Jones v. Bock, 549 U.S. 199, 215, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007)* (ruling an inmate need not specially plead or demonstrate exhaustion in the complaint); *Jenkins v. Haubert, 179 F.3d 19, 28-29 (2d Cir. 1999)* (same). As such, "defendants bear the initial burden of establishing, by pointing to legally sufficient source[s] such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs, 788 F.3d at 59; see Johnston v. Maha, 460 F. App'x 11, 15 (2d Cir. 2012)* ("The defendants have the burden of showing that there is no genuine issue of material fact as to exhaustion that would preclude summary judgment."); *Michalski v. Corr. Managed Health Care, No. 3:15-cv-571 (VAB), 2016 U.S. Dist. LEXIS 146454 *4 (D. Conn. Oct. 21, 2016)* ("Thus, defendants have the burden of proving that [plaintiff] has not exhausted claims prior to filing this action."). Defendants have not waived this affirmative defense as they list the failure to exhaust as the Second Affirmative Defense in their Answer to the Second Amended Complaint. [Dkt. 37 (Ans. to Second Am. Compl.), at 6].

Carter has filed claims against correctional staff and medical **[*29]** staff. Defendants posit that the former are

subject to exhaustion requirements under Directive 9.6, and the latter are subject to exhaustion requirements under Directive 8.9. [Dkt. 45-1, at 9]. Carter does not address Directive 8.9, but rather that Directive 9.6 generally addresses the grievance process. [Dkt. 51-1, at 14-16]. Below the Court will separately address each Directive pertinent to the type of staff.

### 1. Correctional Officers

Defendants argue that Carter failed to exhaust his Directive 9.6 administrative remedies to grieve the correctional officer Defendants' alleged failure to assist him in obtaining treatment for his hand. [*See* Dkt. 45-1, at 9 (citing Directive 9.6 § 4(A))]. In support of their argument, Defendants submitted Directive 9.6 grievance logs for the following: (1) Cheshire's Directive 9.6 grievance log between February 18, 2014, and March 19, 2014 (the time period when he was housed at Cheshire); and (2) Corrigan's Directive 9.6 grievance log between March 19, 2014 and June 12, 2015 (the time period when he was housed at Corrigan). [*See generally* Dkt. 45-8; Dkt. 45-9; Dkt. 45-10]. The grievance logs indicate that Carter did not file any grievances with the respective **[*30]** institutions during these time periods.[10] Moreover, the Administrative Remedies Coordinator is required to "complete and forward CN 9603 Administrative Remedy Receipts to the inmate and place a copy of the receipt in the appropriate file," [Dkt. 45-13, § 5(D)(4)], but there are no such receipts in evidence.

Carter does not dispute in his summary judgment briefing that Directive 9.6 is the appropriate procedure for his claims against the correctional officers, and he does not dispute that he failed to exhaust remedies as outlined under Directive 9.6. Indeed, Carter testified that he submitted a grievance against correctional staff for failing to get medical assistance when he notified them he was in pain due to his thumb injury, but he never

---

[10] The record does not indicate whether and how an inmate housed at Corrigan could file a grievance involving conduct that occurred at Cheshire. This missing procedural evidence is somewhat significant as Carter was transferred from Cheshire to Corrigan on March 19, 2014, and this date precedes the 15-day deadline when he would have received a response to his CN 9601 Form (assuming he filed a CN 9601 as early as March 6, 2014). However, Carter does not allege in the Second Amended Complaint he was unable to or prevented from filing subsequent grievances at Corrigan about events occurring at Cheshire. He also did not testify that he filed a grievance directed to Cheshire while housed at Corrigan. The Court thus finds the submitted grievance logs sufficient.

received a response and he never appealed the nonresponse. [Dkt. 45-4, at 19:25-20:11]. Carter also admits that he never filed a grievance against correctional staff for ignoring his request to contact the medical department on his behalf. *Id.* at 21:4-8. Rather, Carter argues that he could not have exhausted his claims because he never received a response to his grievances, he was transferred to a different facility during the 30-day time period, and there [*31] is evidence of his grievances. [*See* Dkt. 51-1, at 14-15].

The Court cannot render summary judgment for the Defendants on the basis of their contention that Carter did not file grievances when Carter claims that he did. These conflicting factual scenarios create the classic genuine issue of material fact. This is especially true where, as here, the Defendants had reason to know that the delay in treatment caused Carter harm, creating a motivation to conceal the grievances. *Fed. R. Civ. P. 56(a)*; *Anderson, 477 U.S. at 255*; *Matsushita Elec. Indus. Co., Ltd., 475 U.S. at 587*; *Home Assurance Co., 446 F.3d at 315-16*.

a. Remedy So Opaque It Is Incapable Of Use

Assuming Carter filed the grievance, he was required to appeal the nonresponse. [*See* Dkt. 45-13, § 6(I) ("If a response to a Level 1 grievance is not received within 30 business days, an inmate may appeal to Level 2.")]. But an inmate need not exhaust an administrative remedy that is "so opaque that it becomes, practically speaking, incapable of use." *Ross, 136 S. Ct. at 1859*. Carter alleges that his transfer on March 19, 2014, prevented him from exhausting his remedies because he never received a response. [Dkt. 51-1, at 14-15]. The Second Circuit in *Williams v. Corr. Officer Priatno, 829 F.3d at 126-27*, addressed this very issue with respect to the transfer policy at the New York Department of Corrections and Community Supervision ("DOCCS"). The [*32] DOCCS provided that where "the [transferred] grievant wishes to appeal, he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed within seven calendar days after receipt." *Id. at 126* (quoting *N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 7, § 701.6(h)(2)*). The plaintiff in that case never received a response to his grievance filed before his transfer, and the Second Circuit determined that "[t]he regulations plainly do not provide guidance on how a transferred inmate can appeal his grievance with the original facility without having received a response." *Id.* In ruling that the procedures available to the plaintiff were "practically speaking, incapable of use," the Second Circuit

recommended that the DOCCS "revise its grievance procedures to instruct inmates . . . how to appeal a grievance, to which the inmate never received a response, after being transferred." *Id. at 127*. Here, the DOC does not set forth any policy whatsoever instructing inmates on how to navigate the grievance process upon a transfer. This is even more "incapable of use" than the DOCCS's opaque process.

Of note, Carter submitted a CN 9601 Form at Corrigan wherein he stated, "I have filed [*33] grievances in Corrigan and in Cheshire . . . because of my thumb being broken but because they (Cheshire) didn't do anything to fix or help me with the pain for 11 days." [Dkt. 51-13, at 1]. Staff King responded, "You must write to that facility." *Id.* While the statement suggests the appeal process could be conducted by mail, such a process is not set forth in any directive in the record and therefore *Williams* is instructive. Directive 9.6 only allows an appeal to be filed by placing it in the "Administrative Remedies" box. [Dkt. 45-13, § 5(C)]. King's instruction raises the potential that Carter was "thwart[ed] from taking advantage of a grievance process through machination [or] misrepresentation," *Ross, 136 S. Ct. at 1860*, as King's direction contradicts the procedure found in Directive 9.6.

Furthermore, given that Carter was housed in the RHU and claims to have had no access to the appropriate grievance box, [Dkt. 51-6, ¶ 6], the absence of his grievance in the grievance log raises the potential that a correctional officer never filed the claim. The Second Circuit also addressed this situation in *Williams*. While in segregation on January 15, 2013, the plaintiff drafted a grievance about an assault he allegedly suffered [*34] by several correctional officers, and he asked a correction officer to give it to the grievance office in accordance with the DOCCS grievance procedures for inmates housed in the SHU. *See id. at 120-121, 124* ("Prison regulations provide that inmates in the SHU may file grievances by giving the complaint to a correction officer to forward to the grievance clerk.") (citing *NYCRR, tit. 7, § 701.7*). A week later, the plaintiff notified superintendent Ada Perez visiting the SHU that he had not received a response, upon which she stated she would look into the situation. *Id. at 121*. About one week after that, the plaintiff was transferred to a different facility prior to receiving a response. *Id.* The defendants cited the DOCCS regulation enabling an inmate to appeal a grievance when he does not receive a timely response, arguing that this process was available "even if Williams's grievance had not been filed and despite the fact that he had been transferred to a new facility

2017 U.S. Dist. LEXIS 73350, *34

prior to receiving a response." *Id. at 124*. The Second Circuit determined that "the regulations give no guidance whatsoever to an inmate whose grievance was *never* filed," *id. at 124* (emphasis added), and noted that the plaintiff would not have had the right to appeal his grievance until **[*35]** after the time for the superintendent to respond had passed, which was after the filing deadline for his initial grievance. *See id. at 125*. As such, the Second Circuit held that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id. at 126* (applying *Ross, 136 S. Ct. at 1859*).

Were this circumstance to be the case, Directive 9.6 suffers from the same shortcomings as those of the DOCCS: there is no procedure for grievances that are not filed as a result of a correctional officer failing to assist the inmate in the grievance process despite being so required. [*See* Dkt. 45-13, § 5(B)(1)]. Directive 9.6 provides that "[a]ny inmate who needs assistance in using the Inmate Administrative Remedies Process shall receive assistance upon request." *Id.* § 5B(1). Inmates in the RHU are housed in a locked cell for 23 hours each day and have limited access to common areas. Neither the Directive nor any other evidence presented by the Defendants establish that inmates housed in the RHU have access to grievance forms. The Administrative Directives here make no mention of the manner in which an inmate in the RHU or an inmate who has been transferred is to file a grievance, and thus **[*36]** provide no guidance to an inmate in either of these instances.

Unlike the Defendants, Carter has provided sufficient evidence for the Court to conclude he tried to submit the grievance by and through the assistance of correctional officers while he was housed in the RHU. Carter testified that he gave a medical request to Stewart. [*See* Dkt. 45-4, at 26:22-27:1]. Carter's affidavit mentions submitting to correctional officers Mulligan, Deko, and "other available employees" six medical requests and a "written grievance in reference to the lack of response to my requests for medical care." [Dkt. 51-6, ¶¶ 6, 10]. Such evidence is sufficient for the Court to conclude that it was practically impossible to pursue his grievance. *See Williams, 829 F.3d at 123; see also Hubbs, 788 F.3d at 54* (establishing that the availability of an administrative remedy is a question of law for the courts, even if there are factual elements).

As Carter testified, he notified staff of his injury every single day, [Dkt. 45-4, at 16:11-16], but the DOC failed

to facilitate his treatment for 11 days. When he finally did begin to receive treatment, the process took several weeks and he was ultimately informed that the delay caused him to sustain an avoidable permanent **[*37]** disability. [Dkt. 47, at 112 (wherein the orthopedics specialist "explain[ed] to him that he could develop arthritis of the thumb carpal metacarpal joint whether we operate on him or whether we do not operate on him")]. The delay in treatment and the potentially irreversible nature of Carter's resulting disability combined to render the grievance process unavailing. The test of whether an administrative remedy is available to an inmate is an objective one: that is, would "a similarly situated individual of ordinary firmness have deemed them available." *Hemphill v. New York, 380 F.3d 680, 688 (2d Cir. 2004), abrogated on other grounds.* After Carter's treatment began, it would have been reasonable for him to have abandoned any grievance process and he would have reasonably believed his needs were being met.

After the onset of treatment, Carter no longer had a basis to pursue a grievance. His request was no longer being honored, he did not know his thumb had been broken and he did not know that the delay in treatment had caused his hand to heal improperly causing him a permanent injury. As a consequence the grievance process was of no benefit to Carter or to the DOC because they were aware of the delay and its result. *See Ross, 136 S. Ct. at 1859* ("When rules are so confusing **[*38]** that . . . no reasonable prisoner can use them, then they're no longer available.") (internal quotation marks omitted).

Defendants submitted in their Reply brief an affidavit by Brian Viger, Deputy Warden for Operations at Cheshire, who stated:

> [A]n Inmate Request Form or a Grievance received claiming a correction officer <u>failed to respond to a request for medical assistance would result in an immediate investigation of the incident</u>, to include the welfare of the inmate and the conduct of the correction officer. If the investigator determined the inmate was in need of medical assistance, such assistance would be rendered by the prison medical unit. If the investigator determined the correction officer failed to furnish medical assistance, the staff member would be subject to discipline.

[Dkt. 57-2 (Defs.' Ex. O, Viger Aff.), ¶ 3 (emphasis added)]. This response presupposes that the claim he

had access to the forms, access to filing grievances, and was not thwarted from filing such grievances due to his housing in the RHU or his transfer. Unlike the procedures for New York; *Williams, 829 F.3d at 126* (quoting *N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 7, § 701.6(h)(2)*); Defendants point to no evidence that Connecticut's inmate **[\*39]** grievance procedures directly address the manner by which an inmate housed in the RHU can file a grievance and the Court has not found any. Defendants have offered no evidence to support this assertion that Carter's claims that he was denied treatment would have been investigated. Indeed, it was a doctor engaged by the DOC who concluded that Carter's broken hand was not treated in a timely manner. Defendants offer no evidence of an investigation into the reason why. Therefore, the Court finds the hypothetical response to such a grievance to be unavailing here.

b. Remedy Thwarted for Machination, Misrepresentation, or Intimidation

Other evidence on the record raises the issue as to whether Carter was "thwart[ed] . . . from taking advantage of the grievance process through machination, misrepresentation, or intimidation." *Ross, 136 S. Ct. at 1860*. When Carter submitted the CN 9601 Form to "Grievance Coordinator" on September 4, 2014, to ask about the processing of his prior grievances from Cheshire, Staff King responded, "You must write to that facility. If you got a receipt for Corrigan I could check on that." [Dkt. 51-13, at 2]. An administrative remedy is unavailable "if prison officials erroneously inform an inmate **[\*40]** that the remedy does not exist or inaccurately describe the steps he needs to take to pursue it." *Angulo v. Nassau Cty., 89 F. Supp. 3d 541, 552 (E.D.N.Y. 2015)* (quoting *Pavey v. Conley, 663 F.3d 899, 906 (7th Cir. 2011))*. See *Ross, 136 S. Ct. at 1860* ("[I]nterference with an inmate's pursuit of relief renders the administrative process unavailable."); *Brownell v. Krom, 446 F.3d 305, 312 (2d Cir. 2006)* (finding that plaintiff's decision to abandon his reimbursement claim and pursue the grievance, which foreclosed his ability to appeal, justified his failure to exhaust remedies as it was "directly traced to a prison official's advice to [plaintiff'] to follow that course"); *Davis v. Hernandez, 798 F.3d 290, 296 (5th Cir. 2015)* (reversing and remanding grant of summary judgment where jail staff told plaintiff that he could not appeal and plaintiff relied on this representation); *Small v. Camden Cty., 728 F.3d 265, 271 (3d Cir. 2013)* ("Remedies that are not reasonably communicated to inmates may be considered unavailable for exhaustion purposes."); *Goebert v. Lee*

*Cty., 510 F.3d 1312, 1323 (11th Cir. 2007)* (finding it impermissible for "jails and prisons to play hide-and-seek with administrative remedies"); *Robinson v. Ballard, No. 9:13-CV-01213 (TJM/TWD), 2017 U.S. Dist. LEXIS 16368 at \*31 (N.D.N.Y. Feb. 3, 2017)* (finding a triable issue of fact where inmate conscientiously pursued a response to his grievance but received "total silence" to his multiple inquiries about the status of his grievance).

Directive 9.6 does not mention mailing a grievance and it does not state that an inmate must have a receipt to follow-up **[\*41]** on a pending grievance. [*See* Dkt. 45-13, § 5(D)(5) (identifying CN 9603 as an Administrative Remedy Receipt)]. It only requires the Administrative Remedies Coordinator to "ensure that current administrative remedy forms are available in all housing units." *Id.*, § 5(D)(2). The Directive merely states a grievance is to be placed in a box. *Id.*, § 5(B)(1). It is unclear from the record, how an inmate would obtain a receipt after placing a grievance in a box. *See id.*, § 5(D)(5) (failing to specify how an inmate would successfully receive the forwarded CN 9603 Receipt and failing to indicate whether this Receipt is applicable to the instant situation).

Further, Directive 9.6 suggests that there is no receipt issued at this stage, as it states that when an inmate does not get a response to a CN 9601 Form he may file a CN 9602 Form stating that he did not receive a response. *See id.*, § 6(C). The inmate is not required to submit a receipt for the CN 9601 Form. *Id.* Nor do the administrative directives state a grievance must be filed in the facility where the incident occurred. The latter requirement would render the grievance process unavailing to Carter after he was transferred, because he could not deposit the grievance in the box **[\*42]** located in a housing unit in which he was not housed. Contrary to King's instruction, Directive 9.6 suggests that DOC staff should transmit a grievance to the appropriate official. *See id.*, § 6(A) (while the CN 9602 Form procedure is silent on this issue, with respect to all CN 9601 Forms "[t]he Unit Administrator shall ensure that inmate request forms are collected and delivered in a timely manner."). Despite this Directive Staff King failed to transmit Carter's grievance and instead told Carter to file his request with the appropriate facility. King also stated that he could only help if Carter produced a receipt. To the extent King misinformed Carter, and it appears he or she might have, the grievance process was unavailable to Carter and he is excused from exhausting it.

The procedural ambiguity Carter faced was exacerbated by the existence of a parallel process for medical staff. In addition to the grievance process, there was also a medical review process, both of which used the same forms.

### 2. Medical Staff

Defendants posit that Directive 8.9 provides the applicable administrative remedy for Carter's allegations against medical staff as its purpose is "for all health services to enable an **[*43]** inmate to seek formal review of any health care provision, practice, diagnosis or treatment" and to identify "individual and systemic problems." [Dkt. 45-14, § 1; see Dkt. 45-1, at 9]. Carter addresses only Directive 9.6 as to his grievances against medical staff. [Dkt. 51-1, at 14]. The Court will address both Directives as it is Defendants' burden to prove Carter failed to exhaust his administrative remedies. Hubbs, 788 at 59.

#### a. Directive 9.6

The Court agrees with the Defendants that only Directive 8.9 applies to Carter's claims against medical staff. Directive 8.9 provides "formal review of any health care provision, practice, diagnosis or treatment," [Dkt. 45-14, § 1], whereas Directive 9.6 more generally applies to "any aspect of an inmate's confinement that is subject to the Commissioner's authority," [Dkt. 45-13, § 1]. Additionally, the mere fact that Directive 9.6 sets forth the Inmate <u>Grievance</u> Procedure is instructive as health care reviews would not fall in this camp. Therefore, the Court finds only Directive 8.9 applies to Carter's medical claims.

#### b. Directive 8.9

Carter raises allegations of medical staff's failure to treat Carter while he was housed in the RHU. Section 11 of Directive 8.9 applies **[*44]** to the failure to treat an inmate in the first instance, because the Review of a Diagnosis or Treatment includes "a decision to provide no treatment. . . ." [Dkt. 45-14, § 9(A)]. When Carter was first placed in the RHU on March 6, 2014, Estrom performed a cursory evaluation wherein she did not palpate his hand or compare the left hand to the right hand. [Dkt. 51-5, at 12:05-22]. Eight days later on March 14, 2014, a medical staff documented that [TEXT REDACTED BY THE COURT] [Dkt. 47, at 145]. To the extent that these evaluations led nowhere, Carter certainly had the ability to seek review of the non-diagnosis or non-treatment under Directive 8.9. In fact, the record suggests that he was eventually able to obtain a review through this process. Carter's affidavit

indicates that he submitted six medical requests from March 6 to March 17, and he was able to see a physician on March 18, 2014. [Dkt. 51-6, ¶¶ 6, 11]. [TEXT REDACTED BY THE COURT] [Dkt. 54, at 23]. Directive 8.9 provides for a URC review only in the context of filing a Review of a Diagnosis or Treatment. Therefore, Carter must have sought and obtained review of his non-diagnosis or non-treatment as he eventually received adequate **[*45]** medical attention from an orthopedics specialist. Id. at 24.

As it appears Carter successfully navigated through this process and obtained favorable results, he has exhausted his administrative remedies on this issue but can no longer demonstrate that he has standing and falls subject to mootness. Standing requires "(i) an injury in fact (ii) that is fairly traceable to the defendant and (iii) that is likely to be redressed by a favorable decision." *Amador v. Andrews, 655 F.3d 89, 99 (2d Cir. 2011)* (addressing standing in a class action PLRA case); *Manon v. Albany Cty., No. 11-CV-1190 (GTS/CFH), 2012 U.S. Dist. LEXIS 180445, 2012 WL 6202987, at *7-8 (N.D.N.Y. Oct. 9, 2012)* (dismissing inmate's PLRA claim on lack of standing and mootness because the plaintiff "sought no specific relief related to an identifiable harm"); *Butler v. Suffolk Cty., 289 F.R.D. 80, 90 (S.D.N.Y. 2013)* (addressing Article III standing in a PLRA case). "[T]he mootness doctrine ensures that the occasion for judicial resolution established by standing persists throughout the life of a lawsuit." *Amador, 655 F.3d at 99-100*. On the limited issue of Carter seeking review of the medical staff's failure to diagnose or treat him, "the claim has been rectified" by his path through the process and the resulting orthopedics specialist consultation; Carter no longer has an injury to grieve. See id. The Court thus GRANTS summary judgment in favor of Defendants on this issue.

What Carter does **[*46]** not address is the fact that it took a total of 36 days from the date Estrom performed her initial evaluation to the date he finally saw a specialist. Notably, on March 18, 2014, the same day Carter received his X-rays, a [TEXT REDACTED BY THE COURT]. [Dkt. 47, at 111]. [TEXT REDACTED BY THE COURT].[11] Id. It was not until March 26, 2014 (8 days later), that the URC evaluated the case and approved of the request. Id. On April 3, 2014, (8 days later), Carter received the approval and signed the form, which was the last stage before he could see the specialist. Id. It took another 8 days before the specialist finally evaluated him on April 11, 2014.

---

[11] [TEXT REDACTED BY THE COURT]

The orthopedics specialist determined on April 11, 2014, that Carter had already healed too much to operate on him without risking a worse condition. [*See* Dkt. 47, at 112 (finding that "five weeks status post his injury, which could have readily been treated with a closed pinning if we could have gone into it acutely, would be quite a challenging operation due to the small size of the bony fragments, the amount of healing that has already taken place, and the chance that we could comminute even further the small bony fragments or make him worse")]. **[*47]** He opined that Carter could develop arthritis whether or not he elected the operation available to him as of April 11, 2014. *Id.* The record does not establish how soon after his injury Carter would have had to be diagnosed in order to receive proper treatment.

Should Carter want to grieve the delay in treatment as the reason for his permanent injury and lasting pain, Directive 8.9 § 12 is the appropriate provision to remedy Carter's specific situation. It does not appear that Carter has sought an administrative remedy for the length of time it took to complete the [TEXT REDACTED BY THE COURT] process. Thus, Carter has not exhausted his administrative remedy on this issue. Once treatment initiated, Carter reasonably withheld from filing any grievance about the long duration of the process, particularly since he did not learn how he would be impacted until he finally saw the orthopedics specialist. It is unclear at what point Carter had healed too much to be properly treated, but what is clear is that time was of the essence.

Carter is not precluded from initiating the process now because Directive 8.9 contains no statute of limitations for the initial filing of a Review of an Administrative **[*48]** Issue. [*See* Dkt. 45-14, §§ 10, 12 (requiring only that the DOC staff respond to inmates within a specific time period)]. This is in stark contrast to the 30-day statute of limitations imposed on the grievance process under Directive 9.6. [Dkt. 45-13, § 6(C) ("The grievance must be filed within 30 calendar days of the occurrence or discovery of the cause of the grievance.")]. Therefore, to the extent that Carter seeks redress for this issue he may file a Review of an Administrative Issue pursuant to Directive 8.9, § 12.

The Court points out that inmates seeking non-emergency medical attention may also be required to sign up for sick call using CMHC Form HR 901, Cell Block - Sick Call Sign Up. [*See* Dkt. 51-9, at 2]. Generally, any inmate who signs up for sick call "more than two consecutive times without resolution of the same complaint and who has not seen a physician/APRN/PA" shall receive an appointment. The record is unclear as to whether Carter's description—that he submitted to correctional officers "medical requests"—actually refers to sick call sign ups. Carter should have been given access to this resource. To the extent he attempted to file sick call requests but was prevented from doing so **[*49]** or if he was not treated after filing sick call requests on two consecutive days as he claims, Carter may also raise this issue by filing a Review of an Administrative Issue pursuant to Directive 8.9, § 12.

The Court therefore GRANTS summary judgment as to the presently named medical staff on the grounds that (1) Carter does not have standing for Estrom and other medical staff failing to diagnose him as he subsequently obtained treatment; and (2) Carter has not exhausted his administrative remedies under Directive 8.9, § 12 for his claims that medical staff failed to respond to medical requests as required or that their response was unduly delayed. Regarding the latter claim, summary judgment is GRANTED without prejudice.

### B. *Dismissal of Claims Against Jane Does 1-7, Dr. Revine, and Lt. Mauvinchi*

Defendants seek summary judgment as to Jane Does 1-7, Dr. Revine, and Lt. Mauvinchi who currently are either unidentified or improperly identified. As the Court has granted summary judgment in favor of Defendants as to the medical staff, Carter only seeks leave to amend the Second Amended Complaint to replace the now known Lt. Mauvinchi with Matuszczak. [*See* Dkt. 51-1, at 3-8; Dkt. 52 (Mot. Amend), at **[*50]** 1-2]. Carter agrees to remove Jane Does 2-7 from the Second Amended Complaint. [Dkt. 52, at 2]. To the extent the Second Amended Complaint names Jane Does 1-7, Dr. Revine, and Lt. Mauvinchi, the Court hereby GRANTS summary judgment in favor of these Defendants as Carter does not seek to keep these names listed in the case caption. The Court will now address Carter's Motion to Amend the Second Amended Complaint to add Matuszczak to the case.

Leave to amend is to be given freely "when justice so requires," *Fed. R. Civ. P. 15(a)*, unless the moving party acted with "undue delay, bad faith or dilatory motive . . . , repeated failure to cure deficiencies by amendments previously allowed," or the amendment would create undue prejudice to the opposing party" or be futile. *Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)*. However, "where the proposed amendment seeks to add new parties, *Fed. R. Civ. P.*

*21* governs." *Jones v. Smith, No. 9:09-cv-1058 (GLS/ATB), 2015 U.S. Dist. LEXIS 133863, 2015 WL 5750136, at *25 (N.D.N.Y. Sept. 30, 2015)*; *see Fed. R. Civ. P. 21* ("On motion or on its own, the court may at any time, on just term, add . . . a party."). Such a distinction is a mere technicality as "the same standard of liberality applies under either Rule." *Duling v. Gristede's Operating Corp., 265 F.R.D. 91, 96-97 (S.D.N.Y. 2010)*; *Faryniarz v. Ramirez, 62 F. Supp. 3d 240, 249 n.4 (D. Conn. 2014)* (same); *Brown v. Tuttle, No. 3:13 CV 1444 (JBA), 2014 U.S. Dist. LEXIS 103739, 2014 WL 3738066, at *2 n.5 (D. Conn. July 30, 2014)* (same in a prisoner's civil rights case). Where there exists a scheduling order, the lenient **[*51]** standard of *Rule 15(a)* "must be balanced against the requirement under *Rule 16(b)* that the Court's scheduling order 'shall not be modified except upon a showing of good cause.'" *Grochowski v. Phoenix Constr., 318 F.3d 80, 86 (2d Cir. 2003)*; *Velez v. Burge, 483 F. App'x 626, 628 (2d Cir. 2012)*.

The Second Circuit has "referred to the prejudice to the opposing party resulting from a proposed amendment as among the 'most important' reasons to deny leave to amend." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., 626 F.3d 699, 725 (2d Cir. 2010)* (citation omitted). "Amendment may be prejudicial when, among other things, it would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." *Id., 626 F.3d at 725-25* (internal quotation marks and citation omitted). A court may find an amendment to be prejudicial in circumstances where discovery has been completed and the case is near or on the eve of trial. *Ansam Assocs., Inc. v. Cola Petroleum, Ltd., 760 F.2d 442, 446 (2d Cir.1985)* (affirming denial of motion to amend, which asserted new claims about a different time period, as "especially prejudicial given the fact that discovery had been completed and [the defendant] had already filed a motion for summary judgment"); *Braham v. Perelmuter, No. 3:15CV01094 (JCH), 2016 U.S. Dist. LEXIS 162416 at *10 (D. Conn. Nov. 23, 2016)* (denying leave to amend after complaint to add parties and add facts and ordering inmate to respond to the motion for summary judgment). However, **[*52]** a court is not required to deny the motion to amend even if at a later stage of the litigation, particularly where the amendment "seek[s] to insert or correct matters about which parties should have known but did not know," as these matters are "plainly within the scope of *Rule 15(a)*." *Hanlin v. Mitchelson, 794 F.2d 834, 841 (2d Cir. 1986)*.

Defendants give two reasons why the Court should not grant leave to *amend. First*, Defendants claim opposing counsel was "dilatory in discovering the identities of these defendants" as counsel waited until May 24, 2016, to first seek discovery and Defendants provided evidence with information that clearly identified Matuszczak. [Dkt. 58 (Opp'n Mot. Amend), at 4]. Exhibit C contains an Incident Report written by Matuszczak about the event on March 6, 2014, and Carter's placement in the RHU. [Dkt. 58-3 (Defs.' Opp'n Mot. Amend Ex. C, Incident Report), at 7]. Second, Defendants argue that the proposed amendment is futile because Matuszczak has not been served in accordance with *Fed. R. Civ. P. 4(m)* and counsel cannot show good cause for failure to comply. *Id.* at 5.

Carter avers that Defendants sent over 300 pages of discovery on July 25, 2016, just five days before the end of discovery. [Dkt. 59 (Reply to Opp'n Mot. Leave Amend), at 4]. In addition, Carter submitted **[*53]** Walker's responses to his requests for production, requesting "[a] list of all employees assigned to CCI between March 6, 2014 and March 19, 2014, including but not limited to, correctional officers, nurses, physicians, and any other medical personnel subcontracted to provide medical service or transportation to inmates for medical purposes." [*See* Dkt. 51-7 (Pl.'s Ex. E, Request for Production), at 9]. Walker objected, claiming the request was "overly broad and not proportional to the needs of the case," *id.*, but there is no indication that Carter filed a motion to compel or attempted to resolve the discovery dispute in any other way. Carter argues that Defendants are not prejudiced by an amendment to the complaint because he does not seek to add additional counts or facts, and Defendants had notice upon filing of the original complaint. [Dkt. 59, at 7 (citing *Soto v. Brooklyn Corr. Facility, 80 F.3d 34, 35 (2d Cir. 1996))]*.

The Court finds that the Defendants will not be prejudiced by granting leave to amend the Second Amended Complaint. Indeed, the identities of Matuszczak became apparent to both parties during discovery and the Court does not find that the three-month delay, wherein Carter also had to review the discovery, constituted an "undue **[*54]** delay." The number of medical staff and correctional staff assigned to the RHU between March 6 and March 18, 2014, is decidedly limited. The DOC and defense counsel certainly had the ability to discover which personnel accessed the RHU during this period. Moreover, Defendants had a duty to disclose nonprivileged relevant matter proportional to the needs of the case,

*Fed. R. Civ. P. 26(b)(1)*, and take "reasonable steps to preserve" electronically stored information in their possession and control, *Fed. R. Civ. P. 37(e)*, which encompassed documents revealing the identities of people with access to Carter while in the RHU. The Court instead is persuaded that "[t]he better view is that the [result of this] order merely substitutes equivalent parties, different in name but identical in fact." *Arthur v. Nyquist, 573 F.2d 134, 140 (2d Cir. 1978)* (allowing board members to be added as parties after trial closed in a civil rights class action suit under *42 U.S.C. § 1983*).

VI. <u>Conclusion</u>

For the aforementioned reasons, the Court GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment and GRANTS Plaintiff's Motion for Leave to Amend to add Matuszczak as a defendant.

The parties are directed to consider settlement positions and within 21 days of the date of this order to contact Magistrate Judge **[*55]** Robert Richardson to schedule a settlement conference. The parties are encouraged to consider and, if appropriate, timely engage in settlement discussions as the schedule will not be modified to accommodate settlement.

Should the parties determine that settlement is not appropriate, the Court hereby ORDERS Defendants to file supplemental briefing as to the remaining Defendants regarding the merits of Carter's claims within 21 days of the date the parties' decision or 42 days after the date of this order, whichever is earlier. Plaintiff shall file his response within 21 days of the Defendants' filing.

IT IS SO ORDERED.

/s/ Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: May 15, 2017

**A** Neutral
As of: September 25, 2020 4:29 PM Z

## *Germano v. Cook*

United States District Court for the District of Connecticut

January 17, 2020, Decided; January 17, 2020, Filed

No. 3:19-cv-01204 (JAM)

**Reporter**
2020 U.S. Dist. LEXIS 8340 *; 2020 WL 264763

PAUL GERMANO, Plaintiff, v. ROLLIN COOK et al., Defendants.

**Subsequent History:** Appeal terminated, 05/28/2020

**Prior History:** *Germano v. Cook, 2019 U.S. Dist. LEXIS 207562 (D. Conn., Dec. 3, 2019)*

## Core Terms

indifference, deliberate, prescribed, pain, appointment, ankle, tooth, confinement, respite, foot, cellmate, disorder, symptoms, rectal, filling, dental, retaliation, retaliatory, grievances, alleviate, incarceration, experienced, recommended, lawsuit, therapy, inmate, x-rays, diet, discovery, extracted

**Counsel:** **[*1]** Paul R. Germano, Plaintiff, Pro se, Newtown, CT.

For Cook, Commissioner, Defendant: Terrence M. O'Neill, LEAD ATTORNEY, Attorney General's Office, Hartford, CT.

**Judges:** Jeffrey Alker Meyer, United States District Judge.

**Opinion by:** Jeffrey Alker Meyer

## Opinion

### INITIAL REVIEW ORDER

Plaintiff Paul R. Germano is a prisoner in the custody of the Connecticut Department of Correction. He has filed a civil rights complaint under *42 U.S.C. §§ 1983*, *1985* and *1986* against numerous officials of the Connecticut Department of Correction ("DOC"). He principally alleges that he has suffered from severe physical, dental, and mental health issues and that the defendants have been deliberately indifferent to his health and safety. Based upon an initial review in accordance with *28 U.S.C. § 1915A*, I conclude that some of Germano's claims should proceed while others should be dismissed as discussed in this ruling.

### BACKGROUND

*Rule 8 of the Federal Rules of Civil Procedure* requires that a complaint must be "a short and plain statement of the claim showing that the pleader is entitled to relief." Germano has filed a complaint that is neither short nor plain. Instead, he has filed what amounts to be a running monologue of a complaint that weighs in at an enormous book-length 224 pages with some 621 numbered paragraphs. The allegations **[*2]** span for nearly two-and-a-half years of his most recent imprisonment from April 2017 to August 2019, and Germano names some 23 individual or groups of defendants. At times the complaint alleges specific facts, while at other times it lapses into digressions, musings, and conclusory accusations. The sheer

2020 U.S. Dist. LEXIS 8340, *2

immensity of Germano's complaint has vastly complicated and prolonged the effort to conduct an efficient and effective initial review of the complaint as required under 28 U.S.C. § 1915A.

During all relevant times at issue in the complaint, Germano has been incarcerated at the Garner Correctional Institution in Newtown, Connecticut ("Garner"). He names the following defendants:

- DOC Commissioner Rollin Cook
- Former DOC Comissioner Scott Semple
- Former Garner Warden Anthony Corcella
- Deputy Warden Borges of the same institution
- Counselor Supervisor Calderon
- Chief Operating Officer Robert Richeson
- Dr. Gerald Valletta
- APRN Jill Burns
- Colleen Gallagher
- HSC Nurse Cynthia Nadeau
- Nursing Supervisor Mike Desena
- Dr. Craig Burns
- Dr. Kociena
- Dr. Pierre
- Dr. Carhart
- CSW R. Bush
- Garner Grievance Coordinators (John Does)
- Garner Mail Review Staff (John Does)
- Connecticut Transport Unit (CTU) Mitchell

 [*3] • Dr. O'Shea
- Commissary Manager Renzi
- Commissary Officer Fonton
- Commissary Officer Sarano

Notwithstanding the size of Germano's complaint, only some of these named defendants are alleged to have actually had relevant dealings with Germano.

By way of background, Germano alleges that he was previously incarcerated with the DOC from 1998 to 2012. Doc. #1 at 8 (¶ 31). Germano was arrested again in the Spring of 2017, and he was transferred in May 2017 to Garner where he has remained ever since. *Id.* at 14, 15 (¶¶ 56, 61). According to the State of Connecticut Judicial Branch website, Germano was found guilty on two burglary charges by a jury, and he was sentenced to five years imprisonment on each charge on September 20, 2018.[1] Thus, for purposes of

this ruling, I assume that Germano was a pretrial detainee until his sentencing in September 2018.

### Germano's ankle and back conditions

Germano alleges that at the time of his arrival at Garner in May 2017 he suffered from torn ligaments and a cyst in his left ankle, a pinched nerve in his upper back, and lower back pain, which he attributes to a herniated [*4] or degenerative disc condition. *Id.* at 14-21 (¶¶ 56, 61-52, 71-73, 79). Before his incarceration, medical providers had prescribed narcotic medications to alleviate these conditions. *Id.* At Garner, Dr. Valletta treated the pinched nerve in Germano's back with a medication to alleviate nerve pain and referred Germano for x-rays of his spine in October 2018. *Id.* at 25 (¶¶ 89-91); at 36 (¶ 124). The x-rays showed degenerative changes to Germano's spine, but Dr. Valletta did not think the changes warranted further evaluation or treatment. *Id.* (¶ 90). Every night, the pinched nerve in Germano's back interferes with his ability to sleep. *Id.* (¶ 92).

At times, Germano's lower back pain completely immobilizes him. *Id.* at 26 (¶ 95). Dr. Valletta prescribed medication and stretching exercises to treat Germano's lower back pain. *Id.* at 17 (¶ 68); at 26 (¶ 96). Germano sought a medical mattress to alleviate his back and pinched nerve. *Id.* at 24 (¶ 87). But Dr. Valletta denied the request. *Id.*

In February 2019, Dr. Valletta referred Germano for another x-ray of his lower spine. *Id.* at 27 (¶ 97). Because the x-rays did not show significant degenerative changes, Dr. Valletta did not submit a request to the Utilization Review Committee ("URC") for further [*5] evaluation of Germano's lower back. *Id.* (¶

---

is serving a maximum sentence, imposed on September 20, 2018, of ten years of imprisonment); State of Connecticut Judicial Branch, *Criminal/Motor Vehicle Conviction Case Detail*, https://www.jud2.ct.gov/crdockets/CaseDetailDisp.aspx?sourc e=Pending¶Key=44c625ac-e4cf-4c00-8913-d4833558194c [https://perma.cc/6EQL-8ELE] (last accessed Jan. 16, 2019) (conviction for second degree burglary, Case No. #H15N-CR17-0287719-S); State of Connecticut Judicial Branch, *Criminal/Motor Vehicle Conviction Case Detail*, https://www.jud2.ct.gov/crdockets/CaseDetailDisp.aspx?sourc e=Pending¶Key=2aab5bc5-eebf-445f-9755-40024c40ae3c [https://perma.cc/AEF9-ZZF2] (last accessed Jan. 16, 2019) (conviction for third degree burglary, Case No. #H15N-CR17-0286836-S).

---

[1] *See* State of Connecticut Department of Corrections, *Inmate Information*,
http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id   inmt num=230976 [https://perma.cc/2VTU-CGQQ] (accessed Jan. 16, 2019) (indicating that Germano, Inmate Number 230976,

98). Germano's requests for status updates were ignored. *Id.*

Dr. Valletta treated Germano's ankle injury and pain with medication. *Id.* at 30 (¶ 106). Because the pain medication was not effective in alleviating Germano's ankle pain, Dr. Valletta scheduled an appointment in August 2018 with a specialist at the University of Connecticut Health Center ("UCONN") to have Germano's ankle examined. *Id.* at 30-31 (¶¶ 107, 109). But Germano could not attend the appointment due to food poisoning. *Id.* (¶ 109). Dr. Valletta did not submit a new request for an evaluation of Germano's ankle by a specialist until May 2019. *Id.* at 32 (¶ 112). As of August 2019, Germano had not been sent to UCONN for an evaluation of his painful ankle conditions. *Id.* at 33 (¶ 116).

### Germano's foot injury

On November 9, 2017, Germano suffered an injury to his left foot when he lost his balance and fell as he attempted to enter a prison van to be taken to a proceeding in state court. *Id.* at 9 (¶ 34). Correctional Treatment Unit Officer Mitchell was present at the time and failed to assist Germano in entering the van. *Id.* (¶¶ 35-38). Nor did the former DOC Commissioner Semple ensure adequate training for how a correctional officer **[*6]** should help a shackled prisoner into a transport van. *Id.* at 13 (¶ 52).

After the incident at the van, Dr. Valletta ordered x-rays of Germano's left foot. *Id.* at 11 (¶ 43). The x-rays revealed no fractures. *Id.* Dr. Valletta provided Germano with crutches and sent him back to his housing unit. *Id.* (¶ 45). Dr. Valletta did not prescribe pain medication for Germano's foot because Germano was already taking medication for other painful conditions. *Id.* (¶ 44).

A month later, Germano could walk without crutches. *Id.* (¶ 46). At a visit with Dr. Valletta, Germano complained that his foot was still painful. *Id.* Dr. Valletta referred Germano for an x-ray and instructed him to perform stretching exercises with his left foot. *Id.* (¶ 47). But Dr. Valletta refused further medical treatment for his foot despite severe pain. *Id.* at 12 (¶ 49). Germano's complained to the chief medical supervisor, Robert Richeson, about the failure to treat his foot injury, but his complaints were ignored. *Id.* at 14 (¶ 54).

### Germano's rectal condition

In August or September 2018, Germano began to experience severe rectal pain. *Id.* at 35 (¶ 122). Germano observed a polyp or lesion in the area of his rectum. *Id.* At an appointment with Dr. Valletta on October 25, 2018, **[*7]** Germano described his rectal pain, his observation of a lesion or polyp, his belief that it was not a hemorrhoid, and his belief that the polyp or lesion may be caused by the potentially cancer-causing strain of HPV Germano had been diagnosed with some years prior. *Id.* at 36 (¶¶ 123-24). But the appointment was cut short, and Dr. Valletta did not examine Germano. *Id.* Germano's mother called and emailed Dr. Richeson about the polyp on November 30, 2018. *Id.* at 37 (¶ 127).

On December 4, 2018, Dr. Valletta did his own internal examination of Germano's rectum but did not make any visual observations. *Id.* at 38 (¶ 128). He concluded that Germano suffered from hemorrhoids and prescribed hemorrhoidal suppositories. *Id.* at 38-39 (¶ 128-30). Dr. Valleta insinuated—wrongly—that Germano's problems were a result of having anal sex. *Id.* at 39 (¶ 129). The suppositories did not relieve Germano's severe pain. *Id.* at 39, 41 (¶¶ 131, 136).

Dr. Valletta and another visiting physician saw Germano on February 20, 2019. *Id.* at 40 (¶ 134). During the appointment, the visiting physician questioned Germano about his symptoms and performed a physical exam. *Id.* at 41-42 (¶¶ 135-37). The physician and Dr. Valletta observed a lesion or polyp in Germano's rectal area. *Id.* at 42 (¶ 137). Dr. Valletta **[*8]** submitted a request to the URC to have Germano examined by a specialist. *Id.*

On April 9, 2019, two physicians at UCONN questioned Germano about his symptoms, examined his rectal area and diagnosed him as suffering from an anal fissure. *Id.* at 44-45 (¶¶ 142-43). The physicians treated the anal fissure and recommended that Germano undergo a biopsy and colonoscopy to rule out cancer, eat a high fiber diet, and use a sitz bath to keep the rectal area clean. *Id.* at 45-47 (¶¶ 144-47, 150). At the request of Dr. Richeson, Dr Valletta provided Germano with the necessary medical supplies to clean his rectal area. *Id.* at 48-50 (¶¶ 152, 158). Dr. Valletta would not prescribe a high fiber diet or increase Germano's prescription for Metamucil, a fiber supplement, explaining that "[i]f I give you a special diet then I'll have to give everyone a special diet, so no!" *Id.* at 50-54 (¶¶ 158-59, 168). Dr. Richeson likewise denied Germano a special diet. *Id.* at 50 (¶¶ 161-62).

### *Germano's dental conditions*

A few months after Germano arrived at Garner in May 2017, Germano lost a filling. *Id.* at 56 (¶ 174). At an appointment a short time later, Dr. O'Shea refused to re-fill the tooth and insisted that the tooth be extracted. *Id.* at 57 (¶¶ 176-77). The basis for his recommendation was **[*9]** that filling a tooth was more expensive. Germano refused to have the tooth pulled. *Id.* (¶ 177). Over the next two years, Dr. O'Shea filled two other teeth that had cavities but did not fill at least five other teeth that had cavities or re-fill the tooth with the lost filling. *Id.* (¶ 178); at 61 (¶ 189).

In April 2018, Dr. O'Shea informed Germano that he would fill the original tooth that had lost a filling with a temporary material if Germano was close to being released from prison. *Id.* at 59 (¶ 185). Just after speaking to Dr. O'Shea, prison officials at Garner transferred Germano to Whiting Forensic Hospital in Middletown, Connecticut ("Whiting") for two months. *Id.* (¶ 186). Upon Germano's return from Whiting, Dr. O'Shea indicated that he could not fill the tooth because there was too much decay and because the walls of the tooth were too weak. *Id.* Germano still refused to have the tooth pulled. *Id.* In May or June 2019, after the tooth had chipped, Germano agreed to have Dr. O'Shea extract it. *Id.* at 60 (¶¶ 187-88).

### *Germano's mental health conditions*

Germano has suffered from a number of mental health conditions since childhood. *Id.* at 8 (¶ 31). Those conditions include: attention deficit disorder ("ADD"), **[*10]** post-traumatic stress disorder ("PTSD"), severe anxiety, bipolar disorder with psychotic features, borderline personality disorder and anti-social personality disorder. *Id.* at 62 (¶ 192); *id.* at 94 (¶ 267). During his prior incarceration, mental health providers prescribed medications such as Ritalin, Klonopin, Adderall, and Xanax that alleviated the symptoms of Germano's various mental health conditions at least to some degree. *Id.* at 62-63 (¶¶ 19, 194). During the time period from 2012 to 2017, when Germano was out of prison, he took Ritalin, Xanax and Latuda, which were also at least somewhat effective in treating his symptoms. *Id.* at 64 (¶ 196).

In May 2017, APRN Burns began to treat Germano's mental health conditions at Garner. *Id.* at 70 (¶ 208). Germano informed APRN Burns that he had been prescribed Latuda to treat his bipolar condition and that he had experienced uncomfortable and sometimes dangerous side effects after taking other mental health medications such as Zyprexa, Depakote, Tegretol, and lithium. *Id.* (¶¶ 207-08). APRN Burns indicated that Germano would still have to try other medications such as Zyprexa, Depakote, and lithium before she would prescribe Latuda because it was a non-formulary medication that required **[*11]** approval by the URC. *Id.* (¶ 208). APRN Burns indicated that she would review Germano's mental health records regarding medications he had previously been prescribed. *Id.* (¶ 209). She explained to Germano that she would not prescribe a narcotic mental health medication to him unless absolutely necessary or in compliance with a court order. *Id.* at 67 (¶ 202). Because APRN Burns would not prescribe Latuda for him, Germano agreed to take Zyprexa despite its known side effects of weight gain and lethargy. *Id.* at 70 (¶ 209).

From April 6, 2018 to May 22, 2018, Germano was confined at Whiting. *Id.* at 73 (¶ 214). During his confinement at Whiting, physicians prescribed Latuda and Thorazine on a daily basis to treat Germano's mental health conditions and symptoms and prescribed Ativan when needed. *Id.* at 73 (¶ 214); at 77 (¶ 224). Upon his return to Garner, APRN Burns discontinued the prescription for Latuda and re-started the prescription for Depakote. *Id.* at 73 (¶¶ 214-15). She also continued him on Thorazine which had helped Germano to sleep at night. *Id.* (¶ 215).

Because Depalote caused Germano to gain forty pounds and also inhibited his ability to think clearly, Germano asked APRN Burns to discontinue the Depakote prescription and **[*12]** to prescribe Latuda. *Id.* at 74 (¶ 216). APRN Burns refused to prescribe Latuda and insisted that Germano try lithium as a different alternative to Depalote. *Id.* (¶¶ 216-17). Germano did not want to take lithium because he had taken it previously and it had damaged his thyroid gland. *Id.* at 71 (¶ 211); at 74 (¶ 217). Over two years after starting to treat Germano, APRN Burns finally prescribed Latuda to treat Germano's bipolar disorder. *Id.* at 74 (¶ 217).

To treat Germano's ADD condition, APRN Burns prescribed Klonadine, a blood pressure medication. *Id.* at 75 (¶ 219). Germano did not want to take Klonadine because it was a sedative and made him lethargic. *Id.* After a year, APRN Burns prescribed another blood pressure medication to treat Germano's ADD. *Id.* at 76 (¶ 221). APRN Burns informed Germano that the Federal Drug Administration ("FDA") had approved the medication to treat severe ADD symptoms. *Id.* Germano took the medication for some time but experienced little

alleviation of his ADD symptoms. *Id.* He questioned APRN Burns regarding the FDA's approval of the medication to treat severe ADD and she conceded that the FDA had not approved the form of the medication that she had prescribed to treat his ADD symptoms. *Id.* APRN Burns **[\*13]** would not prescribe Germano the form of the medication that *had* been approved to treat severe ADD symptoms. *Id.* (¶ 222).

APRN Burns also refused to prescribe medication to treat Germano's severe PTSD and anxiety attacks. *Id.* at 78 (¶ 226). When Germano experienced anxiety attacks that necessitated his placement in a behavior observation cell, APRN Burns informed Germano that he did not require medication because he was simply overwhelmed. *Id.* (¶ 227).

***Germano's respite and single cell status requests***

From approximately 2006 to 2012, Germano was confined on permanent single cell status. *Id.* at 94 (¶ 269). During his recent re-incarceration, Germano has not been placed on permanent single cell status, and at times prison officials and mental health providers have required Germano to be housed in a cell with a cellmate. *Id.* (¶ 269). On one occasion prior to his transfer to Whiting in April 2018, Germano was able to tolerate his cellmate, Jallen Jones. *Id.* at 96 (¶¶ 272-73). But Jones was "murdered" in some unspecified way by DOC officials on March 24, 2018. *Id.* at 98 (¶ 279).

After his return to Garner from Whiting in May 2018, Germano began to have increasing difficulties with his confinement in a cell with another inmate. **[\*14]** *Id.* at 96 (¶ 272). The cellmate assigned to his cell in May 2018 was severely mentally ill, caused Germano undue stress, and stole some of his property during his trip to court on May 22, 2018. *Id.* at 100-01 (¶¶ 287-90).

Upon his return to Garner after his court trip, Germano was placed in a cell with a different cellmate who did not speak English and played loud Spanish music. *Id.* at 102 (¶ 293). When Germano expressed a need for mental health treatment because he was experiencing thoughts of suicide, mental health officials placed him in a cell on crisis/behavioral observation status for a week. *Ibid.* Warden Corcella said he would allow Germano single cell status if the mental health department said so, but then Dr. Carhart, apparently a member of that department, denied that he could order single cell status. *Id.* at 112 (¶ 313). Later, Warden Corcella said that Germano would have to get a court order to receive single cell status. *Id.* at 114 (¶ 317).

On August 24, 2018, mental health staff at Garner implemented a respite cell behavioral plan for Germano. *Id.* at 123 (¶ 346). Under this plan, provided that Germano was engaged in individual therapy sessions with a mental health provider, Germano could utilize a single cell for a week. At the conclusion **[\*15]** of the week, he was required to return to a cell with a cellmate for two months before he could use the respite cell again. *Id.* At one point, Dr. Carhart informed Germano that the respite cell plan was being used to de-sensitize him to being in a cell permanently with another cellmate. *Id.* at 127 (¶ 362).

In October 2018, Germano informed mental health officials that he was very stressed because his cellmate was masturbating in the cell. *Id.* at 125 (¶ 355). Mental health officials informed Germano that they would place him in a single cell, but only under "person in crisis/behavioral observation status" rather than simply going to the respite cell. *Id.* Germano did not want to go to be confined in a behavioral observation cell. *Id.* In response to these stressful circumstances, Germano attempted to commit suicide by attempting to cut an artery in his arm. *Id.* (¶ 356). Correctional Officers and mental health providers intervened to prevent Germano from seriously injuring himself and moved him to a cell in the mental health unit. *Id.* (¶ 357). Mental health providers placed Germano on crisis/behavioral observation status for over a month. *Id.* at 126 (¶ 359).

On November 27, 2018, mental health providers transferred Germano **[\*16]** to a cell in general population with another cellmate. *Id.* at 130 (¶ 371). Prison officials discharged Germano's cellmate on December 5, 2018, and did not put another inmate in Germano's cell until January 7, 2019. *Id.*

In December 2018, Dr. Carhart assigned CSW Bush to be Germano's therapist. *Id.* at 135 (¶ 383). Germano did not like CSW Bush because he felt Bush had been deliberately indifferent to his mental health conditions, based on his prior experiences with Bush during a previous term of incarceration. *Id.* at 134-35 (¶ 381-84). In 2009, Germano named Bush in a prior lawsuit filed in this court, *Germano v. Cassidy, et al.*, Case No. 3:09cv1316(SRU) (D. Conn.). *Id.* at 134 (¶ 381). The case was dismissed against Bush in March 2011. *See Germano*, Case No. 3:09cv1316(SRU) (Doc. #73, Ruling Mot. Dismiss).

Germano refused to attend any therapy sessions with CSW Bush. *Id.* at 135 (¶¶ 384-85). On or about January 18, 2019, Germano experienced an episode of anxiety

because his cellmate had been masturbating in the cell. *Id.* at 136 (¶ 386). Germano requested to be placed in the respite cell. *Id.* (¶¶ 387-88). CSW Bush refused to permit Germano to spend time in the respite cell because Germano had refused to engage in therapy sessions. *Id.* at 136-37 (¶ 386-89). Instead, **[*17]** CSW Bush authorized Germano's placement in a cell on crisis/behavioral observation status. *Id.* (¶ 388).

On January 22, 2019, mental health providers transferred Germano from his crisis/behavioral observation cell to a cell with a cellmate in general population. *Id.* at 138 (¶ 393). On March 12, 2019, Germano's cellmate moved out of the cell. *Id.* at 139 (¶ 395). Later that day, a new inmate was placed in Germano's cell. *Id.* (¶ 396). Germano remained in the cell until March 29, 2019, when mental health providers permitted him to use the respite cell until April 9, 2019. *Id.* at 140 (¶ 399).

In March 2019, Dr. Carhart assigned a different mental health provider, CSW Bill Kompare, to be Germano's therapist. *Id.* at 140 (¶ 398). On April 9, 2019, Germano attended a medical appointment at UCONN. *Id.* at 141 (¶ 402). Upon his return to Garner later that day, Captain Hughes approved Germano's placement in a single cell due to his anal fissure condition and where he has remained for three months leading to the filing of his court complaint. *Id.* at 141-42 (¶ 402-07).

### Conditions of confinement and retaliatory conduct

Germano devotes multiple paragraphs of the complaint to a claim that Health Services Coordinator Nadeau, Colleen Gallagher, and Grievance Coordinators/Counselors **[*18]** Doe failed or refused to respond to or process his many medical and other grievances regarding conditions of confinement in accordance with the Department of Correction's Administrative Remedy procedures. *Id.* at 150-85 (¶¶ 426-519). He also describes various conditions of confinement that he experienced at Garner as well as multiple instances of alleged retaliatory conduct by some individuals who are defendants and some individuals who are not defendants. *Id.* at 185-207 (¶¶ 520-593).

### DISCUSSION

Pursuant to *28 U.S.C. § 1915A*, the Court must review a prisoner's civil complaint against a governmental entity

or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater, 623 F.3d 90, 101-02 (2d Cir. 2010).*[2]

In recent years, the Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint **[*19]** must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).* Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a *pro se* complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g., Fowlkes v. Ironworkers Local 40, 790 F.3d 378, 387 (2d Cir. 2015).*

Germano alleges that the defendants were deliberately indifferent to his physical, dental, and mental health needs and subjected him to unconstitutional conditions of confinement in violation of the *Eighth Amendment*, denied him the opportunity to pursue his administrative

---

[2] The Court limits its review for purposes of *28 U.S.C. § 1915A* to federal law claims. That is because the core purpose of an initial review order is to make a speedy initial screening determination of whether the lawsuit may proceed at all in federal court and should be served upon any of the named defendants. If there are no facially plausible federal law claims against any of the named defendants, then the Court would decline to exercise supplemental jurisdiction over any state law claims pursuant to *28 U.S.C. § 1367*. On the other hand, if there are any viable federal law claims that remain, then the validity of any accompanying state law claims may be appropriately addressed in the usual course by way of a motion to dismiss or motion for summary judgment. More generally, the Court's determination for purposes of an initial review order under *28 U.S.C. § 1915A* that any claim may proceed against a defendant is without prejudice to the right of any defendant to seek dismissal of any claims by way of a motion to dismiss or motion for summary judgment in the event that the Court has overlooked a controlling legal principle or if there are additional facts that would warrant dismissal of a claim.

remedies in violation of the *Fourteenth Amendment* and retaliated against him for making complaints and filing grievances in violation of the *First Amendment*. He sues the defendants in their individual and official capacities for injunctive and declaratory relief and monetary damages.

**Claims under 42 U.S.C. §§ 1985 and 1986**

Germano relies in part on his rights under *42 U.S.C. §§ 1985* and *1986*. *See* Doc. #1 at 2 (¶ 5). But he does not allege facts that would plausibly allow for relief under either of these two provisions.

*Section 1985* has three subsections. The first two *subsections—1985(1)* and *1985(2)*—relate to conspiracies to prevent an officer from performing duties and conspiracies to obstruct justice. The allegations of the **[*20]** complaint do not implicate this kind of wrongful conduct.

The third *subsection—1985(3)*—applies to conspiracies to deprive a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws, and precedent makes clear that the conspiracy must be motivated by a "racial, or perhaps otherwise class-based invidiously discriminatory animus." *See Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S. Ct. 1790, 29 L. Ed. 2d 338 (1971)*; *Dolan v. Connolly, 794 F.3d 290, 296 (2d Cir. 2015)*. Because Germano does not allege facts to show any type of conspiracy within the scope of *section 1985*, I will dismiss his *section 1985* claims.

*Section 1986* "provides a cause of action against anyone who, having knowledge that any of the wrongs conspired to be done and mentioned in *section 1985* are about to be committed and having power to prevent or aid, neglects to do so." *Thomas v. Roach, 165 F.3d 137, 147 (2d Cir. 1999)* (cleaned up). A prerequisite for a claim under *section 1986* is a cognizable claim under *section 1985*. Because Germano has not plausibly alleged a *section 1985* claim, I will dismiss his *section 1986* claims. In the remainder of this opinion, I will analyze Germano's constitutional claims as being alleged under *42 U.S.C. § 1983*.

**Official capacity claims**

Because each of the defendants is an official of the State of Connecticut, the state's sovereign immunity

forecloses Germano from proceeding against the defendants in their official capacity to the extent **[*21]** that he seeks an award of money damages. *See Kentucky v. Graham, 473 U.S. 159, 169, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)*. On the other hand, sovereign immunity poses no bar to Germano's official capacity claims proceeding to the extent that his complaint seeks relief for continuing deliberate indifference to his safety and serious medical needs. *See Va. Office for Prot. & Advocacy v. Stewart, 563 U.S. 247, 254, 131 S. Ct. 1632, 179 L. Ed. 2d 675 (2011)*; *Tsirelman v. Daines, 794 F.3d 310, 313-14 (2d Cir. 2015)*.

Moreover, because an official capacity claim amounts to a claim against the state itself, *see Reynolds v. Giuliani, 506 F.3d 183, 191 (2d Cir. 2007)*, there is no need to retain all of the many named defendants as defendants in their official capacity, and it is sufficient simply to retain DOC's Commissioner Rollin Cook as an official capacity defendant. *Cf. Odom v. Matteo, 772 F. Supp. 2d 377, 392 (D. Conn. 2011)* (dismissing official capacity claims against municipal officers as duplicative where municipality itself named as defendant). Accordingly, I will dismiss all official capacity claims against all defendants except as to Commissioner Cook with respect to any prayer for injunctive relief.

**Deliberate indifference claims**

Germano alleges that the defendants were deliberately indifferent to his safety and serious medical needs. The legal standards that govern this type of claim are slightly different depending on Germano's status as a pre-trial detainee (April 2017 to September 2018) or a sentenced prisoner (after **[*22]** September 2018). *See Darnell v. Pineiro, 849 F.3d 17, 30-36 (2d Cir. 2017)* (discussing distinction between deliberate indifference claim arising under the *Fourteenth Amendment's due process clause* for a pre-trial detainee and a deliberate indifference claim under the *Eighth Amendment* for a sentenced prisoner).

The first element of a deliberate indifference claim— known as "the objective prong"—requires a showing by the pretrial detainee or sentenced prisoner that the deprivation is sufficiently serious to warrant the need for treatment or more safety measures. *See id. at 30-32*. The second element of a deliberate indifference claim— known as the "subjective prong" or "mental element prong"—requires a showing of that the defendant acted with a culpable mental state. *Id. at 32*. A pretrial

detainee "must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id. at 35*. A sentenced prisoner must prove an even more culpable mental state: "that the charged official possessed 'a state of mind that is the equivalent of criminal recklessness.'" *Benjamin v. Pillai, 2019 U.S. App. LEXIS 33464, 2019 WL 5783304, at *2 (2d Cir. 2019)* (quoting *Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996))*. **[\*23]** Simple negligence of prison personnel does not constitute deliberate indifference. *See Salahuddin v. Goord, 467 F.3d 263, 279-80 (2d Cir. 2006)*.

### *Medical Conditions—Dr. Valletta, CTU Officer Mitchell, and Commissioner Semple*

Germano alleges that upon his admission to Garner in May 2017, he suffered from a painful ankle and back conditions which interfered with his ability to sleep and immobilized him at times. He contends that the medication prescribed by Dr. Valetta to treat his symptoms of pain in his ankle and lower back and the nerve damage in his upper back was ineffective. Although Germano alleges that he has been able to engage in some exercise activities, he still experiences chronic pain in his back and ankle which interferes with his ability to sleep at night. Construing these allegations in Germano's favor, he has asserted sufficient facts to meet the objective component of an *Eighth* and *Fourteenth Amendment* claim for deliberate indifference to serious medical needs.

As regards his back and ankle pain, Germano states that Dr. Valletta had arranged for him to undergo an evaluation of his ankle injury by a specialist in August 2018, but when he missed the appointment due to food poisoning, Dr. Valletta did not attempt to re-schedule the appointment until nine **[\*24]** months later. Even though Germano reported that the medication prescribed for his symptoms did not alleviate his pain, Dr. Valletta has not recommended any further treatment or evaluation of the cause of his back pain.

As regards his rectal condition, Germano alleged that in September or October 2018, he began to experience severe pain in his rectum. He became worried because he had been previously diagnosed as having a strain of HPV that can cause rectal cancer. In December 2018,

Dr. Valletta diagnosed Germano as suffering from hemorrhoids and prescribed a topical ointment. Germano continued to experience pain in his rectum and sought to be examined by a specialist. Despite his complaints of pain, Dr. Valletta did not immediately refer Germano to a specialist for evaluation. Physicians at UCONN subsequently diagnosed Germano as suffering from an anal fissure. They treated the condition, prescribed procedures to keep the area clean and recommended that Germano be placed on a high fiber diet. Upon his return to Garner, Dr. Valletta refused to prescribe Germano the high fiber diet.

These allegations as to the severity of these conditions and the circumstances in which Dr. Valletta failed **[\*25]** to treat Germano's ankle and back and rectal conditions are enough at this very preliminary stage to plausibly allege that Dr. Valletta was more than merely negligent but deliberately indifferent to Germano's serious medical needs.

On the other hand, notwithstanding Germano's allegations that he injured his foot while boarding a prison van in November 2017, he has not alleged facts to show that Dr. Valletta was deliberately indifferent with respect to treatment of Germano's foot injury. Likewise, although Germano alleges that CTU Officer Mitchell neglected to help him safely negotiate the step into the prison van, resulting in his foot injury, these allegations sound at best in negligence and may not support a claim for deliberate indifference to safety. *See Kingsley v. Hendrickson, 576 U.S. 389, 135 S. Ct. 2466, 2472, 192 L. Ed. 2d 416 (2015)*; *Darnell, 849 F.3d at 36*. The failure-to-train allegations against Semple fail for the same reason. Accordingly, I will dismiss Germano's claims against all defendants as to his foot injury.

Accordingly, I will allow Germano's claim for deliberate indifference to proceed against Dr. Valletta as to his ankle, back, and rectal conditions but will dismiss all claims arising from his foot injury.

### *Dental condition—Dr. O'Shea*

Germano alleges that the dentist **[\*26]** Dr. O'Shea was deliberately indifferent to his serious medical needs. The complaint alleges that Germano lost a filling soon after arriving at Garner in 2017 but that Dr. O'Shea refused to give him a new filling on the ground that it would be too expensive compared to extracting the tooth. Germano eventually had to have the tooth extracted in May or June of 2019 and suffered needless pain.

2020 U.S. Dist. LEXIS 8340, *26

The need for a tooth cavity is sufficiently serious for purposes of a deliberate indifference claim, because "a tooth cavity is a degenerative condition, and if it is left untreated indefinitely, it is likely to produce agony and to require more invasive and painful treatments, such as root canal therapy or extraction." *Harrison v. Barkley, 219 F.3d 132, 137 (2d Cir. 2000).* In view of Germano's allegations that Dr. O'Shea refused to give him a filling for reasons of cost savings rather than for reasons of professional medical judgment, the complaint alleges enough facts to plausibly suggest that Dr. O'Shea was deliberately indifferent to Germano's serious medical need. *See Chance v. Armstrong, 143 F.3d 698, 704 (2d Cir. 1998)* (subjective prong for deliberate indifference claim against dentists in light of allegation that "recommended extraction [was] not on the basis of their medical views, but because **[\*27]** of monetary incentives"). Accordingly, I will allow Germano's deliberate indifference claim against Dr. O'Shea to proceed.

### Mental health medications—APRN Burns

Germano alleges that he suffers from ADD, PTSD, severe anxiety, bipolar disorder with psychotic features, borderline disorder and anti-social personality disorder and that during October 2018, he attempted to commit suicide by cutting an artery in his arm. This combination of conditions constitutes a serious medical condition. *See, e.g., Currytto v. Furey, 2019 U.S. Dist. LEXIS 72424, 2019 WL 1921856, at \*5 (D. Conn. 2019)* (inmate's allegation that he suffered from "anxiety disorder, bipolar disorder, delusional disorder, and schizophrenia" constituted serious medical condition) (collecting cases).

Germano alleges that APRN Burns became familiar with his mental health history from reviewing his mental health records and speaking with him and was aware that he had been prescribed various medications in the past. Germano contends that he informed APRN Burns that he had suffered side effects from several medications and that one of the medications that she recommended was contraindicated because it had previously damaged his thyroid gland. APRN Burns insisted that Germano take these medications despite knowing that **[\*28]** they had caused him side effects. She would not prescribe a medication that had been effective in treating his bipolar condition, Latuda, because it was a non-formulary medication which she could not prescribe without seeking prior approval from the URC. Over two years after prescribing the

medications that either caused Germano side effects or were not effective, APRN Burns finally prescribed Latuda for Germano.

The allegations that APRN Burns continued to prescribe various mental health medications despite Germano's complaints of serious side effects from the medication states a plausible claim of deliberate indifference to medical needs. *See Garrett v. Igbinosa, 2018 U.S. Dist. LEXIS 56980, 2018 WL 1605737, at \*3 (E.D. Cal. 2018)* ("Plaintiff has adequately alleged facts to show that Defendant acted with deliberate indifference when she continued the prescription for a generic medication despite being informed that Plaintiff was suffering painful side effects from it"), *report and recommendation adopted, 2018 U.S. Dist. LEXIS 78531, 2018 WL 2128278 (E.D. Cal. 2018); Houck v. Wexford Health Sources, Inc., 2017 U.S. Dist. LEXIS 130049, 2017 WL 3500400, at \*6 (D. Md. 2017)* (denying motion to dismiss *Eighth Amendment* deliberate indifference to medical needs claim against physician because inmate had plausibly alleged that physician had continued to prescribe him medication even when he had informed the physician of his concerns about negative side effects). **[\*29]** I will allow Germano's deliberate indifference claim to proceed against APRN Burns.

### Mental health counseling—Dr. Carhart

Germano claims that Dr. Carhart assigned Bush to be his therapist in December 2018, even though Germano did not trust CSW Bush owing to their past history. Dr. Carhart did not change Germano's therapist until March 2019, and Germano chose not to attend therapy sessions with Bush and alleges that his mental health conditions suffered as a result of receiving no therapy for four months. Doc. #1 at 135 (¶ 385).

I conclude that these facts do not establish deliberate indifference by Dr. Carhart to Germano's mental health needs. Dr. Carhart prescribed mental health counseling for Germano, and the Constitution does not entitle a prisoner to a mental health counselor of his choice. That Dr. Carhart assigned Germano to work with Bush does not plausibly establish that Dr. Carhart was no less than deliberately indifferent to Germano's serious mental health needs, and therefore I will dismiss Germano's deliberate indifference claim against Dr. Carhart.

### Denial of respite cell—CSW Bush

Germano alleges that on January 18, 2019, CSW Bush

did not permit him to go to the respite cell [*30] in retaliation for statements that Germano had made regarding Bush's faults to other individuals as well as Germano's unsuccessful lawsuit against CSW Bush in 2009.

As an initial matter, Germano has not plausibly alleged a deliberate indifference claim against Bush. Although Germano could not spend time as he wished in the respite cell, the complaint acknowledges that Bush placed him in a behavior observation status cell in the mental health unit. Doc. #1 at 388. Bush did not act as Germano wanted him to but the facts do not plausibly suggest that Bush acted with deliberate indifference to Germano's safety and health. Accordingly, I will dismiss Germano's claim against Bush for deliberate indifference to his safety or serious medical needs.

Germano appears to allege that Bush acted against him for retaliatory reasons. In order to establish a *First Amendment* claim for unlawful retaliation, a plaintiff must prove that he engaged in speech activity that is protected by the *First Amendment* and that a governmental defendant took adverse action against the plaintiff because of the plaintiff's protected activity. *See Burns v. Martuscello, 890 F.3d 77, 84 (2d Cir. 2018)*; *Dolan v. Connolly, 794 F.3d 290, 294 (2d Cir. 2015)*. A plaintiff must prove that he suffered an adverse action of sufficient magnitude that it would deter [*31] a similarly situated person of ordinary firmness from exercising his or her *First Amendment* rights. *See Burns, 890 F.3d at 93-94*; *Wrobel v. Cty. of Erie, 692 F.3d 22, 31 (2d Cir. 2012)*.

The Second Circuit has "instructed district courts to approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dolan, 794 F.3d at 294*. For this reason, a prisoner's *First Amendment* retaliation claim must "be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Ibid.*

The complaint lacks allegations to establish a plausible causal connection between Bush's restriction on Germano and any of Germano's complaints about Bush or his prior lawsuit against Bush many years before. Indeed, the complaint itself alleges that Bush did not permit Germano to go to the respite cell because Germano had not met the prerequisite of being involved in individual therapy sessions at that time, Doc. #1 at 136-37 (¶¶ 388-89), and Germano concedes that it was his own decision to refuse to engage in counseling sessions with Bush. Id. (¶ 384). Thus, by the complaint's own [*32] reckoning, there was a non-retaliatory reason for declining to authorize Germano's use of the respite cell. Accordingly, I will dismiss Germano's claim against Bush for retaliation in violation of the *First Amendment*.

### Denial of permanent single cell status

Germano alleges that he was wrongfully denied single cell status, despite having been housed in a single cell during his prior incarceration and despite his requests to be assigned to one upon his reincarceration. He alleges that single cell status alleviates his stress and reduces his desire to self-harm, a desire that led him to attempt suicide in October 2018. He further alleges that he has been denied single cell status for retaliatory reasons.

The Constitution does not guarantee a prisoner a right to a single cell. *See McMahon v. Fischer, 446 F. App'x 354, 356 (2d Cir. 2011)*; *Abrams v. Waters, 2018 U.S. Dist. LEXIS 49206, 2018 WL 1469057, at *5 (D. Conn. 2018)*; *Jarecke v. Hensley, 552 F. Supp. 2d 261, 265-66 (D. Conn. 2008)*. Germano has not alleged sufficient facts to show that the denial of his requests for single cell status amounts to deliberate indifference to his safety and mental health needs. Nor has he alleged specific facts to show that the denial of his single cell requests have been for reasons of retaliation in violation of the *First Amendment*. Accordingly, I will dismiss Germano's claims arising from the denial of single-cell status.[3]

### Due process—grievance [*33] procedures

Germano alleges that Health Services Coordinator Nadeau and unnamed "John Doe" Grievance Coordinators/Counselors did not process his inmate requests and grievances according to the Department of Correction's Administrative Remedy procedures. He also contends that Ms. Gallagher and Counselor Supervisor Calderon failed to take appropriate action after being made aware of the alleged improper

---

[3] I have previously denied Germano's motion for a preliminary injunction and temporary restraining order with respect to his single cell status request. *See Germano v. Cook, 2019 U.S. Dist. LEXIS 207562, 2019 WL 6486006 (D. Conn. 2019)*.

processing of grievances and requests at a meeting in April 2019.

I will dismiss these claims because the Constitution does not require that state prison officials comply with their own internal administrative procedures or that supervisory officials take steps to correct improper processing of prisoner grievances. *See, e.g., Riddick v. Semple, 731 F. App'x 11, 13 (2d Cir. 2018); Green v. Martin, 224 F. Supp. 3d 154, 170 (D. Conn. 2016)*.

## Supervisory Liability

Germano has named Commissioners Cook and Semple, Wardens Corcella and Hannah, Deputy Warden Borges, Chief Operating Officer Richeson, Drs. Kocienda, Pierre and Burns, Nursing Supervisor Desena and Ms. Gallagher because of their roles as supervisors. He alleges that many times he and his mother sent written complaints, letters or requests to these officials regarding his mental health, medical and dental conditions, and treatment or lack of treatment. **[\*34]** *See* Doc. #1 at 35 (¶ 121); at 61 (¶ 190); at 92-93 (¶¶ 263-65) and at 156 (¶ 442).

I conclude that Germano has plausibly alleged the involvement of the above supervisory officials in the alleged deliberate indifference of Dr. Valletta, Dr. O'Shea, and APRN Burns in response to Germano's physical, dental, and mental health needs. *See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)* (personal involvement of a supervisory prison official may be demonstrated if "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, . . . the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or . . . the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.") (citations omitted). Thus, Germano's *Eighth* and *Fourteenth Amendment* deliberate indifference to mental health, medical and dental needs claims will also proceed against Commissioner Cook in his official and individual capacities, and against former Commissioner Semple, Wardens Corcella and Hannah, Deputy Warden Borges, Chief Operating Officer Richeson, Drs. Kocienda, Pierre and Burns, Nursing Supervisor Desena and Ms. Gallagher **[\*35]** in their individual capacities.

## Remaining claims not properly joined in single complaint

Germano asserts additional claims under the *First*, *Eighth* and *Fourteenth Amendments*. Those claims are: retaliatory conduct by various defendants and non-defendants and restrictive/unconstitutional conditions of confinement, including denial of commissary items, an effective cleaning solution, multi-vitamins and other non-prescription medical products; excessive copying costs, lack of grievance receipts, property boxes, a law library, and an ombudsman. *See* Doc. #1 at 150-207 (¶¶ 426-593). He also describes various conditions of confinement that he experienced at Garner as well as multiple instances of alleged retaliatory conduct, not related to the provision of medical or mental health treatment, by some individuals who are defendants and some individuals who are not defendants. *Id.*

*Federal Rule of Civil Procedure 20* permits joinder of multiple defendants in one action only if "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions and occurrences, and any question of law or fact common to all defendants will arise in the action." *Fed. R. Civ. P. 20(a)(2)*. The Court **[\*36]** approaches the determination of "[w]hat [might] constitute the same transaction or occurrence . . . on a case by case basis." *Kehr ex rel. Kehr v. Yamaha Motor Corp., U.S.A., 596 F. Supp. 2d 821, 826 (S.D.N.Y. 2008)* (citation omitted).

*Rule 21 of the Federal Rules of Civil Procedure* provides that a court "may sever any claim against a party" pursuant to a motion filed by a party to the action or on its own. *Fed. R. Civ. P. 21*. In exercising its discretion to decide whether to sever a claim, a court should weigh the following factors: whether "(1) the claims arise out of the same transaction or occurrence; (2) the claims present some common question of law or fact; (3) settlement of the claims or judicial economy [would] be facilitated; (4) prejudice [would] be avoided; and (5) different witnesses and documentary proof [would] be required for the separate claims." *Costello v. Home Depot U.S.A., Inc., 888 F. Supp. 2d 258, 263-66 (D. Conn. 2012)* (citation omitted).

I conclude that the additional allegations in the complaint pertaining to conditions at Garner and the retaliatory conduct do not all arise out of the same transaction or occurrence as the *Eighth/Fourteenth Amendment* deprivations of medical, mental health and dental claims. The claims of retaliatory conduct involving mail tampering, commissary items and random urine

testing involve different defendants and factual issues. In addition, the allegations regarding various conditions **[\*37]** of confinement are either not asserted against any particular individual or are asserted against individuals who are not defendants in this action. These claims are not reasonably related to each other and the factual and legal theories related to each claim are not common to each other. Different witnesses, testimony, and documentary evidence would be required to prove the separate sets of claims at trial.

All in all, I conclude that the sets of unrelated allegations and defendants are not properly joined in this action and that the relevant factors favor severance of these claims. *See Lindsay v. Semple, 2019 U.S. Dist. LEXIS 123603, 2019 WL 3317320, at \*10-11 (D. Conn. 2019)* (severing and dismissing without prejudice all claims unrelated to due process claim as improperly joined in violation of *Fed. R. Civ. P. 20*). *See also Wilson v. McKenna, 2015 U.S. Dist. LEXIS 41357, 2015 WL 1471908, at \*6 (D. Conn. 2015)* (advising plaintiff that improperly joined claims must be pursued in separate actions). That all the conduct Germano complained about occurred at one prison facility does not mean that Germano can address every wrong he believes has been done to him in a single lawsuit.

Therefore, pursuant to *Fed. R. Civ. P. 20* and *21*, I will sever and dismiss without prejudice Germano's *Eighth* and *Fourteenth Amendment* conditions of confinement claims and the *First Amendment* retaliation claims, as well as all other claims not related to the provision **[\*38]** of medical, dental, or mental health treatment. If Germano seeks to pursue these claims, he must do so by filing a separate lawsuit.

Germano is cautioned, however, that any separate lawsuit he may file must comply with the requirement of *Fed. R. Civ. P. 8* that the complaint be a short and plain statement of his grounds for relief. If Germano chooses to file another outsized complaint, then this complaint will likely be dismissed on grounds that it is vexatious and inconsistent with the pleading requirements of the Federal Rules of Civil Procedure.

### *Motion to appoint counsel*

In his prayer for relief, Germano seeks the appointment of pro bono counsel. He states that he cannot represent himself because he is severely mentally ill and that attempting to litigate this case may ultimately result in exacerbation of his mental illness and symptoms. Doc.

#1 at 222 (¶ F). Germano has already filed a separate motion seeking the appointment of counsel. On December 2, 2019, the Court denied the motion because Germano had not made an adequate showing that his sufficient likelihood of merit to warrant the appointment of counsel. *See* Order, Doc. #20.

Civil litigants do not have a constitutional right to the appointment **[\*39]** of counsel. *See Leftridge v. Connecticut State Trooper Officer No. 1283, 640 F.3d 62, 68-69 (2d Cir. 2011)* ("A party has no constitutionally guaranteed right to the assistance of counsel in a civil case.") (citation omitted). Rather, the decision to appoint *pro bono* counsel in a civil case is discretionary. *See Hodge v. Police Officers, 802 F.2d 58, 60 (2d Cir. 1986)* (district judges are afforded "broad discretion" in determining whether to appoint *pro bono* counsel for an indigent litigant in a civil case) (citation omitted); *28 U.S.C. § 1915(e)(1)* ("The court *may* request an attorney to represent any person unable to afford counsel.") (emphasis added). In addition, the Second Circuit has cautioned the district courts against routinely appointing *pro bono* counsel. *See, e.g., Hendricks v. Coughlin, 114 F.3d 390, 393 (2d Cir. 1997)*; *Cooper v. A. Sargenti Co., 877 F.2d 170, 174 (2d Cir. 1989)*.

In considering whether to appoint *pro bono* counsel for an indigent litigant, a district court must "first determine whether the indigent's position seems likely to be of substance." *See Hodge, 802 F.2d at 61*. "[E]ven where the indigent [litigant's] claim is not frivolous, counsel is often unwarranted where the [litigant's] chances of success are extremely slim." *Cooper, 877 F.2d at 171*; *see also Carmona v. United States Bureau of Prisons, 243 F.3d 629, 632 (2d Cir. 2001)* (denying counsel on appeal where petitioner's appeal was not frivolous but nevertheless appeared to have little merit). Although I have decided that Germano has alleged enough facts at this time to allow the complaint to proceed **[\*40]** beyond initial review, it is not clear at all to me that there is any merit to Germano's claims that he has been subject to deliberate indifference or retaliation in connection with his medical, dental, and mental health treatment. Although I am sympathetic to Germano's obvious mental health problems, the fact of these problems does not mean that his rights have been violated, and the law requires me to look not to the circumstances of the defendant but the merit of the complaint when determining whether to appoint *pro bono* counsel. Accordingly, Germano's request for appointment of counsel is denied.

**CONCLUSION**

In accordance with the foregoing analysis, the Court enters the following orders:

1. Germano's *Eighth* and *Fourteenth Amendment* claims for deliberate indifference to serious medical needs may proceed

a. with respect to his back, ankle, and rectal conditions, against Dr. Valetta in his individual capacity and Commissioner Cook in his official capacity;

b. with respect to his dental conditions, against Dr. O'Shea in his individual capacity and Commissioner Cook in his official capacity;

c. with respect to his mental conditions, against APRN Burns in her individual capacity and Commissioner Cook in his official **[*41]** capacity; and

d. with respect to all of the above conditions, as a matter of supervisory liability, against Commissioner Cook in his official and individual capacities, and former Commissioner Semple, Wardens Corcella and Hannah, Deputy Warden Borges, Chief Operating Officer Richeson, Drs. Kocienda, Pierre and Burns, Nursing Supervisor Desena and Gallagher in their individual capacities.

2. All other claims and defendants to this action are DISMISSED.

3. The Clerk shall verify the current work addresses for the above-named defendants with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint to those defendants at the confirmed addresses **within twenty-one (21) days of this Order**, and report to the Court on the status of the waiver requests by not later than **the thirty-fifth (35) day after mailing**. If any defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service on that defendant, and that defendant shall be required to pay the costs of such service in accordance with *Fed. R. Civ. P. 4(d)*.

4. All defendants shall file their response to the complaint, either an answer or motion to dismiss, **[*42] within sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.

5. The Clerk shall send a courtesy copy of the complaint and this Order to the DOC Office of Legal Affairs.

6. The discovery deadline is extended to **six months (180 days) from the date of this Order**. The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures" which the Clerk must send to plaintiff with a copy of this order. The order also can be found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders . Note that discovery requests should not be filed with the Court. In the event of a dispute over discovery, the parties should make a good faith effort to resolve the dispute amongst themselves; then, the parties should file the appropriate motion to compel on the docket.

7. The deadline for summary judgment motions is extended to **seven months (210 days) from the date of this Order**.

8. Pursuant to *Local Civil Rule 7(a)*, a nonmoving party must respond to a dispositive motion (i.e. a motion to dismiss or a motion for summary judgment) **within twenty-one (21) days of the date the motion was filed**. If no response is filed, or the response **[*43]** is not timely, the Court may grant the dispositive motion without further proceedings.

9. If plaintiff changes his address at any time during the litigation of this case, *Local Court Rule 83.1(c)(2)* provides that he **MUST** notify the court. Failure to do so may result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. He should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Plaintiff has more than one pending case, he must indicate all of the case numbers in the notification of change of address. Plaintiff must also notify defendants or defense counsel of his new address.

10. Plaintiff shall utilize the Prisoner E-Filing Program when filing documents with the Court. Plaintiff is advised that the Program may be used only to file documents with the Court. As discovery requests are not filed with the Court, the parties must serve discovery requests on each other by regular mail.

11. Plaintiff's motion for appointment of counsel is DENIED.

2020 U.S. Dist. LEXIS 8340, *43

It is so ordered.

Dated at New Haven this 17th day of January 2020.

/s/ **Jeffrey Alker Meyer**

Jeffrey Alker Meyer

United **[*44]**  States District Judge

---

**End of Document**

2012 WL 2045942
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

UNIVERSITAS EDUCATION, LLC, Petitioner,
v.
NOVA GROUP, INC., Respondent.

No. 11 Civ. 1590(LTS)(HBP).
|
June 5, 2012.

*MEMORANDUM ORDER*

LAURA TAYLOR SWAIN, District Judge.

**\*1** Universitas Education, LLC ("Petitioner" or "Universitas") petitions the Court, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 9, to confirm a January 24, 2011, Phase I arbitration award ("Award") against Respondent Nova Group, Inc. ("Respondent" or "Nova") that was rendered in connection with a dispute arising from Petitioner's claim to certain life insurance policy death benefits. Respondent has cross-moved to vacate the award pursuant to the FAA, 9 U.S.C. § 10. The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1332 and 1331. The Court has reviewed thoroughly all of the parties' submissions in this action. For the following reasons, Petitioner's motion to confirm the Award is granted and Respondent's cross-motion to vacate the Award is denied.

*BACKGROUND*

Respondent Nova is the trustee, sponsor and fiduciary of the Charter Oak Trust Welfare Benefit Plan (the "Plan"). At an unspecified time, Holdings Capital Group, the employer of Sash A. Spencer ("Spencer"), became a participating employer in the Plan and placed two

insurance policies on Spencer's life, totaling $30 million, into the Plan. Spencer named Petitioner Universitas as the sole, irrevocable beneficiary of the proceeds as Plan benefits. (Pet. to Confirm ¶¶ 5–6.) In May 2009, after Spencer's death, the life insurance carrier paid out $30 million in insurance proceeds to the Plan. (*Id.* ¶ 7.) Respondent, however, denied Petitioner's claim to the Plan death benefit, asserting, among other things, that Petitioner had failed to submit a timely claim and that Petitioner had entered an impermissible agreement to share the benefits with third parties.

The parties submitted their dispute to binding arbitration. The arbitration proceeding was bifurcated with the parties' consent. Phase I addressed whether Petitioner was entitled to the death benefits. In the event that Nova failed to satisfy a monetary award, Petitioner would be entitled to initiate Phase II of the arbitration in order to seek to hold certain individuals and entities liable for the Phase I award. On January 24, 2011, upon completion of Phase I proceedings, the arbitrator issued the Award, finding Respondent liable to Petitioner in the amount of $26,558,308. Nova did not pay over the insurance proceeds, and Petitioner initiated Phase II proceedings.

Respondent commenced an action in the District of Connecticut to vacate the Award. Separately, Petitioner commenced an action to confirm the Award in New York state court. Respondent removed the New York action to this Court on March 8, 2011, and, on November 16, 2011, the Connecticut action was transferred to this district and consolidated under this case caption.

*DISCUSSION*

A. *Jurisdiction*
Respondent argues that the Phase I Award is an "interim" Award and that courts only have jurisdiction to confirm or vacate final awards. This argument is meritless. An award is deemed "final" where it " 'finally and conclusively dispose[s] of a separate and independent claim' and therefore 'may be confirmed although [it does] not dispose of all the claims that were submitted to arbitration.' " *Zeiler v. Deitsch,* 500 F.3d 157, 169 (2d Cir.2007) (quoting *Metallgesellschaft A.G. v. M/V Capitan Constante,* 790 F.2d 280, 283 (2d Cir.1986)).

The Phase I proceedings conclusively resolved Petitioner's rights and Nova's liabilities as to the Plan benefits. Moreover, conclusive awards as to fewer than all claims rendered pursuant to voluntary bifurcation agreements are final for purposes of enforcement. *See, e.g., Employers' Surplus Lines Ins. Co. v. Global Reinsurance Corp.-U.S. Branch,* 07 Civ. 2521(HB), 2008 WL 337317, at *5 (S.D.N.Y. Feb. 6, 2008) (citing cases). Accordingly, the Court finds that the Phase I Award is final and may be reviewed under the FAA.

B. *Motions to Vacate/Confirm the Award*
**\*2** Under the FAA, "a court must confirm an arbitration award unless it is vacated, modified or corrected as prescribed in 9 U.S.C.] §§ 10 and 11." *Hall St. Assocs., L.L.C. v. Mattel Inc.,* 552 U.S. 576, 582 (2008). Grounds for vacatur are listed in 9 U.S.C. § 10(a) and include "corruption, fraud, or undue means in procurement of the award, evident partiality or corruption in the arbitrators, specified misconduct on the arbitrators' part, or 'where the arbitrators exceeded their powers.'" *Wall Street Assocs., L.P. v. Becker Paribas Inc.,* 27 F.3d 845, 848 (2d Cir.1994) (quoting 9 U.S.C. § 10(a)).

Rather than rely on any of the grounds enumerated in 9 U.S.C. § 10(a), Respondent argues that the Award should be vacated because the arbitrator exhibited a "manifest disregard for the law." *Jock v. Sterling Jewelers Inc.,* 646 F.3d 113, 121 (2d Cir.2011) (recognizing "manifest disregard for the law" as a "judicially-created ground" for vacatur). Under the three-part test applied in the Second Circuit, manifest disregard may only be found where "the arbitrator knew of the relevant principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it." *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.,* 304 F.3d 200, 217 (2d Cir.2002). An arbitrator's refusal or neglect to apply a governing legal principle " 'clearly means more than error or misunderstanding with respect to the law.'" *Hoeft v. MVL Group. Inc.,* 343 F.3d 57, 69 (2d Cir.2003) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 933 (2d Cir.1986)). It is not enough that a party disagrees, however vehemently, with the arbitrator's determination. A federal court cannot vacate an arbitral award merely because it is convinced that the arbitrator made the wrong call on the law. On the contrary, the award "should be enforced, despite a court's disagreement with it on the merits, if there is a barely colorable justification for the outcome reached." *Banco de Seguros del Estado v. Mutual Marine Office. Inc.,* 344 F.3d 255,

260 (2d Cir.2003) (citation and quotation marks omitted).

Respondent has failed to sustain its heavy burden of establishing manifest disregard for the law. Respondent first argues that the arbitrator ignored the provisions of the Plan requiring that Petitioner's claim be denied for failure to file in a timely manner. However, the arbitrator made findings of fact that (1) Petitioner timely notified Respondent of its claim, (2) Respondent failed to fulfill its duty to supply the claim form in a timely manner, and (3) once Respondent supplied the claim form, Petitioner promptly filled it out. (Award at 5, attached as Ex. 14 to Mot. to Confirm.) The arbitrator's factual findings and legal conclusions have clear support in the record.

Respondent next argues that the arbitrator manifestly disregarded the law by permitting Petitioner to assert state law claims in violation of the preemption provision of the Employee Retirement Income Security Act ("ERISA"). This argument, too, is meritless. The arbitrator explicitly acknowledged the contention that ERISA governs the claims at issue, finding that Respondents' conduct violated both ERISA and common law fiduciary standards. (Award at 2–3 ("[w]hether analyzed under the common law or under ERISA principles, based on the evidence presented, I determine that the PHASE I Respondents violated their fiduciary duties by denying the claim for benefits under the [Charter Oak Trust.]").)

**\*3** Respondent further argues that the arbitrator manifestly disregarded the law by failing to apply the most deferential ERISA standard of review—the arbitrary and capricious standard—in reviewing Respondent's decision to deny death benefits to Petitioner. However, the Supreme Court has held that a denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). "[T]he administrator's burden to demonstrate insulation from *de novo* review requires either language stating that the award of benefits is within the discretion of the plan administrator or language that is plainly the functional equivalent of such wording." *Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243, 252 (2d Cir.1999). Section 10.03 of the Plan provides that "[e]xcept as otherwise provided herein: the Trustee and the Insurance Trustee shall have no discretionary powers," and Respondent did not carry its burden of showing that any other plan language granted it discretion sufficient to warrant arbitrary and capricious review. Accordingly, Respondent has failed to demonstrate that the arbitrator

manifestly disregarded the law.

Respondent further argues that it rightfully denied Petitioner's claim on the grounds that Petitioner had planned on sharing the benefits with third parties in violation of 29 U.S.C. § 1106(a)(1) (D).[1] Respondent asserts that the arbitrator disregarded that provision in issuing the Award. However, the arbitrator made a finding of fact that any agreement to share the benefits had been terminated and, accordingly, would not constitute grounds to deny Petitioner's application for benefits. (Award at 5.) That finding does not remotely approach a manifest disregard for the law.

Finally, Respondent asserts that Petitioner's failure to pay filing fees in a timely manner renders the Award a nullity. Respondents do not cite any authority for the proposition that failure to pay filing fees qualifies as a grounds for vacatur, and the Court's research has disclosed none.

*CONCLUSION*

For the foregoing reasons the petition for confirmation of the Award is granted. Respondent's cross-motion for vacatur of the Award is denied. This Memorandum Order resolves docket entry no. 32. The Clerk of Court is respectfully requested to enter judgment confirming the January 24, 2011, Phase I Arbitration Award, awarding Petitioner $26,558,308.36, plus interest thereon from January 24, 2011, at the rate of 10% per annum ($3,623,571.94), for a total judgment of $30,181,880.30, and close this case as well as the member case, No. 11 Civ. 8726.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2045942

**Footnotes**

[1]   That section provides that a fiduciary of an employee welfare benefit plan, such as Nova, "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect ... transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C.A. § 1106(a)(1)(D) (West 2011).

   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   3

513 Fed.Appx. 62
This case was not selected for publication in the
Federal Reporter.
United States Court of Appeals,
Second Circuit.

UNIVERSITAS EDUCATION, LLC,
Plaintiff–Appellee,
v.
NOVA GROUP, INC., as Trustee, Sponsor and
Named Fiduciary of the Charter Oak Trust Welfare
Benefit Plan, Defendant–Appellant.

No. 12–3504.
|
March 4, 2013.

Appeal from a judgment of the United States District
Court for the Southern District of New York (Swain, J.).

**Attorneys and Law Firms**

Jack E. Robinson, Robinson Law Offices, Stamford, CT,
for Appellant.

Paula K. Colbath, Loeb & Loeb LLP (Michael Barnett,
Loeb & Loeb LLP, on the brief), New York, NY, for
Appellee.

Present: DENNIS JACOBS, Chief Judge, ROSEMARY
S. POOLER, Circuit Judge, ERIC N. VITALIANO,
District *63 Judge.*

*SUMMARY ORDER*

**\*\*1 UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED AND DECREED** that the
judgment of the district court be **AFFIRMED.** The
mandate shall issue immediately. Nova Group shall bear
the costs of appeal.

Nova Group, Inc. ("Nova Group") appeals from the
judgment of the United States District Court for the
Southern District of New York (Swain, *J.*), confirming an
arbitration award in favor of Universitas Education, LLC
("Universitas") in the amount of $26,525,535.88, plus
prejudgment interest and attorneys' fees. We assume the

parties' familiarity with the underlying facts, the
procedural history, and the issues presented for review.

The sole issued raised on appeal is whether the district
court had subject matter jurisdiction over this action. We
review this question *de novo. See Oscar Gruss & Son,
Inc. v. Hollander,* 337 F.3d 186, 193 (2d Cir.2003).

The underlying dispute involves a trustee's refusal to pay
approximately $30 million in life insurance proceeds to
the trust beneficiary following the insured's death in June
2008. When Nova Group (the trustee) rejected a claim by
Universitas (the beneficiary) to the death benefit,
Universitas filed a demand for arbitration, pursuant to a
contract-based arbitration clause. On January 24, 2011,
the arbitrator held Nova liable to Universitas for
$26,525,535.88. Nova then filed a Petition to Vacate in
Connecticut Superior Court pursuant to the Federal
Arbitration Act ("FAA"), 9 U.S.C. § 10, and Universitas
filed an action in New York Supreme Court seeking
confirmation of the award pursuant to 9 U.S.C. § 9. Both
parties removed the respective actions to federal court,
asserting the existence of diversity of citizenship and a
federal question.

After losing on the merits, Nova Group then challenged
the district court's subject matter jurisdiction over the
case. The court court summarily dismissed this argument
as "wholly without merit" and entered judgment for
Universitas. A 249. We agree with this decision.

"[S]ubject matter jurisdiction is an unwaivable *sine qua
non* for the exercise of federal judicial power." *Curley v.
Brignoli, Curley & Roberts Assocs.,* 915 F.2d 81, 83 (2d
Cir.1990). So Nova Group's motion is late in the day, but
not untimely.

Subject matter jurisdiction clearly exists here. Federal
courts have diversity jurisdiction over controversies
between "citizens of different States." 28 U.S.C. §
1332(a)(1); U.S. Const. art. III, § 2. "Diversity
jurisdiction exists over 'civil actions where the matter in
controversy exceeds the sum or value of $75,000,
exclusive of interest and costs, and is between ... citizens
of different States.' " *Hallingby v. Hallingby,* 574 F.3d
51, 56 (2d Cir.2009) (quoting 28 U.S.C. § 1332(a)(1)).

Universitas is a citizen of New York because it is a
limited liability company whose members are domiciled
in New York. Nova Group is a Delaware corporation with
its principal place of business and headquarters in
Simsbury, Connecticut, making it a citizen of both
Delaware and Connecticut. The amount in controversy

indisputably exceeds $75,000. Nova Group argues that a court must *also* consider the **\*64** citizenship of trust beneficiaries for purposes of subject matter jurisdiction if suit is brought by a trustee (which, in this case, would undermine the parties' diversity of citizenship). This argument was rejected in *Navarro Savings Association v. Lee,* 446 U.S. 458, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980). *See id.* 446 U.S. at 465–66 (affirming the rule, "more than 150 years" old, that permits trustees "to sue in their own right, without regard to the citizenship of the trust beneficiaries"). Contrary to Nova Group's contentions, *Carden v. Arkoma Associates,* 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990), which concerned the citizenship of a limited partnership, did not overrule *Navarro.* Rather, the Supreme Court explicitly held that the two opinions did not conflict. *See id.* 494

U.S. at 191–94, 110 S.Ct. 1015. *Navarro* therefore remains good law, and the district court properly held that it had jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).[1]

**\*\*2** For the foregoing reasons, and finding no merit in Nova Group's other arguments, we hereby **AFFIRM** the judgment of the district court. The mandate shall issue immediately. Nova Group shall bear the costs of appeal.

**All Citations**

513 Fed.Appx. 62, 2013 WL 781100

### Footnotes

[*]     The Honorable Eric N. Vitaliano, District Judge of the United States District Court for the Eastern District of New York, sitting by designation.

[1]     Because we hold that the district court had jurisdiction under 28 U.S.C. § 1332(a)(1), we need not determine whether the case also presented a federal question and thus created an independent basis for jurisdiction under 28 U.S.C. § 1331.

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 6123104
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

UNIVERSITAS EDUCATION, LLC, Petitioner,

v.

NOVA GROUP, INC., as trustee, sponsor
and fiduciary of the Charter Oak Trust
Welfare Benefit Plan, Respondent.

Nos. 11 Civ. 1590(LTS)(HBP),
11 Civ. 8726(LTS)(HBP).
|
Nov. 20, 2013.

*MEMORANDUM OPINION AND ORDER*

LAURA TAYLOR SWAIN, District Judge.

 **\*1** Following the entry of judgment in its favor in the above captioned-actions, Universitas Education, LLC ("Petitioner") petitioned this Court for an order to show cause as to why United Services Automobile Association ("USAA") should not be required to turn over to Petitioner the USAA insurance proceeds claimed in connection with any property owned at any point in time by Moonstone Partners, LLC ("Moonstone"), Daniel E. Carpenter, or Molly Carpenter (together with Moonstone, the "Moonstone Respondents"), or any nominee or related party of any of them. The Court issued the order to show cause, which included temporary restraining orders, and scheduled a hearing on the turnover application. USAA does not oppose Petitioner's application, although its attorneys have made appearances (docket entry nos. 227and 228). The Moonstone Respondents have entered appearances and oppose the petition for an order to show cause.

The Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331, 1332(a)(1) and 1441, and under Federal Rule of Civil Procedure 69.

The Court held a bench trial on May 9, 2013. The Court has considered carefully all of the submissions and arguments of the parties, the documentary evidence, including transcripts of deposition testimony, and the courtroom testimony. In accordance with Federal Rule of Civil Procedure 52(a), this Opinion constitutes the Court's findings of fact and

conclusions of law. To the extent any finding of fact includes conclusions of law it is deemed a conclusion of law, and vice versa. For the following reasons, the Petition is granted in part.

*FINDINGS OF FACT*

This case is part of a lengthy and ongoing dispute over the disposition of the $30 million in proceeds of two life insurance policies obtained by the late Sash A. Spencer, who was the Chief Executive Officer of Holding Capital Group, Inc. Mr. Spencer placed the two life insurance policies into the Charter Oak Trust Welfare Benefit Plan ("Charter Oak Trust") which was "established to provide for the acquisition of and investment in various types of insurance policies to provide a welfare benefit fund or estate planning benefits," pursuant to a Funding Obligation Agreement and Power of Attorney. (Ex. E at 1.) Mr. Spencer named Petitioner the sole, irrevocable beneficiary of a Charter Oak Trust death benefit comprising the proceeds payable under two life insurance policies, whose face values totaled $30 million (the "Life Insurance Proceeds"). (Ex. 28 at ¶ 16.) Mr. Spencer died in June 2008, and Petitioner made a valid and timely claim to the Life Insurance Proceeds. (Ex. 18 at 3–4.)

Nova Group, Inc. ("Nova") and the Charter Oak Trust Welfare Benefit Plan ("Charter Oak Trust") are two of the hundreds of business entities organized and controlled, directly or indirectly, by respondent Mr. Carpenter. Wayne H. Bursey was, at relevant times, President of Nova and trustee of the Charter Oak Trust. Ms. Carpenter is married to Mr. Carpenter, and Mr. Bursey is Ms. Carpenter's brother-in-law. (May 9 Tr. at 26:14–21 and 58:8–13.) Nova is the corporate trustee of the Charter Oak Trust. (Ex. 31 at ¶ 5.) After Petitioner made its death beneficiary claim, Mr. Bursey sought payment from the insurer, acknowledging in writing that Nova had "a fiduciary responsibility and legal obligation to carry out Mr. Spencer's wishes as he intended in a timely fashion to pay those death proceeds to a charity that he established prior to his death." (Ex. 18 at pg. 2.) The insurer paid Charter Oak Trust $30.67 million in Life Insurance Proceeds, including interest, and Mr. Bursey signed for the deposit as trustee. (Ex. 1.) In May 2009, after receiving payment of the Life Insurance Proceeds, Nova denied Petitioner's death benefit claim. Petitioner challenged the denial through a demand for arbitration filed on June 17, 2010; a binding arbitration award against Nova, upon which judgment has been entered by this Court, was issued on January 24, 2011 in the

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

amount of $26,525,535.98. (Ex. 18.) The arbitration award explicitly reduced the benefit amount payable to Petitioner from the $30 million in insurance proceeds to account for fees and expenses of $4.02 million, that the arbitrator found had been appropriately charged by Grist Mill Capital, LLC ("Grist Mill"), another Carpenter affiliate, against the benefits payable to the Petitioner in connection with Grist Mill's role in funding the policy premiums. (Ex. 18 at pg. 9.) To date, No payment has been made to Petitioner to satisfy the arbitration award.

**\*2** Petitioner filed a complaint against Nova, as trustee, sponsor, and fiduciary of the Charter Oak Trust, in the Supreme Court of the State of New York, County of New York, to enforce the arbitration award. Separately, Nova commenced an action in the United States District Court for the District of Connecticut seeking to vacate the arbitration award. Nova removed Petitioner's state court action to this Court in March 2011, and the Connecticut action was transferred to this Court and consolidated under this case caption in January 2012. This Court entered an Order confirming the arbitration award and dismissing Nova's action on June 5, 2012. On June 7, 2012, judgment was entered in favor of Petitioner upon the arbitration award in the amount of $30,181,880.30 (the "Judgment"), comprising the $26,525,535.98 arbitration award and prejudgment interest. (Docket entry no. 41.) On October 5, 2012, this Court granted Petitioner $268,810.01 in attorneys' fees in addition to the Judgment. (Docket entry no. 162.) To date, the Judgment has not been satisfied. Petitioner has engaged in wide-ranging discovery efforts in aid of execution of the Judgment, which have been met with vigorous opposition by Nova and its affiliates. In a Report and Recommendation issued in connection with these discovery and execution efforts, Magistrate Judge Pitman noted that Nova "has resisted all efforts to enforce the judgment and has failed to disclose the current location of the proceeds of the insurance policies." (Docket entry no. 176.)[1] The Court adopted the Report and Recommendation, imposing sanctions on Nova and its former attorney, Jack E. Robinson. (Docket entry no. 295.)

*Mr. Carpenter's Retention of the Life Insurance Proceeds*
Respondent Daniel E. Carpenter has founded and controlled hundreds of companies out of his offices at 100 Grist Mill Road in Simsbury, Connecticut. (*See* Tr. at 47:23–25, 48:1–5.) Some of these companies appear to have conducted a variety of businesses; among them was the management

of welfare benefit and estate planning trusts, including the Charter Oak Trust; others are holding or shell entities. Nova, a Delaware corporation, was the trustee of the Charter Oak Trust. Mr. Carpenter was an officer of Nova; at times he signed official filings as "Chairman" or "Secretary." These signed documents, including tax returns, demonstrate that he was an officer of Nova from at least 2008 through 2011. (Exs. 7, 8, 9, and 10.) Mr. Bursey, as President of Nova and trustee for the Charter Oak Trust, was the only signatory on the Charter Oak Trust accounts. (Ex. 1 at 0008.) In his testimony in connection with this matter, Mr. Carpenter nonetheless denied having any relationship with Nova (for example, he testified that he had signed tax returns and other documents indicating that he was "Chairman" and "Secretary" of Nova without reading them carefully). (*See* May 9 Tr. at 45:3–5.) The Court, heaving observed Mr. Carpenter's demeanor while testifying and having reviewed the evidence, finds this testimony incredible.

**\*3** Mr. Carpenter also had control over the Charter Oak Trust, as demonstrated not only by his positions with Nova, but also by his actions on behalf of the trust itself. In May 2009, Mr. Carpenter wrote e-mails to representatives of Bank of America which indicated, first, that he was attempting to open an account for Charter Oak Trust and, later, that "we have already opened new accounts for the Charter Oak Trust with two major banks." (Ex. 12.) Mr. Carpenter acknowledged that he had sent the e-mail, saying "it definitely looks like Dan Carpenter," but he denied having been involved in setting up accounts for Charter Oak Trust. (May 9 Tr. at 56–57.) Again, the Court finds this testimony incredible, and finds that Mr. Carpenter directly controlled material aspects of the affairs of Nova and the Charter Oak Trust during the relevant period.

In order to retain the Life Insurance Proceeds for himself and/or his affiliated entities, Mr. Carpenter orchestrated a series of transfers of money through accounts of various entities that he controlled, withdrawing millions of dollars of the Life Insurance Proceeds from Charter Oak Trust and sending them to Grist Mill. Mr. Carpenter is the only individual with an ownership interest, membership interest, or beneficial interest, direct or indirect, in Grist Mill. (May 9 Tr. at 67:1–3.) Mr. Carpenter held Grist Mill through its two members Caroline Financial Group, Inc. ("Caroline Financial") and Grist Mill Holdings, LLC ("GM Holdings"), each of which is wholly owned by Mr. Carpenter. (May 9 Tr. at 25:2–4; Ex. 22 at 47:15–18 ("[GM Holdings] is my alter ego for collecting commissions.").) Mr. Bursey, in addition to serving as trustee

of the Charter Oak Trust and President of Nova, served as a "manager" at Grist Mill. (Ex. 14.) In testimony that again strained credulity, Mr. Carpenter proffered that Mr. Bursey was identified as a manager at Grist Mill in error. (May 9 Tr. at 59.) The Court finds that Mr. Bursey was a manager of Grist Mill. Mr. Bursey transferred the Life Insurance Proceeds funds from a Charter Oak Trust account, newly opened at TD Bank and with no other assets, to a newly opened account in the name Grist Mill, eventually moving nearly all of the approximately $31 million of the Life Insurance Proceeds (including accrued interest) by October 2009. Two of the transfers into a Grist Mill bank account, at issue in the instant petition, were made in May 2009, in the amounts of $8,677,276.75 and $2,186,566 (totaling approximately $10.8 million). (Ex. 1 at 357.)

In its papers in support of the instant order to show cause, Petitioner demonstrates that a large portion of the Life Insurance Proceeds were transferred without consideration from the Charter Oak Trust through Grist Mill and to other entities that Mr. Carpenter controls, and that some of those proceeds were ultimately applied to purchase and insure a vacation property located at 392B Cards Pond Road in South Kingstown, Rhode Island (the "Property") for the benefit of Mr. Carpenter and his wife. The property and casualty insurance proceeds that Petitioner seeks to have turned over in partial satisfaction of the Judgement are payable on account of storm damage to the Property.

### The Carpenter Entities that Received Relevant Portions of the Life Insurance Proceeds

**\*4** Both Petitioner and the Moonstone Respondents agree that a portion of the Life Insurance Proceeds traveled through the accounts of certain entities. The Court finds that each of these entities was controlled by Mr. Carpenter. The parties agree that Mr. Carpenter controlled each of the following entities: Grist Mill, GM Holdings, Phoenix Capital Management, LLC ("Phoenix"), Hanover Trust Co. ("Hanover"), and Moonstone. Each of these had an account opened on its behalf at TD Bank after Charter Oak Trust's receipt of the Life Insurance Proceeds. Finally, each of these entities shared the office at 100 Grist Mill Road.

The Moonstone Respondents allege that certain of the Life Insurance Proceeds were transferred to the Grist Mill Trust (the "GM Trust"). Mr. Carpenter testified, but proffered no corroborative documentary evidence, that he was not in control of the GM Trust. His testimony is not credible. He acknowledged that he initiated a plan, relevant to the

activities of the Charter Oak Trust, for Grist Mill to enter into "split dollar arrangements" with GM Trust to fund insurance policies. (May 9 Tr. at 53:8–11.) [2] Furthermore, Mr. Carpenter and Mr. Bursey have each been identified as "trustees" of the GM Trust, and, Ms. Carpenter was identified as a "signer" on the account. (Ex. 6; Ex. 31 at pg. 8.) GM Trust had an office at 100 Grist Mill Road, along with the other entities Mr. Carpenter admitted to controlling. (May 9 Tr. at 41:22–24.) The Court finds that Mr. Carpenter controlled the GM Trust during the relevant period.

### The Flow of Funds from Charter Oak Trust to Moonstone
Petitioner alleges that the purchase money for the Property was transferred from the Charter Oak Trust account, which at all relevant times held only the Life Insurance Proceeds, to the Grist Mill account, to the GM Holdings Account, then the Hanover account, and finally, to the Moonstone account. None of the other accounts held more than $1000 before these transfers. Thus, they argue, the purchase money must have been paid out of the Life Insurance Proceeds.

The Moonstone Respondents offer an alternative account of the flow of money, which still begins with Charter Oak Trust and ends with Moonstone's purchase of the Property. Mr. Carpenter asserted in his testimony that money flowed out of Charter Oak Trust to Grist Mill and then to the GM Trust as the result of alleged loan repayments in the amount of $3.79 million. (*See* Ex. H at 359.) Mr. Carpenter testified that he did not simply transfer money from the GM Trust; rather, he requested a loan in the amount of $2.7 million on behalf of Phoenix Capital Management, LLC ("Phoenix"), from a Ms. Donna Dawson, who apparently was authorized to distribute funds as a loan from the GM Trust. (*See* May 9 Tr. 21–23.) Phoenix is another shell company that Mr. Carpenter operates out of 100 Grist Mill Road; he is its sole owner and it has no employees. (Ex. 22 at 34:19–24.) No evidence was presented to document that this transfer was in fact a loan, what the repayment schedule was, or what interest rate was set. Nor have the Moonstone Respondents demonstrated that any repayments have been made against this alleged loan. From there, the money was sent back to Grist Mill, with no explanation for the transfer in the amount of $2.5 million on July 13, 2009. (Ex. 1 at pgs. 345, 361.) $2.2 million of the money then was transferred to GM Holdings on July 13, 2009, again with no explanation for the transfer. (Ex. 1 at pg. 1365, 1366.) GM Holdings thereafter transferred $1.2 million to Hanover on July 15, 2009, again without explanation. (Ex. 1 at pg. 1365, 1366.) Finally, in this flurry of unexplained

Case 3:20-cv-00738-JAM   Document 93   Filed 09/25/20   Page 57 of 63

transfers, Hanover transferred $1.1 million to Moonstone on July 15, 2009, the day Moonstone purchased the vacation property for $1.1 million. (Ex. 1 at pgs. 1008, 1397.)

**\*5** No credible, legitimate rationale for any of these transfers has been offered. In his deposition, Mr. Carpenter asserted that there was a promissory note documenting a loan obligation from Moonstone to Hanover. The note was, however, created more than three months after the closing date. (Ex. 22 at 32:17–20.) In fact, Mr. Carpenter admitted in his deposition that, three months after the purchase of the Property, because of "aggressive" litigation in Boston, he thought "the best thing to do was to establish a direct loan with [Hanover], so that in the case that somebody was going after [him] tangentially, the property basically would be safe." (Ex. 22 at 33:6–13.) Ms. Carpenter, who purportedly owned 99% of Moonstone, testified at her deposition that the Property was not purchased with a loan of any kind. (Ex. 23 at 19:16–23.) In October 2010, Mr. Carpenter testified, that a year after the promissory note was written, he created a mortgage against the Property in favor of Hanover. (May 9 Tr. at 79:14–19.) The date of the later mortgage filing was contemporaneous with the ongoing arbitration proceeding in this case, which began in June 2010 and terminated with the arbitration award in January 2011, and the purpose of this mortgage appears to have been to further protect the Property from collection by certain other creditors, rather than to secure any loan that Mr. Carpenter had actually arranged between his two shell companies, Hanover and Moonstone. (*See* May 9 Tr. at 80:7–24.)

The Court finds that both Petitioner's and Moonstone Respondents' theories of the flow of the Life Insurance Proceeds among the various entities demonstrate that Mr. Carpenter caused the Life Insurance Proceeds that ended up at Moonstone to be transferred through a series of entities that he controlled without any contemporaneous or genuine consideration.

### The Purchase of the Property

Mr. Carpenter, through his corporate shell Caroline Financial, and his wife, Ms. Carpenter, formed Moonstone Partners, LLC on April 20, 2009. (Ex. 3.) Ms. Carpenter purportedly holds 99% of the ownership interest of Moonstone, however, all documentary evidence and the testimony suggest that Mr. Carpenter acted on the company's behalf in connection with the receipt of funds and the purchase of the Property. At the time of the bench trial, and at all relevant times beforehand, Moonstone had no employees or operations. Its sole purpose

appears to have been the purchase of the Property. (*See* May 9 Tr. At 26:17–21.)

Shortly after Moonstone was created, it purchased the Property. (Ex. 23 at 6:20–24.) Mr. Carpenter had made a $1.2 million offer for the Property, on April 8, 2009, on Grist Mill letterhead, purporting to be acting on behalf of Moonstone.[3] Mr. Carpenter testified that the offer was later reduced to $1.1 million due to problems with the Property. (May 9 Tr. at 89–90.)

### The Closing on the Property and Subsequent Insurance Claims

**\*6** On July 15, 2009, Moonstone closed the deal for the Property, paying $1.1 million that was transferred from the Hanover account on the same day. Moonstone obtained insurance policies covering the Property through USAA. Moonstone paid the insurance premium with a check in the amount of $3,469.37 drawn on the same Moonstone account at TD Bank that it drew on to purchase the Property. During the last few days of October 2012, Hurricane Sandy struck the Atlantic Coast of the United States and reportedly inflicted significant damage on the Property.

The Carpenters filed several damage claims with USAA. (Reyhani Decl. Ex. 3.) On February 25, 2013, after a series of discussions with Petitioner's counsel, USAA informed Petitioner that it would pay the claims imminently unless it received a court order to the contrary. (Reyhani Decl. Ex. 1.) Petitioner subsequently filed the instant petition for an order to show cause on March 4, 2013. (Docket entry no. 219.)

### The Moonstone Respondents' Defenses

The Moonstone Respondents argue that, at the time the Life Insurance Proceeds were transferred to the GM Trust, the GM Trust had at least $1.2 million in its account that was "from sources unconnected in any way to the funds GM Trust received from Grist Mill on June 9, 2009." (Docket entry no. 272 at ¶ 25.) They have offered no evidence to demonstrate the source of this money, only a description of the funds held in the GM Trust's account before the transfers from Grist Mill. (Ex. R.) They assert that the purchase money for the Property should be deemed to have been drawn from these funds rather than money removed from Charter Oak Trust. Secondarily, they argue, even if the Property purchase money did come from the Life Insurance Proceeds, the portion transferred should be attributed to the $4.02 million found by

the arbitrator to be payable to Grist Mill rather than to the $26 million plus interest that remains due to Petitioner.

Finally, the Moonstone Respondents offer two February 2007 UCC–1 financing statements filed with the Delaware Department of State. One purportedly documents a security interest in all of the assets of Nova, as trustee for the Charter Oak Trust, in favor of Grist Mill, and the second that purportedly documents a security interest in all assets of the Charter Oak Trust in favor of Grist Mill. (Ex. C.) Mr. Carpenter testified that Grist Mill had previously loaned the Charter Oak Trust approximately $60 Million to finance life insurance policies, yet offered no documentary evidence to support the allegation. (*See* May 9 Tr. at 96–101.) Mr. Carpenter admitted that the only documentation even arguably related to such a loan was a promissory note purportedly documenting an obligation of Grist Mill to an entity called Ridgewood Finance, Inc. ("Ridgewood"). Mr. Carpenter relies solely on his testimony that, as part of the loan proceeds under this promissory note with Ridgewood, Charter Oak Trust borrowed well in excess of $10,863,842.75 from Grist Mill. In fact, Mr. Carpenter could point to no promissory note, default notice, or other documentation that there was ever an obligation or promise by Charter Oak Trust to pay Grist Mill anything, other than the $4.02 million payable under the arbitration award. Mr. Carpenter's testimony confirmed that neither Nova nor the Charter Oak Trust had any payment obligation directly to Ridgewood. (*See* May 9 Tr. at 97:24–25, 98:1–5; see also Ex. A.)

**\*7** In the arbitration proceeding, Nova had proffered five reasons for the denial of Petitioner's claim to the Life Insurance proceeds. Not one of those reasons had anything to do with a purported loan repayment obligation to Grist Mill. Nova's spurious defenses to payment ranged from Petitioner's supposed waiver of the right to $30 million based on failure to fill out the proper claim form to alleged secret agreements among the parties that Mr. Spencer would transfer the rights to the Life Insurance Proceeds to Grist Mill. (Ex. 18.) The arbitrator rejected Nova's defenses. (Ex. 18 at 4–5.) The arbitrator found that Nova had breached its fiduciary duties to the Petitioners by denying its claims to the Life Insurance Proceeds held in trust by the Charter Oak Trust, and by Nova as trustee. (Ex. 18 at 2–3.)

*Investigation by an Independent Agent*
Amid the heated discovery dispute regarding the whereabouts of the Life Insurance Proceeds, Grist Mill appointed Peter A. Goldman, Esq. as its agent to review documents and

testify on its behalf. Mr. Goldman testified at the May 9 bench trial that he also represented Charter Oak Trust and Nova as their agents. Mr. Goldman also testified that he was originally contacted by Mr. Carpenter's attorney to undertake the representation of Grist Mill, and that he was contacted by the attorneys for Nova and the Charter Oak Trust to represent those entities, all in an attempt to "determine what happened to $30 million." (May 9 Tr. at 120:20–22.) Mr. Goldman testified that he had reviewed certain records of Grist Mill, and that he confirmed that there had been transfers totaling about $31 million from the Charter Oak Trust. (May 9 Tr. at 115:14–24.) He reported that he could not explain why the Charter Oak Trust had made any of the three transfers to Grist Mill, including the two transfers in May 2009 which totaled over $10.8 million. (May 9 Tr. at 114:5–25, 115:21–25, 116:1–17.) As to $19.8 million that was transferred from Charter Oak Trust to Grist Mill in October 2009, Mr. Goldman reported that it was recorded in the Grist Mill's general ledger as an "unknown deposit." (May 9 Tr. at 118:19–20.)

The Court finds that Mr. Carpenter caused Nova, the Charter Oak Trust, and other affiliated entities, directly or indirectly, to transfer the Life Insurance Proceeds to which Petitioner is entitled. Mr. Carpenter caused the Life Insurance Proceeds to be transferred to and through entities that he controlled, either directly or indirectly, including Moonstone, for the personal benefit of Mr. Carpenter and his affiliates.

*CONCLUSIONS OF LAW*

Federal Rule of Civil Procedure 69 requires that a money judgment be enforced by a writ of execution and provides that "the procedure on execution ... must accord with the procedure of the state where the court is located." Under New York law, a judgment creditor may move by way of a special proceeding against property not in possession of the judgment debtor, in which the judgment debtor has an interest, where:

> **\*8** [I]t is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee....

N.Y. C.P.L.R. 5225(b) (McKinney 1997). "[T]he rule provides for a two-step analysis in determining whether

property belonging to a judgment debtor-but in the possession of a third party-should be turned over to a judgment creditor. First, it must be shown that the judgment debtor has an interest in the property the creditor seeks to reach. Where this first step is satisfied, the trial court must, second, then make one of two findings: it must find either that the judgment debtor is entitled to the possession of such property, or it must find that the judgment creditor's rights to the property are superior to those of the party in whose possession it is. Only after both steps of the analysis are demonstrated may the trial court order the transferee to turn over the property to the judgment creditor...." *Beauvais v. Allegiance Sec., Inc.,* 942 F.2d 838, 840–41 (2d Cir.1991) (internal quotation marks omitted).

"A judgment creditor may use Section 5225(b) 'as the means to set aside a transfer made by a judgment debtor to defraud his creditors.' " *Leser v. U.S. Bank Nat. Ass'n,* 09 Civ. 2362, 2013 WL 3788877, at *8 (E.D.N.Y. July 18, 2013) (quoting *Gelbard v. Esses,* 96 A.D.2d 573, 465 N.Y.S.2d 264, 267 (N.Y.App.Div.2d 1983)). [4]

Under the New York Debtor and Creditor Law, a conveyance may be avoided as actually fraudulent or constructively fraudulent. *See* N.Y. Debt. & Cred. Law §§ 273, 275 (McKinney 2012).

*Collapsing the Phases of a Fraudulent Conveyance*
"[I]t is well-established that if any component of a transfer is deemed fraudulent, the entire transfer must be voided in its entirety." *Leser,* 2013 WL 3788877, at *8 (citing *HBE Leasing Corp. v. Frank,* 48 F.3d 623, 635 (2d Cir.1995)). The court may "collapse" a series of related transactions and treat them as "phases" of the same transaction. *HBE Leasing,* 48 F.3d at 639. "In equity, substance will not give way to form, and technical considerations will not prevent substantial justice from being done. Thus, an allegedly fraudulent conveyance must be evaluated in context...." *Orr v. Kinderhill Corp.,* 991 F.2d 31, 35 (2d Cir.1993) (quotation marks and internal citation omitted).

Here, although there was a series of transfers through a variety of entities, the evidence demonstrates that each entity that received Life Insurance Proceeds was controlled by Mr. Carpenter. The transactions directly at issue here were structured with a single purpose, to remove a portion of the Life Insurance Proceeds from the Charter Oak Trust and to purchase a property for the Carpenter's personal use, insulated from the reach of Mr. Carpenter's creditors (and, of course,

from Petitioner's claim). The fact that Mr. Carpenter moved assets through a series of his shell companies, while relevant to the Court's analysis of fraudulent intent, had no impact on the equities of the transaction. Thus, if the original transfer away from the control of the judgment debtor, Nova, as trustee for the Charter Oak Trust, was a fraudulent conveyance, the entire transaction was fraudulent and void.

*Actual Fraud under* Section 273
 *9 A debtor's conveyance made with the "actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 276 (McKinney 2012). Under section 276, "[t]he existence of actual intent to defraud is never presumed, and intent to defraud cannot be found 'based merely on suspicion, conjecture, or doubtful inference.' " *Lippe v. Bairnco* Corp., 249 F.Supp.2d 357, 375 (S.D.N.Y.2003), aff'd, 99 F. App'x 274 (2d Cir.2004). Therefore, "[a]ctual fraudulent intent must be proven by clear and convincing evidence, but it may be inferred from the circumstances surrounding the transaction, including the relationship among the parties and the secrecy, haste, or unusualness of the transaction." *HBE Leasing,* 48 F.3d at 639.

Under section 276 of the Debtor and Creditor Law, courts have applied "an analysis of 'badges of fraud' associated with the transaction, which are 'circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent,' to hinder, delay, or defraud a present or future creditor." *See Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.,* No 04 Civ. 4971, 2013 WL 417352, at *11 (E.D.N.Y.Jan.29, 2013) (internal quotation and citation omitted). These "badges of fraud" include: 1) inside transactions among related entities, 2) hasty transfers made outside the ordinary course of business, 3) inadequate or lack of consideration, 4) secret transfers, 5) retention of control by the transferor, and 6) creation of a shield of property from creditors. *See Lippe,* 249 F.Supp.2d at 375; *Lesser,* 2013 WL 3788877, at *8. Alternatively, absence of these indicators-"evidence that fair consideration was paid, the parties dealt at arm's-length, the transferor was solvent, the transfer was not questionable or suspicious, the transfer was made openly, or the transferor did not retain control"- suggests that no fraudulent intent was present. *Lesser,* 2013 WL 3788877, at *8.

Here the badges of fraud are manifest.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

First, this was an inside transaction involving closely related entities. The evidence demonstrates that Mr. Carpenter not only controlled Grist Mill, but also Nova, the Charter Oak Trust, the GM Trust, Phoenix, GM Holdings, and Moonstone, all out of his office at 100 Grist Mill Road. The Court finds that Mr. Carpenter controlled all of the relevant entities that received money from the Charter Oak Trust account. It is highly probative that each of these entities shared the office at 100 Grist Mill Road, from which Mr. Carpenter admits to having established and controlled hundreds of entities, including each of those involved in this transaction. It is also indicative of the close relationship between the entities that Mr. Goldman, retained by Mr. Carpenter's attorney to act as agent of Grist Mill, was also retained to act as an agent of the Charter Oak Trust and Nova. Moreover, time and again, Mr. Carpenter's name appears on the filings of the various entities in capacities indicating positions of responsibility. Despite his self-serving denials, the Court finds that these transactions, including the initial transactions removing $10.8 million of the Life Insurance Proceeds from the Charter Oak Trust to the Grist Mill account, were phases of a transaction among related entities, each of which Mr. Carpenter controlled.

 *10  Second, the evidence demonstrates that the transfers were hasty and not in the ordinary court of business. Many of the transfers were done in the two-day period before Moonstone purchased the Property. Most telling of all is the alleged loan between Charter Oak Trust and Grist Mill, which was allegedly made for millions of dollars, but for which Mr. Carpenter can show no promissory note and no record of repayment or default notice. The Court also finds fraudulent the promissory note and mortgage in favor of Hanover that were made months after the transaction, and admittedly only for purposes of shielding the Property from certain of Mr. Carpenter's creditors. Moreover, the Moonstone Respondents fail to offer any explanation at all for many of the money transfers, a strong indication that they were not in the ordinary course of business, but rather were undertaken for the purpose of shielding the money from creditors.

Third, the conveyances were without consideration. Grist Mill received $10.8 million in funds from the Charter Oak Trust in June 2009 alone, with no consideration given aside from the prior payment of insurance premiums for which the arbitrator held that Grist Mill was entitled to only $4.02 million. Mr. Goldman testified, after reviewing the transfers in his role as agent for Grist Mill, that he could find no explanation for the payments from Charter Oak Trust. Moreover, although the Moonstone Respondents allege that

Grist Mill loaned Charter Oak Trust $60 million, they offered no evidence of the existence of the loan other than the testimony of Mr. Carpenter, which was not at all credible. Furthermore, each of the subsequent transactions between the entities is similarly lacking consideration. Mr. Carpenter's suggestion that Grist Mill owed the GM Trust millions of dollars has no corroborating basis in the documentary record. Moreover, Mr. Carpenter's testimony regarding loans from the GM Trust to Phoenix Capital Management, and from Hanover to Moonstone, is entirely incredible and unsubstantiated by documentary evidence. Thus, the transfers clearly lacked consideration.

Fourth, the transfers were done in secret. Neither Nova, nor any other of Mr. Carpenter's other entities, informed Petitioner that it was removing the Life Insurance Proceeds from the Charter Oak Trust. Despite the fact that Mr. Bursey had earlier acknowledged a fiduciary duty to pay Petitioner the trust funds, he proceeded to transfer the entire amount of the Life Insurance Proceeds to Grist Mill over a period of six months while wrongly denying Petitioner's claims. Petitioner was forced to engage in extensive, fiercely resisted, discovery to uncover the transfers.

Fifth, the transactions were for the sole purpose of retaining the benefit of the Life Insurance Proceeds for the Carpenters. As discussed above, Mr. Carpenter controlled each of the entities that received the Life Insurance Proceeds. Indeed, Mr. Carpenter admitted to orchestrating the creation of the promissory note and mortgage related to the purchase of the Property as an attempt to protect "his" property from his creditors. Through these transactions, Mr. Carpenter retained control of the Life Insurance Proceeds for himself and avoided paying Petitioner, a creditor of Nova and the Charter Oak Trust, the Life Insurance Proceeds to which it is entitled.

 *11  Sixth, the transactions were orchestrated as a complex method of secreting property away from a variety of creditors of Mr. Carpenter and of his entities. The two purported loans, made by the GM Trust to Phoenix and Hanover to Moonstone, each with no documentation of intent to lend money and no repayments demonstrated, are among the indicia of a scheme to move money away from Nova's creditors. *See Leser,* 2013 WL 3788877, at * 10 (holding that a purported loan that had no repayments was a fraudulent mechanism to shield money from creditors). Mr. Carpenter was able to hide the Carpenters' taking of the Life Insurance Proceeds for years because of the complexity of the bank transfers, Mr. Carpenter's creation of a new entity to hold title to the

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Property, and Nova's resistance to efforts to locate the Life Insurance Proceeds through discovery litigation.

*Constructive Fraud under Section 275*

Under New York Debtor and Creditor Law, a transfer that is without fair consideration and occurs at a time when the debtor "believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 275 (McKinney 2012). This "constructive fraud" under section 275 does not require the debtor to have an actual intent to defraud, rather a creditor must demonstrate that the debtor's subjective belief or intent was that it would become incapable of paying its creditors after the conveyance. *MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Servs. Co.,* 910 F.Supp. 913, 943 (S.D.N.Y.1995). "Circumstances [indicative] of [an] actual intent to incur debts beyond the ability [of a debtor] to pay may include: (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry." *SungChang Interfashion Co., Ltd. v. Stone Mountain Accessories, Inc.,* 12 Civ. 7280, 2013 WL 5366373, at \*10 (S.D.N.Y. Sept.25, 2013).

As explained above, there was no fair consideration paid for the $10.8 million transferred from Charter Oak Trust to Grist Mill in May 2009. Mr. Bursey, on behalf of Nova, acknowledged Nova's legal and fiduciary duty to pay to Petitioner the Life Insurance Proceeds prior to the arbitration. Furthermore, Petitioner had made claim to the funds in June 2008, well before they were transferred out of the Charter Oak Trust account, which indicates that Nova knew of the possibility of a law suit to collect the Life Insurance Proceeds. Nova must therefore have believed that it be unable to pay the benefit plan obligation to Petitioner when it drained its bank account by transferring the Life Insurance Proceeds to Grist Mill. As discussed above, there was clearly a close association between the entities involved in this transfer, with Mr. Bursey moving the funds to an entity controlled by his brother-in-law, Mr. Carpenter. Finally, the chronology of events, as discussed above in detail, clearly indicates an intent to shield the Life Insurance Proceeds from creditors for the benefit of the Moonstone Respondents, which is also indicative of the belief that Nova would be unable to pay all of its debts. Under these circumstances, the Court finds that Nova had the actual intent or belief that it would incur debts beyond its ability to repay them and that the Property was purchased as part of a constructive fraudulent conveyance.

*Defenses to Fraudulent Conveyance*

**\*12** The Moonstone Respondents' defenses to the fraudulent conveyance claim are unavailing. First, they offer no evidence to support the alleged $60 million loan from Grist Mill to Charter Oak Trust. The Court finds that Mr. Carpenter's testimony is completely incredible in this regard. Even assuming, *arguendo,* that this loan was made, the Moonstone Respondents have offered no explanation as to how such an obligation would entitle Grist Mill to repayment of funds held in trust by an entity that Mr. Carpenter controlled, which funds Nova, through Mr. Bursey, had admitted it had a fiduciary and legal duty to pay to Petitioner.

Second, the Moonstone Respondents argue that the Property is not traceable to the Charter Oak Trust because GM Trust, one of the entities through which the financial transfers passed, also allegedly held at least $1.2 million in funds unrelated to the Charter Oak Trust. Again, even assuming that the $1.2 million in the GM Trust account was unrelated to Charter Oak Trust, this argument is still unavailing. It is a basic principle of equity that "the mere commingling of [other] property with the proceeds of property fraudulently transferred by the Debtor is not sufficient to defeat tracing." *See In re Bernard L. Madoff Inv. Sec. LLC,* 08–01789, 2012 WL 892514, at \*2 (Bankr.S.D.N.Y. Mar.14, 2012). Because the initial transfer of funds out of the Charter Oak Trust was clearly made with fraudulent intent, subsequent transfers for no consideration cannot "clean" the money for the Moonstone Respondents' benefit.

Finally, the Moonstone Respondents argue that, because $4.02 million was payable to Grist Mill under the arbitration award, and because Moonstone was provided with only $1.1 million to purchase the Property, the Court must trace the Property to the $4.02 million rather than to the remainder of the $10.8 million that was transferred out of Charter Oak Trust in June 2009. This argument is illogical. The court declines to presume that fraudulently conveyed funds, mixed with potentially legitimate funds, are traceable first to the legitimate funds, as this would lead to the inequitable result of permitting Mr. Carpenter and his affiliates to perpetuate their evasion of the legal obligation to pay the Life Insurance Proceeds to Petitioner through manipulation of

money transfers. *See, e.g., United States v. Henshaw,* 388 F.3d 738, 741 (10th Cir.2004) ("[C]ourts exercise case-specific judgment to select the [tracing] method best suited to achieve a fair and equitable result on the facts before them.").

The Court finds that Petitioner has proven by clear and convincing evidence that the Property was purchased and insured through fraudulent conveyances of Life Insurance Proceeds funds held in trust by Charter Oak Trust. The Court also finds that the mortgage, and underlying promissory note, held by Hanover against Moonstone and the Property are invalid for lack of consideration and are fraudulent conveyances. *See Dolphin v. Marocik,* 222 A.D.2d 549, 635 N.Y.S.2d 84 (1995) (holding a mortgage invalid for lack of consideration). Mr. Carpenter testified that he caused the promissory note and mortgage to be created, months after the purchase of the property and the purported loan from Hanover to Moonstone, in an effort to frustrate the efforts of creditors to seize his assets. This demonstrates the fraudulent purpose of the mortgage and the lack of any consideration paid for it.

**\*13** Therefore, the judgment debtor, Nova as trustee for Charter Oak Trust, has an interest in the Property and in any insurance proceeds arising from damage to the Property. Petitioner's interest in the Property and any insurance proceeds is superior to those of the insurance company, USAA, and those of all of the Moonstone Respondents. Accordingly, Petitioner, as judgment creditor, is entitled to the proceeds of any USAA insurance policies covering the Property.

*CONCLUSION*

For the foregoing reasons, the turnover Petition is granted. USAA is directed to pay to Petitioner, within fourteen days from the date hereof, the proceeds all policies held by any of the Moonstone Respondents and covering the Property.

The Order resolves docket entry no. 219.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 6123104

## Footnotes

1    Mr. Bursey has asserted his Fifth Amendment right against self-incrimination regarding essentially all matters relevant to this case, including the operation of Charter Oak Trust, the validity of any liens in favor of Grist Mill; the location or transfers of the Life Insurance Proceeds; and his role in GM Trust, Grist Mill, or any of the Carpenter related entities.
      The Carpenters have each invoked the Fifth Amendment at various times during discovery in this case. In his October 2012 deposition, Mr. Carpenter asserted his Fifth Amendment right against self-incrimination in response to all substantive questions about the whereabouts of the Life Insurance Proceeds. It was only later that Mr. Carpenter agreed to testify regarding the location of the Life Insurance Proceeds, in an apparent attempt to assert fabricated defenses to the paper trail that Petitioner had uncovered. Similarly, Ms. Carpenter also asserted the Fifth Amendment at her first deposition, in November 2012, but did not assert the Fifth Amendment at her April 2013 deposition in connection with the instant turnover proceeding. The Court finds both Carpenters' testimony to be wholly self-serving and unreliable.

2    So-called "Split Dollar Arrangements" are financing mechanisms for life insurance policies that allow the costs of premiums to be split and the benefits of such a policy to be shared with a third-party. *See Conemaugh Star Plan Welfare Benefit Plan & Trust v. Fisher,* 536 F.Supp.2d 231, 233 (D.Conn.2008); 26 C.F.R. § 1.61–22.

3    Mr. Carpenter also sought, and was denied, a loan from Washington Trust, a Rhode Island Bank, on behalf of Moonstone. (May 9 Tr. at 60:20–25, 61:1–10).

4    The Funding Obligation Agreement and Power of Attorney for the Charter Oak Trust, the agreement under which Grist Mill and Nova agreed to fund the trust, provides that it will be governed by New York law. (Ex. E at 1.) Furthermore, both of Mr. Spencer's Election of Participation &

Beneficiary Designation Forms with respect to the two life insurance policies at issue in this case state that each agreement "shall be governed by the laws of the State of New York." (Ex. D.) On the other hand, the arbitrator found that Connecticut law applied to the Charter Oak Trust Welfare Benefit Plan. (Ex. 18.) Petitioner cites New York fraudulent conveyance law in its submissions, and the Moonstone Respondents do not object to its application or argue that application of another forum's law would. Consequently, the Court applies New York law.

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.