## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNIVERSITAS EDUCATION, LLC | : | CIVIL ACTION NO. |
| | : | |
| Plaintiff | : | 3:20-cv-00738-JAM |
| | : | |
| v. | : | |
| | : | |
| BENISTAR, et al. | : | |
| | : | |
| Defendants | : | OCTOBER 2, 2020 |

---

### DEFENDANT GRIST MILL PARTNERS, LLC'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION TO DISMISS COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(6)

---

RESPECTFULLY SUBMITTED,

THE DEFENDANT
GRIST MILL PARTNERS, LLC

Lawrence S. Grossman (ct15790)
Jeffrey M. Sklarz (ct20938)
Green & Sklarz LLC
One Audubon Street, Third Floor
New Haven, CT 06511
(203) 285-8545
Fax: (203) 823-4546
lgrossman@gs-lawfirm.com
jsklarz@gs-lawfirm.com

{00185123.9 }

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................. 1

II.   LAW AND ARGUMENT ..................................................................... 1

    A.  As to the First Count, Plaintiff Can Only Pursue a Reverse Veil Piercing
        Claim, Which is Not Recognized Under Delaware Law ................................1

    B.  The Complaint is Devoid of Facts Connecting GMP to Any Misconduct ...................4

    C.  There are No Allegations that GMP is a "Single Economic Unit" With
        Respect to Any Other Defendants..................................................6

    D.  Constructive Trust (Fifth Count) ..............................................10

    E.  There is No Independent Cause of Action for Attorneys' Fees (Second Count).........10

III.  CONCLUSION................................................................................. 10

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009) ......................................................................... 2

*Burtch* v. *Opus, LLC (In re Opus East, LLC)*, 528 B.R. 30 (Bankr. D. Del. 2015) ................... 7, 8

*CanCan Dev., LLC v. Manno*, 2015 Del. Ch. LEXIS 144 (Del. Ch. May 27, 2015) ..................... 2

*Doreus* v. *Wells Fargo Bank, N.A.*, 2019 U.S. Dist. LEXIS 112682
(D. Conn. June 10, 2019) ............................................................................................ 5

*Faber v. Metro. Life Ins. Co.*, 648 F.3d 98 (2d Cir. 2011) ............................................... 5

*Fletcher v. Atex*, 68 F.3d 1451 (2d Cir. 1995) ............................................................... 7

*Florida Power Corp.* v. *FirstEnergy Corp.*, 2013 U.S. Dist. LEXIS 188954
(N.D. Ohio Mar. 18, 2013) .......................................................................................... 4

*In re Extended Stay, Inc.*, 2020 Bankr. LEXIS 2128 (Bankr. S.D.N.Y. Aug. 8, 2020) ............. 2, 3

*In re LXEng, LLC*, 607 B.R. 67 (Bankr. D. Conn. 2019) .................................................... 8

*Klauder v. Echo/RT Holdings, LLC*, 152 A.3d 581 (Del. 2016) ........................................... 2

*LaMagna v. Brown*, 474 F. Appx 788 (2d Cir. 2012) ........................................................ 2

*Mirlis* v. *Edgewood Elm Housing, Inc.*, 2020 U.S. Dist. LEXIS 134839
(D. Conn. July 30, 2020) ............................................................................................ 1

*Motorola Credit Corp.* v. *Uzan*, 388 F.3d 39 (2d Cir. 2004) ........................................... 4

*National Gear & Piston, Inc.* v. *Cummins Power Systems, LLC*,
975 F. Supp. 2d 392 (S.D.N.Y. 2013) ............................................................................ 7

*Navin* v. *Wells Fargo Bank, N.A.*, 199 F. Sup. 3d 646 (D. Conn. 2016) ........................... 5

*Nisselson* v. *Ford Motor Co. (In re Monahan Ford Corp.)*, 340 B.R. 1
(Bankr. E.D.N.Y. 2006) ............................................................................................. 4

*Official Committee of Unsecured Creditors* v. *Bay Harbour Master Ltd.
(In re BH S&B Holdings LLC)*, 420 B.R. 112 (Bankr. S.D.N.Y. 2009) ............................... 9

*Oldendorff Carriers GmbH & Co., KG* v. *Grand China Shipping (H.K.) Co.*,
2012 U.S. Dist. LEXIS 188347 (S.D. Tex. July 2, 2012) ................................................... 9

*Pirrotti* v. *Respironics, Inc.*, 2011 U.S. Dist. LEXIS 99775 (D. Conn. Sep. 6, 2011) ................ 10

*Psomas* v. *DeRaffele Mfg. Co*, 1997 Conn. Super. LEXIS 3510 (Super. Dec. 29, 1997) ............ 10

*Universitas Education, LLC. V. Nova Group, LLC*, Case No. 14-mc-125 (RNC) ......................... 7

*Waterbury Hospital* v. *U.S. Foodservice, Inc. (In re US Foodservice Inc. Pricing Litigation)*,
   2009 U.S. Dist. LEXIS 117403 (D. Conn. Dec. 15, 2009) ......................................................... 3

Defendant, Grist Mill Partners, LLC ("GMP"), submits the following reply memorandum in response to the *Memorandum in Opposition to Defendant Grist Mill Partners, LLC's Motion to Dismiss* (ECF No. 91, "Memo. Op."),[1] filed by plaintiff, Universitas Education, LLC (the "Plaintiff" or "Universitas").

## I.   <u>INTRODUCTION</u>

The Complaint does not allege facts to support any cause of action against GMP.  Knowing GMP has no liability, Plaintiff strings together a series of conclusions concerning other entities and Daniel Carpenter in the hopes that inflammatory rhetoric, alone, will allow the Complaint to survive.  Stated differently, because Plaintiff cannot allege a viable cause of action against GMP, it is attempting to prevail in this litigation by simply making a series of allegations calculated to make this Court dislike Mr. Carpenter, personally.  However, neither due process nor case law supports Plaintiff's arguments.  With few exceptions, Plaintiff has either misstated the holding of the cases cited in its Memo. Op., or the cases are simply inapposite.  In sum, whatever Mr. Carpenter may have done, the Complaint fails to allege any facts which, if proven, would establish a plausible claim of liability on the part of GMP.  Therefore, the Motion should be granted.

## II.   <u>LAW AND ARGUMENT</u>

### A.   **As to the First Count, Plaintiff Can Only Pursue a Reverse Veil Piercing Claim, Which is Not Recognized Under Delaware Law**

Plaintiff claims GMP is liable for debts owed by Mr. Carpenter, a legal conclusion based on the concept of *reverse veil piercing*.   *Mirlis* v. *Edgewood Elm Housing, Inc.*, 2020 U.S. Dist. LEXIS 134839, at *14-15 (D. Conn. July 30, 2020) ("The case at bar does not involve *traditional* veil piercing. Plaintiff does not seek to hold an individual liable for a corporate

---

[1] Page references are to the ECF page number at the top of the Mem. Op., rather than the page number set forth on the bottom of the brief.

debt. Rather, Plaintiff seeks to hold the Defendant corporations liable for the judgment against Daniel Greer, an individual. This is an exercise in *reverse* veil [piercing].")   "Although all allegations contained in the complaint are assumed to be true, this tenet is 'inapplicable to legal conclusions.'" *LaMagna v. Brown*, 474 F. Appx 788, 789 (2d Cir. 2012) (*quoting Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)).   Accordingly, the Court can only analyze the First Count, as it applies to GMP, as a claim for reverse veil piercing, not traditional veil piercing.

Because neither Delaware nor Connecticut recognizes a claim for reverse veil piercing, Plaintiff argues that Delaware should change its law or that this Court should ignore the law because Mr. Carpenter is a very, very bad man.   There is no merit to either argument.[2]   First, Plaintiff has not cited any Delaware case that has ever recognized reverse veil piercing.   The Delaware cases referenced by Plaintiff actually *dismissed* the lawsuits filed.   *Klauder v. Echo/RT Holdings, LLC*, 152 A.3d 581 (Del. 2016) (judgment of dismissal affirmed because, among other reasons, trustee did not assert reverse veil piercing claims and court did not address whether Delaware recognizes reverse veil piercing); *CanCan Dev., LLC v. Manno*, 2015 Del. Ch. LEXIS 144, at *66 (Del. Ch. May 27, 2015) (no reverse veil piercing raised).

Indeed, *In re Extended Stay, Inc.*, 2020 Bankr. LEXIS 2128, at *136-37 (Bankr. S.D.N.Y. Aug. 8, 2020), on which Plaintiff heavily relies, held: "[t]he Amended Complaint does not allege that the Debtors are sham corporations that exist for no other purpose than as a vehicle for fraud. Therefore, assuming, arguendo, that Delaware law would recognize reverse veil piercing, the Trust has not alleged facts that would provide grounds for permitting the Trust to resort to that remedy." Here, even if the Court were to assume that reverse veil piercing is a viable cause of action under

---

[2] Plaintiff's Memo. Op. cites a gargantuan number of cases in string cites with little or no discussion of their applicability to this case.   Not surprisingly, virtually none of them have any factual or legal similarity to this case. Instead, they are cited because Plaintiff has cherry-picked quotes from them.   It is not possible to address every one of them in this brief.

Delaware law, there are no allegations (as opposed to conclusions) that GMP is a "sham corporation[] that exist[s] for no other purpose than as a vehicle for fraud." *Id.* (no factual support for reverse veil piercing count).

Second, Plaintiff suggests "guilt by association" is a valid manner of alleging reverse veil piercing. Plaintiff relies on *Waterbury Hospital* v. *U.S. Foodservice, Inc.*, 2009 U.S. Dist. LEXIS 117403, at *63 (D. Conn. Dec. 15, 2009), a RICO price fixing case for this proposition. Memo. Op. at 20. In that case, the plaintiff alleged facts explaining how the pass-through entities served no legitimate purpose and the entire corporate structure was created as an artifice to assist with the illegal conduct.[3] Here, the Complaint does not (and could not) allege facts to support a claim GMP was established as part of a fraudulent scheme. The Complaint does not allege facts that GMP was even involved in any wrongdoing. The Complaint alleges only that GMP leased office space to some "Benistar" entities and that GMP is owned by judgment debtors of Plaintiff. In *US Foodservice*, the court found that "USF is on notice that the plaintiffs allege that, in furtherance of the larger scheme to defraud, the purpose and operation of which the plaintiffs plead in great detail, USF sent thousands of invoices on a nearly daily basis from 1998 through 2004 to customers buying products that had been funneled through a VASP." *Id.* at *62. Here, GMP is on notice of nothing more than Plaintiff's legal conclusion that GMP is an alter-ego of Mr. Carpenter. However, the Complaint fails to allege how or why that is the case.

Also unavailing is Plaintiff's assertion that "abuse of the corporate form is rampant." Memo. Op. at 21. There are no allegations as to how Mr. Carpenter abused GMP's corporate form. Plaintiff's citation to *Florida Power Corp.* v. *FirstEnergy Corp.*, 2013 U.S. Dist. LEXIS 188954,

---

[3] "The Complaint also alleges that although the orders were technically placed through the VASPs, USF would communicate directly with the actual suppliers to determine price, specifications of products and other information related to the orders; the amount the VASPs charged USF for the products-which later became the price component of plaintiffs' cost-plus arrangements-was dictated by USF rather than by the VASPs." *Id.*

at *2 (N.D. Ohio Mar. 18, 2013) provides no help.  There, a plaintiff sought to hold prior owners of the property liable "for the cleanup costs under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq*." *Id.*  Discussing whether to apply a veil piercing theory, the court reasoned that "[t]he conclusions of two federal agencies and the facts and opinion testified to by an expert in law and corporate governance—credited by a federal judge and sustained on appeal—describe, not an isolated incident of corporate dominance, but a thoroughgoing practice, a rampant pattern of abuse by the AGECO 'empire' that exploited '*every* possibility for plunder.'"  *Id.* at *7.  It is unclear how this fact pattern applies to this case. Regardless, unlike *Florida Power Corp.*, the Complaint does not plead facts explaining how GMP participated in the alleged fraudulent scheme or any misconduct by Mr. Carpenter.

Other cases cited by Plaintiff offer no support for its claims.  In *Nisselson* v. *Ford Motor Co. (In re Monahan Ford Corp.)*, 340 B.R. 1, 21 (Bankr. E.D.N.Y. 2006), a case involving a fraud claim, the bankruptcy court indicated it applied a special version of Fed. R. Civ. P. 9(b) applicable in bankruptcy cases: "[c]ourts generally evaluate averments of fraud in the bankruptcy context more liberally than in other civil actions charging fraud."  The term "judgment proof" is not even mentioned.  In *Motorola Credit Corp.* v. *Uzan*, 388 F.3d 39, 57 (2d Cir. 2004) the Second Circuit considered a jurisdictional issue.  It held, *inter alia*, "in light of what the District Court found to be defendants' pattern of concealing and diverting assets, there is every reason to believe that defendants would have exploited any delay associated with the transfer of this case to Illinois." The out-of-context, cherry-picked words that Plaintiff liked from the text of *Motorola Credit* have no application to the case before this Court.

## B.   The Complaint is Devoid of Facts Connecting GMP to Any Misconduct

All the Complaint alleges is that Mr. Carpenter owns and controls entities that own GMP. The Complaint contains no plausible *factual* allegations (as opposed to unsupported conclusions)

that Mr. Carpenter used GMP as part of a fraudulent scheme or exerted any improper control over

GMP.  A complaint cannot survive dismissal if it does not allege facts and the Court is not "bound

to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber*

*v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).  The paragraphs referenced by Plaintiff in

its Memo. Op., which ostensibly set forth the factual predicate for GMP's potential liability make

no reference to wrongful conduct by GMP,  or conduct of Mr. Carpenter that could implicate GMP.

Memo. Op. at 13-14.[4]

| Pgf. Cited | Conclusion Set forth in Mem. Op. | Why reference is a Conclusion Not a Factual Allegation |
|---|---|---|
| 67-71 | "Benistar" entities leased space in the Property | (1) Nothing in these paragraphs mentions GMP, let alone explains how it was a "sham entity."  (2) The unnamed, alleged "Benistar" entities leased space at the Property prior to Sash Spencer's death (in 2009). Since 2014, however, Curaleaf has rented the Property.[5] |
| 68-69, 79 | "Benistar" operates in a  manner to "create the appearance of distinction… and evade liability" | GMP is a single-asset real estate company.  There are no allegations that it has any operations other than owning real estate.  *See* Complaint at ¶¶ 106-115. |
| 112, 200, 202 | GMP has a role in a criminal enterprise to obfuscate creditors | ¶ 112 states (accurately) that GMP is a pass-through entity.  It also makes a legal conclusion as to the use of GMP, with no facts alleged.[6] |

---

[4] GMP is not individually mentioned at all between ¶¶ 116 through 198 of the Complaint.

[5] Courts may take judicial notice of public records for purposes of a motion to dismiss without converting the motion into a summary judgment proceeding.  *Navin* v. *Wells Fargo Bank, N.A.*, 199 F. Sup. 3d 646, 649 (D. Conn. 2016) (court considered deeds on file with land records as part of motion to dismiss); *Doreus* v. *Wells Fargo Bank, N.A.*, 2019 U.S. Dist. LEXIS 112682, at *2 n.1 (D. Conn. June 10, 2019).  Based on documents available at the Simsbury Land Records. GMP purchased the Property on August 30, 2007 for $3,765,963.00.  Warranty Deed, Exhibit A.  GMP financed the purchase with a $3,200,000.00 mortgage to TD BankNorth, N.A., Open End Mortgage, Exhibit B.  Since 2014, the Property has been leased to Curaleaf.  Notice of Lease, Exhibit C.

[6] Specifically, the facts missing from a potentially viable complaint are: how exactly is GMP used to "shield its assets" from Plaintiff.  Normally, there would be allegations that Mr. Carpenter parked assets in GMP, used GMP as a personally piggy bank, etc.  No such allegations exist in the Complaint.

| Pgf. Cited | Conclusion Set forth in Mem. Op. | Why reference is a Conclusion Not a Factual Allegation |
|---|---|---|
| | | ¶¶ 200 and 202 are legal conclusions. |
| 79, 86, 122-123, 195, 204-206 | Mr. Carpenter *created* GMP to shield "Benistar" from creditors | Many of these allegations aren't directed to GMP and none specifically reference anything GMP did or did not do, rather they generally allege that Mr. Carpenter is bad and has been found guilty of illegal activities.  In any event, GMP was created prior to the death of Mr. Spencer and purchased the Property with a mortgage from TD Bank. |
| 113-114 | Identifies that GMP's owners are judgment debtors of Plaintiff. | Not factual allegations that support an alter-ego claim. |
| 72 | "Benistar" disregarded its corporate structure. | (1) "Benistar" is a conflation of all defendants, (2) nothing about GMP, and (3) sets forth conclusions not facts. |
| 55-58, 73-76, 110 | Statement of background facts | Nothing about GMP. |
| 33, 55-58, 63, 177, 188 | Statement of background facts and legal conclusions | No facts alleged concerning GMP and ¶ 177 is a legal conclusion. |
| 135-137 | Statements concerning Mr. Trudeau | Nothing about GMP. |
| 92-93, 102, 104, 131, 145 | Statements concerning "executives" at "Benistar" | Nothing about GMP and all legal conclusions. |

Plaintiff attempts to conflate all of the operations of every defendant with the operations of GMP.  No facts are pled that could support a finding that GMP, itself, did anything wrong, received any proceeds of fraudulent conduct, owns anything other than the Property (and lease payment proceeds), or has been anything other than a real estate holding company.  Memo. Op. at 23-24 (all references to "Benistar", not GMP).

## C.    There are No Allegations that GMP is a "Single Economic Unit" With Respect to Any Other Defendants

The Complaint contains no facts allegations that GMP is controlled by or has "intermingled operations" with Mr. Carpenter or anyone else.  Plaintiff misapplies *National Gear & Piston,*

*Inc.* v. *Cummins Power Systems, LLC*, 975 F. Supp. 2d 392, 404 (S.D.N.Y. 2013), which dismissed

a similar complaint, and stands for the proposition that: "[i]t is well established law that allegations

of mere shared management, shared corporate principles, or a parent's ownership and operation of

a subsidiary—even exclusively for the parent's gain—do not merit piercing the corporate veil."

There, the plaintiff claimed a corporate principal, through a variety of shell companies, undertook

illegal activities.   The plaintiff further contended that the "alleged pattern of executive overlap

'indicates a continuous period of professional engagement by a unitary, integrated corporate

structure.'"   *Id.* at 397.   Dismissing the case, the court held:

> ….Plaintiff has failed to plead any of the so-called *Fletcher* factors, and the
> facts that Plaintiff has plead merely establish that Cummins and CPS are in
> a   parent-subsidiary   relationship—which   relationship   is,   by   itself,
> insufficient to pierce the corporate veil. And with respect to the injustice
> requirement, Plaintiff has pleaded no facts to suggest that CPS was a merely
> sham through which Cummins sought to perpetrate an injustice.

*Id.* at 407-08.[7]  Here, Plaintiff has merely pled that GMP is owned by companies that are

judgment debtors of Plaintiff, which, in turn, are owned by Mr. Carpenter.   Plaintiff has charging

orders against these entities, and this is their sole remedy under either Delaware or Connecticut

Law.[8]  This is especially so in this case as there are no factual allegations that GMP was a sham

entity or has been used for improper purposes.   Therefore, *National Gear* and *Fletcher* support

dismissal of this case.

Burch v. *Opus, LLC (In re Opus East, LLC)*, 528 B.R. 30 (Bankr. D. Del. 2015), cited by

Plaintiff, supports dismissal of this case.   There, "[t]he Trustee contend[ed] that the interlocking

---

[7] *See also Fletcher v. Atex*, 68 F.3d 1451, 1458-61 (2d Cir. 1995) ("plaintiffs failed to present evidence of 'overall element of injustice and unfairness' that would result from respecting the two companies' corporate separateness…[t]here is no indication that [defendant parent company] sought to defraud creditors and consumers or to siphon funds from its subsidiary").

[8] *See Charging Order*, ECF No. 8, *Universitas Education, LLC. V. Nova Group, LLC*, Case No. 14-mc-125 (RNC).

directors and officers are evidence that the separate corporations were mere facades for the single

enterprise." *Id.* at 60.  At trial, the Delaware Bankruptcy Court held: "the Court finds that the

Debtor was created for a legitimate business purpose and acted independently of LLC and the

Trusts." *Id.*  There, the court considered: whether the entity was created for a fraudulent purpose,

whether it observed corporate formalities, and whether owners siphoned funds from that entity.

The Plaintiff also cites *In re LXEng, LLC*, 607 B.R. 67, 92-93 (Bankr. D. Conn. 2019),[9] a

fraudulent transfer case brought by a bankruptcy trustee pursuant to Bankruptcy Code §§ 544(b)

(state law fraudulent transfer claim) and 548 (fraudulent transfer under Bankruptcy Code) for the

proposition that: "[t]o the extent Mr. Carpenter vested [GMP] with title to any assets, including

the property located at 100 Grist Mill Road, with an intent to shield the assets from Benistar's

creditors, this constitutes fraud upon Benistar's future creditors, including Universitas."  That isn't

what *LXEng* holds.  There, the trustee sought to avoid fraudulent transfers of specific property the

debtor transferred to his wife.[10]  *Id.* 92-93 ("[The individual debtor] had one paramount goal: to

leave the [d]ebtor judgment-proof and channel its assets to his wife and family.").

Here, applying *Burtch* and *LXEng*, it is clear the Complaint must be dismissed.  The

Complaint does not allege (nor could it) that GMP was *created* for an illegal purpose and does not

allege the siphoning of funds from GMP.  No fraudulent transfer claim has been asserted, because

doing so would be frivolous.  Although the Complaint does suggest that GMP did not observe

corporate formalities, it is well settled that "the Delaware Limited Liability Company Act

(DLLCA) requires little more than that an LLC execute a proper certificate of formation, maintain

---

[9] Memo. Op. at 28.

[10] As to the fraudulent transfer claims, the court specifically noted: "The Chapter 7 Trustee claims that the Debtor made the Transfers to Ms. Chen for no consideration with actual intent to hinder, delay, or defraud its creditors at a time when it owed them millions of dollars and was insolvent." *LXEng,* 607 B.R. at 88.  The bankruptcy court dismissed the claim for relief seeking a constructive trust.  *Id*. at 100.

a registered office in Delaware, have a registered agent for service of process in Delaware, and maintain certain records for membership and tax purposes." *Official Committee of Unsecured Creditors* v. *Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, 420 B.R. 112, 138 (Bankr. S.D.N.Y. 2009).

Plaintiff has cited *Oldendorff Carriers GmbH & Co., KG* v. *Grand China Shipping (H.K.) Co.*, 2012 U.S. Dist. LEXIS 188347 (S.D. Tex. July 2, 2012) for the proposition that GMP is part of a "corporate shell game."[11]  That case, however, is inapposite to the case at bar.  The *Oldendorff* court described the defendant's misconduct there as: "[u]sing this corporate structure, GCL purportedly plays a type of 'shell game' by representing to the market that it and its subsidiaries constitute a 'single business enterprise' even though GCL only provides financial support to its profitable subsidiaries. When GCL's unprofitable subsidiaries can no longer maintain their operations, they are effectively orphaned." *Id.* at *13.

Here, Plaintiff claims Defendants engaged in a corporate "shell game" to "allocate assets amongst themselves in a manner to evade creditors."  Memo. Op. at 28-29.[12]  However, the Complaint contains no facts alleging how GMP purportedly did this.  Plaintiff's argument, that the Property was placed in GMP for a fraud upon Benistar's "future creditors," is nonsensical.  GMP always owned the Property, its sole asset (other than cash derived from lease payments).   There are no facts alleged, which if proven, could lead to the conclusion that GMP has ever held any of Mr. Carpenter's "personal assets."  Memo. Op. at 29; Complaint ¶¶ 112, 200, 202.

---

[11] Memo. Op. at 28.

[12] "The underlying claim against GM Partners is that it is a sham entity intended to shield Mr. Carpenter's personal assets from his creditors, and thus that GM Partners is abusing the corporate form to defraud creditors – this satisfies the requisite injustice component of the alter ego analysis."  Memo. Op. at 29.

### D. <u>Constructive Trust (Fifth Count)</u>

Plaintiff has now refined its "constructive trust" claim in a manner that would require a finding by the Court that Plaintiff has adequately pled GMP is "among the sham entities intended to hold legal title to Mr. Carpenter's personal assets and shield those assets from creditors." Memo. Op. at 32, 34. As detailed above, the Complaint contains no factual allegations that GMP was created for any nefarious purpose or did anything other than lease the Property and collect rent. The Complaint further fails to identify the specific "personal assets" of Mr. Carpenter that GMP holds. Plaintiff contends that "all of [GMP's] assets were necessarily acquired through fraud…." *Id*. at 35. But, the Property was purchased with money borrowed from TD BankNorth. <u>Exhibit B</u>.

### E. <u>There is No Independent Cause of Action for Attorneys' Fees (Second Count)</u>

A claim for attorneys' fees is a prayer for relief, not an independent cause of action. *Psomas* v. *DeRaffele Mfg. Co*, 1997 Conn. Super. LEXIS 3510 (Super. Dec. 29, 1997), is cited by Plaintiff for the proposition that: "[a] party can assert a *cause of action*"[13] for attorneys' fees. *Psomas* did not say that, however. In *Psomas*, the court dismissed a "claim[ ] for attorneys' fees in the prayer for relief…." *Id*. at *4-5; *Pirrotti* v. *Respironics, Inc.*, 2011 U.S. Dist. LEXIS 99775, at *12 (D. Conn. Sep. 6, 2011) (attorneys' fees may be claimed based on a cause of action for "successor liability claim under both actual and constructive fraud theories."). Thus, the Second Count should be dismissed.

## III. <u>CONCLUSION</u>

For the above stated reasons, the Court should grant the Motion, dismiss the Complaint as to GMP, and enter such other relief as is just and proper.

---

[13] Memo. Op. at 36 (emphasis added).

THE DEFENDANT

GRIST MILL PARTNERS, LLC


By:    /s/ Jeffrey M. Sklarz
        Lawrence S. Grossman (ct15790)
        Jeffrey M. Sklarz (ct20938)
        Green & Sklarz LLC
        One Audubon Street, Third Floor
        New Haven, CT 06511
        (203) 285-8545
        Fax: (203) 823-4546
        lgrossman@gs-lawfirm.com
        jsklarz@gs-lawfirm.com


## CERTIFICATE OF SERVICE

       I hereby certify that on the date set forth below a copy of the foregoing was served by CM/ECF and/or mail on anyone unable to accept electronic filing.  Parties may access this filing through the Court's CM/ECF System.


Date: October 2, 2020

                /s/ Jeffrey M. Sklarz

# Exhibit A





## WARRANTY DEED

**ENSIGN-BICKFORD REALTY CORPORATION**, a Connecticut corporation, with an office in Simsbury, Connecticut and **100 GRIST MILL, LLC**, a Connecticut limited liability company with an office in Simsbury, Connecticut, for consideration paid in the amount of THREE MILLION SEVEN HUNDRED SIXTY-FIVE THOUSAND NINE HUNDRED SIXTY-THREE ($3,765,963.00) 00/100 dollars, grant to **GRIST MILL PARTNERS, LLC**, a Delaware limited liability company with an office in Simsbury, Connecticut, with **WARRANTY COVENANTS** in all that certain piece or parcel of land located in the Town of Simsbury, County of Hartford, and State of Connecticut known as 100 Grist Mill reference to which may be had and more particularly bounded and described in <u>Schedule A</u> attached hereto and made a part hereof.

Said premises are subject to the following:

1.     Municipal taxes and Fire District taxes to the Town of Simsbury, becoming due and payable on the List of October 1, 2006 and thereafter.

2.     Water rates, water frontage charges, sewer taxes, and water meter and sewer use charges based thereon, which are due and payable.

3.     Electrical Distribution System Easement in favor of The Connecticut Light & Power Company dated July 26, 1994 and recorded on July 27, 1994 in Volume 433 at Page 68 of the Simsbury Land Records.

4.     Declaration of Easements, Covenants, and Restrictions by Ensign-Bickford Realty Corp. dated December 2, 1983 and recorded on December 9, 1983 in Volume 271 at Page 546 of the Simsbury Land Records, as amended and restated in an Amended and Restated Declaration of Easements, Covenants and Restrictions For The Powder Forest[7] Business Park, dated December 8, 1997 and recorded in Volume 479 at Page 795 of the Simsbury Land Records, and as amended by Second Amendment to Declaration of Easements, Covenants and Restrictions For The Powder Forest® Business Park, dated as of the 17th day of November, 2000, recorded in Volume 533, Page 227 of the Simsbury Land Records.

5.     Sanitary Sewer Easement in favor of the Town of Simsbury recorded on February 6, 1990 in Volume 367 at Page 583 of the Simsbury Land Records.

6.     Riparian rights of others in and to Hop Brook which crosses a portion of the premises.

7.     Utility easement to the Village Water Co. as shown on Map No. 2807 on file in the office of the Town Clerk of the Town of Simsbury.

8.     Prior rights and interests of others in and to the land described in the Declaration of Easements, Covenants and Restrictions referred to above.

9.     Setback lines, notes, easements and other matters shown on a map entitled, "RESURVEY MAP OF PARCEL 25 LAND OWNED BY ENSIGN-BICKFORD REALTY CORPORATION EASTERLY OF GRIST MILL ROAD SIMSBURY, CONNECTICUT SCALE

1"=40' NOVEMBER 1997 HODGE SURVEYING ASSOCIATES, P.C. SHEET 2 OF 2", which map is on file in the office of the Town Clerk of the Town of Simsbury.

10.     A Communication Easement Agreement of even date herewith in favor of the Grantor and its successors and assigns.

11.     Rights of tenants in possession and any state of facts that an accurate survey or personal inspection of the premises would disclose so long as those state of facts do not render title unmarketable.

12.     Any and all laws, statutes, ordinances, codes, regulations or requirements, including, without limitation, building, zoning and other land use restrictions, ordinances, and regulations, affecting the premises adopted by the Town of Simsbury or by any other governmental authority having jurisdiction of the premises, and all amendments or additions thereto now be in force and effect.

Signed this 30th day of August, 2007.

WITNESSED BY:

Katherine E. Abel

HERBERT A. KRASOW

ENSIGN-BICKFORD REALTY CORPORATION

By: _____
        Thomas C. Pedrotty
Its     President and Chief Operating Officer


Katherine E. Abel

HERBERT A. KRASOW

100 GRIST MILL, LLC
By: Ensign-Bickford Realty Corporation
Its   Manager
By: _____
        Thomas C. Pedrotty
Its     President and Chief Operating Officer

STATE OF CONNECTICUT     )
                                              )     ss: Farmington
COUNTY OF HARTFORD       )

This instrument was acknowledged before me on August 30, 2007, by Thomas C. Pedrotty, President and Chief Operating Officer of ENSIGN-BICKFORD REALTY CORPORATION, a Connecticut corporation, on behalf of said corporation.

_____
Commissioner of the Superior Court
Notary Public
My Commission Expires:

STATE OF CONNECTICUT          )
                             )          ss:  Farmington
COUNTY OF HARTFORD            )

    This instrument was acknowledged before me on August 30, 2007, by Thomas C. Pedrotty, President and Chief Operating Officer of Ensign-Bickford Realty Corporation, a Connecticut corporation, as Manager of 100 GRIST MILL, LLC, a Connecticut limited liability company, on behalf of said company.

                             Commissioner of the Superior Court
                             Notary Public
                             My Commission Expires:

00188/00064/31714.2

SCHEDULE A

LEGAL DESCRIPTION
100 GRISTMILL

That certain piece or parcel of land, with the improvements thereon and appurtenances thereto, known as No. 100 Grist Mill Road in the Town of Simsbury, County of Hartford, and State of Connecticut, being shown on a certain map or plan entitled "Resurvey Map Parcel 25 Land Owned by ENSIGN-BICKFORD REALTY CORPORATION Easterly of Grist Mill Road Simsbury, Connecticut Sheets 1 of 2 and 2 of 2 Scale 1" = 40' November 1997 Hodge Surveying Associates, P. C. ... Francis A. Richard, L. S. - #13351", which map or plan is to be filed in the Office of the Simsbury Town Clerk, reference to which is hereby made, and being more particularly bounded and described as follows:

Beginning at a point on the easterly streetline of Grist Mill Road said point being the southwesterly corner of the herein described parcel, thence in a northerly direction along the easterly streetline of Grist Mill Road along a curve to the left having a radius of 2182.68 feet, a distance of 50.49 feet to a point; thence S 89°-14'-42" E a distance of 182.33 feet to a point; thence N 65° - 28'- 04" E a distance of 280.59 feet to a point; thence N 2° - 44'- 27" W a distance of 160.70 feet to a point; thence N 79° - 06'- 32" E a distance of 120.00 feet to a point; thence N 10° - 15' - 04" E a distance of 151.05 feet to a point; thence S 72° - 27'- 29" E a distance of 275.05 feet to a point; thence S 77° - 04'- 33" E a distance of 80.16 feet to a point; thence N 42° - 44'- 29" E a distance of 405.00 feet to a point in the center of Hop Brook; thence south 52°-58'-15" E, a distance of 341.25 feet to a point; thence S 10° - 58'- 40" W a distance of 14.00 feet to a point; thence N 73° - 55'- 26" W a distance of 205.35 feet to a point; thence S 3° - 39'- 30" W a distance of 304.99 feet to a point; thence S 6° - 21'- 18" W a distance of 261.31 feet to a point; thence N 78 °- 35'- 13" W a distance of 770.84 feet to a point; thence S 65° - 28'- 04" W a distance of 291.81 feet to a point; thence N 89° -14'-42" W a distance of 186.50 feet to the point and place of beginning.

TOGETHER WITH an easement, in common with others, for ingress and egress across Grist Mill Road, so called, being a strip of land approximately sixty feet in width and more particularly bounded and described as set forth on Schedule A-1 attached hereto and made a part hereof, for all purposes for which a public road may be used, until such time as said Grist Mill Road shall be accepted as a public road.

TOGETHER WITH all right, title and interest, if any, arising under that certain Declaration of Easements, Covenants, and Restrictions for The Powder Forest Business Park dated December 2, 1983 and recorded December 9, 1983, in Volume 271, Page 546 of the Simsbury Land Records as amended by Amended and Restated Declaration of Easements, Covenants and Restriction for The Powder Forest Business Park dated December 8, 1997, and recorded in Volume 479 at Page 795 of the said Land Records.

Received for Record at Simsbury, CT
On 08/30/2007 At  4:23:43 pm

Carolyn D. Kelly, Town Clerk

# Exhibit B

Book: 743 Page: 398 Page: 1 of 46

Doc ID: 000501000046 Type: LAN
BK **743**  PG**398-443**

## MORTGAGE DEED AND SECURITY AGREEMENT

TO ALL PEOPLE TO WHOM THESE PRESENTS SHALL COME, G R E E T I N GS:

KNOW YE  **GRIST MILL PARTNERS, LLC**, a Delaware limited liability company, with an office at 100 Grist Mill Road, Simsbury, Connecticut  06070 ("**Grantor**"), for the consideration of One and 00/100 Dollar ($1.00) and other valuable consideration received to its full satisfaction of **TD BANKNORTH, N.A.**, a national banking association with an office at 102 West Main Street, New Britain, Connecticut  06050-0174 ("**Grantee**"), does give, grant, bargain, sell and confirm unto the said Grantee, its successors and assigns forever, that certain parcel of land, with the buildings and improvements now or hereafter placed thereon, known as **100 Grist Mill Road, Simsbury, Connecticut** as more particularly bounded and described on **Exhibit A** attached hereto and made a part hereof ("**Premises**");

Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining, and the reversion or reversions, remainder and remainders, rents, issues and profits thereof;

Together with all right, title and interest of the Grantor, if any, in and to the land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the above-described Premises;

Together with all the buildings and improvements now or hereafter placed on the Premises, and all fixtures, appliances, machinery and equipment now or hereafter installed, and all the appurtenances thereto, thereon or therein;

Together with any and all awards or payments, including interest thereon, and the right to receive the same, which may be made with respect to the Premises as a result of (a) the exercise of the right of eminent domain; (b) the alteration of the grade of any street; or (c) any other injury to, or decrease in, the value of the Premises, to the extent of all amounts which may be secured by this Mortgage at the date of receipt of any such award or payment by the Grantee.

To have and to hold the above granted and bargained Premises, with the appurtenances thereof, unto it, the said Grantee, its successors and assigns forever, to it and their own proper use and behoof.  And also, the said Grantor does, for itself, its successors and assigns, covenant with the said Grantee, its successors and assigns, that at and until the ensealing of these presents, it is well seized of the Premises as a good, indefeasible estate in FEE SIMPLE; and has good right to bargain and sell the same in manner and form as is above written; and that the same are free and clear of all encumbrances whatsoever, except as set forth in the title policy insuring Grantee's interest in the Premises.

And furthermore, the said Grantor does, by these presents, bind itself and its successors and assigns forever to WARRANT AND DEFEND the above granted and bargained Premises to it, the said Grantee, its successors and assigns, against all claims and demands whatsoever, except as aforesaid.

THE CONDITION OF THIS DEED is such that:

WHEREAS Grantor has executed and delivered to Grantee its Promissory Note of even date herewith in the original principal amount of THREE MILLION TWO HUNDRED THOUSAND DOLLARS ($3,200,000.00) ("**Note**"), a copy of which Note is attached hereto and made a part hereof as **Exhibit B**; and

WHEREAS Grantor and Grantee have entered into an ISDA Master Agreement of even date herewith together with the schedules and documents related thereto, which provides for interest rate protection and may result in additional indebtedness of the Grantor ("**SWAP Agreement**"), a copy of which SWAP Agreement is attached hereto and made a part hereof as **Exhibit C**. The Note and SWAP Agreement are at times hereafter referred to as the "Obligations ".

GRANTOR AND GRANTEE COVENANT AS FOLLOWS:

1.     Payment of Indebtedness.  The Grantor shall pay the indebtedness evidenced by the Obligations, the interest thereon and all other charges due thereunder in lawful money of the United States at the time and in the manner set forth therein, subject to applicable grace periods.

2.     Payment of Taxes and Assessments.  The Grantor shall pay all taxes, assessments, water rates, sewer rents, utility charges and other charges, and any liens prior to the lien of this Mortgage now or hereafter assessed or liens on or levied against the Premises or any part thereof, and in case of default in the payment thereof when the same shall be due and payable, it shall be lawful for the Grantee, without notice or demand, to pay the same or any of them; and the monies paid by the Grantee in discharge of taxes, assessments, water rates, sewer rents, utility charges and other charges, and prior liens shall be a lien on the Premises added to the amount of the Note and secured by this Mortgage, payable on demand, with interest at the rate set forth in the Note secured hereby from the time of payment of the same; and upon request of the Grantee, the Grantor shall exhibit to the Grantee receipts for the payment of all items specified in this Paragraph prior to the date when the same shall become delinquent.

3.     Tax Escrow.  At the Grantee's option, Grantor shall pay to the Grantee together with, and in addition to, the monthly installments of principal and interest provided in the Note, on the date provided for the first payment of principal and interest in the Note, and on the first day of each month thereafter until the Note has been fully

paid, a sum equal to one-twelfth (1/12) of the yearly taxes assessed against the Premises as estimated by the Grantee.  The Grantee shall hold said sums in a non-interest-bearing account, in trust, to pay said taxes in the manner and to the extent permitted by law when the same become due and payable in each year.  If the total payments made by the Grantor to the Grantee on account of said taxes, up to the time when the same become due and payable, shall exceed the amount of payment for said taxes actually made by the Grantee, such excess shall be credited by the Grantee on the next subsequent payment or payments to become due from the Grantor to the Grantee on account of said taxes.  If, however, said payments shall not be sufficient to pay said taxes when the same become due and payable, then the Grantor agrees to pay to the Grantee the amount necessary to make up the deficiency upon demand by the Grantee.  In case of default in the performance of any of the agreements or provisions contained in the SWAP Agreement, Note or this Mortgage, the Grantee may, at its option, at any time after such default, apply the balance remaining of the sums so accumulated as a credit against the principal or interest of the Mortgage indebtedness, or both.

       4.    <u>Condemnation</u>.  Notwithstanding any taking by eminent domain, alteration of the grade of any street or other injury to, or decrease in, value of the Premises by any public or quasi-public authority or corporation, the Grantor shall continue to pay interest on the entire principal sum then secured and all payments required by the Obligations until any such award or payment shall have been actually received by the Grantee, and any reduction in the principal sum resulting from the application by the Grantee of such award or payment as hereinafter set forth shall be deemed to take effect only on the date of such receipt; said award or payment may, at the option of the Grantee, be retained and applied by the Grantee toward payment of the monies secured by this Mortgage, or be paid over wholly or in part to the Grantor for the purpose of altering, restoring or rebuilding any part of the Premises which may have been altered, damaged or destroyed as a result of any such taking, alteration of grade or other injury to the Premises, or for any other purpose or object satisfactory to the Grantee, but the Grantee shall not be obligated to see to the application of any amount paid over to the Grantor; and that if, prior to the receipt by the Grantee of such award or payment, the Premises shall have been sold on foreclosure of this Mortgage, the Grantee shall have the right to receive said award or payment to the extent of any deficiency found to be due upon such sale, with legal interest thereon.

       5.    <u>Insurance</u>.  The Grantor shall keep the Premises insured for the benefit of the Grantee against loss or damage by fire, lightning, windstorm, hail, explosion, riot, riot attending a strike, civil commotion, aircraft, vehicles, smoke, pollutants, war risks, if available, demolition, if required, and other so-called extended coverage risks and other hazards, casualties and contingencies as may be required by the Grantee from time to time, provide flood insurance in an amount equal to the full replacement cost of the improvements on the Premises, and provide coverage of not less than the coverage en-compassed by Fire, Extended Coverage, and Vandalism and Malicious Mischief perils

8/30/2007                                         -3-

broadened to include the so-called "All Risk of Physical Loss", all in format approved by the Grantee and in sufficient amounts to prevent the application of any insurance policy co-insurance contribution on any loss and shall in no event be less than the appraised value of existing improvements on the Premises.  All insurance herein provided for shall be obtained by the Grantor (notwithstanding the procurement of other insurance policies by other persons or parties and relating to the Premises) and carried in companies approved by the Grantee, and all policies, including additional and renewal policies, marked "premiums paid" and containing an agreement by the insurer that the policy shall not be canceled or materially changed without at least thirty (30) days' prior written notice to the Grantee, shall be delivered to the Grantee, and all renewal policies, including additional and renewal policies, shall be payable, in case of loss or damage, to the Grantee as first mortgagee, and shall contain the standard non-contributing mortgagee clause entitling the Grantee to collect all proceeds payable under all such insurance, as well as standard waiver of subrogation endorsement, and waiver of other endorsements, as the Grantee may require, all to be in form acceptable to the Grantee. In the event of any loss, the Grantor will give immediate notice to the Grantee.  Grantor hereby authorizes the Grantee, at its option, to collect, adjust and compromise any losses under any of the insurance policies, to endorse the Grantor's name on any document or instrument in payment of any insured loss and, after deducting the costs of collection, to apply the proceeds, at the Grantee's sole option, as follows:  (i) as a credit upon the indebtedness secured hereby, whether or not the same shall be then due and payable, in which event, the lien of this Mortgage shall be affected only by a reduction thereof in any amount equal to the amount so applied as a credit, or (ii) to repairing or restoring the Premises or any part thereof, in which event, the Grantee shall not be obligated to see to the proper application thereof, nor shall the amount so released or used be deemed a payment on any indebtedness secured hereby. All such insurance proceeds shall be disbursed by Grantee to Grantor as work progresses in the same manner, and subject to the same fee schedule, as used by Grantee for construction loans.  Grantor shall obtain, carry and maintain Comprehensive General Liability Insurance covering the Premises in an amount of no less than Four Million  Dollars ($4,000,000.00) bodily injury and/or property damage on each property, per occurrence and Rent Interruption Insurance in an amount equal to the aggregate rent under the lease or leases of the Premises for one year. Said insurance shall be with companies approved by the Grantee. Grantor shall provide Grantee with Certificates of Insurance containing provisions designating the Grantee as an additional insured party and providing for not less than thirty (30) days written notice to the Grantee prior to any material change or cancellation of said Liability Insurance.

6.    <u>Compliance With Laws</u>.  The Grantor shall maintain the Premises in good condition and repair, shall not commit or suffer any waste of the Premises, and shall comply with, or cause to be complied with, all statutes, ordinances and requirements of any governmental authority relating to the Premises; and the Grantor shall promptly repair, restore, replace or rebuild any part of the Premises now or hereafter subject to the lien of this mortgage which may be damaged or destroyed by any casualty

whatsoever or which may be affected by any condemnation or eminent domain proceeding, provided Grantee makes available any insurance, condemnation or eminent domain proceeds to repair, restore, replace or rebuild the damaged, destroyed or affected portion of the Premises. The Grantor shall complete and pay for, within a reasonable time, any structure at any time in the process of construction on the Premises; and the Grantor shall not initiate, join in, or consent to, any change in any private restrictive covenant or private restrictions limiting or defining the uses which may be made of the Premises or any part thereof, without the written consent of the Grantee.

7.    Alterations.  The Grantor agrees that no building or other property now or hereafter covered by the lien of this Mortgage shall be removed, demolished or materially altered hereunder without the prior written consent of the Grantee, which consent shall not be unreasonably withheld, conditioned or delayed, except that the Grantor shall have the right, without such consent, to remove and dispose of, free from the lien of this Mortgage, such equipment as from time to time may become worn out or obsolete; provided that, simultaneously with, or prior to, such removal, any such equipment shall be replaced with other equipment of a value at least equal to that of the replaced equipment and free from any title retention or security agreement or other encumbrance, and by such removal and replacement, the Grantor shall be deemed to have subjected such equipment to the lien of this Mortgage.

8.    Rents and Security Deposits.  The Grantor shall not collect rent or license fees of any kind more than thirty (30) days in advance of its due date under any and all leases for any part of the Premises, without the approval of the Grantee herein in writing; and in the event such approval is given, the Grantor agrees to deposit said rents with the Grantee. Any and all tenant's or other users' security deposits, in excess of an amount equal to one month's rent or charges under any and all leases or licenses for any part of the Premises, shall be deposited and pledged so that they cannot be used by the Grantor without the consent of the Grantee, and in the event of foreclosure of this Mortgage, these deposits shall be transferred to the Grantee, if title is acquired by the Grantee, or to the purchaser in the event of a foreclosure sale.

9.    Assignment of Rents.  The Grantor agrees that, in case of default in any of the payments stipulated in any of  the Obligations or in case of default in any of the Grantor's covenants and agreements set forth in any of the Obligations or this Mortgage, the Grantee is hereby authorized and empowered, by its servants, agents or attorneys, to take possession of, and enter upon, the Premises, and to collect and receive the rents, license fees,  and any income therefrom, and to apply so much of said rents, license fees  and income as may be required in the necessary expenses of running the Premises, including attorneys' fees, management agent's fees and, if the Grantee manages the Premises with its own employees, an amount equal to the customary management agent's fees charged for similar property in the area where the Premises are located, and to apply the balance of said rents and income to the payment of the amounts due under the Obligations or in payment of taxes assessed against the

8/30/2007                             -5-

Premises, or both.  And for this purpose and in case of such default, the Grantor hereby assigns, transfers and sets over to the Grantee the rents and income accruing from the Premises.  Nothing contained in the foregoing provision shall impair or affect any right or remedy which the Grantee might now or hereafter have, were it not for such provision, but the rights herein given shall be in addition to any others which the Grantee may have hereunder.

10.   Receiver of Rents.  The Grantee, in any action to foreclose this Mortgage or upon the actual or threatened waste to any part of the Premises or upon default of the observance or performance of any covenant or agreement of the Grantor hereunder, shall be at liberty to apply for the appointment of a receiver of the rents and profits of the Premises, including without limitation all parking license revenue, without notice and shall be entitled to the appointment of such a receiver as a matter of right, without consideration of the value of the Premises as security for the amounts due the Grantee or the solvency of any person or corporation liable for the payment of such amounts.

11.   Entry.  The Grantee and any persons authorized by the Grantee shall have the right to enter and inspect the Premises at all reasonable times.

12.   Appraisal.  At any time during the term of the Obligations, if there exists an event of default, as defined in the Note, SWAP Agreement or herein, or if, in the Grantee's reasonable judgment, a material deterioration in values or market conditions exists, Grantee shall have the option to obtain an appraisal of the Premises at Grantor's expense.

13.   Tax Returns, Financial Statements  and Bank Accounts. The Grantor shall, at its own expense, furnish Grantee with:

(a)  A signed copy of Grantor's current annual federal tax return within 15 days of its filing;

(b)  A signed copy of each guarantor's current annual federal tax return within 15 days of its filing;

(c)  A signed current personal financial statement, on Grantee's form, by Daniel E. Carpenter within 14 months of the receipt of the last statement;

(d) A fiscal year end financial statement within 120 days of fiscal year end for Caroline Financial Group, Inc. and Carpenter Financial Group, Inc.;

(d) A signed copy of a federal tax return within 15 days of filing and a fiscal year end financial statement within 120 days of fiscal year end for Benistar Admin Services, Inc., a corporation which has agreed to lease a portion of the Premises;

8/30/2007                                    -6-

(e) An annual rent roll within 30 days of calendar year end;

(f) Such other financial information as and when Grantee may reasonably require.

In addition, Grantor shall cause Grantor's operating accounts to be maintained with Grantee throughout the term of this mortgage.

14.    <u>Debt Service Coverage</u>.  Grantor shall maintain a minimum annual debt service coverage ratio, defined as Net Operating Income divided by annual debt service expense, of not less than 1.25X ("DSCR"), which DSCR shall be tested annually at Grantor's fiscal year end.

15.    <u>Title</u>.  If title to the Premises shall vest in anyone other than the Grantor, or if Grantor mortgages, leases, or encumbers the Premises or any part thereof without first obtaining the written consent of the Grantee, the whole of Obligations hereby secured shall immediately become due and payable at the option of the Grantee.

16.    <u>Default</u>.  The whole of the Obligations hereby secured shall become due at the option of the Grantee: (a) after default in the payment of any installment of principal and/or of interest as set forth in the Note;  or (b) after default in any of Grantor's obligations under the SWAP Agreement; or (c) after default, after applicable notice and cure periods, under any of the terms of this Mortgage; or (d) after default for thirty (30) days following written notice and demand in the payment of any tax, water rate or assessment prior to the occurrence of a penalty, additional interest or the acceleration of any future installments; or (e) upon default in keeping in force the insurance required herein; or (f) after default for thirty (30) days following written notice and demand, either in delivering the policies of insurance herein described or referred to or in reimbursing the Grantee for premiums paid on such insurance, as herein provided; or (g) after default for thirty (30) days following notice and demand in the payment of any installment which may then be due or delinquent for any assessment for local improvement for which an official bill has been issued by the appropriate authorities and which may now or hereafter affect the Premises and may be or become payable in installments; or (h) upon the actual or threatened waste, removal or demolition of, or material alteration to, any part of the Premises; or (i) upon assignment by the Grantor of the whole or any part of the rents, income or profits arising from the Premises without the written consent of the Grantee; (j) should Grantor sell, lease, encumber or otherwise convey or transfer any of its interest in or ownership of any part of  the Premises without the prior written consent of the Grantee or be deprived of either title or possession or control of any part of the Premises by process or operation of law or order of court;  or (k) should any Grantor change its Articles of Organization or Operating Agreement  or dissolve  its existence as a Delaware  limited liability company, or should there be any change in the ownership, management or control of Grantor without the prior written consent of the Grantee; or (l) should Grantor  be involved as a debtor pursuant to the

bankruptcy laws of the United States, or if any proceeding shall be instituted on any lien or mortgage of any kind effecting the Premises, or should Grantor be judged to be bankrupt or insolvent, or should a judgment lien, execution or similar process be levied against the Premises and any of the aforesaid not be released or otherwise vacated for a period of sixty (60) days; or (m) upon election by the Grantee to accelerate maturity of said principal sum pursuant to the provisions of the Note or of any other instrument which may be held by the Grantee as additional security for the Note; or (n) failure to meet the DSCR required herein; or (o) failure to maintain the required operating accounts with Grantee; or (p) failure to timely provide requested financial information, including but not limited to tax returns and financial statements; (q) should any misrepresentation, misstatement or omission of fact made herein or any other document or statement given in connection herewith by any Grantor prove to have existed when made in any material respect; or (r) after default under any other promissory note or evidence of indebtedness by Grantor, whether such debt now exists or hereafter arises, in favor of the Grantee; or (s) upon default following thirty (30) days written notice and demand in the performance of any Grantor's covenants or agreements in any other mortgage or other security instrument on the Premises.

17.  Late Charges.  The Grantee may collect a "late charge" not to exceed an amount equal to six percent (6%) of any installment of interest or principal under any Obligation or any payment of insurance and taxes due hereunder which is not paid within fifteen (15) days of the due date thereof to cover the extra expenses involved in handling such delinquent payment.

18.  Costs.  The Grantor shall pay all reasonable costs, expenses and attorneys' fees incurred by the Grantee in protecting or sustaining the lien of this Mortgage.

19.  No Waiver.  Any failure by the Grantee to insist upon the strict performance by the Grantor of any of the terms and provisions hereof shall not be deemed to be a waiver of any of the terms and provisions hereof, and the Grantee, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by the Grantor of any and all of the terms and provisions of this Mortgage and the Obligations secured hereby to be performed by the Grantor; and neither the Grantor nor any other person now or hereafter obligated for the payment of the whole or any part of the sums now or hereafter secured by this Mortgage shall be relieved of such obligation by reason of the failure of the Grantee to comply with any request of the Grantor or of any other person so obligated to take action to foreclose this Mortgage or otherwise enforce any of the provisions of this Mortgage or of any obligation secured by this Mortgage; or by reason of the release, regardless of consideration, of the whole or any part of the security held for the indebtedness secured by this Mortgage; or by reason of any agreement or stipulation between any subsequent owner or owners of the Premises and the Grantee extending the time of payment or modifying the terms of any of the Obligations or this Mortgage without first having obtained the consent of the Grantor or such other person; and in the latter event, the Grantor and all such other persons shall

continue liable to make such payments according to the terms of any such agreement of extension or modification unless expressly released and discharged in writing by the Grantee; and regardless of consideration and without the necessity for any notice to, or consent by, the holder of any subordinate lien of the Premises, the Grantee may release the obligation of anyone at any time liable for any of the Obligations secured by this Mortgage or any part of the security held for the indebtedness and may extend the time of payment or otherwise modify the terms of the Note, SWAP Agreement  and/or Mortgage without, as to the security or the remainder thereof, in anyway impairing or affecting the lien of this Mortgage or the priority of such lien, as security for the payment of any of the Obligations as it may be so extended or modified, over any subordinate lien; and the holder of any subordinate lien shall have no right to terminate any lease affecting the Premises, whether or not such lease be subordinate to this Mortgage; and the Grantee may resort, for the payment of the indebtedness secured hereby, to any other security therefor held by the Grantee in such order and manner as the Grantee may elect.

20.    Self-Help.  In the event of any default in the performance of any of the Grantor's covenants or agreements herein, the Grantee may, at its option, perform the same, and the cost thereof, with interest at the rate set forth in the Note secured hereby, shall immediately be due from the Grantor to the Grantee and secured by this Mortgage.

21.    No Marshaling.  The Grantee shall not be compelled to release or be prevented from foreclosing or enforcing this Mortgage upon all or any part of the Premises, unless the entire debt and all items hereby secured shall be paid in lawful money as aforesaid; and shall not be required to accept any part or parts of the said property, as distinguished from the entire whole thereof, as payment of or upon the said debt to the extent of the value of such part or parts; and shall not be compelled to accept or allow any apportionment of the said debt to or among any separate parts of the said property.

22.    Remedies Cumulative.  Upon default, the Grantee may, at its option, foreclose this Mortgage for any portion of the debt or any other Obligations secured thereby which are then due and payable, subject to the continuing lien of this Mortgage for the balance not then due, but nothing in this paragraph contained shall impair or affect any right or remedy which the Grantee might now or hereafter have, were it not for this paragraph, but the right herein given shall be in addition to any others which the Grantee may have hereunder.

23.    Notices.  A demand upon, or notice to, the Grantor shall be sufficient notice and shall be effective if deposited in the mail addressed to the Grantor at the last address furnished in writing to the Grantee, or directed to the address at which the Grantee customarily communicates with the Grantor. If the Grantor consists of more than one person, a demand upon, or notice to, any one of the grantors shall constitute

notice to all the grantors. Any notice to the Grantee hereunder shall be effective only upon its receipt by the Grantee.

24.    Security Agreement.  This Mortgage shall constitute a Security Agreement as defined under the Connecticut Uniform Commercial Code, as amended, and the Grantor hereby grants to the Grantee, and the Grantee has and may enforce a security interest in, all fixtures and equipment now or hereafter installed on the Premises, and all appurtenances thereto, thereon or therein, used in the operation  or maintenance of the building and physical plant excluding, however, any such items of property which are owned by Grantor and used in its manufacturing operations and any such items of property owned by tenants and which, according to the terms of any applicable lease, may be removed by such tenants at the expiration of the lease term ("Collateral"), in addition to the lien hereby imposed upon the same as a part of the real estate.  Grantor agrees to do whatever Grantee may request from time to time by way of obtaining, executing, delivering and filing financing statements, assignments, landlord's or mortgagee's waivers, and other notices and amendments and renewals thereof, and take any and all steps and observe such formalities as Grantee may request in order to create and maintain a valid and enforceable lien upon, pledge of, and first priority security interest in, any and all of the Collateral. Grantor hereby irrevocably authorizes the Grantee at any time and from time to time to file in any Uniform Commercial Code jurisdiction, without Grantor's signature, any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of the Grantor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Connecticut Uniform Commercial Code or such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by the Connecticut Uniform Commercial Code for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Grantor is an organization, the type of organization and any organization identification number issued to the Grantor and, (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as extracted collateral, a sufficient description of real property to which the Collateral relates. The Grantor agrees to furnish any such information to the Grantee promptly upon request. All charges, expenses and fees Grantee may incur in filing any of the foregoing, together with reasonable costs and expenses of any lien search required by Grantee, and any taxes relating thereto, shall be charged to the Grantor and added to the obligations secured by this Mortgage.

25.    Environmental Matters.

a.      Definitions.  The term "Polluting Substance" shall mean any hazardous, ignitable, corrosive, caustic, reactive, toxic, or polluting waste or substance including (without limiting the generality of the foregoing) any of the following:  "hazardous waste" (as defined in the regulations adopted under RCRA, defined below); oil or petroleum products; "chemical liquids or solid, liquid

or gaseous products" (as those terms are used in the Superlien Statute, defined below); asbestos; polychlorinated biphenyls; formaldehyde compounds; explosives; and radioactive materials. The term "Environmental Law" shall mean any statutory, regulatory, or decisional law pertaining to protection of human health or the environment or to any Polluting Substance, including (without limiting the generality of the foregoing) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"); the Resource Conservation and Recovery Act of 1976 ("RCRA"); and Title 22a "Environmental Protection" of the Connecticut General Statutes, including particularly Sections 22a-448 through 22a-457 of the Connecticut General Statutes; as any of them may be amended from time to time, with the regulations promulgated thereunder. The term "release" as used herein shall include both the meaning specified in CERCLA and a "spill" as defined in Section 22a-452c of the Connecticut General Statutes. In the event any Environmental Law is amended to broaden the meaning of any term defined thereby, such broader meaning shall apply subsequent to the effective date of such amendment.

   b. <u>Representations and Warranties</u>.  Grantor represents and warrants that Grantor and those persons having a legal or beneficial interest in Grantor: (i) have not been involved in operations at the Premises involving any Polluting Substances except in compliance with Environmental Laws; (ii) have not caused any release of a Polluting Substance at or affecting the Premises, or any contiguous land included in the property description of the Premises within three years; (iii) after due inquiry,  know of no Polluting Substance located on or affecting the Premises or any contiguous land included in the property description of the Premises within three years or any other properties adjacent to the Premises; (iv) have not permitted any tenant or occupant of the Premises to engage in any activity involving any Polluting Substance other than in compliance with all applicable laws and regulations; (v) have not received any notice, order, claim, or demand from any governmental authority under any Environmental Law except as previously disclosed to Grantee in writing; and (vi) Grantor has disclosed to Grantee all information it has as to whether there are any Polluting Substances located on or affecting the Premises.

   Grantor further represents and warrants to Grantee that, to the best of its knowledge: (i) the Premises and Grantor are not in violation of or subject to any existing, pending, or threatened investigation or inquiry by any governmental authority or any response costs or remedial obligations under any Environmental Law, and this representation and warranty would continue to be true and correct following disclosure to the applicable governmental authorities of all relevant facts, conditions, and circumstances, if any, pertaining to the Premises; and (ii) Grantor has not obtained and is not required to obtain any permits, licenses, or similar authorizations to construct, occupy, operate, or use any buildings,

improvements, fixtures, and equipment forming a part of the Premises by reason of any Environmental Law.

c.   Covenants and Agreements.   Grantor covenants and agrees that: (i) Grantor will not release any Polluting Substance on the Premises or on any properties adjacent to the Premises; (ii) Grantor will not become involved, and will not permit any tenant or occupant of the Premises to become involved, in operations at the Premises involving unlawful use of Polluting Substances or any other activity that would violate any Environmental Law or that could lead to the imposition on Grantor of liability under any Environmental Law; (iii) Grantor at its own expense will comply with all recommendations made by Grantee by separate writing given in connection with this Mortgage within the time periods set forth therein; (iv) Grantor, at its sole cost and expense, will comply strictly and in all respects with the requirements of all Environmental Laws; (v) Grantor will notify Grantee promptly in the event of the presence or release of any Polluting Substance at or affecting the Premises and give to Grantee a copy of any notice of violations of any Environmental Law received by Grantor; (vi) in the event any Polluting Substance is found at the Premises, Grantor will immediately contain and remove the same in compliance with all Environmental Laws and pay immediately when due the cost of removal of such Polluting Substance; (vii) Grantor will keep the Premises free and clear of any lien imposed pursuant to any Environmental Law; and (viii) Grantor will include in all future leases of any portion of the Premises provisions requiring compliance with all Environmental Laws and reporting of information regarding such compliance to Grantor and Grantee.

d.   Site Assessments.   Grantor agrees to permit Grantee, at Grantee's election and in its sole discretion, but with notice to Grantor and at Grantor's expense, from time to time, to cause additional environmental site assessments of the Premises to be undertaken. An environmental site assessment may include a detailed visual inspection of the Premises, including, without limitation, all storage areas, storage tanks, drains, dry wells, and leaching areas, as well as the taking of samples of soil, surface water, and ground water and such other investigation or analysis as is necessary or appropriate for a complete assessment of the compliance of the Premises and the use and operation thereof with all Environmental Laws.

e.   Indemnity.  Except to the extent that any environmental matter arises out of the affirmative wrongful act of Grantee or its agents, Grantor further covenants and agrees unconditionally and absolutely to defend, indemnify, and forever hold Grantee harmless from and against all fines, charges, fees, response costs, losses, liabilities, damages, diminutions in value, costs and expenses, causes of actions, suits, claims, demands, and judgments of any nature suffered or incurred by Grantee and arising out of or in connection with:

8/30/2007                                    -12-

      i.    the presence, or any release, of any Polluting Substance at or affecting the Premises;

      ii.    the application, or any claim of application, of any Environmental Law to the Premises or the operation thereof, including any requirement for clean-up of any Polluting Substance or the assertion of any lien because of any release;

      iii.    any failure by Grantor to comply with the terms of any order of the Connecticut Department of Environmental Protection or any other federal, state, or municipal governmental authority under any Environmental Law; and

      iv.    any inaccuracy in the representations and warranties made by Grantor in paragraph b. above.

Such expenses shall include (without limiting the generality of the foregoing) engineers' and attorneys' fees and the costs of any environmental audits or other tests required by Grantee in its discretion to ascertain whether any Polluting Substance is present at or affects the Premises. Such losses shall include the assertion of any lien relating to any release at or affecting the Premises or any other land included in the same property description with the Premises at any time within three (3) years prior to such release.

f.    Survival. This indemnity shall extend to Grantee as holder of the Mortgage, mortgagee in possession, or as successor in interest to Grantor as owner of the Premises by virtue of foreclosure or acceptance of a deed in lieu of foreclosure and shall survive the repayment of the Loan Documents and the cancellation, release, or discharge of this Mortgage.

26.    Miscellaneous.

a.    Definitions. Wherever used in this Mortgage, unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, the word "Grantor" shall mean "grantor and/or any subsequent owner or owners of the Premises"; the word "Grantee" shall mean "grantees or any subsequent holder or holders of this Mortgage"; the word "person" shall mean "an individual, corporation, partnership or unincorporated association"; and the word "Premises" shall include the real estate hereinbefore described, together with all equipment, condemnation awards and any other rights or property interest at any time made subject to the lien of this Mortgage by the terms hereof;

   b.    <u>Joint and Several Obligation.</u>  If there shall be more than "Grantor" of this Mortgage, then the obligations of all Grantors hereunder shall be joint and several.

   c.    <u>Genders</u>.  Pronouns of any gender shall include the other genders, and either the singular or plural shall include the other;

   d.    <u>Partial Invalidity</u>.  The invalidity of one or more of the phrases, sentences, clauses or Sections of this Mortgage shall not affect the validity of the remaining portions of the Mortgage;

   e.    <u>Connecticut Law</u>.  This Mortgage shall be governed by, construed and enforced in accordance with the laws of the State of Connecticut;

   f.    <u>Modification</u>.  This Mortgage may not be amended in any respect, except by a further agreement in writing, signed by all parties;

   g.    <u>Successors and Assigns</u>.  The rights and covenants contained in this Mortgage shall run with the land, be binding upon and inure to the benefit of the heirs, successors and assigns of the parties.


   NOW, THEREFORE, if the Grantor shall pay the Note according to its tenor, and if all agreements contained in the Note and herein contained are fully kept and performed, then this Deed shall be void, otherwise to remain in full force and effect.

   SIGNED this 30th day of August, 2007.

Witnessed by:                        GRIST MILL PARTNERS, LLC
                                     By: Caroline Financial Group, Inc.
                                         Its Managing Member

_____
  Jack Robinson

                                     By: _____
_____                   Daniel E. Carpenter
  T. J. Donohue                           Its Chairman


8/30/2007                    -14-

STATE OF CONNECTICUT    )
                                ) ss.   FARMINGTON
COUNTY OF HARTFORD    )

The foregoing instrument was acknowledged before me this 30th day of August, 2007 by Daniel E. Carpenter, as Chairman of Caroline Financial Group, Inc., a Delaware corporation, the Managing Member of Grist Mill Partners, LLC, a Delaware limited liability company, on behalf of the company.

                                            _____
                                            T. J. Donohue, Jr.
                                            Commissioner of the Superior Court

EXHIBIT A
PREMISES DESCRIPTION


The land referred to in this Commitment is described as follows:


All that certain piece or parcel of land, with the buildings and improvements thereon and appurtenances thereto, known as No. 100 Grist Mill Road, situated in the Town of Simsbury, County of Hartford and State of Connecticut, being shown on a certain survey entitled "Resurvey Map Parcel 25  Land Owned by Ensign-Bickford Realty Corporation  Easterly of Grist Mill Road  Simsbury, Connecticut  Scale 1" = 40' November 1997", revised 7-23-07, made by Hodge Surveying Associates, P.C., which survey is on file in the Simsbury Land Records.  Said premises are more particularly bounded and described as follows:

Beginning at a point on the easterly streetline of Grist Mill Road, said point being the southwesterly corner of the herein described parcel; thence in a northerly direction along the easterly streetline of Grist Mill Road along a curve to the left having a radius of 2182.68 feet, a distance of 50.49 feet to a point; thence S 89° 14' 42" E, a distance of 182.33 feet to a point; thence N 65° 28' 04" E, a distance of 280.59 feet to a point; thence N 2° 44' 27" W, a distance of 160.70 feet to a point; thence N 79° 06' 32" E, a distance of 120.00 feet to a point; thence N 10° 15' 04" E, a distance of 151.05 feet to a point; thence S 72° 27' 29" E, a distance of 275.05 feet to a point; thence S 77° 04' 33" E, a distance of 80.16 feet to a point; thence N 42° 44' 29" E, a distance of 405.00 feet to a point in the center of Hop Brook; thence S 52° 58' 15" E, a distance of 341.25 feet to a point; thence S 10° 58' 40" W, a distance of 14.00 feet to a point; thence N 73° 55' 26" W, a distance of 205.35 feet to a point; thence S 3° 39' 30" W, a distance of 304.99 feet to a point; thence S 6° 21' 18" W, a distance of 261.31 feet to a point; thence N 78° 35' 13" W, a distance of 770.84 feet to a point; thence S 65° 28' 04" W, a disatnce if 291.81 feet to a point; thence N 89° 14' 42" W, a distance of 186.50 feet to the point and place of beginning.

Together with the easements set forth in a Declaration of Easements, Covenants and Restrictions for Theh Powder Forest Business Park dated December 2, 1983 and recorded in Volume 271 at Page 546 of the Simsbury Land Records; amended by virtue of an Amended and Restated Declaration of Easements, Covenants and Restrictions for The Powder Forest Business Park dated December 8, 1997 and recorded in Volume 479 at Page 795 of the said Land Records; as affected by a Certification Under Declaration by Ensign-Bickford Realty Corporation dated January 6, 1998 and recorded in Volume 481 at Page 116 of the said Land Records; as further amended by virtue of a Second Amendment to Declaration of Easements, Covenants and Restrictions for the Powder Forest Business Park dated Novemnber 17, 2000 and recorded in Volume 533 at Page 227 of the said Land Records; as further affected by a Partial Termination of Declaration of Easements, Covenants and Restrictions for the Powder Forest Business Park dated May 2, 2003 and recorded in Volume 618 at Page 678 of the said Land Records; as further amended by virtue of a Third Amendment to Amended and Restated Declaration of Easements, Covenants and Restrictions for the Powder Forest Business Park dated June 7, 2005 and recorded in Volume 690 at Page 419 of the said Land Records.

<u>Exhibit B</u>
**PROMISSORY NOTE**

$3,200,000.00                   Farmington, Connecticut                   August 30, 2007

FOR VALUE RECEIVED **GRIST MILL PARTNERS, LLC** a Delaware limited liability company with an office at 100 Grist Mill Road, Simsbury, Connecticut 06070 ("Borrower"), promises to pay to the order of **TD BANKNORTH, N.A.**, a national banking association ("Lender"), with an office at 102 West Main Street, New Britain, Connecticut 06050-0174, or at such other place as the holder hereof may designate in writing, the principal sum of THREE MILLION TWO HUNDRED THOUSAND DOLLARS ($3,200,000.00) ("Loan") with interest from the date hereof on the unpaid balance until paid at the rate set forth below, together with all taxes levied or assessed upon that sum against the payee or the holder of this Note, and all costs of collection, including reasonable attorneys' fees incurred in an action to collect this Note, to foreclose the  Mortgage Deed and Security Agreement on property known as 100 Grist Mill Road, Simsbury , Connecticut ("Premises") of even date herewith securing the same ("Mortgage"), or in realizing on or disposing of collateral given under any mortgage or other security agreement securing this Note, or in protecting or sustaining the lien of the Mortgage. The interest charged hereunder shall be computed on the basis of a 360-day year, and interest shall be due and payable for the actual number of days in the period for which interest is being charged.  Effective upon default which is not cured with ten (10) days from occurrence, interest shall accrue from such date until paid at the rate otherwise in effect hereunder plus five percent (5%).

The initial rate charged hereunder shall be an adjustable annual rate equal to one hundred seventy-five (175) basis points (or 1.75%) above the One Month London Interbank Offering Rate ("One Month LIBOR").  Such adjustments shall become effective on the first day of each month beginning October 1, 2007.  Lender shall not be required to notify Borrower of adjustments in said interest rate.

The "One Month LIBOR" means the rate for deposits in U.S. Dollars for a period equal to one month, as such rate appears on Telerate Page 3750 as of 11:00 AM, London time, on the day that is two Business Days prior to the adjustment date.  If such rate does not appear on Telerate Page 3750, the rate for that adjustment date will be the arithmetic mean of the rates quoted by major banks in London, selected by TD Banknorth, N.A., for a period equal to one month, as of 11:00 AM London time, on the day that is two Business Days prior to the adjustment date.

"Telerate Page 3750" means the display designated as "Page 3750" on the Dow Jones Telerate Service (or such other page as may replace Page 3750 on that service or such other service as may be nominated by the British Bankers' Association as the information vendor for

the purpose of displaying British Bankers' Association Interest Settlement Rates for U.S. Dollar Deposits).

"Business Day" means a day (other than Saturday, Sunday or holiday) on which Lender is open and conducting its customary banking transactions in the State of Connecticut. The "Following Business Day Convention" means the convention for adjusting any relevant date that would otherwise fall on a day that is not a Business Day so that the date will be the first following day that is a Business Day.

The Borrower agrees, at its own expense, to furnish Lender with:(a)  A signed copy of Borrower's current annual federal tax return each year, within 15 days of its filing; (b)  A signed copy of each guarantor's current annual federal tax return within 15 days of its filing; (c)  A signed current personal financial statement, on Lender's form, by Daniel E. Carpenter within 14 months of the last statement;  (d) A fiscal year end financial statement within 120 days of fiscal year end for Caroline Financial Group, Ltd. and Carpenter Financial Group, Inc.; (e) A signed copy of the current annual federal tax return within 15 days of filing and a fiscal year end financial statement within 120 days of fiscal year end for Benistar Admin Services, Inc., a Delaware corporation, which has agreed to lease a portion of the premises; and  (e)  Such other financial information as and when Lender may reasonably require.  The foregoing items (a) through (e), inclusive, are hereafter referred to as "Financial Reporting Requirements".

**Upon Borrower's and Guarantors' failure to satisfy any of the foregoing Financial Reporting Requirements at any time, or from time to time, during the term of this Note the interest rate charged hereunder shall increase to an adjustable annual rate equal to two hundred ten (210) basis points (or 2.10%) above the One Month LIBOR, as adjusted in accordance with the procedure set forth above, until such time as the default is cured to Lender's satisfaction and, in addition, Lender shall retain all other rights and remedies available to it on account of such default.**

The principal and interest shall be due and payable as follows:

Payment of accrued interest together with a principal payment in accordance with the attached Principal Payment Schedule, based upon a twenty year amortization, shall be due and payable commencing October 1, 2007 and continuing on the first day of every month thereafter through and including September 1, 2022 ("**Maturity Date**"), subject to adjustment in accordance with the Following Business Day Convention. **The entire outstanding principal due hereunder and all accrued interest, if any, shall be due and payable on the Maturity Date, if not sooner paid.**

All payments shall be in lawful money of the United States in immediately available funds.

In the event of any default in the payment of this Note, and if such default continues for ten (10) days, or in the event of any default in the performance of any of the other conditions or

stipulations of this Note, and if such default continues for thirty (30) days and after notice of such default from Lender, or an event of default beyond any grace or cure period, if applicable, as set forth in the Mortgage, Loan Agreement, Collateral Assignment of Leases and Rentals, or any other instrument securing this Note and the Loan Agreement ("Loan Documents"), all of which are hereby made a part of this Note as if herein set forth, then, at the option of the holder of this Note, the entire amount of principal and interest remaining unpaid shall immediately become due and payable, without notice, except as set forth in the Mortgage.

The undersigned agrees to pay to the holder hereof a monthly "late charge" equal to six percent (6%) of each installment not received by the holder hereof within ten (10) days after the installment is due.

Borrower may prepay this Note in whole or in part without penalty or premium, except as follows: if the Borrower or Guarantor accepts and uses replacement financing from another financial institution or financing source and terminates its lending relationship with the Bank within two (2) years from the date of this Note, a termination fee equal to three (3%) percent of the original principal amount of this Note will be paid and, in addition, any prepayment, at any time, will also be subject to the provisions of the ISDA Master Agreement and all schedules and documents related thereto, as executed together herewith, which may result in a payment due thereunder on account of the prepayment.

The undersigned, and any endorsers or guarantors of this Note, give the holder a lien and right of setoff of all the undersigned's liabilities upon and against all the deposits, credits and property of the undersigned, endorsers or guarantors other than the premises mortgaged to secure this Note and any collateral of the undersigned, endorser or guarantor now or hereafter in the possession or control of the holder or in transit to it; the holder may, at any time following and during the continuance of a default or Event of Default under the Loan Documents or under the ISMA Master Agreement between Borrower and Lender as executed in connection with the Loan, apply the same, or any part thereof, to any liability of the undersigned even though unmatured.

**BORROWER AND EACH AND ALL ENDORSERS AND ANY GUARANTORS OF THIS NOTE ACKNOWLEDGE THAT THE LOAN EVIDENCED BY THIS NOTE IS A COMMERCIAL TRANSACTION AND WAIVE THEIR RIGHTS TO: (1) NOTICE AND HEARING UNDER CHAPTER 903A OF THE CONNECTICUT GENERAL STATUTES, OR AS OTHERWISE ALLOWED BY ANY STATE OR FEDERAL LAW WITH RESPECT TO ANY PREJUDGMENT REMEDY WHICH LENDER MAY DESIRE TO USE, AND (2) REQUEST THAT LENDER POST A BOND, WITH OR WITHOUT SURETY, TO PROTECT BORROWER OR ANY ENDORSER OR GUARANTOR OF THIS NOTE AGAINST DAMAGES THAT MAY BE CAUSED BY ANY PREJUDGMENT REMEDY SOUGHT OR OBTAINED BY LENDER BY VIRTUE OF ANY DEFAULT OR PROVISION OF THIS NOTE OR ANY LOAN DOCUMENT SECURING THE NOTE,** and further waive diligence, demand, presentment for payment, notice of non-payment, protest and notice of protest, and notice of any renewals or extensions of

this Note, and all rights under any statute of limitations, and agree that the time for payment of this Note may be extended at the Lender's sole discretion, without impairing their liability thereon, and further consent to the release of all or any part of the security for payment hereof at the discretion of Lender, or the release of any party liable for the obligation without affecting the liability of the other parties hereto.  Any delay on the part of the Lender exercising any right hereunder shall not operate as a waiver of any such right, and any waiver granted for one occasion shall not operate as a waiver in the event of any subsequent default.

If there shall be more than one maker of this Note, the obligations of the undersigned shall be joint and several.

This Note shall be governed by and construed in accordance with the laws of the State of Connecticut.

> GRIST MILL PARTNERS, LLC
> By: Caroline Financial Group, Inc.
>      Its Managing Member
>
> By: ____/ S /_____
>      Daniel E. Carpenter
>      Its Chairman

**PRINCIPAL PAYMENT SCHEDULE**

Page 5 of 5

# Principal Payment Schedule

| | Start Date | End Date/Pmt Date | Principal Outstanding | Principal Due |
|---|---|---|---|---|
| 1 | 8/30/2007 | 10/1/2007 | $3,200,000.00 | $5,718.00 |
| 2 | 10/1/2007 | 11/1/2007 | $3,194,282.00 | $5,718.00 |
| 3 | 11/1/2007 | 12/1/2007 | $3,188,564.00 | $5,718.00 |
| 4 | 12/1/2007 | 1/1/2008 | $3,182,846.00 | $5,718.00 |
| 5 | 1/1/2008 | 2/1/2008 | $3,177,128.00 | $5,718.00 |
| 6 | 2/1/2008 | 3/1/2008 | $3,171,410.00 | $5,718.00 |
| 7 | 3/1/2008 | 4/1/2008 | $3,165,692.00 | $5,718.00 |
| 8 | 4/1/2008 | 5/1/2008 | $3,159,974.00 | $5,718.00 |
| 9 | 5/1/2008 | 6/1/2008 | $3,154,256.00 | $5,718.00 |
| 10 | 6/1/2008 | 7/1/2008 | $3,148,538.00 | $5,718.00 |
| 11 | 7/1/2008 | 8/1/2008 | $3,142,820.00 | $5,718.00 |
| 12 | 8/1/2008 | 9/1/2008 | $3,137,102.00 | $5,718.00 |
| 13 | 9/1/2008 | 10/1/2008 | $3,131,384.00 | $6,219.00 |
| 14 | 10/1/2008 | 11/1/2008 | $3,125,165.00 | $6,219.00 |
| 15 | 11/1/2008 | 12/1/2008 | $3,118,946.00 | $6,219.00 |
| 16 | 12/1/2008 | 1/1/2009 | $3,112,727.00 | $6,219.00 |
| 17 | 1/1/2009 | 2/1/2009 | $3,106,508.00 | $6,219.00 |
| 18 | 2/1/2009 | 3/1/2009 | $3,100,289.00 | $6,219.00 |
| 19 | 3/1/2009 | 4/1/2009 | $3,094,070.00 | $6,219.00 |
| 20 | 4/1/2009 | 5/1/2009 | $3,087,851.00 | $6,219.00 |
| 21 | 5/1/2009 | 6/1/2009 | $3,081,632.00 | $6,219.00 |
| 22 | 6/1/2009 | 7/1/2009 | $3,075,413.00 | $6,219.00 |
| 23 | 7/1/2009 | 8/1/2009 | $3,069,194.00 | $6,219.00 |
| 24 | 8/1/2009 | 9/1/2009 | $3,062,975.00 | $6,219.00 |
| 25 | 9/1/2009 | 10/1/2009 | $3,056,756.00 | $6,702.00 |
| 26 | 10/1/2009 | 11/1/2009 | $3,050,054.00 | $6,702.00 |
| 27 | 11/1/2009 | 12/1/2009 | $3,043,352.00 | $6,702.00 |
| 28 | 12/1/2009 | 1/1/2010 | $3,036,650.00 | $6,702.00 |
| 29 | 1/1/2010 | 2/1/2010 | $3,029,948.00 | $6,702.00 |
| 30 | 2/1/2010 | 3/1/2010 | $3,023,246.00 | $6,702.00 |
| 31 | 3/1/2010 | 4/1/2010 | $3,016,544.00 | $6,702.00 |
| 32 | 4/1/2010 | 5/1/2010 | $3,009,842.00 | $6,702.00 |
| 33 | 5/1/2010 | 6/1/2010 | $3,003,140.00 | $6,702.00 |
| 34 | 6/1/2010 | 7/1/2010 | $2,996,438.00 | $6,702.00 |
| 35 | 7/1/2010 | 8/1/2010 | $2,989,736.00 | $6,702.00 |
| 36 | 8/1/2010 | 9/1/2010 | $2,983,034.00 | $6,702.00 |
| 37 | 9/1/2010 | 10/1/2010 | $2,976,332.00 | $7,222.00 |
| 38 | 10/1/2010 | 11/1/2010 | $2,969,110.00 | $7,222.00 |
| 39 | 11/1/2010 | 12/1/2010 | $2,961,888.00 | $7,222.00 |
| 40 | 12/1/2010 | 1/1/2011 | $2,954,666.00 | $7,222.00 |
| 41 | 1/1/2011 | 2/1/2011 | $2,947,444.00 | $7,222.00 |
| 42 | 2/1/2011 | 3/1/2011 | $2,940,222.00 | $7,222.00 |
| 43 | 3/1/2011 | 4/1/2011 | $2,933,000.00 | $7,222.00 |
| 44 | 4/1/2011 | 5/1/2011 | $2,925,778.00 | $7,222.00 |
| 45 | 5/1/2011 | 6/1/2011 | $2,918,556.00 | $7,222.00 |
| 46 | 6/1/2011 | 7/1/2011 | $2,911,334.00 | $7,222.00 |
| 47 | 7/1/2011 | 8/1/2011 | $2,904,112.00 | $7,222.00 |
| 48 | 8/1/2011 | 9/1/2011 | $2,896,890.00 | $7,222.00 |

## Principal Payment Schedule

| | Start Date | End Date/Pmt Date | Principal Outstanding | Principal Due |
|---|---|---|---|---|
| 49 | 9/1/2011 | 10/1/2011 | $2,889,668.00 | $7,732.00 |
| 50 | 10/1/2011 | 11/1/2011 | $2,881,936.00 | $7,732.00 |
| 51 | 11/1/2011 | 12/1/2011 | $2,874,204.00 | $7,732.00 |
| 52 | 12/1/2011 | 1/1/2012 | $2,866,472.00 | $7,732.00 |
| 53 | 1/1/2012 | 2/1/2012 | $2,858,740.00 | $7,732.00 |
| 54 | 2/1/2012 | 3/1/2012 | $2,851,008.00 | $7,732.00 |
| 55 | 3/1/2012 | 4/1/2012 | $2,843,276.00 | $7,732.00 |
| 56 | 4/1/2012 | 5/1/2012 | $2,835,544.00 | $7,732.00 |
| 57 | 5/1/2012 | 6/1/2012 | $2,827,812.00 | $7,732.00 |
| 58 | 6/1/2012 | 7/1/2012 | $2,820,080.00 | $7,732.00 |
| 59 | 7/1/2012 | 8/1/2012 | $2,812,348.00 | $7,732.00 |
| 60 | 8/1/2012 | 9/1/2012 | $2,804,616.00 | $7,732.00 |
| 61 | 9/1/2012 | 10/1/2012 | $2,796,884.00 | $8,383.00 |
| 62 | 10/1/2012 | 11/1/2012 | $2,788,501.00 | $8,383.00 |
| 63 | 11/1/2012 | 12/1/2012 | $2,780,118.00 | $8,383.00 |
| 64 | 12/1/2012 | 1/1/2013 | $2,771,735.00 | $8,383.00 |
| 65 | 1/1/2013 | 2/1/2013 | $2,763,352.00 | $8,383.00 |
| 66 | 2/1/2013 | 3/1/2013 | $2,754,969.00 | $8,383.00 |
| 67 | 3/1/2013 | 4/1/2013 | $2,746,586.00 | $8,383.00 |
| 68 | 4/1/2013 | 5/1/2013 | $2,738,203.00 | $8,383.00 |
| 69 | 5/1/2013 | 6/1/2013 | $2,729,820.00 | $8,383.00 |
| 70 | 6/1/2013 | 7/1/2013 | $2,721,437.00 | $8,383.00 |
| 71 | 7/1/2013 | 8/1/2013 | $2,713,054.00 | $8,383.00 |
| 72 | 8/1/2013 | 9/1/2013 | $2,704,671.00 | $8,383.00 |
| 73 | 9/1/2013 | 10/1/2013 | $2,696,288.00 | $9,035.00 |
| 74 | 10/1/2013 | 11/1/2013 | $2,687,253.00 | $9,035.00 |
| 75 | 11/1/2013 | 12/1/2013 | $2,678,218.00 | $9,035.00 |
| 76 | 12/1/2013 | 1/1/2014 | $2,669,183.00 | $9,035.00 |
| 77 | 1/1/2014 | 2/1/2014 | $2,660,148.00 | $9,035.00 |
| 78 | 2/1/2014 | 3/1/2014 | $2,651,113.00 | $9,035.00 |
| 79 | 3/1/2014 | 4/1/2014 | $2,642,078.00 | $9,035.00 |
| 80 | 4/1/2014 | 5/1/2014 | $2,633,043.00 | $9,035.00 |
| 81 | 5/1/2014 | 6/1/2014 | $2,624,008.00 | $9,035.00 |
| 82 | 6/1/2014 | 7/1/2014 | $2,614,973.00 | $9,035.00 |
| 83 | 7/1/2014 | 8/1/2014 | $2,605,938.00 | $9,035.00 |
| 84 | 8/1/2014 | 9/1/2014 | $2,596,903.00 | $9,035.00 |
| 85 | 9/1/2014 | 10/1/2014 | $2,587,868.00 | $9,736.00 |
| 86 | 10/1/2014 | 11/1/2014 | $2,578,132.00 | $9,736.00 |
| 87 | 11/1/2014 | 12/1/2014 | $2,568,396.00 | $9,736.00 |
| 88 | 12/1/2014 | 1/1/2015 | $2,558,660.00 | $9,736.00 |
| 89 | 1/1/2015 | 2/1/2015 | $2,548,924.00 | $9,736.00 |
| 90 | 2/1/2015 | 3/1/2015 | $2,539,188.00 | $9,736.00 |
| 91 | 3/1/2015 | 4/1/2015 | $2,529,452.00 | $9,736.00 |
| 92 | 4/1/2015 | 5/1/2015 | $2,519,716.00 | $9,736.00 |
| 93 | 5/1/2015 | 6/1/2015 | $2,509,980.00 | $9,736.00 |
| 94 | 6/1/2015 | 7/1/2015 | $2,500,244.00 | $9,736.00 |
| 95 | 7/1/2015 | 8/1/2015 | $2,490,508.00 | $9,736.00 |
| 96 | 8/1/2015 | 9/1/2015 | $2,480,772.00 | $9,736.00 |

# Principal Payment Schedule

| | Start Date | End Date/Pmt Date | Principal Outstanding | Principal Due |
|---|---|---|---|---|
| 97 | 9/1/2015 | 10/1/2015 | $2,471,036.00 | $10,449.00 |
| 98 | 10/1/2015 | 11/1/2015 | $2,460,587.00 | $10,449.00 |
| 99 | 11/1/2015 | 12/1/2015 | $2,450,138.00 | $10,449.00 |
| 100 | 12/1/2015 | 1/1/2016 | $2,439,689.00 | $10,449.00 |
| 101 | 1/1/2016 | 2/1/2016 | $2,429,240.00 | $10,449.00 |
| 102 | 2/1/2016 | 3/1/2016 | $2,418,791.00 | $10,449.00 |
| 103 | 3/1/2016 | 4/1/2016 | $2,408,342.00 | $10,449.00 |
| 104 | 4/1/2016 | 5/1/2016 | $2,397,893.00 | $10,449.00 |
| 105 | 5/1/2016 | 6/1/2016 | $2,387,444.00 | $10,449.00 |
| 106 | 6/1/2016 | 7/1/2016 | $2,376,995.00 | $10,449.00 |
| 107 | 7/1/2016 | 8/1/2016 | $2,366,546.00 | $10,449.00 |
| 108 | 8/1/2016 | 9/1/2016 | $2,356,097.00 | $10,449.00 |
| 109 | 9/1/2016 | 10/1/2016 | $2,345,648.00 | $11,304.00 |
| 110 | 10/1/2016 | 11/1/2016 | $2,334,344.00 | $11,304.00 |
| 111 | 11/1/2016 | 12/1/2016 | $2,323,040.00 | $11,304.00 |
| 112 | 12/1/2016 | 1/1/2017 | $2,311,736.00 | $11,304.00 |
| 113 | 1/1/2017 | 2/1/2017 | $2,300,432.00 | $11,304.00 |
| 114 | 2/1/2017 | 3/1/2017 | $2,289,128.00 | $11,304.00 |
| 115 | 3/1/2017 | 4/1/2017 | $2,277,824.00 | $11,304.00 |
| 116 | 4/1/2017 | 5/1/2017 | $2,266,520.00 | $11,304.00 |
| 117 | 5/1/2017 | 6/1/2017 | $2,255,216.00 | $11,304.00 |
| 118 | 6/1/2017 | 7/1/2017 | $2,243,912.00 | $11,304.00 |
| 119 | 7/1/2017 | 8/1/2017 | $2,232,608.00 | $11,304.00 |
| 120 | 8/1/2017 | 9/1/2017 | $2,221,304.00 | $11,304.00 |
| 121 | 9/1/2017 | 10/1/2017 | $2,210,000.00 | $12,182.00 |
| 122 | 10/1/2017 | 11/1/2017 | $2,197,818.00 | $12,182.00 |
| 123 | 11/1/2017 | 12/1/2017 | $2,185,636.00 | $12,182.00 |
| 124 | 12/1/2017 | 1/1/2018 | $2,173,454.00 | $12,182.00 |
| 125 | 1/1/2018 | 2/1/2018 | $2,161,272.00 | $12,182.00 |
| 126 | 2/1/2018 | 3/1/2018 | $2,149,090.00 | $12,182.00 |
| 127 | 3/1/2018 | 4/1/2018 | $2,136,908.00 | $12,182.00 |
| 128 | 4/1/2018 | 5/1/2018 | $2,124,726.00 | $12,182.00 |
| 129 | 5/1/2018 | 6/1/2018 | $2,112,544.00 | $12,182.00 |
| 130 | 6/1/2018 | 7/1/2018 | $2,100,362.00 | $12,182.00 |
| 131 | 7/1/2018 | 8/1/2018 | $2,088,180.00 | $12,182.00 |
| 132 | 8/1/2018 | 9/1/2018 | $2,075,998.00 | $12,182.00 |
| 133 | 9/1/2018 | 10/1/2018 | $2,063,816.00 | $13,128.00 |
| 134 | 10/1/2018 | 11/1/2018 | $2,050,688.00 | $13,128.00 |
| 135 | 11/1/2018 | 12/1/2018 | $2,037,560.00 | $13,128.00 |
| 136 | 12/1/2018 | 1/1/2019 | $2,024,432.00 | $13,128.00 |
| 137 | 1/1/2019 | 2/1/2019 | $2,011,304.00 | $13,128.00 |
| 138 | 2/1/2019 | 3/1/2019 | $1,998,176.00 | $13,128.00 |
| 139 | 3/1/2019 | 4/1/2019 | $1,985,048.00 | $13,128.00 |
| 140 | 4/1/2019 | 5/1/2019 | $1,971,920.00 | $13,128.00 |
| 141 | 5/1/2019 | 6/1/2019 | $1,958,792.00 | $13,128.00 |
| 142 | 6/1/2019 | 7/1/2019 | $1,945,664.00 | $13,128.00 |
| 143 | 7/1/2019 | 8/1/2019 | $1,932,536.00 | $13,128.00 |
| 144 | 8/1/2019 | 9/1/2019 | $1,919,408.00 | $13,128.00 |

# Principal Payment Schedule

|     | Start Date | End Date/Pmt Date | Principal Outstanding | Principal Due |
|-----|-----------|-------------------|-----------------------|----------------|
| 145 | 9/1/2019 | 10/1/2019 | $1,906,280.00 | $14,115.00 |
| 146 | 10/1/2019 | 11/1/2019 | $1,892,165.00 | $14,115.00 |
| 147 | 11/1/2019 | 12/1/2019 | $1,878,050.00 | $14,115.00 |
| 148 | 12/1/2019 | 1/1/2020 | $1,863,935.00 | $14,115.00 |
| 149 | 1/1/2020 | 2/1/2020 | $1,849,820.00 | $14,115.00 |
| 150 | 2/1/2020 | 3/1/2020 | $1,835,705.00 | $14,115.00 |
| 151 | 3/1/2020 | 4/1/2020 | $1,821,590.00 | $14,115.00 |
| 152 | 4/1/2020 | 5/1/2020 | $1,807,475.00 | $14,115.00 |
| 153 | 5/1/2020 | 6/1/2020 | $1,793,360.00 | $14,115.00 |
| 154 | 6/1/2020 | 7/1/2020 | $1,779,245.00 | $14,115.00 |
| 155 | 7/1/2020 | 8/1/2020 | $1,765,130.00 | $14,115.00 |
| 156 | 8/1/2020 | 9/1/2020 | $1,751,015.00 | $14,115.00 |
| 157 | 9/1/2020 | 10/1/2020 | $1,736,900.00 | $15,243.00 |
| 158 | 10/1/2020 | 11/1/2020 | $1,721,657.00 | $15,243.00 |
| 159 | 11/1/2020 | 12/1/2020 | $1,706,414.00 | $15,243.00 |
| 160 | 12/1/2020 | 1/1/2021 | $1,691,171.00 | $15,243.00 |
| 161 | 1/1/2021 | 2/1/2021 | $1,675,928.00 | $15,243.00 |
| 162 | 2/1/2021 | 3/1/2021 | $1,660,685.00 | $15,243.00 |
| 163 | 3/1/2021 | 4/1/2021 | $1,645,442.00 | $15,243.00 |
| 164 | 4/1/2021 | 5/1/2021 | $1,630,199.00 | $15,243.00 |
| 165 | 5/1/2021 | 6/1/2021 | $1,614,956.00 | $15,243.00 |
| 166 | 6/1/2021 | 7/1/2021 | $1,599,713.00 | $15,243.00 |
| 167 | 7/1/2021 | 8/1/2021 | $1,584,470.00 | $15,243.00 |
| 168 | 8/1/2021 | 9/1/2021 | $1,569,227.00 | $15,243.00 |
| 169 | 9/1/2021 | 10/1/2021 | $1,553,984.00 | $16,427.00 |
| 170 | 10/1/2021 | 11/1/2021 | $1,537,557.00 | $16,427.00 |
| 171 | 11/1/2021 | 12/1/2021 | $1,521,130.00 | $16,427.00 |
| 172 | 12/1/2021 | 1/1/2022 | $1,504,703.00 | $16,427.00 |
| 173 | 1/1/2022 | 2/1/2022 | $1,488,276.00 | $16,427.00 |
| 174 | 2/1/2022 | 3/1/2022 | $1,471,849.00 | $16,427.00 |
| 175 | 3/1/2022 | 4/1/2022 | $1,455,422.00 | $16,427.00 |
| 176 | 4/1/2022 | 5/1/2022 | $1,438,995.00 | $16,427.00 |
| 177 | 5/1/2022 | 6/1/2022 | $1,422,568.00 | $16,427.00 |
| 178 | 6/1/2022 | 7/1/2022 | $1,406,141.00 | $16,427.00 |
| 179 | 7/1/2022 | 8/1/2022 | $1,389,714.00 | $16,427.00 |
| 180 | 8/1/2022 | 9/1/2022 | $1,373,287.00 | $1,373,287.00 |

EXHIBIT C

 **Banknorth**

TD Banknorth, N.A.
Derivative Products

(Local Currency-Single Jurisdiction)

# ISDA

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of _____ August 30, 2007 _____

_____ TD BANKNORTH, N.A. _____   and   _____ GRIST MILL PARTNERS, LLC _____

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: --

**1.      Interpretation**

(a)      *Definitions*.  The terms defined in Section 12 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency*.  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between  the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)      *Single Agreement*.  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.      Obligations**

(a)      *General Conditions*.

(i)  Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)  Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant confirmation or elsewhere in this Agreement.

(iii)  Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or potential event of default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

**TD Banknorth**

TD Banknorth, N.A.
Derivative Products

(b)    *Change of Account*.  Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting*.  If on any date amounts would otherwise be payable: --

   (i)  in the same currency; and

   (ii)  in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction.  The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date).  This election may be made separately for different groups of Transactions and will apply separately to each pairing of branches or offices through which the parties make and receive payments or deliveries.

(d)    *Default Interest; Other Amounts*.  Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate.  Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.  If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.    Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into) that: --

(a)    *Basic Representations*.

   (i)  *Status*.  It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

   (ii)  *Powers*.  It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

   (iii)  *No Violation or Conflict*.  Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

   (iv)  *Consents*.  All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been

obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v) *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)     *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)     *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)     *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

**4.     Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party: --

(a)     *Furnish Specified Information*. It will deliver to the other party any forms, documents or certificates specified in the Schedule or any Confirmation by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)     *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)     *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform it obligations under this Agreement or any Credit Support Document to which it is a party.

**5.     Events of Default and Termination Events**

(a)     *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party: --

(i) *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii) *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) or to give notice of a Termination Event) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii) *Credit Support Default*.

(1)  Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)  the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)  the party of such Credit Support Provider Disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity, of such Credit Support Document;

(iv)  *Misrepresentation*.  A representation made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)  *Default under Specified Transaction*.  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)  *Cross Default*.  If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii)  *Bankruptcy*.  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: --

(1)  is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant

**TD Banknorth**

TD Banknorth, N.A.
Derivative Products

to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii)  *Merger Without Assumption*.  The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: --

(1)  the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)  the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)  *Termination Events*.  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, and if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (ii) below or an Additional Termination Event if the event is specified pursuant to (iii) below: --

(i)  *Illegality*.  Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b) for such party (which will be the Affected Party): --

(1)  to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)  to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction.

(ii)  *Credit Event Upon Merger*.  If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the credit worthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(iii)  *Additional Termination Event*.  If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

ISDA®1992
Second Printing

**ID Banknorth**

(c)    ***Event of Default and Illegality***.  If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

**6.**    **Early Termination**

(a)    ***Right to Terminate Following Event of Default***.  If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions.  If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    ***Right to Terminate Following Termination Event***.

(i) ***Notice***.  If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii) ***Two Affected Parties***.  If an Illegality under Section 5(b)(i)(1) occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iii) ***Right to Terminate***.  If: --

(1)  an agreement under Section 6(b)(ii) has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)  an Illegality other than that referred to in Section 6(b)(ii), a Credit Event Upon Merger or an Additional Termination Event occurs,

either party in the case of an Illegality, any Affected Party in the case of an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    ***Effect of Designation***.

(i)  If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)  Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(d) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement.  The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    ***Calculations***.

(i)  ***Statement***.  On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid.  In

the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)  *Payment Date*.  An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event).  Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment), from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate.  Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)      *Payments on Early Termination*.  If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method".  If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply.  The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)  *Events of Default*.  If the Early Termination Date results from an Event of Default: --

(1)  *First Method and Market Quotation*.  If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party over (B) the Unpaid Amounts owing to the Defaulting Party.

(2)  *First Method and Loss*.  If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)  *Second Method and Market Quotation*.  If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect to the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party.  If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss*.  If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement.  If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  *Termination Events*.  If the Early Termination Date results from Termination Event: --

(1)  *One Affected Party*.  If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties*.  If there are two Affected Parties: --

**ID Banknorth**

(A)  if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (1) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Unpaid Amounts owing to X less (II) the Unpaid Amounts owing to Y; and

(B)  if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  *Adjustment for Bankruptcy*.  In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  *Pre-Estimate*.  The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty.  Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7.    Transfer

Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: --

(a)     a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)     a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8.    Miscellaneous

(a)     *Entire Agreement*.  This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)     *Amendments*.  No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)     *Survival of Obligations*.  Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)     *Remedies Cumulative*.  Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)     *Counterparts and Confirmations*.

ISDA®1992
Second Printing

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)     *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)     *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

## 9.     Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 10.     Notices

(a)     *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated: --

(i)   if in writing and delivered in person or by courier, on the date it is delivered;

(ii)  if sent by telex, on the date the recipient's answerback is received;

(iii)  if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)  if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)  if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)     *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 11.     Governing Law and Jurisdiction

(a)     *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)     *Jurisdiction*.    With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably: --

**TD Banknorth**

TD Banknorth, N.A.
Derivative Products

(i) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in its Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)     **Waiver of Immunities**. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdictions of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

**12.     Definitions**

As used in this Agreement: --

"**Additional Termination Event**" has the meaning specified in Section 5(b).

"**Affected Party**" has the meaning specified in Section 5(b).

"**Affected Transactions**" means (a) with respect to any Termination Event consisting of an Illegality, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

"**Affiliate**" means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"**Applicable Rate**" means: --

(a)     in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)     in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)     in respect of all other obligations payable or deliverable (or which would have been but for

Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)     in all other cases, the Termination Rate.

"**consent**" includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

"**Credit Event Upon Merger**" has the meaning specified in Section 5(b).

"**Credit Support Document**" means any agreement or instrument that is specified as such in this Agreement.

"**Credit Support Provider**" has the meaning specified in the Schedule.

**ISDA®1992**
Second Printing

**TD Banknorth**

"**Default Rate**" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

"**Defaulting Party**" has the meanings specified in Section 6(a).

"**Early Termination Date**" means the date determined in accordance with Section 6(a) or 6(b)(iii).

"**Event of Default**" has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

"**Illegality**" has the meaning specified in Section 5(b).

"**law**" includes any treaty, law, rule or regulation and "**lawful**" or "**unlawful**" will be construed accordingly.

"**Local Business Day**" means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

"**Loss**" means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 9. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

"**Market Quotation**" means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided,

**ID Banknorth**

the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

"*Non-default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

"*Non-defaulting Party*" has the meaning specified in Section 6(a).

"*Potential Event of Default*" means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"*Reference Market-makers*" means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding where to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

"*Scheduled Payment Date*" means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

"*Set-off*" means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payers.

"*Settlement Amount*" means, with respect to a party and any Early Termination Date, the sum of: --

(a)     the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)     such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

"*Specified Entity*" has the meaning specified in the Schedule.

"*Specified Indebtedness*" means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

"*Specified Transaction*" means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

"*Terminated Transactions*" means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination applies, immediately before that Early Termination Date).

"*Termination Event*" means an Illegality or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

ISDA®1992
Second Printing

Book: 743 Page: 398 Page: 38 of 46

 **Banknorth**

TD Banknorth, N.A.
Derivative Products

"**Termination Rate**" means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

"**Unpaid Amounts**" owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective date specified below with effect from the date specified on the first page of this document.

| TD BANKNORTH, N.A. | GRIST MILL PARTNERS, LLC |
|---|---|
| (Name of party) | (Name of Party) |

By: Caroline Financial Group, ±±± ±±±
Its: Managing Member

By: /S/                          By: /S/

Name:  David G. Strouse          Name:  Daniel E. Carpenter

Title:  Vice President           Title:  Chairman

Date:                            Date:

13

**ISDA®1992**
Second Printing

**ID Banknorth**

TD Banknorth, N.A.<br>Derivative Products

# SCHEDULE
to the

# ISDA MASTER AGREEMENT

This is the Schedule to that certain ISDA Master Agreement dated as of August 30, 2007 between TD Banknorth, N.A., a national banking association under the laws of the United States ("Party A") and Grist Mill Partners, LLC, a Delaware limited liability company ("Party B").

## PART 1

### Termination Provisions

(A)     "Specified Entity" means in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v) | Affiliates |
| Section 5(a)(vi) | Not Applicable |
| Section 5(a)(vii) | Not Applicable |
| Section 5(b)(ii) | Not Applicable |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v) | Affiliates |
| Section 5(a)(vi) | Affiliates |
| Section 5(a)(vii) | Affiliates |
| Section 5(b)(ii) | Affiliates |

(B)     "Specified Transaction" will have the meaning specified in Section 12 of this Agreement. For purposes of Section 5(a)(v) of the Agreement, the definition of "Specified Transaction" in Section 12 of the Agreement shall be amended by adding ", repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, agreement for the purchase, sale or transfer of any Commodity or any other commodity trading transaction" after the words "currency option" in the eighth line thereof. For this purpose, the term "Commodity" means any tangible or intangible commodity of any type or description (including, without limitation, petroleum, natural gas, natural gas liquids, and byproducts thereof).

(C)     The "Cross-Default" provisions of Section 5(a)(vi) of this Agreement will apply to Party A and to Party B but shall exclude any default that results solely from wire transfer difficulties or an error or omission of an administrative or operational nature (so long as sufficient funds are available to the relevant party on the relevant date), but only if payment is made within three Business Days after such transfer difficulties have been corrected or the error or omission has been discovered.

"Specified Indebtedness" will have the meaning specified in Section 12 and shall include, with respect to Party B, any obligation (whether present or future, contingent or otherwise) for the payment or repayment of money, including, without limitation, any obligation or indebtedness owed by Party B to Party A; and with respect to Party A such term shall not include obligations in respect of deposits received in the ordinary course of Party A's banking business.

"Threshold Amount" means with respect to Party A, 3% of Shareholders' Equity and with respect to Party B, any amount with respect to Specified Indebtedness.

"Shareholders' Equity" means, with respect to an entity, at any time, the sum (as shown in its most recent annual audited financial statements) of (i) its capital stock (including preferred stock

14

**TD Banknorth**

TD Banknorth, N.A.
Derivative Products

outstanding), taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles.

(D)     The "Credit Event Upon Merger" provisions of Section 5(b)(ii) of this Agreement will apply to Party A and to Party B.

(E)     The "Automatic Early Termination" provision of Section 6(a) of this Agreement will not apply to Party A or to Party B.

(F)     Payments on Early Termination.  For the purpose of Section 6(e) of this Agreement:  (i) Loss will apply and (ii) Second Method will apply.

(G)     Additional Termination Event will apply.  Each of the following shall constitute an Additional Termination Event for which Party B shall be the sole Affected Party:

(a) Party B has repaid all amounts owed to Party A under that $3,200,000.00 Promissory Note dated of or near even date herewith (as amended, supplemented or modified the "Note") and Party A has no further obligation to provide any additional credit extension to Party B under the Note, (b) the Note is terminated or otherwise ceases to be in effect, or (c) Party A for any reason ceases to be a lender thereunder.

### PART 2

### Agreement to Deliver Documents

For the purposes of Section 4(a) of this Agreement, the parties agree that the following documents will be delivered:

| Party Required to Deliver Document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B | Operating Agreement and certificate of Manager/Managing Member authorizing the execution, delivery and performance of this Agreement and each Confirmation | Concurrent with the execution of this Agreement and upon request with respect to Confirmations | Yes |
| Party B | Specimen signature(s) of Manager(s)/Managing Member(s) authorized on behalf of the party to execute and deliver this Agreement and each Confirmation | Concurrent with the execution of this Agreement and upon request with respect to Confirmations | Yes |
| Party B | An opinion of counsel to Party B in a form satisfactory to Party A | Concurrent with the execution of this Agreement | No |
| Party B and Party A | The Credit Support document(s), if any, listed in Part 3, Section (C) | Concurrent with the execution of this Agreement | Yes |
| Party B | IRS Form W-9, or any successor form thereto | Concurrent with the execution of this Agreement, promptly upon reasonable demand by Party A and promptly upon learning that any such form previously provided by | Yes |

15

 **Banknorth**

| Party Required to Deliver Document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | | Party B has become obsolete or incorrect. | |
| Party B | Such other documents as Party A may reasonably request in connection with each transaction. | Promptly upon request. | Yes |

**PART 3**

**Miscellaneous**

(A)   <u>Addresses for Notices</u>.  For the purpose of Section 10(a) of this Agreement:

Address for notices or communications to Party B:

Address:   Grist Mill Partners, LLC
100 Grist Mill Road
Simsbury, CT  06070
Fax No.:  To be provided
Phone No.:  To be provided
Attention:  Daniel E. Carpenter

Address for notices or communications to Party A:

Address:   TD Banknorth, N.A.
511 Congress Street
Portland, ME  04101
Fax No.:  (207) 756-6885
Phone No.:  (207) 756-6895
Attention:  Derivatives Documentation Group

(B)   <u>Calculation Agent</u>.  The Calculation Agent is Party A.  No failure by Party A to perform any duties of the Calculation Agent under this Agreement shall be construed as an Event of Default under this Agreement.

(C)   <u>Credit Support Document</u>.

Credit Support Document means, in relation to Party A:  Not applicable.

Credit Support Document means, in relation to Party B:  Any agreement and instrument, now or hereafter existing, of any kind or nature which secures, guarantees or otherwise provides direct or indirect assurance of payment or performance of any existing or future obligation of Party B under this Agreement, made by or on behalf of any person or entity (including, without limiting the generality of the foregoing, any credit or loan agreement, note, reimbursement agreement, security agreement, mortgage, pledge agreement, assignment of rents or any other agreement or instrument granting any lien, security interest, assignment, charge or encumbrance to secure any such obligation, any guaranty, suretyship, letter of credit or subordination agreement relating to any such obligation and any "keep well" or other financial support agreement relating to Party B or any Credit Support Provider), in favor of Party A or any of its Affiliates, including, without limitation, the following documents:

(i) the Note, and

**TD Banknorth**

TD Banknorth, N.A.
Derivative Products

(ii)  the Mortgage Deed and Security Agreement between Party A and Party B dated of or near even date herewith, as the same may be amended, supplemented, modified, renewed, replaced, consolidated, substituted or extended from time to time.

Party B agrees that the collateral securing the obligations of Party B to Party A described in the Credit Support Document(s) shall also secure the obligations of Party B to Party A under this Agreement, whether now existing or incurred hereafter, and such collateral shall enjoy the same priority as any security granted to secure senior indebtedness of Party B.  The obligations of Party B to Party A under this Agreement shall rank pari-passu with all other obligations described in the Credit Support Document(s).

The covenants, terms and provisions of, including all representations and warranties of Party B contained in the Note, as in effect as of the date of this Agreement, are hereby incorporated by reference in, and made part of, this Agreement to the same extent as if such covenants, terms, and provisions were set forth in full herein.  In the event of any inconsistency between the covenants, terms and provisions of the Note and this Agreement, the covenants, terms, and provisions of this Agreement shall govern.  Party B hereby agrees that, during the period commencing with the date of this Agreement through and including such date on which all of Party B's obligations under this Agreement are fully performed, Party B will (a) observe, perform, and fulfill each and every such covenant, term, and provision applicable to Party B, as such covenants, terms, and provisions, may be amended from time to time after the date of this Agreement with the consent of Party A, and (b) deliver to Party A at the address for notices to Party A provided in this agreement, each notice, document, certificate or other writing that Party B *is obligated to furnish to any other party to the Note.* Subject to Part 1(G)(i) of this Schedule, in the event the Note terminates or becomes no longer binding on Party A prior to the termination of this Agreement and any Transactions outstanding hereunder, such covenants, terms, and provisions (other than those requiring payments in respect of amounts owned under the Note) will remain in force and effect for purposes of this Agreement as though set forth in full herein until the date on which all of Party B's obligations under this Agreement are fully performed and this Agreement is terminated.

    (D)    Credit Support Provider.

Credit Support Provider means in relation to Party A: None.

Credit Support Provider means in relation to Party B:  Any person or entity (other than Party B), that now or hereafter secures, guarantees or otherwise provides assurance of payment or performance of any existing or future obligation of Party B under this Agreement or any Credit Support Document, including but not limited to, the following persons and/or entities: Daniel E. Carpenter.

    (E)    Governing Law.  This Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrine.

    (F)    Netting of Payments.  Subparagraph (ii) of Section 2(c) of this Agreement will apply to the Transactions.

    (G)    "Affiliate" will have the meaning specified in Section 12 of this Agreement and shall exclude any broker/dealer affiliates with respect to Party A.

## PART 4

### Other Provisions

    (A)    Confirmations.  Notwithstanding anything to the contrary in this Agreement:

(i)  The parties hereto agree that with respect to each Transaction hereunder a legally binding agreement shall exist from the moment that the parties hereto agree on the essential terms of such Transaction, which the parties anticipate will occur by telephone.

**TD Banknorth**

(ii)  For each Transaction Party A and Party B agree to enter into hereunder, Party A shall promptly send to Party B a Confirmation setting forth the terms of such Transaction.  Party B shall execute and return the Confirmation to Party A or request correction of any error within three Business Days of receipt.  Failure of Party B to respond within such period shall not affect the validity or enforceability of such Transaction and shall be deemed to be an affirmation of such terms.

(B)  <u>Consent to Recording</u>.  Each party (i) consents to the recording of the telephone conversations of trading, marketing, and other relevant personnel of the parties in connection with this Agreement or any potential Transaction and (ii) agrees that such recording may be submitted in evidence to any court or in any proceedings with respect to this Agreement or any Transaction hereunder.

(C)  <u>Definitions</u>.  For each Transaction (unless otherwise specified in the relevant Confirmation for that Transaction) all provisions of the 2000 ISDA Definitions as published by the International Swaps & Derivatives Association, Inc. (formerly the International Swaps Dealers Association, Inc.), including the Annex to the 2000 ISDA Definitions (the "Definitions"), are hereby incorporated by this reference into this Agreement and shall form a part hereof as if set forth in full herein.  In the event of any inconsistency between the provisions of this Agreement and the Definitions, this Agreement will prevail.

Any reference to a:

(i)  "Swap Transaction" in the Definitions is deemed to be a reference to a "Transaction" for the purpose of interpreting this Agreement or any Confirmation; and

(ii)  "Transaction" in this Agreement or any Confirmation is deemed to be a reference to a "Swap Transaction" for the purpose of interpreting the Definitions.

(D)  <u>Notice of Event of Default</u>.  Each party agrees, upon learning of the occurrence of any event or commencement of any condition that constitutes (or that with the giving of notice or passage of time or both would constitute) an Event of Default with respect to that party, promptly to give the other party notice of such event or condition (or, in lieu of giving notice of such event or condition in the case of an event or condition that with the giving of notice or passage of time or both would constitute an Event of Default or Termination Event with respect to the party, to cause such event or condition to cease to exist before becoming an Event of Default or Termination Event).

(E)  <u>Additional Representations</u>.  Section 3 of this Agreement is hereby amended by adding at the end thereof the following subsections (e) through (i):

"(e)  *Eligible Contract Participant*.  It is an "eligible contract participant" as that term is defined in Section 1(a)(12) of the Commodity Exchange Act (7 U.S.C. 1(a)(12)) and was not formed solely for the purposes of constituting an "eligible contract participant.""

"(f)  *Line of Business*.  It has entered into this Agreement (including each Transaction evidenced hereby) in conjunction with its line of business (including financial intermediation services) or the financing of its business."

"(g)  *No Agency*.  It is entering into this Agreement, any Credit Support Document to which it is a party, each Transaction and any other documentation relating to this Agreement or any Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise)."

"(h)  *Creditworthiness*.  The economic terms of this Agreement, and Credit Support Document to which it is a party, and each Transaction have been individually tailored and negotiated by it, and the creditworthiness of the other party was a material consideration in its entering into or determining the terms of this Agreement, such Credit Support document, and such Transaction."

"(i)  Party B makes the following representation (which shall be deemed repeated on any date on which any Transactions under this Agreement are outstanding):

**TD Banknorth**

it is a limited liability company formed under the laws of the State of Delaware and agrees to provide Party A with an IRS Form W-9 (or successor form) upon execution and delivery of the Agreement; (ii) promptly upon reasonable demand by Party A; and (iii) promptly upon learning that any Form W-9 (or successor form) previously provided has become obsolete or incorrect."

    (F)    <u>Right of Setoff</u>.  Section 6 of this Agreement is amended by adding the following new Section 6(f):

    "(f)    ***Set-off.***  Any amount (the "Early Termination Amount") payable under Section 6(e) by one party ("Party X") to the other party that is either the Defaulting Party or the sole Affected Party in the case where a Termination Event under Section 5(b)(ii) or 5(b)(iii) has occurred ("Party Y"), will, at the option of Party X (and without prior notice to Party Y), be reduced by its set-off against any amount(s) (the "Other Agreement Amount") payable (whether at such time or in the future or upon the occurrence of a contingency) by Party Y to Party X (irrespective of the currency, place of payment or booking office of the obligation) under any other agreement(s) between Party X and Party Y or instrument(s) or undertaking(s) issued or executed by one party to, or in favor of, the other party (and the Other Agreement Amount will be discharged promptly and in all respects to the extent it is so set-off).  Party X will give notice to the other party of any set-off effected under this Section 6(f).

For this purpose, either the Early Termination Amount or the Other Agreement Amount (or the relevant portion of such amounts) may be converted by Party X into the currency in which the other is denominated at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the relevant currency.

If an obligation is unascertained, Party X may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section 6(f) shall be effective to create a charge or other security interest. This Section shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise)."

    (G)    <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of the Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.  The parties hereto shall endeavor in good faith negotiations to replace the prohibited or unenforceable provision with a valid provision, the economic effect of which comes as close as possible to that of the prohibited or unenforceable provision.

    (H)    <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY TRIAL OR LITIGATION ARISING OUT OF OR IN CONNECTION WITH ANY TRANSACTION OR THIS AGREEMENT.

    (I)    <u>No Reliance</u>.  In connection with the negotiation of and entering into this Agreement, any Credit Support Document and each Transaction (i) the other party hereto is not acting as a fiduciary or a financial or investment advisor for it; (ii) it is not relying upon any advice, counsel or representations (whether written or oral) of the other party hereto other than the representations expressly set forth in this Agreement, in such Credit Support Document and in any Confirmation; (iii) the other party hereto has not given to it any advice or counsel as to the expected or projected success, return, performance, result, consequence or benefit (either legal, regulatory, tax, financial, accounting, or otherwise) of this Agreement, such Credit Support Document or such Transaction; (iv) it has consulted with its own legal, regulatory, tax, business, investment financial and accounting advisors to the extent it has deemed necessary and has made its own investment, hedging, and trading decisions (including decisions regarding the suitability of such Transaction pursuant to

**TD Banknorth**

this Agreement) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the other party hereto; (v) it has determined that the rates, prices, or amounts and other terms of such Transaction in the indicative quotations (if any) provided by the other party hereto reflect those in the relevant market for similar transactions, and all trading decisions have been the result of arms length negotiations between the parties; (vi) it is entering into this Agreement, such Credit Support Document and such Transaction with a full understanding of all of the terms, conditions and risks thereof (economic and otherwise), and it is capable of assuming and willing to assume (financially and otherwise) those risks; and (vii) it is a sophisticated investor.

     (J)    Events of Default.  Section 5 of this Agreement is hereby amended as follows:

         (i)    Credit Support Default.  Section 5(a)(iii) of this Agreement is hereby amended by the addition of "or if there is no applicable grace period, one Local Business Day after notice of such failure is given to the party or Credit Support Provider (as the case may be)" after "elapsed" in the fourth line thereof.

         (ii)    Default under Specified Transaction.  Section 5(a)(v) of this Agreement is hereby amended by the substitution of "(or such default continues for at least one Local Business Day if there is no applicable notice requirement or grace period)" for the parenthetical clause in the seventh and eighth lines thereof.

     (K)    Escrow.  If by reason of the time difference between the cities in which payments are to be made or otherwise, it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may at its option and in its sole discretion notify the other party that payments on that date are to be made in escrow.  In this case deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instruction (i) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (ii) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it in escrow.  The party that elects to have payments made in escrow shall pay the costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not released by 5:00 p.m. local time on the date it is deposited for any reason other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

Signature page follows.

**Banknorth**

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**"Party A"**

TD BANKNORTH, N.A.

By: _____ /s/ _____

Name:  David G. Strouse
Its:  Vice President
Date: _____

**"Party B"**

GRIST MILL PARTNERS, LLC

By: Caroline Financial Group, LLC, Inc.
Its: Managing Member

By: _____ /s/ _____

Name:  Daniel E. Carpenter
Its:  Chairman
Date: _____

Received for Record at Simsbury, CT
On 08/30/2007 At 4:28:43 pm
Carolyn P. Kelly, Town Clerk

21

# Exhibit C

After recording, return to:
Brian R. Smith, Esquire
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103

Doc ID:   001732340004 Type: LAN
BK**870** PG**391-394**

## NOTICE OF LEASE

This instrument is a Notice of Lease pursuant to Section 47-19 of the Connecticut General Statutes. The statutory information is as follows:

1.  Parties to the Lease:

    (a)  The landlord is Grist Mill Partners, LLC ("Landlord"), a Delaware limited liability company having an address of 1-3 Mill Pond Lane, Simsbury, Connecticut 06070.

    (b)  The tenant is CuraLeaf, LLC ("Tenant"), a Connecticut limited liability company having an address of 145 Doubling Road, Greenwich, Connecticut 06830.

2.  Lease:

The Landlord and Tenant entered into a Lease with Option to Purchase dated as of February _11_, 2014 (the "Lease").

3.  Term of Lease:

The initial term of the Lease commences no later than August _11_, 2014 and terminates no later than August _11_, 2019.

4.  Leased Premises:

The premises leased to the Tenant pursuant to the Lease is that certain real property and the improvements thereon owned by Landlord situated in the Town of Simsbury and more particularly described on Exhibit A attached hereto and made a part hereof.

5.  Right of Renewal:

One (1) term of five (5) years.

6.  Option to Purchase:

The Tenant has the option to purchase the Leased Premises during a period of time commencing on the date set forth on the Lease and ending upon the earlier of the expiration or termination of the Lease, in accordance with the terms and conditions set forth in the Lease.

7.  Filing:

The Lease shall be on file at the offices of Tenant and Landlord set forth above.

SIGNATURE PAGE FOLLOWS

12736410-v1

In witness whereof, Landlord and Tenant have executed this Notice of Lease as of the February 11, 2014.

WITNESSES:

Richard C. Roberts

GRIST MILL PARTNERS, LLC
By Caroline Financial Group, Inc.
   Its Managing Member

By: _____
   Name: Matthew Westcott
   Title: President

Valerie Renee Morris-Harris
Matthew J. Guard, Jr.

CURALEAF, LLC

By: _____
   Name: Robert Birnbaum
   Title: Manager

STATE OF CONNECTICUT)
                    ) ss.: Simsbury
COUNTY OF Hartford )

On this 11th day of February, 2014, before me, the undersigned officer, personally appeared Matthew Westcott, President of Caroline Financial Group, Inc., Managing Member of Grist Mill Partners, LLC, a Delaware limited liability company, who acknowledged himself to be the person whose name is subscribed to the within instrument and acknowledged that he, being duly authorized to do so, executed the same as the President of the Managing Member of Grist Mill Partners, LLC for the purposes therein contained as his free act and deed and said limited liability company's free act and deed.

IN WITNESS WHEREOF, I hereunto set my hand and the official seal.



                            Commissioner of the Superior Court/Notary Public
                            My Commission Expires: 3-31-17

```
JASON J. CONCATELLI
Notary Public, State of Connecticut
My Commission Expires March 31, 2017
```

2

STATE OF CONNECTICUT)

COUNTY OF Hartford )
) ss.: Hartford

On this 11th day of February, 2014, before me, the undersigned officer, personally appeared Robert Birnbaum, Manager of CuraLeaf, LLC, a Connecticut limited liability company, who acknowledged himself to be the person whose name is subscribed to the within instrument and acknowledged that he, being duly authorized to do so, executed the same as the Manager of CuraLeaf, LLC for the purposes therein contained as his free act and deed and said limited liability company's free act and deed.

IN WITNESS WHEREOF, I hereunto set my hand and the official seal.

Commissioner of the Superior Court/Notary Public
My Commission Expires: 2/28/17

SHERRY STRICKLAND
NOTARY PUBLIC
MY COMMISSION EXPIRES FEB. 28, 2017

3

## EXHIBIT A

### LEGAL DESCRIPTION
### 100 GRISTMILL

That certain piece or parcel of land, with the improvements thereon and appurtenances thereto, known as No. 100 Grist Mill Road in the Town of Simsbury, County of Hartford, and State of Connecticut, being shown on a certain map or plan entitled "Resurvey Map Parcel 25 Land Owned by ENSIGN-BICKFORD REALTY CORPORATION formerly of Grist Mill Road Simsbury, Connecticut Sheets 1 of 2 and 2 of 2 Scale 1" = 40' November 1997 Hodge Surveying Associates, P. C. ... Francis A. Richard, L. S. - #13351", which map or plan is to be filed in the Office of the Simsbury Town Clerk, reference to which is hereby made, and being more particularly bounded and described as follows:

Beginning at a point on the easterly streetline of Grist Mill Road said point being the southwesterly corner of the herein described parcel, thence in a northerly direction along the easterly streetline of Grist Mill Road along a curve to the left having a radius of 2182.68 feet, a distance of 50.49 feet to a point; thence S 89°-14'- 42" E a distance of 182.33 feet to a point; thence N 65° - 28'- 04" E a distance of 280.59 feet to a point; thence N 2° - 44'- 27" W a distance of 160.70 feet to a point; thence N 79° - 06'- 32" E a distance of 120.00 feet to a point; thence N 10° - 15' - 04" E a distance of 151.05 feet to a point; thence S 72° - 27'- 29" E a distance of 275.05 feet to a point; thence S 77° - 04'- 33" E a distance of 80.16 feet to a point; thence N 42° - 44'- 29" E a distance of 405.00 feet to a point in the center of Hop Brook; thence south 52°-58'-15" E, a distance of 341.25 feet to a point; thence S 10° - 58'- 40" W a distance of 14.00 feet to a point; thence N 73° - 55'- 26" W a distance of 205.35 feet to a point; thence S 3° - 39'- 30" W a distance of 304.99 feet to a point; thence S 6° - 21'- 18" W a distance of 261.31 feet to a point; thence N 78 °- 35'- 13" W a distance of 770.84 feet to a point; thence S 65° - 28'- 04" W a distance of 291.81 feet to a point; thence N 89° -14'-42" W a distance of 186.50 feet to the point and place of beginning."

TOGETHER WITH an easement, in common with others, for ingress and egress across Grist Mill Road, so called, being a strip of land approximately sixty feet in width and more particularly bounded and described as set forth on Schedule A-1 attached hereto and made a part hereof, for all purposes for which a public road may be used, until such time as said Grist Mill Road shall be accepted as a public road.

TOGETHER WITH all right, title and interest, if any, arising under that certain Declaration of Easements, Covenants, and Restrictions for The Powder Forest Business Park dated December 2, 1983 and recorded December 9, 1983, in Volume 271, Page 546 of the Simsbury Land Records as amended by Amended and Restated Declaration of Easements, Covenants and Restriction for The Powder Forest Business Park dated December 8, 1997, and recorded in Volume 479 at Page 795 of the said Land Records.

Received for Record at Simsbury, CT
On 08/20/2001 At 4:23:43 pm