## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNIVERSITAS EDUCATION, LLC<br><br>        Plaintiff,<br><br>v.<br><br>BENISTAR, GRIST MILL PARTNERS, LLC, ALLIANCE CHARITABE TRUST, PHOENIX CHARITABLE TRUST, ATLANTIC CHARITABLE TRUST, AVON CHARITABLE TRUST, CARPENTER CHARITABLE TRUST, MOLLY CARPENTER, CAROLINE MECKEL, STEVEN MECKEL, 1 & 3 MILL POND PARTNERS, LLC, SEIR HILL PARTNERS, LLC, GREYHOUND PARTNERS, LLC, BIRCH HILL PARTNERS, LLC, JANE DOE ENTITIES UNDER CONTROL OF MOLLY CARPENTER, AND JANE DOE ENTITIES UNDER CONTROL OF JUDGMENT DEBTORS<br><br>        Defendants. | CIVIL ACTION NO. 3:20-cv-738-JAM<br><br><br>_____, 2021 |

## FIRST AMENDED COMPLAINT

Plaintiff Universitas Education, LLC ("Universitas") through the undersigned counsel, hereby files this First Amended Complaint and alleges as follows:

### PARTIES

1.      Universitas is a limited liability company with its primary place of business at 404 East 55th Street, New York, NY. All of Universitas' members are citizens of New York.

2.      Upon information and belief Grist Mill Partners, LLC ("GM Partners") is a Delaware limited liability company with its primary place of business at 35 Tower Lane, Avon, CT. GM Partners' members are citizens of Connecticut and Delaware.

3.     Upon information and belief 1 & 3 Mill Pond Partners, LLC ("Mill Pond") is a Delaware limited liability company with its principal place of business at 35 Tower Lane, Avon, CT. Mill Pond's members are citizens of Connecticut and Delaware.

4.     Upon information and belief Seir Hill Partners, LLC ("Seir Hill") is a Connecticut limited liability company with its principal place of business at 10 Tower Lane, Avon, CT. Seir Hill's members are citizens of Connecticut and Delaware.

5.     Upon information and belief Greyhound Partners, LLC ("Greyhound") is a Connecticut limited liability company with its principal place of business at 10 Tower Lane, Avon, CT. Greyhound's sole member is a citizen of Connecticut.

6.     Upon information and belief Birch Hill Partners, LLC ("Birch Hill") is a Connecticut limited liability company with its principal place of business at 35 Tower Lane, Avon, CT. Birch Hill's sole member is a citizen of Delaware.

7.     Upon information and belief Alliance Charitable Trust (a/k/a Alliance Charitable Remainder Trust and/or Alliance Trust) is a Delaware Trust with its principal place of business at 10 Tower Lane, Avon, CT. The trustee is a citizen of Connecticut. Upon information and belief there are numerous Alliance Charitable Trusts, all of which are citizens of Connecticut.

8.     Upon information and belief Phoenix Charitable Trust (a/k/a Phoenix Charitable Remainder Trust and/or Phoenix Trust) is a Delaware Trust with its principal place of business at 10 Tower Lane, Avon, CT. The trustee is a citizen of Connecticut. Upon information and belief there are numerous Phoenix Charitable Trusts, all of which are citizens of Connecticut.

9.     Upon information and belief Atlantic Charitable Trust (a/k/a Atlantic Charitable Remainder Trust and/or Atlantic Trust) is a Delaware Trust with its principal place of business at

10 Tower Lane, Avon, CT. The trustee is a citizen of Connecticut. Upon information and belief there are numerous Atlantic Charitable Trusts, all of which are citizens of Connecticut.

10.     Upon information and belief Avon Charitable Trust (a/k/a Avon Charitable Remainder Trust and/or Avon Trust) is a Delaware Trust with its principal place of business at 10 Tower Lane, Avon, CT. The trustee is a citizen of Connecticut. Upon information and belief there are numerous Avon Charitable Trusts, all of which are citizens of Connecticut.

11.     Upon information and belief Carpenter Charitable Trust (a/k/a Carpenter Charitable Remainder Trust, Carpenter Charitable Remainder Unitrust, Carpenter Trust, Daniel E. Carpenter Trust, Carpenter Family Trust, and/or Daniel E. Carpenter Charitable Remainder Trust) is a Delaware Trust with its principal place of business at 10 Tower Lane, Avon, CT. The trustee is a citizen of Connecticut. Upon information and belief there are numerous Carpenter Charitable Trusts, all of which are citizens of Connecticut.

12.     Upon information and belief, Molly Carpenter is an individual with her principal place of residence at 18 Pondside Lane, West Simsbury, Connecticut.

13.     Upon information and belief Caroline Meckel is an individual with her principal place of residence at 41 Church Street, Tariffville, Connecticut.

14.     Upon information and belief Steven Meckel is an individual with his principal place of residence at 41 Church Street, Tariffville, Connecticut

## JURISDICTION AND VENUE

15.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Universitas and Defendants are citizens of different states, and the amount in controversy exceeds $75,000.

16.     Venue in this district is proper pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to these claims occurred in this district, and alternatively, because Defendants are subject to this Court's personal jurisdiction.

<u>INTRODUCTION</u>

17.     This is an action to enforce a judgment entered in the United States District Court for Southern District of New York.

18.     This case revolves around convicted felon Daniel Carpenter, a prolific fraudster who has been convicted on seventy-six felony counts including, *inter alia*, the theft of $30 million from Universitas.

19.     Mr. Carpenter developed an extensive criminal network to facilitate his criminal activity and fraudulent behavior. This network is comprised of Judgment Debtors, Defendants, and numerous additional entities and persons. This network collectively constitutes a single economic entity known as "Benistar."

20.     Benistar is controlled by, *inter alia*, Daniel Carpenter and Molly Carpenter. Benistar is operated for the personal financial benefit of, *inter alia*, these two persons.

21.     The underlying litigation involved the fraudulent transfer and criminal usage of $30 million rightfully belonging to Universitas. This money was wrongfully taken from Universitas and used to purchase life insurance portfolios, a luxury vacation property for Daniel and Molly Carpenter, provide cash payments to members of the Benistar criminal organization, and to further Benistar's criminal activity and fraudulent behavior.

22.     Universitas has spent over a decade seeking to recover its criminally misappropriated money. Benistar has obstructed such recovery through fraud, perjury, obstruction of justice, and other wrongful acts.

23.     Universitas' Judgment remains largely unpaid. Through numerous years of post-judgment discovery Universitas has identified entities and persons within the Benistar criminal enterprise with assets capable of satisfying Universitas' judgment, in whole or in part. These entities and persons are the named Defendants in this suit.

24.     The Defendants have helped Daniel Carpenter to conceal assets with the intent to hinder, delay, and/or defraud Universitas and other creditors.

<u>FACTUAL BACKGROUND</u>

25.     Universitas is the research and development arm of its subsidiary, Destination Universitas Foundation, a charitable foundation dedicated to promoting global philanthropy and wellness. Universitas has plans to develop holistic wellness programs for leaders to support global philanthropic and humanitarian efforts – plans that have been largely frustrated by convicted felon Daniel Carpenter, his wife Molly Carpenter, and the Benistar criminal enterprise.

26.     In 2007, Universitas began development of a sanctuary for global leaders to gather and recharge during multi-day retreats.

27.     Within a year, the project was receiving international attention and exposure. Universitas executed a letter of intent for the purchase of a property at Lake Las Vegas in Henderson, Nevada, solicited design proposals, completed a strategic development plan, and was in the process of completing a strategic development plan and funding proposal.

28.     The major contributor to the project was Sash Spencer. Mr. Spencer chaired a private investment firm and was a financial partner to Universitas. Mr. Spencer named Universitas the sole irrevocable beneficiary of two life insurance policies worth $30 million in his retirement plan.

29. Mr. Spencer's life insurance policies were owned and managed by the Charter Oak Trust ("COT"). COT was purportedly an employer welfare benefit plan operating under Section 419 of the Internal Revenue Code. COT was obligated to pay the proceeds from Mr. Spencer's life insurance policies to Universitas upon Mr. Spencer's death.

30. COT was managed by Nova Group, Inc. ("Nova Group"). Nova Group was the trustee, sponsor, and administrator of COT.

31. Both COT and Nova Group operated from offices at 100 Grist Mill Road in Simsbury, CT and used the phone number 860-408-7000.

32. Daniel Carpenter controlled both Nova Group and COT.

33. Mr. Spencer unexpectedly died in June 2008.

34. On or about July 7, 2008 the COT Declaration of Trust ("Trust Document") was fraudulently altered by Daniel Carpenter, with, upon information and belief, the full knowledge of Molly Carpenter, to provide for a holdback provision permitting COT to retain twenty percent of Mr. Spencer's life insurance proceeds. This alteration was performed for the sole purpose of enabling COT to improperly keep twenty percent of the Spencer death benefits which rightfully belonged to Universitas.

35. The Trust Document required all changes to be approved by the insurance trustee – Christiana Bank, which was later acquired by WSFS Financial Corporation ("WSFS"). It was conceded in a subsequent proceeding that the insurance trustee did not approve this fraudulent change in the Trust Document.

36. COT received the Spencer life insurance proceeds on or about May 18, 2009 and disbursed $10.8 million of these proceeds within eight days. The Southern District of New York found the conveyances comprising the $10.8 million disbursal to be fraudulent transfers.

37. Universitas promptly filed a claim for the Spencer life insurance proceeds – Nova Group denied Universitas' claim on fraudulent grounds and refused to transfer the Spencer death benefits to Universitas.

38. Universitas promptly appealed the denial of its claim, and Nova Group denied Universitas' appeal on fraudulent grounds. COT disbursed the remaining Spencer death benefits to entities owned and controlled by Daniel Carpenter during the appeal. The Southern District of New York found this disbursal to be a fraudulent transfer.

39. On or about June 17, 2010 Universitas commenced arbitration against Nova Group and its affiliates to recover the Spencer death benefits.

40. On or about November 18, 2010 Mr. Carpenter sent an email notifying his associate that he intended to submit falsified evidence to the arbitrator unless his associate objected. Upon information and belief, the evidence was altered to make it appear as though the twenty percent holdback provision was added to the Trust Document prior to the acquisition of the second Spencer life insurance policy.

41. Mr. Carpenter's associate did not object to the submission of falsified evidence and the falsified evidence was provided to the arbitrator.

42. Nova Group's representative falsely testified during the arbitration proceedings to corroborate this falsified evidence.

43. Throughout the arbitration Nova Group representatives submitted multiple sworn statements indicating that Nova Group was capable of satisfying an award in Universitas' favor. These statements were false – the Spencer death benefits were fraudulently disbursed before the arbitration commenced.

44.     During the arbitration Universitas sought discovery from Ridgewood Finance, Inc. ("Ridgewood"). On or about December 6, 2010 Daniel Carpenter emailed Ridgewood and threatened it against compliance with Universitas' subpoena. On or about December 7, 2010 Nova Group's general counsel emailed Ridgewood and threatened against compliance with Universitas' subpoena.

45.     On or about January 24, 2011 the arbitrator found that Nova Group breached its fiduciary duty to Universitas by denying Universitas' claim to the Spencer death benefits on fraudulent grounds and further found that Universitas was entitled to $25.7 million of the Spencer insurance proceeds. In addition to awarding COT certain costs and fees to COT, the arbitrator erroneously applied the twenty percent holdback provision to the proceeds from Mr. Spencer's second life insurance policy thereby wrongfully awarding COT $4.02 million of the Spencer death benefits. The arbitrator further found that Universitas was entitled to attorneys' fees and costs and entered a total award in favor of Universitas and against Nova Group in the amount of $26.5 million.

46.     Nova Group subsequently informed the arbitration tribunal that it refused to comply with the arbitrator's decision and that it would not transfer the Spencer death benefits to Universitas.

47.     Universitas then sought post-judgment discovery from TD Bank, N.A. ("TD Bank"). On or about April 13, 2011 Nova Group's general counsel sent a letter to TD Bank threatening against compliance with Universitas' subpoena.

48.     On or about June 5, 2012 the Southern District of New York confirmed the arbitration award and interest thereon from January 24, 2011, at the rate of ten percent per annum, for a total outstanding judgment of $30,181,880.30.

49. Nova Group subsequently moved to dismiss the case for lack of subject matter jurisdiction. Nova Group's brief stated that COT's insurance trustee was M&T Bank and argued that there was not complete diversity because M&T Bank and Universitas were both citizens of New York. However, M&T Bank was not COT's insurance trustee – Christiana Bank was. Nova Group knowingly and purposefully provided false information concerning the identity of the insurance trustee in order to deceive Universitas and misdirect post-judgment discovery efforts.

50. Nova Group continued to file motions constituting "bad faith" litigation tactics and warranting sanctions under Rule 11 of the Federal Rules of Civil Procedure. Eleven of Nova Group's motions were ultimately found sanctionable. One such motion was a second motion to dismiss for lack of subject matter jurisdiction predicated on demonstrably false facts. The Southern District of New York warned Nova Group in advance that this motion was meritless and sanctionable – Nova Group filed the motion anyway and appealed the court's denial of the motion.

51. The Southern District of New York noted that Nova Group's "litigation strategy [was] motivated not by legal merit, but rather by dilatory purposes." Upon information and belief, Nova Group's diversionary, dilatory, and bad faith litigation tactics were intended to delay litigation, increase Universitas' legal fees, and hinder Universitas' collection efforts.

52. On or about August 30, 2012 Nova Group sent a letter to Universitas stating that Nova Group "will not be providing responses or documents" in accordance with court ordered discovery. The Southern District of New York found, *inter alia*, Daniel Carpenter in contempt of court for this refusal to comply with court ordered discovery.

53. Universitas again sought post-judgment discovery from TD Bank. On or about September 28, 2012 Mr. Carpenter and his attorneys sent letters to TD Bank threatening against compliance with Universitas' subpoena. The Southern District of New York *sua sponte* suggested

that Mr. Carpenter's actions likely constituted felony witness intimidation and obstruction of justice.

54.     After finally receiving document production from TD Bank, Universitas filed a turnover application against the recipients of the fraudulently disbursed Spencer death benefits. On or about February 26, 2013 Daniel Carpenter sent an email to Universitas' counsel threatening against proceeding with this turnover motion.

55.     As part of the turnover proceedings the court issued an injunction enjoining Mr. Carpenter and his entities from transferring assets and explicitly directed that settlement proceeds payable to Mr. Carpenter be held in escrow pending determination of the turnover application.

56.     On or about May 1, 2014 Mr. Carpenter sent his attorneys an email instructing them to ignore the court order and pay him the settlement money. Mr. Carpenter fired his attorneys when they refused to do so.

57.     On or about May 1, 2014 Mr. Carpenter sent an email to his settlement counterparty stating that the attorneys insisting that the settlement payment be held in escrow no longer represented him and thus had no authority over the proceeds. Mr. Carpenter demanded that the settlement counterparty make payment to BPETCO Litigation Group, LLC, an entity under Mr. Carpenter's control, and threatened against defiance of his demands.

58.     On or about August 7, 2014, the Southern District of New York found the recipients of the fraudulently transferred Spencer death benefits to be jointly and severally liable for Universitas' judgment. The Southern District of New York found the following parties liable for the corresponding amounts:

- Daniel E. Carpenter - $30,600,000.00

- Grist Mill Capital, LLC - $30,600,000.00

- Grist Mill Holdings, LLC - $21,000,000.00

- Carpenter Financial Group - $11,140,000.00

- Avon Capital, LLC - $6,710,065.92

- Phoenix Capital Management, LLC - $5,000,000.00

- Grist Mill Trust Welfare Benefit Plan, and any trustees and plan sponsors thereof insofar as they hold Grist Mill Trust assets - $4,487,007.81

- Hanover Trust Company - $1,200,000.00

59.	On or about August 12, 2014 the Southern District of New York entered judgement against these Judgment Debtors.

60.	The Southern District of New York also found that Nova Group is liable for the entirety of Universitas' attorneys' fees throughout all post-judgment collection efforts. This finding was based on the COT Trust Document, which provides that the non-prevailing party shall pay all costs of the prevailing party, including attorneys' fees and costs.

61.	All of the Judgment Debtors operated from 100 Grist Mill Road and used the phone number 860-408-7000.

62.	Mr. Carpenter controlled all of the Judgment Debtors.

63.	Daniel Carpenter was criminally prosecuted in the District of Connecticut for his role with COT and Nova Group. Mr. Carpenter was charged with thirty-two counts of mail and wire fraud, ten counts of money laundering, thirteen counts of illegal monetary transactions, conspiracy to commit money laundering, and conspiracy to commit mail and wire fraud. All of the charges for money laundering and illegal monetary transactions in Mr. Carpenter's indictment were predicated upon the fraudulent disbursal and improper use of the Spencer death benefits.

64.     Mr. Carpenter was found guilty on all fifty-seven counts in his indictment. The District of Connecticut's findings support the Southern District of New York's findings, and further detail the fraudulent and criminal behavior of Mr. Carpenter and his associates.

65.     The District of Connecticut also found that Mr. Carpenter's testimony in the Universitas litigation was false, self-serving, perjurious, and constituted obstruction of justice.

66.     Over the course of post-judgment discovery and other related proceedings, Universitas has learned of various fraudulent transfers by the Judgment Debtors and additional facts showing that the Judgment Debtors and the Defendants in this action have disregarded their separate existence to the harm and detriment of Universitas, making each of the Defendants jointly and severally liable for the amount remaining unpaid under the judgment.

67.     Upon information and belief, Daniel Carpenter and Molly Carpenter, *inter alia*, control and own – directly or indirectly – all Defendants and Judgment Debtors. Upon information and belief, Daniel Carpenter, and Molly Carpenter, *inter alia*, used their pervasive control over the Judgment Debtors and Defendants to conduct the frauds and other criminal conduct for which the Judgment Debtors have been found liable, including actions to the detriment of Universitas.

68.     Defendants caused certain Judgment Debtors to fraudulently divest assets in order to preserve value for Benistar and to prevent lawful collection by Universitas. Such transfers violated the Connecticut Uniform Fraudulent Transfer Act, Conn. Gen. Stat. Section 522-552a (the "CUFTA"). These fraudulent transfers were undertaken for the personal benefit of, *inter alia*, Mr. Carpenter and Mrs. Carpenter, and to the detriment of Universitas.

69.     The Southern District of New York found that Daniel Carpenter knew that Universitas was asserting its right to the Spencer insurance proceeds (and considering litigation)

by May of 2009, and that he caused the Judgment Debtors to fraudulently transfer the Spencer insurance proceeds with knowledge of pending litigation concerning these funds.

70.     Judgment Debtors and Defendants continued to transfer Spencer death benefits with an actual intent to hinder, delay, defraud, and otherwise prevent Universitas from enforcing its judgment after Universitas issued restraining notices prohibiting such transfers. The Southern District of New York stated that "Mr. Carpenter's entities have continued to seek to transfer assets from the judgment-debtor to [non judgment-debtor Benistar entities], despite the Judgment and the service of restraining notices."

71.     On or about March 29, 2013 Nova Group instructed a third party insurance carrier to transfer COT assets to Grist Mill Capital, LLC (prior to the entry of judgment against Grist Mill Capital, LLC) in violation of a restraining order. The insurance carrier declined to do so and Nova Group consequently ceased payment of the policy premiums, thereby rendering these assets valueless. Upon information and belief, these actions were intended to hinder, delay, defraud, and otherwise prevent Universitas from enforcing its judgment.

<u>BACKGROUND ON BENISTAR</u>

72.     Benistar is a criminal enterprise. The District of Connecticut found that the furtherance of Benistar business interests sufficed for the criminal intent element of Mr. Carpenter's money laundering charges because the furtherance of Benistar business is a perpetuation of fraud. Benistar's criminal nature is further evidenced, *inter alia*, by the fact that Mr. Carpenter's business partner's work emails constituted nine counts of mail and wire fraud and two counts of money laundering in Mr. Carpenter's indictment and conviction.

73.     Benistar previously operated a property exchange under Section 1031 of the Internal Revenue Code. Mr. Carpenter fraudulently defalcated millions of dollars from the Benistar property exchange to himself, and subsequently lost the entirety of this money in the stock market.

74.     Benistar has operated a series of employer welfare benefit plans under Section 419 of the Internal Revenue Code. An Internal Revenue Service ("IRS") investigation into these plans determined that they provide "a blueprint, and the means, for business owners and individuals to criminally underreport their taxes." The IRS investigation further found that Benistar helps its employer welfare benefit plan participants to "obstruct[] the IRS in the ascertainment, computation, assessment, and collection of taxes." The Second Circuit Court of Appeals affirmed a Tax Court decision finding one such trust to be "a thinly disguised vehicle for unlimited tax-deductible investments" and penalizing participants in the trust.

75.     On or about February 4, 2004, Mr. Carpenter was indicted for his usurpation and use of the Benistar property exchange funds and was subsequently convicted on fourteen counts of wire fraud and five counts of mail fraud. Upon information and belief, Mr. Carpenter's legal problems were a cause for concern for many businesses and financial institutions, which in turn refused to do business with Mr. Carpenter and/or any companies associated with Mr. Carpenter.

76.     Mr. Carpenter allegedly resigned from Benistar in January of 2004 as a result of his forthcoming federal indictment. Mr. Carpenter's purported resignation was a ruse. Upon information and belief, Mr. Carpenter's phony resignation from Benistar was intended to conceal his involvement in Benistar from creditors and enable Benistar to work with businesses and financial institutions that would not do so if Mr. Carpenter's involvement was known.

77.     Upon information and belief, Mr. Carpenter's purported resignation corresponded with a "restructuring" of Benistar. Upon information and belief, this "restructuring" was designed

to provide Mr. Carpenter with control over Benistar operations while concealing his involvement in Benistar. The Western District of Oklahoma explained that "[d]espite others holding titular authority, Carpenter made all significant corporate decisions" and that Mr. Carpenter "exercised ultimate authority" over Benistar entities.

78.     Upon information and belief, Mr. Carpenter remained involved in Benistar operations after his alleged resignation by regularly providing "consulting" services to the entities he supposedly resigned from. Upon information and belief, Mr. Carpenter was not compensated for these "consulting" services.

79.     Upon information and belief, Mr. Carpenter exercises indirect control over Benistar through shell companies and figureheads. Upon information and belief, such figureheads include, *inter alia*, Molly Carpenter, Donald Trudeau, Wayne Bursey, Jack Robinson, Matthew Westcott, Amanda Rossi, and Kathleen Kehoe. Upon information and belief, such persons are common managers throughout the Benistar enterprise.

80.     Upon information and belief, Benistar entities are purposefully structured so as to facilitate Mr. Carpenter's indirect control and conceal his involvement.

81.     Benistar entities are sham entities. The Commonwealth of Massachusetts analyzed numerous Benistar entities and found that: "the corporations were commonly owned by the Carpenters, who had pervasive control over all of their activities; that the business activities, assets, and management of the organizations were intermingled; that the corporations were inadequately capitalized; that corporate formalities were not observed; that no corporate records existed; that no dividends were paid; that Benistar was insolvent; that no officers or directors of any of these corporations existed apart from the Carpenters … and that the corporations were used to promote fraud."

82.     The Commonwealth of Massachusetts accordingly pierced the corporate veil of five Benistar entities. The District of Massachusetts subsequently pierced the corporate veil of another two Benistar entities. The Western District of Oklahoma also pierced the corporate veil of three additional Benistar entities. Upon information and belief, no court to ever consider the issue has found any Benistar entity to be a legitimate company and/or not an alter ego of Daniel Carpenter.

83.     Benistar personnel do not distinguish between Benistar entities. The District of Connecticut found that "the formal corporate structure of the various Benistar Entities had little meaning for the people involved." Similarly, the Southern District of New York found that Mr. Carpenter and his affiliates demonstrated an "absence of respect for distinctions among his business entities …."

84.     Benistar entities are largely interchangeable. The Western District of Oklahoma found that Daniel Carpenter used multiple Benistar entities "interchangeably to suit his needs."

85.     Benistar entities have an amorphous corporate structure. Upon piercing the corporate veil of three Benistar entities, the Western District of Oklahoma noted the "intentionally opaque and interchangeable structure" of Benistar entities.

86.     Benistar entities are intertwined. The 30(b)(6) representative for multiple Benistar entities testified, *inter alia*, that Benistar entities are so intermingled that nobody considers them to be distinct entities.

87.     On or about January 1, 2010 a check made payable to GM Partners for $50,000 was deposited into an account at TD Bank belonging to Grist Mill Holdings, LLC. Mr. Carpenter testified that Grist Mill Holdings, LLC is his "alter ego for collecting commissions."

88.     On or about May 7, 2010 a check made payable to Carpenter Financial Group for $1,192.94 was deposited into an account at TD Bank belonging to Avon Capital, LLC. The

Commonwealth of Massachusetts found Carpenter Financial Group to be a Daniel Carpenter alter ego.

89. On or about November 10, 2010 a check made payable to Daniel Carpenter for $7,203.90 was deposited into an account at Webster Bank belonging to Caroline Financial Group, Inc. The Southern District of New York found that Caroline Financial Group, Inc. is a shell company that Mr. Carpenter uses to "hide assets" from Universitas and other creditors. Upon information and belief, Caroline Financial Group, Inc. serves as the managing member for numerous Benistar entities.

90. On or about November 30, 2010 two checks totaling $4,000 made payable to Birch Hill were deposited into an account at Webster Bank belonging to Caroline Financial Group, Inc.

91. On or about December 17, 2010 Grist Mill Capital, LLC transferred $15,824.98 to Lincoln National Life Insurance Co. from an account at People's United Bank belonging to Avon Capital, LLC.

92. On or about October 5, 2011 two checks totaling $6,500 made payable to Nova Group were deposited into an account People's United Bank belonging to Nova Benefit Plans, LLC.

93. On or about February 26, 2013 Avon Capital, LLC transferred $73,900 to Asset Servicing Group, LLC from an account at People's United Bank belonging to Carpenter Financial Group.

94. Benistar entities are operated so as to "create the impression" that they are not associated with each other. The District of Connecticut found that the dissolution of Benefit Plan Advisors, LLC ("BPA") and creation of U.S. Benefits Group, Inc. was an attempt to create an appearance of distinction between the various Benistar offices and entities. On or about February

12, 2010 Daniel Carpenter sent an email to various Benistar personnel instructing them to "[g]et rid of BPA everywhere" and further stating that "remember you are US Benefits Group, Inc now…. No more BPA."

95.     Benistar entities have confusingly similar names and/or have been formed in multiple jurisdictions – entities will have the same names but be "distinguished" by adding/deleting a comma from its name, or changing from an LLC to an Inc. to Ltd. and/or to a Corp. This confusion is intentional. The Western District of Oklahoma explained that "the confusion and overlap [between three Benistar entities] was by design, at least in part to continue to hide assets from Universitas."

96.     Benistar creates new shell companies as needed to conceal Mr. Carpenter's involvement and/or frustrate creditors' collection efforts. The District of Connecticut found that "the corporate entities were created and discarded at Mr. Carpenter's direction when it suited his purposes." As a result, Benistar has undertaken a massive and protracted corporate shell game intended to frustrate creditors and obfuscate ownership, thereby concealing Daniel Carpenter's involvement in Benistar.

97.     Mr. Carpenter testified that he created a particular entity solely to act as a conduit so as to enable him to transfer money from Carpenter Financial Group to other entities without Carpenter Financial Group appearing on the other entities' financial statements or bank records.

98.     There are hundreds of highly-interconnected corporations, LLCs, trusts, and other entities within the Benistar umbrella. These entities operate as a single economic entity. The Western District of Oklahoma found that multiple Benistar entities operated as a "singular integrated enterprise."

99. Benistar has such a unity of interest that its constituent entities have no independent significance from one another, the interests of some can be and have been subordinated to the interests of others and, ultimately all are operated as a single entity with a common purpose and course of conduct – the personal enrichment of, *inter alia*, Mr. Carpenter, and Mrs. Carpenter.

100. Benistar's constituent entities have a unity of ownership that is evidenced, *inter alia*, by their consistent disregard of corporate formalities and their shared management, phone numbers, computer network, offices, and employees.

101. Any distinction between Benistar entities is fictitious – Benistar entities are operated such that they lack any separate identity and in a manner that is abusive to the corporate form. The supposedly separate entities operating under the Benistar umbrella are effectively branches, divisions, and/or departments within a singular entity. The Western District of Oklahoma found that Mr. Carpenter and his business partner orchestrated a series of "elaborate and complex" transactions that "ignored legal formalities" in order to "hide assets from Universitas."

102. It is the regular course of business for Benistar to disregard the separateness and independent obligations and duties of the various constituent members of Benistar, to the detriment of Benistar creditors and for the overriding goal of enriching, *inter alia*, Daniel Carpenter and Molly Carpenter. The Western District of Oklahoma pierced the corporate veil of three distinctly chartered entities named Avon Capital, LLC because, *inter alia*, of its finding that Daniel Carpenter and his business partner coordinated the abuse of these entities' corporate form with an intent to defraud Universitas and conceal the stolen Spencer death benefits.

103. Upon information and belief, Mr. Carpenter is an equitable owner of all Benistar entities.

104. Upon information and belief, Benistar is an alter ego of Daniel Carpenter.

105.    Upon information and belief, Mr. Carpenter has not paid anything towards the judgment against him and claims to be insolvent. Mr. Carpenter nonetheless paid an army of lawyers <u>millions of dollars</u> to defend him in an array of criminal and civil proceedings and sought permission from the court to take an extravagant international vacation involving a trip to London and the World Cup in South Africa. Mr. Carpenter continues to live an extravagant lifestyle, supposedly by the largesse of his family and various companies.

106.    Upon information and belief, Mr. Carpenter has avoided payment of the judgment by divesting himself of all assets, refusing to accept salary or commissions and allowing them to be paid to his family and/or entities. Upon information and belief, Mr. Carpenter exercises complete control over such entities, and uses their assets for personal use.

107.    The Benistar property exchange victims first obtained a judgment against Daniel Carpenter in 2002. Mr. Carpenter then bragged to these victims that they could not enforce their judgment against him and the judgment debtor Benistar entities because he made them "completely judgment proof," and further boasted to these same victims that they "would never see a penny because all of his assets were safely protected in other people's names."

108.    Mr. Carpenter subsequently testified under oath that **all** of his personal assets are owned by trusts and LLCs in order to conceal his assets from creditors.

109.    Mr. Carpenter further testified that he controls over two hundred bank accounts.

110.    Mr. Carpenter has legal title to no assets, bank accounts, real estate, or income. Upon information and belief, Mr. Carpenter divested the entirety of his assets as part of an overall scheme to put every dollar outside the reach of creditors. Upon further information and belief, Mr. Carpenter structured his business and personal financial affairs so as to hinder his creditors'

attempts to collect the debts due from him. The Southern District of New York found that Mr. Carpenter uses numerous shell companies to conceal assets from Universitas and other creditors.

111.    Upon information and belief, Mr. Carpenter transferred his personal assets to a series of trusts and LLCs under his control with an intent to hinder, delay, and/or defraud Universitas and other creditors. These LLCs and trusts serve to shield Mr. Carpenter's assets from his creditors while providing Mr. Carpenter with equitable ownership of these assets.

112.    Benistar regularly uses the corporate form to defraud Universitas and other creditors. The District of Massachusetts found transfers between Benistar entities to be fraudulent transfers and further found that Benistar "is using the corporate form to perpetrate a fraud." Similarly, this Court previously ruled that fraudulent transfers between Benistar entities are so commonplace that such transfers do not constitute exigent circumstances for purposes of an *ex parte* prejudgment remedy.

113.    The Southern District of New York found that Mr. Carpenter and his associates "moved assets through a series of his shell companies" in order to "insulate" these assets from Universitas and other creditors. These transfers resulted in an entity named Moonstone Partners, LLC ("Moonstone") purchasing the Carpenter family vacation property with proceeds stolen from Universitas. The Southern District of New York found that Mr. Carpenter transferred the Spencer insurance proceeds to Moonstone with an "actual intent" to hinder, delay, and defraud Universitas and other creditors, and further found that Mr. Carpenter purposefully structured the transaction so as to shield the vacation property from Universitas.

114.    The Southern District of New York found that Moonstone was a shell company created by Daniel Carpenter for the sole purpose of shielding the Carpenter family vacation

property from Universitas and other creditors. Moonstone was incorporated on or about April 20, 2009.

115.    On or about October 15, 2010 Moonstone created a promissory note and mortgage on the property in favor of another Benistar shell company. The Southern District of New York vacated both the promissory note and mortgage as fraudulent because they were made "**only** for purposes of shielding the Property from certain of Mr. Carpenter's creditors."

116.    The Defendants in this case, *inter alia*, acted jointly and in concert with Mr. Carpenter and other Judgment Debtors to manipulate the corporate form and structure Benistar's finances and property holdings so as to keep such assets in their possession and evade payment of any debt owed to Universitas and other creditors. Upon information and belief, the Defendants helped Mr. Carpenter to launder and hide assets with knowledge of Universitas' claims and Mr. Carpenter's outstanding debts, and with an intent to perpetrate fraud upon Universitas and other creditors by ensuring that they could not reach property to satisfy the debts.

117.    The Defendants' actions were a violation of common law, unethical, unjust, unscrupulous, intended to injure Universitas, and in contravention to Universitas' legal right to collect its judgment.

<u>GM PARTNERS</u>

118.    GM Partners operated from 100 Grist Mill Road and used the phone number 860-408-7000.

119.    GM Partners is the Benistar entity that owns and operates the building located at 100 Grist Mill Road. Upon information and belief, Daniel Carpenter is an equitable owner of the property located at 100 Grist Mill Road.

120.    Upon information and belief, 100 Grist Mill Road was Benistar's headquarters – every Judgment Debtor and Defendant operated from this address, with the exception of Mr. Meckel.

121.    Upon information and belief, Benistar purchased the building so that Daniel Carpenter had a reason to physically be in the building unrelated to Benistar operations. Upon information and belief, Benistar sought to create a reason for Daniel Carpenter to be in the building unrelated to Benistar operations in order to conceal Mr. Carpenter's role in Benistar.

122.    On or about April 21, 2010 agents from IRS raided the offices of 100 Grist Mill Road in connection with an IRS criminal investigation into the Benistar employer welfare benefit plans.

123.    On or about May 25 and 26, 2011 agents from the Department of Labor ("DOL") raided the offices of 100 Grist Mill Road in connection with a DOL criminal investigation regarding the Charter Oak Trust and related Benistar companies.

124.    Upon information and belief, Benistar relocated after the DOL and IRS raids in an attempt to distance itself from the federal raids at their old address. Upon information and belief, Benistar now primarily operates from 10 Tower Lane, Avon, CT and Benistar's accountant, who has a limited power of attorney over certain Benistar entities, operates from 35 Tower Lane, Avon, CT.

125.    Upon information and belief, GM Partners is a pass-through entity intended to shield its assets from Daniel Carpenter's creditors.

126.    On or about August 30, 2007 Grist Mill Capital, LLC transferred $155,000 to GM Partners. The Southern District of New York found that Grist Mill Capital, LLC is a shell company that Mr. Carpenter uses to "hide assets" from Universitas and other creditors. The District of

Connecticut found Grist Mill Capital, LLC to be one of the "most significant" entities in the Benistar criminal conspiracy.

127.    GM Partners purchased the property located at 100 Grist Mill Road on or about August 30, 2007.

128.    Upon information and belief, GM Partners is 99% owned by Carpenter Financial Group. Carpenter Financial Group is a Judgment Debtor in this proceeding and pays Mr. Carpenter's personal credit card bills.

129.    Upon information and belief, Carpenter Financial Group did not pay rent for its offices at 100 Grist Mill Road.

130.    Upon information and belief, GM Partners is 1% owned by Caroline Financial Group, Inc. Upon information and belief, Caroline Financial Group, Inc. is the managing member of GM Partners.

131.    Upon information and belief, GM Partners is an alter ego of Mr. Carpenter.

<u>THE CHARITABLE TRUSTS</u>

132.    Upon information and belief, Daniel Carpenter transferred the majority of his personal assets and Benistar ownership rights to various LLCs and trusts in order to conceal his involvement in Benistar and to shield his assets from creditors.

133.    Upon information and belief, most of Mr. Carpenter's assets and ownership rights in Benistar are ultimately owned by the Alliance Charitable Trust, Phoenix Charitable Trust, Atlantic Charitable Trust, Avon Charitable Trust, and Carpenter Charitable Trust (collectively the "Charitable Trusts"). Upon information and belief, the Charitable Trusts were expressly created to shield Mr. Carpenter's assets from creditors while providing Mr. Carpenter with unfettered ownership of the proceeds.

134.    Upon information and belief, there are multiple incarnations and/or versions of all Charitable Trusts and all Charitable Trusts are known by multiple names.

135.    Upon information and belief, all of the Charitable Trusts share the same structure – the beneficiaries are Molly Carpenter and (her daughter) Caroline Meckel during their lifetime, and upon their death, payable to the Avon Old Farms School. Upon information and belief, Daniel Carpenter is the sole grantor for all Charitable Trusts, and the Charitable Trusts' sole assets are Mr. Carpenter's personal assets and distributions from Benistar entities.

136.    Upon information and belief, Mr. Carpenter is the sole trustee for all Charitable Trusts and the Charitable Trusts are operated as creditor-proof piggy banks for the Carpenter family. Upon information and belief Mr. Carpenter is the true owner of the Charitable Trusts' assets and retains equitable ownership of the Charitable Trusts' assets. Upon information and belief, Mr. Carpenter uses the Charitable Trusts' assets for personal matters.

137.    Upon information and belief, Mr. Carpenter's income and earnings are paid to the Charitable Trusts. On or about August 21, 2012, Mr. Carpenter published a book entitled AmerWrecka: The Preventable Collapse of the Greatest Nation on Earth. Upon information and belief, all proceeds from the sale of this book are paid to the Charitable Trusts. Upon information and belief, the proceeds from Mr. Carpenter's book are paid to the Charitable Trusts so as to keep Mr. Carpenter's income and earnings out of the reach of creditors, and with an intent to hinder, delay, and/or defraud Universitas and other creditors.

138.    Upon information and belief, Mr. Carpenter further provided the Charitable Trusts with ownership of assets other than his income and earnings. On or about March 2, 2013 Daniel Carpenter sent an email boasting that the Charitable Trusts contain assets worth tens of millions of dollars. Upon information and belief, all such assets were transferred to the Charitable Trusts

so as to keep them from the reach of creditors, and with an intent to hinder, delay, and/or defraud Universitas and other creditors.

139.     On or about October 28, 2009 Mr. Carpenter caused $19 million of the Spencer insurance proceeds to be transferred to Grist Mill Holdings, LLC ("GM Holdings"). GM Holdings. The Southern District of New York found this to be a fraudulent transfer made with an "actual intent" to hinder, delay, and defraud Universitas.

140.     On or about November 2, 2009 GM Holdings transferred $10,000 to Alliance Charitable Trust.

141.     On or about November 12, 2009 GM Holdings transferred $350,000 to Avon Charitable Trust.

142.     On or about November 12, 2009 GM Holdings transferred $350,000 to Phoenix Charitable Trust.

143.     On or about November 12, 2009 GM Holdings transferred $350,000 to Alliance Charitable Trust.

144.     On or about November 12, 2009 GM Holdings transferred $350,000 to Atlantic Charitable Trust.

145.     On or about November 12, 2009 GM Holdings transferred $350,000 to Carpenter Charitable Trust.

146.     Upon information and belief, all transfers from Judgment Debtor GM Holdings to the Charitable Trusts were fraudulent transfers undertaken for the benefit of Mr. and Mrs. Carpenter and were intended to hinder, delay, defraud, and otherwise prevent Universitas from enforcing its judgment.

147.     Upon information and belief, the Charitable Trusts are alter egos of Mr. Carpenter.

## MOLLY CARPENTER

148.     Molly Carpenter is Daniel Carpenter's wife. Mrs. Carpenter operated from 100 Grist Mill Road and used the phone number 860-408-7000.

149.     Mrs. Carpenter is an executive, director, and/or officer of numerous other Benistar entities. Upon information and belief, Mrs. Carpenter uses these positions to facilitate Benistar's fraudulent and criminal activities – Mrs. Carpenter defers all executive decisions to Mr. Carpenter, thereby providing Mr. Carpenter with control over Benistar while helping to conceal his involvement in Benistar.

150.     Upon information and belief, Mrs. Carpenter was heavily involved with COT as evidenced, *inter alia*, by an email sent from Molly Carpenter on or about January 18, 2007 to Daniel Carpenter and other Benistar personnel outlining COT's operating procedure. Federal prosecutors specifically identified Molly Carpenter as one of Daniel Carpenter's co-conspirators in his mail and wire fraud conspiracy.

151.     Molly Carpenter was a signatory on COT's bank account.

152.     Upon information and belief, Mrs. Carpenter is a signatory on more than thirty-three Benistar bank accounts. Upon information and belief, Mrs. Carpenter regularly disbursed money from these accounts to Daniel Carpenter in a manner designed to keep Mr. Carpenter's name off of official financial records and thereby conceal his involvement in Benistar.

153.     Upon information and belief, Mrs. Carpenter regularly provides courts with false, misleading, and self-serving testimony. The Commonwealth of Massachusetts noted that Mrs. Carpenter "falsely stated in her affidavit that she never 'exercised ownership of, dominion, or control over [Benistar property exchange participants'] money.'" Likewise, the Southern District of New York noted that Mrs. Carpenter's testimony was "wholly self-serving and unreliable."

154.    Upon information and belief, Mrs. Carpenter helps Mr. Carpenter hide assets from creditors, and does so with an intent to hinder, delay, and/or defraud creditors. Daniel Carpenter was sued by his former business partners in March of 1995. Mr. Carpenter removed the case to federal court and moved for the case to be referred to a specified judge. On or about May 16, 1995, the judge requested by Mr. Carpenter declined to hear the case. On or about May 17, 1995, Mr. Carpenter executed a quit claim deed conveying to Molly Carpenter his ownership in the property located at 18 Pondside Lane in Simsbury, CT. Upon information and belief, this transfer was intended to shield the property located at 18 Pondside Lane from Mr. Carpenter's former business partners and frustrate their collection efforts. Upon further information and belief, Mrs. Carpenter participated in this conveyance with an intent to hinder, delay, and/or defraud Mr. Carpenter's creditors.

155.    On or about August 11, 2011 Mrs. Carpenter created a promissory note and mortgage against the property located at 18 Pondside Lane in the amount of $417,000. Upon information and belief, Mrs. Carpenter had knowledge that Universitas was attempting to enforce its arbitration award at that time. Upon further information and belief, the promissory note and mortgage were made for the purpose of shielding the located at 18 Pondside Lane from creditors, and were created with an intent to hinder, delay, and/or defraud Universitas and other creditors.

156.    Upon information and belief, Daniel Carpenter is an equitable owner of the property located at 18 Pondside Lane.

157.    Upon information and belief, Mrs. Carpenter further assists Mr. Carpenter's efforts to defraud his creditors by making expenditures for Mr. Carpenter's benefit. Upon information and belief, such expenditures include charitable donations in Daniel Carpenter's name and court-ordered restitution payments owed to Mr. Carpenter's victims. Upon information and belief, such

payments are made with an intent to facilitate Mr. Carpenter's evasion of creditors, and thereby perpetrate fraud upon Universitas and other creditors.

158.    Mrs. Carpenter personally owns 99% of Moonstone, the entity that holds legal title to the luxurious vacation property purchased with Spencer insurance proceeds. On or about August 15, 2009 Moonstone paid $10,287.09 toward Molly Carpenter's personal credit card bill with American Express.

159.    Upon information and belief, Mrs. Carpenter receives substantial payment from Benistar entities. Upon information and belief, certain payments from Benistar entities to Mrs. Carpenter are intended for payment of Mr. Carpenter's personal expenses, and Mrs. Carpenter acts as a conduit for such payments so as to keep these payments out of the reach of creditors.

160.    On or about May 28, 2010 Carpenter Financial Group transferred $5,000 to Mrs. Carpenter.

161.    On or about June 22, 2010 Caroline Financial Group, Inc. transferred $10,000 to Mrs. Carpenter.

162.    On or about March 16, 2011 Carpenter Financial Group transferred $2,000 to Molly Carpenter.

163.    On or about May 2, 2011 Carpenter Financial Group transferred $5,000 to Mrs. Carpenter.

164.    On or about May 24, 2012 Carpenter Financial Group transferred $6,000 to Mrs. Carpenter.

165.    On or about June 29, 2012 Carpenter Financial Group transferred $100,000 to Mrs. Carpenter.

166.     On or about August 7, 2012 Carpenter Financial Group transferred $2,000 to Mrs. Carpenter.

167.     On or about August 23, 2012 Carpenter Financial Group transferred $20,000 to Mrs. Carpenter.

168.     On or about September 13, 2012 Carpenter Financial Group transferred $5,000 to Mrs. Carpenter.

169.     On or about November 13, 2012 Carpenter Financial Group transferred $100 to Mrs. Carpenter.

170.     On or about November 26, 2012 Carpenter Financial Group transferred $6,000 to Mrs. Carpenter.

171.     On or about December 11, 2012 Carpenter Financial Group transferred $2,000 to Mrs. Carpenter.

172.     On or about January 2, 2013 Carpenter Financial Group transferred $10,000 to Mrs. Carpenter.

173.     On or about January 10, 2013 Carpenter Financial Group transferred $1,000 to Mrs. Carpenter.

174.     Upon information and belief, Mrs. Carpenter has no formal affiliation with Carpenter Financial Group, and there is no valid justification for any payment from Carpenter Financial Group to Mrs. Carpenter. Upon information and belief, all transfers from Judgment Debtor Carpenter Financial Group to Mrs. Carpenter were fraudulent transfers undertaken for the sole benefit of Mrs. Carpenter and were intended to hinder, delay, defraud, and otherwise prevent Universitas from enforcing its judgment.

175.     Upon information and belief, Mrs. Carpenter has no formal affiliation with Caroline Financial Group, Inc., and there is no valid justification for any payment from Caroline Financial Group, Inc. to Mrs. Carpenter. Upon information and belief, all transfers from Caroline Financial Group, Inc. to Mrs. Carpenter were fraudulent transfers undertaken for the sole benefit of Mrs. Carpenter and were intended to hinder, delay, defraud, and otherwise prevent Universitas from enforcing its judgment.

176.     Upon information and belief, the Charitable Trusts are alter egos of Mrs. Carpenter and Mr. Carpenter.

177.     Upon information and belief, Seir Hill is an alter ego of Mrs. Carpenter and Mr. Carpenter.

178.     Upon information and belief, Benistar is an alter ego of Mrs. Carpenter and Mr. Carpenter.

<u>SEIR HILL</u>

179.     Seir Hill owns property located at 25 Seir Hill Road in Norwalk, CT. Upon information and belief, Daniel Carpenter is an equitable owner of the property located at 25 Seir Hill Road.

180.     Upon information and belief, Seir Hill is owned by Molly Carpenter and Caroline Financial Group, Inc.

181.     Seir Hill operated from 100 Grist Mill Road.

182.     Seir Hill was incorporated on or about December 14, 2012.

183.     On or about December 19, 2012 Carpenter Financial Group transferred $150,000 to Seir Hill.

184.     On or about January 2, 2013 Seir Hill purchased the property located at 25 Seir Hill Road for $750,000. Upon information and belief, the $150,000 transferred to Seir Hill by Carpenter Financial Group constituted the down payment for the purchase of the property located at 25 Seir Hill Road, and the remainder of the purchase price was secured by a mortgage. Upon information and belief, the mortgage on the property located at 25 Seir Hill Road is guaranteed by Benistar Admin Services, Inc. ("BASI").

185.     The Commonwealth of Massachusetts previously found BASI to be an alter ego of both Daniel Carpenter and Molly Carpenter.

186.     Upon information and belief, Seir Hill is a sham entity created by Mr. Carpenter to shield the property located at 25 Seir Hill Road from Universitas and other creditors.

187.     Upon information and belief, Seir Hill is an alter ego of Carpenter Financial Group.

188.     Upon information and belief, Seir Hill is an alter ego of Grist Mill Capital, LLC.

189.     Upon information and belief, Seir Hill is an alter ego of Daniel Carpenter.

<u>MILL POND</u>

190.     Mill Pond owns the property located at 1 & 3 Mill Pond Lane in Simsbury, CT. Upon information and belief, Daniel Carpenter is an equitable owner of the property located at 1 & 3 Mill Pond Lane.

191.     Mill Pond operated from 100 Grist Mill Road and used the phone number 860-408-7000.

192.     Mill Pond was incorporated on or about December 26, 2007.

193.     Upon information and belief, Mill Pond is 99% owned by Carpenter Financial Group and 1% owned by Caroline Financial Group, Inc. Upon information and belief, Caroline Financial Group, Inc. is the managing member of Mill Pond.

194.    On or about April 16, 2008 Carpenter Financial Group paid $300,000 to Mill Pond via a cashier's check from Bank of America.

195.    Mill Pond purchased the property located at 1 & 3 Mill Pond Lane on or about May 8, 2008 for $1,2750,000. Upon information and belief, the $300,000 transferred to Mill Pond by Carpenter Financial Group constituted the down payment for the purchase of the property located at 1 & 3 Mill Pond Lane, and the remainder of the purchase price was secured by a mortgage. Upon information and belief, the mortgage on the property located at 1 & 3 Mill Pond Lane is guaranteed by GM Partners.

196.    Upon information and belief, Mill Pond is a sham entity used by Mr. Carpenter to shield the property located at 1 & 3 Mill Pond Lane from Universitas and other creditors.

197.    Upon information and belief, Mill Pond is an alter ego of Daniel Carpenter.

BIRCH HILL

198.    Birch Hill owns property located at 68 Phoenix Street in Vernon, CT. Upon information and belief, Daniel Carpenter is an equitable owner of the property located at 68 Phoenix Street.

199.    Birch Hill operated from 100 Grist Mill Road and used the phone number 860-408-7000. Upon information and belief, Birch Hill is owned by Caroline Financial Group, Inc.

200.    Birch Hill was incorporated on or about June 8, 2010. On or about June 18, 2010 Birch Hill received a transfer of $200,000 from an account at Webster Bank ending in 1757. On or about June 22, 2010 Birch Hill purchased the property located at 68 Phoenix Street for $180,000.

201.    On or about August 8, 2010 three checks from Carpenter Financial Group to Birch Hill totaling $3,000 were deposited into Birch Hill's account.

202.     On or about September 30, 2010 Birch Hill received a transfer of $200,000 from an account at Webster Bank ending in 1757. On or about October 4, 2010 Birch Hill purchased a property located at 41 Church Street in Tariffville, CT for $165,000.

203.     Mr. Carpenter testified that Birch Hill was capitalized with funds from an entity under his control. Upon information and belief, the account at Webster Bank ending in 1757 belonged to a Benistar entity under Daniel Carpenter's control. Upon further information and belief, the account at Webster Bank ending in 1757 belonged to a Judgment Debtor entity.

204.     Upon information and belief, Birch Hill is a sham entity created by Mr. Carpenter to shield property from Universitas and other creditors.

205.     Upon information and belief, Birch Hill is an alter ego of Grist Mill Capital, LLC.

206.     Upon information and belief, Birch Hill is an alter ego of Daniel Carpenter.

<u>CAROLINE MECKEL AND STEVEN MECKEL</u>

207.     Caroline Meckel is Daniel Carpenter's daughter.

208.     Steven Meckel is Caroline Meckel's husband.

209.     Caroline Meckel and Steven Meckel jointly own the property located at 41 Church Street. Upon information and belief, Daniel Carpenter is an equitable owner of the property located at 41 Church Street.

210.     Upon information and belief, Mr. Carpenter was first indicted for mail and wire fraud in 2004 and subsequently convicted for mail and wire fraud in 2014.

211.     Upon information and belief, Mr. Carpenter was suspended from both the Bar of the State of Connecticut and the Bar of the District of Connecticut in 2009 for fraudulently misappropriating escrow funds.

212. Upon information and belief, Mr. Carpenter and his confederates knew that they were being criminally investigated in relation to the stolen Spencer insurance proceeds by October of 2012. Universitas deposed Wayne Bursey, Daniel Carpenter, Amanda Rossi, and Molly Carpenter, respectively, on or about October 16, 2012, October 19, 2012, November 20, 2012 and November 29, 2012. All four deponents pled the Fifth Amendment in response to all questions concerning the Spencer insurance proceeds, as well as all questions concerning transfers to Birch Hill, their involvement with Birch Hill, and Birch Hill's assets and/or business.

213. Mrs. Meckel was employed by BASI and operated from 100 Grist Mill Road. Upon information and belief Mrs. Meckel was present for at least one federal law enforcement raid at this address.

214. Upon information and belief, Mrs. Meckel was aware of Mr. Carpenter's indictment for mail and wire fraud in 2004.

215. Upon information and belief, Mrs. Meckel was aware that Daniel Carpenter was suspended from the practice of law.

216. Upon information and belief, Mrs. Meckel was aware of the judgment entered against Daniel Carpenter in 2002 and was generally aware of Mr. Carpenter's efforts to frustrate these creditors. Upon information and belief, Mrs. Meckel was aware that both Daniel Carpenter and Molly Carpenter were deposed in 2011 in relation to these creditors' continued collection efforts. The collection action in which Daniel Carpenter and Molly Carpenter were deposed was not resolved until July of 2014.

217. Upon information and belief, Mrs. Meckel was aware that both Daniel Carpenter and Molly Carpenter testified numerous times in the underlying litigation.

218.     On or about July 16, 2012 Mrs. Meckel attended a BASI board meeting. Upon information and belief, legal proceedings were discussed at BASI board meetings.

219.     Upon information and belief, Mrs. Meckel was aware of the allegations concerning her father and the Spencer insurance proceeds as a result, *inter alia*, of her knowledge of the federal law enforcement raid, her participation in the BASI board meeting, and her knowledge of the underlying litigation.

220.     Upon information and belief, Mrs. Meckel was aware of the ongoing collection efforts by Daniel Carpenter's creditor as a result, *inter alia*, of her participation in the BASI board meeting and her knowledge of the collection action in which her parents were deposed.

221.     On or about November 20, 2013 the Southern District of New York found that Daniel Carpenter fraudulently defalcated the $30 million rightfully belonging to Universitas.

222.     On or about November 22, 2013 Birch Hill conveyed the property located at 41 Church Street to Mr. and Mrs. Meckel for $240,000. Upon information and belief, the Meckels made a down payment of $4,347, and the remainder of the purchase price was secured by a mortgage on the property.

223.     Upon information and belief, Mr. Carpenter transferred the property located at 41 Church Street to the Meckels with an intent to hinder, delay, and/or defraud Universitas and other creditors.

224.     On or about February 13, 2014 Steven Meckel submitted a letter to the court in connection with Mr. Carpenter's sentencing proceeding in the District of Massachusetts. This letter stated, *inter alia*, that: (i) Caroline Meckel updated Mr. Meckel about Mr. Carpenter's legal developments "nearly every night," (ii) Mr. Meckel had been aware of Mr. Carpenter's legal

disputes since 2003, and (iii) Mr. Meckel knew that Mr. Carpenter was involved in Birch Hill's conveyance of the property located at 41 Church Street to the Meckels.

225. Upon information and belief, Mr. Meckel was aware of the judgment entered against Mr. Carpenter in 2002 when Birch Hill conveyed the property located at 41 Church Street to the Meckels.

226. Upon information and belief, Mr. Meckel was aware of the underlying litigation when Birch Hill conveyed the property located at 41 Church Street to the Meckels.

227. Upon information and belief, Mr. Meckel was aware of Mr. Carpenter's indictment for mail and wire fraud in 2004 when Birch Hill conveyed the property located at 41 Church Street to the Meckels.

228. Upon information and belief, Mr. Meckel was aware that Mr. Carpenter was suspended from the practice of law when Birch Hill conveyed the property located at 41 Church Street to the Meckels.

229. Upon information and belief, the Meckels accepted the property located at 41 Church Street from Birch Hill with knowledge of facts and circumstances sufficient to raise a suspicion of fraud, and with knowledge of facts and circumstances that would have prompted a reasonable person to investigate whether Mr. Carpenter was conveying the property located at 41 Church Street with fraudulent intent, and thus had sufficient knowledge of facts to put them on inquiry notice of fraud.

230. Upon information and belief, a diligent inquiry would have caused the Meckels to uncover facts demonstrating Mr. Carpenter's fraudulent intent, and thus the Meckels had constructive knowledge of Mr. Carpenter's fraudulent intent in connection with the transfer of the property located at 41 Church Street.

## GREYHOUND

231.    Greyhound owns property located at 84 Lawton Road, in Canton, CT. Upon information and belief, Daniel Carpenter is an equitable owner of the property located at 84 Lawton Road.

232.    Greyhound was created in December of 2010.

233.    Greyhound operated from 100 Grist Mill Road.

234.    On or about February 28, 2011 Greyhound "purchased" the property located at 84 Lawton Road for $250,000 from the Carpenter Family Trust. Upon information and belief, Daniel Carpenter created the Carpenter Family Trust, and the signatory for the Carpenter Family Trust in this conveyance was Daniel Carpenter's mother.

235.    Upon information and belief, Greyhound's purchase of the property located at 84 Lawton Road was funded entirely by a promissory note payable to the Carpenter Family Trust. Upon information and belief, the promissory note payable to the Carpenter Family Trust is secured by a mortgage on the property located at 84 Lawton Road.

236.    Greyhound is wholly owned and managed by Greyhound Management, Inc. Greyhound Management, Inc. operated from 100 Grist Mill Road and is managed by Daniel Carpenter. Upon information and belief, Greyhound Management Inc. is owned by Daniel Carpenter and his sister Constance Carpenter.

237.    Constance Carpenter has a history of fraudulently shielding assets from Daniel Carpenter's creditors. Mr. Carpenter's creditors attached a writ of execution upon a vacation property belonging to Daniel Carpenter in April of 2004. In May of 2004, Mr. Carpenter conveyed the vacation property to Constance Carpenter for ten dollars, and Constance Carpenter declared bankruptcy shortly thereafter. The aforementioned creditors sought relief from the bankruptcy

court in July of 2004, and Constance Carpenter voluntarily dismissed her bankruptcy claim in August of 2004. In September of 2004, Constance Carpenter conveyed the vacation property to NTS Properties, Inc. for ten dollars. NTS Properties, Inc. then executed two mortgages against the vacation property in favor of an entity controlled by Daniel Carpenter. These mortgages totaled $600,000, an amount in excess of the value of vacation property, thus giving the vacation property a negative value.

238.     NTS Properties, Inc. was created on or about August 25, 2004. Upon information and belief, NTS Properties was created to shield the vacation property from Mr. Carpenter's creditors. Upon information and belief, Constance Carpenter was the sole officer and director of NTS Properties, Inc.

239.     Upon information and belief, Constance Carpenter conveyed the vacation property to NTS Properties, Inc. with an intent to hinder, delay, and/or defraud Mr. Carpenter's creditors. Upon information and belief, NTS Properties, Inc. executed the mortgages against the vacation property in order to further shield the vacation property from Mr. Carpenter's creditors.

240.     Upon information and belief, the mortgage against the property located at 84 Lawton Road is fraudulent and intended only to shield the property from Universitas and other creditors.

241.     Upon information and belief, the note payable to the Carpenter Family Trust by Greyhound is fraudulent and intended only to shield the property located at 84 Lawton Road from Universitas and other creditors.

242.     Upon information and belief, Greyhound is a sham entity created by Mr. Carpenter to shield the property located at 84 Lawton Road from Universitas and other creditors.

243.     Upon information and belief, Greyhound is an alter ego of Grist Mill Capital, LLC.

244.    Upon information and belief, Greyhound is an alter ego of Daniel Carpenter.

<u>COLLECTION EFFORTS</u>

245.    Universitas' judgment against Nova Group has been accruing interest at a rate of ten percent per annum since January 24, 2011, for a total of approximately $25.7 million in accrued interest.

246.    On or about August 12, 2014 the Southern District of New York entered judgment against Daniel Carpenter in the amount of $30.6 million. The court expressly stated that this judgment was less than Universitas' total loss.

247.    On or about May 6, 2020 Carpenter Financial Group paid $7,858.14 toward its outstanding judgment.

248.    As a result of a turnover proceeding against Moonstone, Universitas recovered proceeds from an insurance policy on the Moonstone property. Upon information and belief, such proceeds amounted to $343,031.52.

249.    Universitas settled with Judgment Debtor Grist Mill Trust for approximately $4.2 million.

250.    Universitas filed a related proceeding against the COT insurance trustee that resulted in the settlement of $12 million. That recovery was for breach of fiduciary duty and was not an offset to the judgments for the stolen funds that have remained largely unsatisfied.

251.    Universitas' total recovery is substantially less than the interest accrued on Universitas' judgment.

252.    Benistar's improper litigation tactics, bad faith, fraud, obstruction of justice, contempt of court, falsification of evidence, and witness intimidation harmed Universitas by forcing the closure of the foundation, and further harmed Universitas by causing it to incur

considerable expenses attempting to enforce its judgment. Universitas has spent over $10 million on attorneys' fees and legal costs seeking to locate assets and enforce its judgment. Benistar's recalcitrance has caused Universitas difficulty in paying its legal fees and costs, which caused litigation with its former counsel regarding fees.

CAUSES OF ACTION

253.    Connecticut common law dictates that decisions concerning the disregard of the corporate form are made in accordance with the law of the state of incorporation. *See Wells Fargo Bank, N.A. v. Konover*, Case No. 3:05-cv-01924 (CFD), 2011 U.S. Dist. LEXIS 32079, at *19 n. 21 (D. Conn. Mar. 28, 2011) (citations omitted). The corporate Defendants in this proceeding are all incorporated in Delaware or Connecticut.

254.    Delaware common law allows judgment creditors to pierce the corporate veil and satisfy their judgment with corporate assets when the corporation is an alter ego of the judgment debtor. *See Sky Cable, LLC v. DIRECTV, Inc.*, 886 F.3d 375, 385-88 (4th Cir. 2018).

255.    An alter ego finding under Delaware law requires that the dominant shareholder and corporation be operated as a single economic entity and that there be an overall element of fraud or injustice. *See Fletcher v. Atex*, 68 F.3d 1451, 1457 (2d Cir. 1995) (citations omitted).

256.    Connecticut common law allows judgment creditors to pierce the corporate veil and satisfy their judgment with corporate assets when the corporation is an alter ego of the judgment debtor. *See Wells Fargo Bank, N.A. v. Konover*, Case No. 3:05-cv-01924 (CFD), 2011 U.S. Dist. LEXIS 32079, at *18-*20 (D. Conn. Mar. 28, 2011).

257.    Under Connecticut law, an entity is an alter ego when it is a mere instrumentality or agent of another party owning the majority of its stock, or when it is controlled as part of a larger enterprise. *See Wells Fargo Bank, N.A. v. Konover*, Case No. 3:05-cv-01924 (CFD), 2011

U.S. Dist. LEXIS 32079, at *21-*22, *33-*35 (D. Conn. Mar. 28, 2011); *see also McKay v. Longman*, 332 Conn. 394, 440-43 (2019) (discussing standard for reverse veil-piercing).

258.    Connecticut common law permits plaintiffs to recover from defendants under a theory of unjust enrichment when, under the circumstances, it would be contrary to equity and good conscience for one to retain a benefit which they received at the expense of another. *See Gagne v. Vaccaro*, 255 Conn. 390, 409 (2001).

<u>FIRST COUNT – ALTER EGO LIABILITY (AGAINST ALL DEFENDANTS EXCEPT CAROLINE MECKEL, STEVEN MECKEL, AND MOLLY CARPENTER)</u>

259.    Universitas incorporates paragraphs 1-258 above as paragraphs 1-258 of the First Count.

260.    On or about June 5, 2012 the Southern District of New York confirmed the arbitration award entered against Nova Group in the amount of $26.5 million, plus interest thereon from January 24, 2011 at the rate of ten percent per annum. On or about August 12, 2014 the Southern District of New York entered judgment against Daniel Carpenter in the amount of $30.6 million, plus statutorily allowed post-judgment interest.

261.    At all relevant times, there was such a unity of interest and ownership among the Defendants and Judgment Debtors that the independence of the Judgment Debtors had in effect never ceased or never begun, and an adherence to the fiction that the Judgment Debtors were separate identities would serve only to defeat justice and equity by permitting the economic entities to escape liability arising out of an operation conducted by the Judgment Debtors and Defendants.

262.    At all relevant times, Defendants and Judgment Debtors, *inter alia*, operated as a single economic entity that worked to criminally misappropriate Universitas' money, defraud Universitas, and conceal the stolen funds.

263. Defendants completely dominated the financial, policy, and business practices of the Judgment Debtors such that the Judgment Debtors had no separate mind, will, or existence of their own.

264. Defendants' aforesaid control and acts were used to commit the aforesaid dishonest, criminal, fraudulent and unjust acts, which proximately caused damages to Universitas and for which the Southern District of New York issued the Judgment against the Judgment Debtors.

265. As a result of the aforesaid unity of interest, unity of ownership, and Defendants' control and acts, Defendants are jointly and severally liable for the full amount of the Southern District of New York Judgment against the Judgment Debtors.

266. As a result of Defendants' actions and/or Defendants' aforesaid control of Judgment Debtors, Defendants are jointly and severally liable for the attorneys' fees and legal costs incurred by Universitas in all related post-judgment proceedings.

SECOND COUNT – UNJUST ENRICHMENT (AGAINST BIRCH HILL)

267. Universitas hereby incorporates paragraphs 1-266 above as paragraphs 1-266 of the Second Count.

268. Birch Hill is a sham entity created by Daniel Carpenter to hold title to property and shield such property from creditors.

269. Daniel Carpenter testified that all of his personal assets are owned by trusts and shell companies in order to conceal his assets from creditors.

270. Daniel Carpenter testified that he used trusts and shell companies to conceal assets from the Benistar property exchange victims that obtained a judgment against him.

271. Judgment was entered against Mr. Carpenter and in favor of the Benistar property exchange victims in 2002.

272. Birch Hill was incorporated in 2010.

273. Daniel Carpenter controlled Birch Hill at all relevant times.

274. On or about June 18, 2010 Daniel Carpenter transferred $200,000 to Birch Hill from an account at Webster Bank ending in 1757.

275. At the time of the transfer to Birch Hill, Daniel Carpenter was aware that Universitas was asserting its right to the Spencer insurance proceeds and considering litigation.

276. Daniel Carpenter transferred funds to Birch Hill as part of a scheme to divert his assets outside the reach of Universitas and other creditors, and with an intent to hinder, delay, and/or defraud Universitas and other creditors.

277. Birch Hill had actual or constructive knowledge that the transfer of funds from the account at Webster Bank ending in 1757 was fraudulent at the time the conveyance was made.

278. Birch Hill used the funds from the account at Webster Bank ending in 1757 to purchase the property located at 68 Phoenix Street.

279. Daniel Carpenter is an equitable owner of the property located at 68 Phoenix Street.

280. Daniel Carpenter caused Birch Hill to hold title to the property located at 68 Phoenix Street as part of a scheme to divert his assets outside the reach of Universitas and other creditors, and with an intent to hinder, delay, and/or defraud Universitas and other creditors.

281. Birch Hill had actual or constructive knowledge that its acquisition of legal title to the property located at 68 Phoenix Street was fraudulent at the time it received such title.

282. Birch Hill was unjustly enriched and benefitted from the possession of legal title to the property located at 68 Phoenix Street, and this unjust enrichment caused harm to Universitas.

283. On or about September 30, 2010 Daniel Carpenter transferred $200,000 to Birch Hill from an account at Webster Bank ending in 1757.

284.     Daniel Carpenter transferred funds to Birch Hill as part of a scheme to divert his assets outside the reach of Universitas and other creditors, and with an intent to hinder, delay, and/or defraud Universitas and other creditors.

285.     Birch Hill had actual or constructive knowledge that the transfer of funds from the account at Webster Bank ending in 1757 was fraudulent at the time the conveyance was made.

286.     Birch Hill used the funds from the account at Webster Bank ending in 1757 to purchase the property located at 41 Church Street.

287.     Daniel Carpenter is an equitable owner of the property located at 41 Church Street.

288.     Daniel Carpenter caused Birch Hill to hold title to the property located at 41 Church Street as part of a scheme to divert his assets outside the reach of Universitas and other creditors, and with an intent to hinder, delay, and/or defraud Universitas and other creditors.

289.     Birch Hill had actual or constructive knowledge that its acquisition of legal title to the property located at 41 Church Street was fraudulent at the time it received such title.

290.     Birch Hill was unjustly enriched and benefitted from the possession of legal title to the property located at 41 Church Street, and this unjust enrichment caused harm to Universitas.

291.     Birch Hill participated in Daniel Carpenter's scheme to divert his assets outside the reach of Universitas and other creditors and was unjustly enriched as a result of its participation in this fraudulent scheme.

292.     Birch Hill has not made any payment to Universitas.

293.     Birch Hill's actions were unjust, inequitable, and intended to prevent Universitas and other creditors from reaching property to satisfy the debts.

294.    Daniel Carpenter uses Birch Hill to hide property from creditors, and Birch Hill wrongfully obtained property through fraudulent conduct, and it would be contrary to equity and good conscience for Birch Hill to retain such property.

295.    Equity and good conscience require full restitution of the benefits wrongfully conveyed to Birch Hill, and thus Universitas is entitled to restitution from Birch Hill.

296.    As a result of Birch Hill's past unjust enrichment, Universitas is entitled to the imposition of a constructive trust with respect to the property located at 68 Phoenix Street, as well as any profits received by Birch Hill in connection with the property located at 68 Phoenix Street.

<u>THIRD COUNT – UNJUST ENRICHMENT (AGAINST CAROLINE MECKEL AND STEVEN MECKEL)</u>

297.    Universitas hereby incorporates paragraphs 1-296 above as paragraphs 1-296 of the Third Count.

298.    Daniel Carpenter caused Birch Hill to hold title to the property located at 41 Church Street as part of a scheme to divert his assets outside the reach of Universitas and other creditors.

299.    On or about November 20, 2013, the court first determined that Mr. Carpenter stole $30 million from Universitas.

300.    On or about November 22, 2013, Birch Hill conveyed the property located at 41 Church Street to Caroline Meckel and Steven Meckel.

301.    Daniel Carpenter controlled Birch Hill at all relevant times.

302.    At the time of the transfer to the Meckels, both Daniel Carpenter and the Meckel were aware of litigation concerning Universitas' claims.

303.    Daniel Carpenter transferred the property located at 41 Church Street to the Meckels in furtherance of his scheme to divert assets outside the reach of Universitas and other creditors and with an intent to hinder, delay, and/or defraud Universitas and other creditors.

304. Daniel Carpenter is an equitable owner of the property located at 41 Church Street.

305. The Meckels had actual or constructive knowledge that the transfer of property located at 41 Church Street was fraudulent at the time the conveyance was made.

306. The Meckels were unjustly enriched and benefitted from the possession of legal title to the property located at 41 Church Street, and this unjust enrichment caused harm to Universitas.

307. The Meckels participated in Daniel Carpenter's scheme to divert his assets outside the reach of Universitas and other creditors and were unjustly enriched as a result of their participation in this fraudulent scheme.

308. Caroline Meckel has not made any payment to Universitas.

309. Steven Meckel has not made any payment to Universitas.

310. The Meckels' actions were unjust, inequitable, and intended to prevent Universitas and other creditors from reaching property to satisfy the debts.

311. The Meckels wrongfully obtained property through fraudulent conduct, and it would be contrary to equity and good conscience for the Meckels to retain such property.

312. Equity and good conscience require restitution of the benefits wrongfully conveyed to the Meckels, and thus Universitas is entitled to restitution from Caroline Meckel and Steven Meckel.

313. As a result of the Meckels past unjust enrichment, Universitas is entitled to the imposition of a constructive trust with respect to the property located at 41 Church Street, as well as any profits received by the Meckels in connection with the property located at 41 Church Street.

## FOURTH COUNT – UNJUST ENRICHMENT (AGAINST GREYHOUND)

314.    Universitas hereby incorporates paragraphs 1-313 above as paragraphs 1-313 of the Fourth Count.

315.    Greyhound is a sham entity created by Daniel Carpenter to hold title to the property located at 84 Lawton Road and shield such property from Universitas and other creditors.

316.    Daniel Carpenter testified that all of his personal assets are owned by trusts and shell companies in order to conceal his assets from creditors.

317.    Daniel Carpenter testified that he used trusts and shell companies to conceal assets from the Benistar property exchange victims that obtained a judgment against him.

318.    Judgment was entered against Mr. Carpenter and in favor of the Benistar property exchange victims in 2002.

319.    Greyhound was incorporated in 2010.

320.    Daniel Carpenter controlled Greyhound at all relevant times.

321.    Daniel Carpenter caused Greyhound to hold title to the property located at 84 Lawton Road as part of a scheme to divert his assets outside the reach of Universitas and other creditors, and with an intent to hinder, delay, and/or defraud Universitas and other creditors.

322.    At the time Greyhound acquired title to the property located at 84 Lawton Road, Daniel Carpenter was aware that Universitas was asserting its right to the Spencer insurance proceeds and considering litigation.

323.    Daniel Carpenter is an equitable owner of the property located at 84 Lawton Road.

324.    Greyhound did not provide consideration in exchange for legal title of the property located at 84 Lawton Road.

325.    Greyhound had actual or constructive knowledge that its acquisition of legal title to the property located at 84 Lawton Road was fraudulent at the time it received such title.

326.    Greyhound was unjustly enriched and benefitted from the possession of legal title to the property located at 84 Lawton Road, and this unjust enrichment caused harm to Universitas.

327.    Greyhound participated in Daniel Carpenter's scheme to divert his assets outside the reach of Universitas and other creditors and was unjustly enriched as a result of its participation in this fraudulent scheme.

328.    Greyhound has not made any payment to Universitas.

329.    Greyhound's actions were unjust, inequitable, and intended to prevent Universitas and other creditors from reaching property to satisfy the debts.

330.    Daniel Carpenter uses Greyhound to hide property from creditors, and Greyhound wrongfully obtained property through fraudulent conduct, and it would be contrary to equity and good conscience for Greyhound to retain such property.

331.    Equity and good conscience require full restitution of the benefits wrongfully conveyed to Greyhound, and thus Universitas is entitled to restitution from Greyhound.

332.    As a result of Greyhound's past unjust enrichment, Universitas is entitled to the imposition of a constructive trust with respect to the property located at 84 Lawton Road, as well as any profits received by Greyhound in connection with the property located at 84 Lawton Road.

FIFTH COUNT – UNJUST ENRICHMENT (AGAINST THE CHARITABLE TRUSTS)

333.    Universitas hereby incorporates paragraphs 1-332 above as paragraphs 1-332 of the Fifth Count.

334.    The Charitable Trusts are sham entities created by Daniel Carpenter to hold legal title to property and shield such property from creditors.

335. Daniel Carpenter testified that all of his personal assets are owned by trusts and shell companies in order to conceal his assets from creditors.

336. Daniel Carpenter testified that he used trusts and shell companies to conceal assets from the Benistar property exchange victims that obtained a judgment against him.

337. Judgment was entered against Mr. Carpenter and in favor of the Benistar property exchange victims in 2002.

338. Daniel Carpenter controlled the Charitable Trusts at all relevant times.

339. Between November 2, 2009 and November 12, 2009 Daniel Carpenter caused GM Holdings to transfer $1.76 million to the Charitable Trusts.

340. GM Holdings is a Daniel Carpenter alter ego.

341. At the time of the transfers to the Charitable Trusts, Mr. Carpenter was aware that Universitas was asserting its right to the Spencer insurance proceeds and considering litigation.

342. Daniel Carpenter transferred funds from GM Holdings to the Charitable Trusts as part of a scheme to divert his assets outside the reach of Universitas and other creditors, and with an intent to hinder, delay, and/or defraud Universitas and other creditors.

343. The Charitable Trusts had actual or constructive knowledge that the monetary transfers from GM Holdings were fraudulent at the time the conveyances were made.

344. The Charitable Trusts were unjustly enriched and benefitted from the receipt of funds from GM Holdings, and this unjust enrichment caused harm to Universitas.

345. The Charitable Trusts obtained legal title to Mr. Carpenter's assets, income, and earnings and hold legal title to assets worth millions of dollars.

346.     Mr. Carpenter granted the Charitable Trusts title to his assets, income, and earnings as part of a scheme to divert his assets outside the reach of creditors, and with an intent to hinder, delay, and/or defraud creditors.

347.     The Charitable Trusts had actual or constructive knowledge that the acquisition of legal title to Mr. Carpenter's assets, income, and earnings was fraudulent at the time it received such title.

348.     Daniel Carpenter is an equitable owner of all assets, income, and earnings owned by the Charitable Trusts.

349.     The Charitable Trusts were unjustly enriched and benefitted from the possession of legal title to Mr. Carpenter's assets, income, and earnings, and this unjust enrichment caused harm to Universitas.

350.     The Charitable Trusts participated in Daniel Carpenter's scheme to divert his assets outside the reach of Universitas and other creditors and were unjustly enriched as a result of its participation in this fraudulent scheme.

351.     The Charitable Trusts have not made any payment to Universitas.

352.     The Charitable Trusts' actions were unjust, inequitable, and intended to prevent Universitas and other creditors from reaching property to satisfy the debts.

353.     Daniel Carpenter uses the Charitable Trusts to hide property from creditors, and the Charitable Trusts wrongfully obtained property through fraudulent conduct, and it would be contrary to equity and good conscience for the Charitable Trusts to retain such property.

354.     Equity and good conscience require full restitution of the benefits wrongfully conveyed to the Charitable Trusts, and thus Universitas is entitled to restitution from the Charitable Trusts.

## SIXTH COUNT – UNJUST ENRICHMENT (AGAINST SEIR HILL)

355. Universitas hereby incorporates paragraphs 1-354 above as paragraphs 1-354 of the Sixth Count.

356. Seir Hill is a sham entity created by Daniel Carpenter to hold title to property located at 25 Seir Hill Road and shield such property from Universitas and other creditors.

357. Daniel Carpenter testified that all of his personal assets are owned by trusts and shell companies in order to conceal his assets from creditors.

358. Daniel Carpenter testified that he used trusts and shell companies to conceal assets from the Benistar property exchange victims that obtained a judgment against him.

359. Judgment was entered against Mr. Carpenter and in favor of the Benistar property exchange victims in 2002.

360. Seir Hill was incorporated in 2012.

361. Daniel Carpenter controlled Seir Hill at all relevant times.

362. On or about December 19, 2012 Daniel Carpenter transferred $150,000 from Carpenter Financial Group to Seir Hill.

363. Carpenter Financial Group is a Daniel Carpenter alter ego.

364. At the time of the transfer to Seir Hill, Daniel Carpenter was aware of litigation concerning Universitas' claim to the Spencer insurance proceeds.

365. Daniel Carpenter transferred funds from Carpenter Financial Group to Seir Hill as part of a scheme to divert his assets outside the reach of Universitas and other creditors, and with an intent to hinder, delay, and/or defraud Universitas and other creditors.

366. Seir Hill had actual or constructive knowledge that the monetary transfer from Carpenter Financial Group was fraudulent at the time the conveyance was made.

367. Seir Hill was unjustly enriched and benefitted from the receipt of funds from Carpenter Financial Group, and this unjust enrichment caused harm to Universitas.

368. Seir Hill used the funds from Carpenter Financial Group to purchase legal title to the property located at 25 Seir Hill Road.

369. The property located at 25 Seir Hill Road is secured by a mortgage guaranteed by BASI.

370. BASI is a Daniel Carpenter alter ego.

371. Daniel Carpenter is an equitable owner of the property located at 25 Seir Hill Road.

372. Daniel Carpenter caused Seir Hill to hold title to the property located at 25 Seir Hill Road as part of a scheme to divert his assets outside the reach of Universitas and other creditors, and with an intent to hinder, delay, and/or defraud Universitas and other creditors.

373. Seir Hill had actual or constructive knowledge that its acquisition of legal title to the property located at 25 Seir Hill Road was fraudulent at the time it received such title.

374. Seir Hill was unjustly enriched and benefitted from the possession of legal title to the property located at 25 Seir Hill Road, and this unjust enrichment caused harm to Universitas.

375. Seir Hill participated in Daniel Carpenter's scheme to divert his assets outside the reach of Universitas and other creditors and was unjustly enriched as a result of its participation in this fraudulent scheme.

376. Seir Hill has not made any payment to Universitas.

377. Seir Hill's actions were unjust, inequitable, and intended to prevent Universitas and other creditors from reaching property to satisfy the debts.

378.     Daniel Carpenter uses Seir Hill to hide property from creditors, and Seir Hill wrongfully obtained property through fraudulent conduct, and it would be contrary to equity and good conscience for Seir Hill to retain such property.

379.     Equity and good conscience require full restitution of the benefits wrongfully conveyed to Seir Hill, and thus Universitas is entitled to restitution from Seir Hill.

380.     As a result of Seir Hill's past unjust enrichment, Universitas is entitled to the imposition of a constructive trust with respect to the property located at 25 Seir Hill Road, as well as any profits received by Seir Hill in connection with the property located at 25 Seir Hill Road.

<u>SEVENTH COUNT – UNJUST ENRICHMENT (AGAINST GM PARTNERS)</u>

381.     Universitas hereby incorporates paragraphs 1-380 above as paragraphs 1-380 of the Seventh Count.

382.     Daniel Carpenter testified that all of his personal assets are owned by trusts and shell companies in order to conceal his assets from creditors.

383.     Daniel Carpenter testified that he used trusts and shell companies to frustrate creditors that received a judgment against him in litigation concerning the Benistar property exchange.

384.     Judgment was entered against Mr. Carpenter in litigation concerning the Benistar property exchange in 2002.

385.     Daniel Carpenter controlled GM Partners at all relevant times.

386.     On or about August 30, 2007 Mr. Carpenter transferred $155,000 from Grist Mill Capital, LLC to GM Partners.

387.     Grist Mill Capital, LLC is a shell company that Mr. Carpenter uses to "hide assets" from creditors.

388. GM Partners used the funds from Grist Mill Capital, LLC to purchase the property located at 100 Grist Mill Road.

389. GM Partners is a sham entity used by Daniel Carpenter to hold title to property located at 100 Grist Mill Road and shield such property from creditors.

390. Daniel Carpenter is an equitable owner of the property located at 100 Grist Mill Road.

391. Daniel Carpenter caused GM Partners to acquire legal title to the property located at 100 Grist Mill Road as part of a scheme to divert his assets outside the reach of creditors, and with an intent to hinder, delay, and/or defraud creditors.

392. GM Partners had actual or constructive knowledge that its acquisition of legal title to the property located at 100 Grist Mill Road was fraudulent at the time it received such title.

393. GM Partners was unjustly enriched and benefitted from the possession of legal title to the property located at 100 Grist Mill Road, and this unjust enrichment caused harm to Universitas.

394. GM Partners participated in Daniel Carpenter's scheme to divert his assets outside the reach of creditors and was unjustly enriched as a result of its participation in this fraudulent scheme.

395. GM Partners has not made any payment to Universitas.

396. GM Partners' actions were unjust, inequitable, and intended to prevent creditors from reaching property to satisfy the debts.

397. Daniel Carpenter uses GM Partners to hide property from creditors, and GM Partners wrongfully obtained property through fraudulent conduct, and it would be contrary to equity and good conscience for GM Partners to retain such property.

398.    Equity and good conscience require full restitution of the benefits wrongfully conveyed to GM Partners, and thus Universitas is entitled to restitution from GM Partners.

399.    As a result of GM Partners' past unjust enrichment, Universitas is entitled to the imposition of a constructive trust with respect to the property located at 100 Grist Mill Road, as well as any profits received by GM Partners in connection with the property located at 100 Grist Mill Road.

<u>EIGHTH COUNT – UNJUST ENRICHMENT (AGAINST MILL POND)</u>

400.    Universitas hereby incorporates paragraphs 1-399 above as paragraphs 1-399 of the Eighth Count.

401.    Daniel Carpenter testified that all of his personal assets are owned by trusts and shell companies in order to conceal his assets from creditors.

402.    Daniel Carpenter testified that he used trusts and shell companies to conceal assets from the Benistar property exchange victims that obtained a judgment against him.

403.    Judgment was entered against Mr. Carpenter and in favor of the Benistar property exchange victims in 2002.

404.    Mill Pond was incorporated in 2007.

405.    Daniel Carpenter controlled Mill Pond at all relevant times.

406.    On or about April 16, 2008 Mr. Carpenter transferred $300,000 from Carpenter Financial Group to Mill Pond.

407.    Carpenter Financial Group is a Daniel Carpenter alter ego.

408.    Mill Pond used the funds from Carpenter Financial Group to purchase the property located at 1 & 3 Mill Pond Lane.

409.     Mill Pond is a sham entity used by Daniel Carpenter to hold title to property located at 1 & 3 Mill Pond Lane and shield such property from creditors.

410.     Daniel Carpenter is an equitable owner of the property located at 1 & 3 Mill Pond Lane.

411.     Daniel Carpenter caused Mill Pond to acquire legal title to the property located at 1 & 3 Mill Pond Lane as part of a scheme to divert his assets outside the reach of creditors, and with an intent to hinder, delay, and/or defraud creditors.

412.     Mill Pond had actual or constructive knowledge that its acquisition of legal title to the property located at 1 & 3 Mill Pond Lane was fraudulent at the time it received such title.

413.     Mill Pond was unjustly enriched and benefitted from the possession of legal title to the property located at 1 & 3 Mill Pond Lane, and this unjust enrichment caused harm to Universitas.

414.     Mill Pond participated in Daniel Carpenter's scheme to divert his assets outside the reach of creditors and was unjustly enriched as a result of its participation in this fraudulent scheme.

415.     Mill Pond has not made any payment to Universitas.

416.     Mill Pond's actions were unjust, inequitable, and intended to prevent creditors from reaching property to satisfy the debts.

417.     Daniel Carpenter uses Mill Pond to hide property from creditors, and Mill Pond wrongfully obtained property through fraudulent conduct, and it would be contrary to equity and good conscience for Mill Pond to retain such property.

418.     Equity and good conscience require full restitution of the benefits wrongfully conveyed to Mill Pond, and thus Universitas is entitled to restitution from Mill Pond.

419. As a result of Mill Pond's past unjust enrichment, Universitas is entitled to the imposition of a constructive trust with respect to the property located at 1 & 3 Mill Pond Lane, as well as any profits received by Mill Pond in connection with the property located at 1 & 3 Mill Pond Lane.

NINTH COUNT – UNJUST ENRICHMENT (AGAINST MOLLY CARPENTER)

420. Universitas hereby incorporates paragraphs 1-419 above as paragraphs 1-419 of the Ninth Count.

421. Daniel Carpenter provided Molly Carpenter with full legal title to the property located at 18 Pondside Lane so as to shield this property from his creditors. Mrs. Carpenter accepted full legal title to the property located at 18 Pondside Lane with an intent to hinder, delay, and/or defraud Mr. Carpenter's creditors.

422. Daniel Carpenter is an equitable owner of the property located at 18 Pondside Lane.

423. Mrs. Carpenter was unjustly enriched and benefitted from the possession of legal title to the property located at 18 Pondside Lane, and this unjust enrichment caused harm to Universitas.

424. Mrs. Carpenter had actual or constructive knowledge that her acquisition of legal title to Daniel Carpenter's ownership in the property located at 18 Pondside Lane was fraudulent at the time the conveyance was made.

425. Mrs. Carpenter owns 99% of Moonstone. Mr. Carpenter caused Moonstone to hold legal title to the Carpenter vacation property so as to shield this property from Universitas and other creditors, and with an intent to hinder, delay, and/or defraud Universitas and other creditors.

426. Mrs. Carpenter had actual or constructive knowledge that Moonstone's acquisition of legal title to the Carpenter vacation property was fraudulent at the time it obtained title to such property.

427. Mrs. Carpenter was unjustly enriched and benefitted from Moonstone's possession of legal title to the Carpenter vacation property, and this unjust enrichment caused harm to Universitas.

428. Mrs. Carpenter is a partial owner of Seir Hill. Mr. Carpenter caused Seir Hill to hold legal title to the property located at 25 Seir Hill Road so as to shield this property from Universitas and other creditors, and with an intent to hinder, delay, and/or defraud Universitas and other creditors.

429. Mrs. Carpenter had actual or constructive knowledge that Seir Hill's acquisition of legal title to the property located at 25 Seir Hill Road was fraudulent at the time it obtained title to such property.

430. Mrs. Carpenter was unjustly enriched and benefitted from Seir Hill's possession of legal title to the property located at 25 Seir Hill Road, and this unjust enrichment caused harm to Universitas.

431. Mrs. Carpenter received at least $162,300 from Carpenter Financial Group.

432. Carpenter Financial Group is a Daniel Carpenter alter ego.

433. At the time of the transfers from Carpenter Financial Group to Molly Carpenter, Daniel Carpenter was aware that Universitas was asserting its right to the Spencer insurance proceeds and considering litigation.

434. Daniel Carpenter transferred funds from Carpenter Financial Group to Molly Carpenter with an intend to hinder, delay, and/or defraud Universitas and other creditors.

435. Mrs. Carpenter had actual or constructive knowledge that the monetary transfers from Carpenter Financial Group were fraudulent at the time of the conveyance.

436. Mrs. Carpenter was unjustly enriched and benefitted from the monetary transfers from Carpenter Financial Group, and this unjust enrichment caused harm to Universitas.

437. Mrs. Carpenter received at least $10,000 from Caroline Financial Group, Inc.

438. Caroline Financial Group, Inc. is a company Daniel Carpenter uses to hide assets from Universitas and other creditors.

439. At the time of the transfer from Caroline Financial Group, Inc. to Molly Carpenter, Daniel Carpenter was aware that Universitas was asserting its right to the Spencer insurance proceeds and considering litigation.

440. Daniel Carpenter transferred funds from Caroline Financial Group, Inc. to Molly Carpenter with an intend to hinder, delay, and/or defraud Universitas and other creditors.

441. Mrs. Carpenter had actual or constructive knowledge that the monetary transfer from Caroline Financial Group, Inc. was fraudulent at the time of the conveyance.

442. Mrs. Carpenter was unjustly enriched and benefitted from the monetary transfer from Caroline Financial Group, Inc., and this unjust enrichment caused harm to Universitas.

443. Mrs. Carpenter received substantial income and earnings from BASI.

444. BASI derived its value largely through the continued effort and industry of Daniel Carpenter.

445. BASI did not pay Mr. Carpenter for his effort and industry so as to keep Mr. Carpenter's earnings from the reach of Universitas and other creditors.

446. BASI is a Daniel Carpenter alter ego.

447. BASI is a Molly Carpenter alter ego.

448.     Mrs. Carpenter used the income and earnings paid from BASI to enable Mr. Carpenter to enjoy assets and property as though it were his own while shielding these assets from Universitas and other creditors.

449.     Mrs. Carpenter used the income and/or earnings from Benistar entities to make charitable donations in Daniel Carpenter's name and pay other expenses on behalf of Daniel Carpenter.

450.     Mrs. Carpenter acts as a conduit for Daniel Carpenter so as to keep property from the reach of Universitas and other creditors, and does so with an intent to hinder, delay, and/or defraud Universitas and other creditors.

451.     BASI can afford to pay substantial earnings and income to Mrs. Carpenter as a result of BASI's failure to pay income and earnings to Mr. Carpenter.

452.     Mrs. Carpenter had actual or constructive knowledge that the earnings and income paid to her by BASI in lieu of making such payment to Daniel Carpenter were fraudulent at the time of these conveyances.

453.     Mrs. Carpenter was unjustly enriched and benefitted from the income and earnings from BASI, and this unjust enrichment caused harm to Universitas.

454.     Molly Carpenter participated in Daniel Carpenter's scheme to divert his assets outside the reach of creditors and was unjustly enriched as a result of her participation in this fraudulent scheme.

455.     Molly Carpenter has not made any payment to Universitas.

456.     Mrs. Carpenter's actions were unjust, inequitable, and intended to prevent creditors from reaching property to satisfy the debts.

457.    Molly Carpenter wrongfully obtained property through fraudulent conduct, and it would be contrary to equity and good conscience for Mrs. Carpenter to retain such property.

458.    Equity and good conscience require full restitution of the benefits wrongfully conveyed to Mrs. Carpenter, and thus Universitas is entitled to restitution from Mrs. Carpenter.

459.    As a result of Molly Carpenter's past unjust enrichment, Universitas is entitled to the imposition of a constructive trust with respect to the property located at 18 Pondside Lane, as well as any profits received by Mrs. Carpenter in connection with the property located at 18 Pondside Lane.

460.    As a result of Molly Carpenter's past unjust enrichment, Universitas is entitled to the imposition of a constructive trust with respect to her earnings and income from BASI.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff demands judgment that:

(a)    Defendants be held jointly and severally liable for the full amount of the Southern District of New York Judgment for which Judgment Debtors are liable;

(b)    Defendants be held liable for damages for the additional claims and damages as outlined above;

(c)    Defendants be held jointly and severally liable for the reasonable and necessary attorneys' fees, expenses, and collection costs to the full extent of the Judgment Debtors' liability;

(d)    Defendants be held jointly and severally liable for pre- and post-judgment interest at the applicable rates to the full extent of the Judgment Debtors' liability under the Southern District of New York Judgment;

(e)    Defendants be held jointly and severally liable for all compensatory damages and lost profits;

(f)     Defendants be held jointly and severally liable for any other relief, in law and in equity, to which Universitas may be justly entitled.

**JURY DEMAND**

Universitas demands trial by jury as to all claims.