June 23, 2021

The Honorable Stefan R. Underhill
Chief Judge
United States Courthouse
915 Lafayette Boulevard
Bridgeport, CT 066044

**Re: Consolidation of the Cases Involving 100 Grist Mill Road**

The Petitioner Daniel Carpenter respectfully requests that Your Honor confer confidentially with Judge Chatigny and Judge Meyer to consolidate the various actions currently pending in the District of Connecticut and the unlawful raids on the property known as 100 Grist Mill Road. Petitioner would like to have the charging order in front of Judge Chatigny as well as the lawsuit by Universitas against Grist Mill Partners to be consolidated with this Court as well as Petitioner's criminal case that is also currently in front of Judge Chatigny.

Currently pending before Magistrate Judge Spector is a discovery request for bank records going back to 2009 for Grist Mill Partners ("GMP"), which is the sole owner of the property known as "100 Grist Mill Road" in Simsbury, which was subjected to two unlawful searches in April 2010 and May 2011 that are the subject of the motions before this Court. Apparently, Magistrate Spector did not review the objection filed by Petitioner with Judge Meyer, which is attached here as Exhibit One. Similarly, Magistrate Spector seems to be unaware that Universitas subpoenaed TD Bank in 2010, and actually sued TD Bank in 2015, allegedly on behalf of the Charter Oak Trust. Judge Scheindlin wrote a very clear and straightforward opinion in 2015 stating that the money was gone by October of 2009, so that any claim by Universitas against anyone after October 2012 was barred by the Statute of Limitations. See Judge Scheindlin's 2015 decision attached as Exhibit Two. Similarly, when Universitas brought this very same action in the Southern District of New York ("SDNY") last year, Judge Swain suggested that the Court did not have jurisdiction

over the action pursuant to *Peacock v. Thomas*, 516 U.S. 349 (1996). See Judge Swain's March 2020 Order attached as Exhibit Three. In order to circumvent Judge Swain, counsel for Universitas brought this current "alter-ego" action by actually ignoring the fact that the Judge Swain stated in her January 5, 2015, decision that "alter-ego" claims could not be brought in the Second Circuit, citing *Estate of Ungar v. Orascom*, 578 F. Supp. 2d 536 (2008).

Significantly, this is the decision that Judge Meyer relied upon in dismissing the claims against all of the defendants, except GMP, as barred by the doctrine of *res judicata*. More to the point, Universitas, the Plaintiff in front of Judge Meyer, argued to Judge Thompson 10 years ago that they should not be forced to defend themselves in Connecticut, as that would be too expensive. See attached as Exhibit Four an excerpt filed with Judge Thompson in 2011 explaining that Universitas was a fraudulent charity run by Sash Spencer's mistress, which explains why Spencer's widow, Mary Spencer, had no idea that there was $30 million of insurance on her husband. We have since come to learn that, not only were the fraudulent applications filled out by Spencer's agent Bruce Mactas, the change of beneficiary forms were all forged by Mactas in his office. However, the fraudulent actions by Mactas and Universitas are not necessary for the relief requested in this filing.

A big part of Petitioner's May 2014 Superseding Indictment suggests that Petitioner allegedly changed the Charter Oak Trust document, and several press releases by the Government suggest that Petitioner changed the Charter Oak Trust document to retain 20% for the Trust. See, for example, the press release from May of 2014 attached as Exhibit Five, and the press release after sentencing in December 2018 attached as Exhibit Six. But, we know that this is absolutely not the case and Sharon Siebert, in suing Jack Robinson's estate in September 2019, stated that they knew the Charter Oak Trust was amended in January 2007, but she felt that since that

Spencer's insurance policy was applied for in 2006 (15 years ago), they would be exempt from the 20% holdback. Once again, however, for the purpose of this motion - that is not the point. The point is that Ms. Siebert specifically references Section 6.01, which is the paragraph that the Government incorrectly alleges Petitioner changed in June of 2008, after learning of Mr. Spencer's death. See the Sharon Siebert Affidavit of September 2019 attached as Exhibit Seven.

It is because of these lies by the Government and inconsistencies in the Universitas story that Petitioner brought several motions in front of Judge Chatigny to receive the Grand Jury transcripts, the Jencks Act §3500 material, and the notes of the agents. Petitioner doubts that Judge Chatigny will prosecute AUSA Novick for perjury and other crimes - or submit his name to the Office of Professional Responsibility ("OPR") for review as Judge Nathan did in *US v. Nejad*, 487 F. Supp. 3d 206, 207 (S.D.N.Y. 2020), where only one Government exhibit was in dispute, but Petitioner simply wanted access to the Grand Jury transcripts to discover who told the Grand Jury the lie that Petitioner changed the Charter Oak Trust document Section 6.01 to keep the 20%.

Obviously, the astute reader will come to the conclusion that if Petitioner really controlled everything including the Charter Oak Trust, and had fraudulent intent in 2008, why change the document at all, if you are planning to steal "the whole $30 million dollars?" The mythical 2008 amendment never happened, but instead AUSA Novick strung together unlawfully seized emails from the Grist Mill Road computers to make his case against an innocent man, and we all know what Justice Brandeis had to say about that in his famous quote concerning the interaction between the Fourth Amendment and the Fifth Amendment and the right to be let alone. The Fourth and Fifth Amendment violations in this case are unprecedented, and should lead to AUSA Novick being disbarred, which is why Petitioner's case should be transferred to this Court from Judge Chatigny to be combined with the two Search Warrant cases. The Universitas Charging Order case

is also in front of Judge Chatigny and should be transferred to this Court or to Judge Meyer and Magistrate Spector.

After the Clerk's Judgment of August 2014, Universitas brought actions in Oklahoma against Avon Capital, LLC, and got a Charging Order against Carpenter Financial Group, Inc. ("CFG") in Connecticut, which owns 99% of GMP, which owns the property at 100 Grist Mill Road. Judge Chatigny granted that Charging Order in October of 2015, and Universitas sat on its rights because Judge Swain explained that unless GMP, clearly a non-judgment debtor, distributed money to CFG, there would be no means to attach those proceeds. Judge Swain made that decision in 2014, (seven years ago), when local law firms Halloran & Sage and Robinson & Cole worked together to get a lease for Curaleaf at 100 Grist Mill Road.

Once again, the purpose of this motion is to consolidate the 2015 Charging Order case that is in front of Judge Chatigny and the alter-ego claim against GMP that is currently in front of Judge Meyer with this Court, as well as Petitioner's criminal action, since there is no doubt that both raids violated the Fourth Amendment, which means Petitioner's conviction must be vacated and AUSA Novick's name referred to the OPR. Not only would this preserve scarce judicial resources in this difficult time of the COVID pandemic, it would finally provide some measure of justice for Petitioner's family and the wrongfully maligned family and friends of Petitioner, because of the clearly illegal actions of AUSA Novick.

In that regard, AUSA Novick has done everything possible to block Petitioner's access to his Grand Jury minutes. After playing games for several months, the Government submitted a copy of emails stating that they had provided all of the Grand Jury minutes to Petitioner's attorneys. See Exhibit Eight. Unfortunately, Petitioner was being detained at the Wyatt Detention Center for his trial and never saw any of these documents. But, as if the *Brady-Jenks* violations in this case were

not enough, AUSA Novick ordered attorney Richard Brown not to release any of the documents to Petitioner. See letter from attorney Richard Brown attached as Exhibit Nine. Petitioner was released from Home Confinement on May 7, 2021, and the very next week visited Attorney Brown's office to discover who told the lie that Petitioner had altered the Charter Oak Trust documents to steal the Sash Spencer proceeds from the fraudulent charity Universitas to buy the Rhode Island beach house.

But, what immediately jumped out of the Grand Jury transcripts to Petitioner, was that Agent Lynn Allen testified before the Grand Jury, under oath, that she had interviewed Sash Spencer's "right-hand man" Patrick Donaghy, and he stated that Spencer only took out the policies because he was going to sell them for a couple of million dollars profit to someone else. Petitioner actually testified to that same story in front of Judge Swain that he, Wayne Bursey, and Jack Robinson had discovered that Spencer's broker Bruce Mactas had made a deal with Don Trudeau to sell the Spencer policies for $1.8 million. Judge Swain stated in several of her opinions in 2013 and 2014 that she found Petitioner's testimony on this subject concerning the potential sale of the Spencer policies to Don Trudeau for $1,800,000 to be totally incredible. Now agent Lynn Allen and Patrick Donaghy's FBI 302 report corroborate Petitioner's testimony.

Why was it that Petitioner could not show Judge Swain the documentation that showed the Charter Oak Trust owed over $60 million to Grist Mill Capital at the time that Wayne Bursey paid the money from the Charter Oak Trust the Grist Mill Capital in 2009, which is the basis for Judge Swain's fraudulent conveyance rulings in 2014? The simple answer is that the IRS unlawfully stole Grist Mill Capital's property in April of 2010 in an unlawful search and seizure, and then AUSA Novick arranged to seize those very same boxes as part of the unlawful raid on 100 Grist Mill Road on May 26, 2011. At no time did Petitioner know of AUSA Novick's secret subpoena,

because AUSA Novick asked the law firm Halloran & Sage not to tell anyone about the subpoena as an investigation was ongoing. Needless to say, this was exactly the same conduct that Justice Holmes criticized and deplored in the landmark case of *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1919).

Attached as Exhibit Ten Is Wayne Bursey's Affidavit supporting his emergency Motion for the Return of Charter Oak Trust and Grist Mill Capital's property and boxes. As this Court realizes, those are the very same boxes that are still at the center of the Rule 41(g) dispute in this Court. They have yet to be returned years after Mr. Bursey's filing in front of Judge Covello in 2010. Wayne Bursey died in March of 2015 and Jack Robinson died in 2017, so only Petitioner is left to fight against the IRS and ask for the return of the property illegally seized. In his Motion, Mr. Bursey talks about the loss of a $2 billion deal with a German pension plan in Paragraph 8; and please pay special attention to Mr. Bursey's description of the boxes that he wants returned in Paragraph 12. See Exhibit Ten.

This list of boxes is the exact same list of boxes that AUSA Novick seized with his secret subpoena, which Petitioner never saw, and which is attached as Exhibit Eleven. Needless to say, these boxes are the missing boxes at the center of the current dispute with the IRS and before this Court. See, for example, *Carpenter v. Allen*, docket no. 3:14-cv-00741-SRU, Entry No. 75. More to the point, while Universitas is telling Magistrate Spector that they need more banking information from 2009 in 2021, they subpoenaed bank records from TD Bank in 2010 and from JP Morgan in 2013. They received volumes of information from both TD Bank and JP Morgan Chase, with a listing of all accounts and balances. Additionally, Universitas worked with AUSA Novick to deny Petitioner's bail in January 2014, suggesting that they had ownership of all of Mr. Carpenter's properties, including his wife's home, until Magistrate Martinez told AUSA Novick

to sit down. Now, Universitas is back in 2021 telling the "Big Lie" to try and seize Petitioner's daughter's home in a new motion in front of Judge Meyer. The claims by Universitas are not just untimely, they are absolutely false. This is one big fraud on the court that was created by Universitas in conjunction with AUSA Novick. Not only should Grist Mill Capital's property be returned immediately, this Court should order the release of Petitioner's Grand Jury transcripts so that Petitioner can send a detailed report to Judge Swain that he was telling the truth the entire time - as well as filing a Rule 60(b)(5) that the claims against all of the Judgment Debtors were not just unfounded, but the debt has been paid as Universitas has received a massive unjust enrichment of over $22 million. Furthermore, the simple answer to the question of why Petitioner and Grist Mill Partners do not have access to any of their banking records, is because the Government, the IRS, the DOL and AUSA Novick, are still illegally holding onto the same boxes concerning the Charter Oak Trust and Grist Mill Capital that were seized in the unlawful raid of April 20, 2010.

Therefore, in the interests of justice, Petitioner respectfully asks that Your Honor have a heart-to-heart talk with both Judge Chatigny and Judge Meyer to have all cases involving Petitioner or 100 Grist Mill Road be transferred to this Court, or at the very least, to have the Charging Order in front of Judge Chatigny transferred to Judge Meyer so that all of these untimely claims can be summarily dealt with. Petitioner would also request that this Court order Petitioner's Grand Jury transcripts to be released to Petitioner, and that this Court order the immediate release of all property of Grist Mill Partners and Grist Mill Capital that is already being demanded by Petitioner's Rule 41(g), along with any other remedies this Court deems proper in the interests of justice.

Respectfully submitted,

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro se*
18 Pond Side Lane
West Simsbury, CT 06092

# EXHIBIT ONE

Petitioner's Objection in Support of his Motion to Quash

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNIVERSITAS EDUCATION, LLC<br><br>                               Plaintiff.<br><br>v.<br><br>BENISTAR, ET.AL.<br><br>                               Defendants. | CASE NO. 3:20-cv-00738-JAM<br><br>JUNE 9, 2021 |

### PETITIONER DANIEL CARPENTER'S OBJECTION
### IN SUPPORT OF HIS MOTION TO QUASH

TO THE HONORABLE JEFFREY A. MEYER, MAY IT PLEASE THE COURT:

NOW COMES Daniel Carpenter, the *pro se* Petitioner Non-Party Movant in this case to respectfully object to Magistrate Spector's denial of Petitioner's Motion to Quash. The Magistrate failed to acknowledge Judge Swain's March 2020 Order that this Court lacks jurisdiction as a matter of law. He failed to follow Judge Scheindlin's December 2015 Order that any claim brought by Universitas against anyone after October 2012 was time-barred by the Statute of Limitations. Nor did he cite Judge Swain's Order from January 2015 stating that "alter-ego" claims like this action are barred in the Second Circuit, which is the case this Court largely relied upon in its Order earlier this year, dismissing many of the Universitas claims as barred by the Doctrine of the Res Judicata.

Instead of relying on any of these clear precedents, the Magistrate takes a wrong turn by citing Judge Chatigny's clearly erroneous opinion that Petitioner somehow managed to acquire the Sash Spencer proceeds, and that is what justifies Petitioner being deposed once more, 12 years after the alleged theft of the Sash Spencer proceeds occurred in 2009.

1

In an attempt to give the Magistrate the benefit of the doubt, Petitioner reported to prison in June of 2014 and just came off Home Confinement May 7, 2021. The very next week Petitioner read the Grand Jury Minutes of his Indictment for the very first time. In there, Agent Lynn Allen explains that Sash Spencer's right-hand man, Patrick Donaghy, told her that the only reason that Sash Spencer took out the two life insurance policies was to sell them to someone (Don Trudeau) for a "couple of million" ($1,800,000) dollars. While Petitioner explained this very same transaction to Judge Swain, she found it to be "incredible" in the same decision that this Court cites to several times.

Petitioner has not filed his 2255 Petition yet, but has instead focused on the egregious prosecutorial misconduct in this case, and in fact cites the "Big Lie" told by Universitas as the major reason for needing access to the Grand Jury Minutes. Also the challenges to both Search Warrants are pending in front of Chief Judge Underhill.

The fact that Magistrate Spector ignores the clear obvious truth that Universitas was a fake charity run by Sash Spencer's mistress and had nothing to do with providing Scholarships to "inner city" scholars as Wayne Bursey was told, but accepts the "Big Lie" that somehow Petitioner "stole" the Sash Spencer proceeds to buy the "Beach House" in Rhode Island, is frankly the bane of Petitioner's existence. Clearly the Magistrate could take one look at the Exhibits attached to the various filings and see that the counsel for Universitas has had this banking information from all of these entities since 2012 — and certainly since 2014 from the JPMorgan Chase response.

Furthermore, in suing Attorney Jack Robinson's estate (Jack Robinson who died in 2017 was the attorney that denied the Universitas claim in 2009 that led to the Arbitration of 2010), Sharon Siebert in a September 2019 Affidavit stated that they knew that Section 6.01 of the

Charter Oak Trust was amended in January 2007 — but Sash Spencer's application with Lincoln was approved in 2006 — fully 15 years ago — and it is indisputable that Petitioner did not fill out, sign, or send in either of the Sash Spencer Applications that are at the center of this case.

Therefore, this Court can either choose to believe the "Big Lie" that counsel for Universitas keeps repeating in order to bankrupt the two ladies behind Universitas, or listen to Petitioner that Counsel for Universitas has received over $22,000,000 — very little of which has been recovered by the two ladies. It appears also that they are being sued in Texas and Massachusetts and soon they will be sued in Connecticut and that case will probably be assigned to this Court as a related case. Perhaps it would be better to end this madness, grant Petitioner's Motion to Quash, sanction the counsel for Universitas, and follow Judge Scheindlin's lead that all the claims brought after October of 2012 are time-barred or Judge Swain's lead that his Court lacks Subject Matter Jurisdiction. Either way, there is no reason for Petitioner and his family and friends to be continually harassed over closed accounts at dead companies.

> Respectfully submitted,
> / s / Daniel E. Carpenter
> Daniel E. Carpenter
> Movant/Non-Party
> Petitioner, pro se
> 18 Pond Side Lane
> West Simsbury, CT. 06092

# EXHIBIT TWO
## Judge Scheindlin's Order Granting
## TD Bank's Motion to Dismiss

Universitas Education, LLC v. Bank, Not Reported in Fed. Supp. (2015)

2015 WL 9304551

2015 WL 9304551
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

UNIVERSITAS EDUCATION, LLC, Plaintiff,

v.

T.D. BANK, N.A., Defendant.

15-cv-5643 (SAS)
|
Signed 12/21/2015

**Attorneys and Law Firms**

Annie E. Causey, Esq., Napoli Shkolnik PLLC, 1301 Avenue of The Americas, New York, NY 10019, (212) 397-1000, Marie E. Napoli, Esq., Napoli Law, PLLC, 1301 Avenue of The Americas, New York, NY 10019, (212) 397-1000, Paul J. Napoli, Esq., Napoli Bern Ripka & Associates, 350 Fifth Avenue, New York, NY 10118, (212) 267-3700, for Plaintiff.

Jeffrey J. Chapman, Esq., Aaron F. Jaroff, Esq., McGuire Woods LLP, 1345 Avenue of the Americas, 7th Floor, New York, NY 10105, (212) 548-7060, for Defendant.

## MEMORANDUM OPINION AND ORDER

SHIRA A. SCHEINDLIN U.S.D.J.

*1 Plaintiff Universitas Education, LLC ("Universitas") brings this diversity action against defendant T.D. Bank alleging the aiding and abetting of conversion and related claims stemming from the alleged misappropriation of certain assets by a non-party actor, using T.D. Bank as its financial institution. Defendant moves to dismiss, arguing that plaintiff's claims are time-barred. For the following reasons, defendant's motion is GRANTED.

## I. BACKGROUND[1]

On May 15, 2009, the Lincoln National Life Insurance Company issued two checks to the Charter Oak Trust totaling $30,677,276.85, representing the life insurance proceeds for two life insurance policies issued on the life of Mr. Sash Spencer.[2] Mr. Spencer, now deceased, named Universitas as the sole beneficiary of the Charter Oak Trust.[3] Nova Group, Inc. served as the trustee.[4]

Contemporaneous with the Charter Oak Trust's receipt of the life insurance proceeds, Nova Group sought to open a new bank account for the Trust.[5] It applied for this account with at least three major banking institutions, and was declined by at least Bank of America due to Nova Group's failure to satisfy certain due diligence protocols.[6] T.D. Bank accepted Nova Group's application, and opened an account for Charter Oak Trust on May 12, 2009.[7]

On May 20 and May 21, 2009, T.D. Bank accepted applications for and opened business checking accounts for Nova Group and several related entities.[8] From May 21, 2009 to October 27, 2009, Nova Group transferred Charter Oak Trust proceeds to and

between its business checking accounts, and directly withdrew $19.8 million from the Charter Oak Trust account.[9] Universitas was aware that Nova Group did not intend to remit the Charter Oak Trust's proceeds to it by October 2009.[10]

Plaintiff filed a demand for arbitration against the Nova Group on June 17, 2010.[11] The arbitrator awarded plaintiff damages in the amount of $26,558,308.26 plus interest on January 24, 2011.[12] The award was confirmed on June 5, 2012.[13] In the meantime, T.D. Bank closed all accounts associated with Nova Group, which has yet to pay any of the arbitration award to plaintiff.[14] On July 17, 2015, plaintiff brought this action against T.D. Bank accusing it of aiding and abetting in this conversion, and bringing several related claims.

## II. LEGAL STANDARD

*2  In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept[ ] all factual allegations in the complaint as true and draw[ ] all reasonable inferences in the plaintiff's favor."[15] The court evaluates the sufficiency of the complaint under the "two-pronged approach" set forth by the Supreme Court in *Ashcroft v. Iqbal*.[16] Under the first prong, a court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."[17] For example, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[18] Under the second prong of *Iqbal*, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[19] A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[20] Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[21]

When deciding a 12(b)(6) motion to dismiss, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."[22] " '[I]t is 'axiomatic that the Complaint cannot be amended by briefs in opposition to a motion to dismiss.' "[23]

## III. DISCUSSION

When sitting in diversity, a federal court applies New York's statutes of limitations to state law claims.[24] Under New York law, causes of action accrue at the time and in the place of the injury.[25] Applying these principles to the instant case, each of plaintiff's causes of action is time-barred, and must be dismissed.

### A. Aiding and Abetting Conversion Claim

Allegations for conversion, and aiding and abetting of conversion, are subject to a three-year statute of limitations.[26] A conversion occurs when one exercises unauthorized dominion over the property of another to the exclusion of the rights of the lawful owner.[27] Here, the alleged conversion took place no later than October 2009, when Nova Group formally refused to remit the proceeds of the Charter Oak Trust to plaintiff.[28] Thus, plaintiff's conversion claim was time-barred as of October 2012.

### B. Fraud Claims

Claims for fraud and the aiding and abetting of fraud are normally governed by New York's six-year statute of limitations.[29] However, a "[c]ourt will not apply the six-year statute of limitations if the claim of fraud is merely incidental to another claim with a shorter limitations period."[30] To determine whether a fraud claim is "merely incidental" to other claims in an action, courts examine the "gravamen," or basic essence, of a plaintiff's claims.[31] In order to not be "merely incidental," a fraud claim

must be distinct from a plaintiff's other claims — it must be a claim in its own right, and not merely recast the same facts as other claims in order to obtain the benefit of the longer limitations period.[32]

*3  The gravamen of plaintiff's fraud claims are that Nova Group converted Charter Oak Trust funds meant for Universitas, and that defendant — by opening accounts and approving transfers between them — aided and abetted in that conversion. The facts underlying the fraud and conversion claims are the same. The injuries are the same. The relief sought is identical. Both the fraud and the aiding and abetting fraud claims are identical, for all intents and purposes, to the aiding and abetting conversion claim, and are merely incidental thereto. "Time barred claims cannot be revitalized by tricks of pleading";[33] the six-year statute of limitations does not apply to plaintiff's claim of aiding and abetting fraud. Plaintiff's claims for fraud and aiding and abetting fraud are subject to the three-year statute of limitations governing plaintiff's conversion claim, and are time-barred.

### C. Fiduciary Duty Claims

New York does not prescribe a statute of limitations for claims based on the breach of a fiduciary duty, and instead determines the applicable limitations period based on the substantive remedy sought.[34] Where a plaintiff seeks only money damages — as is the case here — a three-year statute of limitations applies.[35] For the same reasons described above, plaintiff's claims accrued in October 2009, and were time-barred as of October 2012.

### D. Unjust Enrichment Claim

Claims for unjust enrichment are generally governed by a six-year statute of limitations.[36] However, as with claims for fraud and breach of a fiduciary duty, if an unjust enrichment claim is merely incidental to a claim governed by a shorter statute of limitations, "the Court will not allow a plaintiff to avail himself of a longer limitations period."[37] Here, plaintiff's unjust enrichment claim recites the same facts and circumstances as its conversion claim, and is just as incidental to the conversion claim as the fraud claims. The three-year statute of limitations therefore applies, and plaintiff's claim was time-barred as of October 2012.

### E. Negligence Claims

New York applies a three-year statute of limitations to all negligence claims, including claims for negligent hiring and negligent supervision.[38] As with conversion claims, the limitations period begins to run at the time and place of injury, "even though the injured party may be ignorant of the existence of the wrong or injury."[39] The injury alleged in support of the negligence claims is the same injury as alleged for the conversion claim and claims incidental to the conversion. Plaintiff's negligence claims were therefore time-barred as of October 2012.

### F. Racketeer Influenced and Corrupt Organizations Act ("RICO") Claim

Civil RICO claims are subject to a four-year statute of limitations.[40] The four-year limitations period begins to run "upon the discovery of the injury alone."[41] As with all of plaintiff's claims, the only injury alleged in plaintiff's civil RICO claim is the conversion of the Charter Oak Trust funds, of which plaintiff had actual notice in October 2009 when Nova Group formally denied plaintiff's claim to the trust funds. Plaintiff's civil RICO claim was therefore time-barred as of October 2013.

## IV. CONCLUSION

*4  For the foregoing reasons, defendant's motion is GRANTED. The Clerk of the Court is directed to close this motion (Dkt. No. 12) and this case.

SO ORDERED.

Universitas Education, LLC v. Bank, Not Reported in Fed. Supp. (2015)
2015 WL 9304551

**All Citations**

Not Reported in Fed. Supp., 2015 WL 9304551

Footnotes

1   All facts recited herein are taken from the Amended Complaint ("Compl.") unless otherwise noted.
2   *See* Compl. ¶ 38.
3   *See id.*
4   *See id.* ¶ 39.
5   *See id.* ¶ 44.
6   *See id.* ¶ 45.
7   *See id.* ¶ 50.
8   *See id.* ¶¶ 53-54.
9   *See id.* ¶¶ 57-66.
10  *See* Petition to Confirm Arbitration Award ("Petition"), Exhibit 1 to 9/11/15 Declaration of Jeffrey J. Chapman, counsel for defendant, in Support of Defendant's Motion to Dismiss the Amended Complaint ("Chapman Dec.") ¶ 7 ("Nova Group formally rejected Universitas' claim to the Death Benefit twice, initially in October 2009, and on appeal in February 2010."); Affidavit of Sharon Sieber, member of Universitas Education, LLC, Exhibit 4 to Chapman Dec. ¶¶ 8-12 (outlining steps taken by plaintiff to secure Charter Oak Trust monies in 2009).
11  *See* Compl. ¶ 68.
12  *See id.* ¶ 70.
13  *See id.* ¶ 71.
14  *See id.* ¶ 72.
15  *Grant v. County of Erie*, 542 Fed. App'x 21, 23 (2d Cir. 2013).
16  *See* 556 U.S. 662, 678-79 (2009).
17  *Id.* at 679.
18  *Id.* at 678 (citation omitted).
19  *Id.* at 679.
20  *Id.* at 678 (citation omitted).
21  *Id.* (quotations omitted).
22  *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).
23  *Ace Arts, LLC v. Sony/ATV Music Pub., LLC*, 56 F. Supp. 3d 436, 451 (S.D.N.Y. 2014) (quoting *O'Brien v. National Prop. Analysts Partners*, 719 F.Supp. 222, 229 (S.D.N.Y. 1989)).
24  *See, e.g.*, *Thea v. Kleinhandler*, No. 14-3201, 2015 WL 6684322, at *4 (2d Cir. Nov. 3, 2015).
25  *See id.*
26  *See* N.Y. Civil Practice Law & Rules ("C.P.L.R.") § 214(3).
27  *See Kirschner v. Bennett*, 648 F. Supp. 2d 252, 240 (S.D.N.Y. 2009).
28  *See* Petition ¶ 7.
29  *See* N.Y. C.P.L.R. § 213(8).
30  *Malmsteen v. Berdon, LLP*, 447 F. Supp. 2d 655, 663 (S.D.N.Y. 2007).
31  *See Marketxt Holdings Corp. v. Engel & Reiman, P.C.*, 693 F. Supp. 2d 387, 394 (S.D.N.Y. 2010) (holding a fraud claim to be incidental to related claims where "the gravamen of plaintiff's claims is that [defendant] stole funds from [plaintiff], not that he lied about doing so").
32  *See Midwest Mem'l Grp., LLC v. International Fund Servs. (Ireland) Ltd.*, No. 10 Civ. 8860, 2011 WL 4916407, at *5 (S.D.N.Y. Oct. 17, 2011).
33  *Id.*
34  *See Ciccone v. Hersh*, 530 F. Supp. 2d 574, 579 (S.D.N.Y. 2008).

Universitas Education, LLC v. Bank, Not Reported in Fed. Supp. (2015)
2015 WL 9304551

35    *See Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 942 (2d Cir. 1998). Claims for breach of a fiduciary duty based on allegations of fraud may be subject to a six-year statute of limitation, but only in instances where the fraud is not incidental to another claim. *See Marketxt*, 693 F. Supp. 2d at 398. As described above, plaintiff's fraud claims are incidental to its conversion claim, and the three-year statute of limitations applies.

36    *See* N.Y. C.P.L.R. § 213(1).

37    *Malmsteen*, 447 F. Supp. 2d at 667.

38    *See* N.Y. C.P.L.R. § 214(4); *Coleman & Co. Sec., Inc. v. Giaquinto Family Tr.*, 236 F. Supp. 2d 288, 299, 303 (S.D.N.Y. 2002).

39    *Fritzhand v. Discover Fin. Servs., Inc.*, 800 N.Y.S. 2d 319, 319 (Sup. Ct. Nassau Co. 2005). *Accord Midwest Mem'l Grp.*, 2011 WL 4916407, at *3 (holding that New York "does not apply a 'discovery rule' to extend accrual [of a claim] until a plaintiff discovers that injury").

40    *See Rotella v. Wood*, 528 U.S. 549, 552 (2000).

41    *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 150 (2d Cir. 2012).

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT THREE
Judge Swain's March 31, 2020 Order

The following transaction was entered on 4/1/2020 at 9:48 AM EDT and filed on 3/31/2020

**Case Name:**     Universitas Education, LLC v. Nova Group, Inc.

**Case Number:**   1:11-cv-01590-LTS-HBP

**Filer:**

**WARNING: CASE CLOSED on 06/07/2012**

**Document Number:** 661

**Docket Text:**

**ORDER: The Court has received and reviewed in their entirety Plaintiff's March 23, 2020, letter motions requesting entry of judgment against Moonstone Partners, LLC, Benistar Admin Services, Inc. ("BASI"), and Molly Carpenter, (Docket Entry Nos. 658, 659), as well as the March 30, 2020, letter from counsel for those entities opposing entry of judgment (Docket Entry No. 660). Plaintiff's letter motions request relief that is not enumerated in NYSD Local Civil Rule 7.1(d), which describes applications which may be brought by letter motion. Accordingly, the motions are DENIED without prejudice to formal motion practice in compliance with the relevant federal, local, and individual procedural rules of Court. Any such motion must address the legal basis, if any, for the Court's exercise of personal jurisdiction over the non-party entities named in the above-referenced letter motions, whether such a motion is the appropriate procedural mechanism by which the Court can enforce its Memorandum Order confirming the arbitration award in this case (Docket Entry No. 40) against non-parties to the underlying litigation, and whether such motion practice is consistent with the limitations of ancillary jurisdiction as described in Peacock v. Thomas, 516 U.S. 349 (1996), and the Court's order interpreting Peacock and denying Plaintiff's prior turnover motion in this case. See Docket Entry No. 545. Any such motion must also address the legal and factual basis for the requested judgment amount in light of any recoveries Plaintiff has already obtained. (Signed by Judge Laura Taylor Swain on 3/31/2020) (mro)**

# EXHIBIT FOUR

July 25, 2012, Motion to Dismiss in front of Judge Thompson

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

------------------------------------------------------------------------

UNIVERSITAS EDUCATION, LLC,                    :

                         Petitioner,        :        No.: 12-mc-00102-AWT

                     -v-                      :

NOVA GROUP, INC., as Trustee, Sponsor          :
and Named Fiduciary of the CHARTER OAK         :
TRUST WELFARE BENEFIT PLAN,                     :      JULY 25, 2012

                    Respondent.        :

------------------------------------------------------------------------

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
## FOR LACK OF SUBJECT MATTER JURISDICTION

Pursuant to Fed. R. Civ. P. 12(b)(1) and 28 U.S.C. § 1963, respondents Nova Group, Inc. ("Nova") and the Charter Oak Trust Welfare Benefit Plan ("Charter Oak Trust") hereby submit this memorandum in support of their motion to dismiss this action for lack of subject matter jurisdiction.

Subject matter jurisdiction is lacking because petitioner Universitas Education, LLC ("Universitas") "jumped the gun" and prematurely and improperly registered a foreign judgment in this Court in flagrant violation of 28 U.S.C. § 1963. Assuming the action is not dismissed on this basis alone, the action should be dismissed for the additional reason that the rendering court lacked subject matter jurisdiction over the original action.

Furthermore, because counsel for Universitas failed to comply with the strict requirements of 28 U.S.C. § 1963, Nova and the Charter Oak Trust seek an award of their attorneys' fees and costs incurred in this action to be paid by counsel for Universitas *personally* as required by 28 U.S.C. § 1927.

## BACKGROUND

Nova, as the Plan Sponsor and Named Fiduciary of the Charter Oak Trust, denied Universitas' claim for death benefits from the Charter Oak Trust. As required by the express provisions of the Charter Oak Trust, the parties submitted their dispute to binding arbitration. On January 24, 2011, the arbitrator issued an award ("Award") finding that Universitas was entitled to death benefits from the Charter Oak Trust.[1]

On January 25, 2011, Nova (for and on behalf of the Charter Oak Trust) commenced an action to vacate the Award in Connecticut state court. Universitas subsequently removed that action to the District of Connecticut based *solely* on diversity of citizenship. See Universitas Education, LLC v. Nova Group, Inc., No. 11-cv-00342-AWT, Dkt. No. 1 (D. Conn. Mar. 3, 2011). In its Notice of Removal, Universitas alleged that Nova is a Delaware corporation with its principal place of business in Connecticut (meaning that Nova is a citizen of both Delaware and Connecticut) and that all members of Universitas reside and are domiciled in New York (meaning that Universitas is a citizen of New York). Id. at 2. However, and not recognized by the parties at that time, Universitas failed to address the citizenship of the Charter Oak Trust.

On February 11, 2011, Universitas commenced a separate action to confirm the Award in New York state court. Relying on the representations made by Universitas in its removal papers

---

[1] Universitas and its affiliate Destination Universitas Foundation both comprise a sham and now defunct charity, as Universitas has recently admitted that Destination Universitas lost its 501(c)(3) federal tax exempt status. Universitas is headed by the former mistress of decedent S.A. "Sash" Spencer, a successful hedge fund manager who died unexpectedly in June 2008 at the time that he was a participant in the Charter Oak Trust. When Mr. Spencer's widow, Mary Spencer, discovered that a "charity" operated by her late husband's mistress was slated to split a substantial death benefit with Mr. Spencer's former employer Holding Capital Group, Inc. ("Holding Capital"), Mary Spencer threatened to sue Universitas, the former mistress, and Holding Capital. As a result, Mrs. Spencer, Universitas and Holding Capital negotiated a settlement agreement in July 2008 *that they requested the Charter Oak Trust to sign* whereby Mary Spencer would receive the *entire* death benefit in return for making a comparatively small "charitable contribution" to Universitas.

2

# EXHIBIT FIVE

USDOJ May 27, 2014 Press Release

United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE

DISTRICT *of* CONNECTICUT

U.S. Attorneys » District of Connecticut » News And Press Releases

**Department of Justice**

U.S. Attorney's Office

District of Connecticut

FOR IMMEDIATE RELEASE                                                        Tuesday, May 27, 2014

## Two Connecticut Men Face Additional Charges Related To Stranger-originated Life Insurance Scheme

Follow @USAO_CT

Deirdre M. Daly, United States Attorney for the District of Connecticut, Cheryl Garcia, Acting Special Agent-in-Charge, U.S. Department of Labor – Office of Inspector General, Susan A. Hensley, Regional Director, U.S. Department of Labor – Employee Benefits Security Administration's Boston Office, and Christy Romero, Special Inspector General for the Troubled Asset Relief Program (SIGTARP), todayannounced that **DANIEL CARPENTER**, 60, of Simsbury, and **WAYNE BURSEY**, 63, of Bloomfield, have been charged in a 57-count superseding indictment with various conspiracy, fraud and illegal monetary offenses stemming from a scheme to defraud insurance companies into issuing insurance policies on the lives of elderly people for the benefit of the defendants and other investors, also known as a stranger-originated life insurance scheme.

In December 2013, CARPENTER and BURSEY were charged in a 33-count indictment with conspiracy to commit mail and wire fraud, and multiple wire fraud and mail fraud offenses. The superseding indictment, which was returned by a grand jury in Hartford on May 14, 2014, adds one count of conspiracy to commit money laundering, 10 counts of money laundering, and 13 counts of making illegal monetary transactions.

CARPENTER appeared today before U.S. Magistrate Judge Donna F. Martinez in Hartford and entered a plea of not guilty to the charges. BURSEY's arraignment is not yet scheduled.

According to the superseding indictment, CARPENTER and BURSEY ran a series of companies, based in Simsbury and Stamford, that developed an employee welfare benefit plan and trust (the "Trust") whose primary objective was to secure insurance policies on the lives of elderly individuals that could be held by the defendants and others as investments, or resold on the life settlement market, which is a third-party market for life insurance policies. Typically, insurance agents working with, for, or on behalf of the defendants approached individuals who were over the age of 70 (the "Straw Insureds"). The agents promised to provide the Straw Insureds with free life insurance for two years, and, at the end of the two years, would attempt to sell the policies on the life settlement market. In most cases, the agents promised the Straw Insureds that they would receive a portion of any sale proceeds. In other cases, the Straw Insureds were offered a cash inducement up front to participate.

The indictment alleges that CARPENTER and BURSEY, working with insurance agents, caused to be submitted to several insurance providers numerous insurance applications that contained several material misrepresentations, including falsely denying that third-parties were paying the premiums for the insurance, falsely denying discussions about the resale of the policies, falsely inflating the net worth and/or income of the insured, and falsely claiming that the insurance was being purchased for legitimate estate planning-related needs. All applications were signed by BURSEY, who acted as trustee of the Trust, which was to be the "owner" of all policies in the Trust. Moreover, the applications purported that the Trust was a bona fide welfare benefit trust under Internal Revenue Code Section 419(e), wherein employers would be making contributions to the Trust in order to fund the life insurance policies for the benefit of certain select employees.

The indictment further alleges that, in truth, no "employer" or Straw Insured ever paid a premium into the Trust, and the premiums were funded by loans, which typically came to the Trust from another company headquartered in Simsbury and controlled by CARPENTER. In many cases, those loans were, in turn, financed by another third-party financing company based in Stamford. The loan arrangements were withheld from the insurance providers, who would likely not have issued policies had they known the true nature of the Trust, and had the insurance applications been filled out truthfully.

The indictment further alleges that one Straw Insured died within the first two years of the issuance of the two insurance policies on his life. Those policies had been issued in late 2006 and early 2007 based on misrepresentations similar to those described above, specifically that his policies were not being funded by a third party and were not intended for resale. The two insurance policies had a combined death benefit of $30 million, which the insurer paid to the Trust in May 2009, in part based upon further misrepresentations made by CARPENTER, BURSEY and others. According to the indictment, the Trust, directed by CARPENTER and BURSEY and others, failed to pay the $30 million to the Straw Insured's beneficiary, and instead used the funds to pay for various expenses, including other insurance premiums that were related to the underlying fraud, as well as to purchase a home in Rhode Island.

If convicted, CARPENTER and BURSEY face a maximum term of imprisonment of 20 years on each count of wire fraud and mail fraud, a maximum term of imprisonment of 20 years of each count of money laundering and conspiracy to commit money laundering, and a maximum term of imprisonment of 10 years on each count of making illegal monetary transactions.

This case is assigned to U.S. District Judge Robert N. Chatigny in Hartford.

This matter is being investigated by the U.S. Department of Labor – Office of the Inspector General, the U.S. Department of Labor – Employee Benefits Security Administration's Boston Office, and the Special Inspector General for the Troubled Asset Relief Program. The case is being prosecuted by Assistant U.S. Attorneys David E. Novick and Neeraj N. Patel.

**PUBLIC AFFAIRS CONTACT:**

**U.S. ATTORNEY'S OFFICE**
Tom Carson
(203) 821-3722
thomas.carson@usdoj.gov

---

**Component(s):**
USAO - Connecticut

Updated March 18, 2015

# EXHIBIT SIX

USDOJ December 3, 2018, Press Release



United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE
DISTRICT *of* CONNECTICUT

U.S. Attorneys » District of Connecticut » News And Press Releases

**Department of Justice**

U.S. Attorney's Office

District of Connecticut

FOR IMMEDIATE RELEASE

Monday, December 3, 2018

## Simsbury Man Sentenced to Prison for Multimillion Dollar Stranger-Originated Life Insurance Scheme

John H. Durham, United States Attorney for the District of Connecticut, announced that DANIEL CARPENTER, 64, of Simsbury, was sentenced today by U.S. District Judge Robert N. Chatigny in Hartford to 30 months of imprisonment, followed by three years of supervised release, for defrauding insurance companies into issuing insurance policies on the lives of elderly people for the financial benefit of Carpenter and other investors in the scheme.

On June 9, 2016, Judge Chatigny found Carpenter guilty of 57 counts of conspiracy, mail and wire fraud, money laundering and illegal monetary transaction offenses stemming from the scheme, also known as a stranger-originated life insurance scheme. The verdict followed a bench trial that began on February 16, 2016 and concluded on March 21, 2016. Carpenter had waived his right to a trial by jury.

According to the evidence at trial, Carpenter controlled a series of companies, based in Simsbury and Stamford, that developed the Charter Oak Trust (the "Trust"), an employee welfare benefit plan and trust whose primary objective was to secure insurance policies on the lives of elderly individuals that could be held by Carpenter's companies as investments, or resold on the life settlement market, which is a third-party market for life insurance policies. Typically, insurance agents working with, for, or on behalf of Carpenter and his companies approached elderly individuals (the "Straw Insureds"). The agents promised to provide the Straw Insureds with free life insurance for two years, and, at the end of the two years, would attempt to sell the policies on the life settlement market. In most cases, the agents promised the Straw Insureds that they would receive a portion of any sale proceeds.

The evidence at trial established that Carpenter, working with insurance agents, caused to be submitted to several insurance providers numerous insurance applications that contained several material misrepresentations, including falsely denying that third-parties were paying the premiums for the insurance, falsely denying discussions about the resale of the policies, falsely inflating the net worth and/or income of the insured, and falsely claiming that the insurance was being purchased for legitimate estate planning-related needs. All applications were signed by Carpenter's brother-in-law, who acted as trustee of the Charter Oak Trust, which was to be the "owner" of all policies in the trust. Moreover, the applications purported that the Charter Oak Trust was a bona fide welfare benefit trust under Internal Revenue Code Section 419(e), wherein employers would be making contributions to the Charter Oak Trust in order to fund the life insurance policies for the benefit of certain select employees.

The evidence further established that, in truth, no "employer" or Straw Insured ever paid a premium into the Charter Oak Trust.  Rather, the premiums were funded by loans primarily from another company headquartered in Simsbury and controlled by Carpenter.  In many cases, those loans were, in turn, financed by another third-party financing company based in Stamford.  The loan arrangements were withheld from the insurance providers, who would not have issued policies had they known the true nature of the Charter Oak Trust, and had the insurance applications been filled out truthfully.

Based on the false applications that were submitted to the insurance providers, the Charter Oak Trust procured 84 insurance policies that had a total aggregate death benefit of more than $459 million on the lives of 76 different Straw Insureds.  In addition, another company controlled by Carpenter received more than $12 million in commissions from the insurance providers, who would not have paid the commissions had they known about the false representations on the insurance applications and the true nature of the Charter Oak Trust.

Finally, the trial evidence showed that one Straw Insured died within the first two years of the issuance of the two insurance policies on his life.  Those policies had been issued in late 2006 and early 2007 based on misrepresentations similar to those described above, specifically that his policies were not being funded by a third party and were not intended for resale.  The two insurance policies had a combined death benefit of $30 million, which the insurer paid to the Charter Oak Trust in May 2009.  At Carpenter's direction, the Charter Oak Trust failed to pay the $30 million to the Straw Insured's beneficiary, and instead used the funds to pay for various expenses, including other insurance premiums that were related to the underlying fraud, as well as to purchase a home in Rhode Island.

Judge Chatigny will issue a restitution order at a later date.

Carpenter, who is released on bond, was ordered to report to prison on March 4, 2019.

Carpenter was previously convicted in the District of Massachusetts of mail fraud and wire fraud offenses stemming from an unrelated business scheme.  On February 26, 2014, he was sentenced to 36 months of imprisonment for those offenses.

This matter was investigated by the U.S. Department of Labor – Office of the Inspector General, the U.S. Department of Labor – Employee Benefits Security Administration's Boston Office, and the Special Inspector General for the Troubled Asset Relief Program.  The case was prosecuted by Assistant U.S. Attorneys David E. Novick and Neeraj N. Patel.

---

**Topic(s):**
Financial Fraud

**Component(s):**
USAO - Connecticut

Updated December 3, 2018

# EXHIBIT SEVEN

Sharon Siebert September 6, 2019, Affidavit

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSSETTS

| | |
|---|---|
| UNIVERSITAS EDUCATION, LLC<br><br>Plaintiff,<br><br>v.<br><br>JACK E. ROBINSON, III a/k/a JACK E.<br>ROBINSON,<br><br>Defendant. | Civil Action No.<br>1:15-CV-11848 (DPW) |

## AFFIDAVIT OF SHARON E. SIEBERT

SHARON E. SIEBERT, under penalty of perjury, declares and says as follows:

1.  My name is Sharon E. Siebert, and I am a founder and member of Universitas Education, LLC ("Universitas"). I have personal knowledge of the facts set forth herein.

2.  Universitas is a Delaware limited liability company, with its headquarters at 404 East 55th Street, Apartment 13A, New York, New York 10022.

3.  Universitas was previously the research and development arm of the now-defunct Destination Foundation Universitas ("Destination Universitas").

4.  Destination Universitas was a charitable foundation based in New York. Destination Universitas had its charitable designation administratively revoked because Universitas was unable to continue to fund it. Universitas's hardships were a direct result of the costly litigation efforts to enforce Universitas' judgment against the Charter Oak Trust and Nova Group.

5.  Universitas aims to develop and provide programs for leaders and educators around the world to support global philanthropic and humanitarian efforts.

6.    Universitas is operated by myself and my colleague, Donna Vassar.

7.    Ms. Vassar and I are Universitas' only members.

8.    In 2007, Universitas had negotiated for, and had prepared a letter of intent for the purchase of land for the development of a sanctuary on 69.59 acres in Lake Las Vegas, Nevada, for global leaders to gather and recharge during multi-day retreats.

9.    Universitas had discussed the purchase of the Lake Las Vegas property, solicited and selected a design proposal, completed a strategic development plan, and was in the process of finalizing proposals.

10.    One contributor to the project was Mr. Sash Spencer. Mr. Spencer chaired a private investment firm and was a financial partner to Universitas and Destination Universitas. Mr. Spencer died unexpectedly in June 2008. Prior to his death, he named Universitas the sole irrevocable beneficiary of two life insurance policies worth $30,000,000.

11.    Universitas has still not obtained the life insurance proceeds that Mr. Spencer endowed it.

12.    I received and reviewed the correspondence from Jack E. Robinson, Wayne Bursey, and others sent on behalf of the Charter Oak Trust ("COT") and its affiliates. I discussed these communications with Universitas' various representatives, including its attorney when appropriate.

13.    I initially believed that COT's accurately conveyed the provisions of the COT Declaration of Trust and would abide by the provisions thereof. I believed that the COT Declaration of Trust as amended in January 2007 included a provision within Section 6.01 that allowed COT to retain twenty percent of the death benefits of a participant who dies while participating in COT. However, I did not believe that the provision applied to Universitas'

2

circumstances because Mr. Spencer enrolled in COT prior to this alleged amendment, and COT never notified myself or anybody else about this alleged change in the Trust document.

14.    Universitas also undertook the arbitration against COT and its affiliates in good faith. Universitas relied upon Mr. Bursey's affidavit and Mr. Robinson's declaration asserting that COT had the assets to satisfy a judgement against it. Had I known that the proceeds from Mr. Spencer's life insurance proceeds had already been disbursed and spent on things such as a vacation home for Daniel Carpenter, Universitas would have altered its litigation strategy and would likely have sought civil remedies against Carpenter and his affiliates sooner. Universitas likewise would have adopted a much different litigation strategy had I known that the money in dispute had been improperly conveyed and used for criminal purposes. Instead, the misrepresentations and continuing bad faith by Robinson (before his death), Carpenter, and the rest of their affiliates have forced us to engage in protracted litigation that eventually contributed to the dissolution of Destination Universitas.

15.    The arbitration awarded Universitas a judgment against COT and its trustee, Nova Group, Inc. for $26,525,535.98.[1] Universitas' received this award on January 24, 2011, and the award remains largely unsatisfied.

16.    Universitas' effort to enforce its judgement has caused Universitas to become involved in numerous cases across the country. Attached as Exhibit A is a list of cases wherein Universitas has made filings concerning its award.

17.    The cost of this litigation has been high. To date, Universitas been billed for legal fees in excess of $10,000,000.

---

[1] This award was broadened during the subsequent litigation to confirm and enforce the award. The court provided Universitas with a money judgment on August 7, 2014. The money judgment is for $30,181,880.30, to account for interest on the unpaid judgment. The judgment is also enforceable against Daniel Carpenter and some of his companies, in addition to the original judgment debtors.

18.     The judgment debtors and their affiliates have been recalcitrant and obstructive. To date, Universitas has recovered only $4,703,621.64 of its $30,181,880.30 judgment.

19.     The judgment debtors' refusal to satisfy Universitas' judgment has caused Universitas hardship. Universitas has had difficulty paying the excessive legal fees accrued in trying to recover the proceeds from the Spencer policies, and this has led to disputes with former counsel regarding fees.

Dated: New York, New York   West Palm Beach, Fla.
September 6, 2019

Sharon E. Siebert

Sworn to me on this 10 day
of September, 2019

Notary Public

DARLENE A. BROWN
MY COMMISSION # GG 213385
EXPIRES: May 11, 2022
Bonded Thru Notary Public Underwriters

4

# EXHIBIT EIGHT

AUSA Novick February 11, 2016 Email

| | |
|---|---|
| **From:** | Novick, David (USACT) |
| **Sent:** | Thursday, February 11, 2016 6:11 PM |
| **To:** | Richard Brown; Cody Guarnieri |
| **Cc:** | Patel, Neeraj  (USACT) |
| **Subject:** | RE: re: Materials Recieved This Week |

Dick,

Taking your list in order:

1. I was under the impression you had ordered the Martinez and Paulsrud deposition videos from the videographer as you did the Von Noorden deposition video.  You were right there with us in California and Arizona, so nothing in the video should be a surprise.  If you needed it from us, you only needed to ask.  We only learned you didn't order the recordings when Cody asked for a copy (after we sent them to Carpenter) the day before yesterday.
2. The DOL material – this is principally wage records information that I do not believe you are entitled to, but I gave to you out of an abundance of caution.  There does not appear to me to be anything remotely exculpatory there.
3. The grand jury testimony – only two witnesses testified in the grand jury, and I do not expect █████████to testify until later in the trial.  You have all of the interview reports for ██████████ and now ample time to look at his grand jury testimony.  This is a nonissue.
4. Additional business records – I just recently got these, and I gave them to you.  There is no comparative disadvantage here.
5. Notes: As I indicated in my letter, I provided you with notes even though I do not think you are entitled to them.  I simply don't want to waste time arguing about it.  You have all of the interview reports.  The notes are neither the prior statements of the respective witnesses (and thus not Jencks), and I do not see any deviation between the notes and the reports (and thus not Giglio).  Moreover, the volume of notes should come as no surprise, as you are aware of how many interview reports there are.  Likewise, since we are only calling a fraction of the witnesses interviewed, the overall volume of notes is irrelevant. If you want to ask for a delay, I will respond in turn.
6. Your complaint about 80 pages of criminal histories is illusory.  There are very few witnesses who have criminal histories – many of these pages are blank reports so you can see we ran them (with negative results).  For the ones who did have histories, they are hardly complicated.  Finally, it is my practice to wait until near trial to run histories so that you have the most up-to-date information.  Indeed – if we were to run them twice, you would have double the volume.

I am still waiting on your exhibit list and an expert notice that complies with the rules.  It is now five days before trial.

Finally, while we have already given you our draft exhibit list, I now have printed exhibit copies for you.  I can have them transported up to the Hartford USAO tomorrow afternoon if you want to send someone to get them.  I would say the safest time would be between 4 and 5.  Let me know.

Thanks.

Regards,
Dave

**From:** Richard Brown
**Sent:** Thursday, February 11, 2016 5:26 PM
**To:** Novick, David (USACT); Patel, Neeraj (USACT)
**Cc:** Cody Guarnieri
**Subject:** : re: Materials Recieved This Week

David , below is a list of just the stuff we received this week, which we perceive as somewhat overwhelming ; while I recognize from a legal point of view some of the items need not have been produced earlier, such things as grand jury testimony,1300 pages of notes could have been produced a lot earlier, or at least earlier when both Cody and I requested it.....i bring this to your attention because I may have to ask the judge for various delays during the trial to review the same and time to compare it with other documents...........all very time consuming.

**From:** Cody Guarnieri
**Sent:** Thursday, February 11, 2016 5:14 PM
**To:** Richard Brown
**Subject:** re: Materials Recieved This Week

Hey Dick,

This week we received:

- The videos of the Martinez and Paulsrud Depos;
- 120 Pages of materials from the CT DOL
- 140+ Pages of materials from the US DOL
- More than 400 pages of Grandy Jury Testimony
- More records from ISM Advisors; Lincoln; MetLife; Phoenix; Universitas
- 1300 pages of handwritten notes of investigators over the past three years;
- 80+ pages of criminal history records and profer/cooperations agreements from the USAO

# EXHIBIT NINE

Attorney Richard Brown's March 31, 2021, Letter to Petitioner

### BROWN PAINDIRIS & SCOTT, LLP

Attorneys at Law

RICHARD R. BROWN
NICHOLAS PAINDIRIS
RONALD T. SCOTT
JOHN D. MAXWELL
KATE W. HAAKONSEN
SIMON J. LEBO
BRUCE E. NEWMAN•○
SEAN M. PEOPLES
BRIDGET C. GALLAGHER
KEVIN B.F. EMERSON+
NANCY W. TONUCCI
CODY N. GUARNIERI
STEPHEN P. SOBIN
KATHRYN L. BISSONNETTE
EDWARD J. BRYAN
IAN C. BUTLER
SANTOLO L. ODIERNA

100 PEARL STREET

HARTFORD, CONNECTICUT 06103

(860) 522-3343

FAX (860) 522-2490

www.bpslawyers.com

Rbrown@bpslawyers.com

2252 MAIN STREET
GLASTONBURY, CT 06033
(860) 659-0700
FAX (860) 652-4382

42 EAST HIGH STREET
EAST HAMPTON, CT 06424
(860) 267-2044

747 STAFFORD AVENUE
BRISTOL, CT 06010
(860) 589-4417

750 MAIN STREET, SUITE 304
ROCKY HILL, CT 06067
(860) 571-8988

•ALSO ADMITTED IN NY
○ALSO ADMITTED IN CA
♦ALSO ADMITTED TO THE
DISTRICT OF COLUMBIA
+ALSO ADMITTED IN
MASHANTUCKET PEQUOT
TRIBAL COURT

OF COUNSEL
FRANK A. MAY
TIMOTHY R.E. KEENEY•
DEBORAH R. EISENBERG♦
WALTER A. TWACHTMAN, JR.

March 31, 2021

**PERSONAL & CONFIDENTIAL**

Mr. Daniel Carpenter
Grist Mill Capital, LLC
100 Grist Mill Road
Simsbury, CT 06070

Re:   **Grand Jury Transcripts**

Dear Dan:

I have asked Lars to review the discovery in your matter to see if we deleted the Grand Jury transcripts; we did not. He has located the transcripts from Testimony of Lynn Allen, Testimony of Joseph Edward Waesche, IV, and notes from the investigation.

I have communicated with Attorney Novick regarding your access to these documents. He has told me that you may come to our office to review them.

Please do not hesitate to contact me with any questions.

Sincerely,

Richard R. Brown

RRB/lhl

# EXHIBIT TEN

April 29, 2010 Declaration of Wayne H. Bursey

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF CONNECTICUT

PETTIBONE TAVERN, LLC, ET AL.      :

                                       :      Case No. _____

V.                                     :

                                       :

COMMISSIONER OF INTERNAL REVENUE    :      April 29, 2010

                                       :

IN RE: Illegal Seizure of Property by Search    :
Warrant at 100 Grist Mill Road, Simsbury,         :
Connecticut                                    :

## DECLARATION OF WAYNE H. BURSEY

     I, WAYNE H. BURSEY, pursuant to 28 U.S.C. § 1746(2), hereby declare as follows:

     1.      I am over the age of eighteen and understand the obligations of an oath.

     2.      I make this declaration from my personal knowledge and in support of Petitioners' Emergency Motion for Return of Illegally Seized Property.

     3.      I am Trustee of the Charter Oak Trust.

     4.      On April 20, 2010, several of my companies located at 100 Grist Mill Road in Simsbury, Connecticut, including Grist Mill Partners, LLC, Charter Oak Trust, and 1&3 Mill Pond Partners, LLC, were stormed and trampled by 35 – 50 armed Federal IRS CID Agents wearing Kevlar vests.

     5.      On Wednesday, April 21, 2010, I returned to my office located at 100 Grist Mill Road to find a large number of files and personal documents missing from my office.

1

6.      The IRS Agents took all documents relating to one particular trust, Charter Oak Trust, of which I am the Trustee. The Charter Oak Trust does not allow tax deductions so it could not possibly be associated with any tax investigation or the underlying search warrant. The IRS's improper search and illegal seizure of documents that are not, and could not be in any way related to this "criminal investigation" has completely disrupted and effectively destroyed the day-to-day operating capability of our company.

7.      As Trustee of the Charter Oak Trust, I must insist on the immediate return of the property stolen from our building because they took all of the files pertaining to the Charter Oak Trust, which does not allow any tax deduction and which were not listed in the warrant, including:

- Live Original Insurance Policies (not Copies);
- Applications for Insurance;
- Confidential Client Financial Information;
- Confidential Medical Information Protected by HIPAA;
- Claim Files;
- Termination Files;
- Loan Agreements;
- Policy Illustrations;
- Adoption Agreements and other Enrollment Documents;
- Policyholder Servicing Requests and other Paperwork;
- Admin Binders.

8.      The federal agents also took every single file and every single policy and application belonging to Grist Mill Capital, LLC. Grist Mill Capital, LLC's portfolio is currently over Two Billion Dollars. This is particularly harmful in that Grist Mill Capital, LLC is in the midst of engineering a deal to sell its portfolio of insurance policies to a major German pension plan next month. This deal is now at risk because every insurance portfolio and policy was seized by the IRS on April 20, 2010.

2

9.   The IRS agents also took personal and business files and depositions from my office and/or my desk, which were not identified in the search warrant, and which relate to real estate companies 1&3 Mill Pond Partners, LLC and Grist Mill Partners, LLC. Such files include lease agreements and other important documents related to these real estate companies, which are not related to any tax investigations.

10.   The IRS agents also took my daily notebooks that are paramount to my day to day activities and not identified in, or related to, the Search Warrant.

11.   In addition, my personal tax returns and personal 401K file contents were taken from my desk drawers and e-mails, many of which were personal in nature and all of which had nothing to do with the subject matter of the Search Warrant were imaged.

12.   The above mentioned items and files were stolen by IRS FED CID Agents are located in the following boxes:  32, 35, 36, 37, 38, 54, 75, 90, 103, 124, 128, 204, 205, 237, 238, 239, 243, 247, 249, 253, 291, 293 and 300.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: April 29, 2010

_Wayne H Bursey_

Wayne H. Bursey

Wayne Bursey, being known to me or having produced satisfactory identification, affirmed that he had reviewed the contents of the foregoing and affirmed that the statements made within the affidavit are true.

Subscribed and sworn to before me this _29th_ day of April, 2010.

_signature_
Notary Public
My Commission expires: _3/2/18_

JASON J. CONCATELLI
Notary Public, State of Connecticut
My Commission Expires March 31, 2012

# EXHIBIT ELEVEN
AUSA Novick May 25, 2011 Subpoena



**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

| | |
|---|---|
| *Abraham A. Ribicoff Federal Building* | *(860) 947-1101* |
| *450 Main Street, Room 328* | *Fax (860) 760-7979* |
| *Hartford, Connecticut  06103* | *www.usdoj.gov/usao/ct* |

May 25, 2011

Halloran and Sage, LLP
315 Post Road West
Westport, CT 06880-4739
Attention: Dan E. LaBelle, Esq.

                Re:    <u>Non-Disclosure of Subpoena</u>

Dear Sir or Madam:

        You have been served with a subpoena which requires you to appear before a federal grand jury June 28, 2011 with certain specified documents.  Because this subpoena is being issued as part of an ongoing investigation, we request that you do not disclose its existence or its contents to any person who is not involved in your internal document production process.  If at some point you decide that it is necessary to disclose the existence and/or the contents of this subpoena, I request that you notify me of your intent to do so prior to the time of the disclosure.

        In addition, to the extent that you do not produce certain responsive materials on the basis that you believe they are protected by the attorney-client or any other privilege, please  include with your production a log identifying any documents withheld on the basis of privilege.

        YOUR PERSONAL APPEARANCE BEFORE THE GRAND JURY WILL BE EXCUSED if these records are provided to Special Agent Lynn Allen, U.S. Department of Labor, Office of Inspector General, c/o Squad 4, 600 State Street, New Haven, CT 06511, telephone (203) 630-9526, facsimile (203) 630-9530 on or before the grand jury date

                        Very truly yours,

                        DAVID B. FEIN
                        UNITED STATES ATTORNEY

                        DAVID E. NOVICK
                        ASSISTANT UNITED STATES ATTORNEY

Enclosure

AO 110 (Rev. 06/09) Subpoena to Testify Before a Grand Jury

# UNITED STATES DISTRICT COURT

H-10-2-9(416)

for the

District of Connecticut

## SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To:
Halloran & Sage, LLP
315 Post Road West
Westport, CT

**YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: United States District Court   (Grand Jury Room, 3rd Floor)<br>450 Main Street<br>Hartford, CT 06103 | Date and Time:<br>June 28, 2011 at 9:30 a.m. |
| --- | --- |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

### SEE ATTACHMENT.

**PLEASE NOTE:**

In lieu of personally appearing before the Grand Jury, these records may be provided to these records are provided to Special Agent Lynn Allen, U.S. Department of Labor, Office of Inspector General, c/o Squad 4, 600 State Street, New Haven, CT 06511, telephone (203) 630-9526, facsimile (203) 630-9530 on or before the grand jury date

Date:        May 25, 2011

CLERK OF COURT

*Yelena Gutierrez*

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:

Assistant U.S. Attorney David E. Novick
450 Main Street, Room 328
Hartford, CT 06103
Tele: (860) 947-1101    CONTROL #416

## Attachment to Subpoena

TO:   Halloran and Sage, LLP
      315 Post Road West
      Westport, CT 06880-4739

      Attention: Dan E. LaBelle, Esq.


Provide all documents and other items seized pursuant to a search warrant executed at 100 Grist Mill Road, Simsbury, Connecticut, by the IRS-CID of Milwaukee, Wisconsin, on April 20, 2010, that are related to Charter Oak Trust, Charter Oak Trust 2009, Grist Mill Capital, and Avon Capital and associated entities, including but not limited to IRS evidence box numbers 36, 38, 54, 75, 81, 103, 205, 238, 249, 287, 293, 300, 308, 35, 37, 121,128, 129, 125, 239, 32, 90, 124, 204, 237, 243, 247, 253 and 291.


In lieu of personally appearing before the Grand Jury, these records may be provided to Special Agent Lynn Allen, U.S. Department of Labor, Office of Inspector General, c/o Squad 4, 600 State Street, New Haven, CT 06511, telephone (203) 630-9526, facsimile (203) 630-9530 on or before the grand jury date.