# EXHIBIT 1

| | |
|---|---|
| **From:** | Joe Castagno |
| **To:** | Dan Carpenter US |
| **Subject:** | RE: Universitas Complaint Call with Judge |
| **Date:** | Thursday, June 11, 2020 2:35:13 PM |
| **Attachments:** | image001.png |

Nothing bad on Koresko, Molly had just asked me to find the ESOP documents we submitted in that case so we can show Univ that BASI is an ESOP

Joseph Castagno
Benistar Admin Services, Inc.
10 Tower Lane, Suite 100
Avon, CT 06001
860-408-7000 ext. 5259

---

**From:** Molly Carpenter
**Sent:** Thursday, June 11, 2020 11:16 AM
**To:** Dan Carpenter US <dcarpenter@usbgi.com>; Jeffrey Sklarz <jsklarz@gs-lawfirm.com>; Lawrence Grossman <lgrossman@gs-lawfirm.com>
**Cc:** Joe Castagno <JCastagno@benistar.com>
**Subject:** RE: Universitas Complaint Call with Judge

Dan LaBelle is representing Molly, Don, BASI, TPG and Moonstone. I think he is hoping you and Larry will take the Carpenter entities. One of them is Grist Mill Partners which was subject of the charging order … there is a conference with the Magistrate Judge tomorrow.

---

**From:** Dan Carpenter US [mailto:dcarpenter@usbgi.com]
**Sent:** Thursday, June 11, 2020 10:05 AM
**To:** Jeffrey Sklarz <jsklarz@gs-lawfirm.com>; Lawrence Grossman <lgrossman@gs-lawfirm.com>; Molly Carpenter <mcarpenter@benistar.com>
**Cc:** Joe Castagno <JCastagno@benistar.com>; Dan Carpenter US <dcarpenter@usbgi.com>
**Subject:** Universitas Complaint Call with Judge

Jeff:

Thanks.....but please just call Dan LaBelle and find out what time the call with the Court is tomorrow.......I have not been served and you will be representing the "Dan Carpenter" entities....whatever they are.....We just want to protect Molly and BASI from this baseless harassment trying to extort a nuisance settlement.

I just don't want anyone to know that I am out .....

So please coordinate with Dan LaBelle and let him do all the talking on call with Magistrate and then we can talk tomorrow after call with the Court???

Thanks,

Dan C.

---

**From:** Jeffrey Sklarz <jsklarz@gs-lawfirm.com>
**Sent:** Thursday, June 11, 2020 9:46 AM
**To:** Dan Carpenter US <dcarpenter@usbgi.com>; Lawrence Grossman <lgrossman@gs-lawfirm.com>
**Cc:** Joe Castagno <JCastagno@benistar.com>
**Subject:** RE: Universitas Complaint

Dan

Can we talk tomorrow at 1 PM?



**Jeffrey M. Sklarz**
Phone: (203) 285-8545 x101
Direct Dial: (203) 361-3135
Fax: (203) 823-4546
jsklarz@gs-lawfirm.com

www.gs-lawfirm.com

New Haven Office
One Audubon Street, 3rd Floor, New Haven, CT 06511

Stamford Office
243 Tresser Boulevard, Stamford, CT 06901 | P: (203) 428-4907 | F: (203) 286-1311

This message contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended solely for the use of the addressee(s) named above.  Any disclosure, distribution, copying or use of the information by others is strictly prohibited.  If you have received this message in error, please notify the sender by immediate reply and delete the original message.  Thank you.

**From:** Dan Carpenter US <dcarpenter@usbgi.com>
**Sent:** Thursday, June 11, 2020 9:43 AM
**To:** Jeffrey Sklarz <jsklarz@gs-lawfirm.com>; Lawrence Grossman <lgrossman@gs-lawfirm.com>
**Cc:** Joe Castagno <JCastagno@benistar.com>; Dan Carpenter US <dcarpenter@usbgi.com>
**Subject:** Universitas Complaint

**CAUTION - EXTERNAL EMAIL**
**This email originated from outside of Green & Sklarz.  DO NOT click links or open attachments unless you recognize the sender and know the content is safe.**

Jeff:

Pack of lies here....but don't worry.  Important thing is that you and Larry get in touch with Dan LaBelle and please DO NOT let anyone know that I am out of prison.

These people are clueless as to how dangerous this filing is to THEM and I do not want them to know that I am out.  Clearly I have not been served (I am not a party) and Molly has nothing to do with "my" trusts or entities which have not been served either......A first year law student to tear this apart....

I know that you guys understand the "One Satisfaction Rule" so we should ask them to list all of the money they received because that takes care of the Charging Order against CFG with Chatigny in Oct 2015.  See e.g.  Singer v Olympia

Please call Dan LaBelle and let me know what number I should call you at.   I am at 860-573-7770.   Joe Castagno is at 860-408-7000 x 5259.

Thanks,

Dan



Dan LaBelle, Esq.
Halloran & Sage LLP
315 Post Road West
Westport, CT 06880

E labelle@halloransage.com
D 203.222.4303
F 203.227.6992

www.halloransage.com

Confidentiality: The information contained in this e-mail message is intended only for the use of the individual or entity named above and is privileged and confidential. Any dissemination, distribution, or copy of this communication other than to the individual or entity named above is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone.

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

# EXHIBIT 2

| From: | Dan Carpenter US |
| To: | Molly Carpenter |
| Cc: | "Jeffrey Sklarz (jsklarz@gs-lawfirm.com)"; John R Williams; gholmes@odglaw.com |
| Subject: | Universitas v. GMP - materials for email discovery |
| Date: | Wednesday, August 4, 2021 7:43:37 AM |

Molly:

I think you should run this "overly broad" and "overly burdensome" request by Mike McPherson.  Jeff Sklarz will be objecting, of course, but perhaps it makes sense for Halloran & Sage to officially object with Magistrate Spector since they represent BASI, and he is now in charge of the Contempt Motion against me???  I certainly have no right to ask any of these people to search for anything...much less BASI.

Please remember that we objected to the original requests as "overly burdensome" and now they have gotten worse.  Wayne Bursey died in 2015, Jack Robinson died in 2017, and Matt Westcott left the firm in 2017???   All of the checks from Exhibit 21 are from 2014 and the mythical account had to be set up in late 2013 or January 2014.....Right???  Curaleaf was in the building from June 2014 to January 2020......So I think someone needs to reach out to Magistrate Spector on this.....other than Dan Carpenter.

Thanks,

Dan

---

**From:** Dan Carpenter US <dcarpenter@usbgi.com>
**Sent:** Wednesday, August 4, 2021 7:19 AM
**To:** Dan Carpenter US <dcarpenter@usbgi.com>
**Subject:** Fw: Universitas v. GMP - materials for email discovery

---

**From:** Ben Chernow <bchernow@jmansonlaw.com>
**Sent:** Thursday, July 29, 2021 7:36 PM
**To:** Jeffrey Sklarz <jsklarz@gs-lawfirm.com>
**Cc:** Lawrence Grossman <lgrossman@gs-lawfirm.com>; Joseph Manson <jmanson@jmansonlaw.com>
**Subject:** Universitas v. GMP - materials for email discovery

**CAUTION - EXTERNAL EMAIL**
**This email originated from outside of Green & Sklarz.  DO NOT click links or open attachments unless you recognize the sender and know the content is safe.**

Jeff and Lawrence,

Pursuant to the discovery order, please find our list of record custodians and search terms for email production below. We apologize for the delay. We are amenable to a corresponding extension to the production deadliine should such an extension prove necessary. The search terms are the same for all custodians.

**<u>Search terms</u>:**

Grist Mill Partners

GMP

GM Partners

Ensign-Bickford

Ensign

100 Grist Mill

Mill Pond

Curaleaf

Lease

Building

"hidden" or "hide" or "conceal" or "protect" or "secure" or "safe"

Rent

Mortgage

Property

Tenant

Landlord

Universitas

"creditor" or "crediter"

"judgment debtor" or "judgment debter" or "debtor" or "debter"

Lawsuit

Suit

Litigation

CFG

Carpenter Financial

Caroline

"charging order" or "order"

"restrain" or "notice" or "restraining notice"

Judgment

Moonstone

Seir Hill

Account

Bank

Transfer

Swain

Alter ego

"shell" or "sham"

"own" or "hold" or "held" or "title" and "new" or "different" or "other"

**<u>Records Custodians</u>:**

Daniel Carpenter

Molly Carpenter

Kathy Kehoe

Amanda Rossi

Joseph Castagno

Benistar Admin Services, Inc. ("BASI") - we request that BASI search its server for emails that otherwise have no current custodian. These emails are emails sent and/or received by Wayne Bursey, Jack Robinson, and/or Matthew Westcott.

# EXHIBIT
# 3

## Objections to Search Terms

**General Objection**:
1. The search terms provided, when individually run, do not reasonably narrow the document search.  Therefore, the requested production is over broad, unduly burdensome and disproportionate to appropriate discovery in this matter.
2. The search terms requested to be searched result in the return of documents and communications that are subject to attorney client and/or work product privilege.

**Response**:

Notwithstanding the objections set forth above and below, responsive documents will be provided.

**Search terms:**

Grist Mill Partners

GMP

GM Partners

Ensign-Bickford

Ensign

100 Grist Mill

Mill Pond

Curaleaf

Lease

Building

"hidden" or "hide" or "conceal" or "protect" or "secure" or "safe"

Rent

Mortgage

Property

Tenant

Landlord

Universitas

"creditor" or "crediter"

"judgment debtor" or "judgment debter" or "debtor" or "debter"

Lawsuit

Suit

Litigation

CFG

Carpenter Financial

Caroline

"charging order" or "order"

"restrain" or "notice" or "restraining notice"

Judgment

Moonstone

Seir Hill

Account

Bank

Transfer

Swain

Alter ego

"shell" or "sham"

"own" or "hold" or "held" or "title" and "new" or "different" or "other"


**<u>Records Custodians:</u>**

Daniel Carpenter

Molly Carpenter

Kathy Kehoe
**Objection: A no time was Kathy Kehoe a record custodian of GMP.**

Amanda Rossi

Joseph Castagno

Benistar Admin Services, Inc. ("BASI") - we request that BASI search its server for emails that otherwise have no current custodian. These emails are emails sent and/or received by Wayne Bursey, Jack Robinson, and/or Matthew Westcott.

**Objection: A no time was BASI a record custodian of GMP.  This request should be directed to BASI, not GMP.**

# EXHIBIT
# 4

↩ Reply all | ⌄   🗑 Delete   ⊘ Junk   Block   …

## Universitas v. GMP - Discovery Dispute

 **Ben Chernow**
Fri 10/8/2021 9:35 AM

To: Jeffrey Sklarz <jsklarz@gs-lawfirm.com>

Cc: Lawrence Grossman <lgrossman@gs-lawfirm.com>; Joseph Manson; Michael R. McPherson <mcpherson@halloransage.com>; Dan E. LaBelle <LABELLE@halloransage.com>

↪  ↩  ↩  ↑

Jeff,

In accordance with Judge Spector's directives, we are continuing our efforts to resolve this discovery dispute with you. During the discovery hearing you claimed for the first time that you believed Universitas' identification of BASI as a record custodian was unclear. Universitas thus seeks to clarify its position. The intended record custodians are Wayne Bursey, Jackie Robinson, and Matt Westcott. However, these people are either deceased or terminated, and thus cannot presently serve as record custodians. However, these persons were all records custodians during the timeframe provided by the Court, and their emails still exist and are subject to discovery. We believe it is entirely straightforward that responsive emails for these persons emails must be produced. Universitas is not seeking any emails other than emails to/from those three persons. Should GMP produce these emails without court involvment, Universitas will withdraw its request for Kathy Kehoe's emails.

Universitas maintains that GMP must produce these emails. However, Universitas is not opposed to these emails being produced by BASI independent from its role as GMP record custodian. In the absence of the production of these emails, Universitas will move to compel the production of these emails. Please let us know your position. Thanks.

Best Regards,

Ben Chernow

Reply | Reply all | Forward

# EXHIBIT 5

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

PETTIBONE TAVERN, LLC, ET AL.     :
:    Case No. _____
V.     :
:
COMMISSIONER OF INTERNAL REVENUE     :     April 29, 2010
:
IN RE: Illegal Seizure of Property by Search    :
Warrant at 100 Grist Mill Road, Simsbury,       :
Connecticut     :

## DECLARATION OF WAYNE H. BURSEY

I, WAYNE H. BURSEY, pursuant to 28 U.S.C. § 1746(2), hereby declare as follows:

1.     I am over the age of eighteen and understand the obligations of an oath.

2.     I make this declaration from my personal knowledge and in support of Petitioners' Emergency Motion for Return of Illegally Seized Property.

3.     I am Trustee of the Charter Oak Trust.

4.     On April 20, 2010, several of my companies located at 100 Grist Mill Road in Simsbury, Connecticut, including Grist Mill Partners, LLC, Charter Oak Trust, and 1&3 Mill Pond Partners, LLC, were stormed and trampled by 35 – 50 armed Federal IRS CID Agents wearing Kevlar vests.

5.     On Wednesday, April 21, 2010, I returned to my office located at 100 Grist Mill Road to find a large number of files and personal documents missing from my office.

6.     The IRS Agents took all documents relating to one particular trust, Charter Oak Trust, of which I am the Trustee.  The Charter Oak Trust does not allow tax deductions so it could not possibly be associated with any tax investigation or the underlying search warrant.  The IRS's improper search and illegal seizure of documents that are not, and could not be in any way related to this "criminal investigation" has completely disrupted and effectively destroyed the day-to-day operating capability of our company.

7.     As Trustee of the Charter Oak Trust, I must insist on the immediate return of the property stolen from our building because they took all of the files pertaining to the Charter Oak Trust, which does not allow any tax deduction and which were not listed in the warrant, including:

- Live Original Insurance Policies (not Copies);
- Applications for Insurance;
- Confidential Client Financial Information;
- Confidential Medical Information Protected by HIPAA;
- Claim Files;
- Termination Files;
- Loan Agreements;
- Policy Illustrations;
- Adoption Agreements and other Enrollment Documents;
- Policyholder Servicing Requests and other Paperwork;
- Admin Binders.

8.     The federal agents also took every single file and every single policy and application belonging to Grist Mill Capital, LLC.  Grist Mill Capital, LLC's portfolio is currently over Two Billion Dollars.  This is particularly harmful in that Grist Mill Capital, LLC is in the midst of engineering a deal to sell its portfolio of insurance policies to a major German pension plan next month.  This deal is now at risk because every insurance portfolio and policy was seized by the IRS on April 20, 2010.

2

9.  The IRS agents also took personal and business files and depositions from my office and/or my desk, which were not identified in the search warrant, and which relate to real estate companies 1&3 Mill Pond Partners, LLC and Grist Mill Partners, LLC.  Such files include lease agreements and other important documents related to these real estate companies, which are not related to any tax investigations.

10.  The IRS agents also took my daily notebooks that are paramount to my day to day activities and not identified in, or related to, the Search Warrant.

11.  In addition, my personal tax returns and personal 401K file contents were taken from my desk drawers and e-mails, many of which were personal in nature and all of which had nothing to do with the subject matter of the Search Warrant were imaged.

12.  The above mentioned items and files were stolen by IRS FED CID Agents are located in the following boxes:  32, 35, 36, 37, 38, 54, 75, 90, 103, 124, 128, 204, 205, 237, 238, 239, 243, 247, 249, 253, 291, 293 and 300.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  April 29, 2010

_Wayne H. Bursey_
Wayne H. Bursey

Wayne Bursey, being known to me or having produced satisfactory identification, affirmed that he had reviewed the contents of the foregoing and affirmed that the statements made within the affidavit are true.

Subscribed and sworn to before me this 29th day of April, 2010.

_Notary Public_
Notary Public
My Commission expires: 3/31/12

JASON J. CONCATELLI
Notary Public, State of Connecticut
My Commission Expires March 31, 2012

# EXHIBIT 6

**From:** robinsonesq@aol.com 📎

**Subject:** 100 Grist Mill

**Date:** July 7, 2007 at 1:52 PM

**To:** dancarpenter@benistar.com,  mcarpenter@benistar.com,  wbursey@benistar.com,  RobinsonEsq@aol.com

R

---

After reviewing the docs, here's my reading of the situation:

**Issue #1:**  Section 20.6 of the original Lease states that we have to give written notice of our option to purchase not later than 90 days prior to August 31, 2007 - or not later than <u>Monday, June 4, 2007</u> (the 90th day actually falls on Sunday, June 3rd, but if the deadline starts on a weekend or holiday, it goes to the next business day).

***Comment #1:***  *I agree with Wayne that we hand deliver a letter on Monday formally exercising the option to purchase which references our previous email (see attached draft - hopefully we can find an email that predates June 4th).  This satisfies our obligation and puts them on formal notice that we intend to purchase.  This will also allow both parties to comply with Section 20.7 of the Lease, which says a closing of the sale must take place within 90 days following receipt by EBI of our notice.  This will allow both parties to close before August 31, 2007 without running afoul of the deadline.  Also, new Section 3A (added by the First Amendment) gives us the right to extend our existing lease by up to 90 days if the closing doesn't occur by August 31st due to EBI's default.*



EBI Letter.doc

Zero KB

# EXHIBIT
# 7

↰ Reply all | ⌄ | 🗑 Delete | ⊘ Junk | Block | ⋯

**RE: Universitas v. GMP**

⊖ You replied on Tue 9/28/2021 2:00 PM



Jeffrey Sklarz <jsklarz@gs-lawfirm.com>
Tue 9/28/2021 11:23 AM

To: Ben Chernow

Cc: Lawrence Grossman <lgrossman@gs-lawfirm.com>; Joseph Manson; Dan E. LaBelle (labelle@halloransage.com); Michael R. McPherson <mcpherson@halloransage.com> **+1 other**

↰ ↩ ↩ ↑ ⋮

Attorney Manson:

The following responds to your letter of September 21, 2021. That letter contains massive amounts of erroneous information, misstatements of fact and law, and incorrect statements concerning GMP's position. I will now set the record straight:

1. ECF No. 163, which is the Court's recapitulation of a status conference regarding discovery, does not contain any order requiring GMP to any search terms Universitas seeks to unilaterally impose.

2. GMP has produced all documents responsive to the production requests and Judge Spector's order, other than emails for which Plaintiff was required to identify record custodians and search terms.

3. Plaintiff elected to use incredibly board search terms in its request. As a result, a massive number of emails were swept up in the search, including emails between counsel.

4. GMP has no objection to producing a privilege log that complies with the local rules and best practices. This does not mean that GMP has to produce or log documents responsive to an overly broad list of search terms, including search terms that appear calculated to seek privileged communications.

5. Because Plaintiff appears to be unwilling to limit its search terms in any reasonable manner, we will produce a privilege log we believe addresses your non-objectionable document requests prior to the next hearing so any issues can be addressed to Judge Spector.

Following we address your specific comments in your letter:

*GM Partners refuses to produce emails from various record custodians identified by Universitas. At the recent discovery hearing, you indicated that the only record custodian that GM Partners objects to is Benistar Admin Services, Inc. ("BASI"). Prior to the discovery hearing, GM Partners objected to Kathy Kehoe as a record custodian and refused to produce Ms. Kehoe's emails. To the extent GM Partners no longer objects to Ms. Kehoe as a record custodian, Universitas requests that you produce her emails.*

We are reviewing the issue of whether one or more of the objected to record custodians are GMP record custodians and will respond further. However, my client has again confirmed that Kathy Kehoe was not working for GMP.

*Your objection to BASI as a record custodian is premised upon a factual inaccuracy. As Universitas explained in its letter dated August 30, 2021, BASI is a*

RE: Universitas v. GMP

*Your objection to BASI as a record custodian is premised upon a factual inaccuracy. As Universitas explained in its letter dated August 30, 2021, BASI is a record custodian for GMP and GMP must produce the requested emails.*

We are evaluating this new position of yours. However, because you sued BASI as an entity, I am not sure why you are seeking these documents from GMP.

*GM Partners has consistently objected to the production of a privilege log by claiming that the search terms are too broad and would burden GM Partners by requiring GM Partners to include in its privilege log every email from you concerning any development in the above-captioned litigation.*

This is a misstatement of our position.  GMP has no objection to producing a privilege log.  However, it needs to be limited to what is required by the rules.

*However, as you conceded at the discovery hearing, Universitas stipulated that GM Partners' privilege log need not include any communications with counsel after the commencement of this action. As such, GM Partners would not be required to include any emails concerning the above-captioned action, and thus GM Partners' objection is unfounded.*

You stated you would limit the privilege log as set forth above for the first time at the hearing.  Also, Attorney Chernow, in the follow-up call that did not include you as a participant, indicated you would further refine the search terms to be less overbroad, by combining common terms.  Once you do this, we can run the searches and produce a privilege log that is consistent with the rules.

In the future, I would appreciate if you confine your arguments to actual facts and law.  It will make it much easier to get through this case.

GREEN & SKLARZ LLC
www.gs-lawfirm.com

**Jeffrey M. Sklarz**
Phone: (203) 285-8545 x101
Direct Dial: (203) 361-3135
Fax: (203) 823-4546
jsklarz@gs-lawfirm.com

New Haven Office
One Audubon Street, 3rd Floor, New Haven, CT 06511

# EXHIBIT 8



**BENISTAR**

CLEARWATER HOUSE
2187 ATLANTIC ST., STAMFORD, CT 06902

## <u>HIGHLY CONFIDENTIAL MEMORANDUM</u>
## <u>CONTAINS PROPRIETARY INFORMATION</u>

To:         Ridgewood Finance, Inc. ("Ridgewood")

From:       Benistar

Re:         $35MM Premium Funding Facility (the "Facility")

Date:       October 29, 2006

This memorandum is intended to give a brief overview of Benistar, various related entities involving Premium Funding, and how they will all interact as part of the contemplated Facility provided by Ridgewood.

### <u>Benistar</u>

Benistar is headquartered in Simsbury, CT, and has roughly 80 employees in Simsbury, Stamford, Chicago and Charlotte. Benistar is the nation's premier company specializing in the design, installation and administration of all types of employee and welfare benefit plans.

At the hub of the various Benistar entities is Benistar Admin Services, Inc. ("BASI"), a leading third-party administrator (TPA) of employee, health, welfare, and medical plans. TPAs are retained by plan sponsors to provide recordkeeping, benefit payment, transaction processing, and compliance services. Since the passage of Sarbanes-Oxley, plan sponsors have required that their TPAs, custodians, and corporate trustees demonstrate that they have adequate internal controls and safeguards. An independent Statement on Auditing Standards (SAS) 70 audit is the primary way a service organization can convey the validity of its internal controls. BASI is the *only* TPA in the country to have passed a Type II SAS 70 audit conducted by PricewaterhouseCoopers LLP.

Benistar currently sponsors and BASI administers welfare benefit plans and trusts covering over 250,000 participants throughout the country. The administrative trustee for most of Benistar's trusts is JP Morgan Chase. Because BASI has taken over the post-retirement benefit outsourcing for a number of large corporations (both Medicare and non-Medicare eligible), BASI's telephones are answered simply as "benefits." BASI has dedicated switchboards, mail centers, and trust accounts at PNC Bank that BASI administers for the post-retirement benefit needs of some of America's largest companies.

TEL: 203-969-6000  •  WWW.BENISTAR.COM  •  FAX: 203-969-6070
TOLL FREE (800) BENISTAR

NovaDOL 01339

UNIV_AAA 00054809

As one of the nation's leading TPAs, Benistar has a working relationship with 4,000 insurance brokers throughout the country – most of whom are senior and high-level producers. Benistar also has very close working relationships with a core group of about two dozen highly-rated insurance carriers.  Operating as the nexus between the broker community and the carriers gives Benistar a sustainable competitive advantage with respect to market information, underwriting changes, sales & distribution strategies, and legal/regulatory developments in a fast-paced marketplace.

## Multiple Employer Trusts

Over 3,000 employers have participated in a Benistar-sponsored multiple employer trust and to date not a single employer has paid any taxes, penalties, or interest on their contributions to Benistar's plans.  The largest of these so-called 419 Plans (for IRC Sections 419 and 419A) is the Benistar 419 Plan which at one time had over $12 billion in face value of policies and over $500 million in annual contributions.  Benistar's new 419 Plans, created after the IRS issued its final regulations in July 2003, are sponsored by Benistar affiliates Benefit Plan Advisors, LLC and NOVA Benefit Plans, LLC.

Nova Benefit Plans operates the new 419A(f)(6) trusts such as the Long Term Care Trust, the Sickness Accident Disability Indemnity Trust, and the LIFE One Trust.  Benefit Plan Advisors is the creator and sponsor of the Grist Mill Trust, which is a 419(e) Trust that does not purport to be exempt from the various rules and limitations of IRC Sections 419 and 419A.

## The Grist Mill Trust

Aside from providing tax deductions to participating employers, the Grist Mill Trust allows the owners of closely-held businesses and professional firms to put away unlimited amounts of money (without taxation to the owner/executive) and purchase large amounts of life insurance that can go to the next generation income, estate, and gift tax-free.  And, perhaps best of all, the funds within the Grist Mill Trust are maintained in a creditor-proof environment secure from the hands of all creditors (both business and personal – including divorce).

The Grist Mill Trust is a large umbrella that has several other trusts and many different plans operating under its auspices.  Rather than have a sole employer trust of their own, most companies prefer (for a number of tax, cost, and ERISA reasons) to use the Grist Mill Trust as "their" sole employer trust.

The Grist Mill Trust, in just three short years, has grown from nothing to over $40MM in assets.  There is a Grist Mill Trust for physicians and Benistar has recently introduced a Grist Mill Trust (EP) for estate planning.  Since the Grist Mill Trust is both the owner and the beneficiary of all insurance policies, it is clear from the tax law that there are no incidents of ownership in the policies, so the death benefit can go to the next generation income, estate, and gift tax-free.  There is also no generation skipping tax.  Compared to the problems inherent with traditional irrevocable life insurance trusts (ILIT or Crummey trusts), it is easy to see why many business owners prefer to use the Grist Mill Trust as their primary means of estate planning.

2

NovaDOL 01340

UNIV_AAA 00054810

### Policy Administration

Benistar is also a large player in policy administration services and providing "back office" services for various "premium financing" and "life settlement" organizations. Benistar's REX Insurance Services is second only to BISYS in the administration and processing of life insurance policies for premium finance and life settlement purposes. REX currently provides back office services for Sierra Life, Timber Creek, A.J. Meade, Primerica, Life Analysts, Five Star, and other large players in that space. REX's experience in handling the processing of thousands of life insurance policies from start to finish has placed REX in the vanguard of the "premium funding" and "life settlement" industries.

Sophisticated estate planning (Benistar has developed a special proprietary grantor trust for estate planning purposes and will have a new trust company formed in New Hampshire, which has surpassed Delaware and South Dakota as the hot new "trust" State), and high quality life insurance policy administration mean that "all roads" will soon lead to Benistar's 50,000 square foot facility in Simsbury, CT, where all aspects of employee benefit plan and/or insurance policy administration, as well as benefit plan outsourcing, will be handled.

### Grist Mill Capital

At its peak, the Benistar 419 Plan had over $250MM in cash assets, $12 billion in face amount of insurance policies, and a $100MM surplus. Benistar decided to create Grist Mill Capital as the "finance arm" of the Benistar 419 Plan to fund welfare benefit contributions for business owners who might be short of the necessary cash at year-end but who still wanted to obtain a large amount of insurance on a single premium basis. Grist Mill Capital funded $15 million in contributions in this manner.

### Avon Capital

Whereas Grist Mill Capital existed primarily to fund benefit plan contributions, Avon Capital was formed to fund and invest in large life insurance policies that could subsequently be sold in the life settlement secondary market. Using Grist Mill Capital's limited resources, we were able to fund a handful of life settlement transactions.

### The Rapidly Changing Life Settlement Market

Even prior to the January 11, 2006 New York State Insurance Department's Office of General Counsel memorandum denouncing Stranger-Owned Life Insurance (SOLI), some carriers were firmly on record that they wanted no part of the Life Settlement marketplace or "premium finance" arrangements that led to a life settlement, no matter the purpose (*i.e.*, even for good purposes such as CHOLI – Charity-Owned Life Insurance).

3

NovaDOL 01341

UNIV_AAA 00054811

No matter how much we, the proponents of life settlements, preach about the benefits of life settlements to the consumer or to companies owning millions of dollars of Corporate-Owned Life Insurance on their key executives, the harsh reality is that more and more large carriers are walking away from the business, more and more states are enacting laws prohibiting sales within two years from the date of issue, and more and more states are trying to regulate the business.

What is clear from this is that neither the state regulators nor the big insurance companies want the hedge funds to come in and upset the insurance companies' oligopoly on cash value insurance. Now that the statistics are out showing that more than 80% of universal life policies are terminated before death – in other words, less than 20% result in paying a death benefit, it is easy to see that insurance companies love to collect money, invest it, and then buy back the death benefit for a deeply discounted amount of cash value (*i.e.*, the "surrender value").

Hedge funds will only ruin the insurance carriers' legal "racket." They will spoil the odds, make insurance products more competitive, and give the insured – the consumer – a better rate of return on their insurance purchase. These are all good things – which explains the insurance companies' attempts to limit the involvement of hedge funds in the highly profitable marketplace of life settlements.

However, the attractiveness of over-sized returns – which has attracted hedge funds to this space – will inevitably force those same hedge funds to line up behind the big traditional policy purchasers such as Warren Buffett's AIG, Credit Suisse, and the two dozen life settlement companies. *This inevitably means less product and more buyers out there in the 25th month.*

Fewer carriers will allow their products to be used, more state regulation will make it tougher to create new product, and now the secret is out why this is such a good deal for the consumer. This new marketplace reality gives players with superior market knowledge – such as Benistar – a competitive advantage in acquiring the product initially, administering the product, and then selling the product after the 25th month.

<u>Competition</u>

Our two largest competitors were Credit Suisse and Coventry. Credit Suisse has made working with them so difficult – even after buying ING's premium lending business - it will be hard to imagine that they will be able to do much business when Avon Capital is fully functional. Avon Capital will be the only player with whom it will be easy for brokers, insureds, carriers, and purchasers to do business with; and the Avon Capital program will not be oppressive like the Credit Suisse program. Coventry will be hurt by its public squabble with the life expectancy companies and now with its public squabble with Elliot Spitzer.

Avon Capital, leveraging Benistar's relationships with over 4,000 brokers, will not have to advertise. Instead, Avon Capital will fly under the radar with a much more attractive deal structure than Coventry.

4

NovaDOL 01342

UNIV_AAA 00054812

### Benistar Broker Database

Being the number one player in the multiple employer trust field has led Benistar to having a phenomenal nationwide database of 8,000 active, top-notch, and producing life insurance agents and brokers. Of the 8,000 brokers and agents in the database, we have worked with 4,000 and the remainder are those who have worked with our competitors and whom we plan to convert. We also maintain contacts with these brokers on a regular basis through our admin staff (*i.e.*, through phone calls, letters, emails, proposals, illustrations, and presentations).

The size and scope of this database is important for a not-so-obvious reason. If one were to name the top 30 life insurance carriers, each of those carriers has a list of its top producing brokers and agents. If the number of top carriers is multiplied by the number of their top producing brokers and agents, the result would be a list of roughly 3,000 top producing life insurance brokers and agents in the country. Of course, there would be some overlap because top producers will produce business for more than one carrier. The point is that Benistar easily reaches all of these 3,000 or so top producers in the country. With some carriers, such as Jefferson Pilot, we do business with *all* of their top producers. This is why the Benistar broker database is a key competitive advantage that few, if any, in our business can replicate.

### Position in the Marketplace of Grist Mill Capital and Avon Capital

Because of the wide acceptance of the Grist Mill Trust as a successful tool of corporate benefit and estate planning, and Benistar's ongoing working relationships with the country's top producers and carriers, we have numerous brokers bringing attractive premium funding and life settlement cases to us on a daily basis without us having to do any marketing.

In addition to the marketplace bringing transactions to us on an unsolicited basis, we have something that none of the other players in the marketplace have – the Grist Mill Trust, which gives us ownership and control of the policy from inception. There is no "insurable interest" concern with our program at all. Moreover, we plan on having additional business from satisfied clients starting in the 25th month.

Whereas Coventry – through illegal and unethical actions – stifled competition, we will welcome it and suggest that everyone will be better off dealing with us because we do not and will not engage in such counterproductive practices. The higher the bids, the more profit for our clients, our brokers, and ourselves. We are on the product creation side of the business, so we will be the creative force in the marketplace – the "anti-Coventry" (so to speak) that creates a more efficient market through more transparency, more information and, as a result, higher prices.

We will also provide a market for the clients to sell old and unwanted policies as an aid to structuring and planning their individual estate planning situations. We will obviously not receive a commission on an old policy, but more importantly we will not be charging 50% of the new policy as do the Coventry and Credit Suisse agents. We will become the leader in the marketplace by allowing the broker to keep 100% of his side of the commission and by charging

NovaDOL 01343

UNIV_AAA 00054813

the client only 25-40% of the sale price (compared to brokers charging 50-60% of the net sale price after holding back 8-10% for a Coventry-type sale).

We estimate that within the first six months, without any advertising and only by constant word-of-mouth, we will have upwards of 1,000 active top producers working with us on a regular basis. And each one of these brokers will have a dozen or so perfect candidates for a Grist Mill Capital and/or Avon Capital transaction.

### Ridgewood Will Be Over-Collateralized

Ridgewood will be greatly over-collateralized through the Facility. Assume a standard transaction to be the purchase of a $5MM policy on a male age 78 standard for two annual premiums of $300,000 each. Due to the 10% Origination Fee ($30,000) plus the 3% "collateral hold-back" ($9,000), assume our initial borrowing will be $340,000 to create $300,000 net to invest in the policy in the first year.

The $340,000 for the first year premium will accrue interest at 10% ($34,000) for two years (or $68,000), and the second year premium borrowing of $340,000 will cost $34,000 for a total interest cost of $102,000 ($68,000 + $34,000 = $102,000).

Depending on our cash position at the time, we will probably want to borrow $120,000 in order to pay Ridgewood the $102,000. This is because we would not have charged our client annual interest, but instead would have accrued it for the client. We will take the interest and principal "off the top" upon the sale of the policy.

Thus, our "acquisition" cost of the policy is roughly $800,000 ($340,000 x 2 + $120,000) in borrowed principal and interest. Therefore, assuming a sale after the 25th month at the low end of 30% of face value of the $5MM, we would have proceeds available of $1.5MM. We would then split the proceeds on a 60% (client) and 40% (Avon/Grist Mill) basis after the recovery of the costs of financing. So, in this example, out of the $1.5MM, we would pay Ridgewood $800,000. The difference ($700,000) would be split 60% to the client ($420,000) and 40% to Avon/Grist Mill ($280,000).

In addition to this being a profitable transaction for all, from the time the first premium is paid, the resulting policy is worth at least $1.5MM (and likely more based on life expectancy). While it does take two years to realize that value, once we are into the second year of the program, each new premium advance of $340,000 is creating new collateral of $1.5MM through the acquisition of a $5MM policy.

Therefore, beginning in the 25th month of the program, we will be simultaneously paying off old debt as well as creating new collateral. But neither the client nor Avon/Grist Mill will receive anything until Ridgewood is paid off. So, our program is over-collateralized by as much as 2:1 or perhaps even 3:1 beginning after the 25th month.

6

NovaDOL 01344

UNIV_AAA 00054814

**Avon/Grist Mill Long-Term Goals**

Based on an average deal size of $300,000 in annual premium per $5MM of death benefit, the borrowings for two years' worth of premiums plus interest & related costs will be about $750,000 per transaction. Consequently, a Facility of $35MM will easily allow us to consummate roughly 50 transactions in the space of two years. We believe that our growth from there could be to 200 transactions in the following two years ($150MM), and then 360-400 transactions ($300MM) *each year* thereafter.

We already have the building, the space, the people, the computers, and the infrastructure to handle that type of production now, so we are being very conservative in our estimates of future growth in this market without taking away from the normal growth we expect in our other core competencies. Even without Coventry's recent legal problems, we anticipated overtaking Coventry – with Ridgewood as our lender and "partner"– within a span of five years. It is very realistic that could now happen within 24-36 months.

**The Facility**

The Facility will be used by both Grist Mill Capital ("GMC") and Avon Capital ("Avon") to fund premiums due and owing on life insurance policies that will be owned by the Grist Mill Trust and/or one of its affiliated trusts (collectively, the "Grist Mill Trust"). *The Grist Mill Trust will be the owner and beneficiary of all policies securing the Facility.*

In some cases GMC will be the borrower and in other cases Avon will be the borrower, depending on the nature of the transaction and marketplace characteristics then existing. However, regardless of the identity of the borrower, Ridgewood will always have as collateral a first priority lien and security interest in the following:

a)   the underlying Policy (including the cash value and death benefit);
b)   the ownership interests of both GMC and Avon; and
c)   any and all cash, securities, and other assets of GMC and Avon.

**Sample Transactions**

Both GMC and Avon transactions will be facilitated through the Grist Mill Trust. Most major carriers have already approved the Grist Mill Trust for the use of their insurance products. We will have no problem getting "product" through the Grist Mill Trust and the Grist Mill Trust will be the owner and beneficiary of all policies securing the Facility. Frankly, we have no idea how our competitors will be able to produce new cases in the present "hostile" environment for "premium financing" and "life settlements" – a problem that will not be encountered by the Grist Mill Trust

7

NovaDOL 01345

UNIV_AAA 00054815

(a)   **GMC**

A GMC transaction will be where there is an "employer-employee" relationship and the employer is effectively borrowing money from GMC to fund contributions to a welfare benefit plan. In this example, Mr. Big of Acme Corp. really wants $5MM of death benefit but purchases $15MM of death benefit using Acme's tax-deductible contributions provided in large part by GMC. All deductions for contributions to the Grist Mill Trust are based on Mr. Big's age and the amount of death benefit in order to determine the "Qualified Direct Cost" under IRC 419(e). That is the amount *deductible* to Acme. But remember, there is *no limit* on the amount of *contributions* made to a welfare benefit trust by a company on behalf of an executive.

Now it is 2-3 years later and Mr. Big wants to retire. He can use GMC to sell the "unwanted" $10MM of coverage, which on a sale of $4MM will net Mr. Big $3MM (75%) and GMC $1MM (25%). The $3MM net to Mr. Big is more than enough to "pay up" the $5MM death benefit he is keeping for his personal estate planning (*i.e.*, his own Irrevocable Life Insurance Trust (ILIT)).

(b)   **Avon**

In an Avon transaction, the Grist Mill Trust will also be the owner and beneficiary of the policy for its own unique estate planning and asset protection reasons. However, there would be no tax deduction because there would be no employer-employee relationship. In an Avon transaction, we are funding all of the premiums plus any imputed interest cost, and we are then taking a larger share of the death benefit on the sale of the policy (*i.e.*, 40% rather than 25%) after all costs are recouped. We will also make provision for an early death in the Avon transaction so that 20% of the $5MM death benefit will be payable to Avon for facilitating the transaction.

A typical Avon transaction would be a standard male age 78 purchasing a new $5MM policy with Avon, selling his old policies, and then two years later at age 80 buying another $5MM policy and selling the old policy he purchased with us. Even with $800,000 of financing costs and a 60/40 split of the sales proceeds, the sprite 78 year old recently turned 80 could earn as much as $600,000 to $720,000 in his retirement years. And if age 80 is the "new" 60, then why not keep going until his health gives out and then he decides to keep one or more of the purchased policies? Here again, the healthy 78 year old might buy $15MM of coverage with the "real" intent of keeping only $5MM of continuous coverage at the time of death.

The Avon transaction allows virtually any healthy senior to generate a substantial sum of money every two years through the Grist Mill Trust and Avon. That money can be used to fund an ILIT or for other charitable and estate planning purposes.

8

NovaDOL 01346

UNIV_AAA 00054816

**Summary**

      In summary, we will use the GMC transaction for welfare benefit funding where there is an employer-employee relationship supporting the funding for Mr. Big's benefit (and a tax deduction for Acme).  The Avon transaction will be used for funding 100% of the policy cost where there is no employer-employee relationship or a company that needs the tax deduction.  The Grist Mill Trust will be the owner and beneficiary of all policies – whether GMC or Avon – because the Grist Mill Trust will be able to pass muster with the carriers.  This also gives us flexibility to modify our client documents in each case so that we do not run afoul of "premium financing" or "life settlement" laws in the several states.  We will at all times be in the "benefit funding" arena through GMC or the "premium funding" arena through Avon.

9

NovaDOL 01347

UNIV_AAA 00054817

# EXHIBIT
# 9

Case 3:20-cv-00788-NMC Document 181-2 Filed 10/15/21 Page 36 of 49
Case 1:08-cv-11785-NMG Document 517 Filed 03/30/12 Page 1 of 162

2-1

1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4     JOSEPH IANTOSCA, et al.,            )
                          Plaintiffs,     )
5                                         )
                                          )
6     vs.                                 )  CA No. 08-11785-NMG
                                          )
7                                         )
      BENISTAR ADMINISTRATIVE             )
8     SERVICES, INC., et al.,             )
                          Defendants.     )
9


10

      BEFORE:  THE HONORABLE NATHANIEL M. GORTON
11

12

13                     DAY TWO OF JURY TRIAL

14

15

                John Joseph Moakley United States Courthouse
16                        Courtroom No. 4
                          One Courthouse Way
17                        Boston, MA 02210
                          Tuesday, March 27, 2012
18                             9:10 a.m.

19

20

21                    Cheryl Dahlstrom, RMR, CRR
                       Official Court Reporter
22           John Joseph Moakley United States Courthouse
                     One Courthouse Way, Room 3209
23                        Boston, MA 02210
                 Mechanical Steno - Transcript by Computer

24

25

Case 3:20-cv-00788-NAM   Document 1902   Filed 12/15/21   Page 37 of 49
Case 1:08-cv-11785-NMG   Document 517   Filed 03/30/12   Page 68 of 162

2-66

1    (Jury in at 11:45 a.m.)

2         THE COURT:  Good morning again, jurors.  We're ready

3    to resume.  I just want to announce that at some stages in

4    cases the parties have depositions read.  A deposition is a

5    sworn hearing at which the deponent, the one who's being

6    questioned, is under oath just as he or she would be in court.

7    But rather than bringing them into court, it is sometimes more

8    convenient to go through the reading of a deposition.

9         Now, rather than have an attorney read question,

11:45 10   answer, question, answer, we put somebody who isn't the

11   deponent but plays the role of the deponent on the witness

12   stand.  And then the attorney reads the question and the one

13   who plays the deponent will read the answers.  That's what

14   we're going to do now for the next little while.  When the

15   plaintiff calls that person, we will not swear the person, but

16   he will be playing the role of the deponent.  Mr. Zelle.

17        MR. ZELLE:  Yes.  Members of the jury, my partner, Mr.

18   Evans, will read the questions which were asked to Daniel

19   Carpenter.  And my paralegal -- his name is Colby Hetnar --

11:46 20   will sit in the witness box and basically pretend to be Mr.

21   Carpenter reading his answers.

22        THE COURT:  Yes.  He may come forward.  For the

23   record, your name, sir?

24        THE WITNESS:  Colby Hetnar.

25        THE COURT:  Mr. Hetnar, please have a seat.

Case 3:20-cv-00738-NAM  Document 190-2  Filed 12/15/21  Page 38 of 49
Case 1:08-cv-11785-NMG  Document 517  Filed 03/30/12  Page 67 of 162

2-67

1          You may proceed, Mr. Evans.

2          MR. EVANS:  Ladies and gentlemen, the first reading is

3     from trial testimony of Mr. Daniel Carpenter that was given on

4     December 18 of 2006, in the case -- the name of the case was

5     DeAngelis vs. Commissioner of the Internal Revenue Service.

6     (Testimony read as follows:

7     Q.   Okay.  Are you familiar with the Benistar group of

8     companies, I'll call it now, because I understand there are a

9     large number of entities?

11:47 10   A.   Yes.

11    Q.   Were you employed by those entities?

12    A.   Never on a W-2 basis but, yes, I was an officer of several

13    of the Benistar entities.

14    Q.   Mr. Carpenter, I would like now to turn to the work that

15    you did for the Benistar companies up until -- I believe you

16    said it was January 2004.  You indicated that you were an

17    officer of the companies.  What officer were you?

18    A.   I was chairman of Benistar Ltd. and chairman of Benistar

19    419 Plan Services and chairman of Step Plan Services, Inc.

11:47 20   Q.   What about Benistar Ltd.?

21    A.   Benistar Ltd., I was the chairman and the secretary.  I

22    don't believe there were any other officers.

23    Q.   Now, you indicated that you were chairman or an officer of

24    these companies but not on a W-2 basis.  What does that mean?

25    A.   The genesis of Benistar Admin Services, Inc., and Benistar

Case 3:20-cv-00738-NAM   Document 196-2   Filed 12/15/21   Page 39 of 49
Case 1:08-cv-11785-NMG   Document 517   Filed 03/30/12   Page 71 of 162

2-71

1    the top of the food chain in this example is Carpenter

2    Financial Group, Inc.

3    Q.   Okay.  Who is the owner of that particular company?

4    A.   Carpenter Financial Group, Inc., is 100 percent owned by

5    an employee stock ownership plan.

6    Q.   How many employees are in that employee stock ownership

7    plan?

8    A.   Just one.

9    Q.   Who is that employee?

11:52 10   A.   Just myself, your Honor, and I do have W-2 income from

11   Carpenter Financial Group.

12   Q.   Okay.  Now, who ran or administered the Step Plan on

13   behalf of Step Plan Services, Inc.?

14   A.   I was the chairman, but Wayne Bursey was really the CEO.

15   He ran the Step Plan from day one.  He was the signatory and

16   handled most of the administrative details.

17   Q.   Now, you mentioned that there are other entities

18   associated with what I've been calling the Benistar group of

19   companies.  Approximately how many companies overall are part

11:53 20   of this group?

21   A.   Well, it's hard to say what is an affiliate.  In other

22   words, who is an affiliate and who is in the direct ownership

23   role?  But I'm going to say that Benistar Admin Services is at

24   the hub of about a half dozen to a dozen different companies.

25   Q.   Are the employees of Step Plan Services, Inc., separate

Case 3:20-cv-00788-NAM   Document 190-2   Filed 10/15/21   Page 40 of 49
Case 1:08-cv-11785-NMG   Document 517   Filed 03/30/12   Page 72 of 162

2-72

1    and apart from the employees of Benistar Admin?

2    A.    No.  They are all Benistar Admin employees.

3    Q.    They are Benistar Admin employees.  But when they provide

4    services, they are providing them on behalf of Step Plan

5    Services, Inc.?

6    A.    Exactly.

7          MR. EVANS:  The next testimony you'll hear which is

8    being read for Dan Carpenter is testimony that Dan Carpenter

9    gave at a deposition under oath on Monday, June 18 of 2007.  It

11:54 10   was in -- the deposition was in a case that was pending in the

11   United States Tax Court.

12   (Deposition read as follows:

13   Q.    You were saying that Benistar 419 Plan Services, Inc., has

14   no employees?

15   A.    No employees.  It is just a sponsor.

16   Q.    Who owns Benistar Group Ltd.?

17   A.    I don't know.

18   Q.    You don't know?

19   A.    No.

11:54 20   Q.    Do you own it?

21   A.    No.

22   Q.    Do you have a beneficial interest in Benistar Group Ltd.?

23   A.    No, not that I know of.

24   Q.    What was your role in coming up with the terms of the

25   Benistar 419 Plan and putting together the paperwork to make it

Case 3:20-cv-00738-NMC Document 190-2 Filed 10/15/21 Page 41 of 49
Case 1:09-cv-11785-NMC Document 517 Filed 03/30/12 Page 87 of 162

2-87

         1   Q.   Who decided that Ms. Kehoe would be the affiant for the

         2   Benistar Admin family?

         3   A.   I believe it was my recommendation, and I believe it was

         4   Molly Carpenter's decision.

         5        MR. EVANS:  On Page 84, there's a portion of your

         6   answer there.  Could you read that, Mr. Carpenter [sic].

         7   A.   And Benistar.  And the reason I used the "we" term, it

         8   really is a big family.  So there's a lot of different

         9   entities.  Everybody kind of works or is associated with

12:16   10   Benistar.

        11   Q.   All I want to know is if he gets a W-2 from Benistar Admin

        12   Services or BPA.

        13   A.   BPA doesn't do any W-2s.

        14   Q.   Okay.

        15   A.   All paychecks and payroll are handled by Benistar Admin

        16   Services.  Well, BPA was formed to take advantage of a unique

        17   opportunity in the marketplace.  Because of my involvement in

        18   other legal proceedings in February of 2004, I became somewhat

        19   persona non grata in the insurance industry.  And even though

12:16   20   I've been vindicated and all the terrible things that have

        21   happened to me over the last four years, and I've basically

        22   come out on top, we've been told by certain insurance carriers

        23   that Dan Carpenter shouldn't have anything to do with Grist

        24   Mill Trust any of the other trusts.  So we've literally had

        25   good friends of ours with big insurance companies who have

Case 3:20-cv-00788-NAM   Document 190-2   Filed 10/15/21   Page 42 of 49
Case 1:09-cv-11785-NMG   Document 517   Filed 03/30/12   Page 38 of 162

2-88

1   said, Don't have Dan have anything to do with BPA or the Grist

2   Mill Trust or these other things.  So it's very hurtful, but

3   that's the way business is.

4        So I've -- I voluntarily stepped down from everything

5   Benistar in January 2004.  Kind of doing the Martha Stewart

6   thing, you know, what I thought was the right thing to do.  But

7   I definitely have been told by people not to be associated with

8   BPA in any way, shape or form because BPA does so much work

9   with several insurance companies who have said that if Dan

12:17 10   Carpenter is involved, we can't work with you.

11        So Guy Neumann runs a very tight line of basically

12   being able to say to the insurance companies, Dan has nothing

13   to do with this, but he knows that I was the -- I was the

14   architect of Grist Mill Trust and all of the other welfare

15   benefit trusts.  But, you know, we really try to stick to it,

16   and I don't have anything to do with the day-to-day running of

17   BPA.

18   Q.   Does BPA have any employees?

19   A.   Not in the true -- everybody -- as I testified earlier,

12:18 20   everybody other than me gets a paycheck from Benistar Admin

21   Services.  I don't get anything from Benistar Admin Services.

22   But there is no BPA payroll.

23   Q.   Now, was Kenneth Palmer a broker?

24   A.   He was the king of brokers.  He was the -- I would have

25   called -- if you had asked me -- if you had asked me Ken's

# EXHIBIT 10

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

BENISTAR ADMIN SERVICES, INC.　　　　:
　　　　　　　　　　　　　　　　　　　　　　:　　No.
V.　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
UNITED STATES OF AMERICA　　　　　　　:　　April 22, 2010
　　　　　　　　　　　　　　　　　　　　　　:
IN RE:  Search of NOVA BENEFIT PLANS　:
LLC, a/k/a BENISTAR, located at 100 Grist　:
Mill Road, Simsbury, Connecticut　　　　　:

## DECLARATION OF MOLLY CARPENTER

　　　　I, MOLLY CARPENTER, pursuant to 28 U.S.C. § 1746(2), hereby declare

as follows:

　　　　1.　　I am over the age of eighteen and understand the obligations of an

oath.

　　　　2.　　I make this declaration from my personal knowledge and in support

of Petitioners' Emergency Motion for Return of Illegally Seized Property.

　　　　3.　　I am Chairman of Benistar Admin Services, Inc. ("BASI").  BASI

leases the entire suite of offices located at and known as 100 Grist Mill Road,

Simsbury, CT 06070 from Grist Mill Partners, LLC.  There are more than two

dozen separate companies and business entities that occupy these premises.

　　　　4.　　BASI owns all of the computer hardware and software, as well as

all internet and telecommunications connections, at the office facility – including

all of the computers that were imaged by the IRS Agents on April 20, 2010.

1

5.     BASI is the lawful custodian and/or owner of all of the property that was illegally seized by the IRS on April 20, 2010.

6.     Shortly after nine a.m. on Tuesday, April 20, 2010, armed agents came in to our place of business and literally stormed our building, sealing off the entrances without identifying themselves. Every employee was rounded up and put in a conference room. I informed the Agent in Charge ("Kathy") that we were represented by attorneys and would like to call them. She refused to allow us to do so at that time. The agents then began taking employees out one at a time.

7.     I again requested that they not speak to anyone until our attorneys could be contacted. She assured me that they would only take names and phone numbers and would not speak to anyone until our attorneys could get there.

6.     At the same time that Agent Kathy was assuring me that my staff would be protected, Kevin Slattery and Stefan Cherneski were locked away in separate rooms being interrogated. It wasn't until we went outside to meet with the attorneys, who were barred from entering the building, that we saw Stefan and Kevin's cars. We informed our attorneys that we believed both gentlemen were still inside the building.

7.     The agents at first denied such and then eventually conceded that Stefan Cherneski was being interrogated and subsequently let him go. He was very upset upon leaving the building. We then heard Kevin screaming for an attorney. It got very loud and sounded violent. It took approximately another 15 minutes for Special Agent Kathy to come out. The IRS agents had said they

couldn't find her. She denied knowing that Stefan or Kevin were being held. This is an outright lie.

8.     Most of the agents just did their job, but one was smirking and laughing when they physically searched my husband Daniel Carpenter. My daughter Carrie, my assistant Amanda, and I all saw him. When I confronted the agent about the smirking, he invited me to "step outside with him". He acted like he wanted to fight me. My husband, Daniel, intervened and asked three times for the Agent to identity himself and show his badge number. He refused to do so. There was another Agent that took out handcuffs and told my husband to put his hands behind his back and threatened to arrest him and handcuff him in front of his daughter and the employees. Special Agent Kathy intervened and said she had spoken to him. The agent continued to make faces at us and smirk through the window. I informed Special Agent Kathy of such. We all also heard shouting, hooting, laughing, joking, clapping, and cheering from the assembled IRS agents outside the conference room.

9.     This was a terrifying ordeal. We were never even told what the supposed charges were about and the agents acted like it was a party. They kept saying they were only concerned for their own safety. We had nothing more lethal than sticky notes and note pads. They had guns and bullet proof vests on.

10.     When my husband, Daniel, reviewed the Search Warrant he noticed that there was nothing attached to the warrant as required by law. Agent Kathy stated that it was under seal. Another Agent, who said that he was from

New York, agreed that the Search Warrant looked defective and said that was not how they did things in New York.

11.     My husband pointed out to me and Agent Kathy that Benistar, Ltd., had been out of business since January of 2004.  Nowhere on the Search Warrant or the Subpoena did it state anywhere the name of our Company that occupied the building, Benistar Admin Services Inc. (BASI).

12.     BASI is the custodian and legal owner of all of the records that were improperly taken by the IRS in their raid.

13.     BASI is 100% owned by its employees through an Employee Stock Ownership Plan and has been since 1999.  Neither I, nor my husband Daniel participate in the BASI ESOP.

14.     NOVA Benefit Plans, LLC is a company that has no employees and owns no property at 100 Grist Mill Road and is not affiliated with or owned by BASI.  NOVA Benefit Plans has never been "AKA" Also Known As Benistar.  NOVA's only job is to act as the sponsor of various welfare benefit plans.

15.     Literally the IRS Agents have taken every working file in the building.  We are incapable of running our business or servicing any of our thousands of corporate clients or hundreds or thousands of retirees that count on us for their daily healthcare needs.

16.     In May we also have a very important SAS-70 Level II audit coming up that is crucial to our very existence.  We cannot possibly have our internal operating controls reviewed by our auditing firm if all of our files are missing.  We are the only Third Party Administrator in America to have passed a SAS-70 Level

4

II audit administered by PricewaterhouseCoopers. This is the same level of scrutiny that many banks and insurance carriers must pass.

17.    Also next week we have a site visit and inspection by one of our largest partners, Express Scripts (ESRX, Public Company), one of the largest Prescription Benefit Managers in the World and our primary PBM. Without Express Scripts to offer pharmacy benefits to our retirees and active employees alike, we will be out of business. To pass the Express Script inspection next week and our SAS-70 Audit next month we need our files back as soon as possible, if not immediately.

18.    To the best of my knowledge, no one in this building offers "abusive" tax shelters. Certainly no one employed by BASI or associated with any of the NOVA Benefit Plans has anything to do with tax shelters.

19.    I also heard my husband point out to Agent Kathy that the original Grand Jury subpoena was issued on April 13th with a return date for the information to be provided by June 8th. It seems strange to me that on Friday, April 16th, someone made up a story that would require the IRS to storm our building on Tuesday, April 20th, because they thought we would "destroy documents" including all of our working files? This makes no sense to me at all, and I believe this is just one more ruse on the part of the IRS to gain illegitimate access to our private client files to learn the names of participating employers and plan participants in order to audit them. That is certainly not a proper basis for a criminal search warrant.

20.    The files they have taken were outside the scope of the warrant and contain confidential medical information that is to be protected by HIPAA.  All of the files, documents, and paper seized should be returned to us immediately so as to not jeopardize our business, our clients' privacy, and the jobs of sixty employees that have nothing to do with 419 plans.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  April 22, 2010

Molly Carpenter