**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNIVERSITAS EDUCATION, LLC *Plaintiff,* v. BENISTAR, ET AL. *Defendant*s. | CASE NO. 3:20-cv-00738-JAM |

## PLAINTIFF UNIVERSITAS EDUCATION, LLC'S RENEWED MOTION FOR CONTEMPT AGAINST DANIEL CARPENTER

COMES NOW Universitas Education, LLC ("Universitas"), by and through counsel, and files this renewed Motion and Memorandum of Law, along with attached exhibits, to hold Daniel Carpenter in contempt of this Court's orders requiring Mr. Carpenter to produce discovery in the above-captioned matter. In support thereof, Universitas states as follows:

## INTRODUCTION

Mr. Carpenter's decades-long history of litigation and discovery abuse is continuing even after this Court has held him in contempt for failing to produce discovery in a clear and bad-faith violation of its Orders. While this Court noted that it did not have sufficient information to determine whether Mr. Carpenter remains in contempt of these order, his sworn testimony in the deposition authorized by this Court, makes clear that Mr. Carpenter, who did not produce any additional documents, remains in flagrant violation of this Court's orders; continues to conceal highly relevant and important information from Universitas; and continues his flippant disregard for the judicial process. This ongoing contempt is to the clear detriment to Universitas, and this Court should hold Mr. Carpenter in further contempt and impose additional appropriate sanctions on him.

## STATEMENT OF FACTS

### I.     Background on the Discovery Dispute

Universitas reincorporates its factual recitations from its Motion to for Contempt (Doc. No. 167-1), its Supplemental Motion for Contempt (Doc. No. 197), and its Objection to the Recommended Ruling (Doc. No. 218). Universitas realleges only the most salient facts relevant to the disposition of the instant Motion.

In June of 2021, this Court ordered Mr. Carpenter to comply fully with the subpoena Universitas served on him in April of 2021. The subpoena is attached herein as Exhibit 1. This

Court ordered Mr. Carpenter to comply with the subpoena by July 15, 2021. (Doc. No. 159.) Mr. Carpenter failed to comply or produce responsive documents by that deadline, and Universitas moved to hold him in contempt, noting, *inter alia*, Mr. Carpenter's failure to produce any documents and his adjudicated history of discovery abuse. (Doc. No. 167.) Mr. Carpenter subsequently produced a huge quantity of largely irrelevant documents, which were held by one of his attorneys' Jeffrey Sandberg. Universitas moved for contempt regarding this production, as it constituted an improper document dump. (Doc. No. 197.)[1] This Court noted that Mr. Carpenter did not cull out non-responsive documents, despite the fact that Universitas informed him of the existence of such non-responsive documents. (Doc. No. 243 at 5.)

This Court found that Mr. Carpenter was in contempt between July 15, 2021 and September 6, 2021, when he produced the document dump. This Court noted that it was unsure whether Mr. Carpenter remains in contempt, and ordered Mr. Carpenter to sit for a limited deposition to determine whether he had complied with the subpoena. Mr. Carpenter did not produce a single additional document and stated that he was standing pat on his earlier insufficient production. His deposition establishes beyond doubt that Mr. Carpenter continues to violate the Court order and withhold relevant documents from discovery.

---

[1] As this Court noted, Mr. Carpenter never disputed that his only production contained 350,000 documents, less than 1,500 of which are responsive. (Doc. No. 243 at 5.) While Mr. Carpenter has objected to Universitas's characterization of some of these documents, he has not objected to the nature of the documents themselves. For instance, Mr. Carpenter produced multiple erotic images in a folder labeled "Sweet Eco-firendly lesbian travel, lesbian vacations, lesbian events_files." It is clear that Mr. Carpenter's production was indiscriminate and likely calculated to increase Universitas's burden in finding the few responsive documents contained in the production, and thereby further his known strategy of needlessly increasing Universitas' attorneys' fees. Universitas also notes that this is merely one example of the proliferation of non-responsive documents, which is more extensively detailed in its Supplemental Contempt Motion. (Doc. No. 197 at 4-10.)

## II.    Mr. Carpenter's Efforts to Comply with the Subpoena

Universitas sought seven categories of documents from Mr. Carpenter related not just to Mr. Carpenter personally, but also to numerous entities that he controls. As this Court previously found: "Carpenter ignored [the discovery] order in bad faith. He did nothing to comply with the subpoena for over a month after my deadline, with no valid justification…. [H]e was required to respond to the subpoena diligently. Instead, he did not lift a finger. This was in bad faith." (Doc. No. 243 at 6.) The Court further found that, aside from "a classic example of a 'document dump' from one attorney, Carpenter has "made no other effort to find responsive documents from any other lawyer or file system to which he has access." (Doc. No. 243 at 5.) Mr. Carpenter's deposition confirmed the Court's findings and revealed the scope of the responsive documents he refuses to produce. A transcript of Mr. Carpenter's deposition is attached herein as Exhibit 2.

At the deposition, Mr. Carpenter reiterated that he stood by his July of 2021 statement that he possessed no responsive documents. (Ex. 2, 20:22-21:2 ("No, I'm standing by every word of my July 14th statement, and that I answered I gave you all documents that were in my possession, custody, and control." I have no responsive documents to your subpoena in my possession, custody, or control.").)

First, Mr. Carpenter contests the scope of the subpoena. The subpoena sought documents not just related to Mr. Carpenter's personal finances and assets, but also to the finances and assets of numerous entities under his control, which were listed in the appendices to the subpoena. As Mr. Carpenter testified, he "[does not] care about [the court orders attached to the subpoena]" because the subpoena "only says payments to me." (Ex. 2, 59:2-15.) This is categorically false.[2]

---

[2] Mr. Carpenter has previously conceded that the subpoena seeks information concerning numerous other entities. (*See e.g.*, Doc. #129 at 3 ("… the Subpoena requests the Movant/Non-Party Carpenter produce an extremely wide variety of documents regarding several different entities, who are not parties to the action in this matter over the course of a 14-year period.").)

The subpoena requires Mr. Carpenter to produce documents related to any "Judgment Debtor, Company, and/or Affiliate," which are defined to include Mr. Carpenter, all the companies listed in the appendices to the subpoena, and certain other individuals. (Ex. 1, 2-3.)

Second, Mr. Carpenter candidly admits that he made "no effort[s] at all" to see if any of the defined judgment debtors had assets or documents related to the seven categories in the subpoena. (Ex. 2, 26:20-27:3.) Mr. Carpenter further admitted that he refused to even make an inquiry into one of the categories of documents requested. Request number 3 on the subpoena required Mr. Carpenter to produce any documents relating to the ownership of any "Judgment Debtor" or "Company," as broadly defined in the subpoena. When asked what efforts Mr. Carpenter undertook to acquire these documents he stated: "I don't know who the owners are, so why would I bother finding out." (Ex. 2, 65:6-7.)[3] He provided no responsive documents regarding the ownership of the entities listed in the subpoena. Mr. Carpenter even refused to provide information regarding Carpenter Financial Group, one of the entities named in the subpoena. (Ex. 2 24:8-11 ("No, I'm not going to give you any information. So go ahead and tell the judge I am not giving you the names of other people you didn't sue and you didn't serve caucus [sic] on.").) He further stated that he "did not know" if Carpenter Financial Group existed (Ex. 2 29:10-12) and had no knowledge regarding his operational role in it (Ex. 2 31:3-15) despite earlier testifying that he was aware that there existed more than one Carpenter Financial Group (Ex. 2 24:2-5). He further failed to produce documents related to Caroline Financial Group, Inc.'s ownership, despite admitting that he was its "chairman and secretary. (Ex. 2 52: 19-53-1.) Mr. Carpenter eventually testified he had "no way to produced documents" related to the ownership structure of any company. (Ex. 2 66:1-6.)

---

[3] Multiple courts found that Carpenter personally owned and/or controlled numerous entities within the scope of this request.

Third, Mr. Carpenter failed to produce any responsive bank statements or documents, which were the subject of Request number 4. When presented with an email to Mr. Carpenter containing a list of entities with bank accounts at People's United Bank, which is attached herein as Exhibit 3, Mr. Carpenter stated that he did not recall if any of those entities possessed a bank account and falsely stated that such information was outside the scope of the subpoena. (Ex. 2 74:9-75:8, 77:3-20.)[4] Mr. Carpenter admits that he did contact any banks and/or search for any responsive documents. (Ex. 2 66:24-25.) Universitas then presented Mr. Carpenter with a series of checks from Benistar Group, Limited, one of the Companies listed in the subpoena. These checks are attached herein as Exhibit 4. Mr. Carpenter signed all these checks, which were used to pay various legal fees. (Ex. 4.) These checks were all endorsed in 2013, which is within the relevant time for which Mr. Carpenter was obligated to produce documents. He produced no documents related to this account, or the accounts of any of the other listed companies. When asked if Mr. Carpenter sought more information regarding checks or accounts at People's United Bank, he replied "of course not." (Ex. 2 58:10-25, 60:17-25.) Mr. Carpenter also admitted that he had opened a personal bank account, (Ex. 2 66:7-15), and any documents related to that account are indisputably within Request number 4. Mr. Carpenter has produced no documents related to his personal account.[5] He provided no information regarding the accounts from which his lawyers are

---

[4] Mr. Carpenter's claim that Attorney Holmes sought bank documents for relevant entities beyond the Defendant Trusts is false. Attorney Holmes sought bank records for the Defendant Trusts (his clients), and did not seek bank records for any other entities. (Doc. No. 231.)

[5] This revelation is concerning. First, it directly contradicts Mr. Carpenter's admonition that he has no personal assets. Mr. Carpenter has also continuously suggested that he is unable to open personal bank accounts because he has been blacklisted from banks and has not money or other assets. This has deflected discovery efforts from locating assets in his own name, and casts doubt on his prior claims regarding his capacity to hold assets in his own name. Moreover, Mr. Carpenter is a judgment debtor, and the assets in that bank personal bank account would certainly be recoverable by Universitas.

paid, despite the fact that he knows and acknowledges that his wife pays his legal fees from "her own account." (Ex. 2: 56:15-21.)

Finally, Mr. Carpenter's testimony confirmed that his search for responsive documents was not diligent. Mr. Carpenter summarily stated that he could not access emails on his dcarpenter@usbgi.com account prior to 2012. (Ex. 2 74:11-16.) He did not detail any efforts to collect or find such emails, and specifically stated that he did not request a search of those emails by BASI. (Ex. 2 20:5-17.) Mr. Carpenter also stated that he searched all the inboxes and outboxes available to him on his "usbgi.com" email account and that he found absolutely no responsive documents. (Ex. 2 17:19-25.) Not only is Mr. Carpenter's assertion incredible on its face, but it is demonstrably false. The Defendant Charitable Trusts in the above-captioned action produced email correspondence between Mr. Carpenter, Molly Carpenter, and Amanda Rossi dated June 2, 2021. This email correspondence and attachments are attached herein as Exhibit 5. In this email chain, Mr. Carpenter is directing Ms. Rossi to make certain changes to an operating agreement, which Mr. Carpenter claims is being offered as an exemplar for a company not included in the subpoena.[6] Critically, however, the attachment provided by Mr. Carpenter is a limited liability company operating agreement, which explicitly states that Caroline Financial Group possesses a 5% ownership interest in SDM Holdings, LLC, a Connecticut company.[7] This document would clearly be responsive to Request number 5, which seeks "[a]ny and all documents . . . relating to the Property and/or Assets . . . [of] any Judgment Debtor and/or Company." Caroline Financial is a Company as defined in the subpoena, and this document clearly describes an ownership interest

---

[6] This correspondence strongly contradicts Mr. Carpenter's suggestions that he has no relationship or involvement with BASI, as he is directing Ms. Rossi to make changes to certain documents through her official Benistar email address during regular work hours on a weekday. (*See* Ex. 6.)

[7] Universitas contends that this is a sham company intended to interfere with its collection efforts in Oklahoma.

it possesses in another company, which counts as an asset and property as defined in the subpoena. (*See* Ex. 1 3-4.) Mr. Carpenter also admits to having a second email address, dancarpenter@gmail.com, but explicitly stated that he did not search this repository because "he knew what was there." (Ex. 2 18:12-15.)

Mr. Carpenter also admits that he only asked one of his attorneys for responsive documents. Mr. Carpenter has employed an army of lawyers in this single action, and has numerus other attorneys representing him in his numerous other legal disputes. Mr. Carpenter did not ask his criminal attorneys from Sidley & Austin LLP for documents; he did not ask Roger Stavis or Jonathan Einhorn, who continue to litigate on behalf of Grist Mill Capital under Mr. Carpenter's direction; and Mr. Carpenter failed to ask attorneys who previously represented his entities, including Carole Bernstein and Anthony Siano. (Ex. 2 32:21-33:9, 61:15-62:17.) Mr. Carpenter stated he did not believe that asking those lawyers was "relevant." (Ex. 2 61:15-18.) He further admits that he did not ask his accountants, Simone Macca & Larrow for documents related to his tax returns, which they prepared, or the tax returns of the other Companies listed in the subpoena, as he claimed to not know whether they were the accountants for those companies or if the entities even filed tax returns. (Ex. 2 47:2-48:13, 49:3-6, 51:7-8.)[8] Mr. Carpenter similarly made "no effort," (Ex. 2 69:6-9), to get any life insurance policy information, despite the fact that such documents were encompassed in Request number 5, which seeks documents relating to "beneficial interests" in any property or assets. (Ex. 2 71:23-72:1.)

---

[8] Mr. Carpenter claims these tax returns are not responsive. However, income tax returns are clearly responsive to Request number 5, which seeks information regarding any assets and property owned by Mr. Carpenter, other judgment debtors, and other companies. Income tax returns demonstrate the amount of assets, including cash and other property owned, and would clearly be encompassed within this request. (*See* Ex. 1 6.)

Mr. Carpenter makes clear that he did not seek to search BASI's records for documents responsive to the subpoena issued to him. On numerous occasions, Mr. Carpenter conflates BASI's search for documents related to the document requests sent to other defendants, such as the Defendant Trusts, in the above-captioned action. (Ex. 2 36:7-22 ("I know [Mike McPherson] produced a lot of documents because he was working with Jeff Sandberg and Colt Holmes, and I think he was largely responsible for the documents that Colt Holmes and Jeff Sandberg produced.").) However, Mr. Carpenter acknowledges that he was not involved in the discovery efforts undertaken by BASI, and that BASI did not speak or confer with him. (Ex. 2 91:7-93:21 ("Mike McPherson said 'Dan's not to know . . . Dan's not to get involved . . . Mike McPherson gave strict orders that Dan is not to see any of this, and Dan is not to comment on it".) He further acknowledged that he was "not sure" if any of the documents produced by BASI were responsive to the subpoena because he "did not get involved with the search . . . .; (Ex. 2 93:18-25.) BASI is the record custodian for all electronic files relating to all of Mr. Carpenter's companies, including all emails and accounting records. (Doc. #198-2, Ex. 10 ¶¶ 3-4.) Mr. Carpenter's suggestion that that BASI used the search terms agreed upon by the parties to produce documents responsive to his subpoena is false and constitutes an effort by Mr. Carpenter to mislead the Court in attempting to commandeer a search done by BASI for documents requested of the Defendant Trusts. (Ex. 2 92:2-93:10.) Universitas and Mr. Carpenter never agreed on search terms for his subpoena; any searches undertaken were not in relation to the subpoena served on Mr. Carpenter.

Mr. Carpenter is also clearly suppressing documents responsive to the subpoena, which required him to produce additional responsive documents after making his initial production, if he became aware of any new, responsive documents, as required by Federal Rule of Civil Procedure 26(e). Mr. Carpenter continues to move assets so as to defraud Universitas, and all documents

concerning Mr. Carpenter's ongoing fraud is responsive to the subpoena. Exhibit 6 indicates that Mr. Carpenter continues to operate Caroline Financial Group (in direct violation of his probation), and instructs a third party to fraudulently convey funds he claims belongs to Caroline Financial Group. The same email also discusses assets allegedly owned by entities identified in the subpoena. Mr. Carpenter also witnessed the transfer of a property held by 1&3 Mill Pond Partners in March of 2022, which was a Company listed in the subpoena.[9] (Ex. 1, Ex. I.) The transfer deed is attached herein as Exhibit 7. Such a document would have clearly been relevant to Request number 1, which seeks any documents "concerning the receipt, purchase, sale, acquisition, and/or transfer of Property and/or Assets by any . . . Company." (Ex. 1 at 5.) Mr. Carpenter never produced this document.

## ARGUMENT

### I.    Legal Standard

Rule 45 of the Federal Rules of Civil Procedure requires a person or entity served with a subpoena *duces tecum* to produce documents "in that person's possession, custody, or control." *See* Fed. R. Civ. P. 45(a)(1)(A)(iii). To hold a party in contempt, a Court must first find that there was (1) a clear and unambiguous order; (2) clear and convincing proof of noncompliance; and (3) no diligent attempt to comply in a reasonable manner. *See In re Dunne*, No. 3:17-cv-1399 (MPS), 2018 U.S. Dist. LEXIS 166192, at *19 (D. Conn. Sep. 27, 2018) (internal citations omitted);

---

[9] Universitas notes that this transaction is concerning because 1&3 Mill Pond Partners was a party named in its Amended Complaint, which was pending before the Court at the time of the transfer. Molly Carpenter signed the transfer on behalf of Caroline Financial Group, which is allegedly 1&3 Mill Pond Partners' managing member, and her signature was witnessed by Mr. Carpenter. Ms. Carpenter was also listed in the Amended Complaint and clearly had knowledge of 1&3 Mill Pond Partners' status as a potential defendant. Notwithstanding the foregoing, she still disposed of its property knowing that a lawsuit was potentially pending against it. This, combined with the fact that Mr. Carpenter did not produce this document despite an ongoing discovery obligation to do so suggests that it is a fraudulent transfer and demonstrates Mr. Carpenter's intent to hide the sale from Universitas and this Court.

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (internal quotation marks omitted). Evidence of a "reasonable certainty" that an order was violated constitutes clear and convincing evidence of contempt, *see Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002), and sanctions for civil contempt "can be imposed without a finding of willfulness, if the violations were "substantial" and the contemnor has "[f]ailed to energetically police compliance." *Lavatec Laundry Tech. GMBH v. Voss Laundry Solutions*, No. 3:13-cv-00056 (SRU), 2018 WL 2426655, at *10 (D. Conn. Jan. 9, 2018) (internal citation omitted).

Failure to produce responsive documents, or a bad faith effort to make a production constitutes noncompliance with a subpoena. *See Cobell v. Babbitt*, 37 F. Supp. 2d 6 (D.D.C. 1999). A party served with a subpoena must "conduct a reasonable and diligent search for responsive documents." Mintz Fraade Law Firm, P.C. v. Brady, 2021 WL 621206, at *4 (S.D.N.Y. 2021) (Rule 34 case); see New Falls Corp. v. Soni, 2018 WL 3321429, at *5 (E.D.N.Y. 2018) (explaining that "the logic underpinning Rule 34 is helpful in determining the scope of [a] non-party['s] . . . obligations under a Rule 45 document subpoena"). A document dump that leaves a party with "a mass of unmanageable and unusable documents" does not satisfy the "spirit or the letter of the Federal Rules of Civil Procedure." *Giordano v. Rizzo, DiGiacco, Hern & Baniewicz, CPAs, PLLC (In re Turkey Lake, LLC)*, 2021 Bankr. LEXIS 2504, at *20 (Bankr. N.Y.N.D. Sept. 14, 2021) (quoting *Novak v. Yale Univ.*, 14-CV-00153, 2015 U.S. Dist. LEXIS 157067, at *8 (D. Conn. Nov. 20, 2015)): SEC v. Collins & Aikman Corp., 256 F.R.D. 403, 410 (S.D.N.Y. 2009) (finding that dumping large quantities of unrequested materials in addition to responsive documents does not constitute diligent compliance with a subpoena).

"[T]he Federal Rules of Civil Procedure require parties to produce items in their possession, custody, and control, not simply those in their immediate possession." *Flannigan v. Vulcan Power Grp., LLC*, No. 09-CV-8473 (LAP), 2019 U.S. Dist. LEXIS 115634, at *28 (S.D.N.Y. July 3, 2019) (quoting *Leser v. U.S. Bank Nat'l Ass'n*, No. 09-CV-2362 KAM/ALC, 2010 U.S. Dist. LEXIS 47365, 2010 WL 1945806 at *1 (E.D.N.Y. May 13, 2010) (internal quotations and citation omitted). "The documents and records that a corporation requires in the normal course of its business are presumed to be in its control unless the corporation proves otherwise." Flannigan, 2019 U.S. Dist. LEXIS 115634, at *28 (quoting Cooper Indus., Inc. v. British Aerospace, Inc., 102 F.R.D. 918, 920 n.2 (S.D.N.Y. 1984)).

A party upon whom discovery is served has an obligation to search repositories of electronically stored information. See John B. v. Goetz, 879 F. Supp. 2d 787, 857-60 (M.D. Tenn. 2010) (finding ESI maintained by third-party contractors to be within party's control for purposes of Fed. R. Civ. P. 34); Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co., 105 F.R.D. 16, 33-34 (S.D.N.Y. 1984) (collecting cases for precedent that "[i]t is not unusual for documents in the possession of a third party, closely connected to the litigation, to be subject to a Rule 34 request"); see also In re Flag Telecom Holdings, 236 F.R.D. at 180 n. 3 (S.D.N.Y. 2006) ("[T]he scope of discovery and the meaning of 'control' under Rule 45 and Rule 34 are interpreted identically."). Moreover, If a party has a practical ability to produce documents from a non-party, they must do so. See Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co., No. 14-CV- 04394 (AJN) (BCM), 2016 U.S. Dist. LEXIS 133564, at *17-*18 (S.D.N.Y. Sep. 27, 2016) (explaining that parties are required to produce documents that they have the "practical ability to obtain ... from a nonparty") (internal citations omitted); In re Teligent, Inc., 358 B.R. 45, 60 (Bankr. S.D.N.Y. 2006) ("If a party has the legal right or practical ability to obtain documents

from a non-party, he has 'control' of those documents ….") (internal citations omitted). This includes the production of documents in the possession of a party's attorneys. See *Markus v. Rozhkov*, 615 B.R. 679, 705-706 (S.D.N.Y. 2020) (providing that persons maintain control of documents within their attorney's possession) (internal citations omitted).

A party is required to supplement their production if that party discovers new relevant documents or information, and that duty to supplement continues even after the discovery period has closed. Fed. R. Civ. P 26(e); *Star Direct Telecom, Inc. v. Global Crossing Bandwith, Inc.*, 272 F.R.D. 350, 358 (W.D.N.Y. 2011) (citing *McKinney v. Connecticut*, 2011 U.S. Dist. LEXIS 5059, 2011 WL 166199, *2 (D. Conn. 2011)). Rule 45 permits a court to hold in contempt a person "who, having been served, fails without adequate excuse to obey the subpoena or an order related to it." Fed. R. Civ. P. 45(g).

## II.     This Court has Already Found that Its Order Requiring Mr. Carpenter to Produce Discovery is Unambiguous.

This Court noted that Mr. Carpenter never disputed that this Court's Order requiring his compliance with the subpoena was clear. This Court has found that the order was unambiguous. Therefore, the first prong of the contempt analysis is not in dispute.

## III.     Universitas Has Presented Clear and Convincing Evidence of Noncompliance

Universitas has met its burden in demonstrating Mr. Carpenter's continuing noncompliance with its orders by clear and convincing evidence. Universitas has demonstrated by clear and convincing evidence that Mr. Carpenter had the practical ability to acquire responsive documents and simply refuses to do so. At the outset, Universitas notes that Mr. Carpenter himself admits that he did not conduct any search for responsive documents as to the judgment debtors and other companies listed in the subpoena. (Ex. 2, 26:20-27:3) (admitting Mr. Carpenter "made [no] effort at all" to see if any of the judgment debtors had assets or documents related to the

requests in the subpoena). This in and of itself provides the clear and convincing evidence that Mr. Carpenter did not comply with this Court's order to produce the documents requested.

Universitas has demonstrated by clear and convincing evidence that Mr. Carpenter failed to produce documents in his possession, custody, and control related to Request number 1 in the subpoena, which sought documents related to the disposition of assets of any Judgment Debtor or Company, as defined in the subpoena. Mr. Carpenter witnessed and signed a document relating to the disposition of property owned by 1&3 Mill Pond Partners, which was defined as a Company in the subpoena. Despite his clear knowledge of the document and the transfer of the property, he did not produce the transfer document to Universitas, in a transparent effort to conceal the sale from Universitas and this Court. Mr. Carpenter also directed that millions of dollars be fraudulently transferred on behalf of another entity identified in the subpoena. Despite his clear knowledge of these documents, he did not produce them. The date of the documents is irrelevant. The Federal Rules of Civil Procedure impose a continuing obligation to supplement discovery, even after the discovery period has closed, and Universitas took care to codify this obligation in its subpoena. Mr. Carpenter clearly possessed responsive documents and withheld them, and thus he violated by clear and convincing evidence the terms of this Court's order to produce the documents requested in the subpoena.

Universitas has further presented clear and convincing evidence that Mr. Carpenter did not diligently comply with this Court's Order that he produce documents responsive to Request number 3, which requests documents concerning the ownership structure of various entities under his control. Mr. Carpenter explicitly stated that he "did not even bother" inquiring into the ownership structures, which demonstrates a conscious and flippant disregard of his obligations

under this Court's order. (Ex. 2 65:6-7.) He provided no documents related to ownership structure of any of the judgment debtors or other companies.

Universitas has presented clear and convincing evidence that Mr. Carpenter failed to produce documents responsive to Request number 4, which sought bank records. Mr. Carpenter was the signatory for numerous bank accounts, including one belonging to Benistar Group, Limited. Mr. Carpenter had the practical ability as the signatory to request documents from the bank related to at least the Benistar Group, Limited account, and produce those documents to Universitas. Mr. Carpenter likely has online access to that account, and certainly has the practical ability to request the documents from the bank. Mr. Carpenter's self-serving denials that he has no knowledge of the account and that the signatures were simply stamps are unpersuasive. He cannot derive the benefits as the signatory of the account and then claim he had no knowledge of the account in the same breath. Incredibly, Mr. Carpenter admitted that he possessed a personal bank account for which deposits were made. Documents related to that account are indisputably encompassed within Request number 4, and as the account holder, he has access to those documents. Mr. Carpenter certainly has access to bank statements, which he can likely access online, as well as other documents memorializing deposits and withdrawals. Mr. Carpenter failed to produce any such documents related to this bank account. Thus, his failure to comply with this Court's order to produce documents related to that request is clear and convincing.

Mr. Carpenter's failure to inquire or produce tax returns—either his own or those of his companies—and information relating to the insurance policies taken out on his life constitute a clear violation of his obligation to produce documents responsive to Request number 5 in the subpoena. As explained, *supra*, Request number 5 sought information and documents related to assets and beneficial interests held by any of the Judgment Debtors—including Mr. Carpenter—

and any other Company. Tax returns clearly contain information regarding the assets of an individual or company and are presumptively responsive. Nor can Mr. Carpenter claim any uncertainty regarding whether the subpoena requires production of tax returns. Universitas has continually requested the production of the returns since August of 2021, and Mr. Carpenter has not challenged Universitas's entitlement to such documents. Mr. Carpenter is presumed, as a matter of law, to have possession of his tax returns. *See Fed. Sav. & Loan Ins. Corp. v. Hardee*, 686 F. Supp. 885 (N.D. Fla. 1988) (explaining that possession of personal tax returns is a "foregone conclusion") (citing Fisher v. United States, 425 U.S. 391 (1976). He clearly stated he did not ask his accountants to produce tax returns either for himself or for any of the Judgment Debtors or Companies listed in the subpoena, and thus failed to fulfill his obligations under this Court's order by clear and convincing evidence. *See, e.g.*, Safeco Ins. Co. of Am. v. M.E.S., Inc., 09-cv-3312 (PKC) (VMS), 2014 U.S. Dist. LEXIS 200886, 2014 WL 12834210, at *18-19, 28 (E.D.N.Y. June 27, 2014) (finding prima facie showing of clear and convincing noncompliance where party's partial production "fell short of" all documents requested, especially after the party provided a detail account of missing documents"). The same holds true for information regarding life insurance policies taken out on Mr. Carpenter's life, for which he provided no information or documents.

Mr. Carpenter also failed to produce the SDM Limited Liability Company Operating Agreement, which is responsive to Request number 5 because it demonstrates that Caroline Financial Group—a named Company in the subpoena—possessed an ownership interest in a Connecticut entity named SDM Holdings, LLC. This agreement was attached to an email he sent to BASI staff in June of 2021, *after* Universitas served its subpoena and his first motion to quash was rejected, and he still failed to produce it. More concerningly, despite the fact that this

document is clearly relevant, Mr. Carpenter claims that his search of his "usbgi.com" email address yielded absolutely no relevant documents.

There exists even more clear and convincing evidence of Mr. Carpenter's noncompliance. He failed to search for any emails dating back beyond 2012, despite the fact that the subpoena requires production of documents from 2009 onward. Mr. Carpenter admitted that he failed to even check his "gmail.com" email account for responsive documents. Mr. Carpenter admitted that he failed to request documents from many of his attorneys, including those that were counsel to entities specifically named in the subpoena. His testimony also makes clear that he did not search BASI's files for responsive documents or request that those files be searched on his behalf.[10] Thus, the totality of the evidence and Mr. Carpenter's testimony demonstrates unequivocally, and certainly clearly and convincingly, that he failed to comply with the Court's June of 2021 Order by failing to diligently fulfill his discovery obligations and by failing to produce documents within his possession, custody and control.

IV.     **Mr. Carpenter did Not Attempt to Diligently Comply with the Court's Order**

As explained in detail, *supra*, Mr. Carpenter clearly made no effort to diligently comply with the Court's Order and produce responsive documents in the subpoena. By his own admission, he did not even attempt to find documents related to any of the Judgment Debtors—or for that matter any entity listed in the subpoena except himself; he did not search an entire email repository; his claim that he searched another email repository is contradicted by documentary evidence; he did not request responsive documents from his accountants, banks, or other attorneys; he did not search BASI's records for responsive documents, and he clearly p has a practical ability to request documents; and his final production, which he admits to not fully reviewing, was a clear document

---

[10] As stated, *Infra*, his claim that a BASI search was done on his behalf is patently false and an attempt to mislead the Court.

dump containing few relevant documents buried beneath a pile of irrelevant and inappropriate documents. Mr. Carpenter's purported compliance with this Court's judicially imposed discovery obligations is patently unreasonable, and he remains in contempt of this Court's June of 2021 Order.

## V.    <u>This Court should Impose Further Sanctions on Mr. Carpenter.</u>

Courts have the inherent power to award compensatory monetary sanctions against a party who failed to comply with a Court's order. This may include an award of attorneys' fees if the sanctioned party "acted in bad faith." *E.g., Wilson v. Citigroup, N.A.*, 702 F.3d 720, 724 (2d Cir. 2012). Bad faith can be inferred when a party's actions are completely meritless and thus lead to the conclusion that those actions were undertaken for an improper purpose. *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 338 (2d. Cir. 1999). Here, compensatory sanctions and attorneys fees are warranted. Mr. Carpenter's testimony indicates a flagrant disregard for this Court's orders and his discovery obligations. He refused to search multiple, easily accessible repositories of documents. He refused to acknowledge that the subpoena included requests for information related to other entities, not just him. And he did not undertake any efforts to review the production sent to Universitas, which was entirely a document dump. Mr. Carpenter also attempted to conceal certain relevant documents and information, such as the warranty deed for the sale of property by 1&3 Mill Pond Partners, by not producing it to Universitas, despite the fact that it was highly relevant, clearly encompassed by the subpoena, and resulted in net proceeds of over $140,000, which could have been used to partially satisfy the Universitas judgment against him. The same holds true for the bank account in Mr. Carpenter's name and the lack of production of any documents related to that account. Finally, his search of his own emails was either grossly deficient, or he lied about the contents of the search. In any event, all of these facts and

circumstances, taken together, make clear that Mr. Carpenter acted in bad faith. As such, this Court should order Mr. Carpenter to pay Universitas's reasonable attorney's fees and costs associated with its attempts to procure discovery from Mr. Carpenter.[11]

## **CONCLUSION**

For all the aforementioned reasons, this Court should find that Mr. Carpenter continues to be in contempt of its June of 2021 Order and impose appropriate sanctions. If this Court determines that attorneys' fees are warranted as a sanction, Universitas will promptly supplement this filing with legal bills and a sworn affidavit attesting to the amount of legal fees and costs sought.

---

[11] Universitas also contends that coercive sanctions may be appropriate, particularly in light of Mr. Carpenter's statement that he will opt to incur appellate cost greater than any attorney fees awarded (so as to delay Universitas' recovery), and his refusal to verify that he would, in fact, pay any Court-ordered sanctions. (Ex. 2 79:4-82:2.) ). In determining whether coercive sanctions are appropriate, the court should ensure that the sanction is "coercive or compensatory and not punitive," and if coercive sanctions are warranted, should examine the "character and magnitude of the harm threatened by continued contumacy, . . . the probable effectiveness of any suggested sanction in bringing about (compliance), and the amount of (the contemnor's) financial resources and the consequent … burden to (him). *See Trs. of the Conn. Pipe Trades Local 777 Health Fund v. Plumbing Creations, LLC*, No. 3:15-cv-00822 (MPS), 2019 U.S. Dist. LEXIS 115873, at *9-*10 (D. Conn. July 11, 2019). If Mr. Carpenter does not comply with this Court's order to pay sanctions, Universitas suggests that, in light of the severe prejudice it would cause to Universitas, this Court should impose a daily fine to coerce compliance, and if that fails, incarcerate Mr. Carpenter pending his payment of sanctions. Mr. Carpenter had three different law firms representing him at his deposition. If he can afford to pay his lawyers, he can afford to pay this Court's sanctions.

# **EXHIBIT 1**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| UNIVERSITAS EDUCATION, LLC <br><br>                               Plaintiff, <br><br> v. <br><br> BENISTAR, ET AL. <br><br>                               Defendants. | CASE NO. 3:20-cv-00738-JAM <br><br> **NOTICE OF SUBPOENA** |

PLEASE TAKE NOTICE that, pursuant to Federal Rules of Civil Procedure 30 and 45, plaintiff Universitas Education, LLC, intends to serve the attached subpoena of Daniel Carpenter, in the form attached hereto, on April 22, 2021 or as soon thereafter as service may be effectuated.

Dated: April 21, 2021

Respectfully submitted,

By Counsel

/s/ Joseph L. Manson III
Joseph L. Manson III
Law Offices of Joseph L. Manson III
600 Cameron Street
Alexandria, VA 22314
Telephone: 202-674-1450
Email: jmanson@jmansonlaw.com

*Counsel for Universitas Education, LLC*

# UNITED STATES DISTRICT COURT
## for the

| | |
|---|---|
| Universitas Education, LLC | ) |
| _Plaintiff_ | ) |
| v. | ) |
| Benistar, et al | ) |
| _Defendant_ | ) |

Civil Action No. 3:20-cv-738-JAM

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:
                                Daniel Carpenter

_(Name of person to whom this subpoena is directed)_

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: Deposition will take place remotely via LiveLitigation video chat system | Date and Time: May 25, 2021 at 10:00am |
|---|---|

The deposition will be recorded by this method:  Stenographer

☑ _Production:_  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

                    Please see Exhibit A attached hereto

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  4/21/21

_CLERK OF COURT_

                                            OR

_____          /s/ Joseph L. Manson III
Signature of Clerk or Deputy Clerk                Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_
Universitas Education, LLC
                                            who issues or requests this subpoena, are:
Joseph L. Manson III, Law Offices of Joseph L. Manson III, 600 Cameron St., Alexandria, VA 22314
Email: jmanson@jmansonlaw.com

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 3:20-cv-738-JAM

# PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

UNIVERSITAS EDUCATION, LLC

                           *Plaintiff,*

v.

BENISTAR, ET AL.

                           *Defendants.*

CASE NO. 3:20-cv-00738-JAM

**NOTICE OF DEPOSITION**

PLEASE TAKE NOTICE that, pursuant to Conn. Practice Book § 13-27 and Federal Rules of Civil Procedure 30 and 45, plaintiff Universitas Education, LLC, will take the deposition upon oral examination of Daniel Carpenter, who upon information and belief resides at 18 Pond Side Lane, West Simsbury, CT 06092. This deposition will take place remotely via LiveLitigation video chat system, commencing at 10:00am on May 25, 2021. The deposition shall continue day-to-day until completed.

This deposition shall be recorded by stenographic means, and the deposition shall be taken under oath before an officer authorized to administer oaths. The deposition will be taken for discovery purposes in the above-captioned matter, and for any other purposes permitted under the Federal Rules of Civil Procedure. The deposition will concern the network of entities under Mr. Carpenter's control, the location of assets within such network, and related issues of collectability.

PLEASE TAKE FURTHER NOTICE that pursuant to Federal Rules of Civil Procedure 30 and 45, the deponent is to produce at the deposition the documents and categories of documents identified in Exhibit A attached to this notice.

                         Respectfully submitted,

                         By Counsel

                         /s/ Joseph L. Manson III
                         Joseph L. Manson III
                         Law Offices of Joseph L. Manson III
                         600 Cameron Street
                         Alexandria, VA 22314
                         Telephone: 202-674-1450
                         Email: jmanson@jmansonlaw.com

                         *Counsel for Universitas Education, LLC*

# EXHIBIT A

## Schedule of Documents to be Produced

**Definitions:**

1.     "You" or "your" refers to Daniel Carpenter, who upon information and belief resides at 18 Pond Side Lane, West Simsbury, CT 06092. "You" and "your" also includes any and all agents and persons acting on behalf of Daniel Carpenter.

2.     The term "Judgment Debtor" and/or "Judgment Debtors" means the entities identified by Hon. Judge Swain as "Judgment Debtors" in Exhibit B, as well as the entities identified by Hon. Judge Swain as "Entities Adjudicated as Alter Egos of a Judgment Debtor" in Exhibit B.

3.     "Affiliate" and/or "Affiliates" shall include you, Joseph Edward Waesche, Kenneth Landgaard, and all persons identified by Mr. Waesche as a member of the "Carpenter Family" in Exhibit C.

4.     "Company" and/or "Companies" means any entity, whether a corporation, limited liability company, partnership, trust, or otherwise, owned and/or controlled in any capacity by any Judgment Debtor and/or Affiliate, and/or where any Judgment Debtor and/or Affiliate served as an officer, director, employee, and/or agent. "Company" and/or "Companies" shall include, but not be limited to, the entities identified by Mr. Waesche as a "Carpenter Plan" and/or "Carpenter Entity" in Exhibit C. "Company" and/or "Companies" shall further include, but not be limited to, the entities identified in Exhibit D, Exhibit E, Exhibit F, Exhibit G, Exhibit H, and Exhibit I. All entries in Exhibit I shall include entities with any of the following designations added to the end of the entry: LLC, Inc., Ltd., Co., Corp., Company, Corporation, Trust, and/or Partners. For example, Benefit Plan Advisors will be read as Benefit Plan Advisors, Benefit Plan

Advisors, LLC, Benefit Plan Advisors, Inc., Benefit Plan Advisors, Ltd., Benefit Plan Advisors, Co., Benefit Plan Advisors, Corp., Benefit Plan Advisors Company, Benefit Plan Advisors Corporation, Benefit Plan Advisors Trust, and/or Benefit Plan Advisors, Partners. The entities within Exhibit I shall also be read to contain and/or exclude commas between each word so that no entity will be excluded on the basis of a comma distinguishing between otherwise distinct entities. Entries within Exhibit I shall also be read to contain the word "the" prior to the first word in the entry if the word "the" would otherwise distinguish a company from an entry in Exhibit I. "Company" or "Companies" shall further include all parent companies, subsidiaries, and/or companies incorporated in other states under the same name.

5.      "Document" and/or "Documents" is defined to mean any item within the meaning of Rule 34 of the Federal Rule of Civil Procedure and denotes, without limitation, any original, written, printed, typed, recorded, transcribed, punched, taped, filmed, photographic or graphic matter of any kind or nature, however produced or reproduced, whether sent or received or neither, including electronically stored information. Said items shall include, but are not limited to the original and any copy, regardless of origin or location, of any book, pamphlet, communications in any medium, statements, reports, records (including bank records), financial statements (including bank statements), notes, memoranda, agreements, contracts, e-mails, letters, and computer generated and otherwise electronically stored information. "Document" and/or "Documents" also means each draft version of a document and any reproduction of a document bearing any marks or additional recordings (such as initials, comments, notations, notes, or stamped indices) from a similar document.

6.      "Property" is defined to mean any item within 11 U.S.C. §101, and further means any tangible object of any nature, including but not limited to, money, real estate, real property,

incidental property, cash, equity, securities, debt, bonds, notes, insurance policies, anything capable of being owned, used, acquired, enjoyed, transferred, apportioned, distributed, assigned, and/or disposed of, and/or any physical thing inhering property rights of any form. As used herein, "property" shall refer to ultimate ownership and shall include anything owned by a corporation, LLC, trust, and/or other entity, which in turn is owned by another entity, and is ultimately owned by you, under your control and/or a trust of which you are a beneficiary.

7. "Asset" and/or "Assets" shall mean anything of value, monetary or otherwise, and shall include nontangible things such as accounts receivable, claims at law, bank accounts, intellectual property, and/or anything capable of potentially generating future revenue and/or accruing interest.

8. The word "any" shall be construed to mean "all" and vice-versa, and neither of these words shall be interpreted to limit the scope of a document request.

9. As used herein, the terms "relating to", "relate to" and/or "concerning" shall mean pertinent, relevant, reflect, material to, evidencing, having a bearing on, affecting, discussing, dealing with, considering, refer to, and/or otherwise relating in any manner whatsoever to the subject matter of the inquiry.

10. As used herein, the term "and/or" means both "and" and "or," and shall not be interpreted to limit the scope of a document request.

## **Instructions**

1. The time period covered by each request is from January 1, 2007 to the present.

2. Please produce all responsive documents *in your possession, custody, or control* for each document request. This includes all documents stored in an electronic form.

3. You should preserve all relevant and potentially relevant information and

documents related to the above caption matter, even if they are not explicitly listed in the document requests contained herein.

4.      If you object to or otherwise withhold, in good faith, any responsive documents under a claim of privilege or on another basis, Plaintiff Universitas Education, LLC requests that you, consistent with the Requirements of Federal Rule of Civil Procedure 26(b), expressly make such claim and describe the nature of the document(s) withheld and do so in a manner that will enable other parties to assess the claim of privilege.

5.      Plaintiff requests that you produce responsive documents at the time and place of your deposition, which will occur remotely via LiveLitigation video chat system, commencing at 10:00 am on May 25, 2021.

6.      If after making your initial production you obtain or become aware of any further documents responsive to the following requests, you are required to produce such additional documents to Plaintiff's counsel in the above-captioned matter pursuant to Federal Rule of Civil Procedure 26(e).

## Documents to be Produced for Inspection and Copying

1.      Any and all Documents, including communications, relating to any matter concerning the receipt, purchase, sale, acquisition, and/or transfer of Property and/or Assets by any Judgment Debtor, Company, and/or Affiliate.

2.      Any and all Documents concerning payments made to you, by any means, from any Judgment Debtor, Affiliate, and/or Company.

3.      Any and all Documents, including communications, relating to the ownership structure of any Judgment Debtor and/or Company.

4.      Any and all Documents relating to any bank accounts and/or accounts at any

financial institution concerning any Judgement Debtor, Affiliate, and/or Company.

5.      Any and all Documents, including communications, relating to the Property and/or Assets, and/or any beneficial interests of any Property and/or Assets, belonging to any Judgment Debtor and/or Company.

6.      Any and all Documents concerning the good standing, dissolution, and/or other status of any Judgment Debtor and/or Company.

7.      Any and all Documents, including communications, concerning payment for counsel representing the Alliance Charitable Trust, Atlantic Charitable Trust, Avon Charitable Trust, Carpenter Charitable Trust, and/or Phoenix Charitable Trust in the above-captioned matter.

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

UNIVERSITAS EDUCATION, LLC,

               Judgment Creditor,     :

        -against-            :

NOVA GROUP, INC., as trustee, sponsor and   :
fiduciary of THE CHARTER OAK TRUST
WELFARE BENEFIT PLAN,          :

              Judgment Debtor.

-----------------------------------------------------------------X

Case Nos. 11 CV 1590-LTS-HBP and
11-8726-LTS

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11-2-2017

## [PROPOSED] ORDER

This matter having come before the Court on Universitas Education, LLC's ("Universitas") Motion, Pursuant to CPLR 5240, to Extend the Duration of the Restraining Notices Issued to Third-Party Garnishees for the reasons stated below and on the record at the Order to Show Cause hearing held on November 2, 2017, and pursuant to Fed. R. Civ. P. 69(1)(1) and N.Y. C.P.L.R. § 5240, it is hereby ORDERED that:

1.    Effective immediately, all restraining notices previously issued by Universitas Education, LLC ("Universitas") to the following third-party garnishees are hereby EXTENDED and shall remain in full force and effect through and including **NOVEMBER 30, 2020**:

> AAA Life Solutions, AARP, AETNA, AIG, Allianz Life Insurance Company of North America, Allstate Life Insurance, American National, American United Life, Amica Life Insurance, Athene Annuity & Life Insurance Company of New York (Amerus/Aviva), Avon Capital Holdings, LLC, CIGNA, Columbia Universal, Columbus Life Insurance Company, Commonwealth Insurance Services, Inc., Connecticut General Life, Conseco, Country Life, Eerie Family Life, Fidelity Security Life, First UNUM, Fort Dearborn Life, Genworth Financial, Guardian Life, Hartford Life Insurance Co., ING (VOYA), Jackson National Life, Kansas City Life, Knights of Columbus, Lafayette Life, Lincoln Benefit Life Insurance Company, Lincoln Heritage, Madison National Life, Midland National, Minnesota Life, Mutual of Omaha, New York Life Insurance Company, Northwestern Mutual, Pacific Life Insurance Company, Penn Insurance and Annuity Co., Primerica, Principal Financial Group, Protective Life, Provident Life & Accident, RBC Insurance, Reassure America, ReliaStar Life Insurance Co. (VOYA), SBLI USA, State Farm, The North American Company for Life and Health Insurance of New York (Wilton Re), TIAA, United Commercial Travelers, United States Life Insurance Co., UNUM Provident, Washington National Insurance Company (CONSECO), Western & Southern Life and Workmen's Benefit.

2.   All restraining notices issued by Universitas to third-party garnishees shall be effective against and apply to any property or assets in which any Judgment Debtor has an interest. The Judgment Debtors are as follows:

**JUDGMENT DEBTORS:**

(1) Daniel E. Carpenter;

(2) Nova Group, Inc.;

(3) Grist Mill Trust Welfare Benefit Plan and any trustees and plan sponsors thereof insofar as they hold Grist Mill Trust assets ( "GMT");

(4) Grist Mill Capital, LLC;

(5) Grist Mill Holdings, LLC;

(6) Carpenter Financial Group;

(7) Avon Capital, LLC;

(8) Phoenix Capital Management, LLC; and

(9) Hanover Trust Company.

3.   All restraining notices issued by Universitas to third-party garnishees shall be effective against and apply to any property or assets in which an adjudicated alter ego of the Judgment Debtor has an interest. The adjudicated alter egos of the Judgment Debtors are as follows:

**ENTITIES ADJUDICATED AS ALTER EGOS OF A JUDGMENT DEBTOR:**

(1) Carpenter Financial Group, LLC;

(2) Benistar Admin Services, Inc.;

(3) Benistar 419 Plan Services, Inc.;

(4) Benistar Employer Services Trust Corporation;

(5) Benistar, Ltd.;

(6) Benistar Ltd.;

(7) Benistar Property Exchange Trust Company, Inc.;

(8) Benistar Property Exchange Trust Company;

(9) Boston Property Exchange Trust Company;

2

(10) Boston Property Exchange Transfer Company;

(11) Boston Property Exchange Transfer Company, Inc.;

(12) Step Plan Services, Inc.; and

(13) U.S. Property Exchange.

4.      Universitas (or its counsel) shall provide written notice to third-party garnishees to the extent additional entities (other than those set forth in paragraph 4 herein), have been or are, at a future date, adjudicated to be alter egos of any Judgment Debtor. Upon receipt of such written notice, the third-party garnishees shall add and include said entity to the list of alter ego entities enumerated above in paragraph 4 of this Order and any property or asset(s) of such alter ego entity shall be subject to the restraining notices.

5.      The Restraining Notices served on the following carriers by Universitas are hereby lifted only with regard to the processing of the changes of ownership listed below for the identified insureds and policies only:

| Plan | Insured | Carrier/Policy # | Transaction |
|------|---------|------------------|-------------|
| SPT[1] | Robert G. | Lincoln *139 | Change of Ownership |
| B419[2] | Michael M. | AIG *538 | Change of Ownership |
| B419 | Michael D. | AIG *539 | Change of Ownership |
| GMT | Bruce M. | Mass Mutual *160 | Change of Ownership |
| GMT | David H. | F&G *407 | Change of Ownership |
| GMT | Laura H. | F&G *793 | Change of Ownership |
| GMT | James J. | John Hancock *001 | Change of Ownership |
| GMT | Ralph S. | AIG *221 | Change of Ownership |
| GMT | Ralph S. | AIG *222 | Change of Ownership |

---

[1] GMT Survivorship Plan and Trust

[2] Benistar 419 Plan and Trust

6.   The Restraining Notices served on the following carriers by Universitas are
     hereby lifted only with regard to the processing of the full surrenders or partial
     surrenders/withdrawals listed below for the identified insureds and policies only:

| GMT | Thomas R. | Lincoln *777 | Full Surrender |
| GMT | Michael T. | Mass Mutual *855 | Full Surrender |
| GMT | Russell O. | Penn I&A *994 | Full Surrender |
| GMT | Amy&Mark M. | Hartford *198 | Partial Surrender |

Thereafter, upon receipt of funds from the carries for the partial or full surrenders
of the listed policies, GMT shall pay such funds to Loeb & Loeb LLP for the
benefit of Universitas. Thereafter, upon receipt of further written authorization
from Universitas' counsel (Loeb & Loeb), Hartford is free to proceed with the
processing of a change of ownership request with respect to the Amy & Mark M.
policy without further order of the Court.

7.   The Restraining Notices served on the following carriers by Universitas are
     hereby lifted only with regard to the processing of the partial
     surrenders/withdrawals listed below for the identified insureds and policies only:

| B419 | David R. | Lincoln*091 | Partial Surrender/Withdrawal |
| B419 | Thad M. | Mass Mutual *018 | Partial Surrender/Withdrawal |
| B419 | Kathleen B. | AIG *512L | Partial Surrender/Withdrawal |

If Lincoln, Mass Mutual and/or AIG receives a request for change of ownership
of the David R., Thad M. or Kathleen B. polices, the carriers are free to process
the change(s) of ownership without further order of the Court. B419 shall provide
copies to Universitas' counsel of any change of ownership paperwork submitted
to the carriers with respect to these three policies.

SO ORDERED.

Dated:     New York, New York
           November  2  , 2017

_____
LAURA TAYLOR SWAIN
United States District Judge

5095669v 1

4

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
             :

THE PENN MUTUAL LIFE INSURANCE  :
COMPANY,

             :  No. 15-CV-01111 (AJN)

        Plaintiff,      :

             :

      -against-       :  **AFFIDAVIT OF J. EDWARD**
             :  **WAESCHE**
KATHY KEHOE, as Trustee of the    :
SICKNESS ACCIDENT & DISABILITY  :
INDEMNITY TRUST 2005; KATHY    :
KEHOE, as Trustee of the GRIST MILL  :
TRUST DATED 10-1-03; and UNIVERSITAS  :
EDUCATION LLC,          :

             :

       Defendants.     :

             :
--------------------------------------------------------X
             :

LIFE INSURANCE COMPANY OF THE  :
SOUTHWEST,

             :  No. 15-CV-04594 (AJN)

        Plaintiff,      :

             :

      -against-       :

             :

KATHY KEHOE, as Trustee of the GRIST  :
MILL TRUST DATED OCTOBER 1, 2003;  :
and UNIVERSITAS EDUCATION LLC,  :

             :

       Defendants.     :

             :

             :

             :
--------------------------------------------------------X

      STATE OF CONNECTICUT  )

      COUNTY OF FAIRFIELD     )

      I, J. Edward Waesche, being duly sworn, state:

1. I have authorized my attorney, James Filan, to accept service of a subpoena on my behalf served by Third-Party Defendant Universitas Education, LLC ("Universitas") in these consolidated actions. The subpoena requires my attendance at a deposition in these matters.

2. I have reviewed the pleadings in these actions, including the complaints and the answers filed by all parties (collectively, the "Pleadings").

3. If called to testify in these actions, I would assert my Fifth Amendment right against self-incrimination in response to all substantive questions, including, without limitation, questions related to the following subjects:

- The allegations and/or denials made in the Pleadings;
- The formation, operation, solicitation of participants, and activities of: (i) the Grist Mill Trust Welfare Benefit Plan (the "Grist Mill Plan"); (ii) the Sickness, Accident & Disability Indemnity Trust (the "SADI Plan"); (iii) SADI 2005; (iv) the SADI Trust dtd 10-1-03; (v) the SADI 2007 Trust; (vi) the Grist Mill Survivorship TR dtd 10-1-04; (vii) the Charter Oak Trust Welfare Benefit Plan (the "Charter Oak Trust"); (viii) the Benistar 419 Plan & Trust; (ix) the GMT Living Benefits TR dtd 10-1-05; (x) the Nutmeg Trust dtd 10-1-03; (xi) the McAllen Healthcare Svcs Trust 10-01-08; (xii) the Long Term Care Trust dtd 10-1-03; (xiii) the Jefferson Trust dtd 10-1-10; (xiv) the Life One Plan & Trust dtd 9-30-04; (xv) the Life One Trust; (xvi) the Life Five Plan & Trust dtd 9-30-04; (xvii) the Life Five Trust; and (xviii) the Survivorship Plan & TR dtd 9-30-04 (collectively, the "Carpenter Plans"). As used herein, the term "Carpenter Plans" includes any amendments to the identified "Carpenter Plans," as well as any other employee welfare benefit plan involving Daniel E. Carpenter ("Carpenter");
- Commissions (or other monies and payments) received or paid with respect to any life insurance policy or annuity owned or secured by, or in connection with, any Carpenter Plan (and/or paid to any member of the Carpenter Family[1] or any Carpenter Entity[2]);

---

[1] The "Carpenter Family" refers to Carpenter; Molly Carpenter; Kathy Kehoe; Wayne Bursey (now deceased); Donald Trudeau; Charles J. Induddi Westcott; Jack E. Robinson; Donna Wayne; Caroline Carpenter Meckel; Ineke Murphy; Shawndrika Stevens-Gardner; Donna Dawson; Matthew Westcott; Joseph Castagno; Amanda Rossi; Robert Pacini; Stefan Cherneski; Andrew Varner; Paul E. Martin; and/or Guy Neumann.

[2] "Carpenter Entity" or "Carpenter Entities" refers to 1&3 Mill Pond Partners LLC; 41 Church Street Partners LLC; Alliance Charitable Remainder Trust; American Captive Services, Inc.; American Fiduciary Services, Inc.; Atlantic Charitable Remainder Trust; Audit Risk Indemnity Association LLC; ARIA, LLC, Avon Capital, LLC; Avon Charitable Remainder Trust; Avon Old Farm School; BASI; BCNY Litigation Group, LLC; Benefit Concepts Advisors, LLC; Benefit Concepts, Inc.; Benefit Concepts New York; Benefit Plan Advisors, LLC; Benistar; Benistar 419 Plan Services, Inc.; Benistar 419 Plan & Trust (the "Benistar Plan"); Benistar Client Services, Inc.; Benistar Corporation; Benistar Employer Services Trust Corporation; Benistar Financial Group; Benistar Financial Group LLC; Benistar Group Ltd.; Benistar Insurance Group, Inc.; Benistar Insurance Group Holdings, LLC;

2

- The activities of the Carpenter Family and the Carpenter Entities and my involvement with either;

- The formation, operation, and activities of Benefit Plan Advisors, LLC, Nova Benefit Plans, LLC, Nova Group, Inc. and/or Hanover Benefit Plans, LLC, or any other entity or person who served as a plan sponsor, named fiduciary, administrator, and/or trustee of a Carpenter Plan;

- Business relationships between and among me, and any and all members of the Carpenter Family;

- Other persons and/or entities who have been involved in or with the Carpenter Plans, the Carpenter Entities, and/or the Carpenter Family, and their respective roles in same;

- All transactions undertaken in connection with any Carpenter Plan, including all monies and/or assets assigned, sold, pledged, or otherwise transferred to/from any Carpenter Plan;

- All entities controlled by Carpenter, including the Carpenter Plans, that operated out of 100 Grist Mill Road, Simsbury, Connecticut; 10 Tower Lane, Avon, Connecticut; 300 Stamford Place, Stamford, Connecticut; and/or 2187 Atlantic Street, Stamford, Connecticut;

- The origination, transfer, assignment, pledge and/or sale of any life insurance policy or annuity owned by any Carpenter Plan, and any payments of premiums on any such policy or annuity, including, without limitation, the following: (i) Policy No. 008170968, issued by The Penn Mutual Life Insurance Company ("Penn Mutual") in 2005, insuring the life of Mr. Lawrence O. Fischer ("Mr. Fischer"); (ii) Policy No. 008199632, issued by Penn Mutual in 2007, insuring the life of Mr. Fischer; (iii) Policy No. LS0147497, issued by Life Insurance Company of The Southwest in 2007, insuring the life of Mr. Fischer; (iv) Policy No. 546103549, issued by Jefferson Pilot, insuring the life of Keith Kornovich; and (v) Policy No. 546103551, issued by Jefferson Pilot, insuring the life of Mark Kornovich; and

---

Benistar Ltd.; Benistar Media Group, Inc.; Benistar Property Exchange Trust Company; Benistar Property Exchange Trust Company, Inc.; Benistar Publishing, Inc.; Benistar Reinsurance Services Group, Inc.; Birch Hill Partners, LLC; BPETCO Litigation Group; Cambridge Trust; Essex Trust; Capital City Partners, LLC; Carpenter Charitable Remainder Trust (or any similar named trust); Carpenter Financial Group; Caroline Financial Group, Inc.; Charter Oak Trust; Charter Oak Trust 2009; Charter Oak Trust Welfare Benefit Plan ("Charter Oak Trust"); DSP Holdings, LLC; Greenwich Bay Management LLC; Grist Mill Capital, LLC; Grist Mill Holdings, LLC; Grist Mill Partners, LLC; Grist Mill Plan; Grist Mill Trust (GMT) Living Benefits Trust; Grist Mill Trust-Physicians; Grist Mill Trust (GMT) Survivorship Trust; Grist Mill Trust Welfare Benefit Plan (the "Grist Mill Plan"); Hanover Trust Company; Jefferson Trust; Life Five Welfare Benefit Trust; Life One Welfare Benefit Trust; Long Term Care Trust; McAllen Healthcare Services Trust; Mid Atlantic Trust; MidAtlantic Trust; Moonstone Partners, LLC; Natural Benefit Alliance LLC; NBPS, Inc.; Nova Benefit Plans, LLC; Nova Group Holdings, LLC; Nova Group, Inc.; Nova Living Benefits Trust; Nova Partners; Nutmeg Trust; Phoenix Capital Management, LLC; Phoenix Charitable Remainder Trust; Rex Insurance Services; SDM Holdings, LLC; Seir Hill Partners, LLC; Sickness, Accident & Disability Indemnity Trust; Sickness, Accident, Disability Indemnity Trust 2005 (the "SADI Plan"); Sickness, Accident, Disability Indemnity Trust 2007; Split Dollar Trust; Step Plan Services, Inc.; STEP Plan & Trust; Survivorship Welfare Benefit Trust; TPG Group, Inc.; USB Underwriter Services, Inc.; U.S. Benefits Group, Inc.; U.S. Property Exchange; Wilcox Street Partners LLC; Worthy Investments; and/or Zone Partners LLC.

- The disposition of the $30 million in life insurance death benefits paid by The Lincoln National Life Insurance Company to the Charter Oak Trust in May 2009, including all transfers made to entities formed, controlled or operated, directly or indirectly, by any member of the Carpenter Family, including Carpenter and/or Molly Carpenter, and the current whereabouts of such monies.

4. I recognize that this Court may draw adverse inferences against members of the Carpenter Family, the Carpenter Entities, and the Carpenter Plans, including Third-Party Defendants Grist Mill Plan and SADI Plan, as a result of my assertion of my Fifth Amendment right against self-incrimination.

J. Edward Waesche

Sworn to before me this
14th day of January, 2016

Erin E. McGee
NOTARY PUBLIC Public
State of Connecticut
My Commission Expires Sept. 30, 2017

4

# EXHIBIT D

Government's Sentencing Memorandum

## **EXHIBIT 1**

### LIST OF COMPANIES[1]

Abigail Partners, LLC
Alaska Pacific Acquisition Group, Inc.
Alaska Pacific Corporation
Avon Capital LLC
Benefit Concepts, Inc.
Benefit Concepts New York, Inc.
Benefits Concepts Systems Inc.
BCNY, Inc.
BCNY Systems, Inc.
Benistar, Ltd.
Benistar Group, Ltd.
Benistar Corporation
Benistar Employer Services Trust Co., Inc.
Benistar Admin Services, Inc.
Benistar Insurance Group, Inc.
Benistar Capital, LLC
Benistar 419 Plan Services, Inc.
Benistar Step Plan Services, Inc.
Caroline Financial Group, Inc.
Cohen Family Charitable Foundation, Inc.
Florida Air, Inc.
Frace Carpenter & Co., Inc.
GIC Asset Management Corp.
Health Resource Organization, Inc.
National Telcom PCS, Inc.
National Telecom, Inc.
Nova Group Business Trust
The ESOP Group, Inc.
T.P.G. Group, Inc.
United Health Care Organization, Inc.
Voluntary Benefit Systems, Inc.

---

[1] Based on database searches conducted by the government to date, each of the above-listed entities appears to have been associated with Carpenter. It is unclear, at present, which of the entities remains active and what his current relationship with such entities might be.

# EXHIBIT E

April 7, 2011

Department of Treasury
Internal Revenue Service Center
Cincinnati, OH 45999-0045

To Internal Revenue Service Employee:

Please find in the enclosed package 2010 tax return extensions for the following entities:

| | |
|---|---|
| Antioch Partners, LLC× | 26-3821783 |
| Benefit Concepts, Inc.× | 06-1422529 |
| Birch Hill Partners, LLC× | 27-2845861 |
| Caroline LTD LLC× | 06-1448097 |
| Caroline Financial Group, Inc.× | 20-0006208 |
| Clermont Capital Partners, LLC× | 27-3017294 |
| Corsair Holdings Group, LLC.× | 26-3821860 |
| Grist Mill Holdings, LLC× | 20-0688307 |
| Hanover Benefit Plans LLC× | 27-1967071 |
| Legacy Research Partners, LLC.× | 26-3822114 |
| Lighthouse Point Mgmt Group, LLC× | 26-3822501 |
| Mako Development Group, LLC.× | 26-3822695 |
| Marlin Holdings Group, LLC × | 26-3822829 |
| Marlin Mgmt Group, LLC × | 26-3822873 |
| Marlin Partners, LLC.× | 26-3822760 |
| Phoenix Alliance Investment Group Entities, LLC | 26-0029164 |
| Research & Development Group, LLC× | 26-3822347 |
| Sunrise Holdings, LLC× | 26-3822606 |
| Vanguard Royalty Group, LLC× | 26-3822396 |
| Will Call LLC × | 26-1624772 |

Matt Westcott

NovaDOL 02073

UNIV_AAA 00056320

# EXHIBIT
# F

April 7, 2011

Department of Treasury
Internal Revenue Service Center
Ogden, UT 84201-0045

To Internal Revenue Service Employee:

Please find in the enclosed package 2010 CRT extensions for the following entities:

| | |
|---|---|
| Alliance Trust | 06-1426096 |
| Atlantic Trust | 20-6209247 |
| Avon Charitable Trust | 20-0872368 |
| Carpenter Charitable Trust | 06-6649744 |
| Phoenix Trust | 06-6526774 |
| Aragon Charitable Remainder Trust | 26-6652604 |
| Ariel Charitable Remainder Trust | 26-6652591 |
| Augustus Charitable Remainder Trust | 26-6671135 |
| Avalon Charitable Remainder Trust | 26-6652596 |
| Eldora Charitable Remainder Trust | 26-6652585 |
| Herrera Charitable Remainder Trust | 26-6671113 |
| Morris Ashby Charitable Remainder Trust | 26-6671343 |
| Pequot Charitable Remainder Trust | 26-6671154 |
| Saint Barnabas Charitable Remainder Trust | 26-6671414 |
| Saint James Charitable Remainder Trust | 26-6671501 |
| Saint Luke Charitable Remainder Trust | 26-6671461 |
| Saint Paul Charitable Remainder Trust | 26-6671513 |

Matt Westcott

NovaDOL 02096

UNIV_AAA 00056343

# EXHIBIT G

April 8, 2011

Department of Revenue Services
State of Connecticut
PO Box 2967
Hartford, Ct 06104-2967

To Connecticut DRS Employee:

Please find in the enclosed package 2010 extensions for tax returns for the following entities:

| | |
|---|---|
| Avon Capital, LLC | 20-1196827 |
| Benistar Admin Services, Inc. | 06-1490687 |
| BESTCO Benefit Plans LLC | 06-1490685 |
| Birch Hill Partners, LLC | 27-2845861 |
| Caroline LTD LLC | 06-1448097 |
| Clermont Capital Partners, LLC. | 27-3017294 |
| Grist Mill Capital, LLC | 81-0607868 |
| Grist Mill Holdings, LLC | 20-0688307 |
| Hanover Benefit Plans LLC | 27-1967071 |
| Nova Benefit Plans , LLC | 20-0675542 |
| Nova Partners, LLC | 20-0688355 |

Matt Westcott

NovaDOL 02055

UNIV_AAA 00056303

# EXHIBIT H

March 15, 2011

Department of Treasury
Internal Revenue Service Center
Cincinnati, OH 45999-0045

To Internal Revenue Service Employee:

Please find in the enclosed package 2010 corporate extensions for the following entities:

Frank Musseman, PC               27-0845327
Helen Mussemann, PC              27-0845655
Emily Boyd, PC                   27-0846804
American Fiduciary Services, Inc. 27-4201435
PC Therapy, Inc.                 13-3671312
Corsair Financial Group, Inc.    26-3821042
USB Group Inc                    27-3520756
Pandora Financial Group, Inc.    26-1760639

Matt Westcott



NovaDOL 02170

UNIV_AAA 00056417

# EXHIBIT I

1 & 3 Mill Pond Partners
Alaska Pacific
Alaska Pacific Group
Alliance Charitable Trust
Altcara
American Charitable Endowment
Ark Royal
Ark Royal Assurance
Ark Royal Holdings
Atlantic Charitable Trust
Avon Capital Holdings
Avon Holdings
Avon Insurance Welfare Benefit
Avon Trust
Benefit Concepts International
BPA
Britannia
Caledon Trust Company
Cambridge Welfare Benefit Plan
Caroline
Carpenter Charitable Remainder Unitrust
Carpenter Family Trust
Carpenter Financial Group Welfare Benefit Trust
Carpenter Group
Carpenter Trust
CBCA
CBCA Administrators
CBCA Pharmacy Benefits Management
CCP2
Claremont Capital Group
Claremont Capital Partners
Clermont Asset Management
Clermont Capital
Daniel E. Carpenter Charitable Remainder Trust
Daniel E. Carpenter Trust
Global Sports Underwriters
Graham-Bingham Irrevocable Trust
Greyhound Management
Greyhound Partners
Grist Mill Capital Advisors
Gryphon Publishing Group
Health Benefit Alliance
Health Claims Trust Organization

Health Resources Organization
Legal Defense Fund
Leo Group
LICA Admin Services
LICA Admin. Services
Life Insurance Co. of Alaska
Life Insurance Company of Alaska
Life Insurance Fund Elite
Loge Group
Lydia Capital
National Benefit Alliance
National Financial Services
NatTel
Nova Trust
NTS Properties
Perfect Rides
Pettibone Tavern
Phoenix Alliance Investment Group
Phoenix Capital
Phoenix Capital Management Group
Phoenix Charitable Trust
Roth Capital Partners
Step Acquisition Group
Thermionics
Thomas D. Philipsborn Insurance
Torrey Pines Services
US Benefits
US Benefits Group
USB Client Services
USB Services
USBGI
Video Galaxy
Westcott Financial Group
Yates Worldwide Holding
Yates Worldwide Holding Limited

# **EXHIBIT 2**

1            UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT
2
             CIVIL ACTION NO. 3:20-cv-738-JAM
3    _____

4    UNIVERSITAS EDUCATION, LLC

5                 Plaintiff,
          v.
6
     BENISTAR, GRIST MILL PARTNERS, LLC,
7    ALLIANCE CHARITABLE TRUST, PHOENIX
     CHARITABLE TRUST, ATLANTIC
8    CHARITABLE TRUST, AVON CHARITABLE
     TRUST, CARPENTER CHARITABLE TRUST,
9    CAROLINE MECKEL, STEVEN MECKEL, 1 & 3
     MILL POND PARTNERS, LLC, SEIR HILL
10   PARTNERS, LLC, GREYHOUND PARTNERS,
     LLC, BIRCH HILL PARTNERS, LLC, AND JANE
11   DOE ENTITIES UNDER CONTROL OF
     JUDGMENT DEBTORS,
12
                 Defendants.
13   _____

14

15

16
                      Deposition of
17
                      Daniel Carpenter
18
                 Friday, April 15, 2022
19
                       10:11 a.m.
20

21

22

23

24
     Job No:    209796
25   Reporter:  Barbara J. Carey, RPR

```
1   APPEARANCES:
2
3   ATTORNEY FOR PLAINTIFF:
4           Joseph Manson, III, Esq.
            Law Offices of Joseph L. Manson III
5           600 Cameron Street
            Alexandria , VA 22314
6
7
8   ATTORNEY FOR DEFENDANTS:
9           Jonathan Einhorn, Esq.
            Jonathan J. Einhorn Law Offices
10          29 Whitney Avenue
            New Haven, CT 06510
11
12
            Jeffrey Sandberg, Esq.
13          Jeffrey R. Sandberg
            8350 North Central Expressway
14          Dallas, Texas 75206
15
16          Grayson Holmes, Esq.
            Ouellette, Deganis, Gallagher & Grippe
17          143 Main Street
            Cheshire, CT 06410
18
19
            John Williams, Esq.
20          John R. Williams and Associates
            51 Elm Street
21          New Haven, CT 06510
22
23
24
25
```

```
1              I N D E X
2   EXAMINATION OF DANIEL CARPENTER:
3      By Mr. Manson - Page 5
       By Mr. Sandberg - Page 86
4
5   EXHIBITS:
6   Number              Description              Page
7   Exhibit 1.......................................... 6
                4-21-2021 - Notice of Subpoena
8               (33 pages)
9   Exhibit 2.......................................... 6
                7-14-2021 - Responses to Document
10              Request
                (3 pages)
11
12  Exhibit 3.......................................... 6
                8-6-2021 - Deposition of Daniel
13              Carpenter
                (161 pages)
14  Exhibit 4.......................................... 7
                3-22-2011 - Ruling on Motion for
15              Contempt Sanctions
                (8 pages)
16
17  Exhibit 5......................................... 39
                6-2-2021 - Email Chain
18              Subject:  SDM Holdings, LLC Operating
                Agreement
19              (13 pages)
20  Exhibit 6......................................... 50
                Daniel E. Carpenter's 2010 Taxes
21              Bates:  UNIV_AAA 00054877
22  Exhibit 7......................................... 57
                Bates:  UNIV_AAA 00055375 to 409
23              Checks from Benistar Group LTD
                Bates:  JLM032399 to 405
24              Bates:  JLM032146 to 158

                              (Continued...)
25
```

```
1           I N D E X (Continued):
2
3   EXHIBITS:
4   NUMBER/DESCRIPTION                        PAGE
5   Exhibit 8......................................... 73
                7-30-2010 - Email
6               Subject:  Accounts & balances:
                People's United Bank
7               Bates:  JLM019488
8
9                     * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1               DEPOSITION, held pursuant to Notice of
2   Taking Deposition and held pursuant to our Remote Platform
3   Stipulation that all parties are appearing remotely and
4   have agreed to the testimony being transcribed by the
5   court stenographer regardless of the locale of the
6   deponent, and also pursuant to our Remote Platform
7   Stipulation that the oath may be administered remotely by
8   the court stenographer regardless of the locale of the
9   deponent.
10              WHEREUPON, the following proceedings
11  were duly had:
12              THE REPORTER:  We are now on the record.
13  The time is 10:11 a.m.
14          Mr. Carpenter, raise your right hand and I
15  will swear you in.
16              (The oath was administered by the court
17               reporter.)
18          WITNESS RESPONSE:  I do.
19          THE REPORTER:  Thank you. You may begin.
20          DANIEL CARPENTER,
21  After having been first duly sworn, was called as a
22  witness and testified as follows:
23              EXAMINATION
24  BY MR. MANSON:
25      Q.  Good morning, Mr. Carpenter.  My name is
```

1  Joe Manson, and I'm counsel for Universitas.
2        We're here today to continue your deposition
3  pursuant to the order of Judge Meyer on March 22nd, 2022,
4  and in that order, Judge Meyer prescribed the nature of
5  the examination, and he put a four-hour time limit on this
6  deposition, and we will adhere to the terms of the order.
7        Before you got on, I communicated to
8  Mr. Williams that the first four exhibits that we have, we
9  should just mark and enter at this time.
10        And so the first one is the subpoena that was
11  issued to you that is the subject of this deposition.  So
12  the subpoena will be Exhibit 1.
13        (Whereupon, Exhibit 1, 4-21-2021 - Notice
14        of Subpoena, was marked.)
15        Q.  The second exhibit will be your responses to
16  the subpoena, your response to the document requests that
17  you filed on July 14, 2021.
18        (Whereupon, Exhibit 2, 7-14-2021 -
19        Responses to Document Request, was
20        marked.)
21        Q.  The third exhibit will be the transcript of
22  the deposition that I took of you in this case on
23  August 6th, 2021.
24        (Whereupon, Exhibit 3, 8-6-2021 -
25        Deposition of Daniel Carpenter, was

1        marked.)
2        Q.  And the fourth exhibit will be the order of
3  Judge Meyer in this case on March 22nd, 2022.
4        (Whereupon, Exhibit 4, 3-22-2011 - Ruling.
5        on Motion for Contempt Sanctions, was
6        marked.)
7        Q.  Mr. Carpenter, the first question is, are you
8  taking any medications that would impair your ability to
9  fully and accurately answer my questions today?
10        A.  No, sir.
11        Q.  In preparation for your deposition today, did
12  you review certain documents?
13        A.  No.
14        Q.  And it's my understanding that you're
15  represented by three lawyers today; is that correct --
16  Mr. Williams, Mr. Sandberg, and Mr. Einhorn?
17        A.  And I'm not sure if Grayson Colt Holmes is on
18  the line, but definitely I'm in Jeff Einhorn's office, and
19  Mr. Sandberg is definitely here.
20        Q.  Well, Grayson has been representing the trust
21  defendants, and granted, you're the trustee of those
22  trusts, as you previously testified.
23        But is Mr. -- is Grayson representing you in
24  your personal capacity today?
25        A.  No, but I don't even know if he's on the line.

1        Q.  He is on the line -- or he was on the line.
2        MR. HOLMES:  I'm here, yeah.
3        MR. MANSON:  There he is, Mr. Holmes.
4        Q.  So the other three lawyers that I mentioned --
5  Mr. Williams, Mr. Sandberg, and Mr. Einhorn -- are
6  representing you today in your personal capacity; is that
7  correct?
8        MR. SANDBERG:  No, hold on, Dan.  Hold
9  on.
10        Counsel, the attorneys that are present today
11  are appearing consistent with their appearances in this
12  case.
13        MR. MANSON:  Consistent with their what?
14        MR. SANDBERG:  Consistent with their
15  appearances in this case.
16        MR. MANSON:  Well, Mr. Einhorn just
17  entered an appearance, I believe, today.
18        Is that right, Mr. Einhorn?
19        MR. SANDBERG:  He did enter an
20  appearance today, but I don't want this questioning to
21  make it look as if the attorneys are here today solely
22  representing Mr. Carpenter.  The attorneys that are
23  present are here on behalf of their clients.
24        MR. MANSON:  Are you representing
25  Mr. Carpenter individually today, Mr. Sandberg?

1        MR. SANDBERG:  I have entered an
2  appearance in this case on behalf of Mr. Carpenter as well
3  as other -- well, I can't say "other" because
4  Mr. Carpenter is not a party.
5        I did enter an appearance on behalf of
6  Mr. Carpenter and certain parties.
7        Q.  Okay.  Now, we called Mr. Williams --
8  Mr. Karam called Mr. Williams yesterday, I believe, or the
9  day before, and asked if there were any other documents
10  that would be produced today pursuant to the subpoena, and
11  he was told that there were no additional documents to be
12  produced.
13        Is that correct, Mr. Carpenter?
14        A.  I haven't produced any additional exhibits.
15        Q.  Okay.  So just to review the bearing of it,
16  the documents that you did produce were those that came
17  from Mr. Sandberg and his files; correct?
18        MR. SANDBERG:  Objection; form.  Excuse
19  me, we're in Federal Court.
20        A whole bunch of documents have been produced
21  in this case, Counsel.
22        MR. MANSON:  Well, that's what the
23  record shows.  I'm trying to get an understanding from
24  Mr. Carpenter if there were any -- well, let me rephrase
25  it.

1      Q.   Other than your initial production in this
2  case, there have been no other documents produced;
3  correct?
4      A.   No, that's not correct.  I --
5      Q.   What other documents were produced?
6      A.   There were thousands of documents produced on
7  September 6th.  I had an extension to answer until
8  September 9th, and then we produced 100 gigabytes of
9  information, and you seemed to object to all of that
10 information.  So I don't know what else you want me to
11 produce.
12     Q.   I just want -- I just want to get you to
13 confirm for me that the only production -- you're not
14 supplementing the production today.  There are no
15 additional documents.
16          So the documents that were produced by
17 Mr. Sandberg in response to the subpoena, which are the
18 subject of the Magistrate's ruling and Judge Meyer's
19 ruling are the only documents.  That's all.  I'm just
20 trying to get you to confirm that.
21     A.   No.
22          MR. SANDBERG:  Hold on.  I object.
23          The different parties have produced a series
24 of documents.  Mr. Carpenter requested that certain
25 parties to this case produce documents.  Universitas

1  gave -- I mean, let's be clear.
2          MR. MANSON:  You need to stop suggesting
3  answers to the witness.  I'm talking about documents in
4  response to his subpoena.  That's what the question was.
5  It didn't go to any other document request to any other
6  party.  It's just the documents on his behalf responding
7  to the subpoena, which is what this deposition concerns.
8          MR. WILLIAMS:  I'm going to have to
9  interject one thing.  I'm sorry to interrupt.  You may be
10 operating under a slight misunderstanding.
11          In my conversation with your associate earlier
12 this week, the question to me was, do you intend to
13 produce any exhibits at the deposition -- because he and I
14 were talking about the exhibits that he was going to
15 provide -- and I said we do not plan to produce any
16 exhibits at the deposition.  That is what I said.
17          MR. MANSON:  Okay.
18     Q.   Well, with that clarification, will you
19 confirm for me, Mr. Carpenter, that there have been no
20 further documents produced by you in response to your
21 subpoena other than those that were produced by
22 Mr. Sandberg?
23          MR. SANDBERG:  That is false.  Why are
24 you doing this?  You know darn good and well Mr. Holmes
25 provided your office documents.

1          MR. MANSON:  That's not the question.
2  Would you just stop trying to suggest answers to the
3  witness.
4          MR. SANDBERG:  Okay.  Well, then ask a
5  question that's consistent with what's on page 7 of this
6  ruling and stop -- you've already started this morning
7  playing games.
8          MR. MANSON:  No, no, no.  That's wrong.
9  Mr. Sandberg, you would do well to hold your
10 leading suggestions to the witness to yourself, because I
11 can assure you the Court is not going to have patience for
12 this.
13          We're entitled to know if there were any
14 further documents produced in response to the subpoena,
15 and the answer is no, and I need to get the witness to
16 confirm that.
17          MR. SANDBERG:  No.  The answer is not
18 no.
19          MR. MANSON:  You're not the witness.
20          MR. SANDBERG:  You're intentionally --
21          MR. MANSON:  You are not the witness.
22          MR. SANDBERG:  -- trying to get
23 misleading testimony and false testimony from this
24 witness.
25          MR. MANSON:  Okay.  Would you please

1  strike that.  Mr. Carpenter is the witness, not you,
2  Mr. Sandberg.
3          MR. SANDBERG:  I know who the witness
4  is.
5          MR. MANSON:  You need to keep quiet and
6  offer proper objections, or I'll just get the Judge or the
7  Magistrate on the phone shortly.
8          MR. SANDBERG:  Counsel, it's your
9  deposition.  You can do what you want.
10          MR. MANSON:  That's right.
11          MR. SANDBERG:  But be a professional,
12 and if you're going to ask a question, ask a question in a
13 way that does not seek false testimony.
14          MR. MANSON:  Well, that's exactly what
15 I'm doing.
16          MR. SANDBERG:  And stop playing games.
17          MR. MANSON:  And you of all people,
18 Mr. Sandberg, I certainly don't need any ethics lecture
19 from you.
20          MR. SANDBERG:  Thank you.
21          MR. MANSON:  Based on your conduct in
22 the cases that I've been in with you.
23          MR. SANDBERG:  Yeah, and I could say the
24 same, Frank.
25     Q.   Mr. Carpenter, let me ask you the following

1  question:
2           And that is, you testified before that you
3  asked Mr. Sandberg to respond to the subpoena on your
4  behalf, and --
5       A.   That's not true.  Let me --
6       Q.   Since that time, have you asked any other
7  party -- lawyers, people at BASI -- any other party to
8  produce documents to you in response to the subpoena that
9  was issued to you?
10          THE REPORTER:  The witness seems to be
11  frozen on my end.
12          (Technical comments off the stenographic
13          record.)
14          MR. MANSON:  Do you recall the question,
15  Mr. Carpenter?
16      A.   No.  Could you repeat the question?
17  BY MR. MANSON:
18      Q.   Yes.  Since the initial production of
19  documents from Mr. Sandberg on your behalf in response to
20  the subpoena that is Exhibit 1, since that time, have you
21  asked any other parties -- which includes lawyers or
22  individuals at any of the companies that you are
23  affiliated with that are named in the subpoena -- to
24  produce any documents to you in response to that subpoena?
25      A.   Yes, the Sandberg production was a very small

1  part of the 126 gigabytes of information that was
2  produced.
3       Q.   Did anyone other than Mr. Sandberg give you
4  documents after the Sandberg production to produce in
5  response to the subpoena?
6       A.   Yes, a whole bunch of people provided
7  documents because I requested to get their help because I
8  did not have access to the BASI server or the Halloran &
9  Sage server, and the government was not giving me back the
10  documents they took in 2010 or 2011.  And I even explained
11  to Judge Spector and Judge Meyer that the government
12  refused to give back the documents that they stole in 2010
13  and 2011.
14          So I asked my wife to get in touch with her
15  attorneys, and I coordinated that through Grayson Colt
16  Holmes who was kind enough to coordinate with the
17  attorneys at Halloran & Sage.
18      Q.   Did you produce any additional documents, you
19  or your lawyers, produce any additional documents to my
20  firm --
21      A.   Correct.
22      Q.   -- in response to the subpoena?
23      A.   We had a deadline of September 9th, and on
24  September 6th, we produced over 126 gigabytes of
25  documents.  So there were hundreds of thousands of

1  documents in there, and we satisfied our production under
2  the overly broad and unduly burdensome subpoena.
3       Q.   Okay.  So again, Mr. Carpenter, I want a
4  direct answer to my question, which is, after you
5  submitted that -- those documents to my firm in September,
6  have you produced any additional documents from any source
7  on your individual behalf in response to the subpoena?
8       A.   No, because I completed all of the discovery
9  requests on September 6th.
10      Q.   Okay.  By the way, the criminal case, when did
11  the government seize those files?
12      A.   That wasn't part of a criminal case.  It was
13  April 20th, 2010, and then May 26th of 2011, and both
14  cases are still under Judge Underhill.
15      Q.   Okay.  Did you review all the documents
16  produced by Mr. Sandberg in September?
17      A.   No, I did not.
18      Q.   Do you even know what's in all those files?
19      A.   I know what's in a lot because of the fact
20  that I had Attorney Holmes send it to me when somebody
21  from your office said they couldn't open up the files.  So
22  I had Attorney Holmes send it to me, and I was able to
23  open up each of the files, and I saw that they were
24  correctly labeled, but I did not go through, document by
25  document.  I just confirmed that they were properly

1  labeled and that I had no problem opening those documents.
2       Q.   Mr. Carpenter, do you have an email address of
3  dcarpenter@usbgi.com?
4       A.   Yes.
5       Q.   And what does "USBGI" stand for?
6       A.   I don't believe it stands for anything, but
7  originally, it was US Benefits Group, Inc.
8       Q.   And what was the function of US Benefits
9  Group, Inc.?
10      A.   Originally, it was going to be in the benefits
11  business when I left Benistar.  I resigned from all things
12  Benistar in January of 2004, and I set up US Benefits
13  Group as an alternative.
14      Q.   Okay.  Is that email on the BASI server?
15      A.   I don't believe it's on the BASI server.  At
16  some point in time, unbeknownst to me, BASI moved
17  everything to the cloud, and I don't know what they -- or
18  what was on the BASI server or when that happened.
19      Q.   Did you do a search of that email address and
20  the inboxes and outboxes for documents responsive to the
21  subpoena?
22      A.   Yes, I did.
23      Q.   Did you produce those documents?
24      A.   There were no responsive documents that I
25  could find.

1    THE WITNESS:  It says low battery.
2    MR. EINHORN:  You're okay.
3    Q.   When was the last time you used that usbgi.com
4  email address?
5    A.   Probably late last night or early this
6  morning.
7    Q.   Is that your primary email now?
8    A.   Yes.
9    Q.   What other email addresses do you have now?
10    A.   The one I use for legal is
11  dancarpentermail@gmail.com.
12    Q.   Did you search that email for documents
13  responsive to the subpoena in this case?
14    A.   No.  There was no reason to because I know
15  exactly what's on dancarpenter@gmail.com.
16    Q.   And did you -- did you search the USBGI email
17  for documents responsive to the subpoena in this case?
18    A.   Yes.
19    Q.   And is it -- who conducted that search?
20    A.   I did.
21    Q.   And is it your testimony that you found no
22  documents that were responsive to the subpoena in this
23  case?
24    A.   Right.  The subpoena in this case had seven
25  requests, and I'm standing by my July 14th statement that

1  I have no responsive documents to your subpoena in my
2  custody, possession, or control.
3    Q.   So for what period of time did you search the
4  USBGI carpenter email address?
5    A.   I don't remember the exact day, but it was
6  shortly after you made a big deal out of Matt Westcott
7  having a million-and-a-half-dollar slush fund, and you
8  submitted documents to the Court saying we've got to talk
9  about the Matt Westcott slush fund, and it was at that
10  time that I asked my wife to ask her staff to see if they
11  could find the slush fund that never existed and was part
12  of Matt Westcott's imagination.
13    But you made a big deal with Judge Meyer and
14  Judge Spector, so that's when I really wanted to check any
15  computer that I had to see if I had any communication from
16  Matt Westcott talking about the alleged slush fund.
17    Q.   Okay.  Was there any other search conducted
18  other than with respect to the slush fund that you asked
19  your wife to ask her staff to assist you on?
20    A.   When I got the original subpoena -- I'm not
21  sure why you're asking this -- but when I got the original
22  subpoena, I don't have an office.  I've got some boxes
23  downstairs in the basement.  I've got a small filing
24  cabinet, but I haven't had any type of office since 2014,
25  and I don't have a storage facility.

1    So the only thing I was really able to check
2  was my computer, and I went back, and I did not find any
3  responsive documents on my computer, in the basement, or
4  in my small filing cabinet.
5    Q.   All right.  But you didn't ask BASI to do a
6  search of your USBGI emails?
7    A.   No.  My wife -- my wife -- my wife had the --
8  she hired a computer firm to search anything on the BASI
9  server, and Attorney Holmes actually worked with
10  Donna Parrott over at Halloran & Sage to basically search
11  the Halloran & Sage server.
12    And I think that Attorney Holmes did a great
13  job working with Mike McPherson at Halloran & Sage.  But
14  at this late date, I've never met Mike McPherson.  I've
15  never even had a phone call with Mike McPherson, but I
16  think Attorney Holmes looked for anything and everything
17  responsive to your subpoena.
18    Q.   And it's your testimony he didn't find
19  anything?
20    A.   Yes.
21    Q.   Is that your understanding?
22    A.   No, no.  I'm standing by every word of my
23  July 14th statement, and that I answered -- I gave you all
24  documents that were in my possession, custody, and
25  control.

1    Q.   All right.  Let's take a look at the subpoena,
2  and I'm going to direct your attention to Exhibit B of the
3  subpoena, which is an order of Judge Swain that was
4  entered on November the 2nd, 2017.
5    So the first thing I want to ask you about is
6  the list of judgment debtors.  It starts with Daniel
7  Carpenter, 1; and then it's Nova Group, Inc.; Grist Mill
8  Trust Welfare Benefit Plan and any trustees and plan
9  sponsors thereof insofar as they hold Grist Mill Trust
10  Assets; Grist Mill Capital, LLC; Grist Mill Holding, LLC;
11  Carpenter Financial Group; Avon Capital, LLC; Phoenix
12  Capital Management, LLC; and Hanover Trust Company.
13    Do you see that list?
14    A.   Yes, sir.
15    Q.   All right.  Did you -- first of all, of these
16  entities, do any of these entities -- and I'm talking
17  about 2 through 9, did any of them have any employees?
18    A.   I don't even know what entities they're
19  referring to.
20    Q.   I just read them off to you.
21    A.   No.
22    Q.   Nova Group, Inc.  Does Nova Group, Inc. have
23  any employees?
24    A.   Nova Group -- there were two Nova Groups, and
25  you keep, to this day, confusing the two Nova Groups.  To

1  this day, you keep confusing the three Avon Capitals.
2          So all of these companies, for the most part,
3  were dead and out of money in 2009.  So when you asked me
4  does Nova Group -- Nova Group, Delaware has been dead for
5  a while, and Nova Group, Inc. I had nothing to do with.
6          So the Connecticut Nova Group, Inc. I had
7  nothing to do with, so I'm going to give a firm, "I don't
8  know."
9      Q.   How about the rest of them?  Grist Mill
10  Capital, LLC you certainly had something to do with;
11  didn't you?
12      A.   No.  No, as a matter of fact, Grist Mill
13  Capital, LLC was a Delaware entity, and you made a big
14  deal.  Michael Barnett kept sending things up to
15  Judge Swain that were totally false, but you ignored the
16  Grist Mill Capital, LLC that was formed by Halloran & Sage
17  and had Wayne Bursey and Jack Robinson, and you never even
18  sued the correct Grist Mill Capital, never even served the
19  correct Grist Mill Capital, which I had nothing to do
20  with.
21          So the Grist Mill Capital, LLC that had all of
22  those policies and funded all the policies in the Charter
23  Oak Trust, you never even served the agent for service of
24  process.
25          So unfortunately, Wayne Bursey is deceased and

1  Jack Robinson is deceased, but even tomorrow, you can
2  check for yourself that Grist Mill Capital, Connecticut is
3  alive and well, but Grist Mill Capital, Delaware has been
4  out of money since 2009.
5          And Judge Scheindlin ruled against you in the
6  TD Bank case, so I would really appreciate it if you find
7  somebody in your organization that can get the correct
8  facts together instead of lying to judges all over the
9  country.
10      Q.   Okay.  Well --
11      A.   No, no, I would really appreciate that.
12      Q.   Listen.  Listen to me.  Listen to me.
13      A.   No, no.  You asked me a question.  I'm going
14  to give you an answer.
15      Q.   No.  My question was whether they had
16  employees?
17      A.   You don't know what you're talking about.
18      Q.   Answer the question.
19          Do they have employees or not, Grist Mill
20  Capital, LLC?  That was the question.
21      A.   I don't know.
22      Q.   Does Grist Mill Holdings, LLC have employees?
23  Yes or no?
24      A.   I don't know.
25      Q.   How about Carpenter Financial Group?  Maybe

1  you know something about that.
2          Does it have employees?
3      A.   Which Carpenter Financial Group?
4      Q.   Well, you tell me.  Is there more than one?
5      A.   Yes.
6      Q.   Okay.  Tell me -- name all of them, and we'll
7  take them one by one.
8      A.   No, I'm not going to give you any information.
9  So go ahead, tell the Judge I'm not giving you the names
10  of other people that you didn't sue and you didn't serve
11  caucus on.  I really want to get back to Peacock v.
12  Thomas.  So you go ahead and tell the Judge -- no, go
13  ahead and tell the Judge.
14          You're supposed to be focused on the three
15  questions of page 7, so you tell Judge Meyer, "Hey, I
16  asked Carpenter about an entity that hasn't even been sued
17  yet, and we're supposed to be spending four hours on three
18  questions of page 7."
19          So why don't you deal with those three
20  questions instead of asking me about employees of dead
21  companies?  How does that sound?
22          MR. MANSON:  Okay.  I'm going to ask the
23  lawyers to see if they can get this -- this client --
24          MR. SANDBERG:  I have a suggestion.
25          MR. MANSON:  -- this witness under

1  control and just answer my questions.  The questions are
2  whether or not they have employees or not, these entities.
3          MR. SANDBERG:  Hold on.
4      Q.   Does any entity named Carpenter Financial
5  Group have its own employees?
6          MR. SANDBERG:  No.  Hold up here, folks.
7  You're asking about the judgment debtor entity?
8          MR. MANSON:  That's right.
9          MR. SANDBERG:  That is -- which one?
10  Grist Mill Capital or Grist Mill Holdings?
11          MR. MANSON:  Both.
12          MR. SANDBERG:  Well, okay.  Let's start
13  with Number 4 then, because that's the first on the list.
14  BY MR. MANSON:
15      Q.   Do they have employees?
16          MR. SANDBERG:  I'm not finished,
17  Counsel.  Grist Mill Capital -- Grist Mill Capital, LLC is
18  identified as a judgment debtor on this list.  It would be
19  appropriate under the scope of the order to ask a question
20  about that entity that is a judgment debtor.
21          Any other Grist Mill Capital, LLC would not be
22  a judgment debtor, and we don't need to talk about right
23  now.
24          MR. MANSON:  No, you're totally wrong.
25  You can lodge your objection.

1           MR. SANDBERG:  Okay.  I appreciate you
2  saying I'm wrong, but until you want to talk to me or show
3  me, you're talking about Grist Mill Capital that is here
4  on page 13 of 33 of Exhibit 1.  So you're asking him about
5  that entity.
6           Okay.  Now, if you want to explain to me why
7  you get to talk about other entities, you can do that, but
8  I'm looking at the exhibit right now, and I'm looking at
9  page 13 of 33.
10      Q.   Mr. Carpenter, I'm going to ask you again,
11  with respect to all the judgment debtors that are listed
12  in 2 through 9, do any of them have any employees to your
13  knowledge?
14      A.   To the best of my knowledge, the judgment
15  debtors that you have listed there, I don't know any of
16  the -- I have no idea any of the employment status for any
17  of those entities.
18      Q.   Okay.  So you didn't ask -- well, let me ask
19  you this:
20           What efforts did you make to see if any of
21  these judgment debtors listed had assets or documents
22  related to the seven categories in the subpoena?
23           Did you make any effort at all?
24      A.   For those judgment debtors?
25      Q.   Yes.

1      A.   No.
2      Q.   Okay.
3      A.   Wayne Bursey's been dead since 2015.
4      Q.   Right.  You said that.
5      A.   No, no.  I did not hold a seance to ask Wayne
6  Bursey where my documents were for your subpoena, and once
7  again, I'm stating for the record, I'm standing by my
8  July 14th statement that I didn't have any documents
9  relevant or responsive to that subpoena in my possession,
10  custody and control, and that is what today's deposition
11  is meant to be about.
12      Q.   Okay.  So you think today's deposition is
13  about only documents that you thought were relevant?
14           MR. SANDBERG:  That's not the witness's
15  testimony.
16           MR. MANSON:  I'm asking it.
17           MR. SANDBERG:  Ask a question.
18      Q.   Is that what you thought, Mr. Carpenter -- you
19  didn't need to produce anything that you didn't think was
20  relevant?
21      A.   I don't understand your question.
22      Q.   Well, I mean, you just used the words that
23  nothing was relevant and you were standing on your pat
24  answer, and I'm trying to understand if, as a guiding
25  principle, you don't think you need to produce any

1  documents that you think are not relevant to this case.
2           Is that your view?
3      A.   No, I think -- I think you're twisting my
4  words, and you were the one who's misinformed.  So why
5  don't you ask me a specific question, and you tell me what
6  you think I should have produced other than the 126
7  gigabytes.
8           My understanding of this case is I got an
9  extension to produce to September 9th, and on
10  September 6th, I caused to be produced 126 gigabytes of
11  information, and I'm waiting for you to tell me what
12  document do you have that shows I didn't produce
13  everything in my possession, custody, or control, because
14  I am standing by my statement of July 14th that I produced
15  everything relevant and responsive.
16           So I would appreciate if you show me a
17  document that you think I should have produced because I
18  think that's what Judge Meyer wants, is I think I did a
19  great job searching for documents, and your job is to show
20  me a document that was supposedly in my possession,
21  custody, or control that I deliberately didn't produce.
22  I'm waiting to see that document.  And the courtesy
23  exhibits, I didn't see any document that I was supposed to
24  produce, and that's my statement.  I'm standing by my
25  July 14th statement.

1      Q.   Okay.  Look at the entities adjudicated --
2           MR. SANDBERG:  You broke up just now,
3  Counsel.  Can you repeat that?
4      Q.   Yeah.  In Judge Swain's order and in Exhibit B
5  to the subpoena, which is Exhibit 1, here, we've got up on
6  the screen "ENTITIES ADJUDICATED AS ALTER EGOS OF A
7  JUDGMENT DEBTOR."
8           And the first entrance -- the first entity is
9  Carpenter Financial Group, LLC?
10           Does Carpenter Financial Group, LLC exist,
11  Mr. Carpenter?
12      A.   I don't know.
13      Q.   Who would know?
14      A.   I don't know.
15      Q.   How about Benistar Administrative Services --
16  Benistar Admin Services, Inc.; does that exist?
17      A.   Yes.
18      Q.   And that's BASI; correct?
19      A.   Yes.
20      Q.   And BASI does have employees; right?
21      A.   I don't work for BASI.
22      Q.   That's not the question, Mr. Carpenter.
23  Mr. Carpenter, answer my questions and we'll get done a
24  lot quicker.
25           Does BASI have employees; yes or no?

1    A.    Yes.
2    Q.    Okay.  Benistar 419 Plan Services, Inc.; does
3  that entity have employees?
4    A.    I don't know.
5    Q.    How about Benistar Employer Services Trust
6  Corporation?
7    A.    I don't know.
8    Q.    How about Benistar, Limited, L-T-D?
9    A.    I don't know.
10    Q.    There's one with a comma and one with a
11  period, Benistar, Ltd.?
12    A.    I don't know.
13    Q.    How about -- look at the rest of the entries.
14         Is your answer that you don't know whether
15  they have employees or not for 7 through 13?
16    A.    I know for a fact that those companies are
17  basically the companies involved in the 2000 property
18  exchange business, so I don't believe any of those
19  companies have any employees.
20    Q.    Okay.  But you didn't conduct any search of
21  their records to see if they had any documents responsive
22  to the subpoena; correct?
23    A.    Correct; because they've been out of business
24  since 2000, and Judge Spector said from January 1st, 2009.
25  So I know for a fact that those entities involving the

1  Boston Property Exchange have literally been out of
2  business since 2001.
3    Q.    But you know Carpenter Financial Group, LLC is
4  not out of business; is it?
5    A.    I don't know that for a fact.
6    Q.    Aren't you the one that established Carpenter
7  Financial Group, LLC?
8    A.    I'm not sure that I did.
9    Q.    Aren't you a managing member of Carpenter
10  Financial Group, LLC?
11    A.    I don't know.
12    Q.    Have you ever signed any documents where you
13  were the signatory on behalf of Carpenter Financial Group,
14  LLC?
15    A.    I don't recall.
16    Q.    Okay.  And you know that Benistar
17  Administrator Services, Inc. is still a functioning
18  business; correct?
19    A.    Yes.
20    Q.    Now, who were the principal lawyers for the
21  Charter Oak Trust and Nova Group in the arbitration with
22  Universitas that led to the award in the case to
23  Universitas with respect to the funds stolen from
24  Sash Spencer?
25    A.    Well, I know you're trying to bait me because

1  if you really investigated the case, you know the whole
2  arbitration was about the fact that Grist Mill Capital had
3  a secured interest in all of those policies.  So you keep
4  trying to say the funds were stolen, but there would have
5  been no reason to dismiss Grist Mill Capital.
6         And the first thing Paula Colbath did was she
7  dismissed Grist Mill Capital, and then, after the first
8  phase of the arbitration, she dismissed Daniel Carpenter.
9  And I think we've produced that three or four times in
10  various exhibits, so if you'd like to rephrase the
11  question --
12    Q.    No, I just want you to answer the question.
13         Who were the lawyers that represented
14  Turner --
15    A.    I didn't hire them.
16    Q.    -- and Nova Group in that arbitration?
17    A.    I don't know.
18    Q.    Who were they?  You don't know who they were?
19    A.    I don't recall.
20    Q.    Now, you've indicated that you asked
21  Mr. Sandberg to respond to the subpoena, which he did in
22  September.
23         Did you ask any other lawyers to review the
24  subpoena that's Exhibit 1 in this case and to search their
25  files for documents that were responsive?

1    A.    Yes.
2    Q.    And who were those lawyers?
3    A.    I asked -- I asked Colt Holmes to get in touch
4  with Mike McPherson and Jeff Sklarz and Larry Grossman.
5    Q.    Mike McPherson.  And who was the second one?
6    A.    Jeff Sklarz and Larry Grossman.
7    Q.    So Mr. Grossman and Mr. Sklarz represent
8  Grist Mill Partners in this case; correct?
9    A.    Correct.
10    Q.    And Mr. McPherson represented several
11  defendants that have been dismissed out of the case,
12  including BASI and your wife and Mr. Trudeau; correct?
13    A.    Correct.
14    Q.    What cases did any of those three gentlemen
15  handle that would have involved documents that are
16  requested in the subpoena?  Let's start with
17  Mr. McPherson.
18         MR. SANDBERG:  Yeah, at this point, Dan,
19  to the extent Counsel is asking you for any information
20  that would not be public record, I just want to remind you
21  that, because Mr. McPherson is an attorney, some portion,
22  potentially, of the information that Counsel is asking you
23  for may well be Attorney-Client Privileged, so --
24         MR. MANSON:  Yeah, you don't need to
25  suggest any further answers.  Mr. Carpenter is a lawyer.

1    MR. SANDBERG:  You know, every time I
2  talk, Counsel --
3         MR. MANSON:  I'm not asking any
4  questions -- I'm not asking any questions that intrude on
5  the Attorney-Client Privilege.  I'm merely asking him for
6  cases where these lawyers represented him or the companies
7  listed in Judge Swain's order that involved documents that
8  could be responsive to the subpoena.  That's the question.
9         MR. SANDBERG:  And, Counsel, when I
10  speak, don't dismiss it as me telling the witness how to
11  answer or hinting at any answers because it's insulting;
12  okay?
13         If you want to rephrase your question, then
14  feel free, but my reminding the witness that there's a
15  potential for attorney-client information being requested
16  is not improper.
17         Now, I don't remember what your last question
18  is, but please feel free to ask it again.
19         MR. MANSON:  Would you please read it
20  back?
21         (The record was read by the reporter as
22         follows:  "Q What cases did any of
23         those three gentlemen handle that would
24         have involved documents that are
25         requested in the subpoena?  Let's start

1         with Mr. McPherson.")
2    A.   Are you there?
3    Q.   Yes.
4         MR. SANDBERG:  I renew my assertion of
5  the privilege to the extent that question may seek
6  Attorney-Client Privileged information.
7         But to the extent that question does not seek
8  Attorney-Client Privileged information, you may answer it.
9    A.   I don't know.
10    Q.   Do you know if -- you just said earlier that
11  you never met Mr. McPherson.
12    A.   Correct.  And I never spoke to him, and I was
13  the one that suggested that Attorney Holmes get in touch
14  with him, and from what I've heard, he did an excellent
15  job working with Attorney Holmes, but I've never had a
16  conversation, and I couldn't pick Attorney McPherson out
17  of a lineup.
18    Q.   Did you -- did Mr. McPherson produce any
19  documents that were part of the production to Universitas
20  in response to the subpoena?
21         MR. SANDBERG:  Objection.
22    A.   My understanding is that Mike McPherson was
23  the person largely responsible for Attorney Holmes putting
24  together most of those documents, so that I think that
25  Attorney McPherson did an excellent job in working with

1  both Jeff Sandberg and with Colt Holmes.
2    Q.   Okay.  So the documents produced by Mr. Holmes
3  in this case were on behalf of the trusts, who are
4  defendants, and of which you are the sole trustee; is that
5  correct?
6    A.   Yes.
7    Q.   Okay.  I'm talking about the production to
8  you, not to the trusts, pursuant to the subpoena.
9         And I understand you stand pat on the
10  production you did and the 135 gigabytes -- or whatever
11  the number is -- that were produced.
12         But you don't know with any certainty if
13  Mr. McPherson or his law firm produced any documents in
14  response to the subpoena issued to you; do you?
15    A.   I'm not sure what your question is, but I know
16  that he produced a lot of documents because he was working
17  with Jeff Sandberg and with Colt Holmes, and I think he
18  was largely responsible for the documents that Colt Holmes
19  and Jeff Sandberg produced.
20    Q.   You think he was responsible for the documents
21  that Mr. Sandberg produced?
22    A.   I think a big bulk of them, yes.
23    Q.   Did you make any requests to BASI to review
24  the subpoena that's Exhibit 1 in this case and then to
25  produce documents that were responsive to that subpoena?

1  Did you --
2    A.   As I said earlier, I was very upset by your
3  claims in the Matt Westcott -- that there was a slush fund
4  set up, and I asked my wife to see if she could find
5  anything dealing with the Matt Westcott slush fund, and
6  none of the women that work in her office could find
7  anything.  And at my request, she searched Joe Castagno's
8  office, she searched Matt Westcott's office, and nobody
9  could find anything about this alleged slush fund, and
10  that's when I believe my wife hired Mike McPherson to hire
11  a local IT firm, and that's what started Mike McPherson
12  looking through the BASI server.
13    Q.   Okay.  You mentioned Joe Castagno.
14         Who is he?
15    A.   Joe Castagno used to work at Benistar, and a
16  very good friend of mine and did a lot of typing for me
17  over the years.
18    Q.   Is he a lawyer?
19    A.   No.  A lot of people think he is, but
20  basically, while I was in prison, I helped 180 inmates,
21  and it was Joe Castagno that did the typing and did the
22  filing.  So there are a lot of people in the First and
23  Second Circuit that think he is an attorney, but he's
24  really just a good -- a good soul who did a lot of typing
25  and filing to help a lot of people.

Q.    So he's administrative person; is that fair?

A.    You know, Joe Castagno is a very good friend of mine, so I would not want to -- I would not want to call him an administrative person.  He's a good friend that helped me do a lot of typing to help a lot of people, but he was an employee at BASI, and he did a lot of work for BASI that had nothing to do with me.

Q.    Mr. Carpenter, you still give direction to employees of BASI to do work for you; don't you?

A.    No, I never give direction, and I always -- if I have somebody that I need to help me with something, I ask them as a favor, as a friend.  I don't give any direction to any employee at BASI.

Q.    Who's Amanda Ross -- Rossi?

A.    Amanda Rossi works at BASI.

Q.    I'm sorry, I didn't hear the answer.

A.    Amanda Rossi works at BASI.  I don't know what her title or position is.

Q.    Do you ever give her instructions to do things for you?

A.    I would never -- I would never give her instructions to do anything.

Q.    Is she scary?  Or what -- what's the problem?

A.    I'm just saying is that my wife has made it very clear that I'm not to talk to anybody at BASI, and I

certainly wouldn't order Amanda Rossi to do anything.

Q.    I'm going to show you -- we'll mark this as Exhibit 5 -- an email from you to Joe Castagno dated June 2nd, 2021 with a copy to Molly Carpenter.

MR. SANDBERG:  What is this file titled so I can get it labeled accurately?

MR. MANSON:  We're putting it up on the screen right now.

MR. SANDBERG:  But I mean, this is a file that you sent me, so I'm keeping track of the exhibit numbers.  So I just want to -- on my folder here of your exhibits -- just get it labeled.

MR. MANSON:  It's labeled in the chat.

MR. SANDBERG:  So this is a file that was titled, "Emails Regarding SDM's Operating Agreement"?

MR. MANSON:  Yes.

MR. SANDBERG:  All right.

(Whereupon, Exhibit 5, 6-2-2021 - Email Chain Subject: SDM Holdings, LLC Operating Agreement, was marked.)

Q.    Let's go to the end of the exhibit first, and I'm going to give you -- these documents were produced by Mr. Holmes, and the first one I want you to look at is stamped "1759," and this is an email from you on June 2nd, 2021 from your dcarpenter@usbgi.com address to yourself

and to Molly and to Amanda Rossi concerning "SDM Holdings, LLC Operating Agreement."

Do you see that?

A.    Yes.

Q.    Do you recall sending that email to Ms. Rossi?

A.    Yes, I definitely remember this.

Q.    And you recall asking her to make certain changes, telling her what to do with respect to this SDM Holdings, LLC Operating Agreement?

A.    No, I asked her to make certain changes to an agreement that she was doing for Molly, and they asked my advice on how to set up an operating agreement, and I gave them the SDM Operating Agreement as a structure that they could use.

Q.    And this was an operating agreement that you were setting up for SDM Holdings, LLC Connecticut; right?

A.    No.  This had nothing to do with SDM.

You'll also see there's a PAIGE agreement.  So on your document 1754, it's got my brother on it with the PAIGE agreement, and PAIGE is a company that my brother runs, so Amanda and Molly were looking for advice on how to set up an operating agreement for an LLC, and I basically picked out these two from 2017 so that they could basically structure an operating agreement for a new LLC for them, not for me.

Q.    So this is work for BASI that you were doing at Molly's request; right?

A.    No.  It was obviously for a different entity, and I don't remember the name of the entity, but certainly, since they were just creating it, it can't have anything to do with your subpoena.

Q.    Well, it's a fact that, in Oklahoma, you tried to transfer assets from SDM Oklahoma to an entity you created which is called SDM Connecticut; right?

A.    No.  I owned and controlled SDM Oklahoma, and I basically reincorporated it into SDM Connecticut because Connecticut has the best laws in the country for LLC because you can't pierce an LLC using alter ego.  So I think most smart attorneys are now going to be incorporating LLCs in Connecticut rather than Delaware, Nevada, and Wyoming.

Q.    And Judge Heaton did not recognize that transfer; did he?

MR. SANDBERG:  Counsel, I don't see why this is within the scope of --

MR. MANSON:  Well, because --

MR. SANDBERG:  -- the order in the case. No, saying, hey, the Judge in Oklahoma ruled one way or the other on a particular issue I don't see as within the scope of this particular ruling in Connecticut.

1    So please ask a question within the scope of
2 the order in the case that we're here for today.
3         MR. MANSON:  The point, Mr. Sandberg, is
4 that this usbgi.com address has emails that weren't
5 produced within the relevant period that are responsive to
6 the subpoena, and you haven't searched that email.  He's
7 standing on his prior testimony, and that's all properly
8 within the scope of this deposition.
9         MR. SANDBERG:  Okay.  You haven't shown
10 me anything that supports what you just stated, Counsel.
11 But if you have a question for the witness --
12         MR. MANSON:  You can --
13         MR. SANDBERG:  If you have a question
14 for the witness rather than a statement to me, please ask
15 your question of the witness.
16         MR. MANSON:  You can read it in our
17 Motion to Compel after we complete this deposition,
18 Mr. Sandberg, and I'm sure you'll be enlightened.
19         THE WITNESS:  Okay.  Well, if you're
20 talking about --
21         MR. SANDBERG:  No, Dan --
22         THE WITNESS:  No, no.  You basically
23 said -- you basically said I had until September 9th, and
24 Colt basically gave you this document.  So obviously, we
25 had nothing to hide, and this is not relevant to anything

1 in your subpoena.  So make sure you put that in your
2 Motion to Compel, too; all right?  Because I had until
3 September 9th, and Colt produced this document, and you're
4 trying to mischaracterize it.
5         MR. MANSON:  Can somebody control this
6 witness, please?  He's --
7         THE WITNESS:  Why don't you control
8 yourself.  Go ahead.
9         MR. MANSON:  You're not a lawyer
10 anymore, Mr. Carpenter.
11         MR. SANDBERG:  All right.  Mr. Manson,
12 do you have a question for this witness that's actually
13 within the scope of the order --
14         MR. MANSON:  I have a number of
15 questions for this witness.
16         MR. SANDBERG:  -- that's the basis for
17 today's deposition?
18         MR. MANSON:  It will go faster if you
19 stop making spurious objections and he answers the
20 questions correctly.
21         MR. SANDBERG:  It will go faster if you
22 stop insulting the witness.
23         Ask a question of the witness, please.
24    Q.  Mr. Carpenter, are you familiar with Simone,
25 S-I-M-O-N-E, Macca, M-A-C-C-A, and Larrow, L-A-R-R-O-W?

1    A.  Yes.
2    Q.  And what is that entity?
3    A.  They're an accounting firm.
4    Q.  Do you use them as your accountant?
5    A.  Yes.
6    Q.  They prepare your tax returns, your individual
7 tax returns?
8    A.  Yes.
9    Q.  And how long have they been your accountants?
10    A.  For at least 20 years.
11    Q.  And do they also prepare tax returns for the
12 entities that you have been associated with that are
13 listed in Judge Swain's order attached to the subpoena?
14         MR. SANDBERG:  There's a whole series of
15 entities that are listed in that subpoena, so you need to
16 ask him about specific entities, not just a group.
17    Q.  Answer the question, Mr. Carpenter.  Answer
18 the question, Mr. Carpenter.
19         MR. SANDBERG:  All right.  Counsel, you
20 need to stop talking over me because I want what I say on
21 the record.  I appreciate that you may not, but when I say
22 something, I want it on the record.
23         If you want to ask him about a series of
24 entities, then you need to be able to put that list of
25 entities that you are asking him about up on the screen so

1 that it is clear what entities it is that you are asking
2 about.
3         MR. MANSON:  I just did that.  I just --
4         MR. SANDBERG:  No, I don't see anything
5 on the screen.  I see you.
6    Q.  Mr. Carpenter, does this accounting firm --
7 did this accounting firm prepare tax returns for the
8 entities listed in Judge Swain's order, which is in the
9 subpoena?
10         MR. SANDBERG:  Okay.  Now, what I see on
11 the screen is a list of the judgment debtors.
12         Are you asking about the judgment debtors?
13         MR. MANSON:  I'm asking about the
14 judgment debtors the entities adjudicated as alter egos.
15         MR. SANDBERG:  All right.  Well, let's
16 do that one at a time because you're scrolling the screen
17 so that the witness cannot read it.  So let's let him
18 read --
19         MR. MANSON:  Let me ask him a general
20 question.
21    Q.  Were they accountants for all of these
22 entities?  Let's start with that.
23         MR. SANDBERG:  And I'm renewing the
24 objection because you're saying "all these entities."
25         Are you asking him about the list of judgment

1  debtors?

2          MR. MANSON:  The list of judgment

3  debtors and the list of the alter ego.

4          MR. SANDBERG:  Well, you only have

5  judgment debtors on the screen, so rather than rely on the

6  witness's memory, let's -- now it's too small to read.

7          Okay.  Let's just ask him about the judgment

8  debtors, which we can read on the screen, if you would be

9  kind enough to make it larger, and then potentially, if

10  you wish, you could ask him about the list of alter egos,

11  which should fit on the screen, and this way, his

12  testimony is clear.

13          MR. MANSON:  His testimony would be

14  clear if the answer is yes, that they did the accounting

15  for all of these entities.

16          MR. SANDBERG:  Counsel, I appreciate

17  it --

18          MR. MANSON:  We can go one by one.

19          MR. SANDBERG:  -- now that you've let us

20  know what answer you're hoping for, maybe we can get the

21  witness's testimony.  Are you asking --

22      Q.  Mr. Carpenter --

23          MR. SANDBERG:  Are you asking about the

24  list of judgment debtors?

25      Q.  We'll do it your -- I guess it's your

1  counsel -- we'll do it Mr. Sandberg's way.

2          Was Simione Macca & Larrow the accountant for

3  Nova Group, Inc.?

4      A.  For who?

5      Q.  Nova Group, Inc.?

6      A.  I don't know.

7      Q.  Who would know that?

8      A.  I don't know.

9      Q.  How about for the Grist Mill Trust Welfare

10  Benefit Plan?

11      A.  I don't know.

12      Q.  Grist Mill Capital, LLC?

13      A.  I don't know.

14      Q.  Grist Mill Holdings, LLC?

15      A.  I don't know.

16      Q.  Well, how about Carpenter Financial Group?

17  You should know that one.

18      A.  I don't know if Carpenter Financial Group has

19  done tax returns in the past few years.

20      Q.  Okay.  Before the past few years, you said

21  they've been doing it for 20 years.

22          Did they prepare tax returns at any time for

23  Carpenter Financial Group?

24          MR. SANDBERG:  And let's --

25      A.  I don't recall.

1          MR. SANDBERG:  Let's limit our testimony

2  to -- and let's limit our questions to the time period

3  that's the subject of the order.

4      Q.  What about Avon Capital, LLC?

5      A.  I don't know.

6      Q.  Phoenix Capital Management, LLC?

7      A.  I don't know.

8      Q.  Hanover Trust Company?

9      A.  I don't know.

10      Q.  Carpenter Financial Group, LLC?

11      A.  I don't know.

12      Q.  BASI?

13      A.  I don't know.

14      Q.  It's your testimony you don't know if

15  Simione Macca & Larrow are the accountants for BASI?

16      A.  That's my testimony.  I have nothing to do

17  with BASI.  I resigned from all things Benistar in January

18  of 2004.

19      Q.  And so I assume for the items listed,

20  4 through 9, your answer would be the same; you don't know

21  if they were the accountants or not?

22      A.  Well, 7, 8 and 9, I already said those

23  companies don't exist since 2000 and 2001, and I don't

24  recall who did the tax returns for those entities.

25      Q.  Okay.  How about 5 and 6, Benistar, Limited --

1  one of those is a period and one of them's a comma, 7 and

2  8.

3      A.  I don't even know if those entities filed tax

4  returns, so my answer is I don't know.  So I don't know if

5  anybody filed tax returns for them, and I certainly don't

6  know if Simione & Macca filed the tax returns for them.

7      Q.  Okay.  And you did not ask them, did you,

8  whether or not they had any documents, tax returns or

9  other documents that were requested in the subpoena;

10  correct?

11      A.  I did not ask, but Grayson Colt Holmes did

12  ask, and he submitted an affidavit from Ron Larrow saying

13  they did not have any documents responsive to the subpoena

14  in their possession, but you guys keep ignoring things

15  that don't fit into your story of stealing.

16      Q.  Okay.  Are you filing a joint return with your

17  wife, tax return?

18      A.  No.

19      Q.  When was the last time you filed a joint tax

20  return with her?

21      A.  It was a long time ago, and the government

22  seized my wife's refund because of the forfeitures and

23  restitution I had in the Boston case, so I've been filing

24  separately for a long time because the government

25  illegally and unlawfully seized my wife's refund.  So

1　we've been filing separately for a number of years.
2　　　Q.　Okay.　I want to show you a 2010 tax
3　authorization Form 8879.
4　　　　　MR. SANDBERG:　This is, I believe, one
5　of the exhibits that you sent us.
6　　　　　Are you going to number this exhibit?
7　　　　　MR. MANSON:　Yes.
8　　　　　MR. SANDBERG:　Is this going to be 6?
9　　　　　MR. MANSON:　Yes.
10　　　　MR. SANDBERG:　All right.　Let me do
11　that here so I am following along, Counsel.
12　　　　　(Whereupon, Exhibit 6, Daniel E.
13　　　　　Carpenter's 2010 Taxes, was marked.)
14　　　　MR. SANDBERG:　And this is the file that
15　was titled "Daniel Carpenter Taxes"; is that correct?
16　　　　MR. MANSON:　Yes.
17　　　　MR. SANDBERG:　All right.
18　　　Q.　You see the document that's up on the screen,
19　Mr. Carpenter?
20　　　A.　Yes.
21　　　Q.　Now, this seems to indicate that this was a
22　joint filing; correct -- for this year, 2010?
23　　　A.　I -- you know, it appears to be a joint
24　filing.　It's basically Molly Carpenter as the taxpayer
25　and Daniel Carpenter as the spouse.

1　　　Q.　But that year, do you have any evidence you
2　filed a separate return?
3　　　A.　No.
4　　　Q.　Okay.　And you didn't produce to us any of
5　your tax returns that you filed from 2009 to the present
6　time; correct?
7　　　A.　That's correct, because the word "Individual
8　Tax Return" is nowhere to be found in your subpoena.
9　　　Q.　I see.
10　　　A.　Yeah, you keep reading it.　Find "Individual
11　Tax Return."
12　　　Q.　So documents related to income -- do you
13　believe documents related to income would encompass tax
14　returns, Mr. Carpenter?
15　　　A.　No, I don't.　No, I don't.
16　　　Q.　Okay.
17　　　A.　Certainly not in this age -- certainly not in
18　this age of privacy, so make sure you put that in your
19　Motion to Compel as well.　That would be a good argument
20　for the Supreme Court.
21　　　Q.　Okay.　Do you get Social Security now,
22　Mr. Carpenter?
23　　　A.　No.
24　　　Q.　How old are you?
25　　　A.　67.

1　　　Q.　And you don't receive Social Security checks?
2　　　A.　Most smart financial planners wait until
3　age 70.
4　　　Q.　I see.　Who owns Caroline Financial?
5　　　A.　I don't know.
6　　　　MR. SANDBERG:　I couldn't hear you.　Did
7　you say "Caroline Financial Group"?
8　　　　MR. MANSON:　Yes.
9　　　A.　I don't know.
10　　　Q.　Are you a managing member of Caroline
11　Financial?
12　　　　MR. SANDBERG:　I couldn't hear you.
13　What was the name of the entity?　Is it Caroline Financial
14　Group?　Because all I hear is "Caroline Financial."
15　　　　MR. MANSON:　That's all I asked, was
16　Caroline Financial.
17　　　　MR. SANDBERG:　Okay.
18　　　A.　Could you repeat the question?
19　　　Q.　Yeah.　Are you a managing member of Caroline
20　Financial -- either Caroline Financial Group or any entity
21　that's got the words "Caroline Financial" in it?
22　　　A.　I'm the chairman and secretary of Caroline
23　Financial Group, Inc.
24　　　Q.　And what's the ownership breakdown for
25　Caroline Financial Group, Inc.?

1　　　A.　I don't know.
2　　　Q.　How could you not know?　You set it up; right?
3　　　A.　I didn't say I set it up.
4　　　Q.　Did you set it up?
5　　　A.　No.
6　　　Q.　Who did?
7　　　A.　I believe it was set up by Jack Robinson.
8　　　Q.　At your direction; correct?
9　　　A.　I think that he volunteered to do it, but I
10　don't recall.
11　　　Q.　He volunteered to who?　To you?
12　　　A.　What's so funny about Jack Robinson doing
13　something for a good friend?
14　　　Q.　I'm trying to find out who is -- Jack Robinson
15　wouldn't just come to you and say, "Hey, let's form
16　Caroline Financial Group and you be the chairman."
17　　　　That's not how it happened; correct?
18　　　A.　No, that's exactly how it happened.
19　　　Q.　Oh.　It was his idea to form it?
20　　　A.　Yes.
21　　　　MR. SANDBERG:　Let's be mindful -- my
22　understanding is that Mr. Robinson was an attorney.
23　　　　MR. MANSON:　He was an attorney and also
24　held positions that were non-attorney positions.
25　　　　MR. SANDBERG:　Okay.　Well, I appreciate

1  you volunteering that, Counsel, but I just do want to
2  remind Mr. Carpenter that to the extent any of the
3  requested testimony or testimony that you might give would
4  be the subject of Attorney-Client Privilege, I just wanted
5  to remind you of that when Counsel asks you questions
6  about your discussions with Mr. Robinson.
7      Q.  Okay.  Mr. Carpenter, Request Number 1 in the
8  subpoena is for "any and all documents concerning receipt,
9  purchased, sale, acquisition or transfer of property and
10  assets by any judgment debtor or company as defined in the
11  subpoena."
12          Do you recall that?
13      A.  Yes.
14          MR. SANDBERG:  Okay.  The screen's been
15  moving a little bit.  Let's just give Mr. Carpenter an
16  opportunity to read what's on the screen.
17          Mr. Karam, thank you for putting it up there.
18      Q.  Have you read it, Mr. Carpenter?
19      A.  Yes, sir.
20      Q.  Okay.  What repositories did you search to
21  satisfy this document request?
22      A.  As I stated earlier, I've got the several
23  boxes in the basement, and I've got a filing cabinet
24  that's outside my bedroom, and I looked through those, and
25  I also checked my USBGI website and email going through,

1  and to the best of my knowledge, there have been no
2  purchase, sale, acquisition, or transfer of property.
3      Q.  A transfer of property and assets, cash would
4  be an asset; wouldn't it, Mr. Carpenter?
5      A.  If you say so.
6      Q.  So are you telling me that there was no
7  transfer of cash by any judgment debtor that's -- or alter
8  ego listed in Judge Swain's order that's attached to
9  Exhibit 1, here?
10      A.  You keep referring to Judge Swain.  All
11  Judge Swain did was copy Michael Barnett's notice of a
12  restraining order, and you keep calling it like it's a
13  golden judgment, but I don't know of any transfer of
14  property and/or assets that you're asking about in one, so
15  I don't know any transfer of cash.
16          And I looked at this as a sale of property, a
17  transfer of property, and obviously, all of those entities
18  were under a restraining order for a long, long time ago.
19      Q.  But you didn't make any inquiry.  You just
20  said you weren't aware of it.
21      A.  I don't understand the question.
22      Q.  Did you make any inquiry to BASI as to whether
23  or not it had transferred any cash?
24      A.  BASI is not one of those parties.
25      Q.  BASI is listed as an alter ego on that order.

1      A.  That's not an order; it's a restraining
2  notice, and it was done by Michael Barnett, and as I said
3  before, I've had nothing to do with BASI or Benistar since
4  2004.
5      Q.  Yeah, well --
6      A.  Hey, in your universe you say I control, why
7  would I need to talk to BASI if in your universe I control
8  everything?  I could just talk to myself and say there was
9  no transfer of property.  So go ahead, tell me a transfer
10  of property done by those judgment debtors.
11      Q.  Well, Mr. Carpenter, I would appreciate it --
12      A.  Tell me -- please tell me the transfer of
13  property, number one, that any of those judgment debtors
14  did.
15      Q.  Well, let's talk about the payment of your
16  legal fees.
17          Who's paying your legal fees?
18      A.  My wife -- my wife is not on there, and my
19  wife pays all my legal fees.
20      Q.  From what account?
21      A.  From her own account.
22      Q.  Did you ever pay your lawyers, yourself?
23      A.  Not for a long, long time because Universitas
24  sued Latham & Watkins and sent demand letters to Greg
25  Garre threatening to take the retainer, so I had to get

1  another attorney.  So since Paula Colbath threatened Greg
2  Garre at Latham & Watkins, basically, my wife has been
3  paying my legal fees.  He was a former Solicitor General
4  of the United States, and your Paula Colbath sent him a
5  demand letter to get the retainer back, so I had to find
6  new counsel to take my case up to the Supreme Court.
7      Q.  Which you lost; correct?
8          MR. SANDBERG:  Counsel, let's ask
9  questions about topics that are within the scope of why
10  we're here today.
11      Q.  All right.  Let's look at the next exhibit,
12  which is a series of checks.
13          MR. SANDBERG:  Is this the file titled
14  "Checks from Benistar Group, Limited"?
15          MR. MANSON:  Yes, that's it.
16          MR. SANDBERG:  All right.
17          (Whereupon, Exhibit 7, Checks from
18              Benistar Group LTD, was marked.)
19      Q.  The first check up on the screen,
20  Mr. Carpenter, is a check for $26,215.01 dated April 15,
21  2013, payable to Anthony J. Siano, S-I-A-N-O, over your
22  signature.
23          Do you see that?
24      A.  Yes.
25      Q.  Who is Anthony J. Siano?

1    A.   He's an attorney.
2    Q.   And in the description in the same exhibit, it
3    says that the payment was for the "Charter Oak
4    Litigation."
5         Do you see that?
6    A.   Yes.
7    Q.   Did that involve Universitas?
8    A.   It might have been the arbitration.  I don't
9    know.
10   Q.   Well, this bank account was at People's United
11   Bank for Benistar Group, Ltd.; right?
12   A.   Correct.
13   Q.   And did you get the bank statements for this
14   account?
15   A.   No.  No, I did not.
16   Q.   Who got the bank statements?
17   A.   Probably Amanda Rossi.
18   Q.   Did you check to see if there were other
19   checks written on this account that are responsive to the
20   subpoena with People's United Bank or with Amanda Rossi?
21   A.   No, of course not, because the question in the
22   subpoena was payments made to me, not to attorneys, not to
23   Tony Siano.  So that's clearly a Dan stamp, and all of
24   these seem to be the Dan stamp that they had on file for
25   me.  So I did not have any payments made to me, and

1    certainly not from Benistar Group, Ltd.
2    Q.   Well, Benistar Group, Ltd. is listed in the
3    Judge's order; correct -- Judge Swain?
4    A.   I don't care about your Judge's order.
5    Basically, your subpoena said payments to me.
6    Q.   No, it said more than that.  It said to list
7    all the payments of all of the entities listed in
8    Exhibit B to the subpoena, which would include Benistar
9    Group, Ltd.
10        So you made no effort to find the documents
11   that Benistar Group, Ltd. might have that were responsive
12   to the subpoena; right?
13   A.   Well, I don't want -- I don't want to keep
14   correcting you, but you just went over three on page 2,
15   and Benistar Group, Ltd. is not on your subpoena.
16        So paragraph 3, page 2, you went over all
17   those entities; all right?  You had the judgment debtors,
18   and then you had the other entities, and Benistar Group,
19   Ltd. is not there, and then you basically said you wanted
20   all payments to Daniel Carpenter.  You didn't list Tony
21   Siano; all right?  You basically said, "payments from the
22   judgment debtors to Daniel Carpenter," and you haven't
23   produced any yet.
24   Q.   Okay.  Well --
25        MR. SANDBERG:  Counsel, we've been doing

1    this for longer than an hour and a half, and I am ready
2    for a break.
3         MR. MANSON:  Okay.  Let me just ask a
4    couple questions.
5         MR. SANDBERG:  No, you don't have a
6    question on the table, so let us take a break now.  I
7    would like to go down the hall.
8         Thank you very much.
9         MR. MANSON:  Okay.  10 minutes?
10        MR. SANDBERG:  Let's go off the record.
11        MR. MANSON:  Okay.  Off the record.
12        (Whereupon, a recess was taken from
13        11:36 a.m. to 11:53 a.m.)
14        THE REPORTER:  We are back on the
15   record.
16   BY MR. MANSON:
17   Q.   Mr. Carpenter, Nova Group, Ltd. is within the
18   definition of companies in the subpoena, so I'm not
19   expecting you to agree, but I just wanted to state that
20   that's our position.
21        And I wanted to ask you if you ever asked
22   People's United Bank for the bank statements that relate
23   to this account for which you signed checks payable to
24   Mr. Siano?
25   A.   No.

1    Q.   Okay.  I'm not going to go through all these
2    checks, but I do want to direct your attention to other
3    payments from the same account on behalf of Benistar
4    Group, Ltd. to Carol Bernstein, and those are found --
5    yeah, there's one up on the screen now.  This was
6    Check Number 10187 in the amount of $15,000 to
7    Ms. Bernstein over your signature from People's United
8    Bank Account 5172182211 for Benistar Group, Ltd.
9         Who is Ms. Bernstein?
10   A.   She was an attorney that was working -- I
11   forget who she represented, but she was a good friend of
12   Tony Siano, and Tony asked her to get on board to
13   represent one of the entities.  But eventually, she quit
14   and, and I honestly just don't remember much about her.
15   Q.   Okay.  But you didn't ask Tony Siano or
16   Ms. Bernstein to search their files with respect to any
17   documents related to the subpoena; correct?
18   A.   Correct.  I didn't think it was relevant.
19   Q.   Okay.  Who are Richard Brown and
20   Cody Guarnieri, G-U-A-R-N-I-E-R-I?
21   A.   What's the question?
22   Q.   Who are they?
23   A.   They are attorneys that represented me in my
24   Connecticut action.
25   Q.   That's the criminal action?

1    A.  Yes, the Connecticut criminal action in front
2  of Judge Chatigny.
3    Q.  All right.  And then who is James Cole and
4  Michael Bailey from Sidley & Austin?
5    A.  They helped me with the appeal to the Second
6  Circuit.
7    Q.  Okay.  Did you ask any of those four
8  individuals for documents and their files that might be
9  responsive to the subpoena?
10    A.  No.
11    Q.  All right.  Now Mr. Einhorn, who is present
12  today, has represented you in a prior case -- or cases --
13  as well; correct?
14    A.  Yes.
15    Q.  And did you ask Mr. Einhorn if he had any
16  documents responsive to the subpoena for today?
17    A.  No.
18    Q.  Okay.  What is the Legal Defense Fund, LLC?
19    A.  That was an entity that Joe Castagno set up
20  for donations of people who wanted to help inmates.  As I
21  said earlier, Joe helped me do the legal work for
22  180 inmates, and we got 120 of them out, mainly due to the
23  changes in the law under the Fair Sentencing Act and the
24  First Step Act, and even COVID relief.  So I'm very proud
25  of the work that Joe did with the Legal Defense Fund.

1    MR. SANDBERG:  I don't see that on
2  Exhibit 1, but -- and it doesn't mean it's not there.
3  Exhibit 1 is a 33-page document.
4    But, Counsel, could you point me to where is
5  that particular entity is located?
6    MR. MANSON:  It's in Exhibit I.
7    MR. SANDBERG:  Okay.  Let me just see
8  that one there.  Got it.
9    Thank you.
10    MR. MANSON:  Okay.
11    MR. SANDBERG:  Page 33 of 33.
12    Thank you.
13    Q.  Now, Request Number 2 in the subpoena,
14  Mr. Carpenter, is for any and all documents concerning
15  payments made to you from any judgment debtor or company.
16    I believe your prior testimony is that there
17  were no such payments; is that correct?
18    A.  Correct.
19    Q.  Had there been any such payments, they would
20  have been reflected on your tax returns; right?
21    A.  I suppose so.
22    Q.  What about reimbursement of expenses, payment
23  of your credit card bills; was that payment made by any
24  other entity?
25    A.  I honestly don't know.  I just know that, for

1  the longest time, I have to report to the government any
2  payments over 500, and I just haven't had any payments.
3  So my wife takes care of the credit cards in the family,
4  but I don't know of any payments made that are to me, and
5  certainly, you know, my wife takes care of family expenses
6  and my expenses, but I don't have any -- I can't remember
7  the last time I paid a credit card.
8    Q.  Do you have credit cards now?
9    A.  I only have credit cards that -- I basically
10  use my wife's credit card for Amazon, so if I purchase
11  something on Amazon, I use my wife's Prime card.
12    Q.  Do you have any credit cards in your own name?
13    A.  No, not that I know of.
14    Q.  Okay.  The third area in the subpoena,
15  Request Number 3, is for "Any and all documents, including
16  communications, relating to ownership structure of any
17  Judgment Debtor or Company."
18    Did you produce any of those documents?
19    A.  I think there was a number of those documents
20  in the September 6th, because I remember Attorney Holmes
21  showing me documents that -- you know, various trusts,
22  various legal things.  So I know that he had those in
23  there, but I did not find any documents in the basement or
24  in the filing cabinets.
25    Q.  Well, you have testified that you didn't know

1  who the owners were of the entities, the judgment debtors
2  that were listed in Exhibit B to the subpoena,
3  Judge Swain's order.
4    And what effort did you make to try to get
5  copies of those documents?
6    A.  Well, if I don't know who the owners are, why
7  would I bother finding out?  If I don't know who the owner
8  is, where would I begin to look to find out?  So the only
9  thing I could do is, if there was a particular company, I
10  would have to go on the State of Connecticut or State of
11  Delaware website, and most of the times, they don't even
12  say who the owners are.
13    Q.  But you had to file certain papers with the
14  State of Connecticut or other states where you either
15  incorporated or filed an LLC application initially in
16  order to get approval from the states; correct?
17    A.  No, that's not correct.
18    Q.  So did you have to make annual filings with
19  respect to any of these entities that are listed in
20  Judge Swain's order in any state?
21    A.  I don't recall.  I don't recall doing any
22  annual filings for any of the entities listed.
23    Q.  Well, would someone at BASI have done that for
24  you?
25    A.  No.  I don't know.

1    Q.   Okay.  So it's your testimony that there was
2  no way for you to produce documents in response to that
3  request for any and all documents concerning payments
4  made -- I'm sorry, concerning ownership structure of any
5  of the judgment debtors or company?
6    A.   Correct.
7    Q.   Now, the fourth request is for bank accounts
8  of the judgment debtor or affiliated companies.
9         And did you go to any banks and ask them for
10  bank statements for accounts for -- let's start first with
11  you.
12         Do you have a personal bank account now?
13    A.   I do now, but it was set up by my wife,
14  literally just a couple of months ago, to be able to
15  deposit a check, but before that time, I didn't have any.
16         But it's basically -- I don't have control of
17  other people's bank accounts, and in this case,
18  Attorney Holmes actually subpoenaed Bank of America and a
19  couple of other banks because we got kicked out of banks
20  because of Universitas subpoenas, and so in order to help
21  Judge Meyer understand the situation, Colt took it upon
22  himself, and I think that, basically, they got back
23  JPMorgan and Bank of America that there were no accounts.
24         But I personally didn't call up any banks to
25  see if there was a bank account there.

1    Q.   So Colt -- Mr. Holmes's inquiry was for bank
2  accounts for the defendant trusts; correct?
3    A.   No, no.  I think he did it broader than that.
4  I wasn't a party to it, but I was not on the phone call
5  with Judge Meyer, but I think that there was a big
6  argument, and I think Attorney Sandberg suggested that
7  they basically send a list.
8         So I did not participate in that, but my
9  understanding was to see if any of the entities had
10  accounts there after we got kicked out of TD Bank and
11  after we got kicked out JPMorgan because of Universitas
12  subpoenas.
13    Q.   Was there a list of bank accounts or entities
14  along the lines of Mr. Sandberg's suggestion that was sent
15  to the banks?
16    A.   I wasn't -- I wasn't privy to it and, you
17  know, once again, I think that Attorney Holmes did an
18  outstanding job working with Mike McPherson and working
19  with Attorney Sandberg, but I was not privy to any emails
20  or conversations dealing with those subpoenas.
21    Q.   So you don't really have knowledge of what
22  inquiries were made with respect to bank accounts of the
23  judgment debtors; correct?
24    A.   Correct.
25    Q.   Okay.

1         MR. SANDBERG:  Mr. Manson -- or
2  Attorney Manson, are you saying you don't have the
3  subpoenas that were sent to JPMorgan Chase and Bank of
4  America by Attorney Holmes?
5         MR. MANSON:  No, I'm not saying that at
6  all.
7         MR. SANDBERG:  All right.  Good.
8  Because I'd be certainly willing to send that to you if
9  you didn't have them.
10    Q.   Okay.  Request Number 5 is for "Any and all
11  documents, including communications, relating to the
12  Property and/or Assets, and/or any beneficial interests of
13  any Property and/or Assets, belonging to any Judgment
14  Debtor or Company."
15         So we'll get that up on the screen and let you
16  take a look at that.
17         Have you had a chance to read that,
18  Mr. Carpenter?
19    A.   Yes, sir.
20    Q.   And what efforts did you undertake to find
21  documents that are embraced by that request?
22    A.   I don't -- as I've said before, I don't
23  believe there are any.
24    Q.   Okay.  I want to direct your attention, now,
25  to life insurance policies and the few documents that we

1  do have related to that.
2         And in your deposition taken earlier, you said
3  there was 26 million life insurance on your life?
4         Do you recall that?
5    A.   Yes, I think that's a correct number.
6    Q.   Okay.  Did you make any effort to obtain the
7  policies for those 26 -- for that 26 million in life
8  insurance on your life?
9    A.   No, because I'm not the owner or beneficiary.
10    Q.   And who's the owner?
11    A.   The owner is a family trust.
12    Q.   And where did the family trust get the funding
13  to pay for these policies?
14    A.   I don't understand the question.
15    Q.   Did the family trust have to pay, initially,
16  for -- to secure this life insurance coverage under each
17  policy?
18    A.   The policies are very old, and they had
19  substantial cash value, so I think that the policies
20  basically paid their own premiums on automatic premium
21  loan, but it's a standard irrevocable life insurance trust
22  that is a classic great trust.  You know, so it's a trust
23  where my wife is the trustee, and she's the principal
24  beneficiary, but it's done for estate planning reasons so
25  that, upon my death, the proceeds are not taxable in my

1  estate.
2      Q.   Right.  Do the insurance policies indicate who
3  the owner is of each policy?
4      A.   In the beginning, when the policy was taken
5  out?
6      Q.   Yes.
7      A.   Yes.
8      Q.   And if there's a change in the ownership,
9  would that be reflected in documentation that the
10 insurance company would generate?
11     A.   Correct.
12     Q.   And from the time that these initial policies
13 were taken out, have there been any changes in the
14 ownership of the policies for the 26 million of life
15 insurance?
16     A.   Not that I --
17          MR. SANDBERG:  Are you asking within --
18 are you asking about the time frame that's the basis for
19 why we're here today, which I believe is January 1, 2009?
20 But if I have that time frame wrong, feel free to correct
21 me.
22          MR. MANSON:  No, it's for any time frame
23 because it's a question of assets and whether or not those
24 assets can be used to satisfy the judgment against
25 Mr. Carpenter.

1          MR. SANDBERG:  Okay.  Well, I thought we
2  were here for a specific time frame that was the subject
3  of the rulings on the subpoena.
4          MR. MANSON:  We are.  But this question
5  is appropriate because it goes to an asset that may be
6  subject to recovery in this lawsuit.
7      Q.   So can you just answer the question,
8  Mr. Carpenter?
9      A.   What's the question?
10     Q.   The question is:
11          Were there any changes in the ownership of any
12 of these policies from the time that they were taken out
13 until the present day?
14     A.   There have been no changes to the policy since
15 January 1st, 2009.
16     Q.   Before that, were there changes?
17     A.   I think you've got one policy, here, that goes
18 back to 1982, so I honestly don't know if that's one of
19 the policies in the trust or not.
20     Q.   Did you create this trust as an estate
21 planning tool?
22     A.   Yes.
23     Q.   And I believe your testimony is you made no
24 effort to obtain copies of the policies from the insurance
25 carriers to respond to the subpoena; correct?

1      A.   Correct.  None of the seven requests talk
2  about personal insurance policies on my life.
3      Q.   Is it standard that the insured receives a
4  copy of policies?
5      A.   I don't know what you mean by "standard."
6      Q.   Is that normal practice?  I mean, you're an
7  insurance expert.
8      A.   The owner of the --
9      Q.   Isn't that -- go ahead.
10     A.   What's that?
11     Q.   Go ahead.
12     A.   The owner of the policy is the one who usually
13 receives and keeps the insurance policy.
14     Q.   Who named your wife as beneficiary?
15     A.   The trust did.
16     Q.   Does the trust have liquid assets now -- cash?
17          MR. SANDBERG:  What trust are we talking
18 about, Counsel?
19          MR. MANSON:  The trust that he's
20 testifying about, the irrevocable life insurance trust.
21     A.   Could you repeat the question?
22     Q.   Yes.  Is there any cash in the irrevocable
23 life insurance trust?
24     A.   Not that I know of.
25          MR. MANSON:  Let's take about a

1  10-minute break, and I will endeavor to wrap up very
2  quickly after the break.
3          MR. SANDBERG:  Okay.
4          THE REPORTER:  We're off the record.
5          (Whereupon, a recess was taken from
6           12:17 p.m. to 12:26 p.m.)
7          THE REPORTER:  Back on the record at
8  12:26 p.m.
9          MR. MANSON:  The next document, which
10 we'll mark as Exhibit 8, is an email from
11 dona.casey@peoples.com to Mr. Carpenter at US Benefits.
12          MR. SANDBERG:  And that's the file
13 titled, "Email to DC Regarding --" what's the rest of
14 it "-- regarding Bank Accounts"?
15          MR. MANSON:  Yes, and it's dated
16 7/20/2010 at the top.
17          (Whereupon, Exhibit 8, 7-30-2010 - Email
18           Subject: Accounts & balances:
19           People's United Bank, was marked.)
20          MR. EINHORN:  I don't see it.  Why don't
21 you put it up on the screen because we can't see it.
22          MR. SANDBERG:  Could you make that a
23 little bit larger for me, Mr. Karam?
24          Thank you.
25     Q.   Mr. Carpenter, let me know when you've had a

1 chance to review this and you're ready for questions.
2     A.   This is the document from the Terrell
3 deposition, Exhibit 9?
4     Q.   Yes.
5     A.   Okay.  It's up on the screen.
6     Q.   Okay.  This is an email from People's Bank to
7 you, and the subject is, "Accounts and balances at
8 People's United Bank"; correct?
9     A.   It appears to be.  I don't know -- I don't
10 know any of these people.
11     Q.   Do you remember getting this email or emails
12 similar to this from the bank?
13     A.   No, because I don't have -- I can't get any
14 emails from 2012, 2013 back, but I do not remember
15 Dona Casey, and I met Andrew Terrell once or twice at
16 parties, but I don't recognize this document at all.
17     Q.   Do you recall that Avon Capital, LLC had an
18 account at People's United Bank?
19     A.   No, I don't.
20     Q.   Do you recall if Benefits Concepts, Inc. had
21 an account at People's United Bank?
22     A.   No, but it looks pretty small, like $25.
23     Q.   Do you know if Benistar Group, Ltd. had an
24 account at People's United Bank?
25     A.   No, I don't.

1     Q.   Do you know if CFG Roth 401(k)?
2          Who is CFG?  Do you know those initials?
3     A.   Right.  CFG is Carpenter Financial Group, and
4 in the past, it had a 401(k) and a pension plan, but once
5 again, it's got like $25 in it.
6     Q.   That's how much it has, currently?
7     A.   I haven't checked it lately.
8     Q.   Is it still at People's United Bank?
9     A.   No.  As I said, this is from July 30th, 2010,
10 and I don't remember Dona Casey.  I don't know why this
11 was sent, and basically, we were kicked out of a lot of
12 banks.  And so this was during the time period where I was
13 either an indicted person or a convicted felon.
14          So Clermont Capital is Andrew Terrell's
15 company, and I think the other ones are Don Trudeau
16 companies, but I just don't remember anything.  I don't
17 remember receiving the email, and just don't remember
18 anything about this at all.
19     Q.   Okay.  GMT Special Account, would that be
20 Grist Mill Trust?
21     A.   I don't know.
22     Q.   Did Grist Mill Trust, to your knowledge, ever
23 have a special account?
24     A.   I was not the trustee of Grist Mill Trust, and
25 contrary to popular belief, I really did not run

1 Grist Mill Trust or have anything to do with it.
2     Q.   All right.  How about Grist Mill Capital, LLC;
3 do you recall it having an account at People's?
4     A.   I don't.
5     Q.   How about Phoenix Alliance Investment Group?
6     A.   I don't even remember that company.
7     Q.   How about Phoenix Capital Management Group?
8     A.   Once again, don't even remember the company.
9     Q.   And Clemont Capital Partners, LLC, what is
10 that entity?
11     A.   I just remember that Don Trudeau and
12 Andrew Terrell had -- Clermont Capital was to figure out a
13 way where people with HIV/AIDS could get insurance from
14 certain companies, but that was Andrew and Don's company,
15 and I had nothing to do with it.
16     Q.   All right.  And this email was sent to you at
17 your US Benefits address; correct?
18     A.   Yes.
19     Q.   And did you receive similar emails to this
20 from banks at that address?
21     A.   I know that even if I looked for this, I
22 wouldn't find it because I've not been able to find any
23 emails before January 2013 on my computer at home, so I'm
24 not even sure if this is a real email or a photocopy of an
25 email.  It looks like something that they took for the

1 Andrew Terrell deposition, so I don't know what else was
2 going on with this email.
3     Q.   Would you agree with me that this is a
4 document that's covered by the subpoena?
5     A.   No, I wouldn't.
6     Q.   And why not?
7     A.   Well, there's several reasons why not:
8 Because I don't see that this has anything to do with
9 the -- this is 7/30/2010, and basically, Universitas
10 didn't get a judgment against Nova Group until June of
11 2012, and it didn't get the clerk's judgment until
12 August of 2014, so having a list of companies and their
13 bank accounts.
14          And, you know, as I've been saying all along,
15 I didn't have access to this.  I have no idea -- I didn't
16 go to the Terrell deposition, and I had no access.  And
17 clearly, this document was not in my possession, custody,
18 or control.  So I think even Judge Spector would agree
19 this is not something that Carpenter had to create from
20 his possession, custody, or control.
21          MR. SANDBERG:  Are these companies that
22 are on the list of the subpoena?
23          MR. MANSON:  Yes.
24          MR. SANDBERG:  I've been looking.  I
25 can't find -- I mean, I recognize Avon Capital, LLC, but

1  I'm not seeing others.
2          THE WITNESS:  Well, if we go back to the
3  gold standard of Judge Swain's Restraining Notice, Benefit
4  Concepts isn't on there, either.
5      Q.   Mr. Carpenter, how are your lawyers getting
6  paid now?  From what --
7      A.   As I said earlier --
8      Q.   Excuse me.  I know you said that your wife was
9  paying them, but from what source of funding are they
10 being paid?
11     A.   I don't know.
12     Q.   You understand Judge Meyer has already held
13 you in contempt and ordered you to pay the legal fees of
14 Universitas for a discrete period of time.
15         MR. SANDBERG:  Counsel, we're not here
16 to discuss Judge Meyer's orders.  Is there a question you
17 have that's within the scope of what we're supposed to do
18 here today?
19         MR. MANSON:  If you would stop
20 interrupting, maybe you would hear it; okay?
21     Q.   You understand that; right, Mr. Carpenter?
22         MR. SANDBERG:  Counsel, let's ask a
23 question that's within the scope of why we are here today.
24 Judge Meyers' orders, I suspect, speak for themselves.
25     Q.   Mr. Carpenter, the question is, what source of

1  funds do you intend to use to satisfy Judge Meyer's order?
2      A.   Well, first of all, we're going to be doing a
3  Rule 61(b)2 and 3.
4          MR. SANDBERG:  Okay.  Dan, we're not
5  going to discuss Attorney-Client Privilege and Attorney
6  Work Product regarding what the strategy is of what is
7  anticipated.  I have to remind you that those particular
8  topics are privileged; okay?
9          I believe Mr. Manson's question was what do
10 you believe would be the source of payment should
11 Judge Meyers ultimately award a specific dollar amount
12 sanctions in this case against you.
13         And if I've misstated your question, Counsel,
14 please feel free to correct me.
15         MR. MANSON:  No, I'll accept that
16 question.
17     A.   I don't believe Judge Meyer is ever going to
18 do that ruling, and if he does, we'll be taking it to the
19 Second Circuit.
20     Q.   Well, I'd like to know, because I'd like to
21 see documents that reflect the source of funding to pay
22 your expenses.
23     A.   No, it's not part of this discussion.
24     Q.   Well, it certainly is part of your
25 discussion -- part of this discussion, because cash is an

1  asset, and part of this discussion -- most of this
2  discussion functions on the source and the flow of cash
3  through you, personally, and through entities that you
4  control or have been found to control.
5      A.   I disagree.
6          MR. SANDBERG:  Counsel -- I'm not sure I
7  understand what your question is, Counsel.  Could you
8  please just ask the witness a question that's within the
9  scope of the ruling today?  I think we've had -- following
10 your initial question and then my understanding and
11 restatement, I think we've been doing other stuff, and I
12 do not know what the question currently is to
13 Mr. Carpenter.
14         MR. MANSON:  I want to know what the
15 source of funding is.  I asked him what the source of
16 funding is for the payment of his legal expenses, and he
17 said he didn't know.  He said his wife makes the payments,
18 and we have no documents -- we've been given no documents
19 in response to the subpoena that demonstrate that there
20 are assets available to pay his lawyers.
21         So the question -- the follow-up question is,
22 does he intend to pay the contempt fine that the Judge has
23 already ruled on, and if so, what is going to be the
24 source of those funds?
25         MR. SANDBERG:  My client, of course,

1  intends to fully comply with any and all orders entered by
2  the Court.  However, these -- you know, that sometimes is
3  limited by an individual's means, but asking him whether
4  he intends to comply with the Court's order is pretty far
5  beyond the scope of the --
6          MR. MANSON:  I'm not asking him about
7  that.  I'm asking about the means.
8          MR. SANDBERG:  Well, no, actually, you
9  used the word "intent," Counsel, but if you want to ask
10 another question, then perhaps I did not hear it
11 accurately.  But my recollection is you used the word
12 "intent."
13         MR. MANSON:  All right.  Well, let me
14 just follow on to that, Mr. Sandberg.
15     Q.   Mr. Carpenter, do you intend to comply with
16 the order of Judge Meyer on the contempt motion?
17     A.   I intend -- I will definitely follow any
18 Judge's orders, but, as you know, I'm going to appeal it
19 to the Second Circuit and then to the Supreme Court, so I
20 will definitely be following the Judge's orders.
21     Q.   Okay.  Do you have any idea what the cost of
22 those appeals would be?
23     A.   I've done several appeals.  I'm pretty
24 confident I know what the cost of the appeals would be.
25     Q.   And would it be more than the amount the

1  Judge has already ordered you to pay --
2      A.  Yes.
3      Q.  -- Universitas' counsel's costs?
4          MR. SANDBERG:  I don't believe
5  Judge Meyer has ordered my client to pay a specific amount
6  at this point, Counsel.
7          MR. MANSON:  The Judge has said that --
8  well, you may technically be right on that, but the
9  Judge has indicated that Mr. Carpenter is going to be
10  responsible for paying legal fees of Universitas's
11  counsel, and the only question is whether there's a cutoff
12  or whether there is continuing contempt, which we will
13  argue there most certainly is.
14          What is your problem --
15          MR. SANDBERG:  What is the question to
16  the witness, counsel?
17      Q.  Here's the problem -- and maybe your counsel
18  is unaware of this -- but you've been ordered to pay legal
19  fees in other Courts pursuant to contempt holdings against
20  you that you failed to pay; isn't that true?
21      A.  No, totally false.
22          MR. SANDBERG:  Time out.  This is not
23  within the scope of why we are here today as far as I am
24  aware.
25          Now, if you want to point out to me and

1  explain to me why this is within the scope of today's
2  deposition, I'd certainly like to hear that.
3          MR. MANSON:  Because we're trying to
4  find out what happened to the money that Mr. Carpenter
5  stole from Universitas, and whether or not Mr. Carpenter
6  has assets to satisfy the judgments that are already
7  against him and various elements of his criminal network,
8  and that is precisely what the scope is of this deposition
9  and the Judge's order.
10          MR. SANDBERG:  Well, I am looking at
11  page 7 of the order that was entered on March 22nd, 2022,
12  which is Document 243.  It states, "The questions shall be
13  limited to questions about the efforts that Carpenter
14  undertook to comply with each of the requests in the
15  subpoena, what knowledge Carpenter has about the existence
16  and location of documents that are responsive to the
17  subpoena, and what relationship Carpenter has to any third
18  parties that may have documents within the scope of the
19  subpoena."
20          Now, asking my client to opine about orders of
21  other courts that may or may not be pertinent orders and
22  whether or not those orders of other courts were paid, if
23  those orders, in fact, exist, I think is pretty far afield
24  of what Judge Meyer's has told us we're to discuss today.
25          Now, I don't see -- so if you'd like to

1  explain to me -- perhaps I am wrong -- but saying that
2  you're here to do post-judgment discovery I don't believe
3  takes this line of questions and puts it within the scope
4  of Judge Meyer's order.
5          MR. MANSON:  No, let's do this way.
6      Q.  Mr. Carpenter, are you aware of any documents
7  that reflect funding that would be adequate to pay and
8  satisfy a contempt judgment against you in this case?
9      A.  I don't understand the question.
10          MR. MANSON:  Would you read it back,
11  please?
12          (The record was read by the reporter as
13          follows: "Q.  Mr. Carpenter, are you
14          aware of any documents that reflect
15          funding that would be adequate to pay
16          and satisfy a contempt judgment against
17          you in this case?")
18      A.  No.
19      Q.  Are you aware of any documents that reflect
20  the funding that's being used to pay your lawyers in this
21  case?
22      A.  No.
23      Q.  Your wife would be the person that could
24  answer that question?
25      A.  My wife would be the source of the funding, so

1  obviously, my wife would definitely know who she would be
2  paying and how much she would be paying.
3      Q.  And where those funds came from, she would
4  know that?
5      A.  She didn't get them from Sash Spencer's death
6  benefits.
7      Q.  How do you know?
8      A.  Because I read all of the falsehoods Michael
9  Barnett wrote about where the Sash Spencer money went to
10  and from, and as Judge Scheindlin said, all the money was
11  gone by October 9th of 2009.  So that's why
12  Judge Scheindlin said any claim by Universitas against
13  anyone was time-barred after October 2012.  I'd be very
14  happy to send you Judge Scheindlin's decision from
15  December 2015.
16      Q.  No, I have it, and I've read it.
17          MR. SANDBERG:  By the way, Counsel, my
18  recollection is that Judge Meyer has entered an order
19  dismissing Mrs. Carpenter, and has also entered an order
20  denying your Motion for Reconsideration as to
21  Mrs. Carpenter.
22          MR. MANSON:  You are correct.
23          MR. SANDBERG:  But as far as those -- as
24  far as those orders are concerned, and as far as this
25  Court is concerned, Mrs. Carpenter does not have any funds

1  that would be at issue in this case.
2          Or am I mistaken?
3          MR. MANSON:  The issue is the documents
4  and whether or not, with respect to payments that are
5  being made on Mr. Carpenter's behalf, he has diligently
6  searched and reasonably searched for documents that are
7  responsive to the subpoena, and if those documents include
8  documents in the possession of his wife to whom he's made
9  no inquiry, then that's a problem for him.
10          Okay.  I think that's -- that's -- just one
11  moment.  That's it.
12          Thank you very much, Mr. Carpenter.
13          THE WITNESS:  Thank you, guys.
14          MR. SANDBERG:  All right.  I do have a
15  few questions, Mr. Carpenter.  I want to make sure some
16  things are on the record because both you and I were being
17  spoken over periodically during this deposition.  So I
18  want to make sure that certain things are clear.
19          Can you hear me?
20          THE WITNESS:  Yes, sir.
21              EXAMINATION
22  BY MR. SANDBERG:
23      Q.  All right.  Did you possess hard copies of
24  documents in your basement at the house?
25      A.  No.  I searched the basement, and there were

1  no responsive documents in the basement of my house.
2      Q.  All right.  You also mentioned a filing
3  cabinet.
4          Did you search the filing cabinet for
5  responsive documents?
6      A.  Yes, I did.
7      Q.  Were there any?
8      A.  No.
9      Q.  Did you see any old bank statements in those
10  two locations?
11      A.  No, I did not.
12      Q.  You mentioned your email address.
13          Did you search that for financial information
14  or documents that would be responsive to the subpoena?
15      A.  Yes, several times.
16      Q.  Okay.  Were there any responsive documents?
17      A.  No.
18      Q.  Or responsive emails?
19      A.  No, none at all.
20      Q.  You were asked questions about who you asked
21  for responsive information, and there was mention of my
22  office here, Mr. Holmes, information that Halloran & Sage
23  had.
24          And just for purposes of the record,
25  Halloran & Sage represents certain parties to this

1  litigation?
2      A.  Yes.  In other words, Bill McGrath, who is the
3  senior partner and head partner at Halloran & Sage,
4  basically my daughter has grown-up referring to him as
5  "Uncle Bill," and because of the fact that Mike McPherson
6  and Dan LaBelle were defending Don Trudeau, Molly, and
7  BASI, he basically said that they would not be able to
8  help me out.  And that's when I basically talked to Molly,
9  and then I suggested, "Well, if I can't talk to
10  Mike McPherson, can I put Jeff Sandberg and Colt --"
11      Q.  Hold up there; okay?  I need to interrupt you,
12  because I want to get to another point, which is this:
13          Through your attorneys -- well, let me ask you
14  this:
15          Halloran & Sage represents -- or represented,
16  because they've now been dismissed, both your wife,
17  Mrs. Carpenter, and BASI in this particular case; is that
18  correct?
19      A.  They represented my wife and Don Trudeau and
20  BASI.
21      Q.  Okay.  And so is it your understanding that
22  Grant Holmes worked with attorneys at Halloran & Sage who,
23  in turn, requested information from BASI and
24  Mrs. Carpenter that would have been, at least in part,
25  responsive to the subpoena?

1      A.  I think I could say better than that.
2  Colt Holmes --
3          MR. MANSON:  I object, and the reason I
4  didn't do it timely is I was fumbling around for the
5  unmute.  But I object to the question.
6          You can answer it.
7          THE WITNESS:  Great.
8      A.  I just think that Colt Holmes went above and
9  beyond, and I feel very grateful to him because he had
10  several meetings, conversations with both Ron Larrow.
11  Ron Larrow let him come through and search for documents,
12  and Mike McPherson hired some computer consultants, and
13  Mike McPherson set up Colt with Donna Parrott, who is the
14  IT person.
15          So the people at Halloran & Sage and
16  Simione Macca opened up all the files so that Colt could
17  search for them, and that's why I think they did just an
18  outstanding job in searching for documents in a subpoena
19  that I clearly felt was overly broad and unduly
20  burdensome.
21          And then, when we delivered the documents on
22  September 6th, basically everybody called it a "document
23  dump," yet, we had file folders showing where they came
24  from, and that's why I feel that Mike McPherson and
25  Jeff Sandberg and, certainly, Colt Holmes were the heroes

1  of this affair, and it was basically because my wife asked
2  Mike McPherson to help out Colt Holmes.
3        Q.   And I mean, in terms of the production by my
4  office, Grant Holmes, Halloran & Sage, BASI, Ron Larrow,
5  was there any attempt to try to identify how much of that
6  production would have been the subject of discovery
7  requests in this case to multiple parties so that there
8  would have been a need to segregate potentially any
9  overlap between individual parties?
10             MR. MANSON:  Objection.
11       Q.   You may answer.
12       A.   Okay.  I was not privy to any of the
13  discussions, but I know that Jeff Sklarz and --
14  particularly Jeff Sklarz and Larry Grossman were very
15  upset.  They represent Grist Mill Partners, and the
16  building at 100 Grist Mill Road was subject under
17  Judge Swain, and it was determined that there was
18  absolutely no Sash Spencer money that went to
19  100 Grist Mill Road, and Dan LaBelle and a couple of other
20  attorneys negotiated with Judge Swain so that Cure Leaf
21  could take over that building in March of 2014.
22             So they particularly objected to all of the
23  attorneys that were on all of the emails because the fate
24  of 100 Grist Mill Road was in front of Judge Swain and was
25  subject to a lot of legal emails and emails with

1  attorneys' names on it.
2             So I was not subject to those conversations,
3  but I know that Jeff Sklarz and Larry Grossman were
4  particularly upset and wanted to make sure that Colt
5  screened everything for Attorney-Client Privilege before
6  sending it to the Universitas folks.
7        Q.   Okay.  And I guess my question is this,
8  though:
9             Is it your understanding BASI produced
10  responsive documents in this case?
11       A.   I believe they went over and above the call of
12  duty.  I don't remember the name of the computer firm that
13  Mike McPherson hired, but I know for a fact, in talking
14  with my wife, that there were a number of "do another
15  run," "do another run," "check this out," "check that
16  out," so that they were working for Mike McPherson.  And I
17  know for a fact that my wife and Mike McPherson said,
18  "Dan's not to know.  Dan's not to get involved."
19             And I think Mike McPherson gave strict orders
20  that "Dan is not to see any of this, and Dan is not to
21  comment on it."
22       Q.   Okay.  But -- and let me ask you this, though:
23             When BASI produced its information there, was
24  that based upon search terms that it received from
25  Universitas's counsel in this case?

1        A.   Yes, it was.
2        Q.   As we sit here right now, without knowing the
3  specifics of what BASI produced -- well, do you know, at
4  least in part, anything about what BASI produced in this
5  case?
6        A.   The only reason I saw anything dealing with it
7  is the first complaint was there was a document dump, we
8  can't open it -- it crashed the system -- and I had Colt
9  send it to me, and I basically opened a couple files that
10  I was able to open.
11             The second thing that got me upset is they
12  said there's just a bunch of pornography on it, so I asked
13  a computer person that I knew, "Could you just take a look
14  at this and just tell me if you see any pornography," and
15  neither Colt nor the person I asked could find any
16  pornography on it.
17             So as I had said earlier in this deposition, I
18  was very upset of the claim that my wife set up a slush
19  fund and would violate a Court order, and that slush fund
20  didn't exist.  It was totally made up by Matt Westcott.
21             So the only interaction I had was in Colt
22  sending me the files proving that I could open them and
23  then, you know, basically Jeff Sklarz and Larry Grossman
24  said they didn't want anything Attorney-Client Privileged
25  to be sent to Universitas.  And I was privy to those

1  discussions, but I was not privy to how the files were put
2  together, how the information was done, and nobody was to
3  talk to me about it other than the fact that they did do
4  search terms, and search terms like "100 Grist Mill Road"
5  because of the two government raids and all of the
6  attorneys involved in those raids, obviously, that's what
7  got the attorneys upset, that there was a lot of
8  Attorney-Client Privileged information.  And they put the
9  pressure on Colt not to turn over anything that was
10  Attorney-Client Privileged.
11             So I did not see the actual documents, but I
12  know for a fact that Colt would take 6,000 documents, get
13  them down to 50 or 60 documents, go through them
14  personally, and then he would turn over 14 documents, but
15  I did not help in culling the files, I did not help in
16  curating the files.  I just know that Colt Holmes did a
17  heck of a job.
18       Q.   As we sit here today, is it your belief that
19  information that would have been provided by BASI, based
20  upon the search terms from Universitas, would have been,
21  at least in part, responsive to your subpoena?
22       A.   I'm not sure, because I did not -- I did not
23  get involved in the search, the culling, or the curating
24  because everybody was worried that people would come after
25  me saying, "Oh, Carpenter curated it.  Carpenter took it

1    out.  Carpenter did this.  Carpenter's hiding that."

2           And I'm just the opposite:  That I want to --

3    I want to confront directly the big lie that "Carpenter

4    stole the money."  Carpenter didn't steal any money, and I

5    truly believe if there's any fraud here, it was carried

6    out by people at Universitas.

7           So that's why I think everybody wanted to keep

8    me away from the documents, and I'm just very proud of my

9    wife working with Dan LaBelle and Mike McPherson, and I'm

10   very proud of the job Colt that, you know, did working

11   with Mike McPherson and Colt worked with Donna Parrott at

12   Halloran & Sage, and I was literally told not to have any

13   contact with the people at Halloran & Sage, even though

14   they've been representing me and my family for over

15   25 years.

16       Q.   All right.  Looking at what was Exhibit 8,

17   which was the email from someone at People's United Bank,

18   has anyone specifically requested that you ask People's

19   United Bank for any of its records here in the last

20   10 months?

21       A.   No, I didn't know anything about those

22   accounts, and I'm not even sure if those accounts exist.

23       Q.   Has anyone here in the last 10 months -- and I

24   believe we're looking, now, at Exhibit 7 -- has anyone --

25   oh, that's more People's.  All right.

1           Has anyone asked you to get information from

2    New England Financial or MetLife about any insurance

3    policies specific to policies that you might own or be a

4    beneficiary of?

5        A.   No.  As I said earlier, my personal insurance

6    policies and my personal tax returns were not asked for in

7    the original subpoena.

8           MR. SANDBERG:  Pass the witness.

9           MR. MANSON:  Mr. Williams, do you have

10   anything -- or Grayson?

11          MR. WILLIAMS:  No.  And I think that

12   only one lawyer per side should be questioning anyway.  I

13   think that's sort of --

14          MR. MANSON:  I agree with that, but

15   there have been some strange happenings in this

16   deposition, so I just wanted to check.

17          That completes the deposition, and let's

18   go off the record.

19          THE REPORTER:  We're off the record.

20          MR. SANDBERG:  I guess, what's the

21   normal delivery time?

22          THE REPORTER:  Eight to ten days.

23          MR. MANSON:  Okay.  That works for us.

24          MR. SANDBERG:  Barb, you can send the

25   transcript of Mr. Carpenter's transcript to me.  There

1    won't be a need for any further files.

2           THE WITNESS:  We want to read for

3    errors.

4           (The deposition of Daniel Carpenter

5           concluded at approximately 1:05 p.m.)

6           *  *  *  *  *

1                   CERTIFICATE

2           I, Barbara J. Carey, Registered Professional

3    Reporter and Certified Shorthand Reporter, do hereby

4    certify that prior to the commencement of the examination,

5    Daniel Carpenter was duly remotely sworn by me to testify

6    to the truth, the whole truth and nothing but the truth.

7           I DO FURTHER CERTIFY that the foregoing is a

8    verbatim transcript of the testimony as taken

9    stenographically by me at the time, place and on the date

10   hereinbefore set forth, to the best of my ability.

11          I DO FURTHER CERTIFY that I am neither a

12   relative nor employee nor attorney nor counsel of any of

13   the parties to this action, and that I am neither a

14   relative nor employee of such attorney or counsel, and

15   that I am not financially interested in the action.

16          *Barbara J. Carey*

17   BARBARA J. CAREY

18   Registered Professional Reporter

19   Certified Shorthand Reporter

20   Notary Public

21   Dated:  April 27, 2022

1    ERRATA SHEET

2  Case Name:

3  Deposition Date:

4  Deponent:

5  Pg.  No. Now Reads    Should Read  Reason

6   ___  ___ _____   _____  _____

7   ___  ___ _____   _____  _____

8   ___  ___ _____   _____  _____

9   ___  ___ _____   _____  _____

10  ___  ___ _____   _____  _____

11  ___  ___ _____   _____  _____

12  ___  ___ _____   _____  _____

13  ___  ___ _____   _____  _____

14  ___  ___ _____   _____  _____

15  ___  ___ _____   _____  _____

16  ___  ___ _____   _____  _____

17  ___  ___ _____   _____  _____

18  ___  ___ _____   _____  _____

19  ___  ___ _____   _____  _____

20                        _____

21                        Signature of Deponent

22  SUBSCRIBED AND SWORN BEFORE ME

23  THIS _____ DAY OF _____, 2022.

24  _____

25  (Notary Public)   MY COMMISSION EXPIRES:_____

1        J U R A T

2

3  I,          , do hereby certify under

4  penalty of perjury that I have read the foregoing

5  transcript of my deposition taken on         ;

6  that I have made such corrections as appear noted

7  herein in ink, initialed by me; that my testimony as

8  contained herein, as corrected, is true and correct.

9

10 DATED this _____ day of _____,2022,

11 at _____,         .

12

13

14

15

16

17 _____

18        SIGNATURE OF WITNESS

19

20

21

22

23

24

25

## $

**$15,000** 61:6

**$25** 74:22 75:5

**$26,215.01** 57:20

## 1

**1** 6:12,13 14:20 21:7 26:4 29:5 32:24 36:24 54:7 55:9 63:2, 3 70:19

**10** 60:9 94:20,23

**10-minute** 73:1

**100** 10:8 90:16,19,24 93:4

**10187** 61:6

**10:11** 5:13

**11:36** 60:13

**11:53** 60:13

**120** 62:22

**126** 15:1,24 28:6,10

**12:17** 73:6

**12:26** 73:6,8

**13** 26:4,9 30:15

**135** 36:10

**14** 6:17 93:14

**14th** 18:25 20:23 27:8 28:14,25

**15** 57:20

**1754** 40:19

**1759** 39:24

**180** 37:20 62:22

**1982** 71:18

**1st** 30:24 71:15

## 2

**2** 6:18 21:17 26:12 59:14,16 63:13

**20** 44:10 47:21

**2000** 30:17,24 48:23

**2001** 31:2 48:23

**2004** 17:12 48:18 56:4

**2009** 22:3 23:4 30:24 51:5 70:19 71:15 85:11

**2010** 15:10,12 16:13 50:2,13,22 75:9

**2011** 15:10,13 16:13

**2012** 74:14 77:11 85:13

**2013** 57:21 74:14 76:23

**2014** 19:24 77:12 90:21

**2015** 27:3 85:15

**2017** 21:4 40:23

**2021** 6:17,23 39:4,25

**2022** 6:3 7:3 83:11

**20th** 16:13

**22nd** 6:3 7:3 83:11

**243** 83:12

**25** 94:15

**26** 69:3,7 70:14

**26th** 16:13

**2nd** 21:4 39:4,24

## 3

**3** 6:24 59:16 64:15 79:3

**3-22-2011** 7:4

**30th** 75:9

**33** 26:4,9 63:11

**33-page** 63:3

## 4

**4** 7:4 25:13 48:20

**20** 44:10 47:21

**4-21-2021** 6:13

**401(k)** 75:1,4

**419** 30:2

## 5

**5** 39:3,18 48:25 68:10

**50** 93:13

**500** 64:2

**5172182211** 61:8

## 6

**6** 48:25 50:8,12

**6,000** 93:12

**6-2-2021** 39:18

**60** 93:13

**61(b)2** 79:3

**67** 51:25

**6th** 6:23 10:7 15:24 16:9 28:10 64:20 89:22

## 7

**7** 12:5 24:15,18 30:15 48:22 49:1 57:17 83:11 94:24

**7-14-2021** 6:18

**7-30-2010** 73:17

**7/20/2010** 73:16

**7/30/2010** 77:9

**70** 52:3

## 8

**8** 48:22 49:2 73:10,17 94:16

**8-6-2021** 6:24

**8879** 50:3

## 9

**9** 21:17 26:12 48:20, 22 74:3

**9th** 10:8 15:23 28:9 42:23 43:3 85:11

## A

**a.m.** 5:13 60:13

**ability** 7:8

**absolutely** 90:18

**accept** 79:15

**access** 15:8 77:15, 16

**account** 56:20,21 58:10,14,19 60:23 61:3,8 66:12,25 74:18,21,24 75:19,23 76:3

**accountant** 44:4 47:2

**accountants** 44:9 45:21 48:15,21

**accounting** 44:3 45:6,7 46:14

**accounts** 66:7,10, 17,23 67:2,10,13,22 73:14,18 74:7 77:13 94:22

**accurately** 7:9 39:6 81:11

**acquisition** 54:9 55:2

**Act** 62:23,24

**action** 61:24,25 62:1

**actual** 93:11

**additional** 9:11,14 10:15 15:18,19 16:6

**address** 17:2,19 18:4 19:4 39:25 42:4 76:17,20 87:12

**addresses** 18:9

**adequate** 84:7,15

**adhere** 6:6

**adjudicated** 29:1,6 45:14

**Admin** 29:16

**administered** 5:7,16

**administrative** 29:15 38:1,4

**Administrator** 31:17

**advice** 40:12,21

**affair** 90:1

**affidavit** 49:12

**affiliated** 14:23 66:8

**afield** 83:23

**age** 51:17,18 52:3

**agent** 22:23

**agree** 60:19 77:3,18 95:14

**agreed** 5:4

**agreement** 39:15,20 40:2,9,11,12,13,15, 18,20,22,24

**ahead** 24:9,12,13 43:8 56:9 72:9,11

**alive** 23:3

**alleged** 19:16 37:9

**Alliance** 76:5

**alter** 29:6 41:13 45:14 46:3,10 55:7, 25

**alternative** 17:13

**Amanda** 38:14,15,17 39:1 40:1,21 58:17, 20

**Amazon** 64:10,11

**America** 66:18,23 68:4

**amount** 61:6 79:11 81:25 82:5

**and/or** 55:14 68:12, 13

**Andrew** 74:15 75:14 76:12,14 77:1

**annual** 65:18,22

**answers** 11:3 12:2 33:25 34:11 43:19

**Anthony** 57:21,25

**anticipated** 79:7

**anymore** 43:10

**appeal** 62:5 81:18

**appeals** 81:22,23,24

**appearance** 8:17,20 9:2,5

**appearances** 8:11, 15

**appearing** 5:3 8:11

**appears** 50:23 74:9

**application** 65:15

**approval** 65:16

**April** 16:13 57:20

**arbitration** 31:21 32:2,8,16 58:8

**area** 64:14

**argue** 82:13

**argument** 51:19 67:6

**asks** 54:5

**assertion** 35:4

**asset** 55:4 71:5 80:1

**assets** 21:10 26:21 41:8 54:10 55:3,14 68:12,13 70:23,24 72:16 80:20 83:6

**assist** 19:19

**associate** 11:11

**assume** 48:19

**assure** 12:11

**attached** 44:13 55:8

**attempt** 90:5

**attention** 21:2 61:2 68:24

**attorney** 16:20,22 20:9,12,16 33:21 35:13,15,16,23,25 37:23 53:22,23 57:1

58:1 61:10 64:20 66:18 67:6,17,19 68:2,4 79:5

**attorney-client** 33:23 34:5,15 35:6,8 54:4 79:5 91:5 92:24 93:8,10

**attorneys** 8:10,21,22 15:15,17 41:14 58:22 61:23 88:13,22 90:20,23 93:6,7

**attorneys'** 91:1

**August** 6:23 77:12

**Austin** 62:4

**authorization** 50:3

**automatic** 69:20

**Avon** 21:11 22:1 48:4 74:17 77:25

**award** 31:22 79:11

**aware** 55:20 82:24 84:6,14,19

---

**B**

**back** 15:9,12 20:2 24:11 34:20 57:5 60:14 66:22 71:18 73:7 74:14 78:2 84:10

**Bailey** 62:4

**bait** 31:25

**balances** 73:18 74:7

**bank** 23:6 58:10,11, 13,16,20 60:22 61:8 66:7,10,12,17,18,23, 25 67:1,10,13,22 68:3 73:14,19 74:6,8, 12,18,21,24 75:8 77:13 87:9 94:17,19

**banks** 66:9,19,24 67:15 75:12 76:20

**Barb** 95:24

**Barnett** 22:14 56:2 85:9

**Barnett's** 55:11

**based** 13:21 91:24 93:19

**basement** 19:23 20:3 54:23 64:23 86:24,25 87:1

**BASI** 14:7 15:8 17:14,15,16,18 20:5, 8 29:18,20,21,25 33:12 36:23 37:12 38:6,7,9,13,15,17,25 41:1 48:12,15,17 55:22,24,25 56:3,7 65:23 88:7,17,20,23 90:4 91:9,23 92:3,4 93:19

**basically** 20:10 30:17 37:20 40:23,24 41:11 42:22,23,24 50:24 57:2 59:5,19, 21 64:9 66:16,22 67:7 69:20 75:11 77:9 88:4,7,8 89:22 90:1 92:9,23

**basis** 43:16 70:18

**battery** 18:1

**bearing** 9:15

**bedroom** 54:24

**begin** 5:19 65:8

**beginning** 70:4

**behalf** 8:23 9:2,5 11:6 14:4,19 16:7 31:13 36:3 61:3 86:5

**belief** 75:25 93:18

**belonging** 68:13

**beneficial** 68:12

**beneficiary** 69:9,24 72:14 95:4

**Benefit** 21:8 47:10 78:3

**benefits** 17:7,8,10, 12 73:11 74:20 76:17 85:6

**Benistar** 17:11,12 29:15,16 30:2,5,8,11 31:16 37:15 48:17,25 56:3 57:14,18 58:11 59:1,2,8,11,15,18

61:3,8 74:23

**Bernstein** 61:4,7,9, 16

**big** 19:6,13 22:13 36:22 67:5 94:3

**Bill** 88:2,5

**bills** 63:23

**bit** 54:15 73:23

**board** 61:12

**Boston** 31:1 49:23

**bother** 65:7

**boxes** 19:22 54:23

**break** 60:2,6 73:1,2

**breakdown** 52:24

**broad** 16:2 89:19

**broader** 67:3

**broke** 29:2

**brother** 40:19,20

**Brown** 61:19

**building** 90:16,21

**bulk** 36:22

**bunch** 9:20 15:6 92:12

**burdensome** 16:2 89:20

**Bursey** 22:17,25 27:6

**Bursey's** 27:3

**business** 17:11 30:18,23 31:2,4,18

---

**C**

**cabinet** 19:24 20:4 54:23 87:3,4

**cabinets** 64:24

**call** 20:15 38:4 66:24 67:4 91:11

**called** 5:21 9:7,8 41:9 89:22

**calling** 55:12

**capacity** 7:24 8:6

**Capital** 21:10,11,12 22:10,13,16,18,19,21 23:2,3,20 25:10,17, 21 26:3 32:2,5,7 47:12 48:4,6 74:17 75:14 76:2,7,9,12 77:25

**Capitals** 22:1

**card** 63:23 64:7,10, 11

**cards** 64:3,8,9,12

**care** 59:4 64:3,5

**Carol** 61:4

**Caroline** 52:4,7,10, 13,14,16,19,20,21, 22,25 53:16

**carpenter** 5:14,20,25 6:25 7:7 8:22,25 9:2, 4,6,13,24 10:24 11:19 13:1,25 14:15 16:3 17:2 19:4 21:7, 11 23:25 24:3,16 25:4 26:10 27:18 29:9,10,11,22,23 31:3,6,9,13 32:8 33:25 38:8 39:4 43:10,24 44:17,18 45:6 46:22 47:16,18, 23 48:10 50:15,19, 24,25 51:14,22 54:2, 7,15,18 55:4 56:11 57:20 59:20,22 60:17 63:14 68:18 70:25 71:8 73:11,25 75:3 77:19 78:5,21,25 80:13 81:15 82:9 83:4,5,13,15,17 84:6, 13 85:19,21,25 86:12,15 88:17,24 92:25 94:1,3,4

**Carpenter's** 86:5 94:1 95:25

**Carpenter's** 50:13

**carried** 94:5

**carriers** 71:25

**case** 6:22 7:3 8:12,15 9:2,21 10:2,25 16:10, 12 18:13,17,23,24

23:6 28:1,8 31:22 32:1,24 33:8,11 36:3, 24 41:22 42:2 49:23 57:6 62:12 66:17 79:12 84:8,17,21 86:1 88:17 90:7 91:10,25 92:5

**cases** 13:22 16:14 33:14 34:6,22 62:12

**Casey** 74:15 75:10

**cash** 55:3,7,15,23 69:19 72:16,22 79:25 80:2

**Castagno** 37:13,15, 21 38:2 39:3 62:19

**Castagno's** 37:7

**categories** 26:22

**caucus** 24:11

**caused** 28:10

**certainty** 36:12

**CFG** 75:1,2,3

**Chain** 39:19

**chairman** 52:22 53:16

**chance** 68:17 74:1

**change** 70:8

**Charter** 22:22 31:21 58:3

**Chase** 68:3

**chat** 39:13

**Chatigny** 62:2

**check** 19:14 20:1 23:2 57:19,20 58:18 61:6 66:15 91:15 95:16

**checked** 54:25 75:7

**checks** 52:1 57:12, 14,17 58:19 60:23 61:2

**Circuit** 37:23 62:6 79:19 81:19

**claim** 85:12 92:18

**claims** 37:3

**clarification** 11:18

**classic** 69:22

**clear** 11:1 38:25 45:1 46:12,14 86:18

**Clemont** 76:9

**clerk's** 77:11

**Clermont** 75:14 76:12

**client** 24:23 80:25 82:5 83:20

**clients** 8:23

**cloud** 17:17

**Cody** 61:20

**Colbath** 32:6 57:1,4

**Cole** 62:3

**Colt** 7:17 15:15 33:3 36:1,17,18 42:24 43:3 49:11 66:21 67:1 88:10 89:2,8,13, 16,25 90:2 91:4 92:8, 15,21 93:9,12,16 94:10,11

**comma** 30:10 49:1

**comment** 91:21

**comments** 14:12

**communicated** 6:7

**communication** 19:15

**communications** 64:16 68:11

**companies** 14:22 22:2 24:21 30:16,17, 19 34:6 48:23 60:18 66:8 75:16 76:14 77:12,21

**company** 21:12 40:20 48:8 54:10 63:15 64:17 65:9 66:5 68:14 70:10 75:15 76:6,8,14

**Compel** 42:17 43:2 51:19

**complaint** 92:7

**complete** 42:17

**completed** 16:8

**completes** 95:17

**comply** 81:1,4,15 83:14

**computer** 19:15 20:2,3,8 76:23 89:12 91:12 92:13

**Concepts** 74:20 78:4

**concerned** 85:24,25

**concerns** 11:7

**conduct** 13:21 30:20

**conducted** 18:19 19:17

**confident** 81:24

**confirm** 10:13,20 11:19 12:16

**confirmed** 16:25

**confront** 94:3

**confusing** 21:25 22:1

**Connecticut** 22:6 23:2 40:16 41:9,11, 12,15,25 61:24 62:1 65:10,14

**consistent** 8:11,13, 14 12:5

**consultants** 89:12

**contact** 94:13

**contempt** 7:5 78:13 80:22 81:16 82:12,19 83:21 84:8,16

**continue** 6:2

**continuing** 82:12

**contrary** 75:25

**control** 19:2 20:25 25:1 27:10 28:13,21 43:5,7 56:6,7 66:16 77:18,20 80:4

**controlled** 41:10

**conversation** 11:11 35:16

**conversations** 67:20 89:10 91:2

**convicted** 75:13

**coordinate** 15:16

**coordinated** 15:15

**copies** 65:5 71:24 86:23

**copy** 39:4 55:11 72:4

**Corporation** 30:6

**correct** 7:15 8:7 9:13,17 10:3,4 15:21 22:18,19 23:7 29:18 30:22,23 31:18 33:8, 9,12,13 35:12 36:5 49:10 50:15,22 51:6, 7 53:8,17 57:7 58:12 59:3 61:17,18 62:13 63:17,18 65:16,17 66:6 67:2,23,24 69:5 70:11,20 71:25 72:1 74:8 76:17 79:14 85:22 88:18

**correcting** 59:14

**correctly** 16:24 43:20

**cost** 81:21,24

**costs** 82:3

**counsel** 6:1 8:10 9:21 13:8 25:17 29:3 33:19,22 34:2,9 41:19 42:10 44:19 46:16 47:1 50:11 54:1,5 57:6,8 59:25 63:4 72:18 78:15,22 79:13 80:6,7 81:9 82:6,11,16,17 85:17 91:25

**counsel's** 82:3

**country** 23:9 41:12

**couple** 60:4 66:14,19 90:19 92:9

**court** 5:5,8,16 9:19 12:11 19:8 51:20 57:6 81:2,19 85:25 92:19

**Court's** 81:4

**courtesy** 28:22

**courts** 82:19 83:21, 22

**coverage** 69:16

**covered** 77:4

**COVID** 62:24

**crashed** 92:8

**create** 71:20 77:19

**created** 41:9

**creating** 41:5

**credit** 63:23 64:3,7,8, 9,10,12

**criminal** 16:10,12 61:25 62:1 83:7

**culling** 93:15,23

**curated** 93:25

**curating** 93:16,23

**Cure** 90:20

**custody** 19:2 20:24 27:10 28:13,21 77:17,20

**cutoff** 82:11

---

**D**

**Dan** 8:8 33:18 42:21 58:23,24 79:4 88:6 90:19 91:20 94:9

**Dan's** 91:18

**dancarpenter@ gmail.com.** 18:15

**dancarpentermail@ gmail.com.** 18:11

**Daniel** 5:20 6:25 21:6 32:8 50:12,15,25 59:20,22

**darn** 11:24

**date** 20:14

**dated** 39:3 57:20 73:15

**daughter** 88:4

**day** 9:9 19:5 21:25 22:1 71:13

**days** 95:22

**DC** 73:13

**dcarpenter@usbgi. com** 17:3 39:25

**dead** 22:3,4 24:20 27:3

**deadline** 15:23

**deal** 19:6,13 22:14 24:19

**dealing** 37:5 67:20 92:6

**death** 69:25 85:5

**debtor** 25:7,18,20,22 29:7 54:10 55:7 63:15 64:17 66:8 68:14

**debtors** 21:6 26:11, 15,21,24 45:11,12,14 46:1,3,5,8,24 56:10, 13 59:17,22 65:1 66:5 67:23

**deceased** 22:25 23:1

**December** 85:15

**decision** 85:14

**defendant** 67:2

**defendants** 7:21 33:11 36:4

**defending** 88:6

**Defense** 62:18,25

**defined** 54:10

**definition** 60:18

**Delaware** 22:4,13 23:3 41:15 65:11

**deliberately** 28:21

**delivered** 89:21

**delivery** 95:21

**demand** 56:24 57:5

**demonstrate** 80:19

**denying** 85:20

**deponent** 5:6,9

**deposit** 66:15

**deposition** 5:1,2 6:2, 6,11,22,25 7:11 11:7, 13,16 13:9 27:10,12 42:8,17 43:17 69:2 74:3 77:1,16 83:2,8 86:17 92:17 95:16,17

**description** 58:2

**determined** 90:17

**diligently** 86:5

**direct** 16:4 21:2 61:2 68:24

**direction** 38:8,10,13 53:8

**directly** 94:3

**disagree** 80:5

**discovery** 16:8 84:2 90:6

**discrete** 78:14

**discuss** 78:16 79:5 83:24

**discussion** 79:23,25 80:1,2

**discussions** 54:6 90:13 93:1

**dismiss** 32:5 34:10

**dismissed** 32:7,8 33:11 88:16

**dismissing** 85:19

**document** 6:16,19 11:5 16:24,25 28:12, 17,20,22,23 40:19 42:24 43:3 50:18 54:21 63:3 73:9 74:2, 16 77:4,17 83:12 89:22 92:7

**documentation** 70:9

**documents** 7:12 9:9,11,16,20 10:2,5, 6,15,16,19,24,25 11:3,6,20,25 12:14 14:8,19,24 15:4,7,10, 12,18,19,25 16:1,5,6, 15 17:1,20,23,24

18:12,17,22 19:1,8 20:3,24 26:21 27:6,8, 13 28:1,19 30:21 31:12 32:25 33:15 34:7,24 35:19,24 36:2,13,16,18,20,25 39:22 49:8,9,13 51:12,13 54:8 59:10 61:17 62:8,16 63:14 64:15,18,19,21,23 65:5 66:2,3 68:11,21, 25 79:21 80:18 83:16,18 84:6,14,19 86:3,6,7,8,24 87:1,5, 14,16 89:11,18,21 91:10 93:11,12,13,14 94:8

**dollar** 79:11

**Don** 75:15 76:11 88:6,19

**Don's** 76:14

**Dona** 74:15 75:10

**dona.casey@ peoples.com** 73:11

**donations** 62:20

**Donna** 20:10 89:13 94:11

**downstairs** 19:23

**due** 62:22

**duly** 5:11,21

**dump** 89:23 92:7

**duty** 91:12

---

**E**

**earlier** 11:11 35:10 37:2 54:22 62:21 69:2 78:7 92:17 95:5

**early** 18:5

**effort** 26:23 59:10 65:4 69:6 71:24

**efforts** 26:20 68:20 83:13

**ego** 41:13 46:3 55:8, 25

**egos** 29:6 45:14

46:10

**Einhorn** 7:16 8:5,16, 18 18:2 62:11,15 73:20

**Einhorn's** 7:18

**elements** 83:7

**email** 17:2,14,19 18:4,7,9,12,16 19:4 39:3,18,24 40:5 42:6 54:25 73:10,13,17 74:6,11 75:17 76:16, 24,25 77:2 87:12 94:17

**emails** 20:6 39:15 42:4 67:19 74:11,14 76:19,23 87:18 90:23,25

**embraced** 68:21

**employee** 38:6,13

**employees** 21:17,23 23:16,19,22 24:2,20 25:2,5,15 26:12 29:20,25 30:3,15,19 38:9

**Employer** 30:5

**employment** 26:16

**encompass** 51:13

**end** 14:11 39:21

**endeavor** 73:1

**England** 95:2

**enlightened** 42:18

**enter** 6:9 8:19 9:5

**entered** 8:17 9:1 21:4 81:1 83:11 85:18,19

**entities** 21:16,18 25:2 26:7,17 29:1,6 30:25 44:12,15,16, 24,25 45:1,8,14,22, 24 46:15 48:24 49:3 55:17 59:7,17,18 61:13 65:1,19,22 67:9,13 80:3

**entitled** 12:13

**entity** 22:13 24:16 25:4,7,20 26:5 29:8

30:3 41:3,4,8 44:2 52:13,20 62:19 63:5, 24 76:10

**entrance** 29:8

**entries** 30:13

**established** 31:6

**estate** 69:24 70:1 71:20

**ethics** 13:18

**eventually** 61:13

**evidence** 51:1

**exact** 19:5

**examination** 5:23 6:5 86:21

**excellent** 35:14,25

**exchange** 30:18 31:1

**Excuse** 9:18 78:8

**exhibit** 6:12,13,15, 18,21,24 7:2,4 14:20 21:2 26:4,8 29:4,5 32:24 36:24 39:3,10, 18,21 50:6,12 55:9 57:11,17 58:2 59:8 63:2,3,6 65:2 73:10, 17 74:3 94:16,24

**exhibits** 6:8 9:14 11:13,14,16 28:23 32:10 39:12 50:5

**exist** 29:10,16 48:23 83:23 92:20 94:22

**existed** 19:11

**existence** 83:15

**expecting** 60:19

**expenses** 63:22 64:5,6 79:22 80:16

**expert** 72:7

**explain** 26:6 83:1 84:1

**explained** 15:10

**extension** 10:7 28:9

**extent** 33:19 35:5,7 54:2

# F

**facility** 19:25

**fact** 16:19 22:12 30:16,25 31:5 32:2 41:7 83:23 88:5 91:13,17 93:3,12

**facts** 23:8

**failed** 82:20

**fair** 38:1 62:23

**false** 11:23 12:23 13:13 22:15 82:21

**falsehoods** 85:8

**familiar** 43:24

**family** 64:3,5 69:11, 12,15 94:14

**faster** 43:18,21

**fate** 90:23

**favor** 38:12

**Federal** 9:19

**feel** 34:14,18 70:20 79:14 89:9,24

**fees** 56:16,17,19 57:3 78:13 82:10,19

**felon** 75:13

**felt** 89:19

**figure** 76:12

**file** 39:5,10,14 50:14 57:13 58:24 65:13 73:12 89:23

**filed** 6:17 49:3,5,6,19 51:2,5 65:15

**files** 9:17 16:11,18, 21,23 32:25 61:16 62:8 89:16 92:9,22 93:1,15,16

**filing** 19:23 20:4 37:22,25 49:16,23 50:1,22,24 54:23 64:24 87:2,4

**filings** 65:18,22

**financial** 21:11 23:25 24:3 25:4 29:9,10

31:3,7,10,13 47:16, 18,23 48:10 52:2,4,7, 11,13,14,16,20,21, 23,25 53:16 75:3 87:13 95:2

**find** 17:25 19:11 20:2,18 23:6 37:4,6,9 51:10 53:14 57:5 59:10 64:23 65:8 68:20 76:22 77:25 83:4 92:15

**finding** 65:7

**fine** 80:22

**finished** 25:16

**firm** 15:20 16:5 20:8 22:7 36:13 37:11 44:3 45:6,7 91:12

**fit** 46:11 49:15

**flow** 80:2

**focused** 24:14

**folder** 39:11

**folders** 89:23

**folks** 25:6 91:6

**follow** 81:14,17

**follow-up** 80:21

**forfeitures** 49:22

**forget** 61:11

**form** 9:18 50:3 53:15, 19

**formed** 22:16

**found** 18:21 51:8 61:4 80:4

**four-hour** 6:5

**fourth** 7:2 66:7

**frame** 70:18,20,22 71:2

**Frank** 13:24

**fraud** 94:5

**free** 34:14,18 70:20 79:14

**friend** 37:16 38:2,4, 12 53:13 61:11

**front** 62:1 90:24

**frozen** 14:11

**fully** 7:9 81:1

**fumbling** 89:4

**function** 17:8

**functioning** 31:17

**functions** 80:2

**fund** 19:7,9,11,16,18 37:3,5,9 62:18,25 92:19

**funded** 22:22

**funding** 69:12 78:9 79:21 80:15,16 84:7, 15,20,25

**funds** 31:23 32:4 79:1 80:24 85:3,25

**funny** 53:12

# G

**G-U-A-R-N-I-E-R-I** 61:20

**games** 12:7 13:16

**Garre** 56:25 57:2

**gave** 11:1 20:23 40:12 42:24 91:19

**general** 45:19 57:3

**generate** 70:10

**gentlemen** 33:14 34:23

**gigabytes** 10:8 15:1, 24 28:7,10 36:10

**give** 15:3,12 22:7 23:14 24:8 38:8,10, 12,19,21 39:22 54:3, 15

**giving** 15:9 24:9

**GMT** 75:19

**gold** 78:3

**golden** 55:13

**good** 5:25 11:24 37:16,24 38:2,4 51:19 53:13 61:11

68:7

**government** 15:9,11 16:11 49:21,24 64:1 93:5

**Grant** 88:22 90:4

**granted** 7:21

**grateful** 89:9

**Grayson** 7:17,20,23 15:15 49:11 95:10

**great** 20:12 28:19 69:22 89:7

**Greg** 56:24 57:1

**Grist** 21:7,9,10 22:9, 12,16,18,19,21 23:2, 3,19,22 25:10,17,21 26:3 32:2,5,7 33:8 47:9,12,14 75:20,22, 24 76:1,2 90:15,16, 19,24 93:4

**Grossman** 33:4,6,7 90:14 91:3 92:23

**group** 17:7,9,13 21:7,11,22,24 22:4,5, 6 23:25 24:3 25:5 29:9,10 31:3,7,10,13, 21 32:16 44:16 47:3, 5,16,18,23 48:10 52:7,14,20,23,25 53:16 57:14,18 58:11 59:1,2,9,11,15,18 60:17 61:4,8 74:23 75:3 76:5,7 77:10

**Groups** 21:24,25

**grown-up** 88:4

**Guarnieri** 61:20

**guess** 46:25 91:7 95:20

**guiding** 27:24

**guys** 49:14 86:13

# H

**half** 60:1

**hall** 60:7

**Halloran** 15:8,17 20:10,11,13 22:16

87:22,25 88:3,15,22 89:15 90:4 94:12,13

**hand** 5:14

**handle** 33:15 34:23

**Hanover** 21:12 48:8

**happened** 17:18 53:17,18 83:4

**happenings** 95:15

**happy** 85:14

**hard** 86:23

**head** 88:3

**hear** 38:16 52:6,12, 14 78:20 81:10 83:2 86:19

**heard** 35:14

**Heaton** 41:17

**heck** 93:17

**held** 5:1,2 53:24 78:12

**helped** 37:20 38:5 62:5,21

**heroes** 89:25

**hey** 24:15 41:23 53:15 56:6

**hide** 42:25

**hiding** 94:1

**hinting** 34:11

**hire** 32:15 37:10

**hired** 20:8 37:10 89:12 91:13

**HIV/AIDS** 76:13

**hold** 8:8 10:22 12:9 21:9 25:3,6 27:5 88:11

**Holding** 21:10

**holdings** 23:22 25:10 39:19 40:1,9, 16 47:14 82:19

**Holmes** 7:17 8:2,3 11:24 15:16 16:20,22 20:9,12,16 33:3 35:13,15,23 36:1,2,

17,18 39:23 49:11 64:20 66:18 67:17 68:4 87:22 88:22 89:2,8,25 90:2,4 93:16

**Holmes's** 67:1

**home** 76:23

**honestly** 61:14 63:25 71:18

**hoping** 46:20

**hour** 60:1

**hours** 24:17

**house** 86:24 87:1

**hundreds** 15:25

**I**

**idea** 26:16 53:19 77:15 81:21

**identified** 25:18

**identify** 90:5

**ignoring** 49:14

**illegally** 49:25

**imagination** 19:12

**impair** 7:8

**improper** 34:16

**inboxes** 17:20

**include** 59:8 86:7

**includes** 14:21

**including** 33:12 64:15 68:11

**income** 51:12,13

**incorporated** 65:15

**incorporating** 41:15

**indicted** 75:13

**individual** 16:7 44:6 51:7,10 90:9

**individual's** 81:3

**individually** 8:25

**individuals** 14:22 62:8

**information** 10:9,10 15:1 24:8 28:11 33:19,22 34:15 35:6, 8 87:13,21,22 88:23 91:23 93:2,8,19 95:1

**initial** 10:1 14:18 70:12 80:10

**initially** 65:15 69:15

**initials** 75:2

**inmates** 37:20 62:20, 22

**inquiries** 67:22

**inquiry** 55:19,22 67:1 86:9

**instructions** 38:19, 22

**insulting** 34:11 43:22

**insurance** 68:25 69:3,8,16,21 70:2,10, 15 71:24 72:2,7,13, 20,23 76:13 95:2,5

**insured** 72:3

**intend** 11:12 79:1 80:22 81:15,17

**intends** 81:1,4

**intent** 81:9,12

**intentionally** 12:20

**interaction** 92:21

**interest** 32:3

**interests** 68:12

**interject** 11:9

**interrupt** 11:9 88:11

**interrupting** 78:20

**intrude** 34:4

**investigated** 32:1

**Investment** 76:5

**involve** 58:7

**involved** 30:17 33:15 34:7,24 91:18 93:6, 23

**involving** 30:25

**irrevocable** 69:21 72:20,22

**issue** 41:24 86:1,3

**issued** 6:11 14:9 36:14

**items** 48:19

**J**

**Jack** 22:17 23:1 53:7, 12,14

**James** 62:3

**January** 17:12 30:24 48:17 70:19 71:15 76:23

**Jeff** 7:18 33:4,6 36:1, 17,19 88:10 89:25 90:13,14 91:3 92:23

**job** 20:13 28:19 35:15,25 67:18 89:18 93:17 94:10

**Joe** 6:1 37:7,13,15,21 38:2 39:3 62:19,21, 25

**joint** 49:16,19 50:22, 23

**JPMORGAN** 66:23 67:11 68:3

**Judge** 6:3,4 7:3 10:18 13:6 15:11 16:14 19:13,14 21:3 22:15 23:5 24:9,12, 13,15 28:18 29:4 30:24 34:7 41:17,23 44:13 45:8 55:8,10, 11 59:3 62:2 65:3,20 66:21 67:5 77:18 78:3,12,16,24 79:1, 11,17 80:22 81:16 82:1,5,7,9 83:24 84:4 85:10,12,14,18 90:17,20,24

**Judge's** 59:3,4 81:18,20 83:9

**judges** 23:8

**judgment** 21:6 25:7, 18,20,22 26:11,14, 21,24 29:7 45:11,12,

14,25 46:2,5,7,24 54:10 55:7,13 56:10, 13 59:17,22 63:15 64:17 65:1 66:5,8 67:23 68:13 70:24 77:10,11 84:8,16

**judgments** 83:6

**July** 6:17 18:25 20:23 27:8 28:14,25 75:9

**June** 39:4,24 77:10

**K**

**Karam** 9:8 54:17 73:23

**keeping** 39:10

**kicked** 66:19 67:10, 11 75:11

**kind** 15:16 46:9

**knew** 92:13

**knowing** 92:2

**knowledge** 26:13,14 55:1 67:21 75:22 83:15

**L**

**L-A-R-R-O-W** 43:25

**L-T-D** 30:8

**labeled** 16:24 17:1 39:6,12,13

**Labelle** 88:6 90:19 94:9

**largely** 35:23 36:18

**larger** 46:9 73:23

**Larrow** 43:25 47:2 48:15 49:12 89:10,11 90:4

**Larry** 33:4,6 90:14 91:3 92:23

**late** 18:5 20:14

**Latham** 56:24 57:2

**law** 36:13 62:23

**laws** 41:12

**lawsuit** 71:6

**lawyer** 33:25 37:18 43:9 95:12

**lawyers** 7:15 8:4 14:7,21 15:19 24:23 31:20 32:13,23 33:2 34:6 56:22 78:5 80:20 84:20

**leading** 12:10

**Leaf** 90:20

**lecture** 13:18

**led** 31:22

**left** 17:11

**legal** 18:10 56:16,17, 19 57:3 62:18,21,25 64:22 78:13 80:16 82:10,18 90:25

**letter** 57:5

**letters** 56:24

**lie** 94:3

**life** 68:25 69:3,7,8,16, 21 70:14 72:2,20,23

**limit** 6:5 48:1,2

**limited** 30:8 48:25 57:14 81:3 83:13

**lines** 67:14

**lineup** 35:17

**liquid** 72:16

**list** 21:6,13 25:13,18 44:24 45:11,25 46:2, 3,10,24 59:6,20 67:7, 13 77:12,22

**listed** 26:11,15,21 34:7 44:13,15 45:8 48:19 55:8,25 59:2,7 65:2,19,22

**Listen** 23:12

**literally** 31:1 66:14 94:12

**litigation** 58:4 88:1

**LLC** 21:10,11,12 22:10,13,16,21 23:20,22 25:17,21 29:9,10 31:3,7,10,14

39:19 40:2,9,16,22, 25 41:12,13 47:12,14 48:4,6,10 62:18 65:15 74:17 76:2,9 77:25

**LLCS** 41:15

**loan** 69:21

**local** 37:11

**locale** 5:5,8

**located** 63:5

**location** 83:16

**locations** 87:10

**lodge** 25:25

**long** 44:9 49:21,24 55:18 56:23

**longer** 60:1

**longest** 64:1

**looked** 20:16 54:24 55:16 76:21

**lost** 57:7

**lot** 16:19 29:24 36:16 37:16,19,22,24,25 38:5,6 75:11 90:25 93:7

**low** 18:1

**lying** 23:8

**M**

**M-A-C-C-A** 43:25

**Macca** 43:25 47:2 48:15 49:6 89:16

**made** 19:6,13 22:13 38:24 58:22,25 59:10 63:15,23 64:4 66:4 67:22 71:23 86:5,8 92:20

**Magistrate** 13:7

**Magistrate's** 10:18

**make** 8:21 26:20,23 36:23 40:7,10 43:1 46:9 51:18 55:19,22 65:4,18 69:6 73:22 86:15,18 91:4

**makes** 80:17

**making** 43:19

**Management** 21:12 48:6 76:7

**managing** 31:9 52:10,19

**Manson** 5:24 6:1 8:3, 13,16,24 9:22 11:2, 17 12:1,8,19,21,25 13:5,10,14,17,21 14:14,17 24:22,25 25:8,11,14,24 27:16 33:24 34:3,19 39:7, 13,16 41:21 42:3,12, 16 43:5,9,11,14,18 45:3,13,19 46:2,13, 18 50:7,9,16 52:8,15 53:23 57:15 60:3,9, 11,16 63:6,10 68:1,2, 5 70:22 71:4 72:19, 25 73:9,15 77:23 78:19 79:15 80:14 81:6,13 82:7 83:3 84:5,10 85:22 86:3 89:3 90:10 95:9,14, 23

**Manson's** 79:9

**March** 6:3 7:3 83:11 90:21

**mark** 6:9 39:2 73:10

**marked** 6:14,20 7:1,6 39:20 50:13 57:18 73:19

**Matt** 19:6,9,12,16 37:3,5,8 92:20

**matter** 22:12

**Mcgrath** 88:2

**Mcpherson** 20:13, 14,15 33:4,5,10,17, 21 35:1,11,16,18,22, 25 36:13 37:10,11 67:18 88:5,10 89:12, 13,24 90:2 91:13,16, 17,19 94:9,11

**means** 81:3,7

**meant** 27:11

**medications** 7:8

**meetings** 89:10

**member** 31:9 52:10, 19

**memory** 46:6

**mention** 87:21

**mentioned** 8:4 37:13 87:2,12

**met** 20:14 35:11 74:15

**Metlife** 95:2

**Meyer** 6:3,4 7:3 15:11 19:13 24:15 28:18 66:21 67:5 78:12 79:17 81:16 82:5 85:18

**Meyer's** 10:18 78:16 79:1 83:24 84:4

**Meyers** 79:11

**Meyers'** 78:24

**Michael** 22:14 55:11 56:2 64:4 85:8

**Mike** 20:13,14,15 33:4,5 35:22 37:10, 11 67:18 88:5,10 89:12,13,24 90:2 91:13,16,17,19 94:9, 11

**Mill** 21:7,9,10 22:9, 12,16,18,19,21 23:2, 3,19,22 25:10,17,21 26:3 32:2,5,7 33:8 47:9,12,14 75:20,22, 24 76:1,2 90:15,16, 19,24 93:4

**million** 69:3,7 70:14

**million-and-a-half-dollar** 19:7

**mindful** 53:21

**mine** 37:16 38:3

**minutes** 60:9

**mischaracterize** 43:4

**misinformed** 28:4

**misleading** 12:23

**misstated** 79:13

**mistaken** 86:2

**misunderstanding** 11:10

**Molly** 39:4 40:1,11,21 50:24 88:6,8

**Molly's** 41:2

**moment** 86:11

**money** 22:3 23:4 83:4 85:9,10 90:18 94:4

**months** 66:14 94:20, 23

**morning** 5:25 12:6 18:6

**motion** 7:5 42:17 43:2 51:19 81:16 85:20

**moved** 17:16

**moving** 54:15

**multiple** 90:7

**N**

**named** 14:23 25:4 72:14

**names** 24:9 91:1

**nature** 6:4

**negotiated** 90:20

**network** 83:7

**Nevada** 41:16

**night** 18:5

**non-attorney** 53:24

**normal** 72:6 95:21

**notice** 5:1 6:13 55:11 56:2 78:3

**Nova** 21:7,22,24,25 22:4,5,6 31:21 32:16 47:3,5 60:17 77:10

**November** 21:4

**number** 25:13 36:11 43:14 50:1,6 54:7 56:13 61:6 63:13

**misstated** 79:13

**64:15,19 68:10 69:5 91:14

**numbers** 39:11

**O**

**Oak** 22:23 31:21 58:3

**oath** 5:7,16

**object** 10:9,22 89:3,5

**objected** 90:22

**objection** 9:18 25:25 35:21 45:24 90:10

**objections** 13:6 43:19

**obtain** 69:6 71:24

**October** 85:11,13

**offer** 13:6

**office** 7:18 11:25 16:21 19:22,24 37:6, 8 87:22 90:4

**Oklahoma** 41:7,8, 10,23

**open** 16:21,23 92:8, 10,22

**opened** 89:16 92:9

**opening** 17:1

**operating** 11:10 39:15,20 40:2,9,12, 13,15,22,24

**opine** 83:20

**opportunity** 54:16

**opposite** 94:2

**order** 6:3,4,6 7:2 21:3 25:19 29:4 34:7 39:1 41:22 42:2 43:13 44:13 45:8 48:3 55:8, 12,18,25 56:1 59:3,4 65:3,16,20 66:20 79:1 81:4,16 83:9,11 84:4 85:18,19 92:19

**ordered** 78:13 82:1, 5,18

**orders** 78:16,24 81:1,18,20 83:20,21,

22,23 85:24 91:19

**organization** 23:7

**original** 19:20,21 95:7

**originally** 17:7,10

**outboxes** 17:20

**outstanding** 67:18 89:18

**overlap** 90:9

**overly** 16:2 89:19

**owned** 41:10

**owner** 65:7 69:9,10, 11 70:3 72:8,12

**owners** 65:1,6,12

**ownership** 52:24 64:16 66:4 70:8,14 71:11

**owns** 52:4

———————

**P**

**p.m.** 73:6,8

**paid** 64:7 69:20 78:6, 10 83:22

**PAIGE** 40:18,20

**papers** 65:13

**paragraph** 59:16

**Parrott** 20:10 89:13 94:11

**part** 15:1 16:12 19:11 22:2 35:19 79:23,24, 25 80:1 88:24 92:4 93:21

**participate** 67:8

**parties** 5:3 9:6 10:23, 25 14:21 55:24 74:16 83:18 87:25 90:7,9

**partner** 88:3

**Partners** 33:8 76:9 90:15

**party** 9:4 11:6 14:7 67:4

**Pass** 95:8

**past** 47:19,20 75:4

**pat** 27:23 36:9

**patience** 12:11

**Paula** 32:6 57:1,4

**pay** 56:22 69:13,15 78:13 79:21 80:20,22 82:1,5,18,20 84:7,15, 20

**payable** 57:21 60:23

**paying** 56:17 57:3 78:9 82:10 85:2

**payment** 56:15 58:3 63:22,23 79:10 80:16

**payments** 58:22,25 59:5,7,20,21 61:3 63:15,17,19 64:2,4 66:3 80:17 86:4

**pays** 56:19

**Peacock** 24:11

**pension** 75:4

**people** 13:17 14:7 15:6 24:10 37:19,22, 25 38:5 62:20 74:10 76:13 89:15 93:24 94:6,13

**people's** 58:10,20 60:22 61:7 66:17 74:6,8,18,21,24 75:8 76:3 94:17,18,25

**People's** 73:19

**period** 19:3 30:11 42:5 48:2 49:1 75:12 78:14

**periodically** 86:17

**person** 35:23 38:1,4 75:13 84:23 89:14 92:13,15

**personal** 7:24 8:6 66:12 72:2 95:5,6

**personally** 66:24 80:3 93:14

**phase** 32:8

**Phoenix** 21:11 48:6

76:5,7

**phone** 13:7 20:15 67:4

**photocopy** 76:24

**pick** 35:16

**picked** 40:23

**pierce** 41:13

**plan** 11:15 21:8 30:2 47:10 75:4

**planners** 52:2

**planning** 69:24 71:21

**Platform** 5:2,6

**playing** 12:7 13:16

**point** 17:16 33:18 42:3 63:4 82:6,25 88:12

**policies** 22:22 32:3 68:25 69:7,13,18,19 70:2,12,14 71:12,19, 24 72:2,4 95:3,6

**policy** 69:17 70:3,4 71:14,17 72:12,13

**popular** 75:25

**pornography** 92:12, 14,16

**portion** 33:21

**position** 38:18 60:20

**positions** 53:24

**possess** 86:23

**possession** 19:2 20:24 27:9 28:13,20 49:14 77:17,20 86:8

**post-judgment** 84:2

**potential** 34:15

**potentially** 33:22 46:9 90:8

**practice** 72:6

**precisely** 83:8

**premium** 69:20

**premiums** 69:20

**preparation** 7:11

**prepare** 44:6,11 45:7 47:22

**prescribed** 6:4

**present** 8:10,23 51:5 62:11 71:13

**pressure** 93:9

**pretty** 74:22 81:4,23 83:23

**previously** 7:22

**primary** 18:7

**Prime** 64:11

**principal** 31:20 69:23

**principle** 27:25

**prior** 42:7 62:12 63:16

**prison** 37:20

**privacy** 51:18

**privilege** 34:5 35:5 54:4 79:5 91:5

**privileged** 33:23 35:6,8 79:8 92:24 93:8,10

**privy** 67:16,19 90:12 92:25 93:1

**problem** 17:1 38:23 82:14,17 86:9

**proceedings** 5:10

**proceeds** 69:25

**process** 22:24

**produce** 9:16 10:11, 25 11:13,15 14:8,24 15:4,18,19 17:23 27:19,25 28:9,12,21, 24 35:18 36:25 51:4 64:18 66:2

**produced** 9:10,12, 14,20 10:2,5,6,8,16, 23 11:20,21 12:14 15:2,24 16:6,16 28:6, 10,14,17 32:9 36:2, 11,13,16,19,21 39:22 42:5 43:3 59:23 91:9,

23 92:3,4

**Product** 79:6

**production** 10:1,13, 14 14:18,25 15:4 16:1 35:19 36:7,10 90:3,6

**professional** 13:11

**proper** 13:6

**properly** 16:25 42:7

**property** 30:17 31:1 54:9 55:2,3,14,16,17 56:9,10,13 68:12,13

**proud** 62:24 94:8,10

**provide** 11:15

**provided** 11:25 15:6 93:19

**proving** 92:22

**public** 33:20

**purchase** 55:2 64:10

**purchased** 54:9

**purposes** 87:24

**pursuant** 5:1,2,6 6:3 9:10 36:8 82:19

**put** 6:5 43:1 44:24 51:18 73:21 88:10 93:1,8

**puts** 84:3

**putting** 35:23 39:7 54:17

———————

**Q**

**question** 7:7 11:4,12 12:1,5 13:12 14:1,14, 16 16:4 23:13,15,18, 20 25:19 27:17,21 28:5 29:22 32:11,12 34:8,13,17 35:5,7 36:15 42:1,11,13,15 43:12,23 44:17,18 45:20 52:18 55:21 58:21 60:6 61:21 69:14 70:23 71:4,7,9, 10 72:21 78:16,23,25 79:9,13,16 80:7,8,10, 12,21 81:10 82:11,15

84:9,24 85:9 91:7

**questioning** 8:20
95:12

**questions** 7:9 24:15,
18,20 25:1 29:23
34:4 43:15,20 48:2
54:5 57:9 60:4 74:1
83:12,13 84:3 86:15
87:20

**quicker** 29:24

**quickly** 73:2

**quiet** 13:5

**quit** 61:13

---

**R**

**raids** 93:5,6

**raise** 5:14

**read** 21:20 34:19,21
42:16 45:17,18 46:6,
8 54:16,18 68:17
84:10,12 85:8,16

**reading** 51:10

**ready** 60:1 74:1

**real** 76:24

**reason** 18:14 32:5
89:3 92:6

**reasons** 69:24 77:7

**recall** 14:14 31:15
32:19 40:5,7 47:25
48:24 53:10 54:12
65:21 69:4 74:17,20
76:3

**receipt** 54:8

**receive** 52:1 76:19

**received** 91:24

**receives** 72:3,13

**receiving** 75:17

**recess** 60:12 73:5

**recognize** 41:17
74:16 77:25

**recollection** 81:11
85:18

**Reconsideration**
85:20

**record** 5:12 9:23
14:13 27:7 33:20
34:21 44:21,22
60:10,11,15 73:4,7
84:12 86:16 87:24
95:18,19

**records** 30:21 94:19

**recovery** 71:6

**referring** 21:19
55:10 88:4

**reflect** 79:21 84:7,14,
19

**reflected** 63:20 70:9

**refund** 49:22,25

**refused** 15:12

**reimbursement**
63:22

**reincorporated**
41:11

**relate** 60:22

**related** 26:22 51:12,
13 61:17 69:1

**relating** 64:16 68:11

**relationship** 83:17

**relevant** 27:9,13,20,
23 28:1,15 42:5,25
61:18

**relief** 62:24

**rely** 46:5

**remember** 19:5
34:17 40:6 41:4
61:14 64:6,20 74:11,
14 75:10,16,17 76:6,
8,11 91:12

**reminding** 34:14

**Remote** 5:2,6

**remotely** 5:3,7

**renew** 35:4

**renewing** 45:23

**repeat** 14:16 29:3
52:18 72:21

**rephrase** 9:24 32:10
34:13

**report** 64:1

**reporter** 5:12,17,19
14:10 34:21 60:14
73:4,7 84:12 95:19,
22

**repositories** 54:20

**represent** 33:7 61:13
90:15

**represented** 7:15
32:13 33:10 34:6
61:11,23 62:12
88:15,19

**representing** 7:20,
23 8:6,22,24 94:14

**represents** 87:25
88:15

**request** 6:19 11:5
37:7 41:2 54:7,21
63:13 64:15 66:3,7
68:10,21

**requested** 10:24
15:7 33:16 34:15,25
49:9 54:3 88:23
94:18

**requests** 6:16 16:9
18:25 36:23 72:1
83:14 90:7

**resigned** 17:11
48:17

**respect** 19:18 26:11
31:23 40:8 61:16
65:19 67:22 86:4

**respond** 14:3 32:21
71:25

**responding** 11:6

**response** 5:18 6:16
10:17 11:4,20 12:14
14:8,19,24 15:5,22
16:7 35:20 36:14
66:2 80:19

**responses** 6:15,19

**responsible** 35:23
36:18,20 82:10

**responsive** 17:20,24
18:13,17,22 19:1
20:3,17 27:9 28:15
30:21 32:25 34:8
36:25 42:5 49:13
58:19 59:11 62:9,16
83:16 86:7 87:1,5,14,
16,18,21 88:25 91:10
93:21

**rest** 22:9 30:13 73:13

**restatement** 80:11

**restitution** 49:23

**restraining** 55:12,18
56:1 78:3

**retainer** 56:25 57:5

**return** 49:16,17,20
51:2,8,11

**returns** 44:6,7,11
45:7 47:19,22 48:24
49:4,5,6,8 51:5,14
63:20 95:6

**review** 7:12 9:15
16:15 32:23 36:23
74:1

**Richard** 61:19

**Road** 90:16,19,24
93:4

**Robinson** 22:17
23:1 53:7,12,14,22
54:6

**Ron** 49:12 89:10,11
90:4

**Ross** 38:14

**Rossi** 38:14,15,17
39:1 40:1,5 58:17,20

**Roth** 75:1

**Rule** 79:3

**ruled** 23:5 41:23
80:23

**ruling** 7:4 10:18,19
12:6 41:25 79:18
80:9

**rulings** 71:3

**run** 75:25 91:15

**runs** 40:21

---

**S**

**S-I-A-N-O** 57:21

**S-I-M-O-N-E** 43:25

**Sage** 15:9,17 20:10,
11,13 22:16 87:22,25
88:3,15,22 89:15
90:4 94:12,13

**sale** 54:9 55:2,16

**sanctions** 7:5 79:12

**Sandberg** 7:16,19
8:5,8,14,19,25 9:1,
17,18 10:17,22
11:22,23 12:4,9,17,
20,22 13:2,3,8,11,16,
18,20,23 14:3,19,25
15:3,4 16:16 24:24
25:3,6,9,12,16 26:1
27:14,17 29:2 32:21
33:18 34:1,9 35:4,21
36:1,17,19,21 39:5,9,
14,17 41:19,22 42:3,
9,13,18,21 43:11,16,
21 44:14,19 45:4,10,
15,23 46:4,16,19,23
47:24 48:1 50:4,8,10,
14,17 52:6,12,17
53:21,25 54:14 57:8,
13,16 59:25 60:5,10
63:1,7,11 67:6,19
68:1,7 70:17 71:1
72:17 73:3,12,22
77:21,24 78:15,22
79:4 80:6,25 81:8,14
82:4,15,22 83:10
85:17,23 86:14,22
88:10 89:25 95:8,20,
24

**Sandberg's** 47:1
67:14

**Sash** 31:24 85:5,9
90:18

**satisfied** 16:1

**satisfy** 54:21 70:24
79:1 83:6 84:8,16

**scary** 38:23

**Scheindlin** 23:5
85:10,12

**Scheindlin's** 85:14

**scope** 25:19 41:20, 25 42:1,8 43:13 57:9 78:17,23 80:9 81:5 82:23 83:1,8,18 84:3

**screen** 29:6 39:8 44:25 45:5,11,16 46:5,8,11 50:18 54:16 57:19 61:5 68:15 73:21 74:5

**screen's** 54:14

**screened** 91:5

**scrolling** 45:16

**SDM** 39:19 40:1,8,13, 16,17 41:8,9,10,11

**SDM's** 39:15

**seance** 27:5

**search** 17:19 18:12, 16,19 19:3,17 20:6,8, 10 30:20 32:24 54:20 61:16 87:4,13 89:11, 17 91:24 93:4,20,23

**searched** 37:7,8 42:6 86:6,25

**searching** 28:19 89:18

**secretary** 52:22

**secure** 69:16

**secured** 32:3

**Security** 51:21 52:1

**seek** 13:13 35:5,7

**segregate** 90:8

**seize** 16:11

**seized** 49:22,25

**send** 16:20,22 67:7 68:8 85:14 92:9 95:24

**sending** 22:14 40:5 91:6 92:22

**senior** 88:3

**Sentencing** 62:23

**separate** 51:2

**separately** 49:24 50:1

**September** 10:7,8 15:23,24 16:5,9,16 28:9,10 32:22 42:23 43:3 64:20 89:22

**series** 10:23 44:14, 23 57:12

**serve** 24:10

**served** 22:18,23

**server** 15:8,9 17:14, 15,18 20:9,11 37:12

**service** 22:23

**Services** 29:15,16 30:2,5 31:17

**set** 17:12 37:4 40:12, 22 53:2,3,4,7 62:19 66:13 89:13 92:18

**setting** 40:16

**shortly** 13:7 19:6

**show** 26:2 28:16,19 39:2 50:2

**showing** 64:21 89:23

**shown** 42:9

**shows** 9:23 28:12

**Siano** 57:21,25 58:23 59:21 60:24 61:12,15

**side** 95:12

**Sidley** 62:4

**signatory** 31:13

**signature** 57:22 61:7

**signed** 31:12 60:23

**similar** 74:12 76:19

**Simione** 47:2 48:15 49:6 89:16

**Simone** 43:24

**sir** 7:10 21:14 54:19 68:19 86:20

**sit** 92:2 93:18

**situation** 66:21

**Sklarz** 33:4,6,7 90:13,14 91:3 92:23

**slight** 11:10

**slush** 19:7,9,11,16, 18 37:3,5,9 92:18,19

**small** 14:25 19:23 20:4 46:6 74:22

**smart** 41:14 52:2

**Social** 51:21 52:1

**sole** 36:4

**solely** 8:21

**Solicitor** 57:3

**sort** 95:13

**soul** 37:24

**sound** 24:21

**source** 16:6 78:9,25 79:10,21 80:2,15,24 84:25

**speak** 34:10 78:24

**special** 75:19,23

**specific** 28:5 44:16 71:2 79:11 82:5 95:3

**specifically** 94:18

**specifics** 92:3

**Spector** 15:11 19:14 30:24 77:18

**Spencer** 31:24 85:9 90:18

**Spencer's** 85:5

**spending** 24:17

**spoke** 35:12

**spoken** 86:17

**sponsors** 21:9

**spouse** 50:25

**spurious** 43:19

**staff** 19:10,19

**stamp** 58:23,24

**stamped** 39:24

**stand** 17:5 36:9

**standard** 69:21 72:3, 5 78:3

**standing** 18:25 20:22 27:7,23 28:14, 24 42:7

**stands** 17:6

**start** 25:12 33:16 34:25 45:22 66:10

**started** 12:6 37:11

**starts** 21:6

**state** 60:19 65:10,14, 20

**stated** 42:10 54:22

**statement** 18:25 20:23 27:8 28:14,24, 25 42:14

**statements** 58:13,16 60:22 66:10 87:9

**states** 57:4 65:14,16 83:12

**stating** 27:7

**status** 26:16

**steal** 94:4

**stealing** 49:15

**stenographer** 5:5,8

**stenographic** 14:12

**Step** 62:24

**Stipulation** 5:3,7

**stole** 15:12 83:5 94:4

**stolen** 31:23 32:4

**stop** 11:2 12:2,6 13:16 43:19,22 44:20 78:19

**storage** 19:25

**story** 49:15

**strange** 95:15

**strategy** 79:6

**strict** 91:19

**strike** 13:1

**structure** 40:13,24 64:16 66:4

**stuff** 80:11

**subject** 6:11 10:18 39:19 48:3 54:4 71:2, 6 73:18 74:7 90:6,16, 25 91:2

**submitted** 16:5 19:8 49:12

**subpoena** 6:10,12, 14,16 9:10 10:17 11:4,7,21 12:14 14:3, 8,20,23,24 15:5,22 16:2,7 17:21 18:13, 17,22,24 19:1,20,22 20:17 21:1,3 26:22 27:6,9 29:5 30:22 32:21,24 33:16 34:8, 25 35:20 36:8,14,24, 25 41:6 42:6 43:1 44:13,15 45:9 49:9, 13 51:8 54:8,11 58:20,22 59:5,8,12, 15 60:18 61:17 62:9, 16 63:13 64:14 65:2 71:3,25 77:4,22 80:19 83:15,17,19 86:7 87:14 88:25 89:18 93:21 95:7

**subpoenaed** 66:18

**subpoenas** 66:20 67:12,20 68:3

**substantial** 69:19

**sue** 24:10

**sued** 22:18 24:16 56:24

**suggest** 12:2 33:25

**suggested** 35:13 67:6 88:9

**suggesting** 11:2

**suggestion** 24:24 67:14

**suggestions** 12:10

**supplementing** 10:14

**supports** 42:10

**suppose** 63:21

**supposed** 24:14,17 28:23 78:17

**supposedly** 28:20

**Supreme** 51:20 57:6 81:19

**suspect** 78:24

**Swain** 21:3 22:15 55:10,11 59:3 90:17, 20,24

**Swain's** 29:4 34:7 44:13 45:8 55:8 65:3, 20 78:3

**swear** 5:15

**sworn** 5:21

**system** 92:8

**T**

**table** 60:6

**takes** 64:3,5 84:3

**taking** 5:2 7:8 79:18

**talk** 19:8 25:22 26:2,7 34:2 38:25 56:7,8,15 72:1 88:9 93:3

**talked** 88:8

**talking** 11:3,14 19:16 21:16 23:17 26:3 36:7 42:20 44:20 72:17 91:13

**tax** 44:6,7,11 45:7 47:19,22 48:24 49:3, 5,6,8,17,19 50:2 51:5,8,11,13 63:20 95:6

**taxable** 69:25

**Taxes** 50:13,15

**taxpayer** 50:24

**TD** 23:6 67:10

**technical** 14:12

**technically** 82:8

**telling** 34:10 40:8 55:6

**ten** 95:22

**terms** 6:6 90:3 91:24 93:4,20

**Terrell** 74:2,15 76:12 77:1,16

**Terrell's** 75:14

**testified** 5:22 7:22 14:2 64:25

**testifying** 72:20

**testimony** 5:4 12:23 13:13 18:21 20:18 27:15 42:7 46:12,13, 21 48:1,14,16 54:3 63:16 66:1 71:23

**them's** 49:1

**thereof** 21:9

**thing** 11:9 20:1 21:5 32:6 65:9 92:11

**things** 17:11 22:14 38:19 48:17 49:14 64:22 86:16,18

**Thomas** 24:12

**thought** 27:13,18 71:1

**thousands** 10:6 15:25

**threatened** 57:1

**threatening** 56:25

**time** 5:13 6:5,9 14:6, 20 17:16 18:3 19:3, 10 34:1 45:16 47:22 48:2 49:19,21,24 51:6 55:18 56:23 64:1,7 66:15 70:12, 18,20,22 71:2,12 75:12 78:14 82:22 95:21

**time-barred** 85:13

**timely** 89:4

**times** 32:9 65:11 87:15

**title** 38:18

**titled** 39:5,15 50:15 57:13 73:13

**today** 6:2 7:9,11,15, 24 8:6,10,17,20,21, 25 9:10 10:14 42:2 57:10 62:12,16 70:19 78:18,23 80:9 82:23 83:24 93:18

**today's** 27:10,12 43:17 83:1

**told** 9:11 83:24 94:12

**tomorrow** 23:1

**Tony** 58:23 59:20 61:12,15

**tool** 71:21

**top** 73:16

**topics** 57:9 79:8

**totally** 22:15 25:24 82:21 92:20

**touch** 15:14 33:3 35:13

**track** 39:10

**transcribed** 5:4

**transcript** 6:21 95:25

**transfer** 41:8,18 54:9 55:2,3,7,13,15,17 56:9,12

**transferred** 55:23

**Trudeau** 33:12 75:15 76:11 88:6,19

**true** 14:5 82:20

**trust** 7:20 21:8,9,12 22:23 30:5 31:21 47:9 48:8 69:11,12, 15,21,22 71:19,20 72:15,16,17,19,20,23 75:20,22,24 76:1

**trustee** 7:21 36:4 69:23 75:24

**trustees** 21:8

**trusts** 7:22 36:3,8 64:21 67:2

**turn** 88:23 93:9,14

**Turner** 32:14

**twisting** 28:3

**type** 19:24

**typing** 37:16,21,24 38:5

**U**

**ultimately** 79:11

**unaware** 82:18

**unbeknownst** 17:16

**Uncle** 88:5

**Underhill** 16:14

**understand** 27:21, 24 36:9 55:21 66:21 69:14 78:12,21 80:7 84:9

**understanding** 7:14 9:23 20:21 28:8 35:22 53:22 67:9 80:10 88:21 91:9

**undertake** 68:20

**undertook** 83:14

**unduly** 16:2 89:19

**United** 57:4 58:10,20 60:22 61:7 73:19 74:8,18,21,24 75:8 94:17,19

**universe** 56:6,7

**Universitas** 6:1 10:25 31:22,23 35:19 56:23 58:7 66:20 67:11 77:9 78:14 83:5 85:12 91:6 92:25 93:20 94:6

**Universitas'** 82:3

**Universitas's** 82:10 91:25

**unlawfully** 49:25

**unmute** 89:5

**upset** 37:2 90:15 91:4 92:11,18 93:7

**USBGI** 17:5 18:16 19:4 20:6 54:25

**usbgi.com** 18:3 42:4

**V**

**view** 28:2

**violate** 92:19

**volunteered** 53:9,11

**volunteering** 54:1

**W**

**wait** 52:2

**waiting** 28:11,22

**wanted** 19:14 54:4 59:19 60:19,21 62:20 91:4 94:7 95:16

**Watkins** 56:24 57:2

**Wayne** 22:17,25 27:3,5

**website** 54:25 65:11

**week** 11:12

**Welfare** 21:8 47:9

**Westcott** 19:6,9,16 37:3,5 92:20

**Westcott's** 19:12 37:8

**wife** 15:14 19:10,19 20:7 33:12 37:4,10 38:24 49:17 56:18,19 57:2 64:3,5 66:13 69:23 72:14 78:8 80:17 84:23,25 85:1 86:8 88:16,19 90:1 91:14,17 92:18 94:9

**wife's** 49:22,25 64:10,11

**Williams** 6:8 7:16 8:5 9:7,8 11:8 95:9,11

**witness's** 27:14 46:6,21

**women** 37:6

**word** 20:22 51:7 81:9,11

**words** 27:22 28:4 52:21 88:2

**work** 29:21 37:6,15 38:6,9 41:1 62:21,25 79:6

**worked** 20:9 88:22 94:11

**working** 20:13
35:15,25 36:16 61:10
67:18 91:16 94:9,10

**works** 38:15,17
95:23

**worried** 93:24

**wrap** 73:1

**written** 58:19

**wrong** 12:8 25:24
26:2 70:20 84:1

**wrote** 85:9

**Wyoming** 41:16

---

Y

---

**year** 50:22 51:1

**years** 37:17 44:10
47:19,20,21 50:1
94:15

**yesterday** 9:8

# EXHIBIT 3

From: Casey, Dona <Dona.Casey@peoples.com>
To: DCarpenter US Benefits </O=BENISTAR/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=DCUS>
Subject: accounts & balances: People's United Bank
Date: 2010-07-30 15:01:35

Avon Capital Payroll: ▇▇▇23287: $3,935.05
Avon Capital, LLC ▇▇▇▇3288: $429,112.79
Benefit Concepts, Inc: ▇▇▇3288: $25.00
Benistar Group, Ltd: 6▇▇▇3289: $227,648.24
CFG Roth 401(k): ▇▇▇3290: $25.00
GMT Special Account: ▇▇▇3291: $595,025.00
Grist Mill Capital, LLC: ▇▇▇3292: $23,205.45
Phoenix Alliance Investment Group ▇▇▇3293: $25.38
Phoenix Capital Management Group: ▇▇▇3007: $354,450.00
Clermont Capital Partners LLC: ▇▇▇3016: $50,050.00



The security, delivery, and timeliness of delivery of electronic mail sent over the Internet is not guaranteed. Most electronic mail is not secured. Do not send us confidential information like social security numbers, account numbers, or driver's license numbers by electronic mail.

The information transmitted is intended solely for the individual or entity to which it is addressed and may contain confidential, proprietary, and/or privileged material. Any review, re-transmission, dissemination, or other use of or taking action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you have received this e-mail in error, please contact the sender and delete the material from the computer.

File    C  Documents   and   Settings Carole   Bernstein Desktop Grist Mill Grist   Mill   Capital   search Casey   Dona   [Dona Casey@peoples.com]   accounts   &   bala  30-07-2010   15 1 176291 msg

JLM019488

# EXHIBIT 4

BENISTAR GROUP, LTD                                                                        10246

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | CHARTER OAK LITIGATION | | | | 25,215.01 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 4/15/13 | 10246 | ANTHONY J. SIANO, ESQ. | | $25,215.01 |

---

**BENISTAR GROUP, LTD**                                                                    10246
GRIST MILL PLAZA
100 GRIST MILL ROAD                          PEOPLE'S UNITED BANK                    DATE
SIMSBURY, CT 06070                           51-7218-2211                           Apr 15, 2013
(860) 485-7000
                                                                          AMOUNT

Twenty-Five Thousand Two Hundred Fifteen and 01/100 Dollars                    $ ***********$25,215.01

PAY
TO THE
ORDER
OF:
         ANTHONY J. SIANO, ESQ.
         333 WESTCHESTER AVE
         SUITE 300                                              _David E Carpenter_
         WHITE PLAINS, NY 10604                                 AUTHORIZED SIGNATURE

⑈010246⑈ ⑉ ▇ 2186⑈ ▇ 23289⑈

---

BENISTAR GROUP, LTD                                                                        10246

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | CHARTER OAK LITIGATION | | | | 25,215.01 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 4/15/13 | 10246 | ANTHONY J. SIANO, ESQ. | | $25,215.01 |

DELUXE CORP 1-800-328-0304 www.deluxeforms.com
                                        20
                                        DEC10

JLM032399

DEC10
21

BENISTAR GROUP, LTD                                                    10265

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | FOR THE PERIOD APRIL 5, 2013 | | | | 18,983.50 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 5/9/13 | 10265 | ANTHONY J. SIANO, ESQ. | | $18,983.50 |

---

**BENISTAR GROUP, LTD**                                               10265
GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070
(860) 408-7000

PEOPLE'S UNITED BANK
51-7218-2211

DATE
May 9, 2013

AMOUNT

Eighteen Thousand Nine Hundred Eighty-Three and 50/100 Dollars                $ **********$18,983.50

PAY
TO THE
ORDER
OF:
ANTHONY J. SIANO, ESQ.
333 WESTCHESTER AVE
SUITE 300
WHITE PLAINS, NY 10604

AUTHORIZED SIGNATURE

⑈0⑈0265⑈ ⑆ 2486⑆ 3289⑈

---

BENISTAR GROUP, LTD                                                    10265
                                                                      10265

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | FOR THE PERIOD APRIL 5, 2013 | | | | 18,983.50 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 5/9/13 | 10265 | ANTHONY J. SIANO, ESQ. | | $18,983.50 |

DELUXE CORP 1+800-328-0304 www.deluxeforms.com

ENISTAR GROUP, LTD

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | FOR THE PERIOD OF MAY 4, 2013 | | | | 22,289.22 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 5/21/13 | 10276 | ANTHONY J. SIANO, ESQ. | | $22,289.22 |

---

**BENISTAR GROUP, LTD**
GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070
(860) 408-7000

PEOPLE'S UNITED BANK
51-7218/2211

**10276**

DATE
May 21, 2013

AMOUNT

$ ·················$22,289.22

Twenty-Two Thousand Two Hundred Eighty-Nine and 22/100 Dollars

PAY
TO THE
ORDER
OF

ANTHONY J. SIANO, ESQ.
333 WESTCHESTER AVE
SUITE 300
WHITE PLAINS, NY 10604

AUTHORIZED SIGNATURE

⑈010276⑈ ⑆ ⑆2⑆85⑈ ⑆289⑈

---

BENISTAR GROUP, LTD

10276

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | FOR THE PERIOD OF MAY 4, 2013 | | | | 22,289.22 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 5/21/13 | 10276 | ANTHONY J. SIANO, ESQ. | | $22,289.22 |

DELUXE CORP 1-800-328-0304 www.deluxeforms.com

BENISTAR GROUP, LTD                                                    10336

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | FOR THE PERIOD MAY 21, 2013 | | | | 25,050.50 |

| CHECK DATE | CHECK NO | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 7/22/13 | 10336 | ANTHONY J. SIANO, ESQ. | | $25,050.50 |

BENISTAR GROUP, LTD                                                    10336
GRIST MILL PLAZA
100 GRIST MILL ROAD                          PEOPLE'S UNITED BANK
SIMSBURY, CT 06070                               51-7218-2211                    DATE
(860) 408-7000                                                           Jul 22, 2013

                                                                          AMOUNT

Twenty-Five Thousand Fifty and 50/100 Dollars                    $    ***********$25,050.50

PAY
TO THE
ORDER
OF:
        ANTHONY J. SIANO, ESQ.
        333 WESTCHESTER AVE
        SUITE 300
        WHITE PLAINS, NY  10604                      _David E Carpenter_
                                                      AUTHORIZED SIGNATURE

        ⑈010336⑈ ⑆         2185⑈            3289⑈

BENISTAR GROUP, LTD                                                    10336

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | FOR THE PERIOD MAY 21, 2013 | | | | 25,050.50 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 7/22/13 | 10336 | ANTHONY J. SIANO, ESQ. | | $25,050.50 |

DELUXE CORP  1-800-328-0304  www.deluxeforms.com

23
DEC10

JLM032402

BENISTAR GROUP, LTD                                          10360

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| 7/1/13-8/12/13 | | 8/14/13 | 16,905.50 | | 16,905.50 |

| CHECK DATE | CHECK NO. | PAYEE | | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|---|
| 8/22/13 | 10360 | ANTHONY J. SIANO, ESQ. | | | $16,905.50 |

---

BENISTAR GROUP, LTD                                          10360
GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070
(860) 408-7000

PEOPLE'S UNITED BANK
51-7218-2211

DATE
Aug 22, 2013

AMOUNT
$ ***********$16,905.50

Sixteen Thousand Nine Hundred Five and 50/100 Dollars

PAY
TO THE
ORDER
OF:

ANTHONY J. SIANO, ESQ.
333 WESTCHESTER AVE
SUITE 300
WHITE PLAINS, NY 10604

AUTHORIZED SIGNATURE

⑈010360⑈ ⑈ ᝪ86⑈ ᝪ269⑈

---

BENISTAR GROUP, LTD                                          10360

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| 7/1/13-8/12/13 | | 8/14/13 | 16,905.50 | | 16,905.50 |

| CHECK DATE | CHECK NO. | PAYEE | | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|---|
| 8/22/13 | 10360 | ANTHONY J. SIANO, ESQ. | | | $16,905.50 |

DELUXE CORP 1-800-328-0304 www.deluxeforms.com
24
DEC10

JLM032403

BENISTAR GROUP, LTD.                                                          10401

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| 08/13/13-09/17 | | 9/20/13 | 16,566.10 | | 16,566.10 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 9/26/13 | 10401 | ANTHONY J. SIANO, ESQ. | | $16,566.10 |

---

**BENISTAR GROUP, LTD.**                                                      10401
GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070
(860) 408-7000

PEOPLE'S UNITED BANK
51-7218-2211

DATE
Sep 26, 2013

AMOUNT

Sixteen Thousand Five Hundred Sixty-Six and 10/100 Dollars          $ ************$16,566.10

PAY
TO THE
ORDER
OF:

ANTHONY J. SIANO, ESQ.
333 WESTCHESTER AVE
SUITE 300
WHITE PLAINS, NY 10604

*David E Carpenter*
AUTHORIZED SIGNATURE

⑆010401⑈ ⑆ ▇ 218⑇ ▇ 3289⑈

---

BENISTAR GROUP, LTD.                                                          10401

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| 08/13/13-09/17 | | 9/20/13 | 16,566.10 | | 16,566.10 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 9/26/13 | 10401 | ANTHONY J. SIANO, ESQ. | | $16,566.10 |

DELUXE CORP 1-800-328-0304 www.deluxeforms.com

BENISTAR GROUP, LTD                                                      10414

| REFERENCE NO | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | FOR THE PERIOD 9/30/13 - 10/14/13 | | | | 14,182.50 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 10/23/13 | 10414 | ANTHONY J. SIANO, ESQ. | | $14,182.50 |

---

**BENISTAR GROUP, LTD**                                                 10414
GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070
(860) 408-7000

PEOPLE'S UNITED BANK
51-7218-2211

DATE
Oct 23, 2013

AMOUNT

Fourteen Thousand One Hundred Eighty-Two and 50/100 Dollars          $ *************$14,182.50

PAY
TO THE
ORDER
OF:

ANTHONY J. SIANO, ESQ.
333 WESTCHESTER AVE
SUITE 300
WHITE PLAINS, NY 10604

_David E. Carpenter_
AUTHORIZED SIGNATURE

⑆010414⑆ ⑈ ████ 2185⑈ ████ 1289⑈

---

BENISTAR GROUP, LTD                                                     10414

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | FOR THE PERIOD 9/30/13 - 10/14/13 | | | | 14,182.50 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 10/23/13 | 10414 | ANTHONY J. SIANO, ESQ. | | $14,182.50 |

Tolkins corp 1-800-328-0304 www.tuf-usforms.com

26
DEC10

JLM032405

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
|  | CHARTER OAK LITIGATION |  |  |  | 15,000.00 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 1/16/13 | 10187 | CAROLE R. BERNSTEIN, ESQ. |  | $15,000.00 |

**BENISTAR GROUP, LTD**                                                                             10187
GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070
(860) 408-7000

PEOPLE'S UNITED BANK
51-7218-2211

DATE
Jan 16, 2013

AMOUNT

Fifteen Thousand and 00/100 Dollars                          $ ··············$15,000.00

PAY
TO THE
ORDER
OF:

CAROLE R. BERNSTEIN, ESQ.
41 MAPLE AVENUE NORTH
WESTPORT, CT  06880

*David E. Carpenter*
AUTHORIZED SIGNATURE

⑈010187⑈ ⑆▉▉▉2186⑆ ▉▉▉3289⑈

BENISTAR GROUP, LTD                                                                                    10187

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
|  | CHARTER OAK LITIGATION |  |  |  | 15,000.00 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 1/16/13 | 10187 | CAROLE R. BERNSTEIN, ESQ. |  | $15,000.00 |

DELUXE CORP · 1•800-328-0304  www.deluxeforms.com

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | RETAINER | | | | 7,500.00 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 3/21/13 | 10228 | CAROLE R. BERNSTEIN, ESQ. | | $7,500.00 |

---

THIS DOCUMENT CONTAINS MULTIPLE SECURITY FEATURES. SEE REVERSE SIDE FOR DETAILS.

**BENISTAR GROUP, LTD**                    10228

GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070
(860) 408-7000

PEOPLE'S UNITED BANK
51-7218-2211

DATE
Mar 21, 2013

AMOUNT

even Thousand Five Hundred and 00/100 Dollars                    $ ***************$7,500.00

AY
O THE
RDER
F:

CAROLE R. BERNSTEIN, ESQ.
41 MAPLE AVENUE NORTH
WESTPORT, CT 06880

AUTHORIZED SIGNATURE

⑈"0 10 228"⑈ ⑈ ▓▓▓ 2 186⑈: ▓▓▓ 3 289⑈"

---

BENISTAR GROUP, LTD                    10228

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | RETAINER | | | | 7,500.00 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 21/13 | 10228 | CAROLE R. BERNSTEIN, ESQ. | | $7,500.00 |

DELUXE CORP. 1-800-328-0304 www.deluxeforms.com

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | RETAINER FOR GOLDMAN | | | | 3,500.00 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 3/21/13 | 10229 | CAROLE R. BERNSTEIN, ESQ. | | $3,500.00 |

THIS DOCUMENT CONTAINS MULTIPLE SECURITY FEATURES. SEE REVERSE SIDE FOR DETAILS.

**BENISTAR GROUP, LTD** 10229
GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 08070
(860) 408-7000

PEOPLE'S UNITED BANK
51-7218-2211

DATE
Mar 21, 2013

AMOUNT

Three Thousand Five Hundred and 00/100 Dollars          $ ••••••••••••••••$3,500.00

PAY
TO THE
ORDER
OF:

CAROLE R. BERNSTEIN, ESQ.
41 MAPLE AVENUE NORTH
WESTPORT, CT 06880

AUTHORIZED SIGNATURE

�semiⒺ0 10229 ⑆ 2186⑆ 3 289 ⑈

BENISTAR GROUP, LTD 10229

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | RETAINER FOR GOLDMAN | | | | 3,500.00 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 3/21/13 | 10229 | CAROLE R. BERNSTEIN, ESQ. | | $3,500.00 |

DELUXE CORP 1-800-328-0304 www.deluxeforms.com

JLM032148

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | INV#003216 | | | | 8,243.10 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 3/25/13 | 10230 | CAROLE R. BERNSTEIN, ESQ. | | $8,243.10 |

**BENISTAR GROUP, LTD**
GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070
(860) 408-7000

PEOPLE'S UNITED BANK
51-7218-2211

10230

DATE
Mar 25, 2013

AMOUNT

Eight Thousand Two Hundred Forty-Three and 10/100 Dollars

$ ***************$8,243.10

PAY
TO THE
ORDER
OF:

CAROLE R. BERNSTEIN, ESQ.
41 MAPLE AVENUE NORTH
WESTPORT, CT 06880

_Daniel E. Carpenter_
AUTHORIZED SIGNATURE

⑈010230⑈ ⑆ 2186⑆ 3289⑈

ENISTAR GROUP, LTD 10230

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | INV#003216 | | | | 8,243.10 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 3/25/13 | 10230 | CAROLE R. BERNSTEIN, ESQ. | | $8,243.10 |

DELUXE CORP 1-800-328-0304 www.deluxeforms.com

JLM032149

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | CHARTER OAK LITIGATION | | | | 4,000.00 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 3/25/13 | 10231 | CAROLE R. BERNSTEIN, ESQ. | | $4,000.00 |

---

**BENISTAR GROUP, LTD**
GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070
(860) 408-7000

10231

PEOPLE'S UNITED BANK
51-7218-2211

DATE
Mar 25, 2013

AMOUNT

$ ················$4,000.00

Four Thousand and 00/100 Dollars

PAY
TO THE
ORDER
OF:

CAROLE R. BERNSTEIN, ESQ.
41 MAPLE AVENUE NORTH
WESTPORT, CT 06880

_David E Carpenter_
AUTHORIZED SIGNATURE

⑈0 10 2 3 1⑈ ⑆ ▓▓▓ 2 18 6⑆ ▓▓▓ 3 2 8 9⑈

---

ENISTAR GROUP, LTD

10231

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | CHARTER OAK LITIGATION | | | | 4,000.00 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 3/25/13 | 10231 | CAROLE R. BERNSTEIN, ESQ. | | $4,000.00 |

DELUXE CORP. 1+800-328-0304 www.deluxeforms.com

JLM032150

BENISTAR GROUP, LTD                                                    10247

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | UNIVERSITAS/NOVA GROUP | | | | 10,247.15 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 4/16/13 | 10247 | CAROLE R. BERNSTEIN, ESQ. | | $10,247.15 |

---

**BENISTAR GROUP, LTD**                                                 10247
-GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070
(860) 408-7000

PEOPLE'S UNITED BANK
51-7218-2211

DATE
Apr 16, 2013

AMOUNT

Ten Thousand Two Hundred Forty-Seven and 15/100 Dollars

$ **************$10,247.15

PAY
TO THE
ORDER
OF:

CAROLE R. BERNSTEIN, ESQ.
41 MAPLE AVENUE NORTH
WESTPORT, CT 06880

*David E Carpenter*
AUTHORIZED SIGNATURE

INV# 3219

⑅010247⑅ ⑉ 2186⑉ 3289⑅

---

BENISTAR GROUP, LTD                                                    10247

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | UNIVERSITAS/NOVA GROUP | | | | 10,247.15 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 4/16/13 | 10247 | CAROLE R. BERNSTEIN, ESQ. | | $10,247.15 |

DELUXE CORP 1+800-328-0304 www.deluxeforms.com

JLM032151

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | TO REPLENISH GOLDMAN | | | | 10,412.50 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 4/29/13 | 10262 | CAROLE R. BERNSTEIN, ESQ. | | $10,412.50 |

**BENISTAR GROUP, LTD**
GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070
(860) 408-7000

PEOPLE'S UNITED BANK
51-7218-2211

10262

DATE
Apr 29, 2013

AMOUNT

Ten Thousand Four Hundred Twelve and 50/100 Dollars

$ ***************$10,412.50

PAY
TO THE
ORDER
OF:

CAROLE R. BERNSTEIN, ESQ.
41 MAPLE AVENUE NORTH
WESTPORT, CT 06680

AUTHORIZED SIGNATURE

⑈010262⑈ ⑆ ▉2186⑈ ▉3289⑈

BENISTAR GROUP, LTD

10262

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | TO REPLENISH GOLDMAN | | | | 10,412.50 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 4/29/13 | 10262 | CAROLE R. BERNSTEIN, ESQ. | | $10,412.50 |

DELUXE CORP. 1+800-328-0304 www.deluxeforms.com

JLM032152

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | FOR APRIL 2013 | | | | 17,535.35 |

| CHECK DATE | CHECK NO. | PAYEE | | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|---|
| 5/21/13 | 10274 | CAROLE R. BERNSTEIN, ESQ. | | | $17,535.35 |

THIS DOCUMENT CONTAINS MULTIPLE SECURITY FEATURES. SEE REVERSE SIDE FOR DETAILS

**BENISTAR GROUP, LTD**
GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070
(860) 408-7000

**10274**

PEOPLE'S UNITED BANK
51-7218-2211

DATE
May 21, 2013

AMOUNT

Seventeen Thousand Five Hundred Thirty-Five and 35/100 Dollars

$ ***************$17,535.35

PAY
TO THE
ORDER
OF:

CAROLE R. BERNSTEIN, ESQ.
41 MAPLE AVENUE NORTH
WESTPORT, CT 06880

*David E. Carpenter*
AUTHORIZED SIGNATURE

⑈010274⑈ ⑆ 2186⑆ 3289⑈

ENISTAR GROUP, LTD

10274

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | FOR APRIL 2013 | | | | 17,535.35 |

| CHECK DATE | CHECK NO. | PAYEE | | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|---|
| /21/13 | 10274 | CAROLE R. BERNSTEIN, ESQ. | | | $17,535.35 |

DELUXE CORP 1-800-328-0304 www.deluxeforms.com

JLM032153

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | PETER GOLDMAN | | | | 8,137.50 |

| CHECK DATE | CHECK NO. | PAYEE | | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|---|
| 5/21/13 | 10275 | CAROLE R. BERNSTEIN, ESQ. | | | $8,137.50 |

**BENISTAR GROUP, LTD**
10275

GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070
(860) 408-7000

THIS DOCUMENT CONTAINS MULTIPLE SECURITY FEATURES. SEE REVERSE SIDE FOR DETAILS.

PEOPLE'S UNITED BANK
51-7218-2211

DATE
May 21, 2013

AMOUNT

Eight Thousand One Hundred Thirty-Seven and 50/100 Dollars

$ ****************$8,137.50

PAY
TO THE
ORDER
OF:

CAROLE R. BERNSTEIN, ESQ.
41 MAPLE AVENUE NORTH
WESTPORT, CT 06880

_David E Carpenter_
AUTHORIZED SIGNATURE

⑈010275⑈ ⑈ 2186⑈ 3289⑈

BENISTAR GROUP, LTD
10275

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | PETER GOLDMAN | | | | 8,137.50 |

| CHECK DATE | CHECK NO. | PAYEE | | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|---|
| 5/21/13 | 10275 | CAROLE R. BERNSTEIN, ESQ. | | | $8,137.50 |

DELUXE CORP 1-800-328-0304 www.deluxeforms.com

JLM032154

BENISTAR GROUP, LTD                                                          10290

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | FOR THE PERIOD OF MAY 1, 2013 | | | | 7,980.00 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 6/6/13 | 10290 | CAROLE R. BERNSTEIN, ESQ. | | $7,980.00 |

---

**BENISTAR GROUP, LTD**
GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070
(860) 408-7000

PEOPLE'S UNITED BANK
51-7218-2211

10290

DATE
Jun 6, 2013

AMOUNT

Seven Thousand Nine Hundred Eighty and 00/100 Dollars

$ ***************$7,980.00

PAY
TO THE
ORDER
OF:

CAROLE R. BERNSTEIN, ESQ.
41 MAPLE AVENUE NORTH
WESTPORT, CT 06880

AUTHORIZED SIGNATURE

⑈010290⑈ ⑈      2186⑈      3289⑈

---

BENISTAR GROUP, LTD                                                          10290

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | FOR THE PERIOD OF MAY 1, 2013 | | | | 7,980.00 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 6/6/13 | 10290 | CAROLE R. BERNSTEIN, ESQ. | | $7,980.00 |

DELUXE CORP 1-800-328-0304 www.deluxeforms.com

JLM032155

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | REPRESENTATION FOR PETER | | | | 2,600.00 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 6/6/13 | 10294 | CAROLE R. BERNSTEIN, ESQ. | | $2,600.00 |

---

**BENISTAR GROUP, LTD**
GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070
(860) 408-7000

10294

PEOPLE'S UNITED BANK
51-7218-2211

DATE
Jun 6, 2013

AMOUNT

Two Thousand Six Hundred and 00/100 Dollars

$    ***************$2,600.00

PAY
TO THE
ORDER
OF:

CAROLE R. BERNSTEIN, ESQ.
41 MAPLE AVENUE NORTH
WESTPORT, CT 06880

*Security features. Details on back.*

AUTHORIZED SIGNATURE

⑊"010294"⑊ ⑉ 2186⑊ 3289"⑊

---

ENISTAR GROUP, LTD                                       10294

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | REPRESENTATION FOR PETER | | | | 2,600.00 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 6/13 | 10294 | CAROLE R. BERNSTEIN, ESQ. | | $2,600.00 |

DELUXE CORP. 1-800-328-0304 www.deluxeforms.com

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | INV# 003258 | | | | 3,272.60 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 10/22/13 | 10413 | CAROLE R. BERNSTEIN, ESQ. | | $3,272.60 |

**BENISTAR GROUP, LTD**
GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070
(860) 408-7000

PEOPLE'S UNITED BANK
51-7218-2211

10413

DATE
Oct 22, 2013

AMOUNT

Three Thousand Two Hundred Seventy-Two and 60/100 Dollars

$ **************$3,272.60

PAY
TO THE
ORDER
OF:

CAROLE R. BERNSTEIN, ESQ.
41 MAPLE AVENUE NORTH
WESTPORT, CT 06880

AUTHORIZED SIGNATURE

⑈060413⑈ ⑆ 2186⑈ 3289⑈

ENISTAR GROUP, LTD

10413

| FERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | INV# 003258 | | | | 3,272.60 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 22/13 | 10413 | CAROLE R. BERNSTEIN, ESQ. | | $3,272.60 |

DELUXE CORP 1•800-328-0304 www.deluxeforms.com

JLM032157

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| RETAINER | | 10/25/13 | 15,000.00 | | 15,000.00 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 10/25/13 | 10416 | CAROLE R. BERNSTEIN, ESQ. | | $15,000.00 |

---

**BENISTAR GROUP, LTD**        10416

GRIST MILL PLAZA
100 GRIST MILL ROAD
SIMSBURY, CT 06070
(860) 408-7000

PEOPLE'S UNITED BANK
51-7218-2211

DATE
Oct 25, 2013

AMOUNT

Fifteen Thousand and 00/100 Dollars

$ ••••••••••••$15,000.00

PAY
TO THE
ORDER
OF

CAROLE R. BERNSTEIN, ESQ.
41 MAPLE AVENUE NORTH
WESTPORT, CT 06880

*David E Carpenter*
AUTHORIZED SIGNATURE

GRIST MILL CAPITAL RETAINER

⑈010416⑈ ⑆ ▉2186⑆ ▉ 3289⑈

---

**BENISTAR GROUP, LTD**        10416

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| RETAINER | | 10/25/13 | 15,000.00 | | 15,000.00 |

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 10/25/13 | 10416 | CAROLE R. BERNSTEIN, ESQ. | | $15,000.00 |

Deluxe Corp. 1-800-328-0304 www.deluxeforms.com

JLM032158

# EXHIBIT 5

**From:** Dan Carpenter US <dcarpenter@usbgi.com>
**Sent:** Wed, 02 Jun 2021 14:19:45 +0000
**To:** Joe Castagno <jmcastagno@protonmail.com>
**CC:** Molly Carpenter <mcarpenter@benistar.com>, Dan Carpenter US <dcarpenter@usbgi.com>
**Subject:** Fw: PAIGE Agreement
**Attachments:**
· Phoenix Alliance Investment Group Entities LLC Agreement.doc  *(49 kb)*

---

SDM would look like this....minus Jim and plus one CRT: Avon Charitable Remainder Trust

35 Tower address....

CT LLC

Change name of company to SDM, LLC

---

**From:** D.E. Carpenter <dcarpentermail@gmail.com>
**Sent:** Sunday, December 17, 2017 4:12 PM
**To:** Dan Carpenter US <dcarpenter@usbgi.com>; D.E. Carpenter <dcarpentermail@gmail.com>
**Subject:** Fwd: PAIGE Agreement

---------- Forwarded message ----------
From: **Joe Castagno** <JCastagno@benistar.com>
Date: Thu, Dec 14, 2017 at 4:18 PM
Subject: PAIGE Agreement
To: "jimcarpenter5132@gmail.com" <jimcarpenter5132@gmail.com>, DC Gmail
<dcarpentermail@gmail.com>, "DCARPENTER@USBGI.COM" <DCARPENTER@usbgi.com>

Jim:

      Please see enclosed.

Thank you,

Joe

Joe Castagno
Legal Consultant
Benistar Admin Services, Inc.
10 Tower Lane
Suite 100
Avon, CT 06001
Ph: 860-408-7000 ext. 259
Fax: 860-408-7015

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

Trusts Internal Stamp - 001754

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

Trusts Internal Stamp - 001755

**From:** Molly Carpenter <mcarpenter@benistar.com>
**Sent:** Wed, 02 Jun 2021 15:21:21 +0000
**To:** Amanda Rossi <arossi@benistar.com>
**Subject:** FW: PAIGE Agreement
**Attachments:**
· Phoenix Alliance Investment Group Entities LLC Agreement.doc  *(49 kb)*

---

**From:** Dan Carpenter US <dcarpenter@usbgi.com>
**Sent:** Wednesday, June 2, 2021 11:19 AM
**To:** Amanda Rossi <arossi@benistar.com>; Molly Carpenter <mcarpenter@benistar.com>
**Cc:** Dan Carpenter US <dcarpenter@usbgi.com>
**Subject:** FW: PAIGE Agreement

PAIGE in Word

---

**From:** Dan Carpenter US
**Sent:** Wednesday, June 2, 2021 10:20 AM
**To:** Joe Castagno <jmcastagno@protonmail.com>
**Cc:** Molly Carpenter <mcarpenter@benistar.com>; Dan Carpenter US <dcarpenter@usbgi.com>
**Subject:** Fw: PAIGE Agreement

SDM would look like this....minus Jim and plus one CRT: Avon Charitable Remainder Trust

35 Tower address....

CT LLC

Change name of company to SDM, LLC

---

**From:** D.E. Carpenter <dcarpentermail@gmail.com>
**Sent:** Sunday, December 17, 2017 4:12 PM
**To:** Dan Carpenter US <dcarpenter@usbgi.com>; D.E. Carpenter <dcarpentermail@gmail.com>
**Subject:** Fwd: PAIGE Agreement

---------- Forwarded message ----------
From: **Joe Castagno** <JCastagno@benistar.com>
Date: Thu, Dec 14, 2017 at 4:18 PM
Subject: PAIGE Agreement
To: "jimcarpenter5132@gmail.com" <jimcarpenter5132@gmail.com>, DC Gmail
<dcarpentermail@gmail.com>, "DCARPENTER@USBGI.COM" <DCARPENTER@usbgi.com>

Jim:

        Please see enclosed.

Thank you,

Joe

Trusts Internal Stamp - 001756

Joe Castagno
Legal Consultant
Benistar Admin Services, Inc.
10 Tower Lane
Suite 100
Avon, CT 06001
Ph: 860-408-7000 ext. 259
Fax: 860-408-7015

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

Trusts Internal Stamp - 001757

**From:** Amanda Rossi <arossi@benistar.com>
**Sent:** Wed, 02 Jun 2021 18:20:42 +0000
**To:** Dan Carpenter US <dcarpenter@usbgi.com>
**Subject:** RE: SDM Holdings, LLC Operating Agreement
**Attachments:**
· SDM HOLDINGS LLC Agreement.doc *(67 kb)*

---

**From:** Dan Carpenter US <dcarpenter@usbgi.com>
**Sent:** Wednesday, June 2, 2021 2:08 PM
**To:** Amanda Rossi <arossi@benistar.com>
**Subject:** Fw: SDM Holdings, LLC Operating Agreement

Can we get #1 on first page and all of 8 on page 2???

---

**From:** Amanda Rossi <arossi@benistar.com>
**Sent:** Wednesday, June 2, 2021 2:06 PM
**To:** Dan Carpenter US <dcarpenter@usbgi.com>
**Cc:** Molly Carpenter <mcarpenter@benistar.com>
**Subject:** RE: SDM Holdings, LLC Operating Agreement

---

**From:** Dan Carpenter US <dcarpenter@usbgi.com>
**Sent:** Wednesday, June 2, 2021 2:02 PM
**To:** Amanda Rossi <arossi@benistar.com>
**Subject:** Fw: SDM Holdings, LLC Operating Agreement

Computer threw 1 back to page two???

---

**From:** Amanda Rossi <arossi@benistar.com>
**Sent:** Wednesday, June 2, 2021 1:59 PM
**To:** Dan Carpenter US <dcarpenter@usbgi.com>; Molly Carpenter <mcarpenter@benistar.com>
**Subject:** RE: SDM Holdings, LLC Operating Agreement

---

**From:** Dan Carpenter US <dcarpenter@usbgi.com>
**Sent:** Wednesday, June 2, 2021 12:16 PM
**To:** Amanda Rossi <arossi@benistar.com>; Molly Carpenter <mcarpenter@benistar.com>
**Subject:** Re: SDM Holdings, LLC Operating Agreement

on it.....

---

**From:** Amanda Rossi <arossi@benistar.com>
**Sent:** Wednesday, June 2, 2021 12:15 PM
**To:** Dan Carpenter US <dcarpenter@usbgi.com>; Molly Carpenter <mcarpenter@benistar.com>
**Subject:** RE: SDM Holdings, LLC Operating Agreement

Trusts Internal Stamp - 001758

Please see attached.

---

**From:** Dan Carpenter US <dcarpenter@usbgi.com>
**Sent:** Wednesday, June 2, 2021 11:26 AM
**To:** Dan Carpenter US <dcarpenter@usbgi.com>; Molly Carpenter <mcarpenter@benistar.com>; Amanda Rossi <arossi@benistar.com>
**Cc:** Dan Carpenter US <dcarpenter@usbgi.com>
**Subject:** FW: SDM Holdings, LLC Operating Agreement

Let me know you can read all five

1,2,3 are PAIGE and 4 is signature block and 5 is filing with State of CT

Have Molly sign for CFG and Dan sign for the Trusts???

---

**From:** Dan Carpenter US
**Sent:** Wednesday, June 2, 2021 11:21 AM
**To:** Molly Carpenter <mcarpenter@benistar.com>; Amanda Rossi <arossi@benistar.com>
**Cc:** Dan Carpenter US <dcarpenter@usbgi.com>
**Subject:** SDM Holdings, LLC Operating Agreement

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

Trusts Internal Stamp - 001760

**From:** Dan Carpenter US <dcarpenter@usbgi.com>
**Sent:** Wed, 02 Jun 2021 18:23:46 +0000
**To:** Amanda Rossi <arossi@benistar.com>
**Subject:** Fw: SDM Holdings, LLC Operating Agreement
**Attachments:**
· SDM HOLDINGS LLC Agreement.doc *(67 kb)*

---

Thanks....

HappyCamper@ WhoNeedsJoe.com

Please save as Template and send as LLC Op Agreement Template???

---

**From:** Amanda Rossi <arossi@benistar.com>
**Sent:** Wednesday, June 2, 2021 2:20 PM
**To:** Dan Carpenter US <dcarpenter@usbgi.com>
**Subject:** RE: SDM Holdings, LLC Operating Agreement

---

**From:** Dan Carpenter US <dcarpenter@usbgi.com>
**Sent:** Wednesday, June 2, 2021 2:08 PM
**To:** Amanda Rossi <arossi@benistar.com>
**Subject:** Fw: SDM Holdings, LLC Operating Agreement

Can we get #1 on first page and all of 8 on page 2???

---

**From:** Amanda Rossi <arossi@benistar.com>
**Sent:** Wednesday, June 2, 2021 2:06 PM
**To:** Dan Carpenter US <dcarpenter@usbgi.com>
**Cc:** Molly Carpenter <mcarpenter@benistar.com>
**Subject:** RE: SDM Holdings, LLC Operating Agreement

---

**From:** Dan Carpenter US <dcarpenter@usbgi.com>
**Sent:** Wednesday, June 2, 2021 2:02 PM
**To:** Amanda Rossi <arossi@benistar.com>
**Subject:** Fw: SDM Holdings, LLC Operating Agreement

Computer threw 1 back to page two???

---

**From:** Amanda Rossi <arossi@benistar.com>
**Sent:** Wednesday, June 2, 2021 1:59 PM
**To:** Dan Carpenter US <dcarpenter@usbgi.com>; Molly Carpenter <mcarpenter@benistar.com>
**Subject:** RE: SDM Holdings, LLC Operating Agreement

For more information please visit http://www.symanteccloud.com

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

## FOR

## SDM HOLDINGS, LLC
### (A Member-Managed Limited Liability Company)

THIS LIMITED LIABILITY COMPANY AGREEMENT ("Agreement") of and for **SDM HOLDINGS, LLC**, a Connecticut limited liability company (the "Company"), is made and entered into on this 28th day of June, 2017 by and between:

| Name | Address | Capital Interest |
|---|---|---|
| a. Caroline Financial Group, Inc. | Caroline Financial Group, Inc.<br>35 Tower Lane<br>Suite 101<br>Avon, CT 06001 | 5% |
| b. Alliance Charitable Remainder Trust | | 19% |
| c. Atlantic Charitable Remainder Trust | | 19% |
| d. Phoenix Charitable Remainder Trust | | 19% |
| e. Carpenter Charitable Remainder Trust | | 19% |
| f. Avon Charitable Remainder Trust | | 19% |

and each natural person and/or entity subsequently admitted to the Company. These natural persons and/or entities shall be known as and referred to herein collectively as "Members" and individually as a "Member."

The Members have formed the Company under the laws of the State of Connecticut. Accordingly, in consideration of the conditions contained herein, the Members agree as follows:

1.    Formation. The Members formed the Company pursuant to the Connecticut Limited Liability Company Act, as amended (the "Act"). A certificate of formation has been filed with the Connecticut Secretary of State on June 29, 2017.

2.    Name. The name of the Company shall be **SDM HOLDINGS, LLC.**

3.    Registered Office and Agent. The identity of the Company's registered agent and location of its registered office in Connecticut shall be:

> Daniel Carpenter
> c/o Caroline Financial Group, Inc.
> 35 Tower Lane, Suite 101
> Avon, CT 06001

4.    Term. The Company shall continue indefinitely, unless dissolved by:

(a)    Members whose capital interest exceeds fifty percent (50%) vote for dissolution;

(b)    any event which makes it unlawful for the business of the Company to be carried on by the Members;

(c)    the death, resignation, expulsion or bankruptcy of a Member holding more than fifty percent (50%) capital interest; or

(d)    any other event causing a dissolution of the Company under the laws of the State of Connecticut.

5.    Business Purpose. The purpose of the Company is to engage in any lawful act or activity for which a Limited Liability Company may be formed under the Act.

6.    Principal Place of Business. The location of the principal place of business of the Company shall be:

> Caroline Financial Group, Inc.
> 35 Tower Lane, Suite 101
> Avon, CT 06001

7.    Admission of Additional Members. No additional members may be admitted to the Company without the prior unanimous written consent of all the existing members.

8.    Management. The management of the Company shall be vested in and exercised solely by the Managing Member as identified on the last page hereof.  The Managing Member shall be vested with all powers of management as allowed under the Act.  The Managing Member may be replaced at any time and for any reason (or for no

reason) by an affirmative vote of Members holding at least 50.1% of the membership interests in the Company.

9.   <u>Profits, Losses & Distributions</u>. The allocation of profits, losses and distributions in the Company shall be according to the capital interest percentages listed in the preamble above.

10.   <u>Liability</u>. The liability of the Members shall be limited as provided under the Act. The Company shall fully indemnify the Members for any and all damages, actions, claims, demands, causes of actions, lawsuits, attorneys' fees and expenses incurred by reason of the membership in the Company of the Members.

11.   <u>Transfers</u>. If at any time a Member proposes to sell, assign or otherwise dispose of all or any part of his interest in the Company, such Member shall first make a written offer to sell such interest to the other Members at fair market value as determined by either mutual agreement of the Members or an appraisal performed by a qualified appraiser. If such other Members decline or fail to elect to purchase such interest within forty-five (45) days after the fair market value has been determined, then the selling Member may sell, assign or transfer his interest to any third party of his choosing. The purchaser or assignee shall only be entitled to receive the share of the profits or other compensation by way of profit, loss and distributions to which that Member would otherwise be entitled. In the case of death of a Member, that Member's interest shall pass automatically to the heirs of that Member, who shall be bound by the terms of this Agreement.

12.   <u>Fiscal Year</u>. The fiscal year of the Company shall end on December 31st.

13.   <u>Arbitration; Governing Law</u>. Any controversy or claim arising out of or relating to the Agreement, or the breach thereof, which cannot be amicably settled by the Members themselves within thirty (30) days after receipt of notice of breach by a Member, shall be settled by binding arbitration (with a single arbitrator) in Hartford County, Connecticut, administered by the American Arbitration Association ("AAA"). Any decision of the arbitrator may be entered in any court having jurisdiction thereof. This Agreement shall be governed by and according to the Act and the internal laws of the State of Connecticut.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date and year first above written.


MANAGING MEMBER:                    MEMBER:     For the Trusts
CAROLINE FINANCIAL GROUP, INC.


_____          _____

Molly Carpenter                          Daniel E. Carpenter
Attorney in Fact for Managing Member     For the other Members

# EXHIBIT 6

| From: | Dan Carpenter US <dcarpenter@usbgi.com> |
|---|---|
| Sent: | Friday, November 12, 2021 1:40 PM |
| To: | Jessica White; Jeff Sandberg |
| Cc: | McVay, Melvin R.; Ketter, Clayton D.; Dan Carpenter US; Christie Reid |
| Subject: | SDM Legal Status |

**CAUTION:** This email originated from outside Phillips Murrah's Email System. DO NOT CLICK on any links or open attachments unless you recognize the sender and know the content is safe.

Jessica:

No worries....Please let me clarify and explain SDM's legal status to your attorneys so they can get in touch with Jeff Sandberg today.

I am the Chairman of Caroline Financial Group, Inc which is the Managing Member of SDM Holdings, LLC which is a Connecticut registered and domiciled LLC that is owned by Caroline and five trusts.  Avon Capital Wyoming has been defunct for more than five years and since Tom Moran sued Don Trudeau ten years ago...Avon Wyoming has had nothing to do with SDM.  See if your attorneys remember that lawsuit.

I notice that SDM has been paying for your attorneys as well as our fees.  Please have Christie get a Certified check for $450,000 today from Kirkpatrick bank today and Fed-Ex it to Kathy Kehoe's address in Avon CT.  I think you know the address.  And I do mean today.

Your attorneys should have done a better job researching who owns SDM and we will hold ASG responsible for ALL $21,000,000 of the policies under your management or should I say your gross mismanagement???

I am both surprised and disappointed that you did not consult us on this situation,  and you have breached your contract with us and we intend to hold you liable for every penny of losses caused by your incompetence and failure to notify us immediately of some interloper coming in saying he has control over SDM. Please tell your attorneys to read the Order in your files appointing the Receiver.....It is only for assets of Avon Wyoming which has been defunct for years.  SDM Connecticut was NEVER owned by Avon Wyoming.

Please have your attorneys feel free to contact me or Jeff Sandberg at their earliest convenience...but please tell Christie to get to the Bank immediately and cut that check to Kathy Kehoe and then we will talk about refunding the attorney fees that you arbitrarily charged our account next week.

I hope that makes clear to you the official "Legal Status" of SDM.  SDM Holdings, LLC is a Connecticut LLC that has never been owned by Avon Wyoming. please have your high-priced attorneys check that out.  (You know the old-fashioned way---Like checking the CT Secretary of State's office on the Computer).  Check the incorporation date of SDM Holdings LLC with the date of the Judge's ruling recognizing that Avon Wyoming was long dead and defunct.   Very embarrassing.  We will be asking for ALL of the attorneys' fees paid unlawfully from SDM's account to be returned.

Please govern yourselves accordingly,

1

**EXHIBIT**

**3**

Daniel Carpenter
Chairman of the Managing Member of SDM Holdings, LLC

---

**From:** Jessica White <jwhite@asgllc.us>
**Sent:** Wednesday, November 10, 2021 12:30 PM
**To:** Dan Carpenter US <dcarpenter@usbgi.com>
**Cc:** Mel McVay <mrmcvay@phillipsmurrah.com>; Ketter, Clayton D. <cdketter@phillipsmurrah.com>
**Subject:** RE: October 2021 Bank Statement

Hi Dan!

I hope you are well. I apologize for the delay.

Due to the current legal status of SDM, it is ASG's standard practice to include their attorney's on all correspondence.

Kind regards,

*Jessica White*



Director of policy Analysis and Servicing
521 W. Wilshire Blvd., Suite 140
Oklahoma City, OK  73116
OKC Office:  405-753-9100 ext. 145
Discover Real Value

*This email communication and any attached files, may contain material that is protected, proprietary, privileged, confidential, or otherwise legally exempt from disclosure. This communication is intended solely for the use of the individual or entity to which it is addressed. If you are not the intended recipient you are prohibited from retaining, using, disseminating, forwarding, printing, or copying this communication or taking any action based on the contents of this communication. If you have received this communication in error, please immediately notify the sender by replying to this email, then delete the original message and any attachments.*

---

**From:** Dan Carpenter US [mailto:dcarpenter@usbgi.com]
**Sent:** Tuesday, November 9, 2021 11:01 AM
**To:** Jessica White <jwhite@asgllc.us>
**Subject:** October 2021 Bank Statement

Jessica:

Who are these attorneys on the SDM Bank Statement email....and why are they there...???  Is this a mistake or am I missing something....???

Appreciate it...

Thanks,

Dan

---

**From:** Jessica White <jwhite@asgllc.us>
**Sent:** Monday, November 8, 2021 12:48 PM
**To:** dist-sdm <dist-sdm@asgllc.us>
**Cc:** Mel McVay <mrmcvay@phillipsmurrah.com>; Ketter, Clayton D. <cdketter@phillipsmurrah.com>
**Subject:** October 2021 Bank Statement

Good Day!

I have uploaded the October 2021 Bank Statements to your Client Portal. https://portal.asgllc.us/

Once reviewed, please let me know if you have any questions or need additional information.

Thank you!

*Jessica White*



521 W. Wilshire Blvd., Suite 140
Oklahoma City, OK  73116
OKC Office:  405-753-9100 ext. 145
Discover Real Value

*This email communication and any attached files, may contain material that is protected, proprietary, privileged, confidential, or otherwise legally exempt from disclosure. This communication is intended solely for the use of the individual or entity to which it is addressed. If you are not the intended recipient you are prohibited from retaining, using, disseminating, forwarding, printing, or copying this communication or taking any action based on the contents of this communication. If you have received this communication in error, please immediately notify the sender by replying to this email, then delete the original message and any attachments.*

# **EXHIBIT 7**

Return to:
Potok Law, LLC
747 Farmington Ave, Suite 9
New Britain, CT 06053



Doc ID: 002671190003 Type: LAN
BK **997** PG**650-652**

## STATUTORY FORM WARRANTY DEED

KNOW YE that **1&3 MILL POND PARTNERS, LLC**, a Delaware limited liability company with a principal place of business of 10 Tower Lane, Ste 2, Avon, Connecticut (the "Grantor") for consideration in the amount of SEVEN HUNDRED SEVENTY FIVE THOUSAND AND 00/100 DOLLARS ($775,000.00), and other good and valuable consideration, received to its full satisfaction of **D&D PROPERTIES LLC**, a Connecticut limited liability company with a business address of 44 Farnham Road, West Hartford, Connecticut ("Grantee"), hereby grants, bargains, sells and confirms unto the Grantee and unto his successors and assigns forever, with **WARRANTY COVENANTS**, that certain piece or parcel of land, together with the improvements thereon, situated in the Town of Simsbury, County of Hartford and State of Connecticut, known as 1 & 3 Mill Pond Lane, more particularly bounded and described on <u>Schedule A</u> attached hereto.

IN WITNESS WHEREOF, Grantor has hereunto set its hand this __th day of March 2022.

Signed, sealed and delivered
the presence of:

GRANTOR:

**1&3 MILL POND PARTNERS, LLC,**
By: Caroline Financial Group, Inc., Its
Managing Member

By: _____
Name: Molly Carpenter
Title: President

STATE OF CONNECTICUT    )
                        )    ss. Avon
COUNTY OF Hartford      )

On this 2th day of March 2022, personally appeared Molly Carpenter, the President of Caroline Financial Group, Inc., a Connecticut corporation, the Managing Member of 1 & 3 Mill Pond Partners, LLC, a Connecticut limited liability company, signer and sealer of the foregoing instrument and acknowledged the same to be her free act and deed and the free act and deed of said limited liability company, before me.

In witness whereof, I hereunto set my hand.

_____
Commissioner of the Superior Court
Notary Public
My Commission Expires:

**JASON J. CONCATELLI**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES MAR. 31, 2022

CONVEYANCE TAX RECEIVED
TOWN: $1,937.50 STATE: $9,687.50

_____
*Trish Munroe, Town Clerk*
SIMSBURY, CT TOWN CLERK

### Schedule A

A certain piece or parcel of land together with improvements thereon and being located on the easterly side of Grist Mill Road in the Town of Simsbury, County of Hartford, State of Connecticut and being shown as "Parcel 23 Area - 3.416 Acres" on a map entitled "Map Of Parcel 23 Owned By Ensign-Bickford Realty Corp. Grist Mill Road & Mill Pond Lane Simsbury, Connecticut Scale 1"=40' February 1986 Revised to February 12, 2008 certified substantially correct in accordance with class A-2 of the code of recommended practice for accuracy of surveys and maps W. F. Grunewald, surveyor Hodge Surveying Associates, P.C." which map is filed on the Simsbury Land Records as Map #3823. Said piece or parcel of land is bounded and described as follows:

Beginning at a point on the easterly street line of Grist Mill Road at the northwesterly corner of other land of Ensign-Bickford Realty Corp. and the southwesterly corner of the herein described parcel; thence N 11° 11' 24" W sixty-four and no hundredths (64.00) feet to a point; thence running in a general northerly direction on a curve to the right and having a radius of two thousand sixty-seven and thirty-five hundredths (2067.35) feet for a distance of one hundred ten and forty-one hundredths (110.41) feet to a point; thence N 36° 49' 05" E twenty and thirty-six hundredths (20.36) feet to a point; thence N 81° 45' 48" E forty-five and fifty-nine hundredths (45.59) feet to a point; thence running in a general easterly direction on a curve to the left and having a radius of nine hundred forty-five and no hundredths (945.00) feet for a distance of two hundred fifty-two and seventy-three hundredths (252.73) feet to a point; thence N 66° 26' 25"E ninety-two and twenty-nine hundredths (92.29) feet to a point; thence running in a general easterly direction on a curve to the right and having a radius of three hundred thirty-three and no hundredths (330.00) feet for a distance of one hundred sixteen and eighty-one hundredths (116.81) feet to a point; thence S 64° 28' 43" E one hundred seventy-five and two hundredths (175.02) feet to a point; thence S 10° 15' 04" W one hundred ninety-one and five hundredths (191.05) feet to a point; thence S 79° 06' 32" W three hundred seventy-five and seventy-seven hundredths (375.77) feet to a point; thence N 59° 41' 20" W seventy-five and twenty-nine hundredths (75.29) feet to a point; thence S 78° 48' 30" W one hundred fifty-nine and thirty-one hundredths (159.31) feet to the point of beginning.

Bounded: northerly by Mill Pond Lane (Private Road) and Parcel 22 in part by each; easterly by Parcel 22 and other land of Ensign-Bickford Realty Corp. in part by each; southerly by other land of Ensign-Bickford Realty Corp. and westerly by Grist Mill Road.

Said piece or parcel of land is subject to and together with easements and agreements as shown on the above herein referred to map and as of record may appear.

TOGETHER WITH all rights conferred under that certain Declaration of Easements, Covenants and Restrictions for Powder Forest Business Park by Ensign-Bickford Realty Corp. dated December 2, 1983 and recorded December 9, 1983 in Volume 271 at Page 546 of the Simsbury Land Records, as amended and restated by Amended and Restated Declaration by Ensign-Bickford Realty Corporation dated December 8, 1997 and recorded December 8, 1997 in Volume 479 at Page 795 of the Simsbury Land Records, as amended by that certain "Second Amendment to Declaration of Easements, Covenants and

Restrictions for the Powder Forest" Business Park" dated November 17, 2000, and recorded November 21, 2000 in Volume 533 at Page 227; by that certain "Partial Termination of Declaration of Easements, Covenants and Restrictions for the Powder Forest" Business Park" dated May 2, 2003 and recorded May 8, 2003 in Volume 618 at Page 678; and by Third Amendment to Amended and Restated Declaration of Easements, Covenants and Restrictions for the Powder Forest Business Park dated June 7, 2005 and recorded June 8, 2005 in Volume 690 at Page 419; all of the Simsbury Land Records

TOGETHER WITH all rights conferred in that certain Agreement for Easement, dated December 2, 1983, by Ensign-Bickford Realty Corp. and recorded on December 9, 1983, in the Simsbury Land Records in Volume 271 at Page 556.

TOGETHER WITH easement and right of way over Mill Pond Lane as reserved in a Warranty Deed from Ensign-Bickford Realty Corporation to 10 Mill Pond LLC dated November 17, 2000 and recorded in Volume 533 at Page 217 of the Simsbury Land Records.

TOGETHER WITH rights under a Road Maintenance Agreement by and between 10 Mill Pond LLC and Ensign-Bickford Realty Corporation dated November 17, 2000 and recorded in Volume 540 at Page 573 of the Simsbury Land Records.

Subject to:

1. An easement to the Connecticut Light and Power Company dated October 6, 1983 and recorded on November 22, 1983 in Volume 271 at Page 33 of the Simsbury Land Records.

2. Easement in favor of the Town of Simsbury dated December 2, 1983 and recorded December 9, 1983 in Volume 271 at Page 556 of the Simsbury Land Records.

3. Bikeway easement in favor of the Town of Simsbury dated April 17, 1984 and recorded in Volume 274 at Page 155 of the Simsbury Land Records.

4. Terms and conditions of a Road Maintenance Agreement by and between 10 Mil Pond LLC and Ensign-Bickford Realty Corporation dated November 17, 2000 and recorded in Volume 540 at Page 573 of the Simsbury Land Records.

7460357v.1